# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CANDICE HERRERA and
T.H., a minor by and through her father and
guardian VINCENT HERRERA, and all others
similarly situated,

       Plaintiffs,

vs.                                     No. CIV 11-0422 JB/KBM

SANTA FE PUBLIC SCHOOLS, SANTA FE
PUBLIC SCHOOLS BOARD OF EDUCATION,
BARBARA GUDWIN, GLENN WIKLE,
LINDA TRUJILLO, FRANK MONTANO,
STEVEN J. CARRILLO, in their official
capacities as members of the Santa Fe Public
Schools Board of Education, BOBBIE J. GUTIERREZ,
in her official capacity as Superintendent of Santa Fe Public
Schools, MELANIE ROMERO, individually and in her
official capacity as Principal of Capital High
School, ROBERT STEPHENS, in his official capacity
as Principal of Santa Fe High School as a necessary party
for complete relief, ASI NEW MEXICO, LLC,
JOHN/JANE DOE Nos. 1-8,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff Candice Herrera's Motion for

Temporary Restraining Order, filed May 17, 2011 (Doc. 2). The Court held a hearing on May 19,

2011. The primary issue is whether the Court should enter a temporary restraining order, pursuant

to rule 65(b), prohibiting the Defendants from conducting searches at the 2011 Santa Fe High School

prom and the 2011 Capital High School graduation. The Court will grant the motion in part and

deny the motion in part. The Court will not preclude all searches and confiscation, but will not

allow the searches and confiscations as done in the past. The Court will issue a temporary

restraining order, directing the Defendants to limit their searches, because it finds that Plaintiff

Candice Herrera has shown that she will suffer irreparable injury unless some temporary restraining

order issues, that there is a substantial likelihood that C. Herrera will prevail on the merits of some

of her claims under 42 U.S.C. § 1983, that the threatened injury outweighs whatever damage the

restraining order may cause the Defendants, and that the restraining order would not be adverse to

the public interest.[1]

## FINDINGS OF FACT

A temporary restraining order requires the Court to make predictions about the plaintiff's

likelihood of success.  "[T]he findings of fact and conclusions of law made by a court granting a

preliminary injunction are not binding at trial on the merits."  Attorney Gen. of Okla. v. Tyson

Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009)(quoting Univ. of Tex. v. Camenisch, 451 U.S. 390,

395 (1981); other quotations omitted).  "The Federal Rules of Evidence do not apply to preliminary

injunction hearings."  Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).

1.      On April 16, 2011, C. Herrera and her younger sister, T.H., attended Capital High

School's prom at the Santa Fe Convention Center.  See Transcript of Hearing at 66:1-3 (taken May

19, 2011)(Colfax, C. Herrera)("Tr.");[2]  Affidavit of T.H. ¶ 2, at 1 (sworn May 16, 2011), filed May

17, 2011 (Doc. 2-3).

---

[1] Rule 65 of the Federal Rules of Civil Procedure states: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Defendants did not request a security. The Court will therefore not order the Plaintiffs to post a security at this time and on this record, but the Defendants may request that the Plaintiffs post a security at a later time.

[2] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

2.     Like other students at Capitol High, C. Herrera and her sister were dressed in formal clothes.  See Tr. at 67:4-5 (Colfax, C. Herrera); T.H. Aff. ¶ 3, at 1.

3.     When C. Herrera walked into the convention center, school officials checked her school identification and took her prom ticket; they then told her to go to a security table.  See Tr. at 67:13-18 (Colfax, C. Herrera).

4.     Defendant Santa Fe Public Schools ("SFPS") has been conducting searches at extracurricular activities since approximately 2004; in 2005, SFPS entered into a contract for security services with Defendant ASI New Mexico, LLC.  See id. at 51:10-14 (Gutierrez).

5.     SFPS has faced instances where students had alcohol, drugs, or weapons at graduation or prom.  See Tr. at 50:21-51:7, 53:19-20 (Sanchez, Gutierrez).

6.     There were two security lines at the Capital High School prom; one for males and one for females.  See id. at 67:22 (C. Herrera).

7.     A security officer, who was wearing a uniform that said ASI, asked C. Herrera to spread her arms and legs; the security officer then patted down C. Herrera, touching her arms, her stomach, and cupping and shaking C. Herrera's breasts; she also lifted C. Herrera's floor length dress to mid-thigh level and touched C. Herrera's legs.  See Tr. at 68:12-24 (Colfax, C. Herrera).

8.     The security officer then took C. Herrera's shoes, shook them, and hit them on the table.  See id. at 70:25-71:1 (C. Herrera).

9.     The security officer then passed a wand around C. Herrera.  See id. at 69:2 (C. Herrera).

10.     The security officer then had C. Herrera walk forward to a table where they dumped the contents of her purse on the table, and moved the contents around to look for contraband.  See Tr. at 71:14-17 (C. Herrera).

11.     The security officers confiscated C. Herrera's hand lotion, her manicure kit which had her nail file and nail clippers, and her prescription medication for dizziness.  See Tr. at 72:1-12 (Colfax, C. Herrera).

12.     C. Herrera saw other students being searched at the entrance to the prom.  See id. at 74:7-10 (Colfax, C. Herrera).

13.     C. Herrera intends to attend the Santa Fe High School prom on May 21, 2011 and her graduation from Capital High School on May 27, 2011.  See id. at 76:8-9 (C. Herrera).

14.     She is concerned that, if she attends these events. she will undergo a similar search. See id. at 76:10-13 (Colfax, C. Herrera).

15.     Although C. Herrera had attended three proms previously, and three homecoming dances, she had never been touched during a search.  See id. at 80:7-21 (C. Herrera, Sanchez)(stating that she was wanded but was never touched).

16.     Prom and graduation are voluntary events; attendance is not required by the schools and walking in graduation is not required to obtain one's high school degree.  See Tr. at 80:25-83:7 (Sanchez, C. Herrera).

17.     Other school districts, such as Albuquerque Public Schools, do not conduct pat-down searches at graduations.  See id. at 14:17-15:3 (Sanchez, Court).

18.     The rules in the Santa Fe Public Schools Code of Conduct "apply to students whenever students are: 1.  present in any school or on property of the school district; [or] 2.  at any school-sponsored activity, regardless of its location."  Santa Fe Public Schools Code of Conduct at 10 (Plaintiff's Exhibit 2).

19.     In a section entitled "Scope and Extent of Searches of Students," the Santa Fe Public Schools Code of Conduct states:

-4-

More intrusive searches, such as pat-downs, may be conducted only on the basis of reasonable suspicion of the individual student to be searched.  The more intrusive the search of a student's person, the greater the necessity that school officials be able to articulate the specific basis of the suspicion, justifying such a search.

Santa Fe Public Schools Code of Conduct at 57.

## PROCEDURAL BACKGROUND

On May 17, 2011, C. Herrera filed Plaintiff Candice Herrera's Motion for Temporary Restraining Order.  See Doc. 2.  She asks the Court to enter a restraining order directing the Defendants to refrain from conducting searches at the 2011 Santa Fe High School prom or the 2011 Capital High School graduation.  She argues that she will suffer irreparable injury if a temporary restraining order does not issue, that she is likely to prevail on the merits of her claims under 42 U.S.C. § 1983 that the Defendants' conduct violates the Fourth Amendment to the United States Constitution, that the threatened injury to her outweighs whatever damage a restraining order may have on the Defendants, and that the restraining order would not be adverse to the public interest.

On May 19, 2011, Defendants SFPS, Board of Education for the Santa Fe Public Schools, Barbara Gudwin, Glenn Wikle, Linda Trujillo, Frank Montano, Steven J. Carrillo, Bobbie J. Gutierrez, Melanie Romero, and Robert Stephens (collectively "the School District Defendants") filed the School District Defendants' Response in Opposition to Plaintiffs' Motion for Temporary Restraining Order.  See Doc. 28.  The School District Defendants ask the Court to deny C. Herrera's request for a temporary restraining order.  They argue that students who voluntarily participate in extracurricular activities, such as prom and graduation, have a substantially reduced expectation of privacy.  They argue that, given the substantially reduced expectation of privacy, the pat-down searches are not unreasonably offensive or intrusive compared to the governmental interests in health and safety.  They argue that suspicionless pat-down searches of the students' persons are

permissible, because the expectation of privacy has been drastically reduced because of participation in extracurricular activities, and because the searches are conducted to detect drugs, alcohol, and weapons.

At the hearing, Plaintiffs' counsel represented that this action has been filed as a class action, and that the Court should thus issue relief on behalf of the students for whom the action was filed. At the hearing, the Court ordered the School District Defendants to send a notice to students indicating that, at Santa Fe High School's prom, they may be subject to a search, to describe what that search may be, and to indicate what items the students may not bring to prom and that those items may be confiscated. The Court ordered the School District Defendants to file the notice with the Court.

On May 20, 2011, the School District Defendants filed the notice with the Court. See Santa Fe High School Prom Rules and Reminders, filed May 20, 2011 (Doc. 29). This document stated that the SFPS' Code of Conduct would be enforced. It indicated that a search of students and their possessions may be conducted, and that the search may include a body wand and, if necessary, a body pat-down and the inspection of shoes, jackets, purses, bags, or other items. It also indicated that articles such as bottles, metal containers, loose pills, alcoholic beverages, illicit drugs, and other items may be confiscated.

Also on May 20, 2011, C. Herrera filed a letter to the Court. See Letter from Aimee Bevan to the Court (dated May 20, 2011), filed May 20, 2011 (Doc. 30). In the letter, C. Herrera stated that, if the Court was inclined to grant the Plaintiffs' motion and restrict the scope of searches conducted by the Defendants at Santa Fe High School's prom, she requests that the Court's order permit a third-party observer selected by the Plaintiffs to observe the searches conducted at the entrance to the prom to ensure compliance with the Court's order.

## LAW REGARDING REQUESTS FOR TEMPORARY RESTRAINING ORDER

The requirements for the issuance of a temporary restraining order are similar to those for the issuance of a preliminary injunction.  Injunctive relief is considered an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" in order to have a request granted. Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250 (10th Cir. 2003).  In determining whether to grant injunctive relief, courts consider the following four factors: (i) whether the moving party will suffer irreparable injury unless the injunction issues; (ii) whether there is a substantial likelihood that the moving party will eventually prevail on the merits; (iii) whether the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (iv) whether the injunction, if issued, would not be adverse to the public interest. See Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992)(citation omitted); Fed. Lands Legal Consortium ex rel. Robart Estate v. United States, 195 F.3d 1190, 1194 (10th Cir. 1999).  If a movant can show that the first, third, and fourth factors "tip strongly in his favor, the test is modified," and the moving party "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." Okla., ex rel., OK Tax Com'n v. Int'l Registration Plan, Inc., 455 F.3d 1107, 1113 (10th Cir. 2006).  The Tenth Circuit has stated that "in cases where the requested preliminary injunction alters the status quo . . . the movant will ordinarily find it difficult to meet its heavy burden of showing that the four factors, on balance, weigh heavily and compellingly in its favor, without showing a substantial likelihood of success on the merits." Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir.  2001)(citation omitted).

<u>ANALYSIS</u>

The Court will issue a temporary restraining order, directing the Defendants to limit their searches, because it finds that Plaintiff Candice Herrera has shown that she will suffer irreparable injury unless a temporary restraining order issues, that there is a substantial likelihood that C. Herrera will prevail on the merits of some of her claims under 42 U.S.C. § 1983, that the threatened injury outweighs whatever damage the restraining order may cause the Defendants, and that the restraining order would not be adverse to the public interest. Although the temporary restraining order will alter the status quo, C. Herrera has shown that the four factors weigh heavily and compellingly in her favor.

**I.      IT IS LIKELY THAT C. HERRERA WILL SUFFER IRREPARABLE INJURY IF A TEMPORARY RESTRAINING ORDER DOES NOT ISSUE.**

The Court finds that it is likely that C. Herrera will suffer irreparable injury if a temporary restraining order does not issue. C. Herrera means to attend the 2011 Santa Fe High School prom and the 2011 Capital High School graduation. Absent an order from the Court, C. Herrera and the other students attending these events will be subject to the same type of search as was conducted at the Capital High School prom. <u>See</u> Capital High School 2011 Graduation Information (Plaintiff's Exhibit 1)("[Students] will be searched for distracting contraband. <u>Students are not allowed to walk in with flower, leis, or other hand held items.</u>")(emphasis in original); Affidavit of Candice Herrera ¶ 30, at 6 (sworn May 16, 2011), filed May 17, 2011 (Doc. 2-2)("I have a ticket to the Santa Fe High School Prom on May 21, 2011 . . . . I understand that Santa Fe High School personnel will be working jointly with the same ASI security company to provide security at the Santa Fe High School Prom.").

The deprivation, or threat of deprivation, of a constitutional right is sufficient, standing

alone, to constitute irreparable injury.  See Elrod v. Burns, 427 U.S. 347, 373-74 (1976)("It is clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001)("When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (quoting 11A C. Wright, A. Miller & M. Kane, Fed. Prac. & Proc. § 2948.1 (2d ed. 1995)). As a result, courts have regularly found that being subjected to an unconstitutional search causes irreparable harm. See, e.g., Covino v. Patrissi, 967 F.3d 73, 77 (2d Cir. 1992)(stating that, subject to a discussion regarding likelihood of success on the merits or serious questions going to the merits, the United States Court of Appeals for the Second Circuit agreed "with the district court -- given the fundamental right involved, namely, the right to be free from unreasonable searches -- that Covino has sufficiently demonstrated for preliminary injunction purposes that he may suffer irreparable harm arising from a possible deprivation of his constitutional rights." (citing Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984)); Marriott v. County of Montgomery, 426 F. Supp. 2d 1, 11 (N.D.N.Y. 2006)(stating that, because the plaintiffs "allege a violation of a constitutional right, the harm is irreparable" and that, by "succeeding on their motion for partial summary judgment, plaintiffs have also demonstrated actual success on the merits of their claim -- as previously discussed, the 'change out' is an unconstitutional strip search, violative of the Fourth Amendment"); Dodge v. County of Orange, 282 F. Supp. 2d 41, 72 (S.D.N.Y. 2003)("Plaintiffs allege that defendants maintain a policy of strip searching detainees arriving at OCCF that violates their Fourth Amendment right to be free from unreasonable searches and seizures. The alleged violation of a constitutional right suffices to show irreparable harm."). Because C. Herrera has alleged that the searches that the Defendants conduct at the prom and

graduation will violate her Fourth-Amendment right to be free from unreasonable searches and seizure, it is likely that C. Herrera will suffer irreparable injury if a temporary restraining order does not issue.  See Covino v. Patrissi, 967 F.3d at 77.

C. Herrera's theoretical ability to avoid a violation of her constitutional rights by not attending her graduation or the Santa Fe High School prom does not alter the irreparable injury analysis.  Government may not condition the receipt of a benefit or privilege on the relinquishment of a constitutional right.  See Johnston v. Tampa Sports Auth., 530 F.3d 1320, 1329 (11th Cir. 2008)(noting and citing cases analyzing the "unconstitutional conditions" doctrine, and holding that "a government search upon entry was unconstitutional because it required the patron to choose between assertion of his constitutional rights and losing paid admission to the concerts"); Bourgeois v. Peters, 387 F.3d 1303, 1324 (11th Cir. 2004)(stating that the "City may contend that the searches are permissible because they are entirely voluntary. No protestors are compelled to submit to searches; they must do so only if they choose to participate in the protest against the SOA," and finding that "[t]his is a classic 'unconstitutional condition,' in which the government conditions receipt of a benefit or privilege on the relinquishment of a constitutional right")(citation omitted); Pike v. Gallagher, 829 F. Supp. 1254, 1263 (D.N.M. 1993)(Burciaga, C.J.)("Defendants first argue that since Plaintiff consented . . . to a drug test . . . Skinner and Von Raab do not apply. This is a novel and altogether frivolous argument in light of Supreme Court precedent to the contrary. Employment cannot be conditioned upon the waiver of a constitutional right.").  Because government cannot condition the receipt of a benefit or privilege on the relinquishment of a constitutional right, and because C. Herrera can only enjoy the benefit of the school events if she undergoes a search that she alleges is unconstitutional, the Court finds that it is likely that C. Herrera will suffer irreparable injury if a temporary restraining order does not issue.  The Court thus finds

that the irreparable-injury factor weighs in C. Herrera's favor.

**II.    C. HERRERA IS LIKELY TO PREVAIL ON THE MERITS OF HER CLAIMS UNDER 42 U.S.C. § 1983 THAT THE DEFENDANTS' CURRENT PAT-DOWN SEARCHES VIOLATE THE FOURTH AMENDMENT, BUT IS NOT LIKELY TO COMPLETELY PREVAIL ON THE MERITS OF HER CLAIMS THAT THE DEFENDANTS' SEARCHES OF POSSESSIONS VIOLATE THE FOURTH AMENDMENT.**

The Court finds that there is a substantial likelihood that C. Herrera would succeed in showing that the Defendants' current actions of conducting pat-down searches violate the Fourth Amendment, because of the intrusive nature of the pat-down searches, because of the general character of the prom and graduation events, and because there is no evidence that less intrusive alternatives would not adequately accomplish the purposes of the intrusive pat-down searches now employed or that not engaging in pat-down searches would unnecessarily jeopardize the governmental interests. The Court finds that there is not, however, a substantial likelihood that C. Herrera will show that all searches of possessions violated the Fourth Amendment, because the students who choose to attend these voluntary events have a decreased expectation of privacy, because searching possessions is less intrusive than in searching persons, and because the searches of possessions meet important governmental interests of ensuring the students' health and safety, and the purpose of the school activities.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourteenth Amendment to the United States Constitution extends the prohibition against unreasonable search and seizures to state officers, including school officials. See New Jersey v. T.L.O., 469 U.S. 325, 334-37 (1985).

The touchstone for determining the constitutionality of a governmental search is the

"reasonableness" of the search.  Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. 822, 828 (2002)("We must therefore review the School District's Policy for 'reasonableness,' which is the touchstone of the constitutionality of a governmental search.").  "In the criminal context, reasonableness usually requires a showing of probable cause."  Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. at 828 (citing Skinner v. Railway Labor Executives' Assn., 489 U.S. 602, 619 (1989)).  The Supreme Court has held that "in the context of safety and administrative regulations, a search unsupported by probable cause may be reasonable when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable."  Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. at 828-29 (internal quotation marks and citation omitted).  Special needs "inhere in the public school context."  Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. at 828-29 (stating "that a warrant and finding of probable cause are unnecessary in the public school context because such requirements would unduly interfere with the maintenance of the swift and informal disciplinary procedures [that are] needed," and that strict adherence to the probable cause requirement would undercut the substantial need for teachers and administrators to maintain order  in the schools)(quoting Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 653 (1995); New Jersey v. T.L.O., 469 U.S. at 340-41)(internal quotation marks omitted)).

The Supreme Court in New Jersey v. T.L.O. stated that the legality of a search of a student should depend on the reasonableness of the search and that, to determine the reasonableness of the search, a court must consider whether the action was justified at its inception and whether the search was reasonably related in scope to the circumstances which justified the interference.  See New Jersey v. T.L.O., 469 U.S. at 341-42.  A search of a student will be justified at its inception when

"there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." New Jersey v. T.L.O., 469 U.S. at 341-42.  A search of a student will be permissible in scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." New Jersey v. T.L.O., 469 U.S. at 342.

Although it is well-settled that students do not "shed their constitutional rights . . . at the schoolhouse gate," Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969), "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children," Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 656.  The Supreme Court has recognized that a search in the school context may still be reasonable without individualized suspicion in "limited circumstances[ ] where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 674 (O'Connor, J., dissenting)(citation omitted). See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. at 830 (stating that "a finding of individualized suspicion may not be necessary when a school conducts drug testing").

In Vernonia School District 47J v. Acton, the Supreme Court found that Vernonia's student athlete drug policy, which authorized random uranalysis testing of students who participated in the district's school athletics program, was reasonable and thus constitutional. See 515 U.S. at 646, 665. In reaching this conclusion, the Supreme Court considered the nature of the privacy interest upon which the search intruded, the intrusiveness of the search, and the nature and immediacy of the governmental concern at issue and the efficacy of the search's means for meeting it. See id. at 665.

The Supreme Court noted that, "[p]articularly with regard to medical examinations and procedures, therefore, 'students within the school environment have a lesser expectation of privacy than members of the population generally.'" 515 U.S. at 656-57 (citation omitted). "Legitimate privacy expectations are even less with regard to student athletes." Id. at 656.

> They require "suiting up" before each practice or event, and showering and changing afterwards. Public school locker rooms, the usual sites for these activities, are not notable for the privacy they afford. The locker rooms in Vernonia are typical: No individual dressing rooms are provided; shower heads are lined up along a wall, unseparated by any sort of partition or curtain; not even all the toilet stalls have doors. As the United States Court of Appeals for the Seventh Circuit has noted, there is "an element of 'communal undress' inherent in athletic participation," Schaill by Kross v. Tippecanoe County School Corp., 864 F.2d 1309, 1318 (1988).

515 U.S. at 657.  The Supreme Court also noted that there was "an additional respect in which school athletes have a reduced expectation of privacy." 515 U.S. at 657.  The Supreme Court stated that, by choosing to go out for a team, students "voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally."  515 U.S. at 657.

> In Vernonia's public schools, they must submit to a preseason physical exam (James testified that his included the giving of a urine sample, App. 17), they must acquire adequate insurance coverage or sign an insurance waiver, maintain a minimum grade point average, and comply with any "rules of conduct, dress, training hours and related matters as may be established for each sport by the head coach and athletic director with the principal's approval." Record, Exh. 2, p. 30, ¶ 8. Somewhat like adults who choose to participate in a "closely regulated industry," students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy.

515 U.S. at 657.  Turning to the degree of intrusion, the Supreme Court stated that the degree of intrusion depended upon the manner in which production of the urine sample was monitored.  See 515 U.S. at 658.  Under the district's policy, the male students produced samples at a urinal along a wall and remained fully clothed, and only observed from behind, if at all, and the female students produced samples in an enclosed stall, with a female monitor standing outside listening for sounds

-14-

of tampering.  See 515 U.S. at 658.  The Supreme Court stated: "These conditions are nearly identical to those typically encountered in public restrooms, which men, women, and especially schoolchildren use daily. Under such conditions, the privacy interests compromised by the process of obtaining the urine sample are in our view negligible." 515 U.S. at 658.  The Supreme Court also considered the other privacy-invasive aspect of urinalysis -- the information it discloses concerning a person's body, and the materials he or she has ingested.  See 515 U.S. at 658.  The Supreme Court noted that the tests at issue looked only for standard drugs and that the results of the tests were disclosed only to a limited class of school personnel who "have a need to know," and that they were not turned over the law enforcement authorities and were not used for any internal disciplinary function.  515 U.S. at 658.  Turning to the governmental interest, the Supreme Court found that the concern of deterring drug use was important, that there was an immediate crisis of drug use, and that "a drug problem largely fueled by the 'role model' effect of athletes' drug use, and of particular danger to athletes, is effectively addressed by making sure that athletes do not use drugs."  Id. at 661-64.  Taking into account "the decreased expectation of privacy, the relative unobtrusiveness of the search, and the severity of the need met by the search," the Supreme Court concluded that the policy was reasonable and thus constitutional.  515 U.S. at 664-65.

In Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls, the Supreme Court considered whether a student activities drug testing policy, which required all students who participated in competitive extracurricular activities to submit to drug testing, was constitutional, because it reasonably served the school district's important interest in detecting and preventing drug use among its students.  See 536 U.S. at 825.  The Supreme Court noted that a "student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety."  Id. at 830.  The Supreme Court concluded that the

students affected by the policy had a limited expectation of privacy, because the students who

participated in the competitive extracurricular activities voluntarily subjected themselves to many

of the same intrusions of their privacy as do student athletes.  See 536 U.S. at 831  The Supreme

Court stated:

> Some of these clubs and activities require occasional off-campus travel and communal undress.  All of them have their own rules and requirements for participating students that do not apply to the student body as a whole.  For example, each of the competitive extracurricular activities governed by the Policy must abide by the rules of the Oklahoma Secondary Schools Activities Association, and a faculty sponsor monitors the students for compliance with the various rules dictated by the clubs and activities.  This regulation of extracurricular activities further diminishes the expectation of privacy among schoolchildren.

536 U.S. at 832.  The Supreme Court also found that, given the "minimally intrusive nature of the

sample collection and the limited uses to which the test results are put, we conclude that the invasion

of students' privacy is not significant."  536 U.S. at 833.  The policy required a faculty monitor to

wait outside the closed restroom stall, listening for normal sounds of urination to guard against

tampered samples, for the student to produce a sample.  See 536 U.S. at 832-33.  The policy also

required test results to be kept in confidential files separate from the student's other educational

records and that the results be released to school personnel only on a need-to-know basis.  See 536

U.S. at 833.  The Supreme Court analogized this policy to the policy in Vernonia School District 47J

v. Acton and found that, as the policy in Vernonia School District 47J v. Acton, it was minimally

intrusive.  See 536 U.S. at 833-34.  The Supreme Court further noted that governmental concern in

preventing drug use by schoolchildren is an important concern and that "the necessity for the State

to act is magnified by the fact that this evil is being visited not just upon individuals at large, but

upon children for whom it has undertaken a special responsibility of care and direction." Id. at 834.

The Supreme Court also noted that the school district presented specific evidence of drug use in the

schools.  See 536 U.S. at 835.  The Supreme Court found that, given the nationwide epidemic of

drug use, and the evidence of increased drug use in the district's schools, it was reasonable for the

school district to enact the drug testing policy.  See 536 U.S. at 836.

　　　In Doe ex rel. Doe v. Little Rock School District, 380 F.3d 349 (8th Cir. 2004), the United

States Court of Appeals for the Eighth Circuit found that the practice of the Little Rock School

District ("LRSD"), which subjected students to random, suspicionless searches of their persons and

belongings by school officials was unconstitutional, because the searches unreasonably invaded the

students' legitimate expectations of privacy.  See 380 F.3d at 351.  The Eighth Circuit noted that

public school students have lesser expectations of privacy, owing, in large part, to the government's

responsibilities as guardian and tutor of the children entrusted to its care.  See id. at 353.  The Eighth

Circuit stated however, that "[p]ublic school students' privacy interests, however, are not

nonexistent."  Id. at 353.

> It is true that the legitimate expectation of privacy retained by members of certain
> sub-populations of a public school's student body falls below the already limited
> baseline level of privacy afforded to public school students generally. For instance,
> the Supreme Court has analogized students who voluntarily participate in school
> athletics or other competitive extracurricular activities to adults who choose to
> participate in a "closely regulated industry," in that both groups voluntarily subject
> themselves to "intrusions upon normal rights and privileges, including privacy."
> Vernonia, 515 U.S. at 656-57 . . . (internal quotations omitted); Earls, 536 U.S. at
> 831-32 . . . .  Sports and other competitive extracurricular activities usually have
> separate systems of rules that do not apply to the student body as a whole, and often
> involve such requirements as mandatory physicals, frequent communal undress, and
> traveling and lodging in close confines. By consciously choosing to "go out for the
> team" or other competitive extracurricular endeavor, such students agree to waive
> certain privacy expectations that they would otherwise have as students in exchange
> for the privilege of participating in the activity. But the search regime at issue here
> is imposed upon the entire student body, so the LRSD cannot reasonably claim that
> those subject to search have made a voluntary tradeoff of some of their privacy
> interests in exchange for a benefit or privilege.

380 F.3d at 353-54.  The Eighth Circuit then inquired into the intrusiveness of the search.  See id.

at 354.  The Eighth Circuit stated that the search invaded students' privacy interests in a major way,

stating that "[a] search of a child's person or of a closed purse or other bag carried on her person, no

less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective

expectations of privacy."  380 F.3d at 354 (citation omitted).  " Students often carry items of a

personal or private nature in their pockets and bags, and many students (whether or not they are

carrying contraband) must surely feel uncomfortable or embarrassed when officials decide to rifle

through their personal belongings."  380 F.3d at 654-55.

> Whatever privacy interests the LRSD students have in the personal belongings that
> they bring to school are wholly obliterated by the search practice at issue here,
> because all such belongings are subject to being searched at any time without notice,
> individualized suspicion, or any apparent limit to the extensiveness of the search.
> Full-scale searches that involve people rummaging through personal belongings
> concealed within a container are manifestly more intrusive than searches effected by
> using metal detectors or dogs. Indeed, dogs and magnetometers are often employed
> in conducting constitutionally reasonable large-scale "administrative" searches
> precisely because they are minimally intrusive, and provide an effective means for
> adducing the requisite degree of individualized suspicion to conduct further, more
> intrusive searches. The type of search that the LRSD has decided to employ, in
> contrast, is highly intrusive, and we are not aware of any cases indicating that such
> searches in schools pass constitutional muster absent individualized suspicion,
> consent or waiver of privacy interests by those searched, or extenuating
> circumstances that pose a grave security threat.

380 F.3d at 355.  The Eighth Circuit also noted that the character of the intrusions were qualitatively

more severe than that in Vernonia and Earls, because, in the case before it, the searches could lead

directly to the imposition of criminal sanctions.  See 380 F.3d at 355.  The Eighth Circuit further

found that LRSD failed to demonstrate the existence of a need sufficient to justify the substantial

intrusion.  See id. at 356.

> While the LRSD has expressed some generalized concerns about the existence of
> weapons and drugs in its schools, it conceded at oral argument that there is nothing
> in the record regarding the magnitude of any problems with weapons or drugs that
> it has actually experienced.  All schools surely have an interest in minimizing the
> harm that the existence of weapons and controlled substances might visit upon a

-18-

> student population, but public schools have never been entitled to conduct random,
> full-scale searches of students' personal belongings because of a mere apprehension.

380 F.3d at 356.  The Eighth Circuit determined that LSRD's search practice was unreasonable,

because LRSD's search practice effectively reduced expectations of privacy to nothing, and there

was no evidence of unique circumstances that would justify significant intrusions.  See 380 F.3d at

356.

In B.C. v. Plumas Unified School District, 192 F.3d 1260 (9th Cir. 1999), the United States

Court of Appeals for the Ninth Circuit concluded that the "random and suspicionless dog sniff

search" of a high school student "was unreasonable in the circumstances."[3]  192 F.3d at 1267.  The

Ninth Circuit found that the students' privacy interests were not minimal, although they have a lesser

expectation of privacy than members of the population generally.  See 192 F.3d at 1267.  The Ninth

Circuit stated that deterring drug use by students is an important -- if not compelling -- government

interest, but noted that the record did not disclose that there was a drug crisis or a drug problem at

the high school.  See 192 F.3d at 1268.  "In the absence of a drug problem or crisis at Quincy High,

the government's important interest in deterring student drug use would not have been placed in

jeopardy by a requirement of individualized suspicion."  192 F.3d at 1268 (internal quotation marks

and citation omitted).

In Hough v. Shakopee Public Schools, 608 F. Supp. 2d 1087 (D. Minn. 2009), the United

States District Court for the District of Minnesota found that a policy of daily, suspicionless searches

was not reasonable and thus was unconstitutional.  See 608 F. Supp. 2d at 1108.  The district court

recognized that the expectation of privacy of any student is limited in a public school environment.

_____

[3] The Ninth Circuit found that the dog sniff was a search, because it infringed the student's
reasonable expectation of privacy.  See 192 F.3d at 1266.

See 608 F. Supp. 2d at 1100-01.  The defendant argued that students waived their right to privacy

when they chose to accept special-education services from the school district.  See 608 F. Supp. 2d

at 1101.  The district court rejected this argument, stating that

> participating in a special-education program is very different from participating in
> athletics (as in Vernonia School District ) or in competitive extracurricular activities
> (as in Earls ). No student is entitled under the law to play football or sing in the choir,
> but every disabled student is entitled under the law to special-education services.
> Moreover, because school attendance is compulsory, a student's participation in a
> special-education program is not voluntary in the same way that participation in
> extracurricular activities is voluntary. MRVSEC "cannot reasonably claim that those
> subject to search have made a voluntary tradeoff of some of their privacy interests
> in exchange for a benefit or privilege." Doe, 380 F.3d at 354.

608 F. Supp. 2d at 1101.  The district court found that the special-education students' legitimate

expectation of privacy fell below the "already limited baseline level of privacy afforded to public

school students generally," because they sacrifice the privacy of medical and other information

about their disabilities, but stated that the students "nevertheless retain some legitimate expectation

of privacy in their bodies, clothing, and personal possessions."  608 F. Supp. 2d at 1103.  The district

court found that the searches were intrusive.  See 608 F. Supp. at 1103.  Generally, students were

asked to remove their shoes and socks, turn down the waistband of their pants, empty their pockets,

search their backpacks and purses, and, at times, submit to a patdown.  See 608 F. Supp. 2d at 1103.

The district court stated:

> On the whole, MRVSEC's searches were extraordinarily intrusive. As in Doe,
> the students' backpacks and purses, and the contents of their pockets, were searched.
> Doe found such searches to be "highly intrusive" and characterized them as "wholly
> obliterating" the students' "privacy interests . . . in the personal belongings that they
> bring to school." Id. at 355. But whereas Doe involved occasional searches of the
> possessions of randomly selected students, MRVSEC searched the possessions of
> every student every day. Thus, even if MRVSEC had stopped at searching
> possessions, its searches would have been far more intrusive than the "highly
> intrusive" searches struck down in Doe.
>
> But MRVSEC did not stop at searching possessions. MRVSEC searched

people. The students not only had their backpacks, purses, and the contents of their pockets searched, but students were required to partially disrobe (i.e., to take off their shoes and socks, and sometimes coats, sweaters, or sweatshirts) and to permit school employees to look inside their clothes (i.e., under their waistbands and pant legs). And, most importantly, the students were touched. Every day, every student either was patted down or was at least subject to being patted down.

MRVSEC's searches were as intrusive as any government search that any American citizen is likely to experience in her lifetime, unless she is incarcerated. Anyone who has been thoroughly searched at an airport -- who has had her arms, legs, chest, and back touched by a stranger, and then had her most personal possessions pawed through -- knows exactly how intrusive such a search is. The MRVSEC searches were even more intrusive, and every student experienced them every day.

In sum, the Court concludes that the MRVSEC searches were extraordinarily intrusive-far more intrusive than the searches approved in Vernonia School District and Earls, and far more intrusive than the searches disapproved in Doe. In none of those cases did school officials, without individualized suspicion, force students to take off clothing, look inside of students' clothing, or touch students. Indeed, with the exception of one case (discussed below) involving students who had committed crimes and were attending what was essentially a correctional facility, defendants have not cited a single case in which a court approved suspicionless searches of students that were nearly as intrusive as MRVSEC's.

608 F. Supp. 2d at 1105.  The district court found that the evidence regarding the purpose of the

policy, which was to remove distractions and dangerous items and create a calm and focused

environment where students feel safe, was insufficient to justify an intrusive search of every student

every day.  See 608 F. Supp. 2d at 1106.  The district court stated:

MRVSEC has given the Court no reason to believe that far less intrusive searches would not adequately ensure compliance with the guidelines about dangerous and distracting items. Virtually every item that school officials have identified as being dangerous or distracting (guns, knives, cell phones, iPods, and lighters), as well as virtually every dangerous or distracting item that any plaintiff has ever brought to school (Leatherman multi-tools, nunchaku, and lighters), could be detected with a metal detector. Such screening would be far less intrusive than the searches MRVSEC now employs-and, quite possibly, would be more effective at detecting dangerous or distracting items.

. . . .

-21-

The search policy could be narrowed in other respects. The policy could be changed so that illegal items that are found are not required to be turned over to law enforcement. Students could be given the option of checking backpacks, purses, and coats with school officials at the beginning of the day in lieu of having those items searched. And more thorough searches could be reserved for students who set off a metal detector or otherwise give school officials some reason to suspect that they are carrying dangerous or disruptive items. MRVSEC has submitted no evidence that these or other less intrusive alternatives would not adequately accomplish the purposes of the intrusive searches that MRVSEC now employs.

608 F. Supp. 2d at 1106-07. Balancing these factors, the district court thus concluded that the policy of daily, suspicionless searches was not reasonable. See 608 F. Supp. 2d at 1109.

In United States v. Hartwell, 436 F.3d 174 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit addressed a similar issue but in a non-school setting -- whether a search that Transportation Security Administration ("TSA") agent conducted offended the Fourth Amendment. 436 F.3d at 175. On May 17, 2003, Hartwell arrived at the Philadelphia International Airport. See id. at 175. "He reached the security checkpoint, placed his hand luggage on a conveyor belt to be x-rayed, and approached the metal detector. Hartwell's luggage was scanned without incident, but he set off the magnetometer when he walked through." Id. at 175. Hartwell removed all items from his pockets and passed through the metal detector again. See 436 F.3d at 175. A TSA agent took Hartwell aside after he passed through the metal detector, and used a handheld "wand-like magnetometer to discover what set off the metal detector." 436 F.3d at 175. The wand revealed a solid object in Hartwell's cargo pants pocket. See 436 F.3d at 175-76. The agent asked what the object was, but Hartwell did not respond. See 436 F.3d at 176.

What occurred next is the subject of some dispute. Hartwell claims that he was escorted to a private screening room near the checkpoint, where he refused Padua's repeated requests to reveal the contents of his pocket. Frustrated by Hartwell's unresponsiveness, Padua eventually reached into Hartwell's pocket and pulled out a package of drugs. He immediately called the Philadelphia police, who searched Hartwell, found two additional packages of drugs and about $3000 in cash, and promptly arrested him.

-22-

The government claims that neither Padua nor the police officer ever reached into Hartwell's pocket without his consent. According to Agent Padua, the following occurred. After requesting private screening, Hartwell refused several requests to empty his pocket, nervously backed away from Agent Padua while he was being questioned, and suddenly dropped his pants. This suspicious behavior prompted Padua to call for backup. A police officer arrived and asked Hartwell to remove any items from his pocket, and Hartwell complied by handing over one package of drugs. He then feigned falling to the floor and dropped a second package of drugs.

436 F.3d at 176. The Third Circuit found that the administrative search doctrine justified the search at the airport checkpoint. See 436 F.3d at 178. The Third Circuit noted that "[s]uspicionless checkpoint searches are permissible under the Fourth Amendment when a court finds a favorable balance between the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." 436 F.3d at 178-79 (quoting Illinois v. Lidster, 540 U.S. 419, 427 (2004); Brown v. Texas, 443 U.S. 47, 51 (1979)(internal quotation marks omitted). The Third Circuit found that the airport checkpoint passed the test set forth in Brown v. Texas.

First, there can be no doubt that preventing terrorist attacks on airplanes is of paramount importance.

Second, airport checkpoints also "advance[ ] the public interest," as Brown requires. As this Court has held, "absent a search, there is no effective means of detecting which airline passengers are reasonably likely to hijack an airplane." Additionally, it is apparent that airport checkpoints have been effective.

Third, the procedures involved in Hartwell's search were minimally intrusive. They were well-tailored to protect personal privacy, escalating in invasiveness only after a lower level of screening disclosed a reason to conduct a more probing search. The search began when Hartwell simply passed through a magnetometer and had his bag x-rayed, two screenings that involved no physical touching. Only after Hartwell set off the metal detector was he screened with a wand -- yet another less intrusive substitute for a physical pat-down. And only after the wand detected something solid on his person, and after repeated requests that he produce the item, did the TSA agents (according to Hartwell) reach into his pocket.

In addition to being tailored to protect personal privacy, other factors make airport screening procedures minimally intrusive in comparison to other kinds of

-23-

searches. Since every air passenger is subjected to a search, there is virtually no "stigma attached to being subjected to search at a known, designated airport search point." Moreover, the possibility for abuse is minimized by the public nature of the search. "Unlike searches conducted on dark and lonely streets at night where often the officer and the subject are the only witnesses, these searches are made under supervision and not far from the scrutiny of the traveling public."And the airlines themselves have a strong interest in protecting passengers from unnecessary annoyance and harassment.

Lastly, the entire procedure is rendered less offensive -- if not less intrusive -- because air passengers are on notice that they will be searched. Air passengers choose to fly, and screening procedures of this kind have existed in every airport in the country since at least 1974. The events of September 11, 2001, have only increased their prominence in the public's consciousness. It is inconceivable that Hartwell was unaware that he had to be searched before he could board a plane. Indeed, he admitted that he had previously been searched before flying.

In conclusion, Hartwell's search does not offend the Fourth Amendment even though it was initiated without individualized suspicion and was conducted without a warrant. It is permissible under the administrative search doctrine because the State has an overwhelming interest in preserving air travel safety, and the procedure is tailored to advance that interest while proving to be only minimally invasive, as that term is understood in <u>Brown</u>.

436 F.3d at 179-81 (internal citations and footnotes omitted).

There is a substantial likelihood that C. Herrera would prevail on the merits of her claims which are based on the suspicionless pat-down searches.  There is a substantial likelihood that SFPS is responsible for the aspects of the searches conducted at SFPS-sponsored events, because there is evidence that SFPS directed ASI to conduct the searches, and that ASI thus acted as an instrument and agent of the state in searching the students.  <u>See</u> <u>Pleasant v. Lovell</u>, 876 F.2d 787, 796 (10th Cir. 1989); <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d 1442, 1453 (10th Cir. 1995).

To determine whether a particular "type of school search is constitutionally reasonable," a reviewing court must consider the "scope of the legitimate expectation of privacy at issue,"  the "character of the intrusion that is complained of," and the "nature and immediacy of the governmental concern at issue" and the efficacy of the means employed for dealing with it.

-24-

See <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. at 654-66.  The Court concludes that there is a substantial likelihood that the students who attend prom and graduation have a "limited expectation of privacy."  <u>Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls</u>, 536 U.S. at 832.  "Students in public schools do indeed have lesser expectations of privacy than people generally have in public situations, due in large part to the government's responsibilities 'as guardian and tutor of children entrusted to its care.'"  <u>Doe ex rel. Doe v. Little Rock Sch. Dist.</u>, 380 F.3d at 353.  As the students in <u>Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls</u> and <u>Vernonia School District 47J v. Acton</u>, who, in consciously choosing to go out for a sports team or other extracurricular endeavor, voluntarily subjected themselves to intrusions upon normal rights and privileges, including privacy, and agreed to waive certain privacy expectations that they would otherwise have had as students in exchange for the privilege of participating in the activity, students who consciously choose to go to graduation or prom, which are voluntary, not-required school activities, waive certain privacy expectations that they otherwise have as students in exchange for the privilege of participating in prom or graduation.  Although the students voluntarily choose to attend graduation or prom, this situation is not directly analogous to the students who chose to go out for sports or extracurricular activities in <u>Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls</u> and <u>Vernonia School District 47J v. Acton</u>, because most students in the student body attend proms, and virtually all students attend their high school graduation and prom is not an activity involving communal undress.  The Court believes that this situation is more analogous to lunch in the school cafeteria; students are not required to eat lunch in the school cafeteria but most students do.  So while the Court agrees that proms and graduation are extracurricular activities, the Court thinks they are different from some other extracurricular activities, such as sports, where the Supreme Court has in detail described the lack of privacy that

such activities enjoy.  Prom and graduation approach levels of participation that the general body

enjoys, and thus, the Court does not believe, as the School District Defendants apparently do, that

all extracurricular activities should lose privacy equally.  Although the legitimate expectation of

privacy that the students who attend prom and graduation here is "below the already limited baseline

level of privacy afforded to public school students generally," the "students nevertheless retain some

legitimate expectation of privacy in their bodies, clothing, and personal possessions."  Hough v.

Shakopee Pub. Schs., 608 F. Supp. 2d at 1103.

The Court finds that there is a substantial likelihood that the practice of patting down

students, without any individualized reasonable suspicion, is unreasonably intrusive.  Unlike the

searches at issue in Board of Education of Independent School District No. 92 of Pottawatomie

County v. Earls, where the Supreme Court found that the degree of intrusion on privacy was

minimal, because the policy required monitors to wait outside a closed stall for a student to produce

a urine sample, there is a substantial likelihood that each student who attends prom and graduation

will be subject to touching of their bodies, and, possibly, female students will be subject to a guard

cupping and shaking their breasts and grabbing their brassieres.  In United States v. Hartwell, a case

upon which the Defendants rely, the searches "were well tailored to protect personal privacy,

escalating in invasiveness only after a lower level of screening disclosed a reason to conduct a more

probing search[;] [t]he search began when Hartwell simply passed through a magnetometer and had

his bag x-rayed, two screenings that involved no physical touching."  436 F.3d at 181.  Only after

Hartwell "set off the metal detector was he screened with a wand -- yet another less intrusive

substitute for a physical pat-down," and "only after the wand detected something solid on his person,

and after repeated requests that he produce the item, did the TSA agents (according to Hartwell)

reach into his pocket."  436 F.3d at 181.  In this case, the security guards immediately conducted

a physical pat-down and only after the physical pat-down conducted a screening with a wand.  As in Hough v. Shakopee Public Schools, where the district court found that searches were intrusive when the students were required to partially disrobe -- to take off their shoes, socks, coats, or sweatshirts --  to permit school employees to look inside their clothes -- their waistbands and pant legs -- and when the students were subject to pat-down searches, in this case, the touching of students' bodies, and intrusive actions of cupping and shaking girls' breasts, is an intrusive search.

The Court finds that the pat-down searches are likely effective in furthering the SFPS' concerns about drugs, alcohol, weapons, and distracting contraband, but finds that, given the intrusiveness of a pat-down search and less intrusive alternatives, it is likely that the suspicionless pat-down searches are unreasonable under the Fourth Amendment.  SFPS asserts that its concerns regarding prom are that students will take in drugs, alcohol, and weapons.  At the hearing, Gutierrez testified about instances of drug and alcohol abuse at Santa Fe public school proms, and about an instance of a weapon at a Santa Fe public school prom.  The School District Defendants have articulated an important governmental concern in preventing drug and alcohol abuse, and in ensuring the safety of the students.  See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. at 834.  Although reasonableness under the Fourth Amendment does not require employing the least intrusive means, because "the logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers," Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. at 837, there are far less intrusive methods than the searches now employed, see Doe ex rel. Doe v. Little Rock Sch. Dist., 380 F.3d at 355 ("[D]ogs and magnetometers are often employed in conducting constitutionally reasonable large-scale 'administrative' searches precisely because they are minimally intrusive, and provide an effective means for adducing the requisite degree of

individualized suspicion to conduct further, more intrusive searches."); Hough v. Shakopee Pub. Schs., 608 F. Supp. 2d at 1106. ("MRVSEC has given the Court no reason to believe that far less intrusive searches would not adequately ensure compliance with the guidelines about dangerous and distracting items."), and the Court believes these searches will come close, if not approximate well, to furthering the governmental interests as well as the current intrusive procedures.  The School District Defendants appear to assert an argument under which there is no limiting principle.  For example, it appears that, under the School District Defendants' argument, there is nothing which would prevent body cavity searches of the students attending prom and graduation to effect the School District Defendants' asserted purposes.  The School District Defendants conceded that such searches would likely be unreasonable. See Tr. at 17:1-20:1 (Sanchez, Court)(stating that, assuming C. Herrera's allegations were true, he would be concerned with the "manner in which [the officers] conducted the pat-down," and agreeing that reaching inside a woman's brassiere is beyond a pat-down).  Because even the School District Defendants concede there are limits, the question is simply where.  Because the Defendants can reasonably effect their purposes through less intrusive methods, such as screening with wands and observations of the students, the Court believes that there is a substantial likelihood that not engaging in pat-down searches immediately and as first resort will not jeopardize an important governmental interest.  See Doe ex rel. Doe v. Little Rock School District, 380 F.3d at 356 (" In Thompson, as in Earls and Vernonia, random, suspicionless searches by school officials were deemed reasonable only after a specific showing was made that not engaging in the searches would have jeopardized some important governmental interest. No such showing has been made here.").  The Court believes that there is a substantial likelihood that C. Herrera will succeed in showing that the Defendants' current search policy -- under which security officers conduct a suspicionless pat-down search before conducting a wand search -- is

unreasonable, because the students retain some legitimate expectation of privacy, the current nature of the pat-down search is intrusive, and, although SFPS have asserted important governmental concerns, there is no evidence that less intrusive or graduated alternatives would not adequately accomplish the purposes of the intrusive pat-down searches now employed or that not engaging in pat-down searches until there is individualized reasonable suspicion would jeopardize the governmental interests.  See Hough v. Shakopee Pub. Schs., 608 F. Supp. at 1105-08.  Conducting a wand search, by itself, is not unreasonable, because of the students' limited legitimate expectation of privacy, the less intrusive nature of a wand search, and the important governmental concerns.  It is true that such a search would not detect non-metal objects, but it can get a lot of weapons.  As to some containers that could contain alcohol or drugs, the security officer may have to rely more heavily on observation; they can ask a student to unzip their gown to show their clothes, and prom dresses tend to be tight fitting, making it difficult -- but not impossible -- to hide contraband.  But the officials must develop reasonable suspicion to go to the next level of the search.  Furthermore, a pat-down search on the basis of individualized reasonable suspicion would not be unreasonable. The Court finds, however, there is a substantial likelihood that the current practice of conducting suspicionless pat-down searches of every student violates the Fourth Amendment.  In many respects, the Court's ruling is consistent with SFPS' statements in its Code of Conduct.  While SFPS asserts it the Code of Conduct does not apply to these extracurricular activities,[4] the Court believes that it mirrors or approximates the constitutional standard more closely than does SFPS' current policy.

SFPS asserts that its concerns regarding graduation are that the students will take in alcohol,

---

[4] The Court notes the Prom Rules and Reminders that the School District Defendants states: "The Code of Conduct will be enforced."  Santa Fe High School Prom Rules and Reminders at 1. There appears to be tension as to whether SFPS believes the Code of Conduct applies to these events.

drugs, weapons, and distracting contraband.  As the Court has stated, the School District Defendants have articulated an important governmental concern in preventing student drug and alcohol abuse, and in ensuring the safety of the students.  See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. at 834.  The Court believes that the asserted governmental concern about distracting contraband at graduation is also a legitimate governmental interest.  The Court recognizes that the schools can legitimately ban cellular telephones and iPods from the classroom, see Hough v. Shakopee Public Schools, 608 F. Supp. 2d 1106, and that "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children," and the government has a legitimate interest in maintaining discipline and order in the schools, Vernonia School Dist. 47J v. Acton, 515 U.S. at 656.  Similarly, SFPS had a legitimate interest in maintaining discipline and order at graduation, which, for many students is a solemn recognition of their accomplishment.  As the Court has discussed, however, the Defendants can reasonably effect their concerns through far less intrusive measures than its current pat-down-first procedure, and the Court believes that there is a substantial likelihood that, given the intrusiveness of the suspicionless pat-down searches, the suspicionless pat-down searches are unreasonable, despite the legitimate governmental interests.

The Court does not believe that there is a substantial likelihood that C. Herrera will prevail on the merits of all her claims under 42 U.S.C. § 1983 based upon the search of her possessions.  As the Court has discussed, it believes that there is a substantial likelihood that the students who attend prom and graduation have a more limited expectation of privacy than the general student population, because they consciously choose to attend the voluntary events, waiving certain privacy expectations that they would have otherwise had as students in exchange for the privilege in participating in prom or graduation.  The Court  believes that there not a substantial likelihood that

C. Herrera could show that the search of her purse was extremely intrusive.  Searches of belongings are less intrusive than searches of bodies.  See Hough v. Shakopee Pub. Schs., 608 F. Supp. at 1105. Unlike Hough v. Shakopee Public Schools, where the district court found that the searches of possessions were intrusive, because the school officials searched the possessions that students took to school, which they were required to attend, the search of C. Herrera's possessions in this case was at voluntary events, which C. Herrera choose to attend.  Given the less intrusive nature of searching possessions than searching persons, the Court believes that there is not a substantial likelihood on the merits that C. Herrera will show that all searches of her possessions would be unreasonably intrusive.[5]  Finally, as the Court has noted, the governmental concern regarding drugs, alcohol, and weapons at school events are important in modern society, and the Defendants also have a legitimate interest in banning distracting contraband at some voluntary events, such as graduation.  Searching possessions for contraband effectively serves these interests.  See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. at 838 ("Evaluating the Policy in this context, we conclude that the drug testing of Tecumseh students who participate in extracurricular activities effectively serves the School District's interest in protecting the safety and health of its students.").  And if a teacher could take a beach ball or cellular telephone in a classroom, there is no sound reason to not allow the officers to take any devices before they enter the voluntary events.  If, in

---

[5] It may be that the search of C. Herrera's possessions at the Capital High School prom was unreasonable.  There does not appear to be any need to "dump" the contents of a purse on a table in front of everyone.  There does not, however, appear to be anything unreasonable about a visual inspection and, if that is inadequate, then to flip through the items, like at the entry of a sporting or entertainment event.  Moreover, if that inspection proves inadequate, the officers can remove objects in an orderly manner so that everything can be observed.  Dumping in public might, however, not be reasonably related to any governmental purpose.  See Doe ex rel. Doe v. Little Rock School District, 380 F.3d at 354 (stating that "[a] search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy.").

searching the students' possessions, the officers find weapons -- such as guns, razorblades -- alcohol,

drugs, or distracting contraband that the SFPS has notified students will be confiscated -- such as

beach balls or cellular telephones, the officers may reasonably seize these items, at least temporarily

for some items.  Given the decreased expectation of privacy, minimal intrusion, and governmental

interests met through the searches, the Court does not believe there is a substantial likelihood that

the Plaintiffs will show that all searches of possessions, and that seizures of weapons, drugs, and

alcohol for all school events, and, in addition, distracting contraband for graduations, violates the

Fourth Amendment.  See Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 664-65.

## III.   THE THREATENED INJURY TO C. HERRERA OUTWEIGHS WHATEVER DAMAGE A TEMPORARY RESTRAINING ORDER MAY CAUSE THE DEFENDANTS.

The threatened injury to C. Herrera's constitutional rights outweighs the damage a

restraining order may have on the Defendants.  The injury threatened to C. Herrera if she attends the

Santa Fe High School Prom and Capital High School Graduation if a restraining order is not issued

is an alleged violation of her constitutional rights. The deprivation of a constitutional right is a

significant and irreparable injury to the individual holding the right.  See Elrod v. Burns, 427 U.S.

at 373-74; Kikumura v. Hurley, 242 F.3d at 963.  Because the threatened injury to C. Herrera is an

alleged violation of her constitutional rights, the threatened injury is substantial.  See Lindell v.

Frank, No. 02-C-0021-C, 2003 WL 23198184, at *3 (W.D. Wis. Aug. 25, 2003)("A deprivation of

a constitutional right qualifies as a substantial injury.").

The Defendants argue that they conduct the searches to prevent drugs, alcohol, and weapons

at the prom, and to prevent drugs, alcohol, weapons, and distracting contraband at graduation.  There

are less invasive methods of detecting drugs, alcohol, and weapons that more reasonably further the

school's governmental interests than immediately resorting to suspicionless pat-down searches.

Furthermore, there is no concrete evidence demonstrating that the extensiveness of the current searches reduces drug use, drinking or violence.  Instead, the evidence is that the security officers confiscated C. Herrera's hand lotion, her manicure kit, and her prescription medication for dizziness -- none of which contained drugs, alcohol: only certain items in the manicure kit could reasonably be called weapons.  The Court thus finds that the evidence does not indicate that the damage to the Defendants will be substantial.  See Doe ex rel. Doe v. Little Rock Sch. Dist., 380 F.3d at 357 ("The mere assertion that there are substantial problems associated with drugs and weapons in its schools does not give [the school district] *carte blanche* to inflict highly intrusive, random searches upon its general student body.")(emphasis in original).  While the School District Defendants suggested that, once the Court issued its temporary restraining order, it would have to reevaluate its ability to allow the prom and graduation, the Court does not believe that cancellation is an appropriate response to the Court's order.  The searching and confiscations that the Court is allowing appear to go beyond what Albuquerque Public Schools and other area schools conduct.   Because the Court finds that the threatened injury to C. Herrera is substantial and that the damage a carefully tailored restraining order may cause the Defendants is not substantial, the Court finds that the threatened injury to C. Herrera outweighs the potential damage to the Defendants.  The Court thus finds that the balance-of-the-harms factor weighs in C. Herrera's favor.

IV.     THE TEMPORARY RESTRAINING ORDER WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST.

        Issuance of a temporary restraining order would not be adverse to the public interest.  The "public interest" inquiry examines the effect of a proposed restraining order on nonparties rather than on the parties.  See Sammartano v. First. Judicial Dist. Court, in and for County of Carson City, 303 F.3d 959, 974 (9th Cir. 2002).  Courts have found that "[i]t is always in the public interest to

prevent the violation of a party's constitutional rights." G&V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994)(citing Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 383 (1979). See Homans v. City of Albuquerque, 264 F.3d 1240, 1244 (10th Cir. 2001)("[W]e believe that the public interest is better served by following binding Supreme Court precedent and protecting the core First Amendment right of political expression."); Planned Parenthood Assoc. v. City of Cincinnati, 822 F.2d 1390, 1400 (6th Cir. 1987)). A temporary restraining order would not be adverse to the public interest, because it would protect against an alleged violation of C. Herrera's constitutional rights.

Furthermore, a temporary restraining order would protect the other students who will attend the prom and graduation from allegedly unconstitutional searches. When the constitutional rights of an individual and other members of the public are violated, or are threatened to be violated, public interest concerns are implicated because all citizens have a stake in upholding the Constitution. See Sammartano v. First. Judicial Dist. Court, in and for County of Carson City, 303 F.3d at 974 ("The ongoing enforcement of the potentially unconstitutional regulations at the Complex would infringe not only the free expression interests of the dozen Appellants in this case, but also the interests of other people who may wish to enter the Complex."); O'Brien v. Town of Caledonia, 748 F.2d 403, 408 (7th Cir. 1984)("Of course, the public has a strong interest in the vindication of an individual's constitutional rights."); McClendon v. City of Albuquerque, 272 F. Supp.2d 1250, 1259 (D.N.M. 2003)(Vazquez, J.)("The public has an interest in the City's and the County's maintenance of prison facilities that provide the minimal conditions of confinement required by the Constitution and federal law."). The Court thus finds that the public interest prong weighs in favor of granting a temporary restraining order, because preservation of Santa Fe Public Schools students' constitutional rights is in the public interest.

-34-

## V.   ALTHOUGH THE TEMPORARY RESTRAINING ORDER WILL ALTER THE STATUS QUO, THE FOUR FACTORS WEIGH HEAVILY IN C. HERRERA'S FAVOR.

Although the temporary restraining order will alter the status quo, the four factors weigh heavily in C. Herrera's favor. The "historic purpose" of a preliminary injunction is "the preservation of the status quo pending a trial on the merits." O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft, 389 F.3d 973, 977 (10th Cir. 2004)(en banc), aff'd, 546 U.S. 418 (2006). "[T]he status quo is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1155 (10th Cir. 2001)(internal quotation marks omitted). "In determining the status quo for preliminary injunctions, [a] court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d at 1155. SFPS' practice of searching students at extracurricular functions has been in place since approximately 2004 or 2005. As the Court has discussed, however, all four factors weigh heavily in C. Herrera's favor. Moreover, the temporary restraining order will likely change the status quo to meet constitutional standards. This further supports issuance of the temporary restraining order, despite the fact that it will alter the status quo.

IT IS ORDERED that Plaintiff Candice Herrera's Motion for Temporary Restraining Order is granted in part and denied in part. The Court orders Defendant Santa Fe Public Schools ("SFPS") to send students who may attend the 2011 Santa Fe High School prom a notice stating that they may be subject to a search, describing what the search may be, and informing the students what items they may not bring into the prom and that those items may be confiscated. The Court also orders SFPS to send students who may attend the 2011 Capital High School Graduation a notice stating that they may be subject to a search, describing what the search may be, and informing the students what

items they may not bring into the graduation and that those items may be confiscated.  The Court directs the Defendants to refrain from conducting pat-down searches of every student as a first approach.  The security officers must conduct graduated searches.  The security officers may conduct a visual inspection, order students to unzip or to remove their graduation gowns to show their clothes, order students to spread their legs, and screen students with a magnetometric wand. The officers may, as part of the visual observation, ask the students to remove jackets and shoes. If the security officers detect something on a student's person with a wand, they must first ask the student to remove the object.  If they have reasonable grounds, based on personal observation or other sources, for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school, the security officers may conduct a pat-down search of the student.  The officers or agents should use a graduated approach to the pat-down searches similar to that TSA uses and, where appropriate, with open hand out.  The security officers may look in the students' possessions, but they may not dump out the students' possessions on a public table.  The officer may remove objects in an orderly way, at a table removed from the public view, but not from the student's vision, to see all contents.  The officers may inspect telephones and cameras, and ask students to open them if necessary.  The officers may confiscate alcohol, drugs, weapons, and other items that SFPS has notified the students may be confiscated, at least for some items, for the duration of the event; the officer may not, at the prom, confiscate hand lotion, and, at both events, the quantity of prescription medication that the student can show he or she needs to take during the event.  The Court orders the SFPS to require Defendant ASI New Mexico, LLC ("ASI") to provide at least one Transportation Security Administration ("TSA") certified person at the 2011 Santa Fe High School and at the 2011 Capital High School Graduation prom to supervise the searches.  The Court also orders SFPS to require ASI to train its employees working these events

-36-

about TSA procedures. The Plaintiffs may have a third-party observer selected by the Plaintiffs at both events to observe the searches conducted at the events to ensure compliance with the Court's order. The observer will be a witness only, however, and shall not interfere with the school's compliance with the order. The Court anticipates the School's good-faith compliance with its order.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Megan Moran-Gates
Relman, Dane & Colfax PLLC
Santa Fe, New Mexico

-- and--

Reed N. Colfax
Relman, Dane & Colfax PLLC
Santa Fe, New Mexico

-- and --

Aimee Bevan
O'Friel & Levy, P.C.
Santa Fe, New Mexico

    *Attorneys for the Plaintiffs*