## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CANDICE HERRERA, ARIANNA
LONDON, ASHLEY HURTADO, and
T.H., a minor by and through her father and
guardian VINCENT HERRERA, and all others
similarly situated,

       Plaintiffs,

vs.                                                                   No. CIV 11-0422 JB/KBM

SANTA FE PUBLIC SCHOOLS, SANTA FE
PUBLIC SCHOOLS BOARD OF EDUCATION,
BARBARA GUDWIN, GLENN WIKLE,
LINDA TRUJILLO, FRANK MONTANO,
STEVEN J. CARRILLO, in their official
capacities as members of the Santa Fe Public
Schools Board of Education, BOBBIE J. GUTIERREZ,
in her official capacity as Superintendent of Santa Fe Public
Schools, MELANIE ROMERO, individually and in her
official capacity as Principal of Capital High
School, ROBERT STEPHENS, in his official capacity
as Principal of Santa Fe High School as a necessary party
for complete relief, ASI NEW MEXICO, LLC,
JOHN/JANE DOE Nos. 1-8,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Individual School Defendant Melanie

Romero's Motion for Summary Judgment on Count I of the Second Amended Complaint Based

Upon Qualified Immunity, filed Nov. 13, 2012 (Doc. 113)("Motion for Summary Judgment").

The Court held a hearing on December 20, 2012. The primary issues are: (i) whether the

personal involvement of Defendant Melanie Romero, the principal of Capital High School in

Santa Fe, New Mexico, in the Plaintiffs' pat-down searches, to which they were subjected for

admittance to the Capital High School prom, violated the Plaintiffs' rights guaranteed under the

Fourth and Fourteenth Amendments to the United States Constitution; and (ii) whether the Plaintiffs' constitutional rights that Romero violated, if any, were clearly established at the time of the prom in April, 2011.  The Court will grant the Motion for Summary Judgment, because Romero is entitled to qualified immunity.  The Court concludes that, by requesting that guards from Defendant ASI, New Mexico, LLC perform pat-down searches of all Prom attendees, Romero violated the Plaintiffs' constitutional rights.  The Court further concludes, however, that the Plaintiffs' right to be free from these suspicionless pat-down searches was not clearly established at the time of the Prom in April, 2011.  Additionally, with respect to Plaintiff Candice Herrera's 42 U.S.C. § 1983 claim, the Plaintiffs establish a genuine issue of fact whether Romero saw the ASI New Mexico guard require C. Herrera to lift her dress, and expose her bare leg above her knee.  Romero is entitled to qualified immunity, however, even if Romero saw that conduct, because it was not clearly established in April, 2011, that a search requiring female students to lift their dresses up above their knees was an unreasonable, and thus unconstitutional, search in the public school context.

## FACTUAL BACKGROUND

This case arises from searches that occurred at the April 16, 2011, Capital High prom. See Second Amended Complaint ¶¶ 3-4, at 2-3, filed September 18, 2012 (Doc. 100); Motion for Summary Judgment ¶ 1, at 6 (setting forth this fact); Plaintiffs' Opposition to Defendant Romero's Motion for Summary Judgment Based On Qualified Immunity ¶ 1, at 8, filed November 30, 2012 (Doc. 126)("MSJ Response")(not controverting this fact).  Capital High is a high school located in Santa Fe, New Mexico, and is in the Santa Fe Public School District.  See Second Amended Complaint ¶¶ 18-20, at 5-6; Motion for Summary Judgment ¶ 2, at 6 (setting forth this fact); MSJ Response ¶ 2, at 8 (not controverting this fact).  Each of the four individual

Plaintiffs were subject to pat-down searches when they entered the prom.  C. Herrera, in her deposition, testified:

> [The ASI New Mexico security guard] had me spread my arms and legs out, and she patted along my arms, touched along the waist. And then she grabbed the outer part of my bra and moved it here. And then she grabbed the inner part of my bra and moved it here. And then she cupped my breasts and shook them. . . . [T]hen afterwards she moved down to my waist and then she went all the way down my leg. And then she felt over my dress and then she pulled the dress up to about mid-thigh and she felt up the bare leg, as well.

Deposition of Candice Herrera at 198:17-199:3, 199:18-200:9 (taken July 27, 2012), filed November 13, 2012(Doc. 113-4)("C. Herrera Depo."); MSJ Response ¶ 1A, at 3 (setting forth this fact); MSJ Reply at 4 (not controverting this fact).[1]  Plaintiff T.H. testified in her deposition:

> She asked me to spread my arms out and she ran her hands along my arms which she could clearly see. And then she continued down to pat down my waist and my hips…. And then she -- and then she went back up and cupped both my breasts and shook them. And then she continued down to pat down the sides of my dress. And then she lifted up my dress and with her bare hands she ran her hands down along the inside of my legs.

---

[1] In response to all of the Plaintiffs' deposition testimony about their searches at the prom, Romero asserts: "The various 'facts' stated herein are supported **only** by the testimony of each Plaintiff regarding that Plaintiff's own search.  After substantial discovery, **no** other evidence supports these claims.  But Defendant does not deny the Plaintiffs testified to those things."  MSJ Reply at 4 (emphasis in original). Rule 56.1(b) of the United States District Court for the District of New Mexico's Local Court Rules provides in part:

> The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact. All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Romero pointing out that "no other" evidence supports the Plaintiffs' descriptions about the extent of the pat-down searches to which they were subjected at the prom -- the underlying conduct on which this lawsuit is based -- does not affect that all four individual Plaintiffs testified about their searches while under oath and does not "specifically controvert[]" their testimony.  D.N.M.LR-Civ. 56.1(b).  The Court therefore deems these facts undisputed.

Deposition of T.H. at 58:20-23, 59:9-14 (taken August 13, 2012), filed November 13, 2012 (Doc. 113-7)("T. H. Depo."). See MSJ Response ¶ 1B, at 3-4 (setting forth this fact); MSJ Reply at 4 (not controverting this fact).  Plaintiff Ashley Hurtado testified about the ASI New Mexico guard's pat-down search:

> She went down the side of my body and then she went with her hands with her palms facing in and went around my breasts and went inside with her thumb to check if I had anything in my cleavage. Went down -- again down my body. Went down both my thighs. My inner included.

Deposition of Ashley Hurtado at 109:23-110:4 (taken July 30, 2012), filed November 13, 2012 (Doc. 113-5)("Hurtado Depo."). See MSJ Response ¶ 1C, at 4 (setting forth this fact); MSJ Reply at 4 (not controverting this fact).  Plaintiff Arianna London also testified about the ASI New Mexico employee's pat-down search:

> So she told me to spread my legs and then she patted my legs down. And then she went all the way up and then she did the other leg and then she lifted my skirt a little bit and she patted my legs even more. And then she patted the front of me, so she did my stomach and my sides and then she did my chest. And then she put her hands underneath the seams of my dress and on the sides and on the back. And then she patted my back side down.

See Deposition of Arianna London 181:22-185:14, 186:14-21 (taken August 24, 2012), filed November 13, 2012 (Doc. 113-6)("London Depo.").  See MSJ Response ¶ 1D, at 4 (setting forth this fact); MSJ Reply at 4 (not controverting this fact).

The governing and policy-making body for the Santa Fe Public School District ("SFPS") is the Board of Education of SFPS ("Board of Education").  N.M.S.A. 1978, § 22-5-4; Second Amended Complaint ¶¶ 17-18, at 5; Motion for Summary Judgment ¶ 3, at 6 (setting forth this fact).[2]  Romero had no authority to make policies within SFPS.  Compare N.M.S.A. 1978, § 22-

---

[2] The Plaintiffs dispute this fact, asserting: "Defendant Melanie Romero maintained

10A-18 (providing powers and duties and duties of school principal), <u>with</u> N.M.S.A. 1978, § 22-5-4 (Providing the powers and duties of a Board of Education); Motion for Summary Judgment ¶ 7, at 7 (setting forth this fact).[3]   Romero maintained authority, however, to set policies and procedures related to Capital High and Capital High events.   <u>See, e.g.</u>, Transcript of the Videotaped Deposition of Bobbie J. Gutierrez, Vol. I at 123:4-9 (taken March 22, 2012), filed November 30, 2012 (Doc. 126-9)("Gutierrez Depo. Vol. I"); Deposition of Melanie Romero at 132:7-24 (taken March 19, 2012), filed November 30, 2012 (Doc. 126-5)("Romero Depo.");

---

authority to set policies and procedures related to Capital High School and Capital High School events." MSJ Response ¶ 3, at 8. Local rule 56.1(b) states:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b). The local rules regarding summary judgment thus require the responding party to "specifically controvert[]" the movant's fact, or else the fact is deemed admitted. D.N.M.LR-Civ. 56.1(b). The Plaintiffs' assertion that Romero maintains authority to set policies and procedures does not specifically controvert that the Board of Education governs and makes policy affecting the SFPS, but may rather be an additional fact: that, in addition to the policies the Board of Education makes, Romero maintains authority over Capital High particularly. Additionally, N.M.S.A. 1978, § 22-5-4 provides: "A local school board shall have the following powers or duties: A. subject to the rules of the department, develop educational policies for the school district . . . ." Thus, the Board of Education, as a matter of law, sets policy related to the SFPS. Nevertheless, because the Plaintiffs' assertion does not "specifically controvert[]" Romero's asserted fact, the Court deems the fact admitted. D.N.M.LR-Civ. 56.1(b).

[3] The Plaintiffs dispute this fact by asserting again that Romero maintained authority to set policies and procedures relating to Capital High and Capital High events. <u>See</u> MSJ Response ¶ 7, at 8. The Plaintiffs' assertion, as the Court concluded in footnote 2, <u>supra</u>, does not "specifically controvert[]" Romero's statement of fact -- that Romero had no authority to make policies within the SFPS -- but perhaps adds that Romero maintained the ability to set policies and procedures for Capital High, which the Court finds as fact in this Memorandum Opinion and Order. The Court therefore deems this fact admitted. <u>See</u> D.N.M.LR-Civ. 56.1(b).

Deposition of Martin "Mark" Archuleta, Vol. I at 122:17-123:6 (taken March 9, 2012)("Archuleta Depo."); MSJ Response ¶ 3, at 8 (setting forth this fact); Individual School Defendant Melanie Romero's Reply to Plaintiffs' Opposition to Defendant Romero's Motion for Summary Judgment Based Upon Qualified Immunity [Doc. 126] at 2, 5, filed December 17, 2012 (Doc. 130)("MSJ Reply")(not controverting this fact).

At the time of the prom, Romero was the Capital High principal.  See Second Amended Complaint ¶ 20, at 6; Motion for Summary Judgment ¶ 4, at 7 (setting forth this fact); MSJ Response ¶ 4, at 8 (not controverting this fact).  The prom was held off Capital High premises at the Santa Fe Convention Center located in Santa Fe.  See Second Amended Complaint ¶ 3, at 2; id. ¶ 27, at 8; Motion for Summary Judgment ¶ 5, at 7 (setting forth this fact); MSJ Response ¶ 5, at 8 (not controverting this fact).  The prom was a school-sponsored event.  See Second Amended Complaint ¶¶ 27-28, at 8; Motion for Summary Judgment ¶ 6, at 7 (setting forth this fact); MSJ Response ¶ 6, at 8 (not controverting this fact).  ASI New Mexico provided school security services generally to SFPS and specifically for the prom based on a publicly bid and awarded contract pursuant to the New Mexico Procurement Code.  See Second Amended Complaint ¶¶ 24-26, at 7; Proposal No. 1, General 2008-09 School Security Services at 11-15 (dated May 1, 2008), filed October 2, 2012 (Doc. 102-3)("ASI New Mexico Proposal"); Motion for Summary Judgment ¶ 8, at 7 (setting forth this fact); MSJ Response ¶ 8, at 8 (not controverting this fact).

At the time of the prom, and for a number of years before the prom, the two high schools in the SFPS, Capital High and Santa Fe High School, had a practice of having guards provided by ASI New Mexico perform pat-down searches of all attendees at proms and similar events, such as homecoming or other dances.  See Romero Depo. at 53:5-54:22, 138:19-139:8, 235:15-

22; Deposition of Cynthia Clarke, Ph.D. at 34:1-16, 37:20-38:5 (taken May 14, 2012), filed

November 13, 2012 (Doc. 113-9)("Clarke Depo."); C. Herrera Depo.at 198:17-199:3, 199:18-

200:9; Affidavit of Candice Herrera ¶ 26, at 5 (dated May 16, 2011), filed November 13, 2012

(Doc. 113-10)("C. Herrera Affidavit"); Archuleta Depo. at 45:6-7, 133:2-16, 134:7-11; Motion

for Summary Judgment ¶ 9, at 7 (setting forth this fact); MSJ Response ¶ 9, at 8 (not

controverting this fact).[4]

---

[4] The Plaintiffs assert that this fact is "[i]mmaterial."  MSJ Response ¶ 9, at 8.  The Plaintiffs also assert that Romero's proposed facts 14, 15, 17, and 25 are "[i]mmaterial."  MSJ Response at 9, 10.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ. 56.1(b).  The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." Lowery v. City of Albuquerque, No. CIV 09-0457 JB/WDS, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  In O'Brien v. Mitchell, 883 F. Supp. 2d 1055 (D.N.M. 2012)(Browning, J.), the Court explained that, because the proper course is to determine relevance of facts in the analysis section, rather than the factual background section, objecting to an asserted fact as immaterial in a summary judgment motion effectively deems the fact undisputed:

> D. Mitchell's argument that the facts underlying the state criminal case are immaterial does not specifically controvert those facts, and the Court will therefore deem those facts admitted. Immateriality is D. Mitchell's most consistent argument regarding the Plaintiffs' undisputed material facts. See Response at 11-12 (asserting that facts 1-6 and 7-9 are immaterial). The Court notes this argument, but will not address it for each fact which D. Mitchell does not dispute but considers immaterial, in the factual section; the Court will, of course, address materiality and relevance in the analysis. See Wilson v. Jara, 866 F.Supp.2d 1270, 1276-79, No. 10-0797, 2011 WL 5822729, at *2 (D.N.M. Oct. 17, 2011)(Browning, J.)("Whether this fact is relevant is a legal argument, and the Court will not address [United States v. Abdendi 361 F.3d 1282 (10th Cir. 2004)] at this time, but will consider it in its legal analysis."); Ruiz v. City of Brush, No. 05-897, 2006 WL 1816454, at *4 (D. Colo. June 30, 2006) ("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute[;] [l]egal argument should be reserved for separate portions of the brief.'").

Both SFPS administration and ASI New Mexico supervisory employees believe that the searches at such school events, in general, and at the prom, in particular, were reasonably required to exclude drugs, alcohol, weapons, and tobacco from the prom and to dissuade attendees from taking such things to the prom.  See Archuleta Depo. at 115:18-116:19, 126:14-127:8, 112:3-23, 130:11-15, 131:2-132:3; Romero Depo. at 101:10 - 102:5, 102:18 - 104:7, 105:3-106: 6; Affidavit of Melanie Romero ¶ 4, at 2 (dated November 12, 2012), filed November 13, 2012 (Doc. 113-14)("Romero Affidavit"); Motion for Summary Judgment ¶ 10, at 8 (setting forth this fact).[5]   Romero and ASI New Mexico supervising employee Rebecca Reyes acknowledge that the search protocols do not prevent students from bringing prohibited items into proms.  See Romero Depo. at 102:19-104:1; Deposition of Rebecca Reyes at 97:10-24

---

O'Brien v. Mitchell, 883 F. Supp. 2d at 1058 n.1.  The Court thus deems these facts admitted and will determine their relevance in the analysis section.

[5] The Plaintiffs assert in response to Romero's asserted facts 10 and 11 that "Defendant Romero and ASI Supervisory employee Rebecca Reyes acknowledge that the search protocols are not effective in preventing students from bringing prohibited items into proms."  MSJ Reply ¶ 10, at 8.  According to Romero, this assertion is "not responsive to the stated facts."  MSJ Reply at 2.  The local rule requires the non-movant to specifically controvert a fact for the Court to deem the fact in dispute.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Romero is not asserting in her proposed fact that the pat downs were one-hundred percent effective, that SFPS administrators or ASI supervisory employees believed the pat downs to be one-hundred percent effective, or that these people do not acknowledge that drugs and alcohol have made it past the pat downs at these events.  Rather, Romero is asserting only that SFPS administrators or ASI supervisory employees believed the searches were reasonably required to exclude prohibited substances and that Romero's belief is reasonable, stemming from previous incidents involving students bringing prohibited items to events.  See Motion for Summary Judgment ¶¶ 10-11, at 8.  These facts and beliefs are not specifically controverted by Romero's admission that she knows, "at least three, four times" in the past, that drugs or alcohol had gotten into the events, Romero Depo. at 103:3, or by Reyes' admission that she heard from other ASI employees that young attendees in the past bragged about smuggling in contraband by taping it to the inside of their upper legs, see Reyes Depo. at 97:15-24.  The Court thus deems Romero's proposed facts 10 and 11 admitted.

(taken May 8, 2012), filed November 30, 2012 (Doc. 126-6)("Reyes Depo."); MSJ Response ¶¶ 10 & 11, at 8 (setting forth this fact); MSJ Reply at 2.  Romero and others believed it was reasonable and necessary to perform pat-down and possession searches of the prom attendees, because there is a history of students and event attendees hiding banned items to take those items into events.  See Romero Depo. at 101:0-104:1, 168:18-169:8; Archuleta Depo. at 112:3-23, 113:7-25, 115:14-116:19, 117:9-19; Clarke Depo. at 33:5-25, 68:13-69:24; 80:9-20; 106:17-108:16; Romero Affidavit ¶ 3, at 1; Motion for Summary Judgment ¶ 11, at 8 (setting forth this fact).

C. Herrera underwent pat-down searches by ASI New Mexico guards at the 2010 Capital High prom and homecoming dances and, therefore, she knew she would be subject to a pat-down search when she arrived at the prom.  See C. Herrera Depo. at 198:17-200:9, 201:4-202:15, 203:11-204:24; Motion for Summary Judgment ¶ 12, at 8 (setting forth this fact).[6]  C. Herrera's

---

[6] Romero proposes the following as undisputed fact:

Plaintiff Candice Herrera, contrary to her sworn testimony at the TRO hearing and her affidavit submitted to the Court, admitted in her deposition that she underwent pat-down searches by ASI guards at prior CHS proms and homecoming dances and, therefore, she was aware of the practice when she arrived at the Prom.

Motion for Summary Judgment ¶ 12, at 8.  The Plaintiffs dispute this fact: "Plaintiff Herrera did not anticipate the types of searches performed at the 2011 Capital High School Prom."  MSJ Response ¶ 12, at 9.  To support their assertion, the Plaintiffs refer the Court to C. Herrera's Depo., in which she responds to the question why she did not think that she would be subjected to a search at the prom by stating: "Well, I didn't know it was going to be such an intrusive search."  C. Herrera Depo. 198:22-199:1.  C. Herrera's statement does not controvert that she was aware of ASI New Mexico and Capital High's practice of subjecting individuals to pat-down searches when entering dances, but it specifically controverts that "she was aware of the practice," to the extent that statement leads to the inference that she was aware of the extensive pat-down search to which she was subjected at the 2011 prom.  The Court therefore concludes an accurate, and undisputed, fact is that she knew she would be subjected to a pat-down search when she arrived at the prom.

sister, T.H., attended homecoming dances in 2010 and 2011 with C. Herrera before the prom. See T.H. Depo. at 128:8-129:8; Motion for Summary Judgment ¶ 14, at 9 (setting forth this fact); MSJ Response ¶ 14, at 9 (not controverting this fact).  There were pat-down searches at the 2010 and 2011 Capital High homecoming dances, which both C. Herrera and T.H. attended.   C. Herrera Depo. at 202:5-8, 203:11-22; Motion for Summary Judgment ¶ 15, at 9 (setting forth this fact); MSJ Response ¶ 15, at 9 (not controverting this fact).  In addition, pat-down searches were conducted at the 2010 Capital High prom, which C. Herrera attended.   See C. Herrera Depo. 198:17-20; Motion for Summary Judgment ¶ 15, at 9 (setting forth this fact); MSJ Response ¶ 15, at 9 (not controverting this fact).  Hurtado underwent a pat-down search without groping at the 2009 Capital High prom and did not have a problem with the basic pat-down searches.  See Hurtado Depo at 153:23-154:12; Motion for Summary Judgment ¶ 16, at 9 (setting forth this fact).[7] Plaintiff Arianna London underwent pat-down searches at Rio Grande High School, in Albuquerque, New Mexico, as well as at certain concert venues, without objection.  See London Depo at 181:22-185:14, 186:14-21; Motion for Summary Judgment ¶ 17, at 9 (setting forth this fact); MSJ Response ¶ 17, at 9 (not controverting this fact).

Consistent with past Capital High practice, Romero asked the ASI New Mexico personnel providing security services at the prom to perform pat-down searches on attendees entering the Santa Fe Convention Center.  See Romero Depo. at 130:16-132:20, 137:18-139:24; Deposition of Daniel Aguilar 237:3-21 (taken March 8, 2012), filed November 13, 2012 (Doc.

---

[7] Romero's asserted fact states that Hurtado underwent a pat-down search at the 2010 prom, but when the Plaintiffs disputed the fact, and pointed out that Hurtado testified that it was 2009 prom, Romero conceded that it was the 2009 prom.  See MSJ Response ¶ 16, at 9; MSJ Reply at 3.

113-12)("Aguilar Depo."); Romero Affidavit ¶¶ 3, 4, at 1, 2; Motion for Summary Judgment ¶ 18, at 9 (setting forth this fact); MSJ Response ¶ 18, at 9 (not controverting this fact). Romero did not pat down or physically assist in patting down the Plaintiffs at the prom. Female ASI New Mexico employees performed the pat-down searches on female attendees at the prom after the attendees entered the Santa Fe Convention Center. See Second Amended Complaint, ¶¶ 42, 43, 56, 61, 62, 65, 66 and 67, at 10, 12-13; C. Herrera Depo. at 114:16-115:4; T. Herrera Depo. at 58:16-23; Hurtado Depo. at 115:23-116:9; London Depo. at 118:11-13, 119:18-21; Romero Affidavit ¶ 12, at 3; Motion for Summary Judgment ¶ 19, at 9-10 (setting forth this fact); MSJ Response ¶ 19, at 9 (not controverting this fact).[8] Romero participated in the searches of students' bags and purses. See Romero Depo. at 151:3-11; C. Herrera Depo. at 148:6-19; MSJ Response ¶ 6, at 5 (setting forth this fact); MSJ Reply at 4 (not controverting this fact). ASI New Mexico, an independent contractor, employed the ASI New Mexico guards at the prom, and ASI New Mexico's chain of command supervised these guards. See Second Amended Complaint ¶ 26, at 7; ASI New Mexico Proposal at 11-15; Motion for Summary Judgment ¶ 20, at 10 (setting forth this fact); MSJ Response ¶ 20 (not controverting this fact).[9] Romero had the responsibility

---

[8] The Plaintiffs dispute Romero's proposed fact number 19 "to the extent that Defendant Romero's acquiescence in the pat downs constituted assisting the carrying out of the pat downs." MSJ Response ¶ 19, 9. Romero responds: "Since, as will be shown, Principal Romero had no knowledge of searches with groping, she could not have acquiesced." MSJ Reply 3. The Plaintiffs do not refer the Court with particularity to the record in support of their attempt to controvert the fact, nor do they specifically controvert the fact by clarifying that they dispute Romero's acquiescence of the pat-down searches. The Court, nevertheless, concludes that the portions of the record to which Romero cites in support of her proposed fact better reflect finding that she did not physically participate in or pat down any of the prom attendees.

[9] Romero's proposed fact number 20 states: "ASI Guards were employees of independent contractor ASI and were supervised through the chain of command of ASI, not by Principal Romero." Motion for Summary Judgment ¶ 20, at 10. The Plaintiffs assert: "Defendant Romero had the responsibility to ensure that search protocols were followed by both school officials and

ASI employees; Defendant Romero instructed ASI officials to conduct pat downs, wanding, and possessions searches; and Defendant Romero had the power to stop searches of students by ASI Employees." MSJ Response ¶ 20, at 9. See also MSJ Response ¶ 10, at 5 ("Defendant Romero acknowledges that she had the responsibility to ensure that the search protocols were followed at the 2011 Capital High School Prom by both school officials and ASI employees."). The Defendants respond:

> It is not disputed that Melanie Romero said words to this effect in her deposition. However, there is no evidence regarding her meaning of "protocols" (since the dictionary definitions do not seem to apply in these circumstances) and certainly no evidence that "protocols" included specifying the techniques ASI guards would use during a pat down. In fact, Melanie Romero testified that she had never given ASI representatives any direction on how to conduct a pat-down search.

MSJ Reply at 5 (citing Romero Depo. at 98:13-16).

To support their assertion that Romero had the responsibility to ensure certain protocols were followed, and that she instructed ASI employees about the pat downs, the Plaintiffs cite to portions of Romero's deposition testimony, in which she testifies that she discussed with an ASI New Mexico supervisor that she wanted searches to occur, wanted pat downs and wanding at those searches, and that she and her assistant principals "had responsibility to ensure that the protocols" were being followed by ASI New Mexico employees conducting those searches at the prom. Romero Depo. at 132:7-24, 139:9-24. The ASI New Mexico Proposal, however, states that the ASI "Site Supervisor is the main point of contact for" and supervises the "S[ecurity] O[fficer]s," and that the site supervisor works with the Santa Fe School Board technical representative to coordinate the security officers' supervision plan and objectives. ASI New Mexico Proposal at 11, 18. Thus, to the extent that Romero asserts that ASI employed the ASI employees directly and that ASI's chain of command was formally tasked with supervising them, that fact is undisputed. Romero's deposition testimony supports, however, that she supervised the security officers' conduct, and could influence their supervisor if she or the other assistant principals saw that the officers were not carrying out the protocol given them through the chain of command. The Court thus concludes that Romero had the responsibility to ensure ASI New Mexico guards followed specific protocols, and that there is a genuine issue of fact whether Romero supervised -- at least realistically, if not formally -- the ASI New Mexico guards at the prom.

Romero also proposes as fact that she "did not specify how ASI New Mexico personnel were to conduct pat-down searches, but left it to ASI's expertise." Motion for Summary Judgment ¶ 21, at 10 (citing Romero Affidavit ¶¶ 3, 5, 6, 7, 8 and 10, at 1-3). The Plaintiffs assert that "Romero instructed ASI officials to conduct pat downs, wanding, and possessions searches." MSJ Response ¶ 21, at 10 (citing Romero Depo. at 132:7-24). In her deposition testimony, when asked if she "had instructed Mr. Archuleta that [she] did . . . want wanding, pat-downs, and searches of students' possessions," Romero responded: "Yes." Romero Depo at 132:17-20. Romero's proposed fact -- that she did not specify how ASI would conduct their pat-down searches -- is not "specifically controverted" by Romero instructing Archuleta, who

- 12 -

to ensure that both school officials and ASI New Mexico guards at the prom followed search "protocols." Romero Depo. at 139:9-24. <u>See</u> MSJ Response ¶ 10, at 5 (setting forth this fact); MSJ Reply at 5 (not controverting this fact). Romero instructed Mark Archuleta, an ASI New Mexico supervisor, that she wanted pat-down searches conducted at the prom, but did not specify, nor did she give any direction, how the pat-down searches would be conducted. <u>See</u> Romero Depo. at 132:7-24; Romero Affidavit ¶¶ 3, 5, 6, 7, 8 and 10, at 1-3; Motion for Summary Judgment ¶ 21, at 10 (setting forth this fact); MSJ Response ¶ 21, at 10 (not controverting this fact).

The pat-down searches of the Plaintiffs were performed "in public view in the lobby of the Santa Fe Convention Center." Complaint ¶¶ 54, 59, 64 and 69, at 11, 12, 13, and 14. <u>See</u> Motion for Summary Judgment ¶ 22, at 10 (setting forth this fact); MSJ Response ¶ 22, at 10 (not controverting this fact). ASI New Mexico employees Rebecca Reyes and Sandra Vigil conducted pat-down searches of female students at the 2011 Capital High prom. <u>See</u> Reyes Depo. at 85:19-21; Deposition of Sandra Vigil at 46:21-47:2 (taken July 24, 2012), filed November 30, 2012 (Doc. 126-12); MSJ Response ¶ 18, at 6 (setting forth this fact); MSJ Reply at 6 (not controverting this fact). The pat-down searches of the Plaintiffs were performed within a few feet of at least four SFPS employees, including Romero. <u>See</u> Complaint, ¶¶ 7 and 44, at 3 and 10; Motion for Summary Judgment ¶ 23, at 10 (setting forth this fact); MSJ Response ¶ 23,

---

coordinated ASI's security procedures at the prom, that she wanted pat downs, wanding, and possession searches for the students. D.N.M.LR-Civ. 56.1(b). She did not specify how the ASI New Mexico guards were to conduct the pat-down searches. Nevertheless, she told ASI employees to conduct pat-down searches. The Court thus disagrees with Romero's contention that the "Plaintiffs' response to No. 21 is not responsive to the stated fact," MSJ Reply at 3, and concludes as fact that Romero instructed Archuleta that she wanted pat-down searches conducted at the prom, but did not specify how the pat-down searches would be conducted.

at 10 (not controverting this fact).  At least eighteen SFPS employees were present at the prom.

See Electronic Mail Transmission from Melanie Romero to Bobbie Gutierrez at 1 (dated May

23, 2011), filed November 30, 2011 (Doc. 126-11); Romero Depo. at 140:10-20 (identifying the

e-mail to Gutierrez); MSJ Response ¶ 23, at 10 (setting forth this fact); MSJ Reply at 3 (not

controverting this fact).  Romero observed the pat-down searches of some of the female students

entering the prom.  See Romero Depo. at 161:16-23; MSJ Response ¶ 3, at 4 (setting forth this

fact); MSJ Reply at 4 (not controverting this fact).  Romero did not see any search that included

touching the attendees' breasts or pulling their bras.  See Romero Depo. at 236:16-238:6,

238:20-240:22, 244:10-16; Clarke Depo. at 74:25-75:25; Deposition of Susan Lujan at 112:9-16

(taken April 20, 2012), filed November 13, 2012 (Doc. 113-13)("Lujan Depo."); Lucero Depo. at

148:6-149:1; 54:7-10; 60:15-25; Romero Affidavit ¶ 13, at 3; Motion for Summary Judgment ¶

24, at 10 (setting forth this fact).[10]  Romero did not have any individualized suspicion of any

---

[10] Romero proposes the following as her proposed fact number 24: "Melanie Romero and other SFPS employees in the proximity of the pat-down searches did not see any search that included touching breasts or bare legs or pulling the bra of attendees."  Motion for Summery Judgment ¶ 24, at 10.  The Plaintiffs dispute Romero's proposed fact, asserting: "Defendant Romero observed the searches of Plaintiffs Candice Herrera and Arianna London and School employee Rose Lucero describes seeing the ASI guards have female students' [sic] pull and shake their bras."  MSJ Response ¶ 24, at 10.  To support this assertion, the Plaintiffs cite to C. Herrera's, London's, and Lucero's deposition testimony.

London testified that, while the ASI security officer patted her down, she "was looking at Romero" and that Romero was "[g]oing through my purse."  London at 129:23-130:4.  London does not testify that Romero ever looked at her or was watching her pat-down search, and when asked whether she ever made "eye contact with Melanie [Romero]," London responded: "No."  London Depo. at 133:15-18.  These portions of the evidentiary record do not specifically controvert that Romero did not see any "search that included touching" breasts, bare legs, or pulling bras.  Motion for Summary Judgment ¶ 24, at 10.  Indeed, the record does not support that Romero saw London's pat-down search at all.

C. Herrera's deposition testimony supports that Romero saw C. Herrera's pat-down search, at least to an extent:

---

Q.    Okay. And so you said you -- she had you spread your arms and legs. She patted you down. She then touched your breasts. And then is that when she picked up your dress?

A.    Yes.

Q.    And brought it up to mid-thigh where you indicated earlier?

A.    Yes, sir.

Q.    And at that point you do what?

A.    At that point I went to push my hands down to like push the dress back down because I felt really uncomfortable.  And she looked at me and she told me, "You need to move your hands.  I need to finish this."  And so I said, "Okay."  And I put my hands up.  And I didn't know what to do. And that's when I looked up at Ms. Romero and she just looked at me and smiled.

Q.    And how long was your dress lifted up to the place that you indicated on your thigh?

A.    As long as it took for her to pat all the way down to my ankle and up a little higher than where the dress was.  She touched higher than where -- like the bottom of the dress was here and she touched up higher.  And then afterwards she let my dress back down.

C. Herrera Depo. at 130:12-131:10.  C. Herrera then goes on to demonstrate how the ASI New Mexico officer lifted her dress and patted down her legs.  C. Herrera's testimony thus does not specifically contradict that Romero did not see any "search that included touching breasts . . . or pulling bras," Motion for Summary Judgment ¶ 24, at 10, but, because C. Herrera testified that her dress was up for as long as it took the officer to pat down her legs and thighs, and because C. Herrera testified that while her dress was up she made eye contact with Romero, it specifically contradicts that Romero did not see any search that included touching bare legs.  Notably, Romero conceded as much at the hearing on her Motion for Summary Judgment.  See Transcript of Hearing at 7:1-3 (taken December 20, 2012)(Coppler)("Tr.")("Candice can say that Melanie Romero saw the guard lift up Candice's dress, because Candice said she looked over at me and smiled at me and turned back around.")(The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version; any final transcript may contain slightly different page and/or line numbers).  The Court, therefore, concludes that there is a genuine dispute as to the fact that Romero witnessed a search that included an ASI New Mexico officer touching bare leg.

Lucero, a Santa Fe Public School employee, testified that she "saw" the ASI New Mexico security officers performing the pat-down searches require "all the students" entering the prom

student entering the Prom.  See Romero Depo. at 168:23-170:21; MSJ Response ¶ 25, at 7 (setting forth this fact); MSJ Reply at 6 (not controverting this fact).

ASI New Mexico had a contract with the SFPS to provide security services for schools in the Santa Fe Public School District.  ASI New Mexico was hired based in part upon its experience and training in security services, including how a standard school-appropriate pat down should be conducted.  See Romero Affidavit ¶ 6, at 2; Motion for Summary Judgment ¶ 25, at 10 (setting forth this fact); MSJ Response ¶ 25, at 10 (not controverting this fact).  There is no evidence that Romero should have expected at any time before the prom that ASI New Mexico personnel performing pat-down searches at the prom would touch the breasts or bare legs, or pull female attendees' bras, as the searches at earlier Capital High dances and similar off-campus events did not involve touching the breasts or bare legs, or pulling bras.  See Romero Depo. at 218:9-20, 221:20-222:20; C. Herrera Depo. 198:17-200:9, 201:4-202:15, 203:11-204:24; Hurtado Depo. at 153:23-154:12; Motion for Summary Judgment ¶ 26, at 11 (setting

---

"snap the bra."  Lucero Depo. at 59:3-9.  She described what she refers to as snapping the bra: "[Y]ou just pull your bra strap just a little bit.  It's not where you're going to hear the snap . . . you're just asking the girls just to pull it and shake it . . . ."  Lucero Depo. at 114:11-16.  Romero contends that "[t]he statement regarding Rose Lucero 'seeing ASI guards have female students' pull and shake their [own] bras' is not relevant, because none of the Plaintiffs' claims or allegations involve attendees being asked to pull their own bras.  Notwithstanding that Romero's proposed fact includes that Santa Fe Public School employees did not observe bra-pulling, as the Court notes in footnote 4, supra: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."  Lowery v. City of Albuquerque, 2011 WL 1336670, at *4 n.8.   Nevertheless, Lucero's testimony specifically controverts Romero's assertion that "other SFPS employees in the proximity of the pat downs did not see any search that included . . . pulling the bra of attendees."  Motion for Summary Judgment ¶ 24, at 10.  The evidence rather shows that Lucero saw ASI New Mexico security officers requiring the female attendees to pull their bras during the pat-down searches.  The Court therefore excludes from Romero's fact her inclusion of the Santa Fe Public School employees.

forth this fact); MSJ Response ¶ 26, at 10 (not controverting this fact).[11]  Romero did not observe ASI New Mexico personnel touching the Plaintiffs' or any other female attendees' breasts or pulling their bras, while performing pat-down searches at the prom, and did not observe ASI New Mexico personnel touching London's, Hurtado's, or T.H.'s bare legs.  See Romero Depo. 236:16-20; 237:7-21; 239:16-23; 240:6-22; 244:10-23; Romero Affidavit ¶ 13.[12]  Romero acknowledges that she had the power to stop the pat-down searches, as she testified that, if she had seen an ASI New Mexico security guard place her hands on a student's breasts and shake them, or grab a student's bra, she "would have immediately stopped it."  Romero Depo. at 236:21-240:5; Romero Affidavit ¶ 14, at 3; Motion for Summary Judgment ¶ 32, at 12 (setting forth this fact); MSJ Response ¶ 15, at 6 (setting forth the same fact).

No one attending the prom, including the Plaintiffs, informed Romero that ASI New Mexico personnel performing pat-down searches at the prom touched any prom attendees' breasts or bare legs, or pulled any attendees' bras, until several days after the prom, when nothing could be done to stop any such behavior.  See Romero Affidavit ¶¶ 13 and 14, at 3; T.

---

[11] The Plaintiffs dispute this fact, asserting: "Defendant Romero observed the searches of Plaintiffs Candice Herrera and Arianna London."  MSJ Response ¶ 26, at 10.  Asserting that Romero observed the searches at the Prom in 2011 does not controvert that she should have "expected" -- beforehand -- the extent of the pat-down searches.  Motion for Summary Judgment ¶ 26, at 11.  The Court thus deems this fact undisputed.

[12] Romero's proposed fact No. 27 states: "Principal Romero did not observe ASI personnel touching the breasts or bare legs or pulling the bras of Plaintiffs or any other female attendees while performing pat-down searches at the Prom."  Motion for Summary Judgment ¶ 27, at 11.  As the Court determined in footnote 10, supra, given C. Herrera's testimony about the ASI New Mexico officer patting down her leg the duration that her dress was lifted, and that during that time Romero made eye contact with C. Herrera, smiling, there is a genuine issue of material fact whether Romero observed the officer touching C. Herrera's bare leg during the pat-down search.  The Court also finds, however, that there is no evidence in the record supporting that Romero observed the pat-down searches of any of the other three Plaintiffs.  The Court has therefore modified Romero's proposed fact to reflect its determination.

Herrera Depo. at 75:17-76:15; Hurtado Depo. at 134:3-10, 135:9-24; London Depo. at 135:13-24, 139:15-140:10; C. Herrera Depo. at 183:20-184:22; Motion for Summary Judgment ¶ 28, at 11 (setting forth this fact); MSJ Response ¶ 28, at 10 (not controverting this fact).[13]   Vince Herrera, C. Herrera's and T. H.'s father, left a telephone message for Romero on April 19, 2011, three days after the prom, informing her about an alleged problem at the prom.  See Romero Depo. at 188:2-25, 241:19-242:2; Deposition of Vincent Herrera at 114:1-15 (taken July 12, 2012), filed November 30, 2012 (Doc. 126-14)("V. Herrera Depo.").   Twelve days after the prom, on April 28, 2011, Romero learned that C. Herrera was alleging that a female, ASI New Mexico-employed security guard grabbed her breasts and stroked her bare legs.  See Romero Depo. at 190:4-193:3; Motion for Summary Judgment ¶ 29, at 11-12 (setting forth this fact).[14]

---

[13] The Plaintiffs dispute this fact, asserting: "Defendant Romero observed the searches of Plaintiffs Candice Herrera and Arianna London."   MSJ Response ¶ 28, at 10.   Regardless whether Romero observed any pat-down searches at the prom, her observations do not "specifically controvert[]" that no attendee told her about the alleged unconstitutional extent of the pat-down searches.   D.N.M.LR-Civ. 56.1(b).   The Court therefore deems this fact undisputed.

[14] Romero's proposed fact number 29 states:

In fact, Principal Romero was first informed of an alleged problem at the Prom on April 19, 2011, three days after Prom, when Candice and Tiffany's father, Vince Herrera, left a phone message for Melanie Romero. . . .   It was not until April 28, 2011, twelve days after the Prom, that Ms. Romero learned that Candice Herrera claimed that her breasts were grabbed and her bare legs stroked by a female, ASI-employed security guard at the Prom.

MSJ Response ¶ 29, at 11-12.   The Plaintiffs dispute this fact, asserting: "Defendant Romero observed the search of Plaintiff Candice Herrera and Vincent Herrera objected to the nature of the search three days after the prom."   MSJ Response ¶ 29, at 10.   That V. Herrera objected to the search thus is not in dispute.   Moreover, the testimony is undisputed that she learned of C. Herrera's allegations twelve days later, and that the first instance in which Romero was informed -- at least by an outside source other than her own observation -- was V. Herrera's call three days later.   In light of the Court's finding that there is a genuine dispute whether Romero saw the ASI officer touch C. Herrera's leg while her dress was lifted in footnote 10, supra, however, the Court

Hurtado and London never informed Romero of alleged problems with the searches at the prom until they sued her on November 16, 2011, with the filing of the First Amended Complaint. See Doc. 64; Hurtado Depo. at 134:3-10, 135:9-24; London Depo. at 135:13-24, 139:15-140:10; Motion for Summary Judgment ¶ 30, at 12 (setting forth this fact); MSJ Response ¶ 30, at 11 (not controverting this fact).[15]   During the time that Romero was a Capital High co-principal or principal, she was not aware that anyone had complained of being inappropriately touched during a pat-down search conducted at Capital High or at any off-campus, Capital High-sponsored event before she learned of C. Herrera's allegations. See Romero Depo. at 218:9-20, 240:23-242:2; Motion for Summary Judgment ¶ 31, at 12 (setting forth this fact); MSJ Response ¶ 31, at 11 (not disputing this fact).[16]

---

has changed slightly the language of Romero's proposed fact to better reflect what facts are not in dispute.

[15] The Plaintiffs assert:

The original complaint described that multiple female students were subjected to intrusive searches (Doc. No. 1) and the Court's Amended Order on Plaintiffs' Motion for Temporary Restraining Order, entered May 20, 2011, stated that any pat-down, which Ms. Romero acknowledges was done to every student, including Ms. Hurtado and Ms. London, would likely be found to violate the Fourth Amendment (Doc. No. 32 at 11.) [sic]

MSJ Response ¶ 30, at 11.  That the original complaint described that multiple students were subjected the searches, and that Romero acknowledges the searches were done to each student, does not specifically controvert that Hurtado and London, specifically, did not inform Romero about their alleged problems with the search until the First Amended Complaint.  The Court therefore deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b).

[16] Romero's proposed fact number 32 states: "Had Principal Romero seen or been told of ASI guards touching breasts and bare legs or pulling bras on the night of the Prom, she would have stopped the searches."  Motion for Summary Judgment ¶ 32, at 12 (citing Romero Depo. at 236:16-238:6, 238:20-240:5; Romero Affidavit ¶ 14, at 3).  The Plaintiffs dispute this fact, asserting that "Romero observed the searches of Plaintiffs Candice Herrera and Arianna London, yet did not stop them."  MSJ Response ¶ 32, at 11.  Given that the Court finds in footnote 10,

## PROCEDURAL BACKGROUND

On May 17, 2011, C. Herrera and T. H. filed their Complaint, asking for, among the requested relief, a declaratory judgment finding that the Defendants violated their civil rights and for a preliminary and permanent injunction:

> [P]rohibiting all Defendants, except Santa Fe Public Schools and Santa Fe Public Schools Board of Education, from engaging in such conduct and directing [the same] Defendants . . . to take all affirmative steps necessary to remedy the effects of the illegal conduct described herein and to prevent similar occurrences in the future.

Complaint at 28, filed May 17, 2011 (Doc. 1).  On that same day, C. Herrera filed Plaintiff Candice Herrera's Motion for Temporary Restraining Order (Doc. 2)("TRO Motion"), asking the Court to temporarily restrain "Defendants Bobbie Gutierrez, Principal Melanie Romero, Principal Robert Stephens, and the individual members of the Santa Fe Public Schools Board of Education to refrain from conducting searches at the 2011 Santa Fe High School Prom or the 2011 Capital High School Graduation."  TRO Motion at 1.  On May 19, 2011, the Court held a hearing on the TRO Motion.  On May 20, 2011, the Court issued a Memorandum Opinion and Order granting in part and denying in part the TRO Motion.  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174 (D.N.M. 2011)(Browning, J.)("TRO Opinion").  The Court concluded that the pat-down searches to which C. Herrera and T.H. were allegedly subjected before entering the Capital High prom were likely unconstitutional, and that the factors weighed in favor of granting C. Herrera's request for a temporary restraining order.  See 792 F. Supp. 2d at 1178.  The Court thus ordered Capital High and Santa Fe High to cease suspicionless pat-down searches, as the

_____

supra, that there is a genuine dispute whether Romero saw the ASI guard touching C. Herrera's bare leg, and given that the Plaintiffs cite to the particular portion of C. Herrera's statement on which the Court relied to find this dispute, the Court cannot accept this proposed fact as undisputed.  The Court thus finds that this fact is in dispute.

- 20 -

schools had done them in the past, at their dances and precluding them from performing the

searches at the schools' graduation ceremonies, but allowing less invasive visual searches and

searches with a magnetic wand, and also ordering ASI New Mexico guards to undergo

instruction from Transportation Safety Administration officials on performing searches:

> The Court orders Defendant Santa Fe Public Schools ("SFPS") to send students who may attend the 2011 Santa Fe High School prom a notice stating that they may be subject to a search, describing what the search may be, and informing the students what items they may not bring into the prom and that those items may be confiscated. The Court also orders SFPS to send students who may attend the 2011 Capital High School Graduation a notice stating that they may be subject to a search, describing what the search may be, and informing the students what items they may not bring into the graduation and that those items may be confiscated. The Court directs the Defendants to refrain from conducting pat-down searches of every student as a first approach. The security officers must conduct graduated searches. The security officers may conduct a visual inspection, order students to unzip or to remove their graduation gowns to show their clothes, order students to spread their legs, and screen students with a magnetometric wand. The officers may, as part of the visual observation, ask the students to remove jackets and shoes. If the security officers detect something on a student's person with a wand, they must first ask the student to remove the object. If they have reasonable grounds, based on personal observation or other sources, for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school, the security officers may conduct a pat-down search of the student. The officers or agents should use a graduated approach to the pat-down searches similar to that TSA uses and, where appropriate, with open hand out. The security officers may look in the students' possessions, but they may not dump out the students' possessions on a public table. The officer may remove objects in an orderly way, at a table removed from the public view, but not from the student's vision, to see all contents. The officers may inspect telephones and cameras, and ask students to open them if necessary. The officers may confiscate alcohol, drugs, weapons, and other items that SFPS has notified the students may be confiscated, at least for some items, for the duration of the event; the officer may not, at the prom, confiscate hand lotion, and, at both events, the quantity of prescription medication that the student can show he or she needs to take during the event. The Court orders the SFPS to require Defendant ASI New Mexico, LLC ("ASI") to provide at least one Transportation Security Administration ("TSA") certified person at the 2011 Santa Fe High School and at the 2011 Capital High School Graduation prom to supervise the searches. The Court also orders SFPS to require ASI to train its employees working these events about TSA procedures. The Plaintiffs may have a third-party observer selected by the Plaintiffs at both events to

observe the searches conducted at the events to ensure compliance with the Court's order. The observer will be a witness only, however, and shall not interfere with the school's compliance with the order. The Court anticipates the School's good-faith compliance with its order.

Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1200-01.

The Plaintiffs filed their Second Amended Complaint on September 18, 2012. See Doc. 100. Like the two previous versions, the Second Amended Complaint includes a claim against Romero in her individual capacity. Count I alleges a claim under 42 U.S.C. § 1983 for violation of the Plaintiffs' Fourth Amendment rights to "be secure in their persons and effects against unreasonable searches and seizures." Second Amended Complaint ¶ 135, at 24. On October 24, 2012, Romero and the other School Defendants moved to dismiss the remaining counts -- II through V -- of the Second Amended Complaint. See School Defendants' Motion for Summary Judgment on Counts II, III, IV, and V of the Second Amended Complaint [Doc. 100] under the Tort Claims Act and Memorandum in Support (Doc. 108). On November 9, 2012, the Plaintiffs' counsel informed Defendants SFPS Board of Education, Barbara Gudwin, Glenn Winkle, Linda Trujillo, Frank Montano, and Steven J. Carillo, in their official capacity as SFPS Board of Education members, Bobbie J. Gutierrez, in her official capacity as SFPS Superintendent, Romero, in her official capacity as Capital High Principal, and Leslie Kilmer, in her official capacity as Santa Fe High School Principal (collectively "School Defendants") that the Plaintiffs would concede the motion and file a rule 41 dismissal of Counts II-V of the Second Amended Complaint against all School Defendants, which the Plaintiffs filed on November 13, 2012. See Plaintiffs' Unopposed Motion to Voluntarily Dismiss Counts II-V Against the Schools [sic] Defendants (Doc. 114). On November 15, 2012, the Court entered an Order granting the Plaintiffs' motion, and dismissing Counts II, III, IV, and V against Defendants SFPS Board of

Education; Barbara Gudwin, Glenn Wikle, Linda Trujillo, Frank Montano, and Steven J. Carrillo, in their official capacities as members of the SFPS Board of Education; Bobbie J. Gutierrez, in her official capacity as Superintendent of SFPS; Melanie Romero, in her official capacity as Principal of Capital High School; and Leslie Kilmer, in her official capacity as Principal of Santa Fe High School; and dismissing as moot the School Defendants' Motion for Summary Judgment on Counts II, III, IV, and V of the Second Amended Complaint [Doc. 100] under the Tort Claims Act and Memorandum in Support.  See Order at 1 (Doc. 118).

Romero filed her Motion for Summary Judgment on November 13, 2012, moving the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, to enter judgment in her favor on Count I based upon qualified immunity.  See Motion for Summary Judgment at 1.  Romero asserts that "the facts adduced in discovery are very different than those based almost solely upon Plaintiff Candice Herrera's unopposed testimony at the TRO hearing."  Motion for Summary Judgment at 13.  Romero argues that she is entitled to qualified immunity, because it was not clearly established in the United States Court of Appeals for the Tenth Circuit on April 16, 2011, "that requesting ASI New Mexico to perform a limited, school appropriate pat-down and possession search (that does not include groping or inappropriate touching) of all attendees to an off-campus high school prom, for the protection and safety of the attendees and the public, violated the Fourth Amendment."  Motion for Summary Judgment at 14.  Regarding her conduct, Romero notes that she asked ASI New Mexico to have its employees perform pat-down searches of the prom attendees, because

> [h]er experience as an administrator in SFPS high schools, and the experiences, which she had heard from other SFPS employees and ASI supervisors and employees, led her to reasonably believe that standard pat-down searches were reasonably necessary at the Prom to exclude contraband from the event and to dissuade attendees from bringing contraband to the event.

Motion for Summary Judgment at 15.  According to Romero, SFPS principals "have shared that belief back to at least 2004."  Motion for Summary Judgment at 15.  She asserts that "[t]here is no evidence suggesting that Principal Romero knew the request violated the attendees' rights or that she had any intent to violate anyone's constitutional rights," and that "[s]he was just trying to protect her students from themselves at an event well-known to be characterized by attendees making bad decisions before, during and after such events."  Motion for Summary Judgment at 15.

> In relation to these facts, Romero argues:
>
> The issue for the "clearly established" prong of the qualified immunity test is whether it was clearly established on April 16, 2011 that a limited, school-appropriate, pat-down and possession search of all attendees to an off-campus high school prom, pursued for the protection and safety of the attendees, violated the attendees' constitutional rights.

Motion for Summary Judgment at 15-16 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Romero approaches the question by examining the authorities that the Court cited in its TRO Opinion, granting the Plaintiffs' request for a temporary restraining order: Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1174.  See Motion for Summary Judgment at 16.  Addressing those authorities, Romero contends that it is clearly established "[s]earches in the school context are granted more leeway than the usual law enforcement searches because of the special needs inherent in dealing with students."  Motion for Summary Judgment at 16.  Romero points out that no Tenth Circuit or Supreme Court opinion of which she knows has declared that pat-down searches of attendees at a school-sponsored prom are "*per se*, unreasonable and unconstitutional," and asserts that "the rules established are that a school search (at least in the context of searching a student believed to have violated the law or school rules) is reasonable if it

was justified at its inception and the search was reasonably related in scope to the circumstances justifying the search." Motion for Summary Judgment at 17 (citing New Jersey v. T.L.O., 469 U.S. 325, 341-42 (1985)). Romero asserts that a search's scope is reasonable "when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and nature of the infraction." Motion for Summary Judgment at 18 (quoting New Jersey v. T.L.O., 469 U.S. at 342). She also asserts that "the T.L.O. standards are broad ones and do not provide public school employees much detail regarding the contours of the rules and the rights they protect . . . .  [and] courts, including the Supreme Court, have struggled to apply the T.L.O. standards in different circumstances." Motion for Summary Judgment at 18.

Romero discusses the Supreme Court's application of the search rule it announced in New Jersey v. T.L.O. and in its more recent cases of Vernonia School District 47J v. Acton, 515 U.S. 646 (1995), and Board of Education of Independent School District No. 92 v. Earls, 536 U.S. 822 (2002). See Motion for Summary Judgment at 18. Romero asserts that, in relation to the urinalysis testing in Board of Education of Independent School District No. 92 v. Earls particularly, the high school students going to prom here are analogous to the athletes participating in sports in that case, and the searches without suspicion are justified based on the students' limited privacy expectations. See Motion for Summary Judgment at 18-19. She contends, however, that outside of providing the general proposition about the reduced privacy expectation, because the search was for safety purposes rather than for purposes of finding criminal activity, "Vernonia and Earls provide little guidance to a high school principal trying to keep her students and their guests safe by excluding weapons, drugs, alcohol and tobacco from being taken to the Prom." Motion for Summary Judgment at 19.

As to whether the violated right was clearly established at the time of the alleged violation, Romero asserts that there is no Tenth Circuit opinion on point.  See Motion for Summary Judgment at 19.  She asserts that there is no Tenth Circuit or Supreme Court authority

> which would have clearly informed Principal Romero that a limited pat-down search (without untoward groping) for the purpose of excluding, or dissuading attendees from bringing weapons, drugs, alcohol, or tobacco to the Prom, undertaken for the protection and safety of the attendees from themselves and each other, violates the Fourth Amendment.  Indeed, the TRO Opinion cites no Tenth Circuit authority to support the conclusion that Candice Herrera was likely to succeed on her Fourth Amendment claim, let alone a case that would clearly establish such a standard.

Motion for Summary Judgment at 19-20.  Romero also contends that there is also no clearly established precedent outside of the Tenth Circuit.  She argues that the other three cases to which the Court cited in the TRO Opinion "present very different circumstances from searches occurring only at a school-sponsored party and possibly the most dangerous school-sponsored event of the year when considering the health of the attendees."  Motion to Dismiss at 20.  Romero asserts that the Court's statement in the TRO Opinion -- that "[g]overnment may not condition the receipt of a benefit or privilege on the relinquishment of a constitutional right" Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1183 -- "cannot be applied in the context of public schools consistent with controlling Supreme Court law."  Motion for Summary Judgment at 21.  She argues that there is no reasonable basis on which to distinguish students' limited waiver of their Fourth Amendment rights when they decide to participate in extra-curricular sports activities, as the Supreme Court found in Board of Education of Independent School District No. 92 v. Earls, and finding that students waived their rights when they decided to participate in the off-campus prom.  See Motion for Summary Judgment at 21.  Romero thus asserts: "It was not clearly established law in the Tenth Circuit on April 16, 2011 that a limited,

school-appropriate, pat-down and possession search of all attendees to an off-campus high school prom, pursued for the protection and safety of the attendees, violated the attendees' Fourth Amendment rights."  Motion to Dismiss at 21.

Romero recognizes that the "Plaintiffs will claim that these were not limited, school-appropriate pat-down searches" and that, because the Plaintiffs testified on the record that "inappropriate things were done to them," even "though the self-serving testimony of each Plaintiff may be incredible," she concedes that "it may be enough to create justiciable fact issues."  Motion for Summary Judgment at 22.  She responds, however, that "the facts are undisputed that Melanie Romero, the only Defendant sued in her individual capacity, had no part in any searches beyond asking ASI to perform limited (non-groping) pat-down searches," and was not aware of the alleged scope of the searches until after the prom.  Motion for Summary Judgment at 22.

Romero argues that this case is not about limited school-related pat-down searches, but about searches which allegedly included groping and molestation.  See Motion for Summary Judgment at 23.  She contends that, because she "did not order, perform, assist, observe, or have reported to her searches that included touching breasts or bare legs or pulling bras at the Prom," and because Ashcroft v. Iqbal, 556 U.S. 662 (2009), imposes liability on individuals only for their participation in a constitutional violation, the Court should dismiss her from the case. Motion for Summary Judgment at 24.  Romero also argues that, even if the limited searches which she instructed ASI New Mexico to conduct at the Prom were unreasonable searches, there still cannot be any Fourth Amendment violation, as the students consented to the searches.  See Motion for Summary Judgment at 25.  Romero refers the Court to Johnston v. Tampa Sports Auth., 530 F.3d 1320 (11th Cir. 2008), where the United States Court of Appeals for the

Eleventh Circuit held that, where a patron objected to the search a stadium required him to undergo for admittance, because he nevertheless underwent the pat-down search to proceed into the stadium, there was no constitutional violation because patron consented.  <u>See</u> Motion for Summary Judgment at 25.  Romero argues that, viewed against that background, because the Plaintiffs testified that they had all undergone pat-down searches at previous school dances, expected to undergo pat-down searches at this dance, and did not refuse to undergo the pat-down searches at the prom, they consented, or Romero's belief they consented is reasonable.  She asserts that the Plaintiffs could have refused to consent to the searches by not entering the prom, but chose to consent to the searches and continue into the Prom.  <u>See</u> Motion for Summary Judgment at 26-27.  Romero asserts that, because there is no evidence that she participated in the alleged unlawful searches in any way, and because of her reasonable belief that the students consented to the search, the Court should grant summary judgment in her favor and dismiss her from the case.

On November 30, 2012, the Plaintiffs filed their MSJ Response, asserting that the Court should deny Romero's request for summary judgment for two primary reasons.  First, her motion is premised on assuming her account of the facts, which contradict the Plaintiffs' descriptions and which is not appropriate at the summary-judgment stage.  Second, her motion is premised "on the assumption that if the searches did occur as Plaintiffs describe, Defendant Romero did not see them," which the Plaintiffs assert is disputed, and thus also improper as a summary judgment basis.  MSJ Response at 1-2.

The Plaintiffs assert that, at the summary-judgment stage, a court analyzing whether a defendant is entitled to qualified immunity "must construe the facts in the light most favorable to the plaintiff."  MSJ Response at 12 (citing <u>Scott v. Harris</u>, 550 U.S. 372, 378-80 (2007); <u>Riggins</u>

v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009)).  The Plaintiffs assert:

> It is beyond cavil that the pat-down searches described by the four Plaintiffs (with
> the cupping of the breasts, the feeling of bare legs and arms, the lifting of dresses
> to mid-thigh and the putting of fingers inside of a dress to check a student's
> cleavage), which the Court must accept as true descriptions of the searches,
> violate the Fourth Amendment to the Constitution.

MSJ Response at 13.  They assert that under the Fourth Amendment, "[a]s a general rule, in the

school or school-activity context, officials must have 'reasonable, individualized suspicion'

before conducting a search of a student."  MSJ Response at 13 (quoting New Jersey v. T.L.O.,

469 U.S. at 341-42).  The Plaintiffs concede, however, that the Supreme Court in Vernonia

School District 47J v. Acton recognized that a school search "may still be reasonable without

such suspicion in 'limited circumstances where the privacy interests implicated by the search are

minimal, and where an important governmental interest furthered by the intrusion would be

placed in jeopardy by a requirement of individualized suspicion.'"  MSJ Response at 14 (quoting

Vernonia Sch. Dist., 515 U.S at 674).  They assert that the prom search is unconstitutional under

this standard, as the means used to search in pursuit of the government's interest to keep drugs,

alcohol, weapons, and tobacco out of the Prom -- the searches which included cupping the

students' breasts, feeling bare legs and arms, placing fingers inside of a dress to check cleavage,

and lifting dresses to mid-thigh -- are not reasonably related to that interest.  See MSJ Response

at 14-15.

As evidence that the scope of the searches at the prom was not reasonably related to the

school's objectives, the Plaintiffs point to Reyes' testimony that touching students' bare legs and

arms, in plain view, would not help in accomplishing the school's objective.  See MSJ Response

at 15 (citing Reyes Depo at 73:14-21).  The Plaintiffs assert that the searches were also

"excessively intrusive in light of the age and sex of the students."  MSJ Response at 15.  They

contend further that the searches were unreasonable, as there "was no basis to believe that any of the four Plaintiffs had broken any school rule or were in any[] [way] likely to break a school rule," which is a threshold requirement for a reasonable school search.  MSJ Response at 15-16.

As to whether Romero violated the Plaintiffs' clearly established rights, the Plaintiffs assert that Romero misstates the issue in her Motion for Summary Judgment, and contend that the proper issue is "whether it was clearly established in 2011 that a search as described by Plaintiffs, which involves the touching of breasts, bare legs, and bra pulling, violates the Constitution."  MSJ Response at 17.  They assert that the Defendants must concede that the answer to this proper question is yes, as Romero "agrees that the searches as described by Plaintiffs, or as described by ASI guard Rebecca Reyes and Capital High School employee Rose Lucero, were not appropriate."  MSJ Response at 17 (citing Romero Depo. at 211:2-10, 236:16-238:6; 238:20-240:5).  According to the Plaintiffs,

> Defendant Romero's understanding that the searches as described by Plaintiffs were improper is confirmed by the precedent, as set forth above, that Plaintiffs and the Court rely on to show that the highly intrusive, suspicionless pat-down searches are not reasonably related to abstract concerns regarding drugs and alcohol at a high school dance. That precedent was issued by the Supreme Court long before the 2011 Capital High School Prom.

MSJ Response at 17.

The Plaintiffs argue that the Capital High search policies in its code of conduct "inform[s]" whether "it was clearly established that a principal like Defendant Romero could not institute a policy of blanket pat-down searches."  MSJ Response at 17.  They point out that Capital High's policies relating to school searches provide that searches "such as pat-downs may be conducted only on the basis of reasonable suspicion of the individual student to be searched," that Capital High will make efforts to contact the parent and allow their presence during the

search, and that the students' personal effects, such as cellular telephones or purses, "may be searched when school officials have individual reasonable suspicion that such property" contains contraband.  MSJ Response at 18 (quoting SFPS Code of Conduct at 57-58, filed November 30, 2013 (Doc. 126-13)).  They assert that these policies "parrot" the school search requirements that the Supreme Court articulated in New Jersey v. T.L.O. and is "undoubtedly the product of the Schools' legal counsel's attempt to be consistent with existing precedent."  MSJ Response at 18. The Plaintiffs contend:

> Romero stretches the bounds of credulity when she suggests that Supreme Court cases such as Vernonia and Earls created a complex analysis that confused her regarding what suspicionless searches were permitted when her own Code of Conduct committee and the Schools' legal counsel set forth a written policy that school officials such as herself were to follow related to student searches.

MSJ Response at 19.

In response to Romero's contention that she was not personally involved in any alleged violation of the Plaintiffs' Fourth Amendment rights, the Plaintiffs dispute that "she did not 'order, perform, assist, observe, or have reported to her' the intrusive searches," and further assert that "the analysis of Defendant Romero's personal involvement begins with an understanding of the nature of the relationship between her and the ASI personnel who conducted the searches."  MSJ Response at 19 (quoting Motion for Summary Judgment at 24). The Plaintiffs point out that Romero "does not dispute that she was present at the prom and observed pat-down searches," but contends that those "searches that she observed necessarily included (for purposes of this Motion) the pulling and shaking of bras, which the searching guard describes she did for every student," and that "two students describe seeing Ms. Romero looking right at them as the security guard lifted their dresses and patted down their bare legs."  MSJ Response at 20 (citing Reyes Statement at 1, filed November 30, 2012 (Doc. 126-7); C. Herrera

Depo. at 130:12-131:2; A. London Depo. at 129:23-131:4, 132:18-133:1).  They contend that Romero's observation of the searches is sufficient to establish her personal involvement, as she failed to "intercede" when she was constitutionally required to do so.  MSJ Response at 20 (citing Tanner v. San Juan Cnty. Sheriff's Office, 864 F. Supp. 2d 1090 (D.N.M. 2012) (Browning, J.); Dodds v. Richardson, 614 F.3d 1185, 1200-01 (10th Cir. 2010)).

The Plaintiffs also argue that Romero's suggestion that the students waived their Fourth Amendment rights in deciding to undergo the search and enter the prom fails, because the government cannot condition receipt of a privilege on an agreement to a rights waiver, and because there is no evidence that the Plaintiffs were aware they would be subjected to an intrusive pat-down search at the prom.  See MSJ Response at 21-22.  The Plaintiffs assert that Romero's citation to the Eleventh Circuit's decision in Johnson v. Tampa Sports Authority for the proposition that the "'unconstitutional conditions' doctrine" -- the proposition that "'government may not condition access to even a gratuitous benefit or privilege it bestows upon the sacrifice of a constitutional right.'"  MSJ Response at 22 (quoting Blackburn v. Snow, 771 F.2d 556, 568 (1st Cir. 1985)) -- does not always apply is inapposite to this case, because the Eleventh Circuit pointed out that "'the condition for entry was imposed by the NFL and the Buccaneers, both private entities, and not the government.'"  MSJ Response at 22 (quoting Johnson v. Tampa Sports Auth., 530 F.3d at 1329)(emphasis added by the Plaintiffs).  The Plaintiffs also take issue with Romero's reading of Vernonia School District 47J v. Acton and Board of Education of Independent School District No. 92 v. Earls:

> The Supreme Court did not find in those cases, as Defendant argues, that schools can condition participation in particular activities on a waiver of Fourth Amendment rights.  Instead, the Supreme Court found that given all of the facts surrounding the challenged searches, they were reasonable and did not violate the Fourth Amendment. . . .  Neither Vernonia nor Earls involved the conditioning of

a benefit on the relinquishment of a constitutional right.  Instead, they involved
searches that the Court found were constitutional.

MSJ Response at 23.

The Plaintiffs also assert that there is no evidence that any of the Plaintiffs had "any
inkling" that the prom searches would be as highly intrusive as they were.  MSJ Response at 23.
They contend that the fact that the evidence shows that the Plaintiffs appreciated that they were
going to be subjected to pat-down searches does not mean that they anticipated searches to the
same extent as they proved to be at the prom.  See MSJ Response at 23-24.  According to the
Plaintiffs, along the same lines, their consent does not meet the "strict burden" on Romero to
prove that they "impliedly waived" their Fourth Amendment rights by undergoing the searches
to enter the prom.  MSJ Response at 24 (citing Schneckloth v. Bustamonte, 412 U.S. 212 (1973);
United States v. Harrison, 639 F.3d 1273, 1278 (10th Cir. 2011)).  The Plaintiffs contend that
they thus did not waive their rights and that the Court should therefore deny Romero's Motion
for Summary Judgment.

On December 17, 2012, Romero filed her MSJ Reply, arguing that the Court should enter
summary judgment in her favor, because it remains undisputed that she was not personally
involved in the pat-down searches, and because she is entitled to qualified immunity.  Romero
contends that, in relation to her factual defense that she did not in any way participate in the pat-
down searches at the prom, the Plaintiffs have not disputed Romero's asserted facts that she did
not request or order ASI New Mexico or ASI New Mexico employees to perform pat-down
searches with groping at the prom, and that she was not the supervisor of the ASI New Mexico
employees.  See MSJ Reply at 8.  Romero contends that the Plaintiffs point only to testimony in
which Romero explains she requested the security services she needed from ASI New Mexico

and requested pat-down searches generally.  She asserts that the Plaintiffs have not cited any evidence that she directed the ASI New Mexico or its employees how to conduct the pat-down searches, and that there is undisputed evidence that "she did not specify the techniques ASI New Mexico employees use to perform pat-down searches."  MSJ Reply at 8.  Romero also contends that the Plaintiffs have not shown a genuine issue whether Romero was informed that searches with groping were occurring during the prom, as "there is no evidence any one at the Prom informed Principal Romero of groping during pat-down searches."  MSJ Reply at 8.  Romero points out that the Plaintiffs "attempt to show a dispute . . . that Melanie Romero did not see any search with groping," but that they do not support this dispute.  MSJ Reply at 8.  According to Romero, "in her deposition, Candice Herrera plainly admitted that she could not testify that Melanie Romero actually observed her search."  MSJ Reply at 9 (citing C. Herrera Depo. 62:6-11).  Romero contends that the portions of the record upon which the Plaintiffs rely in an attempt to dispute that Romero did not observe C. Herrera's search are insufficient, because C. Herrera testifies only that Romero smiled at her, not that Romero saw the search:

> In Plaintiffs' first citation to Candice Herrera's deposition, at page 130, line 12 to page 131, line 2, Candice testified only that at a single point during her pat-down search, about the time the guard allegedly lifted her dress, Principal Romero looked at her (apparently in the face) and smiled. However, moments before, in testimony not cited by the Plaintiffs, Candice was somewhat clearer when asked, "Okay. And what was Melanie doing when you looked up at Melanie?" Candice answered, "She looked over and smiled at me and turned back around." That is the extent of Candice Herrera's testimony regarding Defendant Romero watching her alleged groping.

> The second citation to Candice Herrera's testimony (page 180, lines 1 through 9) provides no more probative evidence. The cited passage begins with a question to Ms. Herrera concerning the sworn affidavit that she provided the Court as evidence for the TRO hearing which stated, "[I] saw Principal Romero look at me while my body was being searched." However, just a few lines later, Candice was asked: "Can you describe for me what you mean by 'severely violated and exposed?'" CHerrera Depo., Exhibit 2, P. 180, lines 15 to 16.

> Candice answered: "If you're pulling up -- the security guard is pulling up my dress, exposing my legs, which I'm uncomfortable with . . ." and continued regarding her allegations and her view of the school's alleged duty to protect her. <u>Id.</u>, P. 180, line 18 to P. 181, line 11.  The very next exchange provided:
>
>> Q  Well, you've already testified that you don't know if Melanie Romero saw any of that, right?
>>
>> A  Yes, sir.
>
> <u>Id.</u>, P. 181, lines 12 to 14.

MSJ Reply at 9-10.  In relation to London's testimony about Romero watching her pat-down search, Romero argues that London testified that London watched Romero search the purse and not that Romero watched London while ASI New Mexico performed the pat-down search.  <u>See</u> MSJ Reply at 10.  Romero thus argues that, because the Plaintiffs do not show a genuine issue of fact exists whether Romero "order[ed], perform[ed], assist[ed], observe[d] or [knew] of any pat-down searches with groping at the Prom," there is no genuine issue whether she personally participated in the alleged unconstitutional pat-down searches, and the Court should, under <u>Ashcroft v. Iqbal</u>, grant summary judgment in her favor.  MSJ Reply at 10-11.

Romero also argues that, given that any alleged constitutional violation must be based on her requesting ASI New Mexico to provide pat-down searches of students entering the prom to search for weapons, drugs, alcohol and tobacco, and given that there is no Tenth Circuit opinion on point to show any clearly established law, the Court must then look to the Supreme Court, which has not clearly established this conduct to violate the Fourth Amendment, or to the SFPS' Code of Conduct.  <u>See</u> MSJ Reply at 11.  Romero asserts that "even a cursory examination of the Supreme Court's opinions in <u>T.L.O.</u>, <u>Earls</u> and <u>Vernonia</u> . . . shows that the policies expressed in the Code of Conduct do not express the permissible scope of Fourth Amendment searches in the context of public schools as established in those three cases."  MSJ Reply at 11.  She contends:

"Surely, Plaintiffs cannot then contend that a violation of the Code of Conduct by a school official creates a federal constitutional claim for violating the Fourth Amendment."  MSJ Reply at 12.  According to Romero, both Vernonia School District 47J v. Acton and Board of Education of Independent School District No. 92 v. Earls stand for the proposition that school searches do not require individualized suspicion and that Plaintiffs' assertion to the opposite is "simply wrong."  MSJ Reply at 12.  She asserts, however, that the Plaintiffs' error is not pertinent, because these cases "did not involve pat-down searches" and therefore cannot clearly establish any constitutional violation for purposes of Romero's conduct here.  MSJ Reply at 12-13.

Finally, Romero contends that Vernonia School District 47J v. Acton and Board of Education of Independent School District No. 92 v. Earls do not support that public school students cannot be forced to surrender constitutional protections in exchange for certain voluntary activities.  See MSJ Reply at 13.  She contends that these cases "clearly establish that a school can not subject its entire student body to drug testing through urinalysis, but may do so, without constitutional violation, to certain groups based upon the circumstances."  MSJ Reply at 13.  Romero asserts that, if subjecting student athletes to urinalysis was constitutionally permissible, subjecting students to limited pat-down searches for their protection from drugs, alcohol, firearms, and tobacco is also reasonable -- and is certainly not clearly established as unreasonable.  See MSJ Reply at 13-14.

Romero reiterates her argument that "it is not clearly established that a pat-down search at a prom during which a contract security guard, without any school involvement, gropes a student being searched violates the Fourth Amendment."  MSJ Reply at 14.  She points out that the Plaintiffs, in their response, provide no authority to the contrary, and she "suggests that a

- 36 -

reasonable search plus abuse by another party does not result in an unconstitutional search any more than justifiably barring speech lacking First Amendment protection plus sex abuse results in a First Amendment violation." MSJ Reply at 14. She asserts that her conduct is easily separated from any ASI New Mexico contract-employee's alleged unconstitutional conduct. See MSJ Reply at 14. She argues that, because the Plaintiffs cannot show any dispute that she did not in any way participate in a violation of any of the Plaintiffs' clearly established constitutional rights, the Court should grant summary judgment in her favor. See MSJ Reply at 15.

On December 20, 2012, the Court held a hearing on Romero's Motion for Summary Judgment. Romero asserted that her Motion for Summary Judgment is very fact specific, and that the Plaintiffs' blanket statement that C. Herrera and London saw Romero watching their pat-down searches does not find support in the record. See Tr. at 5:14-22; 6:11-18 (Coppler). The Romero referred the Court to C. Herrera's testimony, pointing out that she "testified that during a single point in her pat-down search at about the time the guard was lifting up her dress, principal Romero looked over at her and smiled. That was it." Tr. at 6:22-25 (Coppler). She stated: "At best," C. Herrera "can say that Melanie Romero saw the guard lift up Candice's dress, because Candice said she looked over at me and smiled at me and then turned back around." Tr. at 7:1-3 (Coppler). She points out that none of the Plaintiffs, or anyone else, testified that Romero observed any groping or anyone touch C. Herrera's bare skin. See Tr. at 7:3-10 (Coppler). As to London's testimony about Romero's observation of London's pat-down search, Romero asserts that London testified she was watching Romero search London's purse and not that Romero watched any part of the pat-down search of London. See Tr. at 7:16-23 (Coppler). She argued: "The other two plaintiffs . . . , neither one of them testified at all that Melanie saw any portion of their search, and all four plaintiffs have admitted that they do not know if Melanie Romero saw

any portion of their search."  Tr. at 8:2-6 (Coppler).

The Court asked the Plaintiffs if they agree that the Court should grant summary judgment in Romero's favor with respect to the other two Plaintiffs: T. H. and A. Hurtado.  See Tr. at 10:4-11 (Court).  The Plaintiffs responded that they do not agree that the Court should grant Romero summary judgment, contending that they "are not limited solely to introducing evidence that they observed Ms. Romero observing them as they were being searched," but rather they "can draw from any aspect of the factual record that presents sufficient evidence for a jury to infer from the circumstances that Ms. Romero observed these searches as described both by the plaintiffs and other witnesses . . . at the prom."  Tr. at 10:12-20 (Colfax).  They asserted that the facts that Romero was standing feet away from the ASI New Mexico officers performing these pat-down searches and that she observed students as they were coming through the line, paired with the Plaintiffs' descriptions about how the searches proceeded, is sufficient circumstantial evidence from which a jury could infer that Romero observed the searches, and thus establishes a genuine issue whether Romero observed the searches.  See Tr. at 10:21-11:18 (Colfax).  The Plaintiffs contended that, given that there is sufficient evidence to dispute whether Romero observed the searches, and given that there is no dispute Romero had authority to stop the searches during the prom, there is sufficient evidence that she was personally involved in the alleged violation of the Plaintiffs' rights and that Ashcroft v. Iqbal does not therefore insulate her from individual liability.  See Tr. at 12:17-13:5 (Colfax).

The Court asked the Plaintiffs where in the record London states that Romero observed London's pat-down search.  See Tr. at 13:15-18 (Court).  The Plaintiffs responded that the support is present, because "the implication of what she said is that there was a clear line of sight between her and Ms. Romero as . . . London's going through this search by the ASI security

guard." Tr. at 13:19-23 (Colfax).  The Court then inquired whether the only information in the record about Romero's observation of the ASI New Mexico guard's search of C. Herrera that the Plaintiffs have is her testimony that Romero looked at her and smiled while her dressed was raised.  See Tr. at 15:6-11 (Court).  The Plaintiffs responded that "the answer is yes.  The strongest statement that Ms. Herrera makes is that she was looking at me during the course of the dress being lifted up by the ASI guard."  Tr. at 15:14-17 (Colfax).  The Plaintiffs also pointed out that, "in her affidavit, and I believe also in her testimony before the Court during the TRO hearing, she stated more generally that Ms. Romero observed me while my body was being searched."  Tr. at 15:17-21 (Colfax).  The Court responded by asking the Plaintiffs, because there appears to be some tension in the TRO testimony and the deposition testimony, whether the Court must rely on the more specific deposition testimony.  See Tr. at 15:24-16:3 (Court).  The Plaintiffs agreed that the Court should rely on the deposition testimony, because "the deposition testimony is more specific in terms of precisely when . . . she observed Ms. Romero look up and see the lifting of the dress."  Tr. 16:8-11 (Colfax).  In response to the Court's inquiry whether the Plaintiffs want to add any facts that the Court should consider in deciding the Motion for Summary Judgment, the Plaintiffs asserted that whether C. Herrera or London observed Romero watch the ASI New Mexico guards search them are "in a sense bonus facts for the plaintiff," because there is sufficient circumstantial evidence without that testimony on which they can survive summary judgment in relation to Romero's personal involvement.   Tr. at 16:12-25 (Court, Colfax).

Romero responded that "we can agree that the only facts produced in 19 depositions, written discovery, affidavits, and TRO testimony is that a single point during Candice's search she . . . makes eye contact with Melanie Romero who then smiles and turns her attention away

from her." Tr. at 18:1-6 (Coppler). She added that, while she was in proximity to the searches, she was at the table where the school employees searched personal effects and purses, and testified that, although she saw the ASI searches, she did not see the searches as the Plaintiffs described them. See Tr. at 18:12-21 (Coppler). She stated: "I can accept for purposes of this motion, Your Honor, that if the searches were unconstitutional, that maybe the school board is going to have to answer for that. But right now we are talking about what Melanie Romero did on the night of the prom," and the Plaintiffs do not have evidence that she witnessed any groping. Tr. at 19:20-20:10 (Coppler). The Court noted that there does not appear to be a factual issue whether T. H. and Hurtado can hold Romero individually liable for Romero's failure to intervene, and that it also appears unlikely that there will be any factual issue in relation to London. See Tr. at 22:8-17 (Court). The Court noted that there appears to be a genuine issue of fact, however, whether Romero observed the ASI New Mexico guard lift C. Herrera's dress.

Moving to whether Romero's actions constituted a constitutional violation, the Court asked Romero whether she would make any concessions about the extent to which the searches would have been unconstitutional if they occurred as the Plaintiffs allege. See Tr. at 24:5-17 (Court). Romero responded that she is not willing to concede that the searches were unconstitutional at all, because she believes that the Fourth Amendment inquiry is limited to whether Romero could have ordered pat-down searches, without individualized suspicion, at an off-campus school-related activity. See Tr. at 26:4-13 (Coppler). She asserted that any constitutional argument about the ASI New Mexico-guards' alleged unconstitutional groping needs to be addressed under Fifth Amendment substantive due process analysis. See Tr. at 26:13-16 (Coppler). Romero asserted that, regardless whether the alleged searches fit under the Fourth or Fifth Amendments, Romero's conduct here, asking for a search at an extra-curricular

school event, and asking for that search to include student pat downs, did not violate clearly established Fourth Amendment law.  See Tr. at 29:1-11 (Coppler).

The Court asked whether Romero and SFPS concede that a search which included a security guard reaching inside the students' bras would be unconstitutional.  See Tr. at 29:15-17 (Court).  Romero replied that such a search would "probably" violate the students' substantive due-process rights.  See Tr. at 29:18-22 (Coppler).  In response to the Court's question whether she or the School District concede that conduct would violate the Fourth Amendment, she stated that they "have never seen case law where pat down somehow moves into a sexual assault."  Tr. at 30:1-4 (Coppler).  The Court then noted that, if Romero is not going to concede that a search in which the guard reached inside a student's bra violates the Fourth Amendment, the Court need not continue the inquiry into concessions about unconstitutional conduct any further.  See Tr. 30:5-9 (Court).

The Court asked whether Romero would agree that the search at the prom did not conform to the SFPS' Code of Conduct.  See Tr. at 31:9-13 (Court).  She responded that "the school district did not believe that school policy on student and locker searches applies to searches at off campus, after-hours events like the prom."  Tr. at 31:14-17 (Court).  The Court asked what in the Code of Conduct would provide any support for these policies not applying at off-campus or after-hours events.  See 32:25-33:8 (Court).  Romero responded that, regardless whether the Code of Conduct applies to off-campus events, "[f]or this motion we're dealing with what Melanie Romero's good-faith belief was in trying to apply the code," and she acted in good faith, and pursuant to Capital High's and the SFPS' practices in pursuing the pat-down searches at the prom.  Tr. at 33:10-17 (Coppler).  In response to the Court's inquiry whether a layperson or an attorney drafted the Code of Conduct, Romero responded that she does not know whether

- 41 -

an attorney was involved in the drafting, but she agreed with the Court that it does not appear that a layperson drafted the policies.  See Tr. at 34:3-17 (Court, Coppler).

The Court asked two additional questions about Romero's legal grounds for her request for summary judgment on the qualified immunity basis.  First, it asked Romero whether she agreed with the Court's distinguishing in its TRO Opinion between extra-curricular activities, such as participating in a football team, and a prom, which is more analogous to a commencement ceremony.  See Tr. at 35:11-21 (Court).  The Court's second question was whether Romero's request for ASI New Mexico guards to perform pat-down searches of the students included lifting the female students' skirts.  See Tr. at 35:13-36:9 (Court).  Romero agreed with the Court that drug testing athletes is distinguishable from searching all students who choose to attend a prom.  See Tr. at 36:12-20 (Coppler).  She asserted that distinction, however, evinces that the law was not clearly established at the time of the prom search.  See Tr. at 36:18-20 (Court).  She also asserted that she disagrees with the Court that pulling up female attendees' skirts makes the pat-down searches at all constitutionally questionable, because, according to her, the Fourth Amendment school-related search law is expanding to the point where these searches at the prom are constitutional.  See Tr. at 37:5-11 (Coppler).

The Court asked whether Romero agrees that extra-curricular activities provides a poor point of reference, because the Prom is more analogous to graduation or commencement.  See Tr. at 37:19-24 (Court).  Romero said that she reaches the opposite conclusion and that the prom "absolutely is an extracurricular activity."  Tr. at 37:24-25 (Coppler).  She asserted:

> Only 150 students attended the Capital High school prom, out of a much larger school population.  It's a voluntary event, it's a party, it's off campus, it is school sponsored.  Kids choose to go if they want.  There's no compulsory attendance.  I don't think you can characterize it as anything but an extracurricular activity.  It's not like graduation.

Tr. at 37:25-38:9 (Coppler).  Romero also asserted that, "when you state it plainly the fact is that graduation's probably an[] extra activity as well.  They're both voluntary activities. You don't have to go through graduation to get your diploma."  Tr. at 40:23-41:1 (Coppler).  The Court clarified that the Defendants' position is that the school cannot just impose these pat-down searches as a matter of course at the school, but, other than that, they are constitutional.  See Tr. at 41:6-10 (Court).  Romero clarified that the Defendants' position does not go that far, but only goes as far as to assert that the pat-down searches, to the extent Romero asked for them, were not unconstitutional given the Supreme Court's case law regarding school-related searches.  See Tr. at 41:11-23 (Coppler).

As to whether Romero's request for pat-down searches at the prom included asking for the ASI New Mexico guards to lift the female students' skirts, Romero asserted that there is no evidence that Romero instructed ASI New Mexico as to any details about how to perform the searches.  See Tr. at 43:1-5 (Coppler).  She asserted: "What she did was simply asked for a pat down.  She left the manner in which the pat down was to occur to ASI based on their experience, their training, their expertise, and their past practices at the prior proms."  Tr. at 43:11-14 (Coppler).  The Court asked whether it is a fair assessment of the record to say that "[w]e just don't know her views at all about the lifting of the dresses," to which Romero replied that the Court's assessment is "fair from the evidence."  Tr. at 44:6-12 (Court, Coppler).

The Court asked the Plaintiffs how they respond to Romero's contention that the Fifth Amendment, rather than the Fourth Amendment, redresses a search which includes cupping or touching the female students' breasts.  See Tr. at 45:17-23 (Court).  The Plaintiffs responded that they see no basis for that proposition and that "the mere fact that the nature of the search here

touched some sex-related areas during the course of the searches as described by the plaintiff," does not somehow take the unconstitutional search out of the Fourth Amendment's purview.  Tr. at 45:24-46:3 (Colfax).  They stated that the nature of the search weighs into the Fourth Amendment's reasonableness analysis to determine whether the scope of the government's search goes beyond the government's legitimate interest in performing the search.  See Tr. at 46:11-23 (Colfax).  In response to the Court's question whether they are asserting a substantive due-process violation, the Plaintiffs responded that they are not, because their claim is that the search was an unreasonable government search, which violated the Plaintiffs' Fourth Amendment rights.  See Tr. at 48:4-8 (Colfax).

The Court asked the Plaintiffs whether they distinguish between extracurricular activities along the lines of sports and a prom.  See Tr. at 48:9-18 (Court).  The Plaintiffs responded that they agree with the Court, and would classify school-related events as extracurricular, such as sports, and as school activities, such as graduation and prom.  See Tr. at 48:19-25 (Colfax). They asserted that, whereas a person necessarily loses a certain amount of privacy by participating in extracurricular sports activities, such as football players in the shower after a game, there is no similar diminished expectation of privacy for merely attending a prom.  See Tr. at 50:10-14 (Colfax).  Additionally, according to the Plaintiffs, simply because the activity is voluntary does not diminish the students' reasonable privacy expectation, because the Supreme Court has reiterated that a student need not check their rights at the door.  See Tr. at 51:9-24 (Colfax).  The Court asked whether the Supreme Court's school search cases have modified that statement to now mean that if you choose to go beyond the regular schoolhouse doors -- to participate in events outside of the regular school schedule -- the school can require you to jump through constitutional hoops to participate in those activities outside of the regular school day.

- 44 -

See Tr. at 52:4-13 (Court).  The Plaintiffs conceded that, while the Supreme Court has modified that standard to allow for some searches as a condition for participation in activities outside of the schoolhouse, it has, in every case, balanced the government's legitimate interest against the privacy intrusion of the search, and the Prom search here, viewed against Supreme Court precedent, unconstitutionally intruded on the Plaintiffs' privacy interests.  See Tr. at 52:14-53:22 (Colfax).

The Court asked how the Plaintiffs respond to Romero's contention that Supreme Court precedent is expanding only the permissible bounds of school-related searches.  See Tr. at 53:23-54:1 (Court).  The Plaintiffs disagreed with Romero's position and stated that the Supreme Court has consistently used its balancing test for determining whether a particular school search is reasonable under the circumstances, and, given the extent of the offensive conduct, none of those cases support finding that the searches in this case were constitutional.  See Tr. at 54:7-55:5 (Colfax).  In response to the Court's question whether there is any particular part of the Court's TRO Opinion with which the Plaintiffs disagree, the Plaintiffs responded that they disagree with the Court's acceptance of the Santa Fe School Board's position why they performed the searches and of the SFPS's position that the Code of Conduct somehow did not apply to off-school student searches.  See Tr. at 56:7-58:13 (Colfax).  The Court asked whether the SFPS Code of Conduct accurately reflects constitutional law, and whether the Plaintiffs believe that, if the pat-down searches had complied with the Code of Conduct, they would have been constitutional.  See Tr. at 58:14-22 (Court).  The Plaintiffs replied that they believe the Code of Conduct accurately reflects constitutional law and that the way that the language tracks the law appears purposeful.  See Tr. at 58:23-59:15 (Colfax).

The Court asked the Plaintiffs whether they can hold Romero individually responsible for

a constitutional violation if the facts only go as far as to support that she saw an ASI New Mexico guard lift C. Herrera's skirt.  See Tr. at 60:19-25 (Court).  The Plaintiffs asserted that, as Romero conceded in her testimony, a pat-down search that included lifting female students' skirts "clearly rises to a level that not only does it violate clearly established law but that she knew that it violated the law and was inappropriate given the nature of the event and what they were looking for through the searches."  Tr. at 62:1-5 (Colfax).

Romero responded that it is her position that the Supreme Court, in Vernonia School District 47J v. Acton and Board of Education of Independent School District No. 92 v. Earls, held that suspicionless searches are permissible for extracurricular activities and that the prom has nothing to do with the school's curriculum.  See Tr. at 68:4-20 (Coppler).  She asserted that, regardless whether the constitutional law allowing suspicionless searches in relation to schools is expanding, Romero's qualified immunity turns on whether the law was clearly established, and it is obvious from both Tenth Circuit and Supreme Court precedent that it was not clear in April, 2011, that directing pat-down searches for students entering a prom violated those students' constitutional rights.  See Tr. at 68:19-69:16 (Coppler).  Romero stated that, because Romero is the only defendant before the Court on this Motion for Summary Judgment, and because she is raising the qualified immunity defense, "[w]hether [the searches] included groping or not is not the issue that's going to be decided certainly in this hearing, but what Melanie knew about that is what's going to be decided in this hearing and she didn't know about" the alleged extent of the searches.  Tr. at 73:21-24 (Coppler).  In response to the Court's question whether Romero agrees with the Court's TRO Opinion, she stated that

> I think the law that's cited in the TRO hearing is the law that was established at
> the time, but I don't think that the law that you cited in the memorandum opinion
> clearly establishes that Melanie Romero, in asking for a school-appropriate pat-

down search of the plaintiffs violated the constitution.  I also disagree with the
idea that somehow Melanie Romero could not condition entrance into the prom
on having a school-appropriate pat-down.

Tr. at 74:17-25 (Coppler).  In relation to the Plaintiffs' contention that a pat-down search is

unreasonable, Romero pointed out that, beyond the prom's status as an extracurricular activity,

"[t]his is an event that is attended by both adults and children . . . , it's attended by people who

don't even go to the school, it's attended by people who are invited there.  The school has to do

something to make sure that these kids are safe."  Tr. at 75:8-12 (Coppler).

The Court asked the Plaintiffs whether, if the Court finds there a genuine issue about the

pat-down searches including pulling on the students' bras, given that none of the Plaintiffs allege

that they were required to pull on their bras, the Plaintiffs have standing to challenge that

conduct.  See Tr. at 76:4-11 (Court).  The Plaintiffs asserted that they believe there is adequate

circumstantial evidence about the bra pulling, given the totality of the evidence, to allow a jury to

find that conduct was included in the searches.  See Tr. at 76:12-77:22 (Colfax).  Romero replied

that, in relation to her, there is no evidence she in any way participated, observed, or even knew

about the alleged bra pulling.  See Tr. at 78:1-25 (Coppler).

As to whether the law was clearly established, Romero asserted that, whereas she agrees

with  the Court's statement of the law at the time of the incident that it set forth in the TRO

Opinion, she disagrees that the law indicates Romero violated any clearly established right of the

Plaintiffs.  She also disagreed with "the Court's statement that she supervised pat-downs.  What

she did was she asked for the pat-downs and then . . . . [s]he was not standing there supervising

these searches."  Tr. at 82:4-23 (Coppler).  She asserted that the Plaintiffs have failed to meet

their burden here to refer the Court to Supreme Court or Tenth Circuit opinions showing that any

right Romero violated was clearly established.  See Tr. at 82:24-83:11 (Coppler).

The Plaintiffs responded that the Supreme Court's three leading opinions in this area --

New Jersey v. T.L.O., Vernonia School District 47J v. Acton, and Board of Education of

Independent School District No. 92 v. Earls -- together establish the balancing test and that it

applies for extracurricular activities.  See Tr. at 84:7-25 (Colfax).  They asserted that Romero

violated that clearly established law by contravening the Code of Conduct's requirements for

student searches when she did not even consider whether the pat-down searches were appropriate

under the reasonableness test.  See Tr. at 85:3-19 (Colfax).  Romero responded by conceding that

she "didn't do the analysis in her head in words as spoken by" the Plaintiffs, but asserted:

> She did what any reasonable school principal, who's not an attorney or a judge
> would do and say: "How am I going to keep the kids safe?  What am I worried
> about? And here's what I'm going to do."  That's the balancing that she engaged
> in.  And that is what she testified to.

Tr. at 86:17-24 (Coppler).  She asserted that what she did was therefore consistent with clearly

established law and that any conduct in which she was personally involved did not violate clearly

established law.  See Tr. at 87:2-24 (Coppler).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the

initial burden of "show[ing] that there is an absence of evidence to support the nonmoving

party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir.

1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).  Once the movant meets this burden, rule 56 requires the non-moving party to designate

specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477

U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of

facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS

The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 689 (1978).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).  The Tenth Circuit has recognized that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and a unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)(quoting 42 U.S.C. § 1983; Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)(internal quotation marks omitted)).

### 1.    Supervisory Liability.

The Tenth Circuit has held that supervisors may be liable under 42 U.S.C. § 1983 when a

plaintiff can establish the "defendant-supervisor's personal involvement by demonstrating [the supervisor's] 'personal participation, . . . exercise of control or direction, . . . failure to supervise,' or . . . 'knowledge of the violation and acquiescence in its continuance.'" Dodds v. Richardson, 614 F.3d at 1195 (quoting Poolaw v. Marcantel, 565 F.3d 721, 732 (10th Cir. 2009); Jenkins v. Wood, 81 F.3d 988, 995 (10th Cir. 1996)).  See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881 (D.N.M. Jan. 14, 2013)(Browning, J.)(noting that supervisors are not liable under § 1983 "'unless there is an affirmative link between the constitutional deprivation and the supervisor's exercise of control or direction, his personal participation, or his failure to supervise'")(quoting Kiesling v. Troughton, 107 F.3d 880, 1997 WL 111256, at *2 (10th Cir. 1997)(unpublished table opinion)).  Because a plaintiff can hold supervisors liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires showing that the supervisor "deliberate[ly] or conscious[ly] cho[se]," the policies.  Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)(citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at **25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d at 1185).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is

as follows: "Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff

must plead that each Government-official defendant, through the official's own individual

actions, has violated the Constitution."   556 U.S. at 676.   The Tenth Circuit in <u>Dodds v.</u>

<u>Richardson</u> held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we
> conclude the following basis of § 1983 liability survived it and ultimately resolves
> this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor
> who creates, promulgates, implements, or in some other way possesses
> responsibility for the continued operation of a policy the enforcement (by the
> defendant-supervisor or her subordinates) of which "subjects, or causes to be
> subjected" that plaintiff "to the deprivation of any rights . . . secured by the
> Constitution . . . ."

<u>Dodds v. Richardson</u>, 614 F.3d at 1199.  The Tenth Circuit noted, however, that "<u>Iqbal</u> may very

well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in

ways we do not need to address to resolve this case."   614 F.3d at 1200.   It concluded that

<u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and

personal involvement analysis."   <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  More specifically, the

Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the

unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express

or otherwise -- showing their authorization or approval of such misconduct."  614 F.3d at 1200-

01.  The specific example that the Tenth Circuit gave to illustrate this principle was <u>Rizzo v.</u>

<u>Goode</u>, 423 U.S. 362 (1976), where the plaintiff sought to hold a mayor, police commissioner,

and other city officials liable under 42 U.S.C. § 1983 for constitutional violations that unnamed

individual police officers committed.   See <u>Dodds v. Richardson</u>, 614 F.3d at 1200 (quoting <u>Rizzo</u>

<u>v. Goode</u>, 423 U.S. at 371).   The Tenth Circuit noted that the Supreme Court in that case found a

sufficient link between the police misconduct and the city officials' conduct, because there was a

deliberate plan by some of the named defendants to "crush the nascent labor organizations."

Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

### 2.     Non-Supervisory Liability.

A government actor may be liable for the constitutional violations that another committed, if the actor "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)). "Thus, Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  The Tenth Circuit has found liability for those defendants who proximately caused an injury complained-of under § 1983, and that even when the "conduct of other people may have concurrently caused the harm does not change the outcome as to [Defendants]," so long as there was not a superseding, intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  Id.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange County Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.   Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and ... will not supersede the defendant's responsibility."   Trask v. Franco, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed.1984)).   If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

For example, in the excessive force and unlawful arrest context, the Tenth Circuit has stated that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability." Martinez v. Carson, 697 F.3d at 1255.   The Tenth Circuit gave an example of a criminal suspect's criminal acts superseding officers' unlawful acts, quoting the Honorable Samuel J. Alito, Associate Justice for the Supreme Court of the United States, while he was sitting on the United States Court of Appeals for the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995)).

The Tenth Circuit has found that probation officers, who summoned New Mexico State Police ("NMSP") officers to a home, were not entitled to summary judgment absolving the probation officers for the Fourth Amendment violations the NMSP officers committed.   Trask v. Franco, 446 F.3d at 1045-1047.  The Honorable W. Daniel Schneider, United States Magistrate Judge for the District of New Mexico, had found that there was "no affirmative link between Mr. Trask's [the plaintiff's] alleged constitutional deprivations and the probation officers' exercise of control or failure to supervise." 446 F.3d at 1041 (internal quotations omitted).  Trask alleged that the probation officers were "responsible for his detention and arrest because . . . they called NMSP Officer Smith to the residence, [and] . . . they falsely represented that they had lawful authority to search the residence."  446 F.3d at 1041.  The probation officers maintained that they could not be liable for Trask's alleged constitutional deprivations, because they "did not personally participate in Mr. Trask's detention or arrest," and the NMSP officers "decided to detain Mr. Trask for officer safety," and later "arrested him for obstructing an officer," after the NMSP officers discovered that Trask had lied to them during their search of his residence.  446 F.3d at 1041.

The Tenth Circuit first determined that Trask's alleged unlawful detention and arrest would not have occurred but for the probation officers' conduct.  The Tenth Circuit then explained that Trask's "appearance at the door with knives, which required NMSP Officer Smith to handcuff him for officer safety," was another cause of Trask's detention and arrest.  446 F.3d at 1046-47.  The Tenth Circuit declined to find, however, that Trask's armed appearance at the door was a "superseding act that limited the probation officer's liability," because the probation

officers might have "reasonably foresaw when they first called for police backup" that Trask would be armed when the NMSP Officers arrived.  446 F.3d at 1047.  Thus, Trask's appearance could have superseded the probation officer's responsibility for his unlawful detention only "if the officers, when they called for assistance, did not reasonably foresee detention of Mr. Trask during the search."  446 F.3d at 1047.

Regarding Trask's alleged unlawful arrest, the Tenth Circuit noted that Trask lying to the NMSP officers during their search was an additional cause for his arrest.  The Tenth Circuit once again found, however, that the probation officers would still be liable if "it was reasonably foreseeable to the probation officers that Mr. Trask would lie or warrant arrest."  446 F.3d at 1047.  The Tenth Circuit noted that the criminality of Trask's lie did not preclude the probation officers from liability, as even "an intervening criminal act is not a superseding act to limit the probation officer's liability if the criminal act was foreseeable."  446 F.3d at 1047.  Thus, the Tenth Circuit reversed Judge Schneider's grant of summary judgment in favor of the probation officers, and remanded for the district court to determine whether reasonable minds could differ whether the probation officer's conduct was the proximate cause of Trask's alleged unlawful detention and arrest.  See 446 F.3d at 1047.

Similarly, the Tenth Circuit recently held, in Martinez v. Carson, that New Mexico Department of Corrections ("NMDC") employees, while on patrol of a high-crime neighborhood as part of a task force with Rio Rancho, New Mexico, police officers, could be liable for the Rio Rancho police's unlawful seizure of two plaintiffs, whom the NMDC employees transferred to the custody of the Rio Rancho police officers after the NMDC employees detained the plaintiffs for only a few minutes.  697 F.3d at 1253, 1256-57.  While detaining the plaintiffs, the NMDC employees forced the plaintiffs to the ground, "handcuffed them, drew weapons, and conducted a

pat-down search," and then handed the plaintiffs over to the custody of Rio Rancho police officers, who held one plaintiff for twelve hours and the other for five hours before release.  697 F.3d at 1254.  The Honorable William P. Johnson, United States District Judge for the District of New Mexico, held that the NMDC employees were liable only for the first few minutes of the plaintiffs' unlawful search and seizure, on the grounds that they had not "promoted, suggested, or indirectly caused or conspired with any Rio Rancho DPS personnel to violate Plaintiffs' rights," and did not know, and reasonably should not have known, that the plaintiffs would be deprived of a constitutional right.  697 F.3d at 1255.  The Tenth Circuit, citing Trask v. Franco, reversed Judge Johnson's judgment, and stated that the NMSP employees "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at 1255.  The Tenth Circuit concluded that a reasonable jury could find that the NMSP employees' conduct was the proximate cause "of at least some portion of Plaintiffs' prolonged detention following Defendant's transfer of custody to the Rio Rancho officers."  697 F.3d at 1255.  The Tenth Circuit noted that a jury had found that the NMSP employees lacked reasonable suspicion when they detained the plaintiffs and transferred them to the Rio Rancho officers, and concluded that a reasonable jury could find that the NMSP officers "knew or should have known their illegal seizure and transfer of custody would result in Plaintiffs' prolonged detention after the transfer of custody."  697 F.3d at 1256.

## LAW REGARDING DUTY TO INTERVENE TO STOP
## A CONSTITUTIONAL VIOLATION

"An officer who fails to perform a duty may be liable under § 1983 if that failure causes deprivation of protected rights."  Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1433 (10th Cir.

1984), judgment vacated on other grounds by City of Lawton v. Lusby, 474 U.S. 805 (1985). In

Hall v. Burke, the Tenth Circuit made clear that an officer's duty to intervene applies to instances

involving excessive force and illegal arrests.      See 12 F. App'x at 861 (10th Cir.

2001)(unpublished).[17]   The Tenth Circuit in Hall v. Burke stated:

> [W]e agree . . . that it is clearly established that all law enforcement officials have
> an affirmative duty to intervene to protect the constitutional rights of citizens from
> infringement by other law enforcement officers in their presence.  An officer who
> fails to intercede is liable for the preventable harm caused by the actions of the
> other officers where that officer observes or has reason to know: (1) that
> excessive force is being used, (2) that a citizen has been unjustifiably arrested, or
> (3) that any constitutional violation has been committed by a law enforcement
> official.    In order for liability to attach, there must have been a realistic
> opportunity to intervene to prevent the harm from occurring.  Whether an officer
> had sufficient time to intercede or was capable of preventing the harm being
> caused by another officer is an issue of fact for the jury unless, considering all the
> evidence, a reasonable jury could not possibly conclude otherwise.

12 F. App'x at 861 (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1996)).   Accord

Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008)(quoting almost identical

language from a decision from the United States Court of Appeals for the Second Circuit); Mick

v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996)("[A] law enforcement official who fails to

intervene to prevent another law enforcement official's use of excessive force may be liable

under § 1983."); Lusby v. T.G. & Y. Stores, Inc., 749 F.2d at 1433 (ruling that officer who did

---

[17] Hall v. Burke is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R.
32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their
persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not
binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .  However, if
an unpublished opinion . . .  has persuasive value with respect to a material issue in a case and
would assist the court in its disposition, we allow a citation to that decision."  United States v.
Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Hall v. Burke, Lobozzo v.
Colo. Dep't Of Corr., 429 F. App'x 707 (10th Cir. 2011)(unpublished), and Rhoads v. Miller,
352 F. App'x 289 (10th Cir. 2009)(unpublished), have persuasive value with respect to material
issues, and that they will assist the Court in its disposition of this Memorandum Opinion and
Order.

not prevent fellow officer's use of allegedly excessive force against an arrestee "may be liable [under § 1983] if he had the opportunity to intervene but failed to do so").  An officer thus may be liable if he had the opportunity to prevent or stop a constitutional violation but failed to do so. See Lusby v. T.G. & Y. Stores, Inc., 749 F.2d at 1433.  Accord Mata v. City of Farmington, 791 F. Supp. 2d 1118, 1156 (D.N.M. 2011)(Browning, J.).

In Tanner v. San Juan County Sheriff's Office, the Court held that a defendant police officer, assisting a second officer who used excessive force on the plaintiff by striking him multiple times with a flashlight, did not have a duty to intervene when she was assisting with controlling the scene and detaining the plaintiff's brother.  See 864 F. Supp. 2d at 1145-46.  The plaintiff alleged that, regardless whether the defendant police officer had a duty to intervene when the second officer was holding the plaintiff on a police cruiser's hood by holding a flashlight against the plaintiff's neck, the defendant police officer had a duty to intervene once the first officer pushed the plaintiff to the ground and struck the plaintiff while he was on the ground.  See 864 F. Supp. 2d at 1145-46.  The Court reasoned, because she was engaged in assisting the second officer by securing others on the scene, because the first officer on had the plaintiff on the ground for about twenty seconds before arresting the plaintiff, and because the plaintiff did not show that an officer "has a 'duty to abandon [an] attempt to arrest one potentially dangerous suspect in order to protect another potentially dangerous suspect against whom the other officers may be using excessive force,'" the defendant officer did not violate the plaintiff's constitutional rights.  864 F. Supp. 2d at 1146 (quoting Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998))(original alterations omitted).

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment to the United States Constitution provides that "[t]he right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures, shall not be violated."  U.S. Const. amend. IV.  The Fourteenth Amendment to the

United States Constitution extends the prohibition against unreasonable search and seizures to

state officers, including school officials. See New Jersey v. T.L.O., 469 U.S. 325, 334-37 (1985).

"The touchstone for determining the constitutionality of a governmental search is the

'reasonableness' of the search." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1184 (quoting

Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 828).  See

Maryland v. King, 133 S. Ct. 1958, 1969 (2013)("'The Fourth Amendment's proper function is

to constrain, not against all intrusions as such, but against intrusions which are not justified in the

circumstances, or which are made in an improper manner.'")(quoting Schmerber v. California,

384 U.S. 757, 768 (1966)).  The Supreme Court has reiterated that a warrantless search must be

reasonable in its manner and scope, and that the search's reasonableness depends on balancing

legitimate governmental interests against the intrusion upon individual's privacy:

> Even if a warrant is not required, a search is not beyond Fourth
> Amendment scrutiny; for it must be reasonable in its scope and manner of
> execution. Urgent government interests are not a license for indiscriminate police
> behavior. To say that no warrant is required is merely to acknowledge that "rather
> than employing a per se rule of unreasonableness, we balance the privacy-related
> and law enforcement-related concerns to determine if the intrusion was
> reasonable." This application of "traditional standards of reasonableness" requires
> a court to weigh "the promotion of legitimate governmental interests" against "the
> degree to which [the search] intrudes upon an individual's privacy."

Maryland v. King, 133 S. Ct. at 1970 (citations omitted).

### 1.    **The Special-Needs Doctrine.**

While "[i]n the criminal context, reasonableness usually requires a showing of probable

cause," Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 828

(citing Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 619 (1989)), "in the context of safety

and administrative regulations, a search unsupported by probable cause may be reasonable when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable," Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 828-29 (internal quotation marks and citation omitted). The Supreme Court refers to this "exception[] to the warrant and probable-cause requirements for a search when special needs beyond the normal law enforcement make those requirements impracticable" as the "special needs doctrine." Illinois v. Caballes, 543 U.S. 405, 425 (2005)(Ginsburg, J., dissenting)(quoting Griffin v. Wisconsin, 483 U.S. 868, 873 (1987))(internal quotations omitted). See Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 707 F. Supp. 2d 1190, 1241 n.36 (D.N.M. 2010)(Browning, J.)("The 'special needs' doctrine, which has been used to uphold certain suspicionless searches performed for reasons unrelated to law enforcement, is an exception to the general rule that a search must be based on individualized suspicion of wrongdoing.")(quoting Ferguson v. City of Charleston, 532 U.S. 67, 79 n.15 (2001))(internal quotations omitted), rev'd in part, vacated in part sub nom., Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011).

Special needs "inhere in the public school context." Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 828-29 (stating "that a warrant and finding of probable cause are unnecessary in the public school context because such requirements would unduly interfere with the maintenance of the swift and informal disciplinary procedures [that are] needed," and that strict adherence to the probable-cause requirement would undercut the substantial need for teachers and administrators to maintain order  in the schools)(quoting Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 653; New Jersey v. T.L.O., 469 U.S. at 340-41)). Thus, although it is well-settled that students do not "shed their constitutional rights . . . at the

schoolhouse gate," <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 506 (1969), "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children," <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. at 656.

The Supreme Court has recognized that a search in the school context may still be reasonable without individualized suspicion in "'limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion.'" <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. at 674 (O'Connor, J., dissenting)(quoting <u>United States v. Martinez-Fuerte</u>, 428 U.S. 543, 624 (1976)). <u>See</u> <u>Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls</u>, 536 U.S. at 830 (stating that "a finding of individualized suspicion may not be necessary when a school conducts drug testing"). The Supreme Court in <u>New Jersey v. T.L.O.</u> stated that the legality of a student search depends on the search's reasonableness. <u>See</u> <u>New Jersey v. T.L.O.</u>, 469 U.S. at 341-42. To determine a search's reasonableness, a court must consider: (i) whether the action was justified at its inception; and (ii) whether the search was reasonably related in scope to the circumstances which justified the interference. <u>See</u> <u>New Jersey v. T.L.O.</u>, 469 U.S. at 341-42. A student search will be justified at its inception when "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." <u>New Jersey v. T.L.O.</u>, 469 U.S. at 341-42. The search will be reasonable in scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." <u>New Jersey v. T.L.O.</u>, 469 U.S. at 342.

The Court has recognized that, ultimately, determining whether a student search is reasonable requires balancing the students' privacy interest with the government's interest in performing the search, and then determining whether the scope of the search is reasonably related to that government interest:

> To determine whether a particular "type of school search is constitutionally reasonable," a reviewing court must consider the "scope of the legitimate expectation of privacy at issue," the "character of the intrusion that is complained of," and the "nature and immediacy of the governmental concern at issue" and the efficacy of the means employed for dealing with it.

Herrera v. Santa Fe. Pub. Sch., 792 F. Supp. 2d at 1193 (quoting Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 654-66).

### 2.    Controlling Supreme Court Precedent on School-Related Searches.

In Vernonia School District 47J v. Acton, the Supreme Court found that the school district's student athlete drug policy, which authorized random urinalysis testing of students who participated in the district's school athletics program, was reasonable and thus constitutional. See 515 U.S. at 646, 665.  In reaching this conclusion, the Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the majority, considered the nature of the privacy interest upon which the search intruded, the intrusiveness of the search, and the nature and immediacy of the governmental concern at issue and the efficacy of the search's means for meeting it.  See 515 U.S. at 665.  The Supreme Court noted that, "[p]articularly with regard to medical examinations and procedures, therefore, 'students within the school environment have a lesser expectation of privacy than members of the population generally.'"  515 U.S. at 656-57 (citation omitted).  "Legitimate privacy expectations are even less with regard to student athletes."  515 U.S. at 656.

They require "suiting up" before each practice or event, and showering and

> changing afterwards.  Public school locker rooms, the usual sites for these
> activities, are not notable for the privacy they afford.  The locker rooms in
> Vernonia are typical: No individual dressing rooms are provided; shower heads
> are lined up along a wall, unseparated by any sort of partition or curtain; not even
> all the toilet stalls have doors.  As the United States Court of Appeals for the
> Seventh Circuit has noted, there is "an element of 'communal undress' inherent in
> athletic participation," Schaill by Kross v. Tippecanoe Cnty. Sch. Corp., 864 F.2d
> 1309, 1318 (1988).

515 U.S. at 657.  The Supreme Court also noted that there was "an additional respect in which

school athletes have a reduced expectation of privacy."  515 U.S. at 657.  The Supreme Court

stated that, by choosing to go out for a team, students "voluntarily subject themselves to a degree

of regulation even higher than that imposed on students generally."  515 U.S. at 657.

> In Vernonia's public schools, they must submit to a preseason physical exam
> (James testified that his included the giving of a urine sample, App. 17), they
> must acquire adequate insurance coverage or sign an insurance waiver, maintain a
> minimum grade point average, and comply with any "rules of conduct, dress,
> training hours and related matters as may be established for each sport by the head
> coach and athletic director with the principal's approval."  Record, Exh. 2, p. 30,
> ¶ 8.  Somewhat like adults who choose to participate in a "closely regulated
> industry," students who voluntarily participate in school athletics have reason to
> expect intrusions upon normal rights and privileges, including privacy.

515 U.S. at 657.[18]

---

[18] The Court has noted that, in light of the Supreme Court's recent decisions in Florida v.
Jardines, 133 S. Ct. 1409 (2013), and United States v. Jones, 132 S. Ct. 945 (2012), both of
which Justice Scalia wrote for the majority, and both of which analyze whether government
conduct constituted a Fourth Amendment search using the trespass-based approach, "the
question arises whether the Katz v. United States reasonable-expectation-of-privacy test is still
good law."  United States v. Alabi, No. CR 11-2292 JB, 2013 WL 1876791, at *34 (D.N.M. Apr.
30, 2013)(Browning, J.)(citing Minnesota v. Carter, 525 U.S. 83, 97-98 (1998)(Scalia, J.
concurring)).  Although the Court concluded in United States v. Alabi that, "as the Supreme
Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to
application of the Katz v. United States[, 389 U.S. 347 (1967)] reasonable-expectation-of-
privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-
based approach," 2013 WL 1876791, at *35, these two Supreme Court decisions may also raise
the question whether a search's reasonableness still hinges on balancing the government's
interest in the search against the subject's reasonable privacy expectations.  In June of 2013,
however, after having decided Florida v. Jardines, and United States v. Jones, Justice Scalia

Turning to the degree of intrusion, the Supreme Court stated that the degree of intrusion depended upon the manner in which production of the urine sample was monitored.  See 515 U.S. at 658.  Under the district's policy, the male students produced samples at a urinal along a wall and remained fully clothed, and were observed only from behind, if at all, and the female students produced samples in an enclosed stall, with a female monitor standing outside listening for sounds of tampering.  See 515 U.S. at 658.  The Supreme Court stated: "These conditions are nearly identical to those typically encountered in public restrooms, which men, women, and especially schoolchildren use daily. Under such conditions, the privacy interests compromised by

---

dissented from the Supreme Court's decision in Maryland v. King, and criticized the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to Katz v. United States and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'" Maryland v. King, 133 S. Ct. at 1986 (Scalia, J., dissenting).  Justice Scalia also pointed out that a person's "privacy-related concerns" in their body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the body is at stake? (The Fourth Amendment lists "persons" first among the entities protected against unreasonable searches and seizures.)

Maryland v. King, 133 S. Ct. at 1982 (Scalia J., dissenting)(emphasis in original).  Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school. Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

Maryland v. King, 133 S. Ct. 1989 (Scalia J., dissenting)(emphasis added).  The Court therefore concludes that Justice Scalia, and the Supreme Court, still rely on a person's privacy expectation as one side of the reasonableness balancing equation when determining whether a search is reasonable for Fourth Amendment purposes.

- 66 -

the process of obtaining the urine sample are in our view negligible." 515 U.S. at 658. The Supreme Court also considered the other privacy-invasive aspect of urinalysis -- the information it discloses concerning a person's body, and the materials he or she has ingested. See 515 U.S. at 658. The Supreme Court noted that the tests looked only for standard drugs, that the results of the tests were disclosed only to a limited class of school personnel who "have a need to know," that they were not turned over the law enforcement authorities, and that they were not used for any internal disciplinary function. 515 U.S. at 658. Turning to the governmental interest, the Supreme Court found that the concern of deterring drug use was important, that there was an immediate crisis of drug use, and that "a drug problem largely fueled by the 'role model' effect of athletes' drug use, and of particular danger to athletes, is effectively addressed by making sure that athletes do not use drugs." 515 U.S. at 661-64. Taking into account "the decreased expectation of privacy, the relative unobtrusiveness of the search, and the severity of the need met by the search," the Supreme Court concluded that the policy was reasonable and thus constitutional. 515 U.S. at 664-65.

In Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls, the Supreme Court considered whether a student activities drug testing policy, which required all students who participated in competitive extracurricular activities to submit to drug testing, was constitutional, because it reasonably served the school district's important interest in detecting and preventing drug use among its students. See 536 U.S. at 825. The Supreme Court noted that a "student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety." 536 U.S. at 830. The Supreme Court concluded that the students affected by the policy had a limited expectation of privacy, because the students who participated in the competitive extracurricular activities voluntarily

subjected themselves to many of the same intrusions of their privacy as do student athletes.

See 536 U.S. at 831.  The Supreme Court stated:

> Some of these clubs and activities require occasional off-campus travel and
> communal undress.  All of them have their own rules and requirements for
> participating students that do not apply to the student body as a whole.  For
> example, each of the competitive extracurricular activities governed by the Policy
> must abide by the rules of the Oklahoma Secondary Schools Activities
> Association, and a faculty sponsor monitors the students for compliance with the
> various rules dictated by the clubs and activities.    This regulation of
> extracurricular activities further diminishes the expectation of privacy among
> schoolchildren.

536 U.S. at 832.  The Supreme Court also found that, given the "minimally intrusive nature of

the sample collection and the limited uses to which the test results are put, we conclude that the

invasion of students' privacy is not significant."  536 U.S. at 833.  The policy required a faculty

monitor to wait outside the closed restroom stall, listening for normal sounds of urination to

guard against tampered samples, while the student produced a sample.  See 536 U.S. at 832-33.

The policy also required test results to be kept in confidential files separate from the student's

other educational records and that the results be released to school personnel only on a need-to-

know basis.  See 536 U.S. at 833.  The Supreme Court analogized this policy to the policy in

Vernonia School District 47J v. Acton and found that, as the policy in Vernonia School District

47J v. Acton, it was minimally intrusive.  See 536 U.S. at 833-34.  The Supreme Court further

noted that governmental concern in preventing drug use by schoolchildren is an important

concern, and that "the necessity for the State to act is magnified by the fact that this evil is being

visited not just upon individuals at large, but upon children for whom it has undertaken a special

responsibility of care and direction."  536 U.S. at 834.  The Supreme Court also noted that the

school district presented specific evidence of drug use in the schools.  See 536 U.S. at 835.  The

Supreme Court found that, given the nationwide epidemic of drug use, and the evidence of

increased drug use in the district's schools, it was reasonable for the school district to enact the drug testing policy.  See 536 U.S. at 836.

In Safford Unified School District No. 1 v. Redding, Supreme Court held that a strip search, based upon individualized suspicion, in which school employees required a student suspected of dealing pharmaceutical drugs at school to "remove her clothes down to her underwear, and then 'pull out' her bra and the elastic band on her underpants," was an unreasonable search in violation of the student's Fourth Amendment rights.  Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 374 (2009).  The week before the search, another student told the assistant principal, Kerry Wilson, that students were bringing drugs and weapons on campus, and that he had been sick after taking pills that a classmate gave him.  See 557 U.S. at 371-72.  That student then handed a pill to Wilson and identified another student, Marissa Glines, as having given him the pill. Wilson called Glines out of class and found a day planner with various contraband items, and required Glines to turn out her pockets and open her wallet, in which Wilson found a blue pill, several white pills, and a razor blade.  When Wilson asked where Glines obtained the blue pill, Glines indicated that another student, Savana Redding, gave the pill to her, and denied knowing about the day planner and the contraband items found within the planner.  See 557 U.S. at 372.  "Wilson did not ask [Glines] any followup questions to determine whether there was any likelihood that [Redding] presently had pills: neither asking when [Glines] received the pills from [Redding] nor where [Redding] might be hiding them." 557 U.S. at 372.  Wilson, and the school's administrative assistant, Helen Romero, required Glines to undergo a search of her bra and underpants by the administrative assistant and the school nurse, which did not turn up any additional pills.  See 557 U.S. at 373.  Wilson then called Redding to his office and showed her the day planner.  "[W]hile she denied knowledge of the

contraband, [Redding] admitted that the planner was hers and that she had lent it to [Glines]."

557 U.S. at 373.  In relation to Redding, the Supreme Court noted:

> Wilson had other reports of their friendship from staff members, who had
> identified [Redding] and [Glines] as part of an unusually rowdy group at the
> school's opening dance in August, during which alcohol and cigarettes were
> found in the girls' bathroom. Wilson had reason to connect the girls with this
> contraband, for Wilson knew that Jordan Romero [the student who had originally
> complained and gotten sick] had told the principal that before the dance, he had
> been at a party at [Redding]'s house where alcohol was served. [Gline]'s
> statement that the pills came from [Redding] was thus sufficiently plausible to
> warrant suspicion that [Redding] was involved in pill distribution.

557 U.S. at 373.  Wilson next showed Redding the blue pill and the white pills, and asked her

whether she knew anything about them.  See 557 U.S. at 368.  Redding said that she did not.

When Wilson told Redding that it had been reported to him that she was distributing the pills,

she denied doing so and granted Wilson permission to "search her belongings."  557 U.S. at 368.

Romero came in and helped Wilson search through Redding's backpack, which did not turn up

any contraband or pills.  Wilson then told Romero to take Redding to the nurse's office to search

her clothes for pills.

> Romero and the nurse, Peggy Schwallier, asked [Redding] to remove her jacket,
> socks, and shoes, leaving her in stretch pants and a T-shirt (both without pockets),
> which she was then asked to remove. Finally, [Redding] was told to pull her bra
> out and to the side and shake it, and to pull out the elastic on her underpants, thus
> exposing her breasts and pelvic area to some degree. No pills were found.

557 U.S. at 369.  Redding's mother filed suit against the school district, Wilson, Romero, and

Schwallier.  See 557 U.S. at 369.  The United States Court of Appeals for the Ninth Circuit,

sitting en banc, held that the strip search violated Redding's Fourth Amendment rights and

concluded that Schwallier and Romero were not liable "since they had not acted as independent

decisionmakers."  557 U.S. at 369-70 (citing Redding v. Safford Unified Sch. Dist. No. 1, 531

F.3d 1071, 1089 (9th Cir. 2008)(en banc)).  The Ninth Circuit held that Redding's Fourth

Amendment rights were, however, clearly established at the time of the search and that Wilson

was thus not protected by qualified immunity, because "these notions of personal privacy are

'clearly established' in that they inhere in all of us, particularly middle school teenagers, and are

inherent in the privacy component of the Fourth Amendment's proscriptions against

unreasonable searches." Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 369 (quoting

Redding v. Safford Unified Sch. Dist. No. 1, 531 F.3d at 1089).

In relation to whether the search was unreasonable, and thus violated Redding's

constitutional rights, the Supreme Court first concluded that the T.L.O. reasonable suspicion

standard applied to Wilson's search of Redding's backpack:

> There is no question here that justification for the school officials' search was
> required in accordance with the T.L.O. standard of reasonable suspicion, for it is
> common ground that [Redding] had a reasonable expectation of privacy covering
> the personal things she chose to carry in her backpack, and that Wilson's decision
> to look through it was a "search" within the meaning of the Fourth Amendment.

Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 373 n.3.  The Supreme Court held that

Wilson's suspicion up to the time that he searched Redding's backpack and Romero searched her

"outer clothing" was sufficient to make that extent of the search reasonable:

> If a student is reasonably suspected of giving out contraband pills, she is
> reasonably suspected of carrying them on her person and in the carryall that has
> become an item of student uniform in most places today. If Wilson's reasonable
> suspicion of pill distribution were not understood to support searches of outer
> clothes and backpack, it would not justify any search worth making. And the look
> into [Redding]'s bag, in her presence and in the relative privacy of Wilson's
> office, was not excessively intrusive, any more than Romero's subsequent search
> of her outer clothing.

557 U.S. at 373-74.  The Supreme Court agreed with the Ninth Circuit, concluding that Wilson's

direction to extend the search and require Redding to "pull her underwear away from her body in

the presence of the two officials who were able to see her necessarily exposed her breasts and

- 71 -

pelvic area to some degree," and overstepped the intrusion which Wilson's suspicions permitted and constituted an unreasonable search.  557 U.S. at 374.  The Honorable David Souter, former Associate Justice for the Supreme Court, who penned the decision, pointed out that there is "obviously different meaning of a search exposing the body from the experience of nakedness or near undress in other school circumstances. Changing for gym is getting ready for play; exposing for a search is responding to an accusation reserved for suspected wrongdoers and fairly understood as . . . degrading."  557 U.S. at 375.  Judge Souter noted that "[t]he indignity of the search does not, of course, outlaw it," but concluded that "the content of the suspicion failed to match the degree of intrusion."  557 U.S. at 375.  Judge Souter reasoned:

> Wilson knew beforehand that the pills were prescription-strength ibuprofen and over-the-counter naproxen, common pain relievers equivalent to two Advil, or one Aleve. He must have been aware of the nature and limited threat of the specific drugs he was searching for, and while just about anything can be taken in quantities that will do real harm, Wilson had no reason to suspect that large amounts of the drugs were being passed around, or that individual students were receiving great numbers of pills.
>
> Nor could Wilson have suspected that [Redding] was hiding common painkillers in her underwear. Petitioners suggest, as a truth universally acknowledged, that "students . . . hid[e] contraband in or under their clothing," and cite a smattering of cases of students with contraband in their underwear. But when the categorically extreme intrusiveness of a search down to the body of an adolescent requires some justification in suspected facts, general background possibilities fall short; a reasonable search that extensive calls for suspicion that it will pay off. But nondangerous school contraband does not raise the specter of stashes in intimate places, and there is no evidence in the record of any general practice among Safford Middle School students of hiding that sort of thing in underwear; neither Jordan nor [Gline] suggested to Wilson that [Redding] was doing that, and the preceding search of [Gline] that Wilson ordered yielded nothing. Wilson never even determined when [Gline] had received the pills from [Redding]; if it had been a few days before, that would weigh heavily against any reasonable conclusion that [Redding] presently had the pills on her person, much less in her underwear.
>
> In sum, what was missing from the suspected facts that pointed to [Redding] was any indication of danger to the students from the power of the

> drugs or their quantity, and any reason to suppose that [Redding] was carrying
> pills in her underwear. We think that the combination of these deficiencies was
> fatal to finding the search reasonable.

557 U.S. at 375-77.

Justice Souter, with whom Chief Justice Roberts, Justices Scalia, Kennedy, Breyer, Alito, and Thomas joined, disagreed, however, with the Ninth Circuit's conclusion that Redding's right was clearly established, and held that Wilson was entitled to qualified immunity. See 557 U.S. at 377-79. Justice Souter noted that "there is no need that the very action in question have previously been held unlawful" and that "officials can still be on notice that their conduct violates established law in novel factual circumstances." 557 U.S. at 377-78 (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999); Hope v. Pelzer, 536 U.S. 730, 741 (2002))(internal quotations omitted). Justice Souter nevertheless concluded that, because "the number of cases viewing school strip searches differently from the way we see them are numerous enough, with well-reasoned majority and dissenting opinions, [there existed] doubt that we were sufficiently clear in the prior statement of the law." Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 378-79. The Supreme Court accordingly held that the circumstances "warranted" granting Wilson qualified immunity. 557 U.S. at 379. In reaching this conclusion, the Supreme Court's decision was informed by the fact that

> other courts considering qualified immunity for strip searches have read T.L.O. as
> "a series of abstractions, on the one hand, and a declaration of seeming deference
> to the judgments of school officials, on the other," which made it impossible "to
> establish clearly the contours of a Fourth Amendment right . . . [in] the wide
> variety of possible school settings different from those involved in T.L.O." itself.

557 U.S. at 378 (alterations in original)(quoting Jenkins v. Talladega City Bd. of Ed., 115 F.3d 821, 828 (11th Cir. 1997)(en banc)).

**3.     School-Related Search Precedent.**

- 73 -

In <u>Doe ex rel. Doe v. Little Rock School District</u>, 380 F.3d 349 (8th Cir. 2004), the United States Court of Appeals for the Eighth Circuit found that the practice of the Little Rock School District ("LRSD"), which subjected students to random, suspicionless searches of their persons and belongings by school officials was unconstitutional, because the searches unreasonably invaded the students' legitimate expectations of privacy.  380 F.3d at 351.  The Eighth Circuit noted that public school students have lesser expectations of privacy, owing, in large part, to the government's responsibilities as guardian and tutor of the children entrusted to its care.  <u>See</u> 380 F.3d at 353.  The Eighth Circuit stated however, that "[p]ublic school students' privacy interests, however, are not nonexistent."  380 F.3d at 353.

> It is true that the legitimate expectation of privacy retained by members of certain sub-populations of a public school's student body falls below the already limited baseline level of privacy afforded to public school students generally.  For instance, the Supreme Court has analogized students who voluntarily participate in school athletics or other competitive extracurricular activities to adults who choose to participate in a "closely regulated industry," in that both groups voluntarily subject themselves to "intrusions upon normal rights and privileges, including privacy."  <u>Vernonia</u>, 515 U.S. at 656-57 . . .  (internal quotations omitted); <u>Earls</u>, 536 U.S. at 831-32 . . . .  Sports and other competitive extracurricular activities usually have separate systems of rules that do not apply to the student body as a whole, and often involve such requirements as mandatory physicals, frequent communal undress, and traveling and lodging in close confines.  By consciously choosing to "go out for the team" or other competitive extracurricular endeavor, such students agree to waive certain privacy expectations that they would otherwise have as students in exchange for the privilege of participating in the activity.  But the search regime at issue here is imposed upon the entire student body, so the LRSD cannot reasonably claim that those subject to search have made a voluntary tradeoff of some of their privacy interests in exchange for a benefit or privilege.

380 F.3d at 353-54.  The Eighth Circuit then inquired into the intrusiveness of the search. <u>See</u> 380 F.3d at 354.  The Eighth Circuit stated that the search invaded students' privacy interests in a major way, stating that "[a] search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a

severe violation of subjective expectations of privacy."   380 F.3d at 354 (citation omitted).

"Students often carry items of a personal or private nature in their pockets and bags, and many

students (whether or not they are carrying contraband) must surely feel uncomfortable or

embarrassed when officials decide to rifle through their personal belongings."   380 F.3d at 654-

55.

> Whatever privacy interests the LRSD students have in the personal belongings
> that they bring to school are wholly obliterated by the search practice at issue
> here, because all such belongings are subject to being searched at any time
> without notice, individualized suspicion, or any apparent limit to the
> extensiveness of the search.  Full-scale searches that involve people rummaging
> through personal belongings concealed within a container are manifestly more
> intrusive than searches effected by using metal detectors or dogs.  Indeed, dogs
> and magnetometers are often employed in conducting constitutionally reasonable
> large-scale "administrative" searches precisely because they are minimally
> intrusive, and provide an effective means for adducing the requisite degree of
> individualized suspicion to conduct further, more intrusive searches.  The type of
> search that the LRSD has decided to employ, in contrast, is highly intrusive, and
> we are not aware of any cases indicating that such searches in schools pass
> constitutional muster absent individualized suspicion, consent or waiver of
> privacy interests by those searched, or extenuating circumstances that pose a
> grave security threat.

380 F.3d at 355.   The Eighth Circuit also noted that the character of the intrusions were

qualitatively more severe than that in Vernonia and Earls, because, in the case before it, the

searches could lead directly to the imposition of criminal sanctions.  See 380 F.3d at 355.  The

Eighth Circuit further found that LRSD failed to demonstrate the existence of a need sufficient to

justify the substantial intrusion.  See 380 F.3d at 356.

> While the LRSD has expressed some generalized concerns about the existence of
> weapons and drugs in its schools, it conceded at oral argument that there is
> nothing in the record regarding the magnitude of any problems with weapons or
> drugs that it has actually experienced.  All schools surely have an interest in
> minimizing the harm that the existence of weapons and controlled substances
> might visit upon a student population, but public schools have never been entitled
> to conduct random, full-scale searches of students' personal belongings because
> of a mere apprehension.

- 75 -

380 F.3d at 356.  The Eighth Circuit determined that LSRD's search practice was unreasonable, because LRSD's search practice effectively reduced expectations of privacy to nothing, and there was no evidence of unique circumstances that would justify significant intrusions.  See 380 F.3d at 356.

In B.C. v. Plumas Unified School District, 192 F.3d 1260 (9th Cir. 1999), the Ninth Circuit concluded that the "random and suspicionless dog sniff search" of a high school student "was unreasonable in the circumstances."[19]  192 F.3d at 1267.  The Ninth Circuit found that the students' privacy interests were not minimal, although they have a lesser expectation of privacy than members of the population generally.  See 192 F.3d at 1267.  The Ninth Circuit stated that deterring drug use by students is an important -- if not compelling -- government interest, but noted that the record did not disclose that there was a drug crisis or a drug problem at the high school.  See 192 F.3d at 1268.  "In the absence of a drug problem or crisis at Quincy High, the government's important interest in deterring student drug use would not have been placed in jeopardy by a requirement of individualized suspicion."  192 F.3d at 1268 (internal quotation marks and citation omitted).

In Hough v. Shakopee Public Schools, 608 F. Supp. 2d 1087 (D. Minn. 2009), the United States District Court for the District of Minnesota found that a policy of daily, suspicionless searches was not reasonable and thus was unconstitutional.  See 608 F. Supp. 2d at 1108.  The district court recognized that the expectation of privacy of any student is limited in a public school environment.  See 608 F. Supp. 2d at 1100-01.  The defendant argued that students waived their right to privacy when they chose to accept special education services from the

---

[19]  The Ninth Circuit found that the dog sniff was a search, because it infringed the student's reasonable expectation of privacy.  See 192 F.3d at 1266.

school district.  See 608 F. Supp. 2d at 1101.  The district court rejected this argument, stating

that

> participating in a special-education program is very different from participating in
> athletics (as in Vernonia School District) or in competitive extracurricular
> activities (as in Earls).  No student is entitled under the law to play football or
> sing in the choir, but every disabled student is entitled under the law to
> special-education services.  Moreover, because school attendance is compulsory,
> a student's participation in a special-education program is not voluntary in the
> same way that participation in extracurricular activities is voluntary. MRVSEC
> "cannot reasonably claim that those subject to search have made a voluntary
> tradeoff of some of their privacy interests in exchange for a benefit or privilege."
> Doe, 380 F.3d at 354.

608 F. Supp. 2d at 1101.  The district court found that the special-education students' legitimate

expectation of privacy fell below the "already limited baseline level of privacy afforded to public

school students generally," because they sacrifice the privacy of medical and other information

about their disabilities, but stated that the students "nevertheless retain some legitimate

expectation of privacy in their bodies, clothing, and personal possessions."  608 F. Supp. 2d at

1103.  The district court found that the searches were intrusive.  See 608 F. Supp. at 1103.

Generally, students were asked to remove their shoes and socks, turn down the waistband of their

pants, empty their pockets, search their backpacks and purses, and, at times, submit to a pat

down.  See 608 F. Supp. 2d at 1103.  The district court stated:

> On the whole, MRVSEC's searches were extraordinarily intrusive.  As in
> Doe, the students' backpacks and purses, and the contents of their pockets, were
> searched. Doe found such searches to be "highly intrusive" and characterized
> them as "wholly obliterating" the students' "privacy interests . . . in the personal
> belongings that they bring to school." Id. at 355.  But whereas Doe involved
> occasional searches of the possessions of randomly selected students, MRVSEC
> searched the possessions of every student every day. Thus, even if MRVSEC had
> stopped at searching possessions, its searches would have been far more intrusive
> than the "highly intrusive" searches struck down in Doe.
>
> But MRVSEC did not stop at searching possessions. MRVSEC searched
> people. The students not only had their backpacks, purses, and the contents of

their pockets searched, but students were required to partially disrobe (i.e., to take off their shoes and socks, and sometimes coats, sweaters, or sweatshirts) and to permit school employees to look inside their clothes (i.e., under their waistbands and pant legs). And, most importantly, the students were touched. Every day, every student either was patted down or was at least subject to being patted down.

MRVSEC's searches were as intrusive as any government search that any American citizen is likely to experience in her lifetime, unless she is incarcerated. Anyone who has been thoroughly searched at an airport -- who has had her arms, legs, chest, and back touched by a stranger, and then had her most personal possessions pawed through -- knows exactly how intrusive such a search is. The MRVSEC searches were even more intrusive, and every student experienced them every day.

In sum, the Court concludes that the MRVSEC searches were extraordinarily intrusive -- far more intrusive than the searches approved in Vernonia School District and Earls, and far more intrusive than the searches disapproved in Doe. In none of those cases did school officials, without individualized suspicion, force students to take off clothing, look inside of students' clothing, or touch students. Indeed, with the exception of one case (discussed below) involving students who had committed crimes and were attending what was essentially a correctional facility, defendants have not cited a single case in which a court approved suspicionless searches of students that were nearly as intrusive as MRVSEC's.

608 F. Supp. 2d at 1105. The district court found that the evidence regarding the purpose of the policy, which was to remove distractions and dangerous items, and to create a calm and focused environment where students feel safe, was insufficient to justify an intrusive search of every student every day. See 608 F. Supp. 2d at 1106. The district court stated:

MRVSEC has given the Court no reason to believe that far less intrusive searches would not adequately ensure compliance with the guidelines about dangerous and distracting items. Virtually every item that school officials have identified as being dangerous or distracting (guns, knives, cell phones, iPods, and lighters), as well as virtually every dangerous or distracting item that any plaintiff has ever brought to school (Leatherman multi-tools, nunchaku, and lighters), could be detected with a metal detector. Such screening would be far less intrusive than the searches MRVSEC now employs -- and, quite possibly, would be more effective at detecting dangerous or distracting items.

. . . .

- 78 -

The search policy could be narrowed in other respects. The policy could be changed so that illegal items that are found are not required to be turned over to law enforcement. Students could be given the option of checking backpacks, purses, and coats with school officials at the beginning of the day in lieu of having those items searched. And more thorough searches could be reserved for students who set off a metal detector or otherwise give school officials some reason to suspect that they are carrying dangerous or disruptive items. MRVSEC has submitted no evidence that these or other less intrusive alternatives would not adequately accomplish the purposes of the intrusive searches that MRVSEC now employs.

608 F. Supp. 2d at 1106-07. Balancing these factors, the district court thus concluded that the policy of daily, suspicionless searches was not reasonable. See 608 F. Supp. 2d at 1109.

In United States v. Hartwell, 436 F.3d 174 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit addressed a similar issue but in a non-school setting -- whether a search that Transportation Security Administration ("TSA") agent conducted offended the Fourth Amendment. 436 F.3d at 175. On May 17, 2003, Hartwell arrived at the Philadelphia International Airport. See 436 F.3d at 175. "He reached the security checkpoint, placed his hand luggage on a conveyor belt to be x-rayed, and approached the metal detector. Hartwell's luggage was scanned without incident, but he set off the magnetometer when he walked through." 436 F.3d at 175. Hartwell removed all items from his pockets and passed through the metal detector again. See 436 F.3d at 175. A TSA agent took Hartwell aside after he passed through the metal detector and used a handheld "wand-like magnetometer to discover what set off the metal detector." 436 F.3d at 175. The wand revealed a solid object in Hartwell's cargo pants pocket. See 436 F.3d at 175-76. The agent asked what the object was, but Hartwell did not respond. See 436 F.3d at 176.

What occurred next is the subject of some dispute. Hartwell claims that he was escorted to a private screening room near the checkpoint, where he refused Padua's repeated requests to reveal the contents of his pocket. Frustrated by Hartwell's unresponsiveness, Padua eventually reached into Hartwell's pocket

and pulled out a package of drugs.  He immediately called the Philadelphia police, who searched Hartwell, found two additional packages of drugs and about $3000 in cash, and promptly arrested him.

The government claims that neither Padua nor the police officer ever reached into Hartwell's pocket without his consent.  According to Agent Padua, the following occurred.  After requesting private screening, Hartwell refused several requests to empty his pocket, nervously backed away from Agent Padua while he was being questioned, and suddenly dropped his pants.  This suspicious behavior prompted Padua to call for backup.  A police officer arrived and asked Hartwell to remove any items from his pocket, and Hartwell complied by handing over one package of drugs.  He then feigned falling to the floor and dropped a second package of drugs.

436 F.3d at 176.  The Third Circuit found that the administrative-search doctrine justified the search at the airport checkpoint.  See 436 F.3d at 178.  The Third Circuit noted that "[s]uspicionless checkpoint searches are permissible under the Fourth Amendment when a court finds a favorable balance between the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."  436 F.3d at 178-79 (quoting Illinois v. Lidster, 540 U.S. 419, 427 (2004); Brown v. Texas, 443 U.S. 47, 51 (1979))(internal quotation marks omitted).  The Third Circuit found that the airport checkpoint passed the test set forth in Brown v. Texas.

First, there can be no doubt that preventing terrorist attacks on airplanes is of paramount importance.

Second, airport checkpoints also "advance[] the public interest," as Brown requires. As this Court has held, "absent a search, there is no effective means of detecting which airline passengers are reasonably likely to hijack an airplane." Additionally, it is apparent that airport checkpoints have been effective.

Third, the procedures involved in Hartwell's search were minimally intrusive.  They were well-tailored to protect personal privacy, escalating in invasiveness only after a lower level of screening disclosed a reason to conduct a more probing search.  The search began when Hartwell simply passed through a magnetometer and had his bag x-rayed, two screenings that involved no physical touching.  Only after Hartwell set off the metal detector was he screened with a wand -- yet another less intrusive substitute for a physical pat down.  And only

after the wand detected something solid on his person, and after repeated requests that he produce the item, did the TSA agents (according to Hartwell) reach into his pocket.

In addition to being tailored to protect personal privacy, other factors make airport screening procedures minimally intrusive in comparison to other kinds of searches. Since every air passenger is subjected to a search, there is virtually no "stigma attached to being subjected to search at a known, designated airport search point." Moreover, the possibility for abuse is minimized by the public nature of the search. "Unlike searches conducted on dark and lonely streets at night where often the officer and the subject are the only witnesses, these searches are made under supervision and not far from the scrutiny of the traveling public." And the airlines themselves have a strong interest in protecting passengers from unnecessary annoyance and harassment.

Lastly, the entire procedure is rendered less offensive -- if not less intrusive -- because air passengers are on notice that they will be searched. Air passengers choose to fly, and screening procedures of this kind have existed in every airport in the country since at least 1974. The events of September 11, 2001, have only increased their prominence in the public's consciousness. It is inconceivable that Hartwell was unaware that he had to be searched before he could board a plane. Indeed, he admitted that he had previously been searched before flying.

In conclusion, Hartwell's search does not offend the Fourth Amendment even though it was initiated without individualized suspicion and was conducted without a warrant. It is permissible under the administrative search doctrine because the State has an overwhelming interest in preserving air travel safety, and the procedure is tailored to advance that interest while proving to be only minimally invasive, as that term is understood in Brown.

436 F.3d at 179-81 (internal citations and footnotes omitted).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City

of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economu, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457

U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001).   When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.   See Riggins v. Goodman, 572 F.3d at 1107.

### 1.   Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.   In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."   555 U.S. at 236.   The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.   See Pearson v. Callahan 555 U.S. at 241.   In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."   555 U.S. at 237.   The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).   See also Reichle v. Howards, 132 S. Ct.

2088, 2093 (2012)(affirming Pearson v. Callahan's procedure, and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

　　　The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: When (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage" and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking" because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  Kerns v. Bader, 663 F.3d at 1180-81 (quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary and the conduct is likely only to face

challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. at 2031-32.  See Kerns v. Bader, 663 F.3d at 1181. "Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011).  See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").  Cf. Glover v. Gartman, No. CIV 11-0752 JB/LAM, 2012 WL 4950756, at *30 n.5 (D.N.M. Sept. 27, 2012)(Browning, J.)(expressing concern of Justice Elena Kagan's comments about "large" and "small" cases, and noting that, as a trial court judge, the Court must find both the law and facts correctly and accurately, and must also give its attention and time to each litigant and case before the Court).  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

**2.      Clearly Established Rights in the Qualified Immunity Analysis.**

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't Of Corr., (quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to

be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general

proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  Kerns v. Bader, 663 F.3d at 1183 (emphasis added). Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

### 3.    Factual Disputes in the Qualified-Immunity Analysis.

In determining whether the plaintiff has met his or her burden of establishing a constitutional violation that was clearly established, a court construes the facts in the light most favorable to the plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378-80 (2007); Riggins v. Goodman, 572 F.3d at 1107 (noting that the Tenth Circuit "accept[s] the facts as the plaintiff alleges them").  In Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), the Tenth Circuit explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  "The Tenth Circuit, in Rhoads v. Miller, explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]"  Lymon v. Aramark Corp., 728 F.Supp.2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.  And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility. . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

- 88 -

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court" before

inquiring into whether there are genuine issues of material fact for resolution by the jury.

584 F.3d at 1326-27 (Holmes, J. concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770

(11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these

disputes are irrelevant to the qualified immunity analysis because that analysis assumes the

validity of the plaintiffs' facts")).

## ANALYSIS

The Plaintiffs state in their response to Romero's statement of undisputed facts that they

make their response on the basis of the evidence currently available to the Plaintiffs.  The

Plaintiffs note that discovery is ongoing and that they believe they will gather more facts relevant

to some of the issues which Romero's motion raises.  The Plaintiffs do not, however, seek to

engage in more discovery under rule 56(d) of the Federal Rules of Civil Procedure; the Plaintiffs

maintain that Romero cannot establish an entitlement to qualified immunity based on the

evidence that has already been gathered.  The Court disagrees and concludes that Romero is

entitled to qualified immunity. Although the Court finds that Romero requesting that ASI New

Mexico guards perform pat-down searches of all of the Capital High Prom attendees violated the

Plaintiffs' constitutional rights, the Plaintiffs' right to be free from these suspicionless pat-down searches was not clearly established at the time of the Prom in April, 2011.  Additionally, with respect to C. Herrera's § 1983 claim, although there is a genuine issue of fact whether Romero saw the ASI New Mexico guard require C. Herrera to lift her dress, and expose her bare leg, above her knee, even if Romero did see that conduct, it was not clearly established in April, 2011, that a school search to that extent violated C. Herrera's constitutional rights.

I.    **ROMERO VIOLATED THE PLAINTIFFS' CONSTITUTIONAL RIGHTS BY ORDERING ASI TO SEARCH EVERY STUDENT ENTERING THE PROM AND ASKING FOR THE INCLUSION OF PATDOWN SEARCHES OF THE STUDENTS.**

Romero asserts that she did not violate the Plaintiffs' constitutional rights, because she did not participate in the searches, as "[s]he did not order them, did not perform them, did not see them, . . . was not told about them until it was too late to do anything," and because she "only asked ASI to perform pat-down searches."  Motion for Summary Judgment at 24.  She asserts that she "assumed those searches would be performed by ASI in the same manner that they had always been performed by ASI personnel; without touching of breasts or bare legs or bra pulling."  Motion for Summary Judgment at 24.  The Plaintiffs point out, however, that "[a] finding that the searches violate the Constitution is consistent with the Court's finding" in its TRO Opinion that "it was likely that no form of pat-down search could be justified under the Fourth Amendment."  MSJ Response at 16.  The Court agrees with the Plaintiffs point, and concludes that, by asking ASI New Mexico to perform pat-down searches at the Prom, Romero violated the Plaintiffs' constitutional rights.

The Court recently noted that, in the Supreme Court's two most recent Fourth Amendment cases in which the Court analyzed whether government conduct constituted a Fourth

Amendment search, the Supreme Court's "recent guidance in Florida v. Jardines" provides that "the trespass-based search analysis is a 'baseline' to determine whether [a state officer's] . . . conduct constitutes a Fourth Amendment search." United States v. Alabi, 2013 WL 1876791, *56 (quoting Florida v. Jardines, 133 S. Ct. at 1417). Under the trespass-based approach, "[w]hen 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" United States v. Alabi, 2013 WL 1876791, *33 (quoting Florida v. Jardines, 133 S. Ct. at 1414)(internal quotations omitted). Notably, no party here disputes that the pat-down searches to which the prom attendees were subjected entering the prom are Fourth Amendment searches. And given Justice Scalia's recent statement in Maryland v. King that a DNA swab is a Fourth Amendment search because it is "a physical intrusion onto the person," the pat-down searches are Fourth Amendment searches as well. 133 S. Ct. 1986 (Scalia, J., dissenting)(citing Florida v. Jardines, 133 S. Ct. at 1413-14). Thus, the Court will not conduct the trespass-based analysis that the Supreme Court conducted in Florida v. Jardines, and United States v. Jones, or that the Court conducted in United States v. Alabi.

Nevertheless, as the Supreme Court pointed out in Maryland v. King, concluding there was a Fourth Amendment search is only the first step in the process, because, a reasonable Fourth Amendment search is constitutional. See 133 S. Ct. at 1970; Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1184 ("The touchstone for determining the constitutionality of a governmental search is the 'reasonableness' of the search.")(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 828). While, "[i]n the criminal context, reasonableness usually requires a showing of probable cause," Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 828 (citing Skinner v. Ry. Labor Execs.'

Ass'n, 489 U.S. at 619), "in the context of safety and administrative regulations, a search

unsupported by probable cause may be reasonable when special needs, beyond the normal need

for law enforcement, make the warrant and probable-cause requirement impracticable," Bd. of

Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 828-29 (internal

quotation marks and citation omitted).

> Even if a warrant is not required, a search is not beyond Fourth
> Amendment scrutiny; for it must be reasonable in its scope and manner of
> execution. Urgent government interests are not a license for indiscriminate police
> behavior. To say that no warrant is required is merely to acknowledge that "rather
> than employing a per se rule of unreasonableness, we balance the privacy-related
> and law enforcement-related concerns to determine if the intrusion was
> reasonable." This application of "traditional standards of reasonableness" requires
> a court to weigh "the promotion of legitimate governmental interests" against "the
> degree to which [the search] intrudes upon an individual's privacy."

Maryland v. King, 133 S. Ct. at 1970 (citations omitted).

In its TRO Opinion, the Court concluded that "there is a substantial likelihood that the

practice of patting down students, without any individualized reasonable suspicion, is

unreasonably intrusive," and, unconstitutional.   Herrera v. Santa Fe. Pub. Sch., 792 F. Supp. 2d

at 1194.  The Court noted that, "in this case, the touching of students' bodies . . . is an intrusive

search."  792 F. Supp. 2d at 1194.  Romero does not address the Court's preliminary conclusion

about the general touching of students' bodies in pat-down searches, and the Court's

determination that, "given the intrusiveness of a pat-down search and less intrusive alternatives,

it is likely that the suspicionless pat-down searches are unreasonable under the Fourth

Amendment."  792 F. Supp. 2d at 1194 (emphasis added).  She assumes that the problem is "the

alleged inappropriate actions of ASI employees during the pat-down searches": the further

"touching of breasts or bare legs or bra pulling," rather than the blanket requirement of pat-down

searches without individualized suspicion.  Motion for Summary Judgment at 24 (emphasis

added).

The Court concluded that, what was likely problematic about the searches was that the

SFPS -- and Romero -- required suspicionless pat-down searches of every student entering the

prom, rather than using less invasive searches, such as searching the students by using a metal

detector "wand" and then "escalating [the search's] invasiveness only after a lower level of

screening disclosed a reason to conduct a more probing search."  Herrera v. Santa Fe Pub. Sch.,

792 F. Supp. 2d at 1194 (quoting United States v. Hartwell, 436 F.3d at 181)(internal quotations

omitted).  The Court found that the privacy invasion which inheres in touching students' bodies

in the public's plain view implicates the students' privacy interests to a greater extent than

"requir[ing] monitors to wait outside a closed stall for a student to produce a urine sample,"

which the Supreme Court found constitutional in Board of Education of Independent School

District No. 92 of Pottawatomie County v. Earls.  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d

at 1194.  The Court recognized that "pat-down searches are likely effective in furthering the

SFPS' concerns about drugs, alcohol, weapons, and distracting contraband," but, "given the

intrusiveness of a pat-down search and less intrusive alternatives," the Court found it "likely that

the suspicionless pat-down searches are unreasonable under the Fourth Amendment."  792 F.

Supp. 2d at 1194.  The Court ultimately concluded that requiring students to undergo pat-down

searches generally to enter the prom, although furthering an important government interest,

likely violated the Fourth Amendment, because the pat-down searches are intrusive, and because

there was no evidence that the SFPS could not further those interests with, at least initially, less

intrusive means:

> The Court finds that the pat-down searches are likely effective in
> furthering the SFPS' concerns about drugs, alcohol, weapons, and distracting
> contraband, but finds that, given the intrusiveness of a pat-down search and less

intrusive alternatives, it is likely that the suspicionless pat-down searches are unreasonable under the Fourth Amendment. SFPS asserts that its concerns regarding prom are that students will take in drugs, alcohol, and weapons. At the hearing, Gutierrez testified about instances of drug and alcohol abuse at Santa Fe public school proms, and about an instance of a weapon at a Santa Fe public school prom. The School District Defendants have articulated an important governmental concern in preventing drug and alcohol abuse, and in ensuring the safety of the students. See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 834. Although reasonableness under the Fourth Amendment does not require employing the least intrusive means, because "the logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers," Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 837, there are far less intrusive methods than the searches now employed, see Doe ex rel. Doe v. Little Rock Sch. Dist., 380 F.3d at 355 ("[D]ogs and magnetometers are often employed in conducting constitutionally reasonable large-scale 'administrative' searches precisely because they are minimally intrusive, and provide an effective means for adducing the requisite degree of individualized suspicion to conduct further, more intrusive searches."); Hough v. Shakopee Pub. Sch., 608 F.Supp.2d at 1106. ("MRVSEC has given the Court no reason to believe that far less intrusive searches would not adequately ensure compliance with the guidelines about dangerous and distracting items."), and the Court believes these searches will come close, if not approximate well, to furthering the governmental interests as well as the current intrusive procedures. The School District Defendants appear to assert an argument under which there is no limiting principle. For example, it appears that, under the School District Defendants' argument, there is nothing which would prevent body cavity searches of the students attending prom and graduation to effect the School District Defendants' asserted purposes. The School District Defendants conceded that such searches would likely be unreasonable. See Tr. at 17:1–20:1 (Sanchez, Court)(stating that, assuming C. Herrera's allegations were true, he would be concerned with the "manner in which [the officers] conducted the pat-down," and agreeing that reaching inside a woman's brassiere is beyond a pat-down). Because even the School District Defendants concede there are limits, the question is simply where. Because the Defendants can reasonably effect their purposes through less intrusive methods, such as screening with wands and observations of the students, the Court believes that there is a substantial likelihood that not engaging in pat-down searches immediately and as first resort will not jeopardize an important governmental interest. See Doe ex rel. Doe v. Little Rock School District, 380 F.3d at 356 ("In Thompson [v. Carthage School Dist., 87 F.3d 979 (8th Cir.1996)], as in Earls and Vernonia, random, suspicionless searches by school officials were deemed reasonable only after a specific showing was made that not engaging in the searches would have jeopardized some important governmental interest. No such showing has been made here."). The Court believes that there is a substantial likelihood that C. Herrera will succeed in

showing that the Defendants' current search policy -- under which security officers conduct a suspicionless pat-down search before conducting a wand search -- is unreasonable, because the students retain some legitimate expectation of privacy, the current nature of the pat-down search is intrusive, and, although SFPS have asserted important governmental concerns, there is no evidence that less intrusive or graduated alternatives would not adequately accomplish the purposes of the intrusive pat-down searches now employed or that not engaging in pat-down searches until there is individualized reasonable suspicion would jeopardize the governmental interests. See Hough v. Shakopee Pub. Sch., 608 F.Supp.2d at 1105–08. Conducting a wand search, by itself, is not unreasonable, because of the students' limited legitimate expectation of privacy, the less intrusive nature of a wand search, and the important governmental concerns. It is true that such a search would not detect non-metal objects, but it can get a lot of weapons. As to some containers that could contain alcohol or drugs, the security officer may have to rely more heavily on observation; they can ask a student to unzip their gown to show their clothes, and prom dresses tend to be tight fitting, making it difficult -- but not impossible -- to hide contraband. But the officials must develop reasonable suspicion to go to the next level of the search. Furthermore, a pat-down search on the basis of individualized reasonable suspicion would not be unreasonable. The Court finds, however, there is a substantial likelihood that the current practice of conducting suspicionless pat-down searches of every student violates the Fourth Amendment. In many respects, the Court's ruling is consistent with SFPS' statements in its Code of Conduct. While SFPS asserts [that] the Code of Conduct does not apply to these extracurricular activities, the Court believes that it mirrors or approximates the constitutional standard more closely than does SFPS' current policy.

SFPS asserts that its concerns regarding graduation are that the students will take in alcohol, drugs, weapons, and distracting contraband. As the Court has stated, the School District Defendants have articulated an important governmental concern in preventing student drug and alcohol abuse, and in ensuring the safety of the students. See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 834. The Court believes that the asserted governmental concern about distracting contraband at graduation is also a legitimate governmental interest. The Court recognizes that the schools can legitimately ban cellular telephones and iPods from the classroom, see Hough v. Shakopee Pub. Sch., 608 F.Supp.2d at 1106, and that "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children," and the government has a legitimate interest in maintaining discipline and order in the schools, Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 656. Similarly, SFPS had a legitimate interest in maintaining discipline and order at graduation, which, for many students is a solemn recognition of their accomplishment. As the Court has discussed, however, the Defendants can reasonably effect their concerns through far less intrusive measures than its current pat-down-first procedure, and the Court

believes that there is a substantial likelihood that, given the intrusiveness of the
suspicionless pat-down searches, the suspicionless pat-down searches are
unreasonable, despite the legitimate governmental interests.

Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1194-96.

In her Motion for Summary Judgment, Romero does not take issue with, or discuss the
Court's preliminary legal conclusions about pat-down searches, nor does she refer the Court to
any precedent which she thinks should cause the Court to come to a different final conclusion
about the searches' reasonabless.   Instead, the only argument she makes -- aside from the
argument that she did not participate in the searches beyond requesting the unconstitutional pat-
down searches -- is that, "because [the attendees] consented to the pat-down searches," Romero
did not violate the Plaintiffs' rights.   Motion for Summary Judgment at 25.   She refers the Court
to the Eleventh Circuit's opinion in Johnston v. Tampa Sports Authority, in which the Eleventh
Circuit concluded that a patron who objected to being searched as a condition of entering the
sports stadium consented to the search by entering the stadium.   See 530 F.3d at 1329.   Romero's
reliance on Johnston v. Tampa Sports Authority is misplaced, however, as the Eleventh Circuit's
opinion was based on the district court's error in "its application of the unconstitutional condition
doctrine," because "the condition for entry was imposed by the NFL and the Buccaneers, both
private entities, and not the government."[20]   530 F.3d at 1329.   The Eleventh Circuit noted:

> [The plaintiff] did not have any right or entitlement to enter the Stadium.   His
> purchase of a ticket granted him at most a revocable license to a seat.   As is
> typical of sporting events, the NFL and the Buccaneers explicitly retained the
> right to exclude him from the Stadium for any reason.

530 F.3d at 1329.   Important for purposes of Romero's motion, the Eleventh Circuit, in the next

---

[20]   The "unconstitutional condition doctrine" is the doctrine which proscribes the
government's ability to "'condition[] receipt of a benefit or privilege on the relinquishment of a
constitutional right.'"   Johnston v. Tampa Sports Auth., 530 F.3d at 1329 (quoting Bourgeois v.
Peters, 387 F.3d 1303, 1325 (11th Cir. 2004)).

paragraph, points out that, "[i]n other cases where we have used the unconstitutional conditions doctrine to invalidate consent, we found that it was <u>the government imposing the condition and performing the search</u>," and noted that other courts deciding the same issue have held that requiring government searches for entry into events is unconstitutional.   530 F.3d at 1329 (emphasis added)(citing, as an <u>e.g.</u> cite, <u>Bourgeois v. Peters</u>, 387 F.3d at 1324).

Like the Eleventh Circuit in <u>Johnston v. Tampa Sports Authority</u>, the Tenth Circuit recognizes that the government may not condition a benefit on the basis of waiving a constitutional right.  <u>See, e.g.</u>, <u>KT.&G Corp. v. Attorney General of Okla.</u>, 535 F.3d 1114, 1135 (10th Cir. 2008)("The government 'may not deny a benefit to a person on the basis that infringes his constitutionally protected interests . . . .'")(quoting <u>Perry v. Sindermann</u>, 408 U.S. 593, 597 (1972)).   The Tenth Circuit has pointed out that "[t]his is true even if the person has no entitlement to the benefit and even though the government can deny the benefit for a number of other reasons."  <u>KT.&G Corp. v. Attorney General of Okla.</u>, 535 F.3d at 1135-36.  The Supreme Court has explained the reasoning behind the unconstitutional-conditions doctrine is that the government cannot, by withholding a benefit, produce a result that it could not otherwise command: "For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.  This would allow the government to 'produce a result which [it] could not command directly.'"  <u>Perry v. Sinderman</u>, 408 U.S. at 597 (quoting <u>Speiser v. Randall</u>, 357 U.S. 513, 526 (1958))(alteration in original).  Like the Eleventh Circuit, the Tenth Circuit focuses the inquiry on whether it is a government entity denying the benefit.  <u>KT.&G Corp. v. Attorney General of Okla.</u>, 535 F.3d at 1135-36 ("[T]he focus of the unconstitutional conditions doctrine is on whether a governmental entity is denying a benefit to Plaintiffs that they could

obtain by giving up their [constitutional right], or is penalizing them for refusing to give up their . . . rights." (internal quotations omitted)).

Moreover, similar to the Eleventh Circuit's recognition in <u>Johnston v. Tampa Sports Authority</u> that the unconstitutional-conditions doctrine invalidates consent, in the airport screening context, the Ninth Circuit concluded that the proper analysis for pat-down searches attributable to the state is the special-needs or administrative-search doctrine, and not whether the person searched consented to the search.  <u>See</u> <u>United States v. Aukai</u>, 497 F.3d 955, 960 (9th Cir. 2007)("Our case law, however, has erroneously suggested that the reasonableness of airport screening searches is dependent upon consent, either ongoing consent or irrevocable implied consent.  The constitutionality of an airport screening search, however, does not depend on consent.")(footnote omitted).   The Supreme Court has explained that, like the special-needs doctrine, the administrative-search doctrine allows for warrantless searches because of the government's special needs in performing particular searches:

> Two "limited exception[s]" to this rule are our special-needs and administrative-search cases . . . .  A judicial warrant and probable cause are not needed where the search or seizure is justified by "special needs, beyond the normal need for law enforcement," such as the need to deter drug use in public schools, or the need to assure that railroad employees engaged in train operations are not under the influence of drugs or alcohol; and where the search or seizure is in execution of an administrative warrant authorizing, for example, an inspection of fire-damaged premises to determine the cause, or an inspection of residential premises to assure compliance with a housing code.

<u>Ashcroft v. al-Kidd</u>, 131 S. Ct. 2074, 2080-81 (2011).  Like the special-needs doctrine, the administrative-search doctrine analyzes a particular search's reasonableness, and thus its constitutionality, by "'balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"   <u>Skinner v. Ry. Labor Execs.' Ass'n</u>, 489 U.S. at 619.  Given that this standard is the same standard as the Supreme Court

articulated in New Jersey v. T.L.O., and that the Supreme Court cited to New Jersey v. T.L.O. in articulating this standard for the administrative-search doctrine in Skinner v. Railway Labor Executives' Association, the administrative-search doctrine's application to airport searches supports the conclusion that suspicionless pat-down searches of attendees at a public school prom should be analyzed under the special-needs doctrine.

Like the permissibility of warrantless searches in schools, courts hold that, because of the government's need to protect the public's safety, airport screening searches do not require probable cause or individualized suspicion, but rather depend upon the searches' reasonableness in balancing "the individual's privacy expectations against the Government's interests" in performing the search. United States v. Aukai, 497 F.3d at 959 (quoting Nat'l Treasury Emps. v. Von Raab, 489 U.S. 656, 665-66 (1989))(internal quotations omitted). Cf. City of Indianapolis v. Edmond, 531 U.S. 32, 47-48 (2000)(noting that, in reviewing the "the validity of . . . searches at places like airports," courts must consider that "the need for such measures to ensure public safety can be particularly acute"). Thus, requiring a traveler through an airport to undergo a suspicionless search of the traveler's person or luggage does not condition a benefit on the traveler's divestment of the Fourth Amendment right to be free from unreasonable searches, but rather recognizes that, "where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable' -- for example, searches now routine at airports and at entrances to courts and other official buildings." Chandler v. Miller, 520 U.S. 305, 323 (1997).

Contrary to Romero's position that the attendees here consented to the pat-down searches by entering the prom, the Ninth Circuit in United States v. Aukai rejected that travelers' consent to the TSA's search of their person and property by entering airport security checkpoints. The

Ninth Circuit recognized that, up to 2007, "[o]ur case law . . . has erroneously suggested that the reasonableness of airport screening searches is dependent upon consent, either ongoing consent or irrevocable implied consent."  497 F.3d at 960.  The Ninth Circuit stated instead that "[t]he constitutionality of an airport screening search, however, does not depend on consent" and held that whether an airport security screening violates a traveler's Fourth Amendment rights depends on whether "[a] particular airport security screening search is constitutionally reasonable."  497 F.3d at 961-62.

Romero, as the Capital High principal, was a government actor when she requested the ASI New Mexico guards to perform pat-down searches of all the students as a condition for their entrance to the prom.  That act is attributable to the government.  See, e.g., Jojola v. Chavez, 55 F.3d 488, 493 (10th Cir. 1995)("[A]n individual employed by the state who violates another individual's federal rights will 'generally' (i.e., in most cases), do so by virtue of the authority vested in them under state law.").  Romero contends that she did not violate the Plaintiffs' constitutional rights, as "[a]ny reasonable person would have understood, as surely the Plaintiffs must have, that to avoid being searched, they merely had to refrain from entering the Prom." Motion for Summary Judgment at 26-27.  In other words, she argues that any reasonable student should have understood that, to avoid the infringement on their Fourth Amendment rights effectuated in the pat-down searches she required, they "merely had to refrain from entering the Prom," Motion for Summary Judgment at 27, or not receive the benefit that the government was providing.  This argument is the same argument that the Ninth Circuit rejected in relation to airport security screenings in United States v. Aukai and violates the unconstitutional-conditions doctrine.  See Johnston v. Tampa Sports Auth., 530 F.3d at 1329 ("[W]here we have used the unconstitutional conditions doctrine to invalidate consent, we found that it was the government

- 100 -

imposing the condition . . . .").  This argument thus does not help her avoid liability for her constitutional violations.

Romero further contends that the requirement for pat-down searches as a condition for receiving the benefit of the prom "is just like students deciding that they did not want be watched (for males) or listened to (for females) while urinating for a drug test and, to avoid the search, refrained from 'going out' for sports."  Motion for Summary Judgment at 27.  The Court does not believe Romero's analogy is on solid ground when it comes to the nature of the activities.  In its TRO Opinion, the Court concluded that sports or other extracurricular club-type activities are a poor analog for a prom, which the Court likened to graduation or even lunch in the cafeteria, because it is a benefit that most students enjoy:

> As the students in Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls and Vernonia School District 47J v. Acton, who, in consciously choosing to go out for a sports team or other extracurricular endeavor, voluntarily subjected themselves to intrusions upon normal rights and privileges, including privacy, and agreed to waive certain privacy expectations that they would otherwise have had as students in exchange for the privilege of participating in the activity, students who consciously choose to go to graduation or prom, which are voluntary, not-required school activities, waive certain privacy expectations that they otherwise have as students in exchange for the privilege of participating in prom or graduation. Although the students voluntarily choose to attend graduation or prom, this situation is not directly analogous to the students who chose to go out for sports or extracurricular activities in Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls and Vernonia School District 47J v. Acton, because most students in the student body attend proms, and virtually all students attend their high school graduation and prom is not an activity involving communal undress. The Court believes that this situation is more analogous to lunch in the school cafeteria; students are not required to eat lunch in the school cafeteria but most students do. So while the Court agrees that proms and graduation are extracurricular activities, the Court thinks they are different from some other extracurricular activities, such as sports, where the Supreme Court has in detail described the lack of privacy that such activities enjoy. Prom and graduation approach levels of participation that the general body enjoys, and thus, the Court does not believe, as the School District Defendants apparently do, that all extracurricular activities should lose privacy equally. Although the legitimate expectation of privacy that the students who

> attend prom and graduation here is "below the already limited baseline level of privacy afforded to public school students generally," the "students nevertheless retain some legitimate expectation of privacy in their bodies, clothing, and personal possessions." <u>Hough v. Shakopee Pub. Sch.</u>, 608 F. Supp. 2d at 1103.

<u>Herrera v. Santa Fe Pub. Sch.</u>, 792 F. Supp. 2d at 1193-94.  In fairness to Romero, there are conditions students must meet to attend a prom.  Generally, students must be juniors or seniors, or invited by juniors and seniors, and must have a ticket.  There is also probably a dress code. These conditions, however, do not implicate the same reasonable privacy expectations that pat-down searches implicate in the way that communal showering in the same bathroom, which is implicit in high-school sports participation, implicates the same privacy expectations that urinalysis implicates.  Without explanation why subjecting oneself to ASI New Mexico Guards' pat-down searches to receive the benefit of the prom -- open to all junior and senior students to celebrate the end of their high school tenure -- "is just like" refraining from sports -- open to only those students "voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally," 515 U.S. at 657 -- the Court does not find its previous analysis unsound or flawed.  The Court concludes that its analysis in the TRO Opinion remains sound and that Romero's request for the suspicionless pat-down student searches as a condition for entrance to the prom violated the Plaintiffs' constitutional rights.

## II.   ROMERO'S VIOLATION OF THE PLAINTIFFS' CONSTITUTIONAL RIGHTS WAS NOT CLEARLY ESTABLISHED AT THE TIME OF THE VIOLATION IN <u>APRIL OF 2011</u>.

Aside from the consent argument, which, as the Court has concluded, the unconstitutional condition doctrine forecloses, Romero does not challenge or discuss the Court's finding the pat-down searches were unconstitutional.  She argues, rather, that the further alleged groping and cupping of the students' breasts is not attributable to her or that she did not have the

constitutional duty to intervene in these further searches, as she did not know about the searches'
extent.   Given the Court's conclusion in the TRO Opinion that conditioning each student's
entrance to the Prom on a suspicionless pat-down search likely was unconstitutional, given the
affirmation of that analysis here, and given that Romero concedes that she requested ASI New
Mexico to perform pat-down searches, the Court need not find that she personally involved
herself in that further conduct. Her only opportunity to escape individual liability for violating
the Plaintiffs' constitutional rights, therefore, is to show that the violation was not clearly
established at the time.   Thus, as the Plaintiffs point out, in the Motion to Dismiss, Romero
"focuses exclusively on the second prong of the qualified immunity analysis and whether the
searches violated a <u>clearly established</u> constitutional right."   MSJ Response at 16 (emphasis in
original).   Focusing her time and energy on this argument was a prudent choice.   The Court
concludes that it was not clearly established at the time of the prom in April, 2011, that ordering
suspicionless pat-down searches for all prom attendees violated the Plaintiffs' constitutional
rights.

Qualified immunity shields government officials from liability where "their conduct does
not violate clearly established statutory or constitutional rights of which a reasonable person
would have known."   Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457
U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken
beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.
Saucier v. Katz, 533 U.S. at 205.   When a defendant asserts qualified immunity, the plaintiff
must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory
rights; and (ii) that the right was clearly established at the time of the alleged misconduct.   See
Riggins v. Goodman, 572 F.3d at 1107.

"A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't Of Corr., 429 F. App'x at 710 (quoting Zweibon v. Mitchell, 720 F.2d at 172-73).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  See Medina v. City & Cnty. of Denver, 960 F.2d at 1498.  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that [the proposed conduct] . . . violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Saucier v. Katz, 533 U.S. at 202).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 131 at 2083.  While a case directly on point is not required, the Supreme Court held that "existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 131 at 2083.  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established."  Ashcroft

v. al-Kidd, 131 at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs," as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

A.    **SUPREME COURT PRECEDENT HAD NOT CLEARLY ESTABLISHED BY APRIL OF 2011 THE PLAINTIFFS' RIGHT TO BE FREE FROM A SUSPICIONLESS PATDOWN SEARCH APPLIED TO ALL STUDENTS ENTERING A PROM.**

Although Supreme Court precedent analyzes the Fourth Amendment's application in the context of school-related searches based upon the searches' reasonableness, it has analyzed only searches in which there is individualized suspicion of unlawful activity, or in which the searches are limited to a specific group of students.  First, in New Jersey v. T.L.O., in relation to the first prong of the school-search reasonableness test -- whether the search was justified at its inception -- the Supreme Court held that, "if [the school official] in fact had a reasonable suspicion that T.L.O. had cigarettes in her purse, the search was justified."  469 U.S. at 345 (emphasis added). Then, in Vernonia School District 47J v. Acton, the Supreme Court recognized that, because "the Fourth Amendment imposes no irreducible minimum of reasonable suspicion," without individualized suspicion, the reasonableness, and constitutionality, of a search "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." 515 U.S. at 652, 653 (quoting Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. at 619; New Jersey v. T.L.O.,  469 U.S. at 342 n.8)(internal quotations omitted). The Supreme Court in Vernonia School District 47J v. Acton concluded that a policy authorizing random urinalysis drug testing of student-athletes is reasonable and constitutional, in part because students who choose to participate in athletics, where "'communal undress'" inheres in

- 105 -

that activity, have a lesser privacy expectation than students generally, "[p]articularly with regard to medical examinations and procedures." 515 U.S. at 656-57.

More recently, in Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls, the Supreme Court held that a random drug-testing policy extended to students "who participate in competitive extracurricular activities," who agree as a condition of participation "to take a drug test before participating in an extracurricular activity," and who "submit to random drug testing while participating in that activity, and . . . agree to be tested at any time upon reasonable suspicion," was constitutional. 536 U.S. at 825-26. The Supreme Court noted that "students who participate in competitive extracurricular activities voluntarily subject themselves to many of the same intrusions on their privacy as do athletes," and that "[a]ll of them have their own rules and requirements for participating students that do no not apply to the student body as a whole." 536 U.S. at 831-32.

Romero's request that ASI New Mexico perform pat-down searches of all students entering the prom did not rely on individualized suspicion, or apply to a specific group which had subjected itself to intrusions of privacy or regulations above and beyond that of the general student body.  It is undisputed that Romero asked the ASI New Mexico personnel providing security services at the Prom to perform pat-down searches on all Prom attendees entering the Santa Fe Convention Center.  See Romero Depo. at 130:16-132:20, 137:18-139:24.  Thus, whereas the suspicionless drug testing policies that the Supreme Court analyzed in Vernonia School District 47J v. Acton and Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls applied only to students who had voluntarily participated in competitive extracurricular activities, who subject themselves to "regulation" beyond that to which the student body is subjected, the suspicionless pat-down searches applied to every student

entering the prom, regardless whether they participated in extracurricular activities or had otherwise voluntarily subjected themselves to their own or outside additional regulations. Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 832. Given that both Vernonia School District 47J v. Acton and Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls pointed out in some way that this regulation decreases these particular students' reasonable privacy expectation, which is the first test of Vernonia Sch. Dist. 47J v. Acton's school-search reasonableness analysis, that the pat-down searches Romero requested ASI New Mexico to perform applied to all students entering the prom might make a constitutional difference. See Kerns v. Bader, 663 F.3d at 1188 (holding that a constitutional violation is not clearly established when "a distinction might make a constitutional difference")(emphasis in original).

Moreover, looking at the Supreme Court's student search jurisprudence, aside from those discussing individualized suspicion, the conclusion that the suspicionless searches were reasonable was based, at least in part, on different privacy expectations and lesser alternatives than are present in this case. With respect to the first factor in the school search reasonableness analysis, in both Vernonia School District 47J v. Acton and Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls, the searches were limited to students who had voluntarily subjected themselves to extracurricular activities, which necessarily lessened their reasonable privacy expectations beyond that of the student body generally, and the search -- the drug testing -- touched on the lessened privacy interests that inhere in required physical examinations and communal showering or undress in the activities. In relation to the third factor, how closely the search is tailored to the interest, the Supreme Court noted in Vernonia Sch. Dist. 47J v. Acton that the only less intrusive means that the parties identified for

effectuating drug-use deterrence was "drug testing on suspicion of drug use." 515 U.S. at 661-63. In light of the fact that the ASI New Mexico Guards physically touched every person entering the prom, patting down each person's body in public view, that the Supreme Court found the drug test policies were reasonable searches under those circumstances "is of little help in determining whether the volatile nature of [the] particular conduct" in different circumstances "is clearly established." Ashcroft v. al-Kidd, 131 at 2084.  Similarly, whereas the Supreme Court has pointed out that the level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law, Saucier v. Katz, 533 U.S. at 205, gleaning that a suspicionless pat-down search applied to all students is unconstitutional from a drug test search applied to a particular group of students, in which there is no physical touching, requires navigating the hazy boarders of the Fourth Amendment school search reasonableness analysis.   The difference in circumstances bearing on two out of the three elements for Vernonia Sch. Dist. 47J v. Acton's school search reasonableness analysis cases show that Supreme Court cases did not put "beyond debate" in 2011 that Romero's request for the suspicionless pat-down "search[es] lacked legal justification."  Kerns v. Bader, 663 F.3d at 1183 (emphasis in original).  The Court cannot reasonably conclude that these Supreme Court cases put it beyond debate in April 2011 that subjecting all prom attendees to suspicionless pat-down searches was unconstitutional.

**B.      TENTH CIRCUIT PRECEDENT HAD NOT CLEARLY ESTABLISHED THE PLAINTIFFS' RIGHT TO BE FREE FROM A SUSPICIONLESS PATDOWN SEARCH APPLIED TO ALL STUDENTS ENTERING THE PROM IN APRIL 2011.**

Controlling Tenth Circuit law is particularly sparse in relation to the Fourth

Amendment's special-needs doctrine in the public-school student search context.  Romero points

out that the Court, in its TRO Opinion, did not cite to a Tenth Circuit decision to support finding

that the pat-down searches likely violated C. Herrera's constitutional rights.   Although the

clearly established prong does not require a controlling decision declaring the "very action in

question . . . unlawful," Anderson v. Creighton, 483 U.S. at 640, neither party in their briefing on

this Motion for Summary Judgment cite to, nor could the Court in its research for this opinion

find, a Tenth Circuit decision about suspicionless pat-down searches sufficient to "put officials

on fair notice that the described conduct was unconstitutional" without requiring officers to

engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359

F.3d at 1298.

The closest Tenth Circuit decision that may provide some contours of the Plaintiffs' right

is Dubbs v. Head Start, Inc., 336 F.3d 1194 (10th Cir. 2003), wherein the Tenth Circuit, in dicta,

noted that a head start program subjecting eight pre-school children to physical examinations,

including genital examinations and blood tests, on school premises, "if performed without the

necessary consent the searches were unconstitutional even if we employ the 'special needs'

balancing test."  336 F.3d at 1214.  This case may implicate Romero's failure to obtain parental

consent for the pat-down searches at the prom, as the Tenth Circuit reasoned in Dubbs v. Head

Start, Inc. that the Fourth Amendment's special-needs doctrine could not justify the physical

examinations. The Tenth Circuit reasoned that invoking the special-needs doctrine requires that

ordinary compliance with the Fourth Amendment be impractical and that Fourth Amendment

compliance in relation to the examinations was not impractical:

> The sole "special need" invoked by CAP, and accepted by the district
> court, was "the 'special need' that the physical examination of a child, 'done in
> order to comply with federal regulations, is an effective means of identifying

physical and developmental impediments in children prior to them starting school, a goal of Head Start . . . .'" The district court found that this qualified as a "special need" because "CAP is bound to follow the Head Start regulations and those regulations require a health determination for each child . . . . [I]t is clearly impracticable to demand adherence to the traditional warrant and probable cause requirements considering the number of children dealt with by the Head Start program."

We cannot agree with this logic. While it is certainly true that a properly conducted physical examination is "an effective means of identifying physical and developmental impediments in children," this supplies no justification for proceeding without parental notice and consent. The premise of the "special needs" doctrine is that these are cases in which compliance with ordinary Fourth Amendment requirements would be "impracticable." There is no reason, however, to think that parental notice and consent is "impracticable" in this context. On the contrary, CAP claims to adhere to a policy of obtaining parental consent and providing advance notice to the parents so that they can be present at the examination. The failure to do so in this case appears to be a product of sloppy draftsmanship (with respect to consent forms) and carelessness (with respect to notice), rather than to any inherent "impracticability" of compliance with ordinary Fourth Amendment norms.

Nor does compliance with Head Start regulations excuse CAP's failure to obtain parental consent. On the contrary, the regulations expressly require Head Start grantees to "obtain advance parent or guardian authorization" for "all health and developmental procedures administered through the program." Contrary to CAP's interpretation, the regulations do not require them to obtain a physical examination within 90 days of enrollment. The regulations require Head Start grantees, within 90 days of enrollment, to "make a determination" as to whether enrolled children have an "ongoing source of continuous, accessible health care" and whether they are "up-to-date on a schedule of appropriate preventive and primary health care." If the children are lacking in these respects, it is an obligation of the Head Start grantee to "assist the parents in making the necessary arrangements." It is not the place of a Head Start agency to usurp the parental role. Indeed, to schedule medical examinations without the knowledge of the parents would thwart the purpose of the regulations. Examinations performed on the children without parental participation could not reveal whether they had access to ongoing medical care or whether they were up to date on a schedule of preventive and primary health care. To make those "determinations," the agency has to communicate with the parents and with the children's regular doctors.

Dubbs v. Head Start, Inc., 336 F.3d at 1214-15 (internal citations and footnote omitted).  The

Tenth Circuit reasoned that "[t]he premise of the 'special needs' doctrine is that these are cases

in which compliance with ordinary Fourth Amendment requirements would be 'impracticable'"
and that "parental notice and consent" for the physical examinations was not "'impracticable' in
this context."   336 F.3d at 1214-15 (quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of
Pottawatomie Cnty. v. Earls, 536 U.S. at 829).  So here, given that prom is a once-per-year event
that happens at a specified time, and given that the students receive notice and usually purchase
advance tickets to proms, it was not impractical for Romero to give the Plaintiffs' parents notice
and obtain their consent for the students' pat-down searches for entrance to the prom.

Nevertheless, Dubbs v. Head Start, Inc. also has multiple facts which might have
constitutional implications.  First, whereas the students subjected to physical examinations were
preschoolers, students attending prom are likely high-school age and above, and most are likely
about sixteen years of age or older.  Cf. T.H. Depo. at 6:5-7 (noting that the youngest of the four
Plaintiffs was "sixteen" years old at the time of the prom).  Second, a physical examination that
includes extracting blood and examining the person's genitals implicates reasonable privacy
expectations to a much greater extent than a pat-down search, even a pat-down search that
extended as far as the Plaintiffs allege here.  Third, aside from the Tenth Circuit statement in
Dubbs v. Head Start, Inc. that "[i]t is not clear . . . that the 'special needs' doctrine has any place
in this case," the Tenth Circuit also discussed that the special-needs doctrine's borders are
themselves hazy:

> At this stage in development of the doctrine, the "special needs" category
> is defined more by a list of examples than by a determinative set of criteria.
> Among the cases said by the Court to involve "special needs" are: a principal's
> search of a student's purse for drugs in school; a public employer's search of an
> employee's desk; a probation officer's warrantless search of a probationer's
> home; a Federal Railroad Administration regulation requiring employees to
> submit to blood and urine tests after major train accidents; drug testing of United
> States Customs Service employees applying for positions involving drug
> interdiction; schools' random drug testing of athletes; and drug testing of public

school students participating in extracurricular activities. The Supreme Court has not told us what, precisely, this set of cases has in common, but the cases seem to share at least these features: (1) an exercise of governmental authority distinct from that of mere law enforcement -- such as the authority as employer, the *in loco parentis* authority of school officials, or the post-incarceration authority of probation officers; (2) lack of individualized suspicion of wrongdoing, and concomitant lack of individualized stigma based on such suspicion; and (3) an interest in preventing future harm, generally involving the health or safety of the person being searched or of other persons directly touched by that person's conduct, rather than of deterrence or punishment for past wrongdoing.

336 F.3d at 1213-14 (internal footnotes and citations omitted).  Thus, given the number and the nature of the distinctions between  Dubbs v. Head Start, Inc. and the facts here, the Court cannot reasonably conclude that the Tenth Circuit has "generally defined" the Plaintiffs' right to be free from a suspicionless pat-down search at a school-sponsored dance "as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't Of Corr., 429 F. App'x at 710 (quoting Zweibon v. Mitchell, 720 F.2d at 172-73).  The Court therefore concludes that, as of April, 2011, Tenth Circuit precedent had not clearly defined the Plaintiffs' rights, which Romero violated by requesting suspicionless pat-down searches of all students entering the Prom.

### C.   THE WEIGHT OF AUTHORITY IN OTHER COURTS HAD NOT CLEARLY ESTABLISHED BY APRIL 2011 THE PLAINTIFFS' RIGHT TO BE FREE FROM A SUSPICIONLESS PATDOWN SEARCH APPLIED TO ALL STUDENTS ENTERING A PROM.

The Court, in its TRO Opinion, cited to three decisions from outside of the Tenth Circuit to support its conclusion that the pat-down searches likely violated the Plaintiffs' rights: (i) a Ninth Circuit decision analyzing "random and suspicionless dog sniff searches," B.C. v. Plumas Unified School District, 192 F.3d at 1267; (2) an Eighth Circuit decision concerning the random, suspicionless searches of all students and their possessions, see Doe ex rel. Doe v. Little Rock Sch. Dist., 380 F.3d at 349; and (3) an opinion from the District of Minnesota, in which the court

concluded that subjecting special education students to daily suspicionless searches before they could go to classes violated their constitutional rights, see Hough v. Shakopee Pub. Sch., 608 F. Supp. 2d at 1087.  The Court concludes that there are two reasons to find that these authorities are insufficient to conclude that the weight of authority from other courts clearly established the Plaintiffs' constitutional rights that Romero's requested suspicionless pat-down searches violated.

First, none of these cases is on all fours with this case, nor are the facts close enough for the Court to conclude that there are no distinguishing circumstances that might make a constitutional difference. Importantly, all of the searches in these cases took place on campus during the school day, whereas the April, 2011 prom, at which the Plaintiffs were subjected to the suspicionless pat-down searches, took place off campus and outside of the regular school day hours.  Although the Court concluded that the prom is distinguishable from the extracurricular activities which the Supreme Court analyzed in upholding suspicionless urinalysis examinations, those Supreme Court cases counsel that Capital High holding the prom off campus and after school hours, which is not part of the Capital High curriculum, might constitutionally distinguish the searches from the on-campus searches during school hours.  Moreover, the searches in B.C. v. Plumas Unified School District, Doe ex rel. Doe v. Little Rock Sch. Dist., and Hough v. Shakopee Pub. Sch., took place on campus and did not involve searching non-students; Capital High students attending the prom are allowed to invite non-Capital High students as guests to the prom.  That persons who were not Capital High students attend high school proms distinguishes the pat-down searches at the prom from the suspicionless searches in precedent cases, because it likely both increases the Defendants' interest in protecting the students from weapons, drugs or other contraband brought in by non-students, and because these non-students' reasonable privacy

expectations are not co-extensive with Capital High students' privacy interests.

Second, comparing the weight of these cases to the weight of authority found sufficient to clearly establish the plaintiff's right in Stewart v. Donges, 915 F.2d 572 (10th Cir. 1990), the case in which the Tenth Circuit established that the weight of authority outside the circuit can clearly establish a right, counsels against finding these limited authorities sufficient.  In Medina v. City and Cnty. of Denver, the Tenth Circuit first stated that, even if the Supreme Court or Tenth Circuit do not have a decision "on point," the law can still be clearly established if "the clearly established weight of authority from other courts . . . have found the law to be as the plaintiff maintains," and cited to Stewart v. Donges to support this proposition.  Medina v. City and Cnty. of Denver, 960 F.2d at 1498.

In Stewart v. Donges, the Tenth Circuit analyzed whether it was clearly established that the standard which the Supreme Court articulated in Franks v. Delaware, 438 U.S. 154 (1978), for determining when affirmative falsehoods in a warrant affidavit prevent an officer's good-faith reliance on that warrant also apply to an officer's material omissions in a warrant affidavit.[21]  See Stewart v. Donges, 915 F.2d at 581-82.  The Tenth Circuit noted that neither the

---

[21] The Supreme Court in Franks v. Delaware held that, where an affiant made a false statement -- either knowingly or with reckless disregard for the truth -- in an affidavit attached to a warrant, if the warrant lacks probable cause without the statement, the court must treat the warrant as if probable cause was originally lacking on the warrant's face:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly, or with reckless disregard for the truth, was included by the affiant, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and

Supreme Court nor the Tenth Circuit had directly addressed whether the <u>Franks v. Delaware</u> deliberate falsehood or reckless disregard standards "governed omissions as well as affirmative statements." 915 F.2d at 582. Nevertheless, because "several of the other circuits had indicated that the 'deliberate falsehood' and 'reckless disregard' standards of <u>Franks</u> applied to material omissions, as well as affirmative falsehoods," the Tenth Circuit held that, at the time the officer submitted the affidavit, "it was a clearly established violation of plaintiff's Fourth and Fourteenth Amendment rights to knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable cause." 915 F.2d at 582-83. "[S]everal of the other circuits" included the Ninth Circuit, two decisions from the Seventh Circuit, the Second Circuit, the United States Court of Appeals for the District of Columbia Circuit, the Eleventh Circuit, and the United States Court of Appeals for the Fifth Circuit. 915 F.2d at 582. Fidelity to <u>Stewart v. Donges</u>, therefore, counsels that, to find that "the clearly established weight of authority from other <u>courts</u>" found the law to be "as the plaintiff maintains," <u>Medina v. City and Cnty. of Denver</u>, 960 F.2d at 1498 (emphasis added), the Court must find that many "other <u>circuits</u> had indicated" that the law is in the Plaintiffs' favor, <u>Stewart v. Donges</u>, 915 F.2d at 582 (emphasis added). Regardless whether the standard is that high, the Court concludes that two similar, but not on point, circuit court cases, and one district court case is insufficient to find that the weight of authority from other courts clearly established the Plaintiffs' rights to be free from suspicionless pat-down searches at the prom in April, 2011.

    The Court, therefore, concludes that it was not clearly established in April 2011 that a

---

the fruits of the search excluded to the same extent as if the probable cause was lacking on the face of the warrant.

438 U.S. at 155-56.

suspicionless pat-down search of all attendees to an off-campus high school prom violated the attendees', including the Plaintiffs', constitutional rights.   Accordingly, it was not clearly established that Romero requesting ASI New Mexico to require pat-down searches of every person entering the prom violated the Plaintiffs' constitutional rights.  The Court thus concludes that Romero is entitled to qualified immunity on the Plaintiffs' § 1983 claims against her, and the Court will dismiss with prejudice Count I against Romero in her individual capacity.

> ### D.   THE LAW WAS NOT CLEARLY ESTABLISHED IN 2011 THAT AN OFF-CAMPUS, SUSPICIONLESS SEARCH THAT INCLUDES LIFTING FEMALE PROM ATTENDEES' DRESSES ABOVE THEIR KNEES VIOLATED THE ATTENDEES' RIGHTS, AND ROMERO IS THEREFORE ALSO IMMUNE FROM C. HERRERA'S § 1983 CLAIM.

Based on the record as it stands now, it is that undisputed that Romero did not participate in the pat-down searches she requested by patting down any prom attendees, that she did not specify or request how the ASI New Mexico guards were to conduct the pat-down searches, and that she did not see any conduct beyond the pat-down searches in relation to T.H.'s, London's, or Hurtado's searches.  The Plaintiffs established, however, a genuine issue whether Romero saw the ASI New Mexico guard lift C. Herrera's dress while effecting the pat-down search.  Thus, in relation to C. Herrera, the Court must further analyze whether, if Romero saw the ASI New Mexico guard lift C. Herrera's dress during the pat-down search and failed to intervene, she violated C. Herrera's clearly established constitutional rights. The Court concludes that, even with these additional facts, the law was not clearly established in April, 2011.

> ### 1.   Based on the Record, Romero can Invoke Qualified Immunity Only if It Was Not Clearly Established in 2011 that a School Search which Included Requiring Female Prom Attendees to Lift Their Dresses to Mid-Thigh Violated the Attendees' Constitutional Rights.

Romero asserts that the law was not clearly established in 2011 "that a limited, school-

appropriate, pat-down and possession search of all attendees to an off-campus high school prom, pursued for the protection and safety of the attendees, violated the attendees' constitutional rights." Motion for Summary Judgment at 15-16. In response, the Plaintiffs assert that "[t]he question for the purposes of this Motion is even simpler, could a trier-of-fact find that the searches at the 2011 . . . Prom, as Plaintiffs describe them, violate the Fourth Amendment." MSJ Response at 16 (emphasis added). Neither party correctly frames the issue with regard to C. Herrera's search, however.

The undisputed facts establish that Romero asked ASI New Mexico to perform pat-down searches only and left the searches' details to the ASI's discretion. See Romero Depo. at 98:13-16, 130:16-132:20, 137:18-139:24; Aguilar Depo. at 237:3-21; Romero Affidavit ¶¶ 3, 4, at 1, 2. The undisputed facts also establish that Romero did not participate in the pat-down searches, and that she did not observe T.H.'s, London's, or Hurtado's pat-down searches. See Second Amended Complaint, ¶¶ 42, 43, 56, 61, 62, 65, 66 and 67, at 10, 12-13; C. Herrera Depo. at 114:16-115:4; T. Herrera Depo. at 58:16-23; Hurtado Depo. at 115:23-116:9; London Depo. at 118:11-13, 119:18-21; Romero Affidavit ¶ 12, at 3. There is a genuine issue of material fact, however, whether Romero saw the ASI guard lift C. Herrera's dress above her knees during C. Herrera's search, as C. Herrera testified in her deposition that, when she looked up as the security guard put back down her dress, Romero was looking at C. Herrera, smiled, and then turned away. See C. Herrera Depo. at 130:12-131:10 & footnote 10, supra. Thus, the Plaintiffs' assertions about the extent of the searches they underwent when attending the prom are sufficiently grounded in the record only to the extent that there is a genuine issue whether Romero observed that C. Herrera's pat-down search included the ASI New Mexico guard lift her dress and expose her bare legs, above her knees.

Given that the Court found that the suspicionless pat-down searches of the prom attendees are unconstitutional, Romero had already violated C. Herrera's constitutional rights regardless of the further lifting of C. Herrera's dress to expose legs. Nevertheless, Romero is subject to individual liability only to the extent she personally participated in the search or proximately caused the alleged constitutional violation. State actors, however, have a duty to intervene to ensure that they do not "cause[] [a person] to be subjected" to a constitutional violation. McClelland v. Facteau, 610 F.3d 693, 696 (10th Cir. 1979)(quoting 42 U.S.C. § 1983)(internal quotations omitted). And it is undisputed that Romero had the responsibility to ensure that ASI New Mexico officials followed search "protocols" at the prom and that Romero had the power to stop the pat-down searches. Romero Depo. at 139:9-24. See Romero Depo. at 236:21-240:5; Romero Affidavit ¶ 14, at 3. The proper framing of the issue is thus whether it was clearly established at the time of the Prom that the suspicionless pat-down searches that included lifting attendees' dresses above their knees was unconstitutional. If it was clearly established, and Romero failed to intervene, she cannot properly invoke qualified immunity's protections.

> ### 2.    Because the Law was Not Clearly Established in 2011 That a Student Search Which Included Requiring Female Prom Attendees to Lift Their Dresses to Mid-Thigh Violated the Attendees' Constitutional Rights, Romero is Entitled to Qualified Immunity.

The Supreme Court's decision in Safford Unified School District No. 1 v. Redding provides the closest analogy to this case. When taken together with the Supreme Court's other school search jurisprudence discussing suspicionless school searches, it is possible that school officials may have been on notice that C. Herrera had the constitutional right to be free from a suspicionless search that included requiring her to pull her dress up, and expose her leg, above

the knees.  The Court concludes, however, that it did not put beyond dispute that C. Herrera had

such a right, and thus, C. Herrera's right was not clearly established.

The Supreme Court in Safford Unified School District No. 1 v. Redding, discussing

qualified immunity, recognized that, like New Jersey v. T.L.O., the search was premised on

individualized suspicion of wrongdoing, but nevertheless concluded it was not clearly

established that the particular search was unconstitutional.  Notably, the searches in this case do

not involve individualized suspicion.  The Supreme Court's holding that the school search in

Safford Unified School District No. 1 v. Redding was unconstitutional even though the search

was premised on individualized suspicion cuts both ways in relation to whether it was clearly

established that suspicionless pat-down school searches were unconstitutional in 2011.  On the

one hand, that the search in Safford Unified School District No. 1 v. Redding, which elevated

from a search of the student's bag and outer clothing to a strip search, was premised on

individualized suspicion does not affect largely the clearly established analysis as it relates to the

searches the Plaintiffs underwent here, because the Safford Unified School District No. 1 v.

Redding search fits into New Jersey v. T.L.O.'s two-part school search test, analyzing whether

the search was justified at its inception and whether the search conducted was reasonably related

in scope to the circumstances justifying the search; because the searches to which the Plaintiffs

were subjected at the 2011 prom here were suspicionless searches, they fit into Vernonia School

District 47J v. Acton's three-part suspicionless search test.  On the other hand, a suspicionless

search logically should not intrude as far into a student's privacy as a search which is based, at

least to some degree, on individualized suspicion.  In Safford Unified School District No. 1 v.

Redding, Wilson's individualized suspicion that Redding possessed and distributed drugs

justified "a search of her outer clothing," but the Supreme Court held that more "distinct

elements of justification on the part of school authorities [was constitutionally required] for going beyond a search of outer clothing." 557 U.S. at 373-74. Safford Unified School District No. 1 v. Redding thus seems to support the proposition that the law was clearly established in June, 2009, that a reasonable school search of even outer clothing requires some individualized suspicion, and that anything beyond that -- such as searching a student's leg that her outer clothing covers -- requires more justification than general individualized suspicion. Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 374 (emphasis added).

The Supreme Court's discussion in that case whether the right was clearly established, however, ultimately counsels finding here C. Herrera's right was not clearly established at the time of the prom. The Supreme Court, faced with the clearly established prong of Wilson's qualified immunity, recognized that "courts considering qualified immunity for strip searches" have found it "impossible to establish clearly the contours of a Fourth Amendment right in the wide variety of possible school settings different from those involved in T.L.O. itself." Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 378 (internal quotations, alterations, and citations omitted). Likewise, the Supreme Court has cautioned that, in deciding whether a right is clearly established, "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 at 2084. The setting of the 2011 prom was not the schoolhouse, which was where the searches in Safford Unified School District No. 1 v. Redding, New Jersey v. T.L.O., Vernonia School District 47J v. Acton, and in Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls all took place. Moreover, the school searches in those Supreme Court decisions similarly took place during the school day, whereas, given that the 2011 prom took place on a Saturday night from 8

o'clock p.m. to midnight, attendees had ample time outside of the school day in which to obtain

drugs, tobacco, alcohol, or weapons, and attempt to bring them into the off-campus prom.

Beyond the circumstances surrounding the searches generally, the invasiveness of the

particular searches in which Romero was involved, or of which Romero may have had notice,

did not invade the attendees' privacy to the extent of the strip search in Safford Unified School

District No. 1 v. Redding.   The Supreme Court in Safford Unified School District No. 1 v.

Redding analyzed a strip search in which the school administrators required Redding to strip

down to her underwear and then "pull[] her underwear away from her body," allowing the two

administrators to "see her necessarily exposed  . . . breasts and pelvic area to some degree."  557

U.S. at 374.  It is undisputed here that Romero did not see a strip search in which an ASI New

Mexico guard searched to this same extent, and undisputed that she did not see the ASI New

Mexico guards touch the female attendees' breasts or require the female attendees' to pull out

their bra straps.  The dispute that the Plaintiffs established is whether Romero saw the ASI New

Mexico guard require C. Herrera pull her dress up above her knee and expose her leg. Given the

recognized difficulty in assessing the reasonableness of searches in the public school context,

and the divergences in many of the circumstances present in C. Herrera's case from the

circumstances in Supreme Court or Tenth Circuit authority, or the weight of authority from other

Circuit Courts of Appeal, the Court concludes that "the[] differences of opinion" in the Fourth

Amendment school search jurisprudence "is substantial enough to require immunity for the

school officials in this case."  Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 378.  The

Court therefore concludes that, even if Romero saw the ASI New Mexico guard require C.

Herrera to lift her dress in effecting the pat-down search Romero requested, "qualified immunity

is warranted."   Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 379.

In conclusion, the Court finds that Romero requesting that ASI New Mexico guards perform pat-down searches of all of the Capital High prom attendees violated the Plaintiffs' constitutional rights.  The Court concludes, however, that the Plaintiffs' right to be free from these suspicionless pat-down searches was not clearly established at the time of the prom in April, 2011.  Additionally, with respect to C. Herrera's § 1983 claim, although there is a genuine issue of fact whether Romero saw the ASI New Mexico guard require C. Herrera to lift her dress, and expose her bare leg, up above her knee, even if Romero did see that conduct, it was not clearly established in April, 2011, that a school search to that extent violated C. Herrera's constitutional rights.  Accordingly, Romero is entitled to qualified immunity and the Court will dismiss the Plaintiffs' § 1983 claims against Romero in her individual capacity.

**IT IS ORDERED** that the Individual School Defendant Melanie Romero's Motion for Summary Judgment on Count I of the Second Amended Complaint Based Upon Qualified Immunity, filed Nov. 13, 2012 (Doc. 113), is granted.  Accordingly, the Plaintiffs' claims against Defendant Melanie Romero in her individual capacity brought under 42 U.S.C. § 1983 are dismissed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Aimee Bevan
O'Friel & Levy, P.C.
Santa Fe, New Mexico

--and--

Megan Cacace
Relman, Dane & Colfax PLLC

Washington, D.C.

--and--

Reed N. Colfax
Relman, Dane & Colfax PLLC
Santa Fe, New Mexico

     *Attorneys for the Plaintiffs*

Andrew M. Sanchez, Sr.
Matthew Lee Campbell
Cuddy & McCarthy, LLP
Albuquerque, New Mexico

--and--

Gerald A. Coppler
Coppler Law Firm, P.C.
Santa Fe, New Mexico

     *Attorneys for the Defendants Santa Fe Public School*
       *Board of Education, Barbara Gudwin, Glenn Wikle,*
       *Linda Trujillo, Frank Montano, Steven J. Carrillo,*
       *Bobbie J. Gutierrez, Melanie Romero*

Terry R. Guebert
Alisa Wigley-DeLara
Christopher J. DeLara
Guebert Bruckner, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant ASI New Mexico LLC*