## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CANDICE HERRERA, T.H., a minor by
and through her father and guardian
VINCENT HERRERA, ASHLEY HURTADO,
ARIANNA LONDON, and all others similarly
situated,

        Plaintiffs,

vs.                                      No. CIV 11-0422 JB/KBM

SANTA FE PUBLIC SCHOOLS, SANTA FE
PUBLIC SCHOOLS BOARD OF EDUCATION,
BARBARA GUDWIN, GLENN WIKLE,
LINDA TRUJILLO, FRANK MONTANO,
STEVEN J. CARRILLO, in their official
capacities as members of the Santa Fe Public
Schools Board of Education, BOBBIE J. GUTIERREZ,
in her official capacity as Superintendent of Santa Fe Public
Schools, MELANIE ROMERO, individually and in her
official capacity as Principal of Capital High
School, ROBERT STEPHENS, in his official capacity
as Principal of Santa Fe High School as a necessary party
for complete relief, ASI NEW MEXICO, LLC,
JOHN/JANE DOE Nos. 1-8,

        Defendants.

## MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** comes before the Court on the Santa Fe Public Schools Board of

Education's Motion for Summary Judgment on Count I of Plaintiffs' Second Amended

Complaint [Doc. 100], filed March 3, 2014 (Doc. 187)("MSJ").  The Court held a hearing on

---

    [1]In its Sealed Memorandum Opinion and Order, filed May 27, 2014 (Doc. 219)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court published a public version of the Sealed MOO.  See Sealed MOO at 1 n.1.  The Court gave the parties 14 calendar days to provide notice of any proposed redactions.  See Sealed MOO at 1 n.1.  The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions.  Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

April 8, 2014.  The primary issues are: (i) whether evidence in the record supports the Plaintiffs Candice Herrera, T. H., a minor by and through her father and guardian Vincent Herrera, Ashley Hurtado, and Arianna London's allegation that Defendants Santa Fe Public Schools Board of Education, Barbara Gudwin, Glen Wikle, Linda Trujillo, Frank Montano, Steven J. Carrillo, Bobbie J. Gutierrez, Melanie Romero and Leslie Kilmer (collectively "the SFPS Defendants"), each of which remain in this case in their official capacities as employees or members of the Santa Fe Public Schools Board of Education, are responsible, under Monell v. New York City Department of Social Services, 436 U.S. 658 (1978), for certain searches that the Plaintiffs allegedly endured at the 2011 Capital High School Prom ("CHS Prom"); and (ii) if they are responsible, whether the Court should limit the Plaintiffs' recovery to nominal damages.  The Court will grant the MSJ in part and deny it in part.  The Court concludes that there is sufficient evidence in the record from which a reasonable jury could find that the SFPS Defendants had a custom or practice of conducting suspicionless pat-down searches before school events; that this policy caused the Plaintiffs' injuries, insofar as they relate to the suspicionless nature of the searches; and that the SFPS Defendants acted with the requisite state of mind.  There is not, however, sufficient evidence in the record for which a jury could reasonably hold the SFPS Defendants accountable for the invasive manner in which Defendant ASI New Mexico, LLC's officers conducted the pat-down searches.  The Court will not limit the Plaintiffs' potential recovery to nominal damages, because there is sufficient evidence on which a reasonable jury could hold that the Plaintiffs have suffered compensable harm beyond the abstract harm to their constitutional rights and that the SFPS Defendants caused some percentage of that separate harm. Finally, the Court will deny the MSJ as to that portion of the Plaintiffs' claims that relates to possession searches and seizures.  The SFPS Defendants only cursorily refer to those claims in

the MSJ, leaving the argument substantially undeveloped until the Santa Fe Public School Board of Education's Reply in Support of Motion for Summary Judgment on Count I of Plaintiffs' Second Amended Complaint, filed April 7, 2014 (Doc. 203)("Reply").  Moreover, on the merits, a reasonable jury could find that the SFPS Defendants had a custom or practice of conducting suspicionless possession searches and seizures before school events, that this policy injured the Plaintiffs, and that the SFPS Defendants acted with the requisite state of mind.

## FACTUAL BACKGROUND

The Court will first provide those facts that it deems undisputed for purposes of this motion as they are found in the MSJ and in the Plaintiffs' Opposition to Defendant Santa Fe Public Schools Board of Education's Motion for Summary Judgment on Count I of Plaintiffs' Second Amended Complaint, filed March 20, 2014 (Doc. 192)("Response").  It will discuss, where appropriate, the SFPS Defendants' factual arguments in their Reply.[2]

1.      **The Undisputed Facts.**

The Court will discuss the undisputed facts in several parts.  The Court will first discuss

---

[2]At the outset, it is useful to review some basic summary-judgment principles.  The burden lies on the movant -- here, the SFPS Defendants -- to demonstrate the absence of a genuine issue of material fact.  See Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  If the movant carries that burden, the non-movant -- here, the Plaintiffs -- must designate specific facts showing a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 232 (1986).  The Court must indulge reasonable inferences and doubts in the non-movant's favor, and must construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).

With this backdrop in mind, the Court underscores something that seems to have been lost on the SFPS Defendants in their Reply: because the Plaintiffs are the non-movants, it is not their burden, in responding to the MSJ, to show that the facts on which they rely are undisputed.  It is, instead, the Plaintiffs' burden to show that there is a genuine issue for trial, see Celotex Corp. v. Catrett, 477 U.S. at 232, and, in making that determination, it is the Court's obligation to view the facts in the light most favorable to the Plaintiff, see Hunt v. Cromartie, 526 U.S. at 550-55.  Accordingly, the theme shot throughout the Reply that the SFPS Defendants dispute certain facts is largely inapposite: where there is a disputed fact, the Court is obligated to view the fact in the light most favorable to the Plaintiffs.

the organization of Capital High School ("CHS") and the Santa Fe public school board, its

arrangement with ASI New Mexico, and these organizations' knowledge of search procedure.  It

will then discuss the searches of the Plaintiffs, the Plaintiffs' mindset, and the searches' effects on

the Plaintiffs.  Finally, the Court will discuss parental complaints about the CHS Prom.

> a.   **The Organization of Capital High School and the Santa Fe Public School Board, the Arrangement with ASI New Mexico, and These Organizations' Knowledge of Search Procedure.**

"Capital High School ('CHS') is a secondary school located in Santa Fe, New Mexico

and is in the Santa Fe Public School District."  MSJ ¶ 2, at 4 (setting forth this fact); Response

¶ 2, at 2 (not disputing this fact).  See Second Amended Complaint ¶¶ 18-20, at 5-6, filed

September 18, 2012 (Doc. 100)("Complaint").  "Defendant School Board is the governing body

of SFPS with sole, statutory, policy-making authority for SFPS."  MSJ ¶ 3, at 4 (setting forth this

fact).  See N.M. Stat. Ann. § 22-5-4.[3]  "Defendant Melanie Romero, principal of CHS at the time

---

[3]The SFPS Defendants state that the School Board has "sole" authority over the Santa Fe Public Schools.  MSJ ¶ 4, at 2.  The Plaintiffs dispute this characterization, noting that the board "has delegated some of its authority to others, such as the Superintendent."  Response ¶ 3, at 2 (citing Santa Fe Public Schools Board of Education Policy Manual, dated June 18, 2006, filed March 20, 2014 (Doc. 192-20)).  The SFPS Defendants respond that, although the cited portion of the policy manual

> does purport to make such a delegation, there are two reasons why the apparent delegation relied upon by Plaintiffs does not dispute the fact.  First, the Board simply cannot delegate to the superintendent powers and responsibilities originally vested in the superintendent by the New Mexico Legislature in NMSA 1978, § 22-5-14. Secondly, the policy only purports to endow the superintendent with administrative authority, not policy-making authority.  Thus, School Board policy § 191-1 does not put the fact that the School Board is the governing body of SFPS with sole, statutory, policy-making authority for SFPS" into dispute.  Similarly, § 110 of the Policies of the Board of Education, included in Plaintiffs' Exhibit 20, *Id.*, at p. 3, also purports to grant authority to the superintendent to determine procedures and regulations, but includes the explicit limitation that such actions "must be consistent with board policy."

Reply at 6.  The Court concludes that the SFPS Defendants' proposed undisputed fact is correct,

of the [CHS] Prom," lacked formal statutory authority to make policies within SFPS, although

she had some de facto authority to make decisions to ensure her students' safety.  See N.M. Stat.

Ann. § 22-10A-18 (outlining a school principal's statutory authority); Videotaped Deposition of

Bobbie J. Gutierrez at 121:8-12 (taken March 22, 2012), filed March 20, 2014 (Doc. 192-

5)("Gutierrez Depo. Vol. I")(noting that principals "are the CEOs of their schools, and that they

need to make some decisions that will insure" their students' safety).[4]

---

so far as it goes: although the School Board has delegated some authority to others, it remains
undisputed that the School Board alone is vested with a statutory basis for its policy-making
authority.

[4] The SFPS Defendants assert as undisputed that Romero "had no authority to make
policies within SFPS," citing provisions of state law that lay out the respective responsibilities of
the school principal and boards of education, as well as the Court's similar finding of fact in its
previous Memorandum Opinion and Order, filed June 28, 2013 (Doc. 142)("Romero MOO").
MSJ ¶ 4, at 4.  The Plaintiffs respond by citing the following portion of the Gutierrez Depo.
Vol. I:

> Q.     Is there a procedure for a supervisor or a principal to approve a
> procedure that the principal wants to adopt?
>
> A.     Principals really are charged with ensuring the safety of their
> students at all times, regardless of the location or setting.  As defined by law,
> principals are the CEOs of their schools, and they need to make some decisions
> that will ensure that safety.

Gutierrez Depo. Vol. I at 121:5-12.  The SFPS Defendants reply:

> Plaintiffs' [sic] claim that Board's Fact No. 4, that "Defendant Melanie Romero,
> principal of CHS at the time of the Prom, had no authority to make policies within
> SFPS" is "immaterial," thus apparently waiving any claim based upon Principal
> Romero being a policy-maker who could create liability for the School District
> under § 1983.  As shown by the School District, powers granted Principal Romero
> by statute as a school principal (See NMSA 1978, § 22-10A-18) were constrained
> by the policies of the School Board as are those of a superintendent.
> Superintendent Gutierrez testified only that Principal Romero had the executive
> power of a CEO to operate CHS and keep students safe.

Reply at 6.  The Court concludes that its formulation more fairly reflects the cited evidence and
reconciles it into a single undisputed fact than the SFPS Defendants' proposed fact does: Romero

"In 2004, SFPS contracted with ASI to provide security services for SFPS on school grounds and at school-sponsored events."   Response ¶ 13, at 9 (setting forth this fact).   See Gutierrez Depo. Vol. I at 80:22-24; Deposition of Martin "Mark" Archuleta at 51:8-52:2, taken March 9, 2012, filed March 20, 2014 (Doc. 192-2)("Archuleta Depo. Vol. I"); Reply ¶ 13, at 16 (not controverting this fact).[5]   "At the beginning of its contract with ASI," school officials "and then-Superintendent [Gloria] Rendon instructed ASI that pat-down searches were to be conducted of all students entering" school "dances."   Response ¶ 14, at 16 (setting forth original version of this fact).   See Deposition of Micah Johnson at 84:10-85:15, taken January 16, 2014, filed March 20, 2014 (Doc. 192-11)("Johnson Depo."); id. at 89:13-22;[6]   Deposition of Martin

_____

lacked formal statutory policymaking authority, but, by virtue of her position, she retained some de facto authority to make certain decisions about her students' safety.
    The Plaintiffs also assert that this proposed fact is immaterial.   See Response ¶ 4, at 2. The Court will decide materiality in its analysis.

    [5] In the SFPS Defendants' Reply, they state:

        Plaintiffs' Additional Fact No. 13 is not disputed by the School Board to the extent that the School Board entered into a contract with ASI New Mexico, LLC ("ASI") written to provide security services for the school district. However, this fact is immaterial to the issues raised in the School Board's Motion.

Reply ¶ 13, at 16.   Because the SFPS Defendants did not specifically controvert this fact, the Court deems it undisputed for purposes of this opinion.   As for the SFPS Defendants' assertion that the fact is immaterial, the Court will decide materiality in its analysis.

    [6] The Plaintiffs ask the Court to find undisputed that, "[a]t the beginning of its contract with ASI, SFPS and then-Superintendent Rendon instructed ASI that pat-down searches were to be conducted of all students entering SFPS dances."   Response ¶ 14, at 16 (emphasis added). The SFPS Defendants dispute this fact "to the extent that 'SFPS' is intended to mean the School Board.  There is no evidence in the record that the School Board instructed ASI to perform any searches of students other than those searches authorized pursuant to the Code of Conduct." Reply ¶ 14, at 6.   The Court has reviewed the testimony that the Plaintiffs have cited and determined that, making all inferences in the Plaintiffs' favor, the SFPS Defendants are correct.
    The Plaintiffs first cite sections of the Archuleta Depo. Vol. II that, in the Court's view, do not support the Plaintiffs' proposed fact.  First, they cite this section:

Q.      And is it fair to say that for all 16 of those proms, you tried to provide the same type of security for each one?

A.      Yes.

[Counsel for ASI New Mexico:] Object to form.

Q.      And the 2011 Capital High School prom was not -- was not significantly different in any way.

A.      The Only changes in any of the proms were venues.

Q.      And it was typical to have a premeeting before the prom with Public Schools staff to talk through the setup?

A.      Yes.

Q.      When was it first decided upon about how much security would be provided at the prom?  Is that way back before the first one of the proms that --

[Counsel for ASI New Mexico:] Objection, foundation and form.

A.      It was the first prom we ever did.

Q.      And do you recall that meeting, who gave the instructions, who had the discussion about how to set up security?

A.      I do not know who said what.  I remember a few people that were there at the time was Bill Belzner, Gloria Rendon I believe was the superintendent.  That's all I can remember offhand.

Q.      And then at subsequent proms, you would not go back and revisit whether you were going to, for example, search bags or do patdowns; that was something that was decided at the start and then just continued on through all the proms?

A.      Yes.

[Counsel for ASI New Mexico:] Objection, form and foundation to that question as well.

Archuleta Depo. Vol. II at 168:2-169:10.  That ASI New Mexico staff met with "Public Schools staff" to discuss the setup of security does not mean that the School Board, acting as an entity, instructed ASI New Mexico to conduct pat-down searches of students entering dances. Moreover, that Bill Belzner -- identified in the briefing only as "Chief Operating Officer" of an unidentified entity, see Response at 29 -- and the school superintendent discussed how to set up

security also does not mean that the School Board acted as an entity to instruct ASI New Mexico to conduct pat-down searches. Accordingly, this section does not support the portion of the Plaintiffs' proposed fact that speaks to the School Board's conduct.

The Plaintiffs also point to this section of the Archuleta Depo. Vol. II:

> Q. Do you recall having these conversations with any other superintendents, about the conduct of searches at proms?
>
> A. The only one I remember that was originally brought up about searches was Dr. Rendon when we first took over the contract.
>
> Q. And was that the same initial discussion that you talked about earlier, where you set up what the -- how the searches would go?
>
> A. Yes.

Archuleta Depo. Vol. II at 182:2-11. Although this section supports that Rendon instructed ASI New Mexico how it should conduct the searches, it does not support that the School Board made that instruction. Accordingly, this section does not support the portion of the Plaintiffs' proposed fact that speaks to the School Board's conduct.

The final set of evidence that the Plaintiffs cite also does not establish their proposed fact:

> Q. Were you aware of an oral standard operating procedure how to conduct a search at special events?
>
> A. How to conduct them or whether or not to conduct them?
>
> Q. Let's start with whether or not to conduct them.
>
> A. It was always in place.
>
> Q. So you always would conduct them?
>
> A. Yes. From the first prom we did for them, we always did them.
>
> Q. And that came as a directive from someone in the school's administration?
>
> A. Yes.
>
> Q. In terms of how you conduct the searches, were there any oral standard operating procedures of how searches were conducted?
>
> A. Yes. We would go over it with the officers every major event before the event. Mr. Archuleta would pull the guards into a room and say,

"Mark" Archuleta at 168:2-169:8 (taken January 30, 2014), filed March 20, 2014 (Doc. 192-

3)("Archuleta Depo. Vol. II"); id. at 182:2-11.  "Based on" directives from SFPS officials, "ASI

---

"Here's how we're going to do our searches tonight," and we review with them how to make sure you respect the students' space.  But at the same time, we make sure there's no weapons, drugs or alcohol that get in.

Q.    In those situations, would Mr. Archuleta be the one deciding how to conduct the search, or was he just carrying out an order from Santa Fe Public Schools' administration?

[Counsel for ASI New Mexico:] Object to form.

A.    He was carrying out a directive from the schools.  He was doing what he was asked but went on to make sure the guards knew the boundaries.

Q.    (By Mr. Colfax) At some proms, pat-down searches were conducted by ASI guards on all students, right?

A.    At some proms?

Q.    All proms.

A.    All proms.

Johnson Depo. at 84:10-85:21 (capitalization altered for legibility).

Q.    But you are one of the highest-ranking people in ASI.  I'm trying to find out whether anybody in ASI made a decision to pat down every student entering Santa Fe high school proms.

A.    That's not a decision that we can make.  We work for the client; the client can make that decision.

Q.    So the answer to my question is: ASI did not make the decision to pat down every student going into the proms; is that right?

A.    No.  It was a directive.

Johnson Depo. at 89:13-22 (capitalization altered for legibility).  Reading the evidence together and taking all inferences in the Plaintiffs' favor, although Johnson contends that school administrators directed ASI New Mexico's conduct of the search, there is no evidence that the School Board as an entity directed ASI New Mexico to conduct pat-down searches.  Accordingly, the Court has altered the Plaintiffs' proposed fact to more closely reflect the evidence.

representatives understood that pat-down searches had long been part of . . . standard search practices" in the SFPS "and that ASI was expected to continue those practices."  Response ¶ 15, at 16 (setting forth unmodified version of this fact).[7]  "ASI officials agreed that" the existing

---

[7] The Plaintiffs ask the Court to find undisputed that ASI New Mexico's understanding was "[b]ased on SFPS's directives."  Response ¶ 15, at 16.  The SFPS Defendants dispute this fact "to the extent that "SFPS" is intended to mean the School Board. There is no evidence in the record that the School Board instructed ASI to perform any searches of students other than those searches authorized pursuant to the Code of Conduct."  Reply ¶ 15, at 16.  The Court substantially agrees with the SFPS Defendants that it is inappropriate to attribute these acts to the School Board.

In addition to the testimony that the Court has already discussed, the Plaintiffs cite the following testimony:

> Q.  Do you think searching every student going into the 16 proms that you have attended is consistent with Santa Fe Public Schools' Code of Conduct?
>
> A.  Yes.
>
> * * * *
>
> Q.  All right.  Let me ask you a question that might be slightly different, but as close as I can make it.  For the 16 proms that you talked about where every student was searched before entering, do you think every student was searched, in part, because of input you gave to the Santa Fe Public Schools administrators?
>
> [Counsel for ASI New Mexico:] Object to form.
>
> A.  No.  Not solely, no.  It's based on events that have occurred.

Deposition of Martin "Mark" Archuleta, Vol. I at 118:21-25 (taken March 9, 2012), filed March 20, 2014 (Doc. 192-2)("Archuleta Depo. Vol. I"); id. at 121:5-14.  Nothing in the cited testimony suggests that the School Board, as an entity, directed ASI New Mexico to continue the pat-down searches.

The Plaintiffs also cite the following testimony:

> Q.  Did you ever see anywhere from Santa Fe Public Schools any policies related to searches at off-campus special events?
>
> A.  No.  When we took over the contract it was just a general directive that there would be searches; there always have been and will continue to be.

"blanket pat-down rule should be applied at SFPS proms."  Response ¶ 16, at 10 (setting forth

this fact).  See Archuleta Depo. Vol. I at 118:6-20.[8]

"ASI trained its employees" in a manner consistent with certain "written Pat Down

Guidelines when performing searches at SFPS events."  Response ¶ 18, at 10 (setting forth

_____

* * * *

Q.      (By Mr. Colfax) Let me make sure I understand correctly.  It's your
understanding that, as long as ASI has had the contract with public schools, at all
these high-risk events -- which I think were all dances -- the policy was to do a
pat-down search and bag searches of every student going into them?

A.      Yeah.  I think we backed off a little bit in the bag search.  The
wand made a big difference, and we realized when we wanded successfully, if not
on top of aluminum, that we can be a little bit less invasive as the students go with
their bags.  The problem was also with the parking lot.  That is where the real
problem was.

Johnson Depo. at 124:20-25; id. at 130:21-131:8 (capitalization altered for readability).  The
SFPS Defendants are correct that this statement does not indicate that the School Board directed
ASI New Mexico to conduct these pat-down searches.  Accordingly, the Court has adjusted the
proposed fact.

The Plaintiffs ask the Court to find undisputed that, "[f]or years, SFPS maintained a
practice of conducting pat-down searches of all students entering the Santa Fe High School and
Capital High School proms."  Response ¶ 17, at 10.  In support, they cite a portion of Individual
School Defendant Melanie Romero's Motion for Summary Judgment on Count I of the Second
Amended Complaint Based Upon Qualified Immunity, filed November 13, 2012
(Doc. 113)("Romero MSJ").  See Response ¶ 17, at 10 (citing Romero MSJ at 7).  First, this
basis is not an appropriate one on which the Court can base a finding of undisputed fact, because
Romero spoke in her individual capacity and the Court should not attribute her individual
statement to the SFPS Defendants.  Moreover, as the SFPS Defendants point out in their Reply,
the cited statement in the other motion does not show that the School Board formally maintained
this practice, but that particular schools within the Santa Fe Public School District had such a
practice.  See Reply ¶ 17, at 17.  Accordingly, the Court will not find this fact undisputed.

_____

[8] The Plaintiffs ask the Court to attribute this fact to "SFPS," presumably including the
School Board.  Response ¶ 16, at 10.  The SFPS Defendants assert that no evidence supports
"that the School Board had a blanket pat-down rule. Moreover, this claimed undisputed 'fact' is
disputed by the School Board's policies in its Code of Conduct. It is not disputed that ASI
thought pat-down searches at the Prom were reasonable under the circumstances."  Reply ¶ 16, at
16.  The Court concludes that the SFPS Defendants are correct: the cited evidence does not tie
the rule to the School Board.  Accordingly, the Court has adjusted the proposed fact.

unmodified version of this fact).[9]  Johnson Depo. at 73:18-25. "The Pat Down Guidelines require bra searches of female subjects in which the front of the bra is pulled away from the body." Response ¶ 19, at 16 (setting forth this fact).  See "Pat Down" Guidelines, no date provided, filed March 20, 2014 (Doc. 192-24).[10]  "The Pat Down Guidelines indicate that it is 'important to be vigilant' and state that students have hidden contraband on 'the inside of their legs.'"  Response ¶ 20, at 16 (setting forth this fact)(quoting "Pat Down" Guidelines at 1).[11]  "The principals of

---

[9] The SFPS Defendants state:

> Plaintiffs' Additional Fact No. 18 is immaterial and is disputed by the School Board. First, there is no evidence that these were the School Board's pat-down guidelines and said pat-down guidelines were created after the Prom and are, therefore, immaterial to searches at the Prom.  See Affidavit of Troy Dunn, Sr., executed on April 3, 2014, filed on April 4, 2014 [Doc. 199], ¶¶ 2-4.

Reply ¶ 18, at 17.  Given the absence of further argument, the word "[f]irst" is confusing.  In any event, the Court will decide materiality in the analysis.  The Court has, however, modified the fact to more closely reflect Johnson's testimony that the training was "consistent with" the "Pat Down" Guidelines -- not that ASI New Mexico trained its guards using the "Pat Down" Guidelines.

[10] The SFPS Defendants reply:

> Plaintiffs' Additional Fact No. 19 is disputed by the School Board if Plaintiffs intend to imply that any evidence in the record of this case tends to establish that the School Board allowed for pat-down searches without individualized reasonable suspicion at a prom, let alone required any particular technique in doing so. Moreover, none of the Plaintiffs claim they were asked to pull out the center of their bras themselves as discussed in the ASI "guidelines."

Reply ¶ 19, at 17-20.  This argument does not specifically controvert the fact, but instead asks the Court to read it in a particular light.  The Court will decide such issues in its analysis.

[11] The SFPS Defendants dispute this fact "to the extent Plaintiffs intend to imply that ASI's pat-down guidelines represent any policy or practice of the School Board. There is no evidence in the record that the pat-down "guidelines" were the Board's. To the contrary, the guidelines were prepared by ASI employees after the Prom."  Reply ¶ 20, at 18.  This argument does not specifically controvert the fact, but instead asks the Court to read it in a particular light. The Court, therefore, deems this fact undisputed.  The Court will decide the fact's import in its analysis.

Capital High School and Santa Fe High School reviewed the written Pat Down Guidelines."

Response ¶ 21, at 18 (setting forth this fact).  See Gutierrez Depo. Vol. II at 213:13-214:11; id. at

215:5-9.[12]  "The Pat Down Guidelines are consistent with the training SFPS administrators

received regarding SFPS's pat-down procedure."  Response ¶ 22, at 11.  See Gutierrez Depo.

Vol. II at 216:17-217:4.[13]  When asked after the event, "Superintendent Gutierrez ha[d] no

objection to any aspect of the Pat Down Guidelines."   Response ¶ 23, at 11 (setting forth

---

[12] The SFPS Defendants dispute this fact

to the extent it is intended to show that the "written Pat Down Guidelines" were
reviewed by any School District employees prior to the Prom at which Plaintiffs'
alleged claims arose. It has been established that said "Pat Down Guidelines"
were drafted after the Prom entirely by ASI employees. See Affidavit of Troy
Dunn, Sr., filed on April 4, 2014 [Doc. 199], ¶¶ 2-4. Moreover, Plaintiffs have not
put forth any evidence that said guidelines are not appropriate for circumstances
where pat-down searches are usually required -- in school, based upon
individualized reasonable suspicion that a student has broken a law or school rule.
In addition, said fact is immaterial to any claim that said guidelines represent a
policy or practice of the School Board.

Reply ¶ 21, at 18.  The bulk of this argument does not specifically controvert the fact, but instead
asks the Court to read it in a particular light.  The Court, therefore, substantially deems this fact
undisputed.  The Court will decide the fact's import in its analysis.

[13] The SFPS Defendants dispute this fact

to the extent it is intended to show that the "written Pat Down Guidelines" were
reviewed by any School District employees prior to the Prom at which Plaintiffs'
alleged claims arose.  It has been established that said "Pat Down Guidelines"
were drafted after the Prom entirely by ASI employees. See Affidavit of Troy
Dunn, Sr., filed on April 4, 2014 [Doc. 199], ¶¶ 2-4. Moreover, Plaintiffs have not
put forth any evidence that said guidelines are not appropriate for circumstances
where pat-down searches are usually required -- in school, based upon
individualized reasonable suspicion that a student has broken a law or school rule.
In addition, said fact is immaterial to any claim that said guidelines represent a
policy or practice of the School Board.

Reply ¶ 22, at 18.  This argument does not specifically controvert the fact, but instead asks the
Court to read it in a particular light.  The Court, therefore, deems this fact undisputed.  The Court
will decide the fact's import in its analysis.

unmodified version of this fact).  See Gutierrez Depo. Vol. II at 217:5-17.[14]  "SFPS officials

reviewed and were familiar with ASI's pat-down methods."  Response ¶ 24, at 17 (setting forth

this fact).[15]  Deposition of Melanie Romero at 48:16-49:19 (taken March 19, 2012), filed March

20, 2014 (Doc. 192-19)("Romero Depo.").

    "The same search procedures, which included pat-downs of all students, were followed at

Santa Fe High School and Capital High School proms every year for at least sixteen consecutive

---

[14] The SFPS Defendants reply:

    Plaintiffs' Additional Fact No. 23 is disputed by the School Board to the
extent it is intended to show that the "written Pat Down Guidelines" were
reviewed by any School District employees prior to the Prom at which Plaintiffs'
alleged claims arose. It has been established that said "Pat Down Guidelines"
were drafted after the Prom entirely by ASI employees. See Affidavit of Troy
Dunn, Sr., filed on April 4, 2014 [Doc. 199], ¶¶ 2-4. Moreover, Plaintiffs have not
put forth any evidence that said guidelines are not appropriate for circumstances
where pat-down searches are usually required -- in school, based upon
individualized reasonable suspicion that a student has broken a law or school rule.
In addition, said fact is immaterial to any claim that said guidelines represent a
policy or practice of the School Board.

Reply ¶ 23, at 19.  This argument does not specifically controvert the fact, but instead asks the
Court to read it in a particular light.  The Court, therefore, deems this fact undisputed.  The Court
will decide the fact's import in its analysis.  The Court has, however, clarified its finding of an
undisputed fact to clarify that Gutierrez voiced her lack of objections to the "Pat Down"
Guidelines after the fact.

[15] The SFPS Defendants reply:

    Plaintiffs' Additional Fact No. 24 is disputed by the School Board in that
the cited testimony does not establish that ASI's pat-down guidelines existed prior
to the Prom or that said "guidelines" were ever presented to the School Board for
review or approval.  To the contrary, the guidelines were prepared by ASI
employees after the Prom.  See Affidavit of Troy Dunn, Sr., executed on April 3,
2014, filed on April 4, 2014 [Doc. 199], ¶¶ 2-4.  The School Board does not
dispute that the guidelines were "ASI's pat-down methods."

Reply ¶ 24, at 19.  This argument does not specifically controvert the fact, but instead asks the
Court to read it in a particular light.  The Court, therefore, deems this fact undisputed.  The Court
will decide the fact's import in its analysis.

proms." Response ¶ 25, at 11 (setting forth this fact).[16]  See Archuleta Depo. Vol. II at 168:2-

169:8; id. at 244:2-20;  Romero Depo. at 53:9-54:2; id. at 138:19-139:8; Deposition of Michael

Hagele at 75:5-12 (taken May 7, 2012), filed March 20, 2014 (Doc. 192-7)("Hagele Depo"); id.

at 77:6-16; id. at 78:6-16; 86:22-87:5.  School Board members attended proms and observed the

search procedures.  Gutierrez Depo. Vol. I at 131:13-25.  "Bra searches of female students were

part of" the "standard pat-down search practice."  Response ¶ 25, at 11 (setting forth unmodified

version of this fact).[17]  See Deposition of Rose Lucero at 28:19-25 (taken May 15, 2012), filed

March 3, 2014 (Doc. 132-11)("Lucero Depo."); id. at 35:6-12; Deposition of Rebecca Reyes

---

[16] The SFPS Defendants reply:

> Plaintiffs' Additional Fact No. 25 is not disputed by the School Board in
> that there is evidence in the record that since 2004 ASI has performed pat-down
> searches at the Santa Fe High School and Capital High School proms.  However,
> there is no evidence that deliberate conduct of the School Board was the moving
> force behind this practice or that it constituted the practice of the School Board.
> Indeed, there is no evidence that the Board had knowledge of this "practice."  But
> there is evidence that the School Board was not aware of the practice. See
> Affidavit of Mary Ellen Gonzales, dated March 18, 2014, filed on March 20, 2014
> as Exhibit "A" to the School Board's Response to Plaintiffs' Motion for Partial
> Summary Judgment, [Doc. 195-1] ("Gonzales Affidavit").

Reply ¶ 25, at 19.  This argument does not specifically controvert the fact, but instead asks the
Court to read it in a particular light.  The Court, therefore, deems this fact undisputed.  The Court
will decide the fact's import in its analysis.

[17] The Plaintiffs ask the Court to attribute this practice to the School Board.  See
Response ¶ 26, at 11. The SFPS Defendants reply:

> Plaintiffs' Additional Fact No. 26 is disputed by the School Board in that
> there is no evidence in the record of this case that the School Board had any
> standard pat-down practice.  Moreover, none of the four Plaintiffs have alleged or
> testified that they were subjected to a "Bra search" as described in ASI's pat-down
> guidelines.

Reply ¶ 26, at 20.  The Court substantially concludes the SFPS Defendants to be correct: the
evidence does not provide a sound basis to attribute these searches to a formal School Board act.
The Court has, therefore, modified the proposed fact.

Vol. I at 60:6-61:22 (taken May 8, 2012), filed March 20, 2014 (Doc. 192-17)("Reyes Depo.");

id. at 62:1-13.  It had been the practice in schools within SFPS to conduct pat-down searches that

required female subjects to pull their bras away from their body, allowing contraband to fall.

See, e.g., Romero Depo. at 53:9-54:2; id. at 138:19-139:8; Reyes Depo. at 60:6-61:22; id. at

63:17-64:9; id. at 114:24-115:9; Deposition of Michael Hagele at 75:5-12 (taken May 7, 2012),

filed March 20, 2014 (Doc. 192-7)("Hagele Depo."); id.  at 78:6-16; id. at 86:22-88:5; Gutierrez

Depo. Vol. II at 215:5-217:4; "Pat Down" Guidelines at 1.  Those searches did not include

searches of the bare skin.[18]

---

[18] The SFPS Defendants ask the Court to find undisputed that

> [t]here is no evidence in the record of this case tending to show that the School
> Board should have expected, at any time before the prom, that ASI personnel
> performing patdown searches at the prom would touch the breasts or bare legs, or
> pull female attendees' bras, as the searches at earlier CHS dances and similar off
> campus events did not involve touching the breasts or bare legs, or pulling bras.

MSJ ¶ 13, at 6.  The Plaintiffs respond:

> Disputed. The record indicates that invasive pat-downs involving the
> pulling and shaking of bras and/or breasts were part of SFPS's standard search
> protocol implemented at proms for at least nine years.  The record further
> demonstrates that the pulling of bras was part of the standard Pat Down
> Guidelines that ASI guards were trained to follow, that SFPS principals reviewed,
> and that were consistent with the training SFPS officials received regarding how
> patdowns would be performed.  The Pat Down Guidelines' directive to be
> "vigilant" and specific identification of the bra area and inner legs as locations
> where contraband may be concealed further rendered the invasive searches
> experienced by Plaintiffs foreseeable.

Response ¶ 13, at 4-5 (citations omitted).  The SFPS Defendants reply:

> Plaintiffs attempt to show Board's Fact No. 13 is disputed by making
> misleading statements followed by string cites to the record that do not support
> the statement.  The School Board, therefore, simply states that there is no
> evidence in the record of this case tending to show that the School Board should
> have expected, at any time before the prom, that ASI personnel performing pat-
> down searches at the prom would touch the breasts or bare legs, or pull female

The schools' "standard search practice also included possession searches where students' bags and belongings were searched."  Response ¶ 27, at 11 (setting forth unmodified version of this fact).  See Romero Depo. at 139:19-139:9; Lujan Depo. at 138:15-22; id. at 155:13-156:4; Deposition of Cynthia Clarke, Ph.D. at 71:16-73:10 (taken May 14, 2012), filed March 20, 2014

---

attendees' bras, as the searches at earlier CHS dances and similar off campus events did not involve touching the breasts or bare legs, or pulling bras.  Nothing cited by Plaintiffs puts this fact into dispute.  Moreover, it has been established that said "Pat Down Guidelines" were drafted after the Prom entirely by ASI employees.  See Affidavit of Troy Dunn, Sr., filed on April 4, 2014 [Doc. 199], ¶¶ 2-4.

Reply at 8 (emphasis in original).

The Court concludes that the proposed fact is not undisputed.  Reading together the evidence that the Plaintiffs have cited -- and taking, as it must, all inferences in their favor -- shows that search protocols at the Capitol High School prom reflected long-standing practice, and that that practice included manipulation of bras.  See, e.g., Romero Depo. at 53:9-54:2; id. at 138:19-139:8; Reyes Depo. at 60:6-61:22; id. at 63:17-64:9; id. at 114:24-115:9; Deposition of Michael Hagele, taken May 7, 2012, filed March 20, 2014 (Doc. 192-7).  Moreover, the evidence -- particularly the "Pat Down" Guidelines -- demonstrates that ASI trained its officers to instruct female subjects to, "using their own hands[,] pull the front of the bra at the underwire slightly away from the skin to allow any contraband to fall."  "Pat Down" Guidelines at 1.  Accordingly, the Court concludes that there is enough evidence from which a jury could find that there was a long-standing practice of conducting those searches, and that the School Board was, therefore, probably aware of that practice.

There is not, however, any evidence to suggest that the School Board would have known that ASI New Mexico officers would touch the breasts or bare legs of the search's subjects.  Although the evidence to which the Plaintiffs have pointed tends to show that the ASI New Mexico instructed its officers to pull their bras away from their bodies to allow contraband to fall, no evidence tends to show that the School Board knew that ASI New Mexico officers would touch the subjects' breasts or bare legs.  Indeed, the exhibit that the Plaintiffs cite for the proposition that "[t]he Pat Down Guidelines' directive to be 'vigilant' and specific indication of the bra area and inner legs as locations where contraband may be concealed further rendered the invasive searches experienced by Plaintiffs foreseeable" points the other direction: it instructs that "[n]o pat downs are to be done on the bare skin" and that "[n]o pat downs are to be done on the groin area (males), groin and breast area (females)," and defines "[t]he breast area . . . as area [sic] from the front bra line( typically [sic] where the underwire is) to approximately 1 [inch] below the collar bone."  "Pat Down" Guidelines at 1.  Accordingly, the Court finds undisputed, for purposes of this motion, that the searches of which the School Board was aware did not include touching of the breasts or bare legs.

- 17 -

(Doc. 192-4)("Clarke Depo.").[19]  "During possession searches, the contents of students' bags were often emptied in public view."  Response ¶ 28, at 11 (setting forth this fact).  See Clarke Depo. at 71:16-73:10.[20] "Personal items, such as lotion, makeup, and perfume, were confiscated

---

[19]The Plaintiffs ask the Court to attribute this search practice to the School Board.  See Response ¶ 27, at 11.  The SFPS Defendants reply: "Plaintiffs' Additional Fact No. 27 is disputed by the School Board in that there is no evidence in the record of this case that the School Board had any standard search practice, including the cited testimony."  Reply ¶ 27, at 20.  The Court concludes the SFPS Defendants to be substantially correct: the evidence does not provide a sound basis to attribute these searches to the School Board.

[20]The SFPS Defendants dispute this fact "to the extent the fact implies possession searches at the Prom were performed pursuant to any School Board policy or practice. Moreover, the claim of Plaintiffs that searches of their bags included dumping out the contents of the bag in public view is not supported by the cited testimony."  Reply ¶ 28, at 20.  The first argument does not specifically controvert the fact, but instead asks the Court to read it in a particular light.  The Court, therefore, deems this fact undisputed.  The Court will decide the fact's import in its analysis.  As to the second argument, the Court disagrees that the evidence does not support that the bags' contents were emptied in public.  The testimony of Cynthia Clarke, Ph.D., supports this proposed fact:

> Q.     Every time that you would search a bag, would you ask the student if there's anything harmful in the bag?
>
> A.     Uh-huh.
>
> Q.     Yes?
>
> A.     Yes, yes.
>
> Q.     And then you said -- I'm not sure I followed you.  Would you ask the student then to take things out of the bag, or would you --
> A.     If there is time permitting, I would have the student empty the articles.
> Q.     Do you --
>
> A.     If it's a clutch, small, and you can look in and see, then there would be no reason to remove things.
>
> Q.     But if it was a larger bag, your practice would generally be, first, you would ask the student, if there's time, to remove the items out of the bag?
>
> A.     Uh-huh.

as part of the possession searches."  Response ¶ 29, at 11 (setting forth this fact).  See Romero

Depo. at 155:1-7; Deposition of Arianna London at 156:25-157:4 (taken August 24, 2012), filed

March 20, 2014)("London Depo."); id. at 212:20-213:7.[21]  "If medication was found during

possession searches, it was confiscated."  Response ¶ 30, at 12 (setting forth this fact).[22]  See

Deposition of Candice Herrera at 151:9-21 (taken July 27, 2012), filed March 20, 2014 (Doc.

192-8)("C. Herrera Depo."); Romero Depo. at 155:8-17.

"Wand searches were added to [the schools'] search protocol during ASI's tenure,

resulting in students entering an SFPS prom being subjected to three searches: a pat-down, a

wand search, and a possession search."  Response ¶ 31, at 12 (setting forth unmodified version of

---

Q.     Then, where there were situations where there wasn't time, when
the line was getting long, would you pull items yourself out of the bag?

A.     I have.

Clarke Depo. at 71:16-72:13.  Reading this evidence in the light most favorable to the Plaintiff --
as it must, because the Plaintiff is the non-movant -- the Court concludes that Clarke testified
about emptying the contents of bags publicly.  Accordingly, the Court will deem the fact
undisputed for purposes of this opinion.

[21]The SFPS Defendants dispute this fact "only to the extent the fact implies possession
searches at the Prom were performed pursuant to any School Board policy or practice.  There is
no evidence in the record that such searches were performed pursuant to Board policy or that it
was Board practice."  Reply ¶ 29, at 20.  This argument does not specifically controvert the fact,
but instead asks the Court to read it in a particular light.  The Court, therefore, deems this fact
undisputed.  The Court will decide the fact's import in its analysis.
       The Court also notes that, although the cited testimony does not specifically mention
lotion, it does mention that any liquids were confiscated, and the Court reads "liquids"
sufficiently broadly to include lotion.  Romero Depo. at 155:1-7.

[22]The SFPS Defendants dispute this fact "to the extent the fact implies possession
searches at the Prom were performed pursuant to any School Board policy or practice.
Moreover, it is undisputed that Candice Herrera brought a pill to the Prom in violation School
Board policies."  Reply ¶ 30, at 20.  This argument does not specifically controvert the fact, but
instead adds an additional fact and asks the Court to read it in a particular light.  The Court,
therefore, deems this fact undisputed.  The Court will decide the fact's import in its analysis.

this fact).  See Archuleta Depo. Vol. II at 183:8-11; id. at 188:4-15.[23]  "In preparation for a

school-sponsored special event, the principal of the high school sponsoring the event would

typically instruct ASI regarding the implementation of [the school's] customary search practices

at the event."  Response ¶ 32, at 12 (setting forth unmodified version of this fact).  See Archuleta

Depo. Vol. II at 168:11-14; Romero Depo. at 94:6-95:8; id. at 96:7-21; id. at 97:9-17.[24]

         "The version of the Code of Conduct that was in place on April 16, 2011, was adopted by

---

[23]The SFPS Defendants dispute this fact

     to the extent Plaintiffs intend to state that the School Board had a policy or
     practice that provided any "search protocol" for the Prom.  Moreover, though
     contrary to School Board policy and practice, the School Board disputes that the
     searches of the attendees at the Prom, as established by all testimony in this case
     other than the testimony of the four Plaintiffs, was unreasonable under the
     circumstances.

Reply ¶ 31, at 21.  The Court substantially agrees with the SFPS Defendants that this testimony
does not provide a basis to attribute the search protocol to the School Board.  The Court has,
therefore, modified the proposed fact.  As to the second argument -- that searches of other
attendees were reasonable -- the argument does not specifically controvert the fact, but instead
asks the Court to read it in a particular light.  The Court, therefore, deems this fact undisputed, as
modified.  The Court will decide the fact's import in its analysis.

     [24]The Plaintiffs ask the Court to attribute this instruction to the School Board.  See
Response ¶ 32, at 12.  The SFPS Defendants reply:

          Plaintiffs' Additional Fact No. 32 is disputed by the School Board to the
     extent Plaintiffs intend to imply that the evidence in this case supports any
     assertion that a principal under those circumstance would instruct ASI guards as
     to how to perform a pat-down search.  Moreover, there is no evidence that such
     school principal was instructing ASI on a School Board "customary search
     practice."  There is no evidence that the School Board had or even knew about a
     customary search practice outside of the searches authorized by its Code of
     Conduct.

Reply ¶ 32, at 21.  The Court substantially agrees with the SFPS Defendants that the cited
testimony does not provide a basis to attribute a "customary search practice" to the School
Board.  The Court has, therefore, modified the proposed fact.  Otherwise, because the argument
does not specifically controvert the fact, but instead asks the Court to read it in a particular light,
the Court deems this fact undisputed, as modified.  The Court will decide the fact's import in its
analysis.

the School Board at the regular School Board Meeting on July 20, 2010 for the 2010-2011 school year." MSJ ¶ 7, at (setting forth this fact); Response ¶ 7, at 2-3 (not disputing this fact).[25]  See Board of Education Minutes of a Regular Board Meeting (dated July 20, 2010), filed March 3, 2014 (Doc. 187-2).  The new version of the Code of Conduct that the School Board adopted on July 20, 2010, reflected substantial, although not total, revisions, made in consultation with legal counsel.  See Board of Education Minutes of a Study Session, dated July 8, 2010, filed March 3, 2014 (Doc. 187-3).[26]

> Nothing in the School Board's Code of Conduct authorizes searches as alleged by the Plaintiffs or suspicionless possession and pat-down searches as occurred at the Prom.  To the contrary, it provides that "[m]ore intrusive searches, such as pat-downs, may be conducted only on the basis of reasonable suspicion of the individual student to be searched" (Code of Conduct, Exhibit 1 at p. 57) and "[p]urses, wallets, book bags, cell phones, and similar items of student's [sic]

---

[25]The Plaintiffs do not expressly state that it is undisputed that the School Board's meeting was the regular School Board's meeting, but they also do not expressly controvert that portion of the statement.  Accordingly, the Court deems it undisputed.

The SFPS Defendants ask the Court to conclude that "the Prom held on April 16, 2011 was the first high school Prom held under the newly revised Code."  MSJ ¶ 7, at 5 (setting forth this fact).  The Plaintiffs correctly point out that the SFPS Defendants do not cite evidence for this assertion.  See Response ¶ 7, at 2-3.  Accordingly, the Court will not find this proposed fact to be an undisputed fact.

The Plaintiffs also assert that "whether the April 2011 prom was the first held under the revised Code of Conduct is immaterial because the policies regarding searches of students or their possessions was not amended."  Response ¶ 7, at 3.  The Court will decide materiality in its analysis.

[26]The SFPS Defendants ask the Court to find undisputed that "[t]he Code of Conduct adopted by the School Board on July 20, 2010 was a complete and total legal revision by the School Board's attorney, which was reviewed page by page at weekly meetings of the SFPS's Code of Conduct Committee, from January through June, 2010."  MSJ ¶ 8, at 5.  The Plaintiffs dispute this fact, stating that the cited minutes "demonstrate that the Code was not entirely revised but only revised on certain pages," and add that, "[n]otably, SFPS's stated policies regarding when and how searches of students or student possessions could be conducted were not revised."  Response ¶ 8, at 3.  The Court has modified the proposed fact to more closely reflect the cited evidence.

The Plaintiffs assert that this undisputed fact is immaterial.  The Court will decide materiality in its analysis.

personal property may be searched when school officials have individualized reasonable suspicion that such personal property contains contraband in violation of school rules or state or federal law" (***Id.***, p. 58).

MSJ ¶ 9, at 5-6 (emphasis in original)(correction added)(setting forth this fact); Response ¶ 9, at

3 (stating that this fact is "[u]ndisputed").[27]

---

[27]The SFPS Defendants ask the Court to conclude that it is undisputed that

[n]othing in the School Board's Code of Conduct authorizes pat-down searches of female attendees at a prom that include grabbing or "cupping" her breasts, shaking her breasts, feeling around her breasts, putting fingers inside her dress or bra, pulling her bra, lifting her dress above her knees and/or touching bare skin on her arms or legs.

MSJ ¶ 10, at 6.  The Plaintiffs respond that this fact is

[d]isputed.  The Code of Conduct permits pat-downs of students where there is reasonable suspicion.  The Code of Conduct authorizes student searches based on reasonable suspicion, where the "scope and extent of the search" is "reasonably related" to the reason for the search.  [Code of Conduct, no date provided, filed March 20, 2014 (Doc. 192-23).]  Accordingly, the Code would authorize a search involving the bra/bra area or bare arms and legs of a student where justified by reasonable suspicion and reasonably related to the reason for the search.

Response ¶ 10, at 3.  The Plaintiffs are correct that the Code of Conduct's relevant provisions authorize searches under the quoted standards, and that nothing in it indicates that school officials should treat differently the pat-down searches of female attendees that the MSJ describes in this paragraph.  Accordingly, the Court will not treat the proposed fact as undisputed.
      The SFPS Defendants ask the Court to conclude that "[t]here is no evidence in the record of this matter that any deliberate conduct of the School Board was the moving force causing Melanie Romero to require searches at the Prom that violated the School Board's Code of Conduct or that caused the allegedly unprofessional searches of the ASI guards."  MSJ ¶ 11, at 6. The Plaintiffs respond:
            Disputed.  This is not a true statement of "fact." The claim that there is "no evidence" that SFPS's conduct was the "moving force" behind the searches or ASI's conduct necessarily subsumes multiple questions of law. Record evidence shows that SFPS had custom and practice of suspicionless pat-downs (that included the pulling of female students' bras) and that custom was the moving force behind the searches at the 2011 prom.

Response ¶ 11, at 3.  The Plaintiffs are correct that this proposed fact is a legal conclusion and not a fact.  Accordingly, the Court will not treat it as a fact.

b.      Planning for and Execution of Searches at the CHS Prom.

"Prior to the [CHS Prom], Principal Romero directed ASI to carry out the same pat-downs, wanding, and possession searches that were part of [the] customary practice."  Response ¶ 33, at 12 (setting forth unmodified version of the fact).[28]  See Romero Depo. at 132:7-20; id. at 137:13-18; id. at 138:19-139:8.  "Principal Romero had" de facto "authority to issue instructions regarding the searches to be conducted at the [CHS Prom]."  Response ¶ 34, at 12 (setting forth unmodified version of this fact).[29]  See Gutierrez Depo. Vol. I at 123:4-9; Videotaped Deposition of Bobbie Gutierrez at 227:18-228:2 (taken April 3, 2012), filed March 20, 2014 (Doc. 192-

---

[28]The Plaintiffs ask the Court to attribute this customary practice to the School Board.  See Response ¶ 33, at 12.  The SFPS Defendants reply: "Plaintiffs' Additional Fact No. 33 is disputed by the School Board in that there is no evidence in the record of this case that the School Board had any policy or "customary practice" that pat-downs, wanding, and possession searches were to be performed on attendees at any prom or dance."  Reply ¶ 33, at 21.  The Court substantially agrees with the SFPS Defendants that the cited testimony does not provide a basis to attribute this "customary practice" to the School Board.  The Court has, therefore, modified the proposed fact.  Otherwise, because the argument does not specifically controvert the fact, but instead asks the Court to read it in a particular light, the Court deems this fact undisputed, as modified.

[29]The Plaintiffs' proposed fact does not include the phrase "de facto" -- that is, they ask the Court to conclude that Romero had this authority.  See Response ¶ 34, at 12.  The SFPS Defendants reply:

Plaintiffs' Additional Fact No. 34 is disputed by the School Board in that, though school principals are granted executive authority to operate their schools by the New Mexico Legislature, as a matter of law and School Board policy, no principal of a school in the School District has authority to do anything contrary to School Board official policies.  Moreover, there is no evidence in this case that the School Board knew or approved of a high school principal issuing instructions to ASI or anyone else to perform suspicionless pat-down searches of all attendees at a school prom.

Reply ¶ 34, at 21.  To hedge against the risk that one might understand the proposed fact to refer to legal authority, the Court has modified the proposed fact to reflect that, by "authority," the Court is not referring to legal authority under state law.  As to the second argument, because the argument does not specifically controvert the fact, but instead asks the Court to read it in a particular light, the Court deems this fact undisputed, as modified.

6)("Gutierrez Depo. Vol. II").

"All students attending the [CHS Prom] were subjected to a pat-down search, a wand search, and a search of any bags or jackets they had in their possession."  Response ¶ 35, at 12 (setting forth this fact).[30]  See Romero Depo. at 139:9-17; id. at 171:3-11. "Students entering the [CHS Prom] were subjected to pat-down searches without any individualized suspicion." Response ¶ 36, at 12 (setting forth this fact).[31]  See Reyes Depo. Vol. II at 48:9-21. "Female students' bras were pulled and shaken or otherwise searched at the [CHS Prom] as part of the pat-down search."  Response ¶ 37, at 13.  Reyes Depo. Vol. I at 60:6-61:22; id. at 1-13; id. at 114:21-115:9; Lucero Depo. at 28:29-25; id. at 58:16-19; id. at 58:16-19; id. at 59:3-9; id. at 64:22-24; id. at 130:8-23; Gutierrez Depo. Vol. II at 246:14-21.[32]  "The searches conducted at

_____

[30]The SFPS Defendants reply:

> Plaintiffs' Additional Fact No. 35 is not disputed by the School Board though the evidence in the record shows that all attendees to the Prom underwent such searches, including non-student dates.  However, the proposed fact is immaterial to the issue of whether such searches occurred as a result of School Board policy or practice (which they did not).

Reply ¶ 35, at 22.  The Court will decide materiality in its analysis.

[31]The SFPS Defendants reply:

> Plaintiffs' Additional Fact No. 36 is not disputed by the School Board though the evidence in the record shows that all attendees to the Prom underwent searches without individualized suspicion, including non-student dates.  However, the proposed fact is immaterial to the issue of whether such searches occurred as a result of School Board policy or practice (which they did not).

Reply ¶ 36, at 22 (emphasis in original).  The Court will decide materiality in its analysis.

[32]The SFPS Defendants dispute this fact, saying:

> None of the cited testimony supports that searches as alleged and testified to by the four Plaintiffs occurred at the Prom.  No witness in this case other than the four Plaintiffs observed any School District or ASI employee touch the bra of

the 2011 Capital High School prom were conducted pursuant to Principal Romero's instructions for implementing [the] customary search practice." Response ¶ 38, at 13 (setting forth unmodified version of this fact).[33] See Romero Depo. at 132:7-20; id. at 137:13-18; id. at 138:19-8. "Both ASI and SFPS personnel carried out the searches at the [CHS Prom]." Response ¶ 39, at 39 (setting forth this fact).[34] Romero Depo. at 141:14-23; id. at 142:19-22;

_____

any attendee to the Prom, which logically excludes shaking an attendee's bra.

Reply ¶ 37, at 22. Insofar as this argument implicitly attacks the Plaintiffs' testimony, for the reasons the Court will explain more fully, see infra note 36, that argument is not appropriate for the summary-judgment stage. Moreover, setting aside the Plaintiffs' testimony, the cited testimony demonstrates that bra-pulling and -shaking were part of the normal search practice, see, e.g., Reyes Depo. Vol. I at 60:6-61:22, and that this manner of searching would apply at the prom, see, e.g., Reyes Depo. Vol. I 64:6-9. Although it may be true that no witnesses other than the Plaintiffs have testified with respect to bra-pulling or -shaking at the prom, that situation is a quintessential fact dispute for the jury to decide. Accordingly, the Court deems this fact undisputed for purposes of this motion.

[33]The SFPS Defendants reply:

Plaintiffs' Additional Fact No. 38 is disputed by the School Board in that there is no evidence in the record of this case that the School Board had any policy or "customary search practice" that pat-downs, wanding, and possession searches were to be performed on attendees at any prom or dance. In addition, Plaintiffs' Additional Fact No. 38 is disputed to the extent Plaintiffs intend to imply that the evidence in this case supports any assertion that a school principal under those circumstance would instruct ASI guards as to how to perform a pat-down search or that such instruction, if given, would constitute a "practice" of the School Board.

Reply ¶ 38, at 22. The Court substantially agrees with the SFPS Defendants that it is inappropriate to attribute the "customary search practice" to the School Board. The Court has, therefore, modified the proposed fact. As to the second argument, the argument does not controvert the proposed fact. Accordingly, the Court deems the fact, as modified, undisputed for purposes of this motion.

[34]The SFPS Defendants respond:

Plaintiffs' Additional Fact No. 39 is not disputed by the School Board except to the extent Plaintiffs intend to imply that School District employees performed any pat-down search at the Prom. None of Plaintiffs' cited evidence

Archuleta Depo. Vol. II at 166:23-167:13; Aguilar Depo. at 227:9-22.  "ASI guard Rebecca

Reyes . . . patted down bare arms, had students pull their bras away from their bodies and shake

them, and conducted the pat-downs with her palms open, facing toward the student."  Response

¶ 40, at 13 (setting forth this fact).[35]   Reyes Depo. Vol. I at 59:5-25; id. at 60:14-61:7; id. at

73:14-21.

            c.      **The Searches of the Plaintiffs, the Mindset of the Plaintiffs, and the**
                    **Searches' Effects on the Plaintiffs.**

    "Each of the four individual Plaintiffs" -- Candice Herrera, Tiffany Herrera, Ashley

Hurtado, and Arianna London -- underwent a pat-down search at the CHS Prom.  Response ¶ 1

(setting forth this fact); C. Herrera Depo. at 127:16-128:9; Deposition of Tiffany Herrera at

58:20-23 (taken August 13, 2012), filed March 20, 2014 (Doc. 192-9)("T. Herrera Depo."); id. at

59:9-14; Videotaped Deposition of Ashley Hurtado. at 109:23-110:4 (taken July 30, 2012), filed

March 20, 2014 (Doc. 192-10)("Hurtado Depo."); London Depo. at 120:9-17.[36]   The security

_____

        supports such an implication.  Moreover, the proposed fact is immaterial to the
        issue of whether such searches occurred as a result of School Board policy or
        practice (which they did not).

Reply ¶ 39, at 22-23.  This argument does not controvert the proposed fact, but instead asks the
Court to read it in a particular light.  The Court will, therefore, deem this fact undisputed for
purposes of this opinion.  The Court will consider the fact's import in its analysis.

        [35]The SFPS Defendants do not dispute this fact, but state that it "is immaterial to the issue
of whether such searches occurred as a result of School Board policy or practice (which they did
not)."  Reply ¶ 40, at 23.  The Court will address materiality in its analysis.

        [36]The SFPS Defendants dispute this proposed fact and the Plaintiffs' descriptions of the
searches generally in the following extended section of their Reply:

        Plaintiffs' use of the phrase "intrusive pat-down search" is obviously defined for
        each Plaintiff by the portions of their deposition testimony quoted under
        subsections (a), (b), (c) and (d) of Plaintiffs' Additional Fact No. 1, which, in each
        case, describe alleged groping.  Since the inception of this case, the School Board
        has been made aware of the Plaintiffs' claims that they suffered injuries as the

result of being wrongfully subjected to pat-down searches at the Prom during which they were groped and that Principal Romero stood by and watched as the Plaintiffs were groped and refused to save them from the alleged groping. Including the School Board's first appearance in this case on short notice at the hearing on Candice Herrera's motion for a TRO, no school defendant has denied that all attendees at the Prom underwent pat-down searches.  That is not something Plaintiffs have ever had to prove in this case.  However, their quoted descriptions of groping during those searches are disputed and are, in fact, supported only by each Plaintiff's own testimony.  Indeed, no Plaintiff even claims to have witnessed any pat-down of any other person.  And not one of the numerous witnesses deposed in this case, other than the Plaintiffs, witnessed any groping.  Each Plaintiff carries the burden of proof before a jury in this case and their claims that they were groped cannot be determined as a matter of summary judgment.  Moreover, and in any event, whether the Plaintiffs were groped during a pat-down search is immaterial to the issue of whether the School Board had a practice of performing pat-down searches at proms such as the 2011 Capital High School Prom.  In addition, the School Board disputes these facts as follows:

     **First**, the credibility of the Plaintiffs in making these statements is disputed by the fact that not one of the great number of witnesses deposed in this case observed any search during which an attendee was groped other tha[n] each Plaintiff to her own search in spite of the fact that they underwent the pat-downs in a public space full of people.

     **Second**, the credibility of each of the Plaintiffs in making these statements is disputed by the fact that none of them complained that they were groped to any School District or ASI employee at the Prom;

     **Third**, the credibility of Candice Herrera and, therefore, the truthfulness of her quoted testimony is further disputed by the facts that: (a) she lied in her affidavit presented with her motion for a TRO and in her testimony presented at the TRO hearing that she had never undergone a previous pat-down search at any CHS event and was, therefore surprised by the search at the Prom; (b) she misrepresented or, at least, greatly exaggerated in her Complaint and at the TRO hearing the extent that she had personal knowledge that Principal Romero allegedly stood by and watched her being groped by the female ASI employee performing her pat-down search; and (c) she had no trouble complaining about her pill that had been confiscated while at the Prom, including immediately after she had allegedly been groped and yet did not say a single word to any School District or ASI employee at the prom that she had, in fact, been groped to the extent it made her feel like she had been "molested" or "raped."

     **Fourth**, the credibility of Tiffany Herrera and, therefore, the truthfulness of her quoted testimony is further disputed by the fact that she denied undergoing pat-down searches at prior CHS events to which she went with her sister,

_____

Candice, and as to which Candice admitted they had undergone pat-down searches;

**Fifth**, the credibility of Ashley Hurtado and, therefore, the truthfulness of her quoted testimony is further disputed by the fact that her description of the alleged groping changed from the First Amended Complaint to her written discovery responses to her quoted testimony at her deposition;

**Sixth**, the credibility of Arianna London and, therefore, the truthfulness of her quoted testimony is further disputed by the facts that: (a) she claimed to have been embarrassed by undergoing a pat-down at the Prom and yet publicly posted on her Facebook page a photograph of her wearing a bra on her head; (b) her description of the alleged groping changed from her supposed contemporary diary entry about the Prom to the First Amended Complaint to her written discovery responses to her deposition testimony quoted by the Plaintiffs;

**Seventh**, by the time they got to their video depositions, each Plaintiff demonstrated how they claimed the female ASI employee had simultaneously grabbed both of their breasts, one breast in each hand and yet nobody in the room noticed anything was wrong; and

**Finally**, the testimony of each Plaintiff is directly disputed by the testimony of Rose Lucero, the school employee who "wanded" the female attendees at the same place the pat-downs were performed, and who was the only school employee paying full attention to the pat-down searches, testified in her deposition that she saw every pat-down search of female attendees and observed no inappropriate touching during the pat-down searches of female attendees at the Prom. Moreover, this fact is immaterial to the issue of whether the School Board had a practice of performing suspicionless searches of all attendees at Capital High proms or whether any deliberate conduct of the School Board was the moving force behind such a practice.

Reply ¶ 1, at 11-14 (citations omitted)(emphasis in original).

With the backdrop that the Court laid out in note 1 in mind, the SFPS Defendants' argument is curious in multiple respects. First, the Court is not sure what to make of the SFPS Defendants' assertion that the Plaintiffs need not demonstrate that they underwent pat-down searches; the searches are, after all, the central events in the Plaintiffs' case. The SFPS Defendants appear to mean that all agree that pat-down searches occurred, but that they disagree about how one should characterize the searches: that is, on whether searches constituted "groping." Reply at 11. In the interest of describing the facts as even-handedly as possible, the Court has removed the Response's characterization of the searches as "intrusive" and, instead, characterizes the facts in a more neutral way. Still, the SFPS Defendants' fixation on the word "groped" largely misses the point. Nothing of significance to the Court's disposition of the MSJ turns on whether the Plaintiffs were "groped," insofar as that word connotes that the searching officers had prurient intentions, or merely searched the Plaintiffs in an invasive but non-sexual

guard

> had [C. Herrera] spread   [her] arms and legs out, and she patted along
> [C. Herrera's] arms, touched along the waist.  And then she grabbed the outer part
> of [C. Herrera's] bra and moved it here.  And then she grabbed the inner part of
> [C. Herrera's] bra and moved it here.  And then she cupped [C. Herrera's] breasts
> and shook them.
>
> * * * *
>
> [A]fterwards she moved down to [C. Herrera's] waist and then she went all the
> way down [C. Herrera's] dress and then she pulled the dress up to about mid-thigh
> and she felt up the bare leg, as well.

C. Herrera Depo. at 127:16-128:9.  <u>See</u> Response ¶ 1(a), at 7 (setting forth this fact).[37]

---

way.

The thrust of the SFPS Defendants' purported basis for disputing this fact is that the Plaintiffs are not credible.  Black-letter law bars this argument.  "It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment."  <u>Seamons v. Snow</u>, 206 F.3d 1021, 1026 (10th Cir. 2000)(citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)).  <u>See also</u> MSJ at 11 ("[T]he court cannot decide any issues of credibility." (quoting <u>Herrera v. Santa Fe Pub. Schs.</u>, 956 F. Supp. 2d 1191, 1223 (D.N.M. 2013)(Browning, J.)).  Accordingly, this argument is misplaced.

The SFPS Defendants also suggest that certain of the Plaintiffs' contentions are immaterial.  Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. <u>See</u> D.N.M.LR-Civ. 56.1(b). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis." <u>Lowery v. City of Albuquerque</u>, No. CIV 09-0457 JB/WDS, 2011 WL 1336670, at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  Accordingly, the Court will return to materiality in its analysis.

The Court suspects that the SFPS Defendants' principal objection to the Plaintiffs' proposed fact is more thematic than legal: in their view, the key issue is not whether the searches occurred or how one characterizes the searches, but whether the School Board is legally accountable for those searches, whatever their character.  Even if that issue is, in the SFPS Defendants' view, the principal issue in the MSJ, the Plaintiffs need not accept the SFPS Defendants' framing of the case; they may include in their Response such facts as are necessary to put the other acts in context.  And, as the Court has explained, it must indulge all reasonable inferences in the Plaintiffs' favor.

Accordingly, the SFPS Defendants have not provided sound reasons for rejecting the Plaintiffs' proposed fact.

[37]The Court discussed and disposed of the SFPS Defendants' objections to this proposed

C. "Herrera felt exposed and uncomfortable with her dress pulled up."  Response ¶ 2, at 8 (citing C. Herrera Depo. at 177:15-178:3).[38]  She tried "to stop the guard from lifting her dress by holding it down with her hands but the guard demanded that she remove her hands to allow the search to continue."  Response ¶ 3, at 8 (setting forth this fact).  See C. Herrera Depo. at 129:10-130:25).[39]  She "did not know how to react when her breasts were touched during her pat-down search, especially because of the guard's position of authority."  Response ¶ 4, at 8 (citing C. Herrera Depo. at 130:3-11).[40]  "The experience of being searched left Candice Herrera feeling . . . violated and exposed."  Response ¶ 9, at 9 (setting forth this fact).[41]  "The presence"

---

fact in note 36.

[38]The SFPS Defendants assert that this fact "is immaterial and is disputed by the School Board for the reasons asserted in the School Board's response to" the Plaintiffs' discussion of the search and their effects.  Reply ¶ 2, at 14.  The Court discussed and disposed of the SFPS Defendants' objections to this fact in note 36.

[39]The SFPS Defendants assert that this fact "is immaterial and is disputed by the School Board for the reasons asserted in the School Board's response to" the Plaintiffs' discussion of the search and their effects.  Reply ¶ 3, at 14.  The Court discussed and disposed of the SFPS Defendants' objections to this fact in note 36.

[40]The SFPS Defendants assert that this fact "is immaterial and is disputed by the School Board for the reasons asserted in the School Board's response to" the Plaintiffs' discussion of the search and their effects.  Reply ¶ 4, at 14.  The Court discussed and disposed of the SFPS Defendants' objections to this fact in note 36.

[41]The Plaintiffs ask the Court to find undisputed that C. Herrera felt "extremely violated and exposed."  Response ¶ p, at 9 (emphasis added).  The SFPS Defendants assert that this fact "is immaterial and is disputed by the School Board for the reasons asserted in the School Board's response to" the Plaintiffs' discussion of the search and their effects.  Reply ¶ 9, at 14.  The Court discussed and disposed of the SFPS Defendants' objections to this fact in note 36.  The Court has, however, removed the word "extremely" from the proposed fact, because C. Herrera did not use that word to describe her sense that she was violated and exposed:

> Q       Paragraph 10 [of an unidentified document] says that you were extremely uncomfortable during the pat-down body search and felt severely violated and exposed.  Do you see that?

and evident approval of school administrators made the situation "that much more uncomfortable."   C. Herrera Depo. at 180:11-181:11.[42]   She "continues to worry about the

---

       A      Yes, sir.

       Q      Can you describe for me what you mean by 'severely violated and exposed'?

     [Plaintiffs' counsel:] Objection; asked and answered.

       A     If you're pulling up -- the security guard is pulling up my dress, exposing my legs, which I'm uncomfortable with, she's grabbing my breasts, which is a stranger pretty much walking up to you, if somebody were to do that to you on the street, you'd call the cops.  So -- but because it was a school event and it's supposed to be sponsored and watched over by all the administration, it's supposed to be a comfortable situation.  By it being supported by our administration, it made it that much more uncomfortable, because they're supposed to be watching out for their students, protecting them from something.  And yet they're watching it and authorizing it.

     So what would make it not violating?  You're being touched.  You're being shown on body parts that you don't want to be shown and they're standing by and watching.  They're standing by knowing that it's going on.  They're allowing everybody to be pat down.

C. Herrera Depo. at 180:11-181:11.  The Court believes that its description of the testimony, with the word "extremely" excised, fairly represents the testimony.

[42]The Plaintiffs ask the Court to find undisputed that "[t]he presence of SFPS administrators made Candice Herrera feel 'much more uncomfortable.'"  Response ¶ 10, at 9 (quoting C. Herrera Depo. at 181:2-3).  The SFPS Defendants assert that this fact "is immaterial and is disputed by the School Board for the reasons asserted in the School Board's response to" the Plaintiffs' discussion of the search and their effects.  Reply ¶ 4, at 14.  The Court discussed and disposed of the SFPS Defendants' objections to this fact in note 36.  The Court has, nonetheless, modified the Plaintiffs' proposed fact, because the cited testimony is of a slightly different tenor than the Plaintiffs' rephrasing of it makes it sound.  The proposed fact suggests that the mere presence of administrators made C. Herrera feel "much more uncomfortable," without explaining the context -- that is, the baseline against which she measured her discomfort.  In context, a different nuance is apparent: C. Herrera meant that, although being touched in that manner would be offensive in other settings, that administrators were not only present, but "watching . . . and authorizing" the touching made what should have been a "comfortable situation" in which the administration was "watching out for their students, protecting them from something," an uncomfortable situation.  C. Herrera Depo. at 180:11-181:6.  The Court believes

possibility of people touching her." C. Herrera Depo. at 204:25-207:9.

> The security guard

> asked [T. Herrera] to spread [her] arms out and she ran her hands along [T. Herrera's] arms which she could clearly see. And then she continued down to pat down [T. Herrera's] waist and hips.

> * * * *

> And then she -- and then she went back up and cupped both [T. Herrera's] breasts and shook them. And then she continued down to pat down the sides of [T. Herrera's] dress. And then she lifted up [T. Herrera's] dress and with her bare hands she ran her hands down along the inside of [T. Herrera's] legs.

T. Herrera Depo. at 58:20-23; id. at 59:9-14. See Response ¶ 1(b), at 7-8 (setting forth this fact).[43] The security guard

> went down the side of [Hurtado's] body and then she went with her hands with her palms facing in and went around [Hurtado's] breasts and went inside with her thumb to check if [Hurtado] had anything in [her] cleavage. Went down  -- again down [her] body. Went down both [her] thighs. [Her] inner included.

Hurtado Depo. at 109:23-110:4. See Response ¶ 1(c), at 8 (setting forth this fact).[44] She "felt humiliated and embarrassed about being touched inappropriately by a stranger in public and in front of classmates." Response ¶ 5, at 9 (setting forth this fact).[45] Hurtado Depo. at 185:15-25. She "worries every day about being subjected to [a] search." Response ¶ 6, at 9 (setting forth

---

that its phrasing captures C. Herrera's testimony's nuances more precisely than does the Plaintiffs' proposed fact.

[43]The Court discussed and disposed of the SFPS Defendants' objections to this proposed fact in note 36.

[44]The Court discussed and disposed of the SFPS Defendants' objections to this proposed fact in note 36.

[45]The SFPS Defendants assert that this fact "is immaterial and is disputed by the School Board for the reasons asserted in the School Board's response to" the Plaintiffs' discussion of the search and their effects. Reply ¶ 5, at 15. The Court discussed and disposed of the SFPS Defendants' objections to this fact in note 36.

this fact).[46]  "The searches at prom made [her] emotionally distressed and afraid to go to events

where there might be similar searches."  Response ¶ 7, at 9.[47]  See Hurtado Depo. at 186:23-

187:11; id. at 233:21-234:17.

> The security guard
>
> told [London] to spread [her] legs and then she patted [London's] legs down.  And then she went all the way up and then she did the other leg and then she lifted [London's] skirt a little bit and she patted [London's] legs even more.  And then she patted the front of [London], so she did [London's] stomach and [her] sides and then she did [London's] chest.  And then she put her hands underneath the seams of [London's] dress and on the sides and on the back.  And then she patted [London's] back side down.

London Depo. at 120:9-17.  See Response ¶ 1(d), at 8 (setting forth this fact).[48]  Her "prom

search ruined the memory of prom for her and made her feel disrespected and bad about herself."

Response ¶ 8, at 9 (setting forth this fact).[49]  See London Depo. at 212:17-213:7.

---

[46]The SFPS Defendants assert that this fact "is immaterial and is disputed by the School Board for the reasons asserted in the School Board's response to" the Plaintiffs' discussion of the search and their effects.  Reply ¶ 6, at 15.  The Court discussed and disposed of the SFPS Defendants' objections to this fact in note 36.

[47]The SFPS Defendants assert that this fact "is immaterial and is disputed by the School Board for the reasons asserted in the School Board's response to" the Plaintiffs' discussion of the search and their effects.  Reply ¶ 7, at 15.  The Court discussed and disposed of the SFPS Defendants' objections to this fact in note 36.

[48]The Court discussed and disposed of the SFPS Defendants' objections to this proposed fact in note 36.

[49]The SFPS Defendants assert that this fact "is immaterial and is disputed by the School Board for the reasons asserted in the School Board's response to" the Plaintiffs' discussion of the search and their effects.  Reply ¶ 8, at 15.  The Court discussed and disposed of the objections to which the SFPS Defendants allude in note 36.  The SFPS also state, without attribution: "Also, the evidence shows that Arianna London had other experiences that would make a person feel disrespected and bad about herself prior to the prom."  Reply ¶ 8, at 15.  The SFPS Defendants cited nothing to support this proposed rebuttal.  Moreover, even if they had cited evidence, that other events made London feel "disrespected" and "bad about herself" do not controvert that the search at the prom made her feel disrespected and badly about herself.  Accordingly, the Court deems this fact undisputed for purposes of this opinion.

The "Plaintiffs Candice Herrera, Tiffany Herrera and Ashley Hurtado had prior notice and knowledge that they would undergo pat-down and possession searches at the prom."  MSJ ¶ 14, at 7 (setting forth this fact).  See Response ¶ 14, at 5 (not controverting this fact).[50]  C. "Herrera underwent pat-down searches by ASI guards at the 2010 CHS prom and homecoming dances and, therefore, she knew she would be subjected to a patdown search when she arrived at the prom."  MSJ ¶ 14(a), at 7 (setting forth this fact).  See Response ¶ 14(a), at 5 (not controverting this fact).[51]  "Tiffany Herrera and Candice Herrera attended homecoming dances in 2010 and 2011, at which there were pat-down searches, before the prom."  MSJ ¶ 14(b), at 7 (setting forth this fact).  See Response ¶ 14(b), at 5 (not controverting this fact).[52]  "Ashley Hurtado underwent a pat-down search without groping at the 2009 CHS prom."  MSJ ¶ 14(c), at 7 (setting forth this

---

[50]In response to this proposed fact, the Plaintiffs state: "Court previously deemed undisputed," citing the Romero MOO.  Response ¶ 14, at 5.  Local rule 56.1(b) states:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  The local rules regarding summary judgment thus require the responding party to "specifically controvert[]" the movant's fact or else the fact is deemed admitted. D.N.M.LR-Civ. 56.1(b).  Because the Plaintiffs have not specifically controverted this fact, the Court deems the fact undisputed for purposes of this opinion.

[51]In response to this proposed fact, the Plaintiffs state: "Court previously deemed undisputed," citing the Romero MOO.  Response ¶ 14(a), at 5.  Because the Plaintiffs have not specifically controverted this fact, the Court deems the fact undisputed for purposes of this opinion.  See D.N.M.LR-Civ. 56.1(b).

[52]In response to this proposed fact, the Plaintiffs state: "Court previously deemed undisputed," citing the Romero MOO.  Response ¶ 14(b), at 5.  Because the Plaintiffs have not specifically controverted this fact, the Court deems the fact undisputed for purposes of this opinion.  See D.N.M.LR-Civ. 56.1(b).

fact).  See Response ¶ 14(c), at 5 (not controverting this fact).[53]

C. Herrera underwent pat-down searches by ASI New Mexico guards at the 2010 Capital

High prom and homecoming dances, and, therefore, she knew she would be subject to a pat-

down search when she arrived at the prom; despite this knowledge, she attended the 2011 CHS

Prom, although she did not know that the search would be as intrusive as it was.  See Deposition

of Candice Herrera at 198:22-200:9 (taken July 27, 2012), filed November 13, 2012 (Doc. 113-

4); id. at 201:4-202:15; id. at 203:11-204:24.[54]  "Hurtado testified that she did not have a

problem with the basic pat-down search without groping that she experienced at the 2009 CHS

prom."  MSJ ¶ 15(b), at 8 (setting forth this fact).  See Response ¶ 15(b), at 5 (not controverting

this fact).[55]  "Plaintiff Arianna London underwent pat-down searches at a dance at Rio Grande

---

[53]In response to this proposed fact, the Plaintiffs state: "Court previously deemed undisputed," citing the Romero MOO.  Response ¶ 14(c), at 5.  Because the Plaintiffs have not specifically controverted this fact, the Court deems the fact undisputed for purposes of this opinion.  See D.N.M.LR-Civ. 56.1(b).

[54]The SFPS Defendants ask the Court to find undisputed that, "[t]hough Candice Herrera knew she would be subjected to a pat-down search when she arrived at the Prom, she attended because, as she testified, 'Well, I didn't know it was going to be such an intrusive search.'"  MSJ ¶ 15(a), at 7.  The Plaintiffs respond: "Disputed.  Plaintiff Candice Herrera indicated that any pat-down not based on reasonable suspicion is invasive."  Response ¶ 15(a), at 5.  First, the Court notes that Herrera's testimony differs slightly from the Plaintiffs' characterization of it: she testified that "[a]ny pat-down search without probable cause would technically be invasive," Herrera Depo. at 203:18-20 (emphasis added), not that "any pat-down not based on reasonable suspicion is invasive," Response ¶ 15(a), at 5.  Second, and more significantly, that testimony does not contradict either portion of the proposed fact -- that is, that Herrera knew she would endure a pat-down search, and that she attended anyway, because she did not know that the search would be as intrusive as it was.  Accordingly, the Plaintiffs have not cited evidence disputing the SFPS Defendants' proposed fact.
    The Court has, however, modified the SFPS Defendants' proposed fact to eliminate the characterization of Herrera's testimony and replace it with a fact.

[55]In response to this proposed fact, the Plaintiffs state: "Court previously deemed undisputed," citing the Romero MOO.  Response ¶ 15(b), at 5.  Because the Plaintiffs have not specifically controverted this fact, the Court deems the fact undisputed for purposes of this opinion.  See D.N.M.LR-Civ. 56.1(b).

High School, in Albuquerque, New Mexico, as well as at certain concert venues, without objection."   MSJ ¶ 15(c), at 8 (setting forth this fact).   See Response ¶ 15(c), at 5 (not controverting this fact).[56]

"Plaintiff T. Herrera did not object to undergoing a pat-down search at the [CHS] Prom, or complain regarding its scope, at the time of the search."   MSJ ¶ 17, at 8 (setting forth this fact).   See Deposition of Tiffany Herrera at 67:8-10 (taken August 13, 2012), filed March 3, 2014 (Doc. 182-14).[57]   "T. Herrera describes the pat-down search that allegedly included the

---

[56]In response to this proposed fact, the Plaintiffs state: "Court previously deemed undisputed," citing the Romero MOO.  Response ¶ 15(c), at 5.  Because the Plaintiffs have not specifically controverted this fact, the Court deems the fact undisputed for purposes of this opinion.  See D.N.M.LR-Civ. 56.1(b).

[57]The Plaintiffs respond: "Disputed. Plaintiff Tiffany Herrera objected to the pat-down search while at prom; she specifically discussed the inappropriateness of the search with other students."  Response ¶ 17, at 6.  The Plaintiffs cite a portion of the T. Herrera Depo. in which T. Herrera reports discussing this matter with her friends.  See Response ¶ 17, at 6 (citing T. Herrera Depo. at 17:19-72:1; id. 74:13-17).  The SFPS Defendants reply, without elaboration: "Plaintiffs dispute Board's Fact No. 17 regarding whether Tiffany Herrera objected to the pat-down search at the Prom because she discussed 'the inappropriateness of the search with other students.'"  Reply at 9.  That T. Herrera later discussed feeling uncomfortable with the search does not specifically controvert the proposed fact, which is that she did not object or complain about the search at the time of the search.  Accordingly, the Court deems this fact undisputed for purposes of this opinion.
The SFPS Defendants ask the Court to find undisputed that "Plaintiff C. Herrera did not object to undergoing a pat-down search at the Prom, or complain regarding its scope, at the time of the search."  MSJ ¶ 16, at 8.  The Plaintiffs respond: "Disputed.  Plaintiff Candice Herrera objected by attempting to stop the guard from raising her dress higher up her legs during the conduct of the pat-down search but was ordered by the guard to remove her hands and allow the search to proceed."  MSJ ¶ 16, at 5.  Specifically, C. Herrera testified:

Q.      And did you try to stop her from touching your breasts?

A.      I didn't know what was going on.  It didn't give me enough time to react.  I had my arms still out from this and then she did that.  And then after that she went to reach for the dress and I tried to push her down like that.  And she said, "You need to move your arms.  I need to finish."  I said, "Okay."  I put my hands back up.

_____

* * * *

> Q      Okay.  Where were you looking?
>
> A      At the security guard.  I was kind of surprised.  I'm not sure what to do.
>
> Q      Okay.
>
> A.      Instinct would be to try and push them away, but it's supposed to be an authoritative person that's supposed to be assessing, checking you for something.  So I didn't know if it was -- I didn't know how to react to it.
>
> Q      Okay.  And you said you -- she had you spread your arms and legs.  She patted you down.  She then touched your breasts.  And then is that when she picked up your dress?
>
> A      Yes.
>
> Q      And brought it up to mid-thigh where you indicated earlier?
>
> A      Yes, sir
>
> Q      And at that point you do what?
>
> A      At that point I went to push my hands down to like push the dress back down because I felt really uncomfortable.  And she looked at me and she told me, "You need to move your hands.  I need to finish this."  And so I said, "Okay."  And I put my hands up.

C. Herrera Depo. at 129:10-18; id. at 130:2-25.

> The SFPS Defendants reply:
>
> Regarding Board's Fact No. 16, Plaintiffs claim it is disputed because Candice Herrera objected to her search by, as she testified, pushing her dress down when the ASI guard performing her pat-down search lifted or was lifting her dress up to her mid-thigh -- at the same moment Candice's attention was drawn to Principal Romero standing at the table where she had been helping with searches of purses and cell phones. Therefore, her testimony provides some evidence that Candice may have somewhat resisted one portion of the search after it had begun. There is no evidence that Candice Herrera, or any of the Plaintiffs, objected to undergoing a pat-down search or complained to any School District or ASI employee regarding the scope of the search on the night of the Prom.

MSJ ¶ 16, at 9.  The Court concludes that, taking all inferences in the Plaintiffs' favor, this proposed fact is not undisputed.  One could characterize C. Herrera's act of physically resisting the search to be an objection or a complaint about the search's scope at the time of the search.

security officer touching T. Herrera's breast area and touching her bare skin as improper[,] because," among other reasons, "'they shouldn't have done such an invasive search.'"  MSJ ¶ 18, at 8 (setting forth this fact)(quoting T. Herrera Depo. at 74:13-17).  See T. Herrera Depo. at 183:7-16; id. at 190:13-191:6.[58]

"Hurtado did not object to undergoing a pat-down search at the Prom, or complain regarding its scope," to Romero or to the guards "at the time of the search."  MSJ ¶ 19, at 9 (setting forth this fact).  See Deposition of Ashley Hurtado at 135:9-21 (taken July 30, 2012),

_____

Accordingly, the Court will not deem this fact undisputed.

[58]The SFPS Defendants ask the Court to conclude that it is undisputed that "Plaintiff T. Herrera describes the pat-down search that allegedly included the security officer touching T. Herrera's breast area and touching her bare skin as improper because 'they shouldn't have done such an invasive search.'"  MSJ ¶ 18, at 8 (quoting T. Herrera Depo. at 74:13-17).  The Plaintiffs respond:

> Disputed. The quoted passage is not Tiffany Herrera's explanation of why the search was improper.  Instead, it is her paraphrasing of a statement she made to her classmates following the search and therefore does not capture all of the reasons she found the search improper.  For example, Tiffany also objected to the search because it was an "unwanted touch" and because it seemed unnecessary given that she had spent much of the day at the venue setting up for prom.

Response ¶ 18, at 6 (quoting T. Herrera Depo. at 190:21).  The SFPS Defendants reply:

> While Plaintiffs claim that Board's Fact No. 18 is disputed, they merely attempt to explain the testimony that is the subject of the fact and add to it. They do not dispute that Tiffany Herrera testified that her pat-down search was improper because "they shouldn't have done such an invasive search."

Reply at 9-10.  The Court concludes that its modified fact better reflects the evidence: it is true that T. Herrera believed that the search was improper because it was invasive, but is also true that she characterized the touch as "molestation," T. Herrera Depo. at 190:17-19 ("[Q:] Would you characterize [being touched by the guard] as your sister did, as molestation? A[:] Yes"), as an "unwanted touch," T. Herrera Depo. at 190:21, as embarrassing, see T. Herrera Depo. at 183:7-12, and as confusing, because she did not understand why she was being searched, see T. Herrera Depo. at 183:13-16.  Accordingly, the Court has qualified the proposed fact to clarify that T. Herrera objected to the search for reasons other than to its invasiveness.

filed March 3, 2014 (Doc. 182-15); id. at Affidavit of Melanie Romero ¶ 14, at 3 (executed

November 12, 2012), filed November 13, 2012 (Doc. 113-14)("Romero Aff.").[59]  "Plaintiff

London did not object" to the guard or to Romero about "undergoing a pat-down search at the

[CHS] Prom, or complain regarding its scope, at the time of the search."  MSJ ¶ 20, at 9 (setting

forth this fact).  See Deposition of Arriana London at 135:10-24 (taken August 24, 2012), filed

March 3, 2014 (Doc. 182-16); Romero Aff. ¶ 14, at 3; Lucero Depo. at 143:16-19.[60]

---

[59]The SFPS Defendants ask the Court to find undisputed that "Plaintiff Hurtado did not object to undergoing a pat-down search at the Prom, or complain regarding its scope, at the time of the search."  MSJ ¶ 19, at 9.  The Plaintiffs respond: "Disputed.  Plaintiff Hurtado objected to the search while at prom; she complained to both another student at prom and her date about the invasiveness of her search."  Response ¶ 19, at 6.  The SFPS Defendants reply: "Plaintiffs' only claim to dispute Board's Fact No. 19 the extent that Ashley Hurtado claims to have objected to the pat-down search at the Prom by complaining to another attendee and her date about 'the invasiveness of the [sic] search.'"  Reply at 10 (quoting Response ¶ 19, at 6).  First, the Court notes that the excerpts of the Hurtado Depo. that the Plaintiff included are incomplete: they cite page 149, see Response 19, at 6, but do not provide it in their attached excerpts.  Moreover, that Hurtado complained to another student and to her date about the invasiveness of her search during the prom would not specifically controvert the SFPS Defendants' proposed fact that Hurtado did not object to or complain about the search at the time of the search -- that is, before she entered the prom.  Accordingly, the Court will substantially deem this fact undisputed.

The Court has, however, modified the fact proposed slightly: although the testimony reflects that Hurtado did not complain or object to Romero or to the guards, it does not demonstrate that Hurtado did not complain to anyone.  Accordingly, the Court has qualified the proposed fact to reflect this limitation.

[60]The SFPS Defendants ask the Court to find undisputed that "Plaintiff London did not object to undergoing a pat-down search at the Prom, or complain regarding its scope, at the time of the search."  MSJ ¶ 20, at 9.  The Plaintiffs respond: "Disputed. Plaintiff London objected to the search while at prom; she complained to another student at prom that her search was 'crazy.'"  Response ¶ 20, at 6 (quoting Deposition of Ashley Hurtado (taken July 30, 2012), filed March 20, 2014 (Doc. 192-10)).  The SFPS Defendants reply: "Plaintiffs' [sic] only claim to dispute Board's Fact No. 20 to the extent that Arianna London only claims to have objected to the occurrence or extent of the pat-down search at the Prom after the fact to another attendee at the prom by saying it was 'crazy.'"  Reply at 10.  The Court agrees with the SFPS Defendants that, because the Plaintiffs cite evidence only of London's comments after the fact, the Plaintiffs have not controverted the proposed fact that London did not object to or complain about the search at the time of the search.  Accordingly, the Court will substantially deem this fact undisputed.

The Court has, however, modified the fact proposed slightly: although the testimony reflects that London did not complain or object to Romero or to the guard, it does not demonstrate that London did not complain to anyone.  Accordingly, the Court has qualified the fact to reflect this limitation.

The SFPS Defendants ask the Court to find undisputed that "Plaintiffs Candice Herrera, Ashley Hurtado and Arianna London admit they would not have thought that a pat-down search without groping was offensive," citing portions of their depositions.  MSJ ¶ 15, at 7-8 (emphasis in original).  The Plaintiffs respond only that C. "Herrera indicated that any pat-down not based on reasonable suspicion is invasive," citing her deposition.  Response ¶ 15, at 5.  The SFPS Defendants reply that, "[a]ccording to Plaintiffs, this is disputed because though she did admit to as much, after a break immediately requested by her attorney, she then thought better of her position and stated the legal premise, as stated by the Plaintiffs, 'that any pat-down not based on reasonable suspicion is invasive.'"  Reply at 9 (citing Deposition of Candice Herrera (taken on July 27, 2012), filed on November 13, 2012 (Doc. 113-4); id. at 201:4-15; id. at 202:5-15; id. at 203:6-204:24).

The Court concludes that the proposed fact is not undisputed.  Although the Court recognizes that the SFPS Defendants may find C. Herrera's arguable inconsistency on this topic useful grist for cross-examination, taking all inferences in the Plaintiffs' favor, the Court will not conclude that C. Herrera found that all pat-down searches without groping were inoffensive.  As for London and Hurtado, although the Plaintiffs did not specifically controvert this proposed fact, the Court concludes that the evidence that the SFPS Defendants cite does not support the proposed fact.  The testimony indicates that Hurtado did not have a problem with a pat-down search that she underwent at a previous prom, see Deposition of Ashley Hurtado at 153:23-154:12 (taken July 30, 2012), filed November 13, 2012 (Doc. 113-5), and that London did not have a problem with pat-down searches that she underwent before a previous dance and before certain concerts, see Deposition of Arianna London (taken August 24, 2012), filed November 13, 2012 (Doc. 113-6).  Taking every inference in the Plaintiffs' favor, as the Court must, the evidence that Hurtado and London did not object to pat-down searches on other specific occasions does not support the general proposition that Hurtado and London categorically "would not have thought that a pat-down search without groping was offensive," MSJ ¶ 15, at 7 (emphasis in original).  Although that inference is defensible, it is not the only plausible inference, because certain factors could have distinguished the searches on other occasions from the searches before the CHS Prom: what the young woman was wearing, with whom she attended the event, who searched her, and who watched the students while they were searched all could conceivably distinguish a pat-down before another event from the pat-down before the CHS Prom.

The SFPS Defendants' use of this proposed fact in the MSJ supports the Court's conclusion.  The SFPS Defendants' reading of the testimony would infer from the specific fact to a general proposition, and then would deduce a different specific fact from the inferred general proposition: in other words, it would infer from the Plaintiffs' testimony about pat-down searches before certain individual past events a general proposition about their reaction to undergoing pat-down searches, and would then deduce from the inferred general proposition that the only thing about the searches before the CHS Prom that harmed them was the invasive nature of the search and not fact of the pat-down search or its suspicionless nature.  Effectively, the SFPS Defendants want the Court to infer the answer to a question they did not ask: whether the

C. Herrera discovered, when she left the CHS Prom, that prescription medication that had

been confiscated during her search was thrown away; this discovery upset her.[61]  See Deposition

_____

only thing that offended the Plaintiffs about the searches was the invasive manner in which ASI
New Mexico guards carried it out.  In other words, the SFPS Defendants want the Court to read
the Plaintiffs' testimony about other specific events as effectively conceding that certain events
underlying this lawsuit did not damage them.  If the SFPS Defendants wanted the Plaintiffs to
concede their damages case against them, the SFPS Defendants should have asked such a
question.  As the record stands, the Court cannot definitively say that Hurtado and London would
not have thought that a pat-down search without groping was offensive -- and the Court also
cannot, as the SFPS Defendants ask, read the Plaintiffs as having effectively conceded their
damages case against them.  Accordingly, the Court will not treat the fact as undisputed.

[61]The SFPS Defendants ask the Court to find undisputed that,

> [e]ven though she raised no complaint while her pat-down search was being
> performed, Plaintiff C. Herrera became upset and spoke with SFPS personnel and
> an ASI security officer when she discovered, as she was leaving the Prom, that a
> prescription medicine pill confiscated from her on arrival had been discarded and
> would not be returned to her before she left.

MSJ ¶ 21, at 9.  The Plaintiffs respond:

> Disputed.  Candice Herrera did object while her search was being
> conducted; she attempted to physically prevent the guard from lifting her dress up
> while the pat-down was being conducted, but she was forced to remove her hands
> and allow the search to continue.  Disputed that Candice Herrera "became" upset
> upon learning that her medication had been discarded; she was already upset
> about being searched and having her medication confiscated.

Response ¶ 21, at 6 (citations omitted).  In their Reply, the SFPS Defendants refer the Court to
this discussion of an earlier fact:

> Regarding Board's Fact No. 16, Plaintiffs claim it is disputed because
> Candice Herrera objected to her search by, as she testified, pushing her dress
> down when the ASI guard performing her pat-down search lifted or was lifting
> her dress up to her mid-thigh -- at the same moment Candice's attention was
> drawn to Principal Romero standing at the table where she had been helping with
> searches of purses and cell phones.  Therefore, her testimony provides some
> evidence that Candice may have somewhat resisted one portion of the search after
> it had begun.  There is no evidence that Candice Herrera, or any of the Plaintiffs,
> objected to undergoing a pat-down search or complained to any School District or
> ASI employee regarding the scope of the search on the night of the Prom.

_____

Reply at 9.

First, for substantially the reasons that the Plaintiff outlines, the Court has not concluded that it is undisputed that C. Herrera raised no complaints: one could interpret her physical resistance as a complaint or objection to the search.   Accordingly, it will not adopt the first clause of the proposed fact as undisputed.  Second, and the Court agrees with the Plaintiffs that, insofar as the proposed fact suggests that C. Herrera became upset for the first time after she discovered that her medication would not be returned to her, the fact is not undisputed: the evidence shows that the facts that C. Herrera's medication had been confiscated, see C. Herrera Depo. at 154:25-155:16, and that she had been searched, see C. Herrera Depo. at 177:15-178:3; id. at 180:11-181:11, upset C. Herrera.  Accordingly, the Court has modified the proposed fact to eliminate the implication that she became upset for the first time after she discovered that her medication would not be returned to her and does not read its undisputed fact to suggest that nothing else that evening upset C. Herrera.

The SFPS Defendants ask the Court to find undisputed that

[t]here is no evidence in the record of this case tending to show that conduct properly attributable to the School Board was the moving force causing Plaintiffs' alleged injuries resulting from pat-downs, which allegedly involved grabbing or cupping breasts, shaking breasts, feeling around breasts, putting fingers inside dresses or bras, pulling bras, lifting dresses above the knee and/or touching bare skin on her arms or legs.

MSJ ¶ 22, at 9.  The Plaintiffs respond:

Disputed.  This is not a true statement of "fact."  The claim that there is "no evidence" "tending to show" that SFPS's conduct caused Plaintiffs' injuries subsumes multiple questions of law.   Record evidence shows that SFPS had custom and practice of suspicionless pat-downs (that included the pulling of female students' bras) and that custom was the moving force behind the searches at the 2011 prom.

Response ¶ 22, at 6-7 (citations omitted).  The SFPS Defendants reply:

Regarding Board's Fact No. 22, Plaintiffs carry the burden of proof on this issue and there is no evidence in the record of this case tending to show that conduct properly attributable to the School Board was the moving force causing Plaintiffs' alleged injuries resulting from pat-downs, which allegedly involved grabbing or cupping breasts, shaking breasts, feeling around breasts, putting fingers inside dresses or bras, pulling bras, lifting dresses above the knee and/or touching bare skin on her arms or legs.   See the discussion below in the Introduction to the Argument regarding Plaintiffs' penchant for replacing "School Board" with "SFPS."   Moreover, even ignoring that important distinction, Plaintiffs citations to the record do not dispute the School Board's statement of fact or support their statements in response.

of Stephanie Gurule-Leyba at 44:15-24, taken December 10, 2013, filed March 3, 2014 (Doc. 182-8)("Gurule-Leyba Depo.); id. at 61:10-62:16; C. Herrera Depo. at 160:7-162:21; T. Herrera Depo. at 156:2-158:14.

### d.   Parental Complaints About the CHS Prom.

"Shortly after the [CHS Prom] , both Plaintiff Candice Herrera and Vincent Herrera expressed concern to Principal Romero about the searches that had been conducted."  Response ¶ 41, at 13 (setting forth this fact).[62]  Romero Depo. at 188:2-10; id. at 190:17-191:20.  "Vincent Herrera expressed concern about the searches that had been conducted at the [CHS Prom] to Associate Superintendent Susan Lujan, who relayed Mr. Herrera's concerns to Superintendent Gutierrez."  Response ¶ 42, at 13 (setting forth this fact).[63] See Lujan Depo. at 129:21-130:5; id.

---

Reply at 10 (emphasis in original).  The Court substantially agrees with the Plaintiffs that the proposed "fact" is not a fact, but is, in substance, a legal conclusion drawn from applying the law to the facts.  Accordingly, the Court will not find this proposed fact to be an undisputed fact.

[62]The SFPS Defendants reply:

Plaintiffs' Additional Fact No. 41 is disputed by the School Board to the extent "shortly" is intended to imply a time shorter than 3 days after the prom when Vincent Herrera left a message for Principal Romero indicating merely that he had a problem with searches at the Prom or a time shorter than 12 days after the Prom when Candice Herrera informed Principal Romero for the first time that she had allegedly been groped by the ASI guard performing her pat-down search at the Prom and provided Principal Romero with her written statement. Deposition of Melanie Romero at pages 188-191, attached as Exhibit 20 to Plaintiffs' Motion for Partial Summary Judgment, filed on March 3, 2014 [Doc. 185-21]. Moreover, the proposed fact is immaterial to the issue of whether the School Board had a policy or practice of suspicionless blanket searches (which they did not).

Response ¶ 41, at 23.  Nothing in the proposed fact defines "shortly" to mean any particular timespan.  Accordingly, the Court will treat this fact as undisputed for purposes of this opinion. As for the materiality objection, the Court will discuss materiality in its analysis.

[63]The SFPS Defendants do not dispute this fact, but assert that it is immaterial.  See Reply ¶ 42, at 23.  The Court will discuss materiality in its analysis.

at 136:2-21.   An "Executive Team discussed [the existing] search practices and the Herreras'

complaints, and decided not to change [the] search practices" that would govern the Santa Fe

High School prom.   Response ¶ 43, at 13 (setting forth this fact).   See Lujan Depo. at 138:15-22;

id. at 155:13-156:4.[64]

## PROCEDURAL BACKGROUND

"This case arises from searches that occurred at the" CHS Prom.   MSJ ¶ 1, at 4 (setting

forth this fact); Response ¶ 1, at 2 (not disputing this fact).   See Complaint ¶¶ 3-4, at 2-3.   The

"Plaintiffs allege . . . that the Code of Conduct requires individualized reasonable suspicion

before pat-down or possession searches can properly be pursued and . . . that '[t]he searches of

students, including Plaintiffs, and their personal property on April 16, 2011, occurred in violation

of the code of conduct . . . .'"   MSJ ¶ 5, at 5 (quoting Complaint ¶¶ 111-13, at 20-21)(setting

forth these facts).   See Response ¶ 5, at 2 (stating that this fact is "[u]ndisputed"); Complaint

¶¶ 111-13, at 20-21.[65]   Each Plaintiff claims that a female ASI New Mexico guard performed pat-

---

[64]The Plaintiffs ask the Court to find that this "Executive Team" was "SFPS's Executive Team," and that it discussed "SFPS's search practices . . . and decided not to change SFPS's search practices."   Response ¶ 43, at 13.   The SFPS Defendants reply: "Plaintiffs' Additional Fact No. 43 is disputed by the School Board because there is no evidence in the record of this case that the School Board had any policy or practice regarding searches at a prom. Moreover, the alleged 'executive team' is clearly not the School Board."   Reply ¶ 34, at 23.   The cited evidence does not explain whom the "Executive Team" is or associate it with the School Board. Although evidence cited in connection with a different motion indicates that there are at least two members of this "Executive Team," see Deposition of Melanie Romero at 68:1-3, taken March 18, 2012 (Doc. 202-10)(stating that Dr. Mel Morgan, whom the Court understands to have been the Deputy Superintendent, and Sue Lujan were members of the Executive Team), the cited evidence does not support attributing the actions of this "Executive Team" to the School Board. Accordingly, the Court has modified the proposed fact.

[65]The SFPS Defendants ask the Court to find undisputed that the

Plaintiffs' expert witness, David Keylon, testified at his deposition on December 19, 2013, to only two opinions. His first opinion was that the School Board's policies regarding student searches were consistent with those of other school

- 44 -

down searches at the CHS Prom, the guards searched her bra, breasts, and/or legs, and that the

guards touched their bare skin invasively.[66]   Complaint ¶¶ 41-43, at 10; id. at 55-57, at 12; id.

_____

> districts in New Mexico and were adequate.  His second opinion was that those
> policies of the School Board were not followed at the Prom.

MSJ ¶ 6, at 5 (citations omitted).  First, this characterization of testimony is not properly
considered an undisputed fact so much as part of the case's procedural history.  Second, the cited
pages of Keylon's deposition demonstrate that the SFPS Defendants' characterization of his
testimony is incorrect: for example, he testified "that the searches went above reasonable
searches for entering a prom and that they didn't have any reasonable suspicion or probable
cause."  Deposition of David Keylon at 101:23-102:1, taken December 19, 2013, filed March 3,
2014 (Doc. 187-4).  Accordingly, the Court will not deem this proposed fact an undisputed fact
for purposes of this motion.

   The Plaintiffs' Response to this asserted fact is inadequate.  They state that the proposed
fact is "Disputed.  Plaintiffs' expert, David Keylon, testified to more than two opinions."
Response ¶ 6, at 2.  In support, the Plaintiffs cite what they call Keylon's expert report, contained
in a letter from David Keylon to Daniel J. O'Friel, dated February 16, 2012, filed March 20,
2014 (Doc. 192-21).  The proposed fact was not, however, that Keylon never endorsed more than
one opinion; the proposed fact was that Keylon testified to only two opinions "at his deposition
on December 19, 2013."  MSJ ¶ 6, at 5.  Accordingly, the Plaintiffs did not specifically
controvert this proposed fact and support their disagreement with evidence.  The issue is
however, largely beside the point, because the evidence that the SFPS Defendants cite does not
support their proposed fact.

   [66]The Court has characterized this fact differently than either party proposes to more
faithfully reflect the evidence.  The SFPS Defendants ask the Court to find undisputed that
"[e]ach of the Plaintiffs claim that they underwent pat-down searches at the Prom during which
they were groped by a female ASI guard performing the pat-down searches."  MSJ ¶ 12, at 6.
The Plaintiffs dispute this assertion, stating that they

> do not contend (nor do any of the cited paragraphs of the Second Amended
> Complaint state) that they were "groped" to the extent that that word has sexual
> connotations.  Plaintiffs maintain that their bras and/or breasts were pulled,
> touched, and/or shaken and that their bare skin was touched on their arms and/or
> legs.

Response ¶ 12, at 4.  Although the Court's disposition of the MSJ does not turn on whether the
guards "groped" the Plaintiffs, the Court agrees that the word "groped" may connote, at least to
some readers, that the ASI guards performed the allegedly invasive searches with a prurient
intent, and that the Plaintiffs do not allege that intent.  Accordingly, the Court has not used the
word "groped" in describing the Plaintiffs' claims.

   A close reading of the Complaint reveals that the Plaintiffs' characterization of their
claims in the Response is imprecise.  One Plaintiff, London, does not allege that her "bra[]

¶¶ 65-67, at 13.

"The Court issued a Temporary Restraining Order requiring SFPS to only conduct pat-down searches of students entering the 2011 Santa Fe High School prom upon individualized reasonable suspicion."   Response ¶ 44, at 14 (setting forth this fact).[67]   See Amended Memorandum Opinion and Order at 36, filed May 20, 2011 (Doc. 32)("TRO MOO").   "In its Temporary Restraining Order, the Court prohibited SFPS from conducting pat-down searches of every student entering the event, from emptying the contents of students' bags in public view, and from confiscating medicine and other personal items without prior notice."   Response ¶ 45, at 14 (setting forth this fact).[68]   See TRO MOO at 35-37.   "There were no" observed or reported "incidents or problems with drugs, weapons, or alcohol being present at the 2011 Santa Fe High School prom."   Response ¶ 46, at 14 (setting forth unmodified version of this fact).   See Clarke Depo. at 67:9-12; id. at 67:23-25; Padilla Depo. at 47:13-17; Morgan Depo. at 77:22-25; Gutierrez Depo. Vol. I at 188:14-17.[69]   "Superintendent Gutierrez admitted that conducting pat-

---

and/or breasts were pulled, touched, and/or shaken," Response ¶ 12, at 4.  Her allegation instead focuses on an invasive search of her legs; she does not mention anything about her bra or her breasts.   See Complaint ¶¶ 65-67, at 13. The Court has, therefore, altered the Plaintiffs' characterization of their allegations.

[67]The SFPS Defendants do not dispute this fact, but assert that it is immaterial.   See Reply ¶ 44, at 23.  The Court will decide materiality in its analysis.

[68]The SFPS Defendants do not dispute this fact, but assert that it is immaterial.   See Reply ¶ 45, at 24.  The Court will decide materiality in its analysis.

[69]The Plaintiffs ask the Court to find undisputed that "[t]here were no incidents or problems" of this sort.  Response ¶ 46, at 14.  The SFPS Defendants reply:

Plaintiffs' Additional Fact No. 46 is not disputed by the School Board to the extent it is logically intended to state that neither counsel for Plaintiffs nor School District personnel in attendance at the 2011 SFHS prom were aware of, or had brought to their attention, any incident or problem with drugs, weapons, or alcohol being present.   However, the School Board submits that, based on evidence in the record, no one can be certain that "[t]here were no incidents or

down searches of students only after a wand alerted would be a sufficient and effective procedure for SFPS proms."   Response ¶ 47, at 13 (setting forth unmodified version of this fact).[70]  Gutierrez Depo. Vol. I at 195:13-196:1.

### 1.    The Complaint.

The Plaintiffs filed their Complaint on September 18, 2012.  See Doc. 100.  Count I alleges a claim under 42 U.S.C. § 1983 for violation of the Plaintiffs' rights under the Fourth Amendment to the Constitution of the United States of America to "be secure in their persons and effects against unreasonable searches and seizures."  Complaint ¶ 135, at 24.  On October 24, 2012, Romero and the SFPS Defendants moved to dismiss the remaining counts -- II through V -- of the Second Amended Complaint.   See School Defendants' Motion for Summary

---

> problems with drugs, weapons, or alcohol being present at the 2011 Santa Fe High School prom." The School Board also submits that even such a limited conclusion regarding drugs, weapons and alcohol at the 2011 SFHS prom has to take into account: (1) the news coverage of this lawsuit and the Court's TRO; (2) the media coverage of Plaintiffs' claims that was actively sought by Candice Herrera and her attorney; and (3) the unusually heavy police presence at that prom, including the presence of New Mexico State Police, that was brought about by the above reasons, though said fact is immaterial.

Reply ¶ 46, at 14.  The SFPS Defendants are correct that the cited testimony can reflect only the limits of the witnesses' knowledge.  Accordingly, the Court has qualified the proposed fact with the phrase "observed or reported."  The Court otherwise deems the fact undisputed for purposes of this opinion.

[70]The SFPS Defendants reply:

> Plaintiffs' Additional Fact No. 47 is not disputed by the School Board. However, the School Board disputes that local superintendent Gutierrez possessed the knowledge or training necessary to competently testify to such an opinion or that she was speaking for the School Board at her deposition and, therefore, the testimony has no persuasive value, though said fact is immaterial.

Reply ¶ 47.  Because this argument does not specifically controvert the proposed fact, the Court will deem it undisputed for purposes of this opinion.  The Court will discuss any other pertinent arguments about this testimony's significance in its analysis.

Judgment on Counts II, III, IV, and V of the Second Amended Complaint [Doc. 100] under the Tort Claims Act and Memorandum in Support (Doc. 108).  On November 9, 2012, the Plaintiffs' counsel informed Defendants SFPS Board of Education, Barbara Gudwin, Glenn Winkle, Linda Trujillo, Frank Montano, and Steven J. Carillo, in their official capacity as SFPS Board of Education members, Bobbie J. Gutierrez, in her official capacity as SFPS Superintendent, Romero, in her official capacity as Capital High Principal, and Leslie Kilmer, in her official capacity as Santa Fe High School Principal (collectively "School Defendants") that the Plaintiffs would concede the motion and file a rule 41 dismissal of Counts II-V of the Second Amended Complaint against all School Defendants, which the Plaintiffs filed on November 13, 2012.  See Plaintiffs' Unopposed Motion to Voluntarily Dismiss Counts II-V Against the Schools [sic] Defendants (Doc. 114).  On November 15, 2012, the Court entered an Order granting the Plaintiffs' motion, and dismissing Counts II, III, IV, and V against Defendants SFPS Board of Education; Barbara Gudwin, Glenn Wikle, Linda Trujillo, Frank Montano, and Steven J. Carrillo, in their official capacities as members of the SFPS Board of Education; Bobbie J. Gutierrez, in her official capacity as Superintendent of SFPS; Melanie Romero, in her official capacity as Principal of Capital High School; and Leslie Kilmer, in her official capacity as Principal of Santa Fe High School; and dismissing as moot the School Defendants' Motion for Summary Judgment on Counts II, III, IV, and V of the Second Amended Complaint [Doc. 100] under the Tort Claims Act and Memorandum in Support.  See Order at 1 (Doc. 118).  In the Romero MOO, the Court granted the Romero MSJ, eliminating the individual-capacity claim against Romero.  See Romero MSJ *passim*.

    **2.**　　**The MSJ.**

    The SFPS Defendants move for summary judgment on Count I of the Complaint,

because "the facts in the record herein do not support any claim made by Plaintiffs against the School Board or its employees in their official capacities."  MSJ at 1.  The SFPS Defendants note that "the individual school defendants sued only in their official capacities moved for dismissal or summary judgment on Count I."  MSJ at 1 n.1.  After reviewing the Romero MOO, in which the Court disposed of the Plaintiffs' claims against Romero, see MSJ at 2, the SFPS Defendants narrow the questions that the Court faces in the MSJ:

> Regarding whether the School Board is liable for Ms. Romero's actions or the alleged actions of ASI employees, the following questions should be examined: Was there conduct that is properly attributable to the School Board that evidences a deliberate or conscious choice of the School Board that was the moving force causing Plaintiffs' alleged injuries?  If so, the School Board is only liable for injuries as to which its deliberate or conscious choice was the moving force causing those injuries.  If not, the School Board and its employees in their official capacities are entitled to summary judgment on Count I of the Second Amended Complaint and to be dismissed from the action with prejudice.  However, if the Court finds conduct properly attributable to the School Board evidences a deliberate or conscious decision by the School Board that was the moving force causing Defendant Romero to violate Plaintiffs' Fourth Amendment rights by asking ASI and its employees to perform pat-down searches on all Prom attendees, two additional questions follow.  First, are the Plaintiffs entitled to more than nominal damages based solely on having to undergo a pat-down at the Prom?  Second, does conduct properly attributable to the School Board evidence a deliberate or conscious decision by the School Board that was the moving force in causing, if such allegations are proved, further alleged damages to the Plaintiffs as a result of inappropriate touching or groping by ASI employees during their pat-down searches?

MSJ at 2-3.  In the SFPS Defendants' view, the Plaintiffs have not alleged or proved that the SFPS Defendants made "a deliberate or conscious decision . . . that was the moving force in causing any constitutional injury to any Plaintiff."  MSJ at 3.  They contend that, if the Court disagrees, and holds that the SFPS Defendants may be liable

> merely for injuries caused by Defendant Romero's decision to require that all attendees to the Prom undergo pat-down searches without individualized reasonable suspicion, but not liable for any additional injuries caused by improper and unprofessional conduct of ASI employees and supervisors, . . . Plaintiffs are entitled to no more than nominal damages.

- 49 -

MSJ at 3.  In the SFPS Defendants' view, the Plaintiffs have not developed "evidence that the policies and practices of the School Board caused any harm to Plaintiffs or their rights and the School Board and individual official capacity school defendants should be dismissed from this matter with prejudice."  MSJ at 3.

After reviewing the familiar standards for summary judgment, see MSJ at 10-11, the SFPS Defendants note that the only remaining claim against the SFPS Defendants is a claim that they violated the Plaintiffs' Fourth-Amendment rights, see MSJ at 12.  In their view, "[n]o conduct that is properly attributable to the School Board evidences a deliberate or conscious choice of the School Board that was the moving force causing Melanie Romero to request pat-down searches without individualized reasonable suspicion."  MSJ at 12.  Citing the familiar standards for municipal liability under 42 U.S.C. § 1983, see MSJ at 12-13, the SFPS Defendants argue that,

> to hold the School Board liable for Melanie Romero's actions, Plaintiffs must establish that conduct properly attributable to the School Board evidences a deliberate or conscious choice of the School Board making a policy or practice that was the moving force causing Melanie Romero to request pat-down searches without individualized reasonable suspicion, contrary to the School Board's Code of Conduct, thereby causing Plaintiffs' to suffer the alleged violations of their Fourth Amendment rights.

MSJ at 13.  The SFPS Defendants then put the facts in context, noting that, because the School Board governs the Santa Fe Public School district and has "sole, statutory, policy-making authority for SFPS, . . . in effect, the School Board is SFPS."  MSJ ¶ 13.  At the same time, it notes that Romero did not have authority to make policies within SFPS -- indeed, she "lacked authority to adopt even CHS policies that were not consistent with School Board policies."  MSJ ¶ 13.  They note that the Code of Conduct "allows only that '[e]ach school may adopt additional

policies and regulations <u>that are consistent with school district standards of behavior</u>.'"  MSJ at

13-14 (quoting Code of Conduct at 10).

It also notes that, as part of its authority under state law, the School Board is responsible

for the Code of Conduct's content.  <u>See</u> MSJ at 14.  After reviewing the history of the Code of

Conduct that the Court laid out in the factual background, it argues:

> It is clearly undisputed that the Code of Conduct does not permit pat-down
> and possession searches without individualized reasonable suspicion. Plaintiffs
> allege in the Second Amended Complaint [Doc. 100], at paragraphs 111-112, that
> the School Board's Code of Conduct requires individualized reasonable suspicion
> before pat-down or possession searches can properly be pursued and, at ¶ 113,
> that "[t]he searches of students, including Plaintiffs, and their personal property
> on April 16, 2011, occurred in violation of the Santa Fe Public Schools Code of
> Conduct . . . [.]"   Undisputed Fact No. 5.   Plaintiffs' expert witness, David
> Keylon, testified at his deposition that the School Board's policies regarding
> student searches were consistent with those of other school districts in New
> Mexico and were adequate.  Undisputed Fact No. 6.  His second opinion was that
> those policies of the School Board were not followed at the Prom.  ***Id.***
>
> <u>Nothing</u> in the School Board's Code of Conduct authorizes searches as
> alleged by the Plaintiffs or suspicionless possession and pat-down searches as
> occurred at the Prom.  Undisputed Fact No. 9.  To the contrary, it specifically
> provides that "[m]ore intrusive searches, such as pat-downs, may be conducted
> only on the basis of reasonable suspicion of the individual student to be searched"
> (Code of Conduct, Exhibit 1, at p. 57) and "[p]urses, wallets, book bags, cell
> phones, and similar items of student's personal property may be searched when
> school officials have individualized reasonable suspicion that such personal
> property contains contraband in violation of school rules or state or federal law."
> ***Id.***  There is no evidence in the record of this matter that any deliberate conduct of
> the School Board was the moving force causing Melanie Romero to require
> searches at the Prom that violated the School Board's Code of Conduct.
> Undisputed Fact No. 11.
>
> The School Board is not liable for Melanie Romero's alleged violation of
> Plaintiffs' Fourth Amendment rights by requesting that all attendees at the Prom
> undergo possession and pat-down searches.

MSJ at 14-15 (emphasis in original).

The SFPS Defendants contend that, if the Court finds that they are liable for Romero's

actions, it should limit the Plaintiffs' recovery to nominal damages.  <u>See</u> MSJ at 15.  They point

- 51 -

to the Plaintiffs' histories with patdown searches at other school events, and contend that they

did not object

> to undergoing a pat-down search at the Prom, or complained regarding its scope, at the time of the search. Indeed, the only complaint made that night about searches was Candice Herrera's complaint concerning the confiscation of contraband (the pill) that she brought to the Prom in violation of school rules. Though the Plaintiffs have testified that they were injured by the searches each claims she underwent (that included the ASI guard grabbing or "cupping" her breasts, shaking her breasts, feeling around her breasts, putting fingers inside her dress or bra, pulling her bra, lifting her dress above her knees or to mid-thigh and/or touching bare skin on her arms or legs), none have claimed to be injured in any way, let alone traumatized, by a pat-down search without groping.

MSJ at 14-15.  In the SFPS Defendants' view, the Plaintiffs have not shown that they were

injured by undergoing "a normal administrative pat-down search that did not include improper

touching."  MSJ at 15.  Accordingly, the SFPS Defendants ask the Court to limit the Plaintiffs'

recovery to nominal damages on any claim that the School Board is liable for Romero's actions.

See MSJ at 16.

> The SFPS Defendants finally argue that no evidence tends

> to show that conduct properly attributable to the School Board was the moving force causing Plaintiffs' alleged injuries resulting from pat-downs, which allegedly involved grabbing or cupping breasts, shaking breasts, feeling around breasts, putting fingers inside dresses or bras, pulling bras, lifting dresses above the knee and/or touching bare skin on her arms or legs.

MSJ at 17.  They also contend that no evidence shows that the School Board should have

expected that ASI New Mexico guards "would touch the breasts or bare legs, or pull female

attendees' bras, as the searches at earlier CHS dances and similar off-campus events did not

involve such conduct."  MSJ at 17.  They contend that the Code of Conduct does not authorize

pat-down searches of the sort of which the Plaintiffs complain, and that the evidence does not

show "that groping, if it did occur, was caused by any policy or practice of the School Board."

MSJ at 17.  In its view, "[t]here is not sufficient evidence to send the School Board to trial and

expose it to liability for alleged groping during the pat-down searches and such claims should be dismissed with prejudice."  MSJ at 17.  It notes that, under <u>Lugar v. Edmonson Oil Co., Inc.</u>, 457 U.S. 922 (1982), "[a] state, its agencies or officials may not be assessed liability for the acts of a private individual, except by a 'fair attribution' of those actions to the State."  MSJ at 17 (quoting 457 U.S. at 936-37).  In sum, in its view, the Court should grant summary judgment on Count I as against the SFPS Defendants.  <u>See</u> MSJ at 17-18.

After reviewing the summary-judgment standards, <u>see</u> Response at 14-15, the Plaintiffs recast the SFPS Defendants' position as follows:

> This Court has already found that requiring Plaintiffs (and all other students) to undergo suspicionless pat-down searches at the 2011 Capital High School prom was unconstitutional and violated Plaintiffs' Fourth Amendment rights.  Defendant SFPS nevertheless attempts to evade liability for these constitutional violations based on: (1) the claim that no formal SFPS policy, provision in its Code of Conduct, or "deliberate choice" of a final decision-maker specifically authorized the suspicionless searches at prom; (2) the assumption that SFPS's potential liability is limited to a "normal administrative pat-down search" as opposed to the invasive searches Plaintiffs describe; and (3) the suggestion that Plaintiffs somehow consented to the unconstitutional searches.  None of these arguments has merit.

MSJ at 15-16 (citations removed).  After reviewing the Court's decision "that the suspicionless pat-downs at prom violated Plaintiffs' Fourth Amendment rights" and the basic case law undergirding that decision, <u>see</u> Response at 16-20 (citing Romero MOO *passim*),[71] the Plaintiffs note that, in the Romero MOO, "the Court limited its analysis to the question of whether a pat-down of outer clothing violated the Constitution," and argue that "SFPS's further, and more intrusive, practice of allowing students' bras to be searched is also unconstitutional," Response at 20.  The Plaintiffs note that "the Supreme Court [of the United States] has held that a search

---

[71]    The Plaintiffs concede that the Code of Conduct "tracks Supreme Court [jurisprudence] regarding student searches and applies to school-sponsored activities held off campus, such as the 2011 Capital High School prom."  Response at 16-17.

requiring a student to pull her bra away from her body was unconstitutional even where school officials had individualized reasonable suspicion that the student possessed contraband." Response at 20-21 (citing Safford United Sch. Dist. No. 1 v. Redding, 557 U.S. 364 (2009)). The Plaintiffs contend that, because "[t]he unconstitutionality of the searches of Plaintiffs [has] been established, the only remaining liability question is whether a reasonable jury could find SFPS liable for those constitutional violations under § 1983."  Response at 21.

In the Plaintiffs' view, two assumptions that undergird the SFPS Defendants' argument are faulty:

> (1) that § 1983 liability may only be based on SFPS's formal search policies or a specific decision by the Board ordering the searches at the 2011 prom; and (2) that SFPS can only be held liable for a "non-invasive" "normal" pat-down as opposed to the intrusive searches performed on Plaintiffs.

Response at 21.  As to the first assumption, the Plaintiffs contend that the SFPS Defendants are liable for their "informal, longstanding practice of conducting suspicionless pat-downs of all students entering prom regardless of whether that practice was documented in its Code of Conduct or whether the Board ever made an identifiable 'deliberate choice' to formally adopt that practice."  Response at 21.  They resist the SFPS Defendants' conflation of "the requirement that SFPS's custom or practice be the cause or 'moving force' behind the violation with a requirement that the searches be the result of a specific or formal policy or 'choice' of the School Board."  Response at 22.  In their view, they need not show such an affirmative choice; "[t]o the contrary, when a challenged action is taken pursuant to a 'custom or usage' a § 1983 plaintiff can establish liability 'without adducing evidence of an affirmative decision by policymakers.'" Response at 22 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 502 n.10 (1986).  They note that Monell v. N.Y.C. Department of Social Services, 436 U.S. 658 (1978), itself "provid[es] for § 1983 liability for an established custom 'even though such a custom has not received

formal approval through the body's official decisionmaking channels.'"  Response at 22 (citing

Monell v. N.Y.C. Dep't Soc. Servs., 436 U.S. at 690-91).   The Plaintiffs point to Romero's

Motion and argue that

> SFPS states that "[a]t the time of the [2011 Capital High School] Prom, and for a
> number of years prior to the prom, the two high schools in the Santa Fe Public
> School District, [Capital High School] and Santa Fe High School, had a *practice*
> of having guards provided by ASI perform pat-down searches of all attendees at
> proms and similar events. . .[ .]"

Response at 22-23 (quoting Romero MSJ).  They note that the blanket pat-down policy "was

applied at every prom from at least 2004 through the 2011 Capital High School prom -- an

uninterrupted practice of suspicionless pat-downs carried through at least sixteen SFPS proms."

Response at 23 (citing, e.g., Archuleta Depo. Vol. II at 168:2-169:8).  In their view, "[t]he only

alteration made to this search protocol between 2004 and 2011 was the introduction of wand

searches, such that all students would be subjected to three searches (pat-down, wand, and

possession) instead of only pat-downs and bag searches."  Response at 23 n.1 (citing Archuleta

Depo. Vol. II at 183:8-12).  They note that, "[y]ears before the 2011 prom, SFPS officials

(including then-Superintendent Rendon) in a meeting with ASI officials established that pat-

down searches were to be conducted of all students at prom as part of SFPS's standard search

protocol."  Response at 23 (citing, e.g., Archuleta Depo. Vol. II at 168:2-169:8; id. at 182:2-11).

In their view, "[b]ased on SFPS's directive, it was clear to ASI that such searches had 'always'

been conducted and would 'continue to be' part of SFPS's customary practice."  Response at 24

(citing, e.g., Johnson Depo. at 84:10-16; id. at 85:16-21; id. at 124:20-25; id. at 130:21-131:8).

The Plaintiffs submit that "SFPS's customary search practice includes bra searches of female

students," that "written Pat Down Guidelines applicable to student searches specifically required

bra searches, and both SFPS administrators and ASI security guards were trained that pat-down

searches were to be conducted in a manner consistent with the Guidelines," and that "[t]he principals of Capital High School and Santa Fe High School reviewed the written Pat Down Guidelines." Response at 24.

The Plaintiffs note that, in their view, "Romero implemented SFPS's established custom and practice of suspicionless pat-down searches at the 2011 Capital High School prom by instructing ASI and SFPS personnel to conduct pat-downs, wandings, and possession searches of all students." Response at 24. They state that, "[c]onsistent with SFPS's customary practice and Romero's directive, ASI employees patted down all students entering the prom, including Plaintiffs," and that, "[f]ollowing SFPS's standard search procedure, the pat-down searches conducted at the 2011 Capital High School prom also included searches of the bra area." Response at 24-25. They note that, after the Plaintiffs expressed their concerns about the searches conducted at the 2011 CHS prom, the "Executive Team" considered changing search policies, but decided to keep them in place. See Response at 25. Moreover, they note that "Superintendent Gutierrez indicated she had no objection to any aspect of the Pat Down Guidelines (which included bra searches)." Response at 25.

In the Plaintiffs' view, this "persistence in maintaining its blanket pat-down protocol further confirms that suspicionless pat-downs were a custom and practice of SFPS." Response at 25-26. They characterize Connick v. Thompson, 131 S. Ct. 1350 (2011), as "holding that a city's choice to retain its training program after being on notice that the existing program resulted in constitutional violations would be 'the functional equivalent of a decision by the city itself to violate the Constitution,'" Response at 26 (quoting Connick v. Thompson, 131 S. Ct. at 1360 (internal citations omitted in Response), and quoting Henry v. Cnty of Shasta, 132 F.3d 512, 519 (9th Cir. 1997)("[P]ost-event evidence is not only admissible for purposes of proving the

existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry").)  The Plaintiffs maintain that "SFPS's admission that SFPS maintained a longstanding 'practice' of conducting suspicionless pat-downs (including bra searches) of all students at SFPS proms satisfies the first element of the § 1983 analysis: establishing the existence of a policy, custom, or practice."   Response at 26.   "Accordingly, the searches of Plaintiffs conducted pursuant to SFPS's longstanding practice of subjecting all prom attendees to suspicionless pat-downs are attributable to SFPS regardless of whether SFPS's written policies provide for blanket pat-down searches or SFPS made a specific decision to order the searches at prom."  Response at 27.

The Plaintiffs next attack "[t]he second assumption underlying Defendant's argument -- that SFPS is somehow only liable for 'normal administrative pat-down search[es].'"  Response at 27 (quoting MSJ at 16-17)(alterations in Response).  In their view,

> [t]he invasive searches Plaintiffs endured are fully attributable to SFPS as the natural and foreseeable consequence of its established search protocol.  Indeed, where bra searches were part of SFPS's established pat-down practice, and those conducting pat-downs were specifically instructed to be vigilant of contraband being hidden in precisely the locations where Plaintiffs were invasively searched (in the bra and inner thigh areas), the intrusive searches of Plaintiffs' searches were foreseeable, if not expected.

Response at 27.  They contend that "'[t]ort defendants, including those sued under § 1983, are responsible for the natural consequences of their actions,' and may be 'held liable for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties.'"   Response at 27 (citing Kerman v. City of New York, 374 F.3d 93, 126 (2d Cir. 2004)(internal punctuation and quotations omitted from Response).  They argue that, "[e]ven where a third party (here, the ASI guards performing searches) exercises 'independent judgment in determining whether to follow a course of action recommended by the defendant[,]' that does

not absolve the defendant [of] liability for the consequences of that course of action."  Response at 28 (quoting Kerman v. City of New York, 374 F.3d at 127).

With these standards in mind, the Plaintiffs argue that they have set forth "sufficient evidence to support a finding that SFPS's established pat-down search practice included the pulling and shaking of students' bras, and that the bra areas of Plaintiffs were searched as a result of that established practice."  Response at 28.  The Plaintiffs assert that "[t]he parties agree that bras were pulled and bras and/or breasts were shaken at the 2011 prom, they merely disagree as to the way in which the bra searches were conducted."  Response at 28-29.  In their view, "[r]egardless of how these factual disputes are resolved, SFPS is liable for the intrusive bra searches of Plaintiffs because they foreseeably flowed from SPFS's search practices."  Response at 29.  The Plaintiffs contend that, "[b]ecause the evidence suggests that Plaintiffs' bra searches were conducted as part of SFPS's custom and practice of suspicionless pat-downs, the bra searches of Plaintiffs are attributable to SFPS," and further argue that "[t]he inclusion of bra searches in SFPS's standard pat-down procedure alone requires rejection of SFPS's attempt to limit its liability to 'normal' pat-downs."  Response at 29.

The Plaintiffs assert that "[t]he manner in which ASI guards were instructed to carry out SFPS's search protocol invited the additional type of invasive elements of the pat-downs Plaintiffs experienced."  Response at 29.  They elaborate:

> The written Pat Down Guidelines (which were reviewed by SFPS principals and the Superintendent) specifically instruct those performing pat-downs to "be vigilant" in their searches and remind that contraband may be hidden in the bra area between a student's breasts.  Such instructions invite guards seeking to employ the required vigilance to conduct their searches in such a way as to ensure that no contraband hidden around a student's breasts could escape detection. Because personally pulling and shaking the student's bra and/or feeling around and under her breasts provides greater assurance that no contraband goes undetected, it is foreseeable that guards tasked with performing mandatory bra searches on student after student might conduct more invasive searches in an

attempt to quickly identify contraband concealed in the bra area.

Response at 29 (citations omitted).   Moreover, they contend that, because the "Pat Down" Guidelines warned guards that students may conceal contraband in their inner thighs, it was "likely that guards would check students' inner thighs for contraband (which is most easily accomplished by lifting the student's dress and/or feeling with one's hand)."  Response at 30. They submit that "[t]he more intrusive aspects of Plaintiffs' searches, including the guard cupping breasts, putting fingers into cleavage, and rubbing inner thighs thus foreseeably flow from SFPS's search protocol."  Response at 30.

The Plaintiffs point to the Court's decision in Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1253-55 (D.N.M. 2009)(Browning, J.), for the proposition that where evidence supports a finding of foreseeability, whether a result is foreseeable is a fact question for the jury:

> This Court's decision in Train v. City of Albuquerque is particularly illustrative.  In Train, a plaintiff was subjected to an illegal search that resulted in discovery of a firearm and the plaintiff was charged and incarcerated pending trial for the firearm before the firearm was suppressed as the result of the unlawful search.  629 F. Supp. 2d at 1253-55.  This Court held that there was sufficient basis to find that the litigation expenses, incarceration, and emotional distress associated with the firearm prosecution "foreseeably flow[ed]" from the illegal search, requiring that the determination of foreseeability be left to a jury. Id.

> Here, the connection between SFPS's custom and practices of suspicionless pat-downs (including bra searches) is far less attenuated than the connection found sufficient to support a finding of foreseeability in Train.  SFPS required students' bra areas to be searched and left those conducting the searches with instructions that invited precisely the type of intrusive searches experienced by Plaintiffs.  The highly invasive pat-downs that resulted were the natural and foreseeable consequences of SFPS's search protocol.

> A ruling limiting SFPS's liability to a "normal" pat-down would thus be contrary to the record and the case law and should be rejected accordingly.

Response at 30.

The Plaintiffs then turn to the SFPS Defendants' argument that their actions were not the

- 59 -

moving force behind the Plaintiffs' constitutional injuries:

> The claim that Defendant's practice of suspicionless pat-downs did not "cause" the suspicionless pat-downs of Plaintiffs is simply untenable.   To establish causation under § 1983, a plaintiff need only show that the defendant's policy, custom, or practice was the "moving force" behind the constitutional violations at issue.   See, e.g., Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998). "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights."    Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir. 1990)(internal citation omitted).
>
> Here, SFPS's custom and practice of requiring suspicionless pat-down searches of all students entering prom led to Plaintiffs' unconstitutional pat-downs.  Because, as the Court has already found, SFPS's practice of suspicionless pat-downs itself violates the Constitution, the causal connection between that practice and the violation of Plaintiffs' Fourth Amendment rights is "readily apparent."  See City of Springfield, Mass. v. Kibbe, 480 U.S. 257, 267 (1987); Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 408 (1997).

Response at 31.  They contend that, regardless that ASI New Mexico searched the Plaintiffs,

"[t]he fact that the pat-down searches were physically performed by ASI personnel does not

break the causal chain or absolve SFPS from liability for the searches."  Response at 31.  In their

view,

> [t]he Eleventh Circuit's decision in [Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263 (11th Cir. 2003),] illustrates this point.  In Focus on the Family, a private company that had contracted with the municipal transit authority to place advertisements on transit bus shelters for third parties, refused to post an advertisement submitted by a religious organization based on its content.  Focus on the Family, 344 F.3d at 1267-1270.  The Eleventh Circuit held that there was sufficient evidence to support a § 1983 claim against the municipal transit authority based on evidence that the municipal entity requested that the private company reject certain types of advertisements (including those with religious content).  Id. at 1278-79.  Because the municipal transit authority had directed that the private entity reject certain advertising content, there were sufficient grounds to find it liable for the private entity's rejection of signs based on the municipality's unlawful content restrictions.
>
> Similarly here, the pat-downs ASI performed were conducted pursuant to SFPS's directive as part of SFPS's search protocol and were but one component of a larger search process that was jointly carried out by ASI and SFPS staff. Accordingly, there is ample basis for a reasonable jury's finding that SFPS's

custom and practice caused Plaintiffs' constitutional violations regardless of
whether SFPS staff or ASI staff actually performed the pat-downs.

Response at 32 (selected citations omitted).

They note that, to the extent that the SFPS Defendants suggest that the Plaintiffs' notice
that they would be subjected to pat-down searches is tantamount to consent to undergo the
searches, the Court rejected the SFPS Defendants' suggestion of consent in the Romero MOO,
because "[t]he government may not condition a benefit (such as attending prom) on waiving a
constitutional right (including the Fourth Amendment right to be free from unreasonable
searches)."  Response at 33 (citing, e.g., Romero MOO at 96-102).

With respect to the damages argument, the Plaintiffs contend that

SFPS's claim that Plaintiffs are only entitled to nominal damages is premised on
the erroneous assumption that SFPS's liability is somehow limited to a "normal
administrative pat-down search."  See id.  As detailed [above,] that argument fails
as contrary to the record and the governing caselaw, and SFPS is subject to
liability for the highly invasive pat-downs Plaintiffs experienced.  Accordingly, in
order to limit SFPS's liability to nominal damages, the Court would have to find
that Plaintiffs suffered no injury whatsoever from the highly invasive and
unconstitutional searches they experienced at prom.  The record testimony
recounting Plaintiffs' injuries precludes such a finding.  In short, "this case is not -
-- at least not as a matter of law -- a 'one dollar' case."  Train, 629 F. Supp. 2d at
1255.

Response at 33-34.  The Plaintiffs argue that the Court should not restrict their recovery to
nominal damages, because compensatory damages are the appropriate way to redress the
emotional and dignitary harms that they have suffered.  See Response at 34.  They contend that
"[a] plaintiff's testimony is sufficient to establish her emotional injuries; no medical testimony or
treatment is required."  Response at 34 (citing, e.g., Forsyth v. City of Dallas, Tex., 91 F.3d 769
(5th Cir. 1996)).  They contend that "[t]he determination of damages for non-pecuniary injuries
such as emotional distress, humiliation, and harm to personal dignity and security is a
quintessential factual question for the jury to resolve."  Response at 35.  In their view,

Nominal damages are only appropriate where a plaintiff does not suffer compensable injury as a result of the constitutional violation. See [Carey v. Piphus, 435 U.S. 247, 266 (1978)]; RESTATEMENT (SECOND) OF TORTS § 907. By contrast, where a constitutional violation has resulted in some injury, compensatory damages are "mandatory." See Smith v. Wade, 461 U.S. 30, 52 (1983); Kerman, 374 F.3d at 124 (where plaintiff suffers injury from a constitutional violation, plaintiff is "entitled to an award of compensatory damages as a matter of law"); Wheatley v. Beetar, 637 F.2d 863, 867 (2d Cir. 1980)(finding issuance of a nominal damages instruction error where there was undisputed evidence of injury resulting from a constitutional violation).

Response at 35.  The Plaintiffs argue that the SFPS Defendants are liable for their damages, because the searches that they underwent "foreseeably flowed from SFPS's custom and practice."  Response at 35-36.  Accordingly, in their view, "limiting Plaintiffs to nominal damages would only be appropriate if there were no evidence that Plaintiffs suffered any injuries from any aspect of the searches.  There is ample evidence of the injuries Plaintiffs suffered." Response at 36.  The Plaintiffs point to their testimony about their substantial emotional injuries and contend that "[t]he scarring experience of being unlawfully searched left plaintiffs with ongoing anxiety, worry, and fear about being subjected to unlawful searches again in the future" -- anxiety and fear that "could be so debilitating as to actually prevent plaintiffs from engaging in certain activities."  Response at 36 (internal quotation marks omitted).  They also note that "[t]he sensation of being unlawfully patted down was especially devastating to those who had previous traumatic experiences."  Response at 37 (citing London Depo. at 212:17-213:7).  They note that, to the extent that the SFPS Defendants' actions exacerbated the Plaintiffs' pre-existing wounds, they are liable for any damages that they cause.  See Response at 37 n.2 (citing Figueroa-Torres v. Toledo-Davila, 232 F.3d 270 (1st Cir. 2000); Pieczynski v. Duffy, 875 F.2d 1331 (7th Cir. 1989)).

They also resist the SFPS Defendants' "repeated suggestion that Plaintiffs did not suffer injury because they purportedly had no objection to the searches at the time they were being

conducted." Response at 37. They explain:

> For example, Plaintiff Candice Herrera objected to the search as it was being conducted; she attempted to hold her dress down to prevent the guard from pulling it up farther to expose more of her bare legs, but the guard disregarded her objection and ordered that she remove her hands so that the search could proceed. Moreover, the record reflects that Plaintiffs' hesitancy to speak up at the time the searches were occurring was motivated not by indifference but by shock as to what was happening and confusion as to how to respond given that the SFPS and ASI personnel charged to protect them from injury were performing and/or supervising the very acts causing them harm.

> Illustrating their substantial distress and concern, all Plaintiffs promptly expressed their concerns about the searches and reported the incidents to their parents/guardians.

> For all of these reasons, and in light of Plaintiffs' testimony specifically documenting their injuries, there is substantial evidence refuting SFPS's contention that the timing of Plaintiffs' objections somehow evinces a lack of injury.

> On this record, the evidence of Plaintiffs' compensable injuries precludes any order limiting SFPS's damages exposure to nominal damages. The factual determinations required to assign an appropriate monetary value to Plaintiffs' injuries are uniquely within the province of the jury and must be left to the jury's discretion.

Response at 36-37 (citations omitted).

The Plaintiffs contend that the Court should not limit the SFPS Defendants' liability to damages associated only with a normal pat-down, because the SFPS Defendants and ASI New Mexico are jointly and severally liable for the Plaintiffs' injuries. See Response at 38-39. They note that, under Tenth Circuit law, multiple defendants -- including § 1983 defendants -- who concurrently cause a single, indivisible injury are jointly and severally liable for the entire injury. See Response at 39 (citing Northington v. Marin, 102 F.3d 1564 (10th Cir. 1996)). They contend that the SFPS Defendants and ASI New Mexico

> concurrently violated Plaintiffs' Fourth Amendment rights. Both SFPS and ASI personnel participated in the search process at the 2011 Capital High School prom and followed SFPS's standard search protocol. SFPS directed ASI to perform

pat-down and bra searches, and ASI performed those searches at SFPS's direction and under SFPS's supervision. Principal Romero supervised the searches and maintained responsibility for ensuring that SFPS's search protocol was followed. Acting cooperatively, SFPS and ASI subjected Plaintiffs to unlawful searches.

SFPS and ASI's concurrent conduct caused each Plaintiff an indivisible injury: emotional damages including humiliation, distress, anxiety, and feelings of being violated.  With SFPS and ASI having simultaneously violated Plaintiffs' Fourth Amendment rights, it is impossible to apportion Plaintiffs' injuries or assign some fraction of their damages to one party or another.

Just as SFPS and ASI's conduct is so intertwined as to preclude any apportionment of fault or liability between them, Plaintiffs' injuries are equally indivisible.

Further, because both Defendants are jointly and severally liable, ASI's exposure to damages necessarily exposes SFPS to those same damages.  See Northington, 102 F.3d at 1569.  Accordingly, any order confining any award against SFPS to nominal damages would be improper and contrary to law.

Response at 39-40 (citations omitted).

The Plaintiffs also note that the SFPS Defendants do not argue that the Court should enter summary judgment on their claims "based on SFPS's suspicionless searches of possessions and seizure of personal items."  Response at 40.  They contend that the Court's TRO MOO indicated that the searches and seizures were probably unreasonable, see Response at 40 (citing MOO at 31, 35-37), and submit that

[t]he possession searches and seizures of Plaintiffs' medicine and personal property were unconstitutional because: Plaintiffs retain some expectation of privacy in their possessions and right to personal property even at prom; by emptying the contents of Plaintiffs' purses onto a table in public view and seizing legally possessed items (i.e., prescription medication, makeup, lotion, perfume) without prior notice, SFPS substantially invaded Plaintiffs' privacy and personal property interests; and Defendant's interest in excluding alcohol, drugs, and weapons from prom could be equally served without emptying students' bags in public view or confiscating personal items without notice.

Response at 40-41.  They contend that the SFPS Defendants are liable for this conduct: "Because the possession searches and confiscation of personal property at the 2011 Capital High School

- 64 -

Prom were carried out pursuant to [its] established practice, SFPS' custom is the moving force behind the unlawful searches and seizures." Response at 41. They assert that, "[f]ar from demonstrating the absence of any dispute of material fact entitling it to summary judgment on the issue, SFPS hardly makes any mention of the possession searches and seizures claims," but "instead focuses on the pat-down searches with only passing reference to the fact possession searches were performed." Response at 41. They contend that

> Defendant does not address the unconstitutionality of SFPS' possession searches or seizures of personal property, nor does it present any argument challenging the imposition of liability for these searches and seizures under § 1983. Having failed to put forth any meaningful evidence or argument supporting summary judgment on these claims, SFPS's motion for summary judgment must be denied as to the possession searches and seizures.

Response at 41-42. Accordingly, the Plaintiffs ask the Court to deny the MSJ. See Response at 42.

In their Reply, the SFPS Defendants reiterate their request that the Court grant them summary judgment as to the Plaintiffs' Fourth-Amendment claim. See Response at 2. After recounting the Court's holding in the Romero MOO, see Response at 2-3, the SFPS Defendants assert that

> [t]he issue before the Court on this motion is whether the School Board, the entity of the School District endowed with sole statutory policy-making authority as well as being the entity within a School District with the statutory authority to sue and be sued, is liable to Plaintiffs for injuries allegedly caused by Principal Romero requesting pat-down searches at the Prom -- or, as Plaintiffs argue, even for injuries caused by female ASI guards allegedly performing searches involving inappropriate touching, which Plaintiffs allege to have included, [sic] grabbing or "cupping" their breasts, shaking their breasts, feeling around their breasts, putting fingers inside their dress or bra, pulling their bra, lifting their dress above the knees and/or touching bare skin on their arms or legs (any combination of which the School Board will refer to as "groping"). Candice Herrera, Tiffany Herrera, Ashley Hurtado and Arianna London are the Plaintiffs in this case. Candice Herrera, her attorney and her mother held a press conference on the day Candice and her father (Vincent Herrera, for Candice's sister, Tiffany Herrera, a minor at the time of the filing) filed the original Complaint herein, advertising that the case

was filed as a class action through the local and regional news media. Nevertheless, only two additional plaintiffs have joined the case in the two amended complaints filed since -- Candice's best friend, Arianna London, and Ms. London's good friend, Ashley Hurtado.  None of the four has alleged, testified about, or claimed damages resulting from a search during which they were asked to, themselves, pull out on the center of their own bra.  Each of the four Plaintiffs had undergone pat-down searches before the Prom without complaint or claimed injury.  The Plaintiffs have been clear, as they are again in Plaintiffs' Response [Doc. 192], that it was the overly intrusive nature of the pat-down searches at the Prom as a result of alleged groping to which they personally objected and which, they claim, caused compensable injuries.

Even Plaintiffs admit that it is undisputed that the Code of Conduct for Santa Fe Public Schools, the School Board's official statement of policy on the issue of student searches, did not allow for the searches of persons and possessions which occurred at the Prom without individualized reasonable suspicion. Thus, the limited issue that the Board's Motion [Doc. 187] (and Plaintiffs' Motion for Partial Summary Judgment [Doc. 185] turns on is whether a practice of the School Board was the moving force causing the violation of Plaintiffs' rights the Court found. Controlling law and undisputed facts establish that no practice of the School Board caused any injury to Plaintiffs.  Certainly, no practice of the School Board was the moving force causing any alleged groping. Plaintiffs' argument that evidence that female students, during a pat-down search, including pat-down searches during school hours based on individualized reasonable suspicion, have been asked, when appropriate, to, themselves, pull out their bra just enough to see if anything falls out makes it foreseeable that ASI employees would allegedly grab the bras and breasts and stroke the bare arms and legs of female attendees at a high school prom is baseless and strains credulity.

The Court has ruled that Principal Romero violated the Plaintiffs' Fourth Amendment rights by having all attendees receive pat-down searches at the Prom without individualized reasonable suspicion. Therefore, if not for the Court's grant of qualified immunity, she would be liable for compensable damages for injuries Plaintiffs are able to prove were caused by her actions. However, that does not translate into liability of the School Board as Plaintiffs contend.

Response at 3-5 (citation and footnote omitted).[72]

---

[72]The SFPS Defendants explain their reasons for using the word "groping" as follows:

Plaintiffs state in their response to the School Board's Undisputed Fact No. 12 [p. 4 of Plaintiffs' Response (Doc. 192)] that they "do not contend (nor do any of the cited paragraphs of the Second Amended Complaint state) that they were "groped" to the extent that the word has sexual connotations."  However, the School Board contends that is exactly the gravamen of Plaintiffs' allegations and

- 66 -

The SFPS Defendants review their view of the law -- most significantly, the "moving force" requirement.  Reply at 24-25.  They note that, in Brammer-Hoelter v. Twin Peaks Charter Academy, 602 F.3d 1175 (10th Cir. 2010), the United States Court of Appeals for the Tenth Circuit held that, because it

> is a local governmental entity, [a charter school] cannot be held liable for the acts of its employees on a theory of *respondeat superior.*  Rather, it will only be held liable for its own acts -- acts it "has officially sanctioned or ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 . . . .

---

> testimony concerning searches at the Prom.  On May 17, 2011 (the same day she filed her Complaint and Motion for TRO, a month after the Prom and just four days before the Santa Fe High School prom which she planned to attend), Candice Herrera reported to representatives of local and regional news media at a press conference staged by herself, her attorney Colfax, and her mother at the location of the Prom, that after she underwent a pat-down search performed by a female ASI employee at the Prom, that she felt like she had been "molested" by the ASI employee.  See Exhibit 15 to Individual School Defendant Melanie Romero's Motion for Summary Judgment on Count I of the Second Amended Complaint Based upon Qualified Immunity [Doc. 113], filed November 13, 2012 [113-16].  Vincent Herrera, Candice and Tiffany's father and an original Plaintiff herein on behalf of Tiffany, testified that, based on what his daughters told him about the pat-down searches, they had been molested and "raped[]" during their searches at the Prom.  See e.g. Deposition of Vincent Herrera, taken on July 12, 2012, filed on November 13, 2012 [Doc. 113-15] ("V Herrera Dep."), 81:19-82:2; 131:6-15; 134:8-13.  At their respective depositions, each of the Plaintiffs demonstrated how the ASI employee grabbed both of their breasts full on from the front, one in each hand, and then squeezed or shook their breasts.  There is no testimony or evidence in this case that such behavior could be part of any proper pat-down under the circumstances presented. Common sense tells us, **if** those things actually happened, i.e., grabbing breasts and stroking bare thighs, the actions indeed had some sexual connotations.  Thus, the verb grope seems to offer an appropriate short hand for the alleged actions and the school defendants will continue to use the term.

Reply at 3 n.2 (emphasis in original).  Although the Court will relate the SFPS Defendants' arguments in the vocabulary that they have selected, it does not agree that the gravamen of the Plaintiffs' claims is sexual.  In the Court's view, the upshot of the Plaintiffs' claims is that the searches were invasive.  Statements at a press conference and stray deposition testimony to the effect that the Plaintiffs were "molested" or "raped" probably reflects the fact that the searches' effects on the Plaintiffs were deeply invasive and not that the ASI New Mexico officer searched the Plaintiffs for their sexual gratification.  In any event, as the Court has explained, the Court's disposition of the MSJ does not turn on this semantic dispute.

"[M]unicipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Id. at 483-84 . . . .

* * * *

The inquiry of whether a government employee is a policy-making official is a question of state law.  See [City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988)].  In deciding whether an official is a final policymaker, "we are interested only in delegations of legal power."  Milligan-Hitt v. Bd. of Trs. of Sheridan County Sch. Dist. No. 2, 523 F.3d 1219, 1227 (10th Cir. 2008); see also Wulf v. City of Wichita, 883 F.2d 842, 869 (10th Cir. 1989)("Praprotnik directs us to look only at where statutory policymaking authority lies, rather than where *de facto* authority may reside.").

Brammer-Hoelter v. Twin Peaks Charter Academy, 602 F.3d at 1188-89 (emphasis In original).

See Response at 25-26.  In that case, the SFPS Defendants point out, the Tenth Circuit

found that "Colorado law, the charter contract, the Academy's bylaws, and the administrator's employment contract all make clear the Academy Board was the sole final policymaker on school matters" and that the administrator's allegedly unconstitutional actions, "were legally constrained by Board policies [and thus, the administrator] was not a final policymaker for the Academy" (Id., 602 F.3d at 1190).  The Tenth Circuit, therefore, affirmed the District Court's dismissal of the plaintiff's claims against the Academy board based on the principals of municipal liability.  In Randle v. City of Aurora, 69 F.3d 441, 447-448 (10th Cir. 1995), quoted in Brammer-Hoelter, the Tenth Circuit, citing City of St. Louis v. Praprotnik, 485 U.S. [at] 124 . . . , was clear that "final policymaking authority" is a legal issue to be determined by the court based on state and local law.

Reply at 26 (bolded citations altered).  The SFPS Defendants assert that the Plaintiffs' argument that they need show only that a policy, custom, or practice exists, and that it is causally connected to the constitutional violation, is incorrect.  See Reply at 27.  They note that the Plaintiffs have conceded that the School Board's policies, as the Code of Conduct expresses them, "disallow searches of persons and possessions without individualized reasonable suspicion."  Reply at 27.  They contend that the Plaintiffs' custom-or-practice argument -- that is, that School District employees have testified to a history of searches like those that occurred at

the Capital High School Prom -- "misconstrue[s] the School Board's position and the controlling law." Reply at 27-28.  The SFPS Defendants state:

> The School Board can only be held liable if it adopted a formal policy calling for pat-down searches at proms.  Clearly, liability can be based on a School Board practice. However, that does not change the fact that Plaintiffs must show a deliberate and conscious choice of the School Board, which does not have to be in the form of the adoption of a formal policy.

Reply at 27.  The SFPS Defendants concede that the Plaintiffs could satisfy this requirement by pointing to a custom and not only to a policy, but assert that they still "'must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.'"  Reply at 27-28 (quoting Goff v. City of Tulsa, 202 F.3d 282, at *2 (10th Cir. 1999)(unpublished table disposition)(internal quotation marks omitted)).  They also point to Schneider v. City of Grand Junction Police Department, 717 F.3d 760 (10th Cir. 2013), which explains that, "[t]o establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right.  This requirement is satisfied if the plaintiff shows that the municipality was the moving force behind the injury alleged." 717 F.3d at 770 (citations and internal quotation marks omitted).  See Response at 28.[73]  They note that the Tenth Circuit has held that,

> [a]bsent an official policy, a municipality may be held liable if the unconstitutional practice is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." [Lankford v. City of Hobart, 73 F.3d 283, 286 (10th Cir. 1996)] (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 168 (1970)).  In order to establish a custom, the actions of the municipal employees must be "continuing, persistent and widespread."  Gates v. Unified

---

[73]The Reply slightly misconstrues the case.  Schneider v. City of Grand Junction Police Department says that the "moving force" showing is sufficient to satisfy the "closely related" requirement, but, strictly speaking, it does not say that the requirement is satisfied only if the Plaintiffs satisfy the "moving force" requirement.

Sch. Dist. No. 449, 996 F.2d 1035, 1041 (10th Cir. 1993).  In addition, the plaintiff must show deliberate indifference to or tacit approval of such misconduct by policymaking officials after notice of such misconduct.  Id.

Goff v. City of Tulsa, 202 F.3d 282, at *2.[74]  See Reply at 28.  Moreover, they point to Cacioppo v. Town of Vail, 528 F. App'x 929 (10th Cir. 2013)(unpublished), in which the Tenth Circuit explained that,

> for state of mind, the plaintiff must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences.  This standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.  While notice in most instances is established by proving a pattern of tortious conduct, in a narrow range of circumstances, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction.

528 F. App'x at 932 (citations, internal quotation marks, and alterations omitted).  See Reply at 28.  They also note that the Tenth Circuit has "warn[ed] in Cacioppo[ v. Town of Vail] that, 'where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'"  Response at 29 (quoting Cacioppo v. Town of Vail, 528 F. App'x at 931).

The SFPS Defendants then turn to New Mexico school districts' statutory structure:

> Article XII, § 1 of the Constitution of New Mexico ("NM Constitution") and NMSA 1978, § 22-1-4 (A) grant school-aged residents of the state a right to a free public school education and creates, along certain statutes, the structure of the system that is to provide such a public education. Article XII, § 6 of the NM Constitution provides for the creation of a state-level regulatory agency, presently named the Public Education Department ("NMPED"). The New Mexico Legislature has enacted the Public School Code to flesh out the system providing a free, public education in New Mexico.  See NMSA 1978, § 22-1-1 et seq. Article 2 of the Public School Code (NMSA 1978 §§ 22-2-1 through § 22-2-21 generally provide the NMPED its powers and duties. Section 22-1-2 provides

---

[74] The SFPS Defendants, apparently inadvertently, misattribute this quote to Cacioppo v. Town of Vail.  See Response at 28.

important definitions including:

> H. "local school board" means the policy-setting body of a school district;

> I. "local superintendent" means the chief executive officer of a school district;

> L. "public school" means that part of a school district that is a single attendance center in which instruction is offered by one or more teachers and is discernible as a building or group of buildings generally recognized as either an elementary, middle, junior high or high school or any combination of those and includes a charter school;

> R. "school district" means an area of land established as a political subdivision of the state for the administration of public schools and segregated geographically for taxation and bonding purposes; [and]

> T. "school principal" means the chief instructional leader and administrative head of a public school…

Article 4 of the Public School Code (NMSA 1978 § 22-4-1 through § 22-4-18 provides for the creation, consolidation and annexation of school districts and related school district elections.

The Legislature has further provided for the governance of a geographical school district by creating publically-elected local school boards, providing procedures for the election and terms of board members, defining the duties of such boards, and granting each local school board certain powers with which to meet those duties. See NMSA 1978 §§ 22-5-1 to 22-5-13. A local school board is created as the governing body of the district with full authority to set policies for the district, approve an annual budget, and sue or be sued on behalf of the school district. See NMSA 1978, § 22-5-4. A school board, by statute[,] has the power to hire and fire one person -- the local superintendent. NMSA 1978, § 22-5-4 (B). A local school board, as a local government entity, is treated like the governing entity of a municipality for purposes of a claim under 42 U.S.C. § 1983. See, e.g., Brammer-Hoelter, 602 F.3d at 1188. The Legislature separately provided for the administrative operation of a school district by creating and defining the duties and powers of a local superintendent (see NMSA 1978, § 22-5-14) and for the administrative operation of individual schools by creating and defining the duties of school principals including specifying that they work under the supervision of the local superintendent and that, in addition to the duties listed in the section, they must "perform other duties assigned to [them] by the local superintendent to implement the policies of the local school board. See NMSA 1978, § 22-10A-18

- 71 -

> (A) and (F) of the School Personnel Act (codified as Chapter 22, Article 10A
> NMSA 1978).

Reply at 29-30 (bolded citation altered).  The SFPS Defendants note that the enabling statutes

constrain a school district's operations, and that the School Board could not ignore this statutory

framework and restructure a school district and "redistribut[e] legislatively specified powers and

duties.  Similarly, a school principal is not empowered to ignore or violate policies properly

adopted by the local school board."  Reply at 30-31.

The SFPS Defendants explain what they understand to be a key problem with the

Plaintiffs' argument:

> The Plaintiffs properly named the School Board as an entity in this case
> because it is the only entity authorized to sue and be sued on behalf of the
> School District, including individual board members and district and school
> administrators sued in their official capacities.  NMSA 1978 § 22-5-4 (E).  Thus,
> the School Board is what is generally thought of as the "Santa Fe Public Schools"
> or "Santa Fe Public School District."  Also, for simplicity (though at the expense
> of some clarity), it is often useful to speak of "Santa Fe Public Schools" or
> "SFPS" when referring to an employee or administrator of SFPS or when
> generally referring to the entire statutory structure of the School District,
> including the School Board, the local superintendent, and School District
> administrators and employees when the distinctions discussed above and laid out
> in statute are not important to a particular legal question, as is often the case.
> However, when dealing with the issues in this motion, referring to "SFPS," as the
> Plaintiffs do in argument and offered "undisputed facts," only operates to obscure
> and confuse the actual legal question presented to the Court [the MSJ] as well as
> in the Plaintiffs' Motion for Partial Summary Judgment [Doc. 185].  That question
> is: Whether liability created by 42 U.S.C. § 1983, arising from an action of a
> school-site administrator, who the Court has previously ruled called for an
> unreasonable search violating the Plaintiffs' Fourth Amendment rights, but was
> granted qualified immunity, can be imposed on the School Board. Under
> controlling law and facts of this case, the answer is "no."

Reply at 31.

The SFPS Defendants note that the Plaintiffs "spend time arguing that the Court was

correct" in its ruling that "Romero violated Plaintiffs' Fourth Amendment rights by calling for a

pat-down search of all attendees at the Prom without individualized reasonable suspicion."

Reply at 32.

>The School Board   disagrees and suggests that the question of whether the
>searches at the Prom, performed solely for the protection of the attendees at an
>off-campus, after-hours party traditionally known as a dangerous event for the
>attendees, and in the current context of senseless violence in the educational
>context, were reasonable would be better presented to the jury.  Nevertheless, the
>School Board recognizes that the ruling is the law of this case.  Thus, Principal
>Romero, in her personal capacity, would have been liable for injuries that
>Plaintiffs can prove were caused by that decision were it not for the Court's ruling
>that the law in that regard was not well-established and, therefore, she was
>entitled to qualified immunity.

Reply at 32.

>The SFPS Defendants contend that,
>
>[f]ar from establishing that there is a justiciable question as to whether the School
>Board, through its deliberate conduct, was the moving force causing pat-down  or
>possession searches at the Prom, Plaintiffs have produced no evidence that the
>School Board even knew about pat-down searches at any prom beyond a copy of
>the Minutes of the School Board's May 18, 2011 general meeting.

Reply at 32.  In the SFPS Defendants' views, those minutes "and the allegations in Plaintiffs'

initial and Second Amended Complaint indicates [sic] that Plaintiffs always understood they

would have the burden to prove that the School Board caused, or at least knew of, the allegedly

unconstitutional conduct which forms the basis of their claims."   Reply at 32-33 (citing

Complaint ¶¶ 101-102, at 19).  The SFPS Defendants assert that the "Plaintiffs learned early that

the searches at the Prom violated the official School Board policies in its Code of Conduct," and

that it, therefore, "seems they reasonably searched the publicly available Minutes of the School

Board prior to filing the original Complaint for evidence of School Board deliberate conduct that

might be characterized as the moving force causing pat-down and possession searches at the

Prom and that was all they found."  Reply at 33.  The SFPS Defendants contend that "it was the

School Board member alleged to have been present at the 2010 Santa Fe High School prom in

paragraph 102 that brought up searches at that prom as alleged in paragraph 101 of the Second

Amended Complaint."   Reply at 33-34.   The SFPS Defendants assert that the Minutes "indicate

that [Mary Ellen Gonzales, a School Board member,] reported that she attended the 2010 SFHS

Prom and was shocked at what she characterized as a 'generational gap' because attendees were

being searched."   Reply at 34 (misquoting Minutes of a Regular Board Meeting, May 18, 2010,

filed May 17, 2011 (Doc. 2-5)).[75]

---

[75]The quoted section of the minutes indicates that Gonzales "[w]ent to Santa Fe High's
Prom and it was a <u>generational shock</u>.   She was part of the search process and was shocked
because she was never searched when she went to prom, but the students obeyed the process. She
did not stay for the dance."   Minutes of a Regular Board Meeting at 11 (emphasis added).

   The SFPS Defendants state as follows:

   In the School Board's Response to Plaintiffs' Motion for and Memorandum in
   Support of Partial Summary Judgment, filed on March 20, 2014 [Doc. 195], the
   School Board presented additional undisputed material facts designated "N"
   through "O-12," which address the allegations in paragraphs 101 and 102 of the
   Second Amended Complaint as well as the Minutes of the May 18, 2010 School
   Board meeting.   Those additional undisputed material facts are based upon
   Exhibit "A" to that response, being an affidavit of former School Board member
   Mary Ellen Gonzales dated March 18, 2014 and filed on March 20, 2014
   [Doc. 195-1].   The School Board hereby incorporates undisputed material facts
   "N" through "O-12," from the School Board's Response to Plaintiffs' Motion for
   Partial Summary Judgment and the Gonzales Affidavit attached thereto as Exhibit
   "A" [Doc. 195].   Those facts and the Gonzales Affidavit establish that the School
   Board was not informed about pat-down or possession searches at high school
   proms and that the revision of the Code of Conduct adopted in the summer prior
   to the 2010-2011 school year maintained the School Board's requirement of
   individualized reasonable suspicion before pat-down and possession searches
   could be pursued.

Reply at 34-35.   The SFPS Defendants also state: "At this point, the School Board incorporates
by reference pursuant to D.N.M.LR-Civ. 7.1(a) its Santa Fe Public Schools Board of Education's
Response to Plaintiffs' Motion for Partial Summary Judgment and its associated Exhibit "A,"
filed on March 20, 2014 [Docs. 195 and 195-1]."   Reply at 34 n.4.
   This purported incorporation by reference of additional facts in a reply is inappropriate
for at least three reasons.   First, the local rule to which the SFPS Defendants point provides that
"[a] party may adopt by reference <u>another party's</u> motion or other paper by making specific
reference to the filing date and docket number of such motion or other paper."   D.N.M.LR-Civ.
7.1(a)(emphasis added).   The SFPS Defendants have not here adopted by reference <u>another
party's</u> motion or other paper; they instead purport to incorporate <u>its</u> response to a separate

The SFPS Defendants assert that

it is clear that the School Board's policies did not provide Principal Romero authority to order pat-down searches of all attendees at the Prom without individualized reasonable suspicion.  It is also clear that Principal Romero is not a final policy-maker for the School District and, therefore, liability cannot be imputed to the School Board merely based upon her decision that attendees be searched.  Therefore, Plaintiffs rely on a history of pat-down searches at past proms and testimony that contradicts controlling New Mexico law and official School Board policy to assign liability for Principal Romero's decision to the School Board.  As already established above, Plaintiffs' approach is not supported by controlling Supreme Court and Tenth Circuit law regarding municipal liability under 42 U.S.C. § 1983.

Reply at 35.  The SFPS Defendants assert that no evidence supports a showing "that the School

Board adopted or knew of any search protocol that permitted or required 'bra searches' of any

kind or searches of bare limbs."  Reply at 35.  Moreover, the SFPS Defendants assert that "the

---

motion.  Such a maneuver is not proper incorporation by reference, but is, in effect, an end run around page limits.

Second, this purported incorporation by reference violates the local rules for summary judgment briefing.  The local rules provide that "[t]he Memorandum must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists." D.N.M.LR-Civ. 56.1(b) (emphasis added).  The local rules regarding a reply do not provide for additional facts.  See D.N.M. LR-Civ. 56.1(b).  That rule exists for a reason: the logic of summary judgment depends on the non-movant's ability to see the entire field of facts on which the movant depends and to argue about their legal import.  To allow a reply to incorporate wholesale new facts from separate briefing would sandbag the non-movant, leaving them with no opportunity to respond.

Third, and perhaps most significantly, this purported incorporation by reference makes no sense given the different inferences the Court must draw in the summary-judgment context.  In deciding the MSJ, the Court must indulge all reasonable inferences and doubts in the Plaintiffs' favor, and must construe all evidence in the light most favorable to them.  See Hunt v. Cromartie, 526 U.S. at 550-55.  In deciding the Plaintiffs' Motion for and Memorandum in Support of Partial Summary Judgment, filed March 3, 2014 (Doc. 185), the Court must make the opposite inferences -- that is, it must indulge all reasonable inferences and doubts in the SFPS Defendants' favor, and must construe all evidence in the light most favorable to them.  Accordingly, it would be impossible to draft an intelligible decision if parties could incorporate by reference facts drafted with the backdrop of opposite inferences in mind.

Moreover, even if the Court were to consider the facts that the SFPS Defendants have put forth in a separate motion, those facts would not change the result.  In the end, even taking into account the SFPS Defendants' other briefing, the two sets of facts on which the Court principally bases its decision would remain intact: (i) a widespread, years-long pattern of suspicionless searches at proms existed; and (ii) School Board members attended and chaperoned those proms.

School Board does not admit 'to having a suspicionless pat-down search practice at high school proms.'" Reply at 35. The SFPS Defendants elaborate:

> Plaintiffs' statement that the School Board made admissions through the statement of undisputed facts in Melanie Romero's Motion for Qualified Immunity is simply incorrect. Plaintiffs brought Principal Romero into this case and the public eye in her personal capacity. In that capacity, Principal Romero, in her capacity as Melanie Romero, moved for summary judgment on the grounds of qualified immunity because there was no well-established law that would have reasonably informed her that patting-down students for their own protection in an attempt to exclude dangerous weapons, drugs and alcohol from the event was an unconstitutional action. She did not represent the School Board and had no power to bind the School Board to any of her stated undisputed material facts. The School Board is not aware of any legal principal [sic] that would support such a conclusion.

Reply at 35-36.

The SFPS Defendants conclude as follows:

> Melanie Romero's decision at the Prom cannot properly form the basis of School Board liability. There is no evidence of conduct that is properly attributable to the School Board that evidences a deliberate or conscious choice of the School Board that was the moving force causing Plaintiffs' alleged injuries. The School Board and its employees in their official capacities are entitled to summary judgment on Count I of the Second Amended Complaint and to be dismissed from the action with prejudice. In addition, Plaintiffs have not demonstrated that they were injured in fact by any pat-down search that did not include groping. Such a claim would not be objectively reasonable as each of the Plaintiffs had previous[ly] undergone pat-down searches without groping that did not leave them emotionally scar[r]ed. Therefore, if the School Board should be found liable, Plaintiffs are entitled to [no] more than nominal damages.

Reply at 37.

The bulk of the discussion at the hearing concerned the Plaintiffs' motion on the same subject, and the parties discussed the MSJ with that backdrop in mind. Accordingly, the Court will not rehearse the arguments here. The Court stated, however, that it was inclined to deny the MSJ as to damages, because, although the damages case did not seem robust, the Court could not, as a matter of law, limit the damages to a dollar. See Transcript of Hearing at 202:8-16

(taken April 8, 2014)(Court).[76]

After the hearing, the Plaintiffs sent the Court a letter.  See Electronic Mail Transmission from Reed Colfax to the Court (dated April 14, 2014), filed April 14, 2014 (Doc. 207)("Plaintiffs' Letter").  The Plaintiffs' Letter covers a variety of topics, some of which are irrelevant to the MSJ.  Related to the MSJ, the Plaintiffs noted that, as they argued in their briefing, the SFPS Defendants need not have known of the suspicionless-search practice, and stated "that the Board had been aware of the search policy and the executive team's interpretation of the search policy through the comments of Board member Gonzales and Deputy Superintendent Morgan during Board meetings that pre-dated the 2011 Capital High School Prom."  Plaintiffs' Letter at 1.[77]  The Plaintiffs also "highlight for the Court determinative testimony on the issue by Superintendent Gutierrez, which establishes that the SFPS Board was

---

[76]The Court's citation to the transcript of the hearing refers to the Court reporter's original, unedited version.  Any final transcript may have slightly different page and/or line numbers.

[77]One piece of evidence to which the Plaintiffs refer is the Board of Education Minutes of a Study Session, dated July 8, 2010, filed April 7, 2014 (Doc. 202).  That document includes the following statements:

> Ms. Gudwin asked if students were getting caught smoking or having tobacco is much of a problem.  Dr. Morgan answered yes we confiscate quite a bit.  Ms. Gudwin asked if they have to have cause to search a girl's purse.  Dr. Morgan answered in public school we are not held to the same standard and can search.

Board of Education Minutes of a Study Session at 3-4.  The Plaintiffs suggest that this evidence tends to show that the School Board knew of the search policy and the executive team's interpretation of the search policy.  See Plaintiffs' Letter at 1.  The Court has substantially found the fact that the Plaintiffs ask the Court to find, but not on this basis: the statement correctly relates the law, in the sense that the Constitution does not hold public schools to the same standards that police must follow.  As for the second clause -- "can search" -- the statement is inconclusive about the basis for that search.  The Court rests its fact on more sound bases -- principally, that School Board members had attended proms in the past and observed the search procedures that were in place.

aware of, and several members had personally observed, the long-standing SFPS search custom and practice."  Plaintiffs' Letter at 1.  They Plaintiffs quote the following portion of the Gutierrez Depo. Vol. I:

> Q.     Do you have any knowledge of whether the Board of Education is aware of the fact that principals are permitted to develop procedures that are inconsistent with the "LOCKER AND STUDENT SEARCHES" policy?
>
> A.     The Board of Education is aware that we do searches for prom and graduation.
>
> Q.     And when did the Board become aware of that fact?
>
> A.     I guess for as long as I can remember in working at this level.  I mean, we've even had Board members that come and help chaperone and assist in the past and have observed the procedures that we use for checking students before permitting them into the dance.

Gutierrez Depo. Vol. I at 131:8-25.  See Plaintiffs' Letter at 2.  They note that, because "SFPS has consistently conducted pat-down searches as part of the search process at dances for at least seven years," "[t]he searches the Board members observed, therefore, necessarily included pat-downs."  Plaintiffs' Letter at 2.

The Plaintiffs further note that, during the hearing, the Court asked the SFPS Defendants' counsel "whether Ms. Gutierrez was aware of pat-downs being part of the search practice.  Ms. Gutierrez testified before this Court at the hearing on Plaintiffs' Motion for Temporary Restraining Order that pat-downs were part of the 'standard procedure' for conducting searches of students entering proms."  Plaintiffs' Letter at 2 (citing Transcript of Temporary Restraining Order Hearing at 56:9-58:23 (taken May 19, 2012), filed April 15, 2014 (Doc. 207)).

Finally, the Plaintiffs note

> that SFPS has taken the position during the course of this litigation that the School District has "determined that pat-downs are necessary to detect drugs, alcohol and weapons secreted on the person of its students to prevent a tragedy of teenage alcohol and drug use resulting in injury or death to a student."

Plaintiffs' Letter at 2 (quoting School District Defendants' Response in Opposition to Plaintiffs'

Motion for Temporary Restraining Order at 12, filed May 19, 2011 (Doc. 28)("SFPS Defendants'

TRO Opp.")(emphasis added in Plaintiffs' Letter)).  The Plaintiffs assert that

> SFPS stated in its TRO briefing that "[t]he <u>School District's</u> practice of searching
> students at extracurricular functions has been in place for more than five years --
> spanning Plaintiff Candice Herrera's entire career in high school.  In fact, the
> testimony at the TRO Hearing established that it had been taking place for six to
> seven years."

Plaintiffs' Letter at 2 (quoting SFPS Defendants' TRO Opp. at 3.)(emphasis added in Plaintiffs'

Letter).  The Plaintiffs state that the evidence which they have cited "should help resolve the

questions the Court raised at the hearing about Plaintiffs' ability to prove, if the Court deems

such proof is necessary, that the Board had knowledge of the nature of the SFPS search custom

and practice."  Plaintiffs' Letter at 3.[78]

> The SFPS Defendants' counsel responds:

> Dear Mr. Colfax:

> I do not believe that your 22 page letter submission to Judge Browning constitutes
> proper motion practice under the Federal Rules of Civil Procedure or the Local
> Rules.  While I do recall that the Court invited letter submissions regarding the
> issue of non-payment of Arianna London's sanction, I don't recall that the Court
> established a timeframe for additional briefing on the cross motions for summary
> judgment.  It has now been 6 days since the motions hearing and we are put at a
> significant disadvantage in having to respond to your additional briefing and

---

[78]The Plaintiffs also raise arguments related to Ms. Gutierrez' role in the School Board's
decision-making processes and in this litigation. <u>See</u> Plaintiffs' Letter at 3-4.  These arguments
principally relate to issues that the Plaintiffs do not raise in the briefing on this MSJ, but instead
in their own motion for partial summary judgment.  The Court will consider these arguments in
connection with that motion.  Moreover, the arguments would make no difference to the Court's
disposition of the MSJ, which principally rests on the existence of a years-long practice and on
the fact that the School Board was, taking the evidence in the light most favorable to the
Plaintiffs, on notice of that long-standing practice.
      The Plaintiffs also raise arguments that relate exclusively to ASI New Mexico's motion.
<u>See</u> Plaintiffs' Letter at 4-5.  The Court will not rehearse those arguments in this memorandum
opinion.

> evidence that was delivered directly to the Court without seeking leave of the Court to do so.  I object to your submissions to the Court and ask the Court not to consider this matter absent proper motion practice and an opportunity to be heard.

Electronic Mail Transmission from Gerald Coppler to Reed Colfax, et al., dated April 14, 2014, filed April 14, 2014 (Doc. 208).  The SFPS Defendants did not provide additional briefing or evidence.

> ASI New Mexico responds:
>
> Judge Browning and counsel:
>
> ASI joins SFPS in objecting to Plaintiffs' 22-page letter to the Court, which includes unauthorized additional briefing and record references.  Plaintiffs failed to seek the Court's permission for this briefing, which as SFPS' counsel points out is not allowed by the rules.  With respect to ASI's Motion for Summary Judgment, Plaintiffs are effectively submitting a sur-reply to address the deficiencies of their Response.  Plaintiffs' response ignored ASI's argument with respect to [the issue that the Plaintiffs' Letter raises].  ASI also asks the Court not to consider the unauthorized and belated matter in Plaintiffs' letter.  This submission is particularly inappropriate and contrary to judicial economy in light of the Court's current docket and the short timeframe for consideration of the existing, properly filed briefing and exhibits prior to the May pretrial conference.

Electronic Mail Transmission from Matt T. Tucker to the Court, dated April 14, 2014, filed April 14, 2014 (Doc. 209).  ASI New Mexico did not provide further briefing or evidence.

The Court will consider this additional material.  The Court is sensitive to the Defendants' objections to these arguments' timeliness, but, in the interest of deciding the MSJ and other motions correctly on the merits, the Court concludes that it serves the interests of justice to consider the evidence that the Plaintiffs have cited.  The SFPS Defendants have not disputed the evidence, offered any contrary evidence, or disputed what the Plaintiffs contend.  The SFPS Defendants have had ample opportunity to make their case, and they have declined to put forth further evidence or argument.  Nothing in the rules requires that the Court ignore apparently good evidence because of when it was presented in the summary judgment process.

Moreover, to the extent that anything in the rules would prevent the Court from considering this material, the Court concludes that it is in the interest of justice to consider this material, and, therefore, waives any such prohibition in the local rules.  See D.N.M.LR-Civ. 1.7 ("These rules may be waived by a Judge to avoid injustice.").

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., No. CIV 11-0422 JB/KBM, 2013 WL 3462484, at *23 (D.N.M. June 28, 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[79]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

---

[79]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A C. Wright & A. Miller, Federal Practice & Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).   Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).   It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.   See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).   Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).   "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope

that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254. Third, the court must resolve all reasonable

inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the Court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified-immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

>     At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at 586-87] (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
>     That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]"   York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[80]] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]"  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury."  Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.  And

---

[80]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility. . . .

Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92). In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury.  584 F.3d at 1326-27 (Holmes, J. concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the

purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)). The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983. See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens[ v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971)("Bivens")] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

1.      **Color of State Law**.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'"
Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-
color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . .
furthers the fundamental goals of preserving an area of individual freedom by limiting the reach
of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for
conduct for which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir.
1995).  "The traditional definition of acting under color of state law requires that the defendant in
a § 1983 action have exercised power 'possessed by virtue of state law and made possible only
because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at
49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the
defendant is allegedly 'clothed' may be either actual or apparent."  Jojola v. Chavez, 55 F.3d at
493.  Accordingly, at a base level, to find that an action was taken under color of state law, the
court must find that "'the conduct allegedly causing the deprivation of a federal right' must be
'fairly attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447
(quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state
employment is generally sufficient to render the defendant a state actor . . . . [,]' at the same time,
it is 'well settled that an otherwise private tort is not committed under color of law simply
because the tortfeasor is an employee of the state.'"  Jojola v. Chavez, 55 F.3d at 493 (quoting
Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d
1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it
constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's

use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.    Individual Liability.

Under § 1983, "Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255.  Thus, government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded: "[A] plaintiff who establishes liability for deprivations of constitutional

rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."   Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury complained-of under § 1983, and stated that fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.   Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."   Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."   Id.   In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.   See, e.g., Warner v. Orange County Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.   Thus, in the context of a claim under the Fourth Amendment to the Constitution of the United States of America, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."   Martinez v. Carson, 697 F.3d at 1255.   The Tenth Circuit gave an example of a superseding intervening cause, quoting the Honorable Samuel J. Alito, then-Circuit Judge for the Third Circuit, now-associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.   Once inside, they encounter the suspect, identify themselves, show him

the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 104 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).  If

the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.    **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, [] exercise of control or direction, or [] failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(internal alterations omitted).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not

enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, 2011 WL 7444745, at *25-*26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Aschroft v. Iqbal:

A plaintiff may [] succeed in a § 1983 suit against a defendant-supervisor by

demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in Bd. of Cnty. Comm'rs v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01

(quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

**4.    Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  The Fourteenth Amendment extends the prohibition against unreasonable search and seizures to state officers, including school officials. See New Jersey v. T.L.O., 469 U.S. 325, 334-37 (1985).   "The touchstone for determining the constitutionality of a governmental search is the 'reasonableness' of the search."  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1184 (quoting   Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)).  See Maryland v. King, 133 S. Ct. 1958, 1969 (2013)("'The Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner.'")(quoting Schmerber v. California, 384 U.S. 757, 768 (1966)).  The Supreme Court has reiterated that a warrantless search must be reasonable in its manner and scope, and that the

search's reasonableness depends on balancing legitimate governmental interests against the intrusion upon individual's privacy:

> Even if a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for it must be reasonable in its scope and manner of execution. Urgent government interests are not a license for indiscriminate police behavior. To say that no warrant is required is merely to acknowledge that "rather than employing a per se rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." This application of "traditional standards of reasonableness" requires a court to weigh "the promotion of legitimate governmental interests" against "the degree to which [the search] intrudes upon an individual's privacy."

Maryland v. King, 133 S. Ct. at 1970 (citations omitted).

## 1. The Special-Needs Doctrine.

While "[i]n the criminal context, reasonableness usually requires a showing of probable cause," Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 828 (citing Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 619 (1989)), "in the context of safety and administrative regulations, a search unsupported by probable cause may be reasonable when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable," Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 828-29 (internal quotation marks and citation omitted). The Supreme Court refers to this "exception[] to the warrant and probable-cause requirements for a search when special needs beyond the normal law enforcement make those requirements impracticable" as the "special needs doctrine." Illinois v. Caballes, 543 U.S. 405, 425 (2005)(Ginsburg, J., dissenting)(quoting Griffin v. Wisconsin, 483 U.S. 868, 873 (1987))(internal quotation marks omitted). See Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 707 F. Supp. 2d 1190, 1241 n.36 (D.N.M. 2010)(Browning, J.)("The 'special needs' doctrine, which has been used to uphold certain suspicionless searches performed for reasons unrelated to law

enforcement, is an exception to the general rule that a search must be based on individualized suspicion of wrongdoing.")(quoting <u>Ferguson v. City of Charleston</u>, 532 U.S. 67, 79 n.15 (2001))(internal quotation marks omitted), <u>rev'd in part, vacated in part sub nom., Kerns v. Bader</u>, 663 F.3d 1173 (10th Cir. 2011).

Special needs "inhere in the public school context." <u>Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls</u>, 536 U.S. at 828-29 (stating "that a warrant and finding of probable cause are unnecessary in the public school context because such requirements would unduly interfere with the maintenance of the swift and informal disciplinary procedures [that are] needed," and that strict adherence to the probable-cause requirement would undercut the substantial need for teachers and administrators to maintain order  in the schools)(quoting <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. 646, 653 (1995); <u>New Jersey v. T.L.O.</u>, 469 U.S. at 340-41)).   Thus, although it is well-settled that students do not "shed their constitutional rights . . . at the schoolhouse gate," <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 506 (1969), "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children," <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. at 656.

The Supreme Court has recognized that a search in the school context may still be reasonable without individualized suspicion in "'limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion.'" <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. at 674 (O'Connor, J., dissenting)(quoting <u>United States v. Martinez-Fuerte</u>, 428 U.S. 543, 624 (1976)).  <u>See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls</u>, 536 U.S. at 830 (stating that "a finding of

individualized suspicion may not be necessary when a school conducts drug testing").   The

Supreme Court in New Jersey v. T.L.O. stated that the legality of a student search depends on the

search's reasonableness.   See 469 U.S. at 341-42.   To determine a search's reasonableness, a

court must consider: (i) whether the action was justified at its inception; and (ii) whether the

search was reasonably related in scope to the circumstances which justified the interference.   See

New Jersey v. T.L.O., 469 U.S. at 341-42.   A student search will be justified at its inception when

"there are reasonable grounds for suspecting that the search will turn up evidence that the student

has violated or is violating either the law or the rules of the school."   New Jersey v. T.L.O., 469

U.S. at 341-42.   The search will be reasonable in scope when "the measures adopted are

reasonably related to the objectives of the search and not excessively intrusive in light of the age

and sex of the student and the nature of the infraction."   New Jersey v. T.L.O., 469 U.S. at 342.

The Court has recognized that, ultimately, determining whether a student search is

reasonable requires balancing the students' privacy interest with the government's interest in

performing the search, and then determining whether the scope of the search is reasonably

related to that government interest:

> To determine whether a particular "type of school search is constitutionally
> reasonable," a reviewing court must consider the "scope of the legitimate
> expectation of privacy at issue," the "character of the intrusion that is complained
> of," and the "nature and immediacy of the governmental concern at issue" and the
> efficacy of the means employed for dealing with it.

Herrera v. Santa Fe. Pub. Sch., 792 F. Supp. 2d at 1193 (quoting Vernonia Sch. Dist. 47J v.

Acton, 515 U.S. at 654-66).

## 2.   Controlling Supreme Court Precedent on School-Related Searches.

In Vernonia School District 47J v. Acton, the Supreme Court found that the school

district's student athlete drug policy, which authorized random urinalysis testing of students who

participated in the district's school athletics program, was reasonable and thus constitutional. See 515 U.S. at 646, 665.   In reaching this conclusion, the Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the majority, considered the nature of the privacy interest upon which the search intruded, the intrusiveness of the search, and the nature and immediacy of the governmental concern at issue and the efficacy of the search's means for meeting it.   See 515 U.S. at 665.   The Supreme Court noted that, "[p]articularly with regard to medical examinations and procedures, therefore, 'students within the school environment have a lesser expectation of privacy than members of the population generally.'"   515 U.S. at 656-57 (citation omitted).   "Legitimate privacy expectations are even less with regard to student athletes."   515 U.S. at 656.

> They require "suiting up" before each practice or event, and showering and changing afterwards.   Public school locker rooms, the usual sites for these activities, are not notable for the privacy they afford.   The locker rooms in Vernonia are typical: No individual dressing rooms are provided; shower heads are lined up along a wall, unseparated by any sort of partition or curtain; not even all the toilet stalls have doors.   As the United States Court of Appeals for the Seventh Circuit has noted, there is "an element of 'communal undress' inherent in athletic participation," Schaill by Kross v. Tippecanoe Cnty. Sch. Corp., 864 F.2d 1309, 1318 (1988).

515 U.S. at 657.   The Supreme Court also noted that there was "an additional respect in which school athletes have a reduced expectation of privacy."   515 U.S. at 657.   The Supreme Court stated that, by choosing to go out for a team, students "voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally."   515 U.S. at 657.

> In Vernonia's public schools, they must submit to a preseason physical exam (James testified that his included the giving of a urine sample, App. 17), they must acquire adequate insurance coverage or sign an insurance waiver, maintain a minimum grade point average, and comply with any "rules of conduct, dress, training hours and related matters as may be established for each sport by the head coach and athletic director with the principal's approval."   Record, Exh. 2, p. 30, ¶ 8.   Somewhat like adults who choose to participate in a "closely regulated industry," students who voluntarily participate in school athletics have reason to

expect intrusions upon normal rights and privileges, including privacy.

515 U.S. at 657.[81]

----

[81]The Court has noted that, in light of the Supreme Court's recent decisions in Florida v. Jardines, 133 S. Ct. 1409 (2013), and United States v. Jones, 132 S. Ct. 945 (2012), both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the Katz v. United States reasonable-expectation-of-privacy test is still good law." United States v. Alabi, No. CR 11-2292 JB, 2013 WL 1876791, at *34 (D.N.M. Apr. 30, 2013)(Browning, J.)(citing Minnesota v. Carter, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)).  Although the Court concluded in United States v. Alabi that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the Katz v. United States[, 389 U.S. 347 (1967)] reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach," 2013 WL 1876791, at *35, these two Supreme Court decisions may also raise the question whether a search's reasonableness still hinges on balancing the government's interest in the search against the subject's reasonable privacy expectations.  In June of 2013, however, after having decided Florida v. Jardines, and United States v. Jones, Justice Scalia dissented from the Supreme Court's decision in Maryland v. King, and criticized the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to Katz v. United States and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'" Maryland v. King, 133 S. Ct. at 1986 (Scalia, J., dissenting).  Justice Scalia also pointed out that a person's "privacy-related concerns" in their body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the body is at stake? (The Fourth Amendment lists "persons" first among the entities protected against unreasonable searches and seizures.)

Maryland v. King, 133 S. Ct. at 1982 (Scalia, J., dissenting)(emphasis in original).  Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school. Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

Maryland v. King, 133 S. Ct. 1989 (Scalia, J., dissenting)(emphasis added).  The Court therefore concludes that Justice Scalia, and the Supreme Court, still rely on a person's privacy expectation

Turning to the degree of intrusion, the Supreme Court stated that the degree of intrusion depended upon the manner in which production of the urine sample was monitored.  See 515 U.S. at 658.  Under the district's policy, the male students produced samples at a urinal along a wall and remained fully clothed, and were observed only from behind, if at all, and the female students produced samples in an enclosed stall, with a female monitor standing outside listening for sounds of tampering.  See 515 U.S. at 658.  The Supreme Court stated: "These conditions are nearly identical to those typically encountered in public restrooms, which men, women, and especially schoolchildren use daily.  Under such conditions, the privacy interests compromised by the process of obtaining the urine sample are in our view negligible."  515 U.S. at 658.  The Supreme Court also considered the other privacy-invasive aspect of urinalysis -- the information it discloses concerning a person's body, and the materials he or she has ingested.  See 515 U.S. at 658.  The Supreme Court noted that the tests looked only for standard drugs, that the test results were disclosed only to a limited class of school personnel who "have a need to know," that they were not turned over to the law enforcement authorities, and that they were not used for any internal disciplinary function.  515 U.S. at 658.  Turning to the governmental interest, the Supreme Court found that the concern of deterring drug use was important, that there was an immediate crisis of drug use, and that "a drug problem largely fueled by the 'role model' effect of athletes' drug use, and of particular danger to athletes, is effectively addressed by making sure that athletes do not use drugs."  515 U.S. at 661-64.  Taking into account "the decreased expectation of privacy, the relative unobtrusiveness of the search, and the severity of the need met by the search," the Supreme Court concluded that the policy was reasonable and thus constitutional.  515 U.S. at 664-65.

─────────────────

as one side of the reasonableness balancing equation when determining whether a search is reasonable for Fourth Amendment purposes.

In Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls, the Supreme Court considered whether a student activities drug testing policy, which required all students who participated in competitive extracurricular activities to submit to drug testing, was constitutional, because it reasonably served the school district's important interest in detecting and preventing drug use among its students.  See 536 U.S. at 825.  The Supreme Court noted that a "student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety."  536 U.S. at 830.  The Supreme Court concluded that the students affected by the policy had a limited expectation of privacy, because the students who participated in the competitive extracurricular activities voluntarily subjected themselves to many of the same intrusions of their privacy as do student athletes. See 536 U.S. at 831.  The Supreme Court stated:

> Some of these clubs and activities require occasional off-campus travel and communal undress.  All of them have their own rules and requirements for participating students that do not apply to the student body as a whole.  For example, each of the competitive extracurricular activities governed by the Policy must abide by the rules of the Oklahoma Secondary Schools Activities Association, and a faculty sponsor monitors the students for compliance with the various rules dictated by the clubs and activities.  This regulation of extracurricular activities further diminishes the expectation of privacy among schoolchildren.

536 U.S. at 832.  The Supreme Court also found that, given the "minimally intrusive nature of the sample collection and the limited uses to which the test results are put, we conclude that the invasion of students' privacy is not significant."  536 U.S. at 833.  The policy required a faculty monitor to wait outside the closed restroom stall, listening for normal sounds of urination to guard against tampered samples, while the student produced a sample.  See 536 U.S. at 832-33. The policy also required test results to be kept in confidential files separate from the student's other educational records and that the results be released to school personnel only on a need-to-

know basis.  See 536 U.S. at 833.  The Supreme Court analogized this policy to the policy in Vernonia School District 47J v. Acton and found that, as the policy in Vernonia School District 47J v. Acton, it was minimally intrusive.  See 536 U.S. at 833-34.  The Supreme Court further noted that governmental concern in preventing drug use by schoolchildren is an important concern, and that "the necessity for the State to act is magnified by the fact that this evil is being visited not just upon individuals at large, but upon children for whom it has undertaken a special responsibility of care and direction."  536 U.S. at 834.  The Supreme Court also noted that the school district presented specific evidence of drug use in the schools.  See 536 U.S. at 835.  The Supreme Court found that, given the nationwide epidemic of drug use, and the evidence of increased drug use in the district's schools, it was reasonable for the school district to enact the drug testing policy.  See 536 U.S. at 836.

In Safford Unified School District No. 1 v. Redding, the Supreme Court held that a strip search, based upon individualized suspicion, in which school employees required a student suspected of dealing pharmaceutical drugs at school to "remove her clothes down to her underwear, and then 'pull out' her bra and the elastic band on her underpants," was an unreasonable search in violation of the student's Fourth Amendment rights.  Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 374 (2009).  The week before the search, another student told the assistant principal, Kerry Wilson, that students were bringing drugs and weapons on campus, and that he had been sick after taking pills that a classmate gave him.  See 557 U.S. at 371-72.  That student then handed a pill to Wilson and identified another student, Marissa Glines, as having given him the pill.  Wilson called Glines out of class and found a day planner with various contraband items, and required Glines to turn out her pockets and open her wallet, in which Wilson found a blue pill, several white pills, and a razor blade.  When Wilson asked where

Glines obtained the blue pill, Glines indicated that another student, Savana Redding, gave the pill to her, and denied knowing about the day planner and the contraband items found within the planner.  See 557 U.S. at 372.  "Wilson did not ask [Glines] any followup questions to determine whether there was any likelihood that [Redding] presently had pills: neither asking when [Glines] received the pills from [Redding] nor where [Redding] might be hiding them."  557 U.S. at 372.  Wilson, and the school's administrative assistant, Helen Romero, required Glines to undergo a search of her bra and underpants by the administrative assistant and the school nurse, which did not turn up any additional pills.  See 557 U.S. at 373.  Wilson then called Redding to his office and showed her the day planner.  "[W]hile she denied knowledge of the contraband, [Redding] admitted that the planner was hers and that she had lent it to [Glines]."  557 U.S. at 373.  In relation to Redding, the Supreme Court noted:

> Wilson had other reports of their friendship from staff members, who had identified [Redding] and [Glines] as part of an unusually rowdy group at the school's opening dance in August, during which alcohol and cigarettes were found in the girls' bathroom.  Wilson had reason to connect the girls with this contraband, for Wilson knew that Jordan Romero [the student who had originally complained and gotten sick] had told the principal that before the dance, he had been at a party at [Redding]'s house where alcohol was served.  [Gline]'s statement that the pills came from [Redding] was thus sufficiently plausible to warrant suspicion that [Redding] was involved in pill distribution.

557 U.S. at 373.  Wilson next showed Redding the blue pill and the white pills, and asked her whether she knew anything about them.  See id. at 368.  Redding said that she did not.  When Wilson told Redding that it had been reported to him that she was distributing the pills, she denied doing so and granted Wilson permission to "search her belongings."  557 U.S. at 368.  Romero came in and helped Wilson search through Redding's backpack, which did not turn up any contraband or pills.  Wilson then told Romero to take Redding to the nurse's office to search her clothes for pills.

> Romero and the nurse, Peggy Schwallier, asked [Redding] to remove her jacket, socks, and shoes, leaving her in stretch pants and a T-shirt (both without pockets), which she was then asked to remove. Finally, [Redding] was told to pull her bra out and to the side and shake it, and to pull out the elastic on her underpants, thus exposing her breasts and pelvic area to some degree.  No pills were found.

557 U.S. at 369.  Redding's mother filed suit against the school district, Wilson, Romero, and Schwallier.  See 557 U.S. at 369.  The United States Court of Appeals for the Ninth Circuit, sitting en banc, held that the strip search violated Redding's Fourth Amendment rights and concluded that Schwallier and Romero were not liable "since they had not acted as independent decisionmakers."  557 U.S. at 369-70 (citing Redding v. Safford Unified Sch. Dist. No. 1, 531 F.3d 1071, 1089 (9th Cir. 2008)(en banc)). The Ninth Circuit held that Redding's Fourth Amendment rights were, however, clearly established at the time of the search and that Wilson was thus not protected by qualified immunity, because "these notions of personal privacy are 'clearly established' in that they inhere in all of us, particularly middle school teenagers, and are inherent in the privacy component of the Fourth Amendment's proscriptions against unreasonable searches."  Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 369 (quoting Redding v. Safford Unified Sch. Dist. No. 1, 531 F.3d at 1089).

In relation to whether the search was unreasonable, and thus violated Redding's constitutional rights, the Supreme Court first concluded that the New Jersey v. T.L.O. reasonable suspicion standard applied to Wilson's search of Redding's backpack:

> There is no question here that justification for the school officials' search was required in accordance with the T.L.O. standard of reasonable suspicion, for it is common ground that [Redding] had a reasonable expectation of privacy covering the personal things she chose to carry in her backpack, and that Wilson's decision to look through it was a "search" within the meaning of the Fourth Amendment.

Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 373 n.3.  The Supreme Court held that Wilson's suspicion up to the time that he searched Redding's backpack and Romero searched her

"outer clothing" was sufficient to make that extent of the search reasonable:

> If a student is reasonably suspected of giving out contraband pills, she is reasonably suspected of carrying them on her person and in the carryall that has become an item of student uniform in most places today.  If Wilson's reasonable suspicion of pill distribution were not understood to support searches of outer clothes and backpack, it would not justify any search worth making.  And the look into [Redding]'s bag, in her presence and in the relative privacy of Wilson's office, was not excessively intrusive, any more than Romero's subsequent search of her outer clothing.

557 U.S. at 373-74.  The Supreme Court agreed with the Ninth Circuit, concluding that Wilson's direction to extend the search and require Redding to "pull her underwear away from her body in the presence of the two officials who were able to see her necessarily exposed her breasts and pelvic area to some degree," and overstepped the intrusion which Wilson's suspicions permitted and constituted an unreasonable search.  557 U.S. at 374.  The Honorable David Souter, former Associate Justice for the Supreme Court, who penned the decision, pointed out that there is "obviously different meaning of a search exposing the body from the experience of nakedness or near undress in other school circumstances.  Changing for gym is getting ready for play; exposing for a search is responding to an accusation reserved for suspected wrongdoers and fairly understood as . . . degrading."  557 U.S. at 375.  Justice Souter noted that "[t]he indignity of the search does not, of course, outlaw it," but concluded that "the content of the suspicion failed to match the degree of intrusion."  557 U.S. at 375.  Justice Souter reasoned:

> Wilson knew beforehand that the pills were prescription-strength ibuprofen and over-the-counter naproxen, common pain relievers equivalent to two Advil, or one Aleve.  He must have been aware of the nature and limited threat of the specific drugs he was searching for, and while just about anything can be taken in quantities that will do real harm, Wilson had no reason to suspect that large amounts of the drugs were being passed around, or that individual students were receiving great numbers of pills.
>
> Nor could Wilson have suspected that [Redding] was hiding common painkillers in her underwear. Petitioners suggest, as a truth universally acknowledged, that "students . . . hid[e] contraband in or under their clothing,"

and cite a smattering of cases of students with contraband in their underwear.  But when the categorically extreme intrusiveness of a search down to the body of an adolescent requires some justification in suspected facts, general background possibilities fall short; a reasonable search that extensive calls for suspicion that it will pay off.  But nondangerous school contraband does not raise the specter of stashes in intimate places, and there is no evidence in the record of any general practice among Safford Middle School students of hiding that sort of thing in underwear; neither Jordan nor [Gline] suggested to Wilson that [Redding] was doing that, and the preceding search of [Gline] that Wilson ordered yielded nothing.  Wilson never even determined when [Gline] had received the pills from [Redding]; if it had been a few days before, that would weigh heavily against any reasonable conclusion that [Redding] presently had the pills on her person, much less in her underwear.

 In sum, what was missing from the suspected facts that pointed to [Redding] was any indication of danger to the students from the power of the drugs or their quantity, and any reason to suppose that [Redding] was carrying pills in her underwear.  We think that the combination of these deficiencies was fatal to finding the search reasonable.

557 U.S. at 375-77.

Justice Souter, with whom Chief Justice Roberts, Justices Scalia, Kennedy, Breyer, Alito, and Thomas joined, disagreed, however, with the Ninth Circuit's conclusion that Redding's right was clearly established, and held that Wilson was entitled to qualified immunity.  See 557 U.S. at 377-79.  Justice Souter noted that "there is no need that the very action in question have previously been held unlawful" and that "officials can still be on notice that their conduct violates established law in novel factual circumstances."  557 U.S. at 377-78 (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999); Hope v. Pelzer, 536 U.S. 730, 741 (2002))(internal quotation marks omitted).  Justice Souter nevertheless concluded that, because "the number of cases viewing school strip searches differently from the way we see them are numerous enough, with well-reasoned majority and dissenting opinions, [there existed] doubt that we were sufficiently clear in the prior statement of the law."  Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 378-79.  The Supreme Court accordingly held that the circumstances "warranted" granting

- 106 -

Wilson qualified immunity.  557 U.S. at 379.  In reaching this conclusion, the Supreme Court's

decision was informed by the fact that

> other courts considering qualified immunity for strip searches have read T.L.O. as
> "a series of abstractions, on the one hand, and a declaration of seeming deference
> to the judgments of school officials, on the other," which made it impossible "to
> establish clearly the contours of a Fourth Amendment right . . . [in] the wide
> variety of possible school settings different from those involved in T.L.O." itself.

557 U.S. at 378 (alterations in original)(quoting Jenkins v. Talladega City Bd. of Ed., 115 F.3d

821, 828 (11th Cir. 1997)(en banc)).

**3.      School-Related Search Precedent.**

In Doe ex rel. Doe v. Little Rock School District, 380 F.3d 349 (8th Cir. 2004), the United

States Court of Appeals for the Eighth Circuit found that the practice of the Little Rock School

District ("LRSD"), which subjected students to random, suspicionless searches of their persons

and belongings by school officials was unconstitutional, because the searches unreasonably

invaded the students' legitimate expectations of privacy.  380 F.3d at 351.  The Eighth Circuit

noted that public school students have lesser expectations of privacy, owing, in large part, to the

government's responsibilities as guardian and tutor of the children entrusted to its care.  See 380

F.3d at 353.  The Eighth Circuit stated however, that "[p]ublic school students' privacy interests,

however, are not nonexistent."  380 F.3d at 353.

> It is true that the legitimate expectation of privacy retained by members of certain
> sub-populations of a public school's student body falls below the already limited
> baseline level of privacy afforded to public school students generally.  For
> instance, the Supreme Court has analogized students who voluntarily participate
> in school athletics or other competitive extracurricular activities to adults who
> choose to participate in a "closely regulated industry," in that both groups
> voluntarily subject themselves to "intrusions upon normal rights and privileges,
> including privacy."  Vernonia, 515 U.S. at 656-57 . . .  (internal quotations
> omitted); Earls, 536 U.S. at 831-32 . . . .  Sports and other competitive
> extracurricular activities usually have separate systems of rules that do not apply
> to the student body as a whole, and often involve such requirements as mandatory
> physicals, frequent communal undress, and traveling and lodging in close

confines.  By consciously choosing to "go out for the team" or other competitive extracurricular endeavor, such students agree to waive certain privacy expectations that they would otherwise have as students in exchange for the privilege of participating in the activity.  But the search regime at issue here is imposed upon the entire student body, so the LRSD cannot reasonably claim that those subject to search have made a voluntary tradeoff of some of their privacy interests in exchange for a benefit or privilege.

380 F.3d at 353-54.  The Eighth Circuit then inquired into the intrusiveness of the search.

See 380 F.3d at 354.  The Eighth Circuit stated that the search invaded students' privacy interests

in a major way, stating that "[a] search of a child's person or of a closed purse or other bag

carried on her person, no less than a similar search carried out on an adult, is undoubtedly a

severe violation of subjective expectations of privacy."  380 F.3d at 354 (citation omitted).

"Students often carry items of a personal or private nature in their pockets and bags, and many

students (whether or not they are carrying contraband) must surely feel uncomfortable or

embarrassed when officials decide to rifle through their personal belongings."  380 F.3d at 654-

55.

> Whatever privacy interests the LRSD students have in the personal belongings that they bring to school are wholly obliterated by the search practice at issue here, because all such belongings are subject to being searched at any time without notice, individualized suspicion, or any apparent limit to the extensiveness of the search.  Full-scale searches that involve people rummaging through personal belongings concealed within a container are manifestly more intrusive than searches effected by using metal detectors or dogs.  Indeed, dogs and magnetometers are often employed in conducting constitutionally reasonable large-scale "administrative" searches precisely because they are minimally intrusive, and provide an effective means for adducing the requisite degree of individualized suspicion to conduct further, more intrusive searches.  The type of search that the LRSD has decided to employ, in contrast, is highly intrusive, and we are not aware of any cases indicating that such searches in schools pass constitutional muster absent individualized suspicion, consent or waiver of privacy interests by those searched, or extenuating circumstances that pose a grave security threat.

380 F.3d at 355.  The Eighth Circuit also noted that the character of the intrusions were

qualitatively more severe than that in Vernonia School District 47J v. Acton and Board of

Education of Independent Sch. Dist. No. 92 of Pottawatomie County v. Earls, because, in the

case before it, the searches could lead directly to the imposition of criminal sanctions.  See 380

F.3d at 355.  The Eighth Circuit further found that LRSD failed to demonstrate the existence of a

need sufficient to justify the substantial intrusion.  See 380 F.3d at 356.

> While the LRSD has expressed some generalized concerns about the existence of
> weapons and drugs in its schools, it conceded at oral argument that there is
> nothing in the record regarding the magnitude of any problems with weapons or
> drugs that it has actually experienced.  All schools surely have an interest in
> minimizing the harm that the existence of weapons and controlled substances
> might visit upon a student population, but public schools have never been entitled
> to conduct random, full-scale searches of students' personal belongings because of
> a mere apprehension.

380 F.3d at 356.  The Eighth Circuit determined that LSRD's search practice was unreasonable,

because LRSD's search practice effectively reduced expectations of privacy to nothing, and there

was no evidence of unique circumstances that would justify significant intrusions.  See 380 F.3d

at 356.

    In B.C. v. Plumas Unified School District, 192 F.3d 1260 (9th Cir. 1999), the Ninth

Circuit concluded that the "random and suspicionless dog sniff search" of a high school student

"was unreasonable in the circumstances."[82]  192 F.3d at 1267.  The Ninth Circuit found that the

students' privacy interests were not minimal, although they have a lesser expectation of privacy

than members of the population generally.  See 192 F.3d at 1267.  The Ninth Circuit stated that

deterring drug use by students is an important -- if not compelling -- government interest, but

noted that the record did not disclose that there was a drug crisis or a drug problem at the high

school.  See 192 F.3d at 1268.  "In the absence of a drug problem or crisis at Quincy High, the

government's important interest in deterring student drug use would not have been placed in

---

[82] The Ninth Circuit found that the dog sniff was a search, because it infringed the
student's reasonable expectation of privacy.  See 192 F.3d at 1266.

jeopardy by a requirement of individualized suspicion."  192 F.3d at 1268 (internal quotation

marks and citation omitted).

In Hough v. Shakopee Public Schools, 608 F. Supp. 2d 1087 (D. Minn. 2009), the United

States District Court for the District of Minnesota found that a policy of daily, suspicionless

searches was not reasonable and thus was unconstitutional.  See 608 F. Supp. 2d at 1108.  The

district court recognized that the expectation of privacy of any student is limited in a public

school environment.  See 608 F. Supp. 2d at 1100-01.  The defendant argued that students

waived their right to privacy when they chose to accept special education services from the

school district.  See 608 F. Supp. 2d at 1101.  The district court rejected this argument, stating

that

> participating in a special-education program is very different from participating in
> athletics (as in Vernonia School District) or in competitive extracurricular
> activities (as in Earls).  No student is entitled under the law to play football or
> sing in the choir, but every disabled student is entitled under the law to
> special-education services.  Moreover, because school attendance is compulsory, a
> student's participation in a special-education program is not voluntary in the same
> way that participation in extracurricular activities is voluntary.  MRVSEC "cannot
> reasonably claim that those subject to search have made a voluntary tradeoff of
> some of their privacy interests in exchange for a benefit or privilege." Doe, 380
> F.3d at 354.

608 F. Supp. 2d at 1101.  The district court found that the special-education students' legitimate

expectation of privacy fell below the "already limited baseline level of privacy afforded to public

school students generally," because they sacrifice the privacy of medical and other information

about their disabilities, but stated that the students "nevertheless retain some legitimate

expectation of privacy in their bodies, clothing, and personal possessions."  608 F. Supp. 2d at

1103.  The district court found that the searches were intrusive.  See 608 F. Supp. at 1103.

Generally, students were asked to remove their shoes and socks, turn down the waistband of their

pants, empty their pockets, search their backpacks and purses, and, at times, submit to a pat

down.  See 608 F. Supp. 2d at 1103.  The district court stated:

> On the whole, MRVSEC's searches were extraordinarily intrusive.  As in Doe, the students' backpacks and purses, and the contents of their pockets, were searched.  Doe found such searches to be "highly intrusive" and characterized them as "wholly obliterating" the students' "privacy interests . . . in the personal belongings that they bring to school."  Id. at 355.  But whereas Doe involved occasional searches of the possessions of randomly selected students, MRVSEC searched the possessions of every student every day.  Thus, even if MRVSEC had stopped at searching possessions, its searches would have been far more intrusive than the "highly intrusive" searches struck down in Doe.
>
> But MRVSEC did not stop at searching possessions.  MRVSEC searched people. The students not only had their backpacks, purses, and the contents of their pockets searched, but students were required to partially disrobe (i.e., to take off their shoes and socks, and sometimes coats, sweaters, or sweatshirts) and to permit school employees to look inside their clothes (i.e., under their waistbands and pant legs).  And, most importantly, the students were touched. Every day, every student either was patted down or was at least subject to being patted down.
>
> MRVSEC's searches were as intrusive as any government search that any American citizen is likely to experience in her lifetime, unless she is incarcerated. Anyone who has been thoroughly searched at an airport -- who has had her arms, legs, chest, and back touched by a stranger, and then had her most personal possessions pawed through -- knows exactly how intrusive such a search is.  The MRVSEC searches were even more intrusive, and every student experienced them every day.
>
> In sum, the Court concludes that the MRVSEC searches were extraordinarily intrusive -- far more intrusive than the searches approved in Vernonia School District and Earls, and far more intrusive than the searches disapproved in Doe. In none of those cases did school officials, without individualized suspicion, force students to take off clothing, look inside of students' clothing, or touch students.  Indeed, with the exception of one case . . . involving students who had committed crimes and were attending what was essentially a correctional facility, defendants have not cited a single case in which a court approved suspicionless searches of students that were nearly as intrusive as MRVSEC's.

608 F. Supp. 2d at 1105.  The district court found that the evidence regarding the purpose of the

policy, which was to remove distractions and dangerous items, and to create a calm and focused

environment where students feel safe, was insufficient to justify an intrusive search of every

student every day.  See 608 F. Supp. 2d at 1106.  The district court stated:

MRVSEC has given the Court no reason to believe that far less intrusive searches would not adequately ensure compliance with the guidelines about dangerous and distracting items. Virtually every item that school officials have identified as being dangerous or distracting (guns, knives, cell phones, iPods, and lighters), as well as virtually every dangerous or distracting item that any plaintiff has ever brought to school (Leatherman multi-tools, nunchaku, and lighters), could be detected with a metal detector.  Such screening would be far less intrusive than the searches MRVSEC now employs -- and, quite possibly, would be more effective at detecting dangerous or distracting items.

. . . .

The search policy could be narrowed in other respects.  The policy could be changed so that illegal items that are found are not required to be turned over to law enforcement.  Students could be given the option of checking backpacks, purses, and coats with school officials at the beginning of the day in lieu of having those items searched.  And more thorough searches could be reserved for students who set off a metal detector or otherwise give school officials some reason to suspect that they are carrying dangerous or disruptive items.  MRVSEC has submitted no evidence that these or other less intrusive alternatives would not adequately accomplish the purposes of the intrusive searches that MRVSEC now employs.

608 F. Supp. 2d at 1106-07.  Balancing these factors, the district court thus concluded that the

policy of daily, suspicionless searches was not reasonable.  See 608 F. Supp. 2d at 1109.

In United States v. Hartwell, 436 F.3d 174 (3d Cir. 2006), the United States Court of

Appeals for the Third Circuit addressed a similar issue but in a non-school setting -- whether a

search that Transportation Security Administration ("TSA") agent conducted offended the Fourth

Amendment.   436 F.3d at 175.   On May 17, 2003, Hartwell arrived at the Philadelphia

International Airport.  See 436 F.3d at 175.  "He reached the security checkpoint, placed his hand

luggage on a conveyor belt to be x-rayed, and approached the metal detector.  Hartwell's luggage

was scanned without incident, but he set off the magnetometer when he walked through."  436

F.3d at 175.  Hartwell removed all items from his pockets and passed through the metal detector

again.  See 436 F.3d at 175.  A TSA agent took Hartwell aside after he passed through the metal

detector and used a handheld "wand-like magnetometer to discover what set off the metal

detector." 436 F.3d at 175. The wand revealed a solid object in Hartwell's cargo pants pocket.

See 436 F.3d at 175-76. The agent asked what the object was, but Hartwell did not respond.

See id. at 176.

> What occurred next is the subject of some dispute. Hartwell claims that he was escorted to a private screening room near the checkpoint, where he refused Padua's repeated requests to reveal the contents of his pocket. Frustrated by Hartwell's unresponsiveness, Padua eventually reached into Hartwell's pocket and pulled out a package of drugs. He immediately called the Philadelphia police, who searched Hartwell, found two additional packages of drugs and about $3000 in cash, and promptly arrested him.
>
> The government claims that neither Padua nor the police officer ever reached into Hartwell's pocket without his consent. According to Agent Padua, the following occurred. After requesting private screening, Hartwell refused several requests to empty his pocket, nervously backed away from Agent Padua while he was being questioned, and suddenly dropped his pants. This suspicious behavior prompted Padua to call for backup. A police officer arrived and asked Hartwell to remove any items from his pocket, and Hartwell complied by handing over one package of drugs. He then feigned falling to the floor and dropped a second package of drugs.

436 F.3d at 176. The Third Circuit found that the administrative-search doctrine justified the

search at the airport checkpoint. See 436 F.3d at 178. The Third Circuit noted that

"[s]uspicionless checkpoint searches are permissible under the Fourth Amendment when a court

finds a favorable balance between the gravity of the public concerns served by the seizure, the

degree to which the seizure advances the public interest, and the severity of the interference with

individual liberty." 436 F.3d at 178-79 (quoting Illinois v. Lidster, 540 U.S. 419, 427 (2004);

Brown v. Texas, 443 U.S. 47, 51 (1979))(internal quotation marks omitted). The Third Circuit

found that the airport checkpoint passed the test set forth in Brown v. Texas.

> First, there can be no doubt that preventing terrorist attacks on airplanes is of paramount importance.
>
> Second, airport checkpoints also "advance[] the public interest," as Brown requires. As this Court has held, "absent a search, there is no effective means of detecting which airline passengers are reasonably likely to hijack an airplane."

Additionally, it is apparent that airport checkpoints have been effective.

Third, the procedures involved in Hartwell's search were minimally intrusive. They were well-tailored to protect personal privacy, escalating in invasiveness only after a lower level of screening disclosed a reason to conduct a more probing search. The search began when Hartwell simply passed through a magnetometer and had his bag x-rayed, two screenings that involved no physical touching. Only after Hartwell set off the metal detector was he screened with a wand -- yet another less intrusive substitute for a physical pat down. And only after the wand detected something solid on his person, and after repeated requests that he produce the item, did the TSA agents (according to Hartwell) reach into his pocket.

In addition to being tailored to protect personal privacy, other factors make airport screening procedures minimally intrusive in comparison to other kinds of searches. Since every air passenger is subjected to a search, there is virtually no "stigma attached to being subjected to search at a known, designated airport search point." Moreover, the possibility for abuse is minimized by the public nature of the search. "Unlike searches conducted on dark and lonely streets at night where often the officer and the subject are the only witnesses, these searches are made under supervision and not far from the scrutiny of the traveling public." And the airlines themselves have a strong interest in protecting passengers from unnecessary annoyance and harassment.

Lastly, the entire procedure is rendered less offensive -- if not less intrusive -- because air passengers are on notice that they will be searched. Air passengers choose to fly, and screening procedures of this kind have existed in every airport in the country since at least 1974. The events of September 11, 2001, have only increased their prominence in the public's consciousness. It is inconceivable that Hartwell was unaware that he had to be searched before he could board a plane. Indeed, he admitted that he had previously been searched before flying.

In conclusion, Hartwell's search does not offend the Fourth Amendment even though it was initiated without individualized suspicion and was conducted without a warrant. It is permissible under the administrative search doctrine because the State has an overwhelming interest in preserving air travel safety, and the procedure is tailored to advance that interest while proving to be only minimally invasive, as that term is understood in <u>Brown</u>.

436 F.3d at 179-81 (internal citations and footnotes omitted).

<u>**ANALYSIS**</u>

The Court will grant the MSJ in part and deny it in part.  There is sufficient evidence in the record from which a reasonable jury could find that the SFPS Defendants had a custom or practice of conducting suspicionless pat-down searches before school events; that this policy caused the Plaintiffs' injuries, insofar as they relate to the suspicionless nature of the searches; and that the SFPS Defendants acted with the requisite state of mind.  There is not, however, sufficient evidence in the record from which a jury could reasonably hold the SFPS Defendants accountable for the invasive manner in which ASI New Mexico conducted the pat-down searches.  The Court will not limit the Plaintiffs' potential recovery to nominal damages, because there is sufficient evidence on which a reasonable jury could hold that the Plaintiffs have suffered compensable harm beyond the abstract harm to their constitutional rights and that the SFPS Defendants caused some percentage of that harm.  Finally, the Court will deny the MSJ as to that portion of the Plaintiffs' claims that relates to possession searches and seizures.  The SFPS Defendants only cursorily refer to those claims in the MSJ, leaving the argument substantially undeveloped until the Reply.  Moreover, on the merits, a reasonable jury could find that the SFPS Defendants had a custom or practice of conducting suspicionless possession searches and seizures before school events, that this policy injured the Plaintiffs, and that the SFPS Defendants acted with the requisite state of mind.

**I.    THERE IS SUFFICIENT EVIDENCE ON WHICH A REASONABLE JURY COULD FIND THAT THE SFPS DEFENDANTS HAD A CUSTOM OR PRACTICE OF CONDUCTING SUSPICIONLESS SEARCHES BEFORE SCHOOL EVENTS; THAT THIS CUSTOM OR PRACTICE CAUSED A PORTION OF THEIR DAMAGES; AND THAT THE SFPS DEFENDANTS <u>ACTED WITH DELIBERATE INDIFFERENCE.</u>**

There is sufficient evidence on which a reasonable jury could find that the SFPS Defendants had a custom or practice of conducting suspicionless searches before school events.

The evidence is primarily circumstantial, but there is enough of it that a reasonable jury could conclude that the SFPS Defendants trained its agents in search policy with deliberate indifference: that is, there is enough evidence from which a jury could infer that the suspicionless-search practice was widespread, that the SFPS Defendants were on notice of the practice, and that they were deliberately indifferent to this pattern of constitutional violations. The jury also could reasonably conclude that this deliberate indifference was the moving force behind the Plaintiffs' constitutional injuries, and that the SFPS Defendants acted with a culpable state of mind. Accordingly, summary judgment as to that portion of the Plaintiffs' claims that relates to the suspicionless nature of the searches conducted is inappropriate.

The Tenth Circuit, in an opinion that Judge Scott M. Matheson, Jr. authored, and Judges Paul Kelly, Jr. and William J. Holloway, Jr. joined, has recently succinctly laid out municipal-liability law:

> . . . *Municipal Liability*
>
> In contrast to individual supervisor liability, we have explained that nothing in Iqbal changed the "longstanding interpretation" of § 1983's standards for imposing municipal liability. Dodds[ v. Richardson, 614 F.3d 1185, 1202 (10th Cir. 2010)]. That interpretation dates back to Monell v. Department of Social Services, 436 U.S. [at 691-92], which held that a plaintiff must identify "a government's policy or custom" that caused the injury. In later cases, the Supreme Court required a plaintiff to show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury. See [Board of County Comm'rs v.] Brown, 520 U.S. at 403 . . . ; see also City of Canton v. Harris, 489 U.S. 378, 389 . . . (1989). We briefly discuss each of the three elements: (1) official policy or custom, (2) causation, and (3) state of mind.
>
> **i. *Official Policy or Custom***
>
> In Monell, the Supreme Court stated that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." 436 U.S. at 691 . . . . "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,

inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694 . . . .

"The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."  Pembaur v. City of Cincinnati, 475 U.S. 469 . . . .  A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision.  See Martin A. Schwartz, Section 1983 Litigation Claims & Defenses, § 7.06[A] (2013), available at Westlaw SNETLCD.

* * * *

### ii. *Causation*

To establish the causation element, the challenged policy or practice must be "closely related to the violation of the plaintiff's federally protected right." Schwartz, at § 7.12[B].  This requirement is satisfied if the plaintiff shows that "the municipality was the 'moving force' behind the injury alleged." Brown, 520 U.S. at 404 . . . .

[The plaintiff] must therefore "demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  Id.  As with so-called supervisory liability discussed above, municipal liability in a § 1983 case cannot be established on a theory of vicarious liability.  "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  Id. at 405 . . . .  "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring."  Schwartz, at § 7.12.

### iii. *State of mind*

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  Brown, 520 U.S. at 407 . . . ; see also City of Canton, 489 U.S. at 389 . . . .

The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard

the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]

Barney, 143 F.3d at 1307 (citations and internal quotation marks omitted).

Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 769-771 (10th Cir. 2013). The

issues, then, are whether there is enough evidence that a reasonable jury could conclude that:

(i) the SFPS Defendants had a well-settled custom or practice, or deliberately indifferent training

or supervision; (ii) the SFPS Defendants' well-settled custom or practice is closely related to the

violation of the Plaintiffs' Fourth Amendment rights -- that is, it is the moving force behind the

injury alleged -- and (iii) whether the SFPS Defendants adopted this practice with deliberate

indifference to its known or obvious consequences. The Court concludes that there is enough

evidence that a reasonable jury could find for the Plaintiffs on each point. Accordingly,

summary judgment is inappropriate.

### A. A REASONABLE JURY COULD DEEM THE PRACTICE OF SUSPICIONLESS PAT-DOWN SEARCHES TO ARISE FROM THE SFPS DEFENDANTS' DELIBERATELY INDIFFERENT TRAINING OR SUPERVISION.

There is enough evidence that a reasonable jury could deem the practice of suspicionless

pat-down searches to arise from the SFPS Defendants' deliberately indifferent training or

supervision.[83] The Court is conscious that the SFPS Defendants have not promulgated a formal

---

[83]The Court's analysis diverges slightly from the briefing and the pleading, in that the Plaintiffs did not formally rely on the phrase "deliberate indifference" in either the Complaint or Response. Cases on which the Plaintiffs rely make clear, however, the role that the "deliberate indifference" analysis plays in municipal liability claims based on both failure to train and failure to supervise. Response at 26-27 (citing Connick v. Thompson, 131 S. Ct. at 1360; Anderson v. City of Atlanta, 778 F.2d 678, 685-86 (11th Cir. 1985)). Moreover, the Court notes that, although the Complaint uses only the phrase "failed to train," Complaint ¶ 115, at 21, and not

policy of suspicionless searches -- and that they have, in the Code of Conduct, formally prohibited that policy.  A reasonable jury could, however, conclude that the SFPS Defendants were on notice that, despite the limits in the SFPS Defendants' formal policy, in practice, ASI New Mexico had, for years, conducted suspicionless pat-down searches at proms.  Accordingly, a jury may deem the SFPS Defendants deliberately indifferent for failing to change their training and supervision practices.

As all parties agree, no formal policy of the SFPS Defendants caused the Plaintiffs' constitutional injuries.  The parties have agreed, and the Court has found undisputed, that

> [n]othing in the School Board's Code of Conduct authorizes searches as alleged by the Plaintiffs or suspicionless possession and pat-down searches as occurred at the Prom.  To the contrary, it provides that "[m]ore intrusive searches, such as pat-downs, may be conducted only on the basis of reasonable suspicion of the individual student to be searched" (Code of Conduct, Exhibit 1 at p. 57) and "[p]urses, wallets, book bags, cell phones, and similar items of student's [sic] personal property may be searched when school officials have individualized reasonable suspicion that such personal property contains contraband in violation of school rules or state or federal law" (**Id.**, p. 58).

MSJ ¶ 9, at 5-6 (emphasis in original)(correction added)(setting forth this fact); Response ¶ 9, at 3 (stating that this fact is "[u]ndisputed").

That there was no formal policy is not, however, the end of the inquiry.  As the parties substantially agree, the MSJ focuses on whether, despite the paper policy, the SFPS Defendants had a de facto custom or practice that caused the Plaintiffs' injuries.  In other words, there remains the question whether the SFPS Defendants had a well-settled custom or practice, or

---

"failed to supervise," the Plaintiffs' Response refers to supervision as well as training.  <u>See</u> Response at 39 ("SFPS directed ASI to perform pat-down and bra searches, and ASI performed those searches at SFPS's direction and under SFPS' supervision.").  The SFPS Defendants did not object that the Plaintiffs had not pled a failure-to-supervise claim.  Accordingly, the Court will consider the claim as a failure-to-supervise claim as well as a failure-to-train claim, and will also analyze the claim under the "deliberate indifference" standard.

trained or supervised its agents with deliberate indifference to their acts' known or obvious constitutional consequences. See Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 770.

At the outset, it is important to clarify something that the Plaintiffs' briefing obscures: the fact that individual public-school employees engaged in a custom or practice does not, of its own force, mean that the SFPS Defendants are responsible for that custom or practice. Much of the Plaintiffs' briefing rests on a fallacy of equivocation: the Plaintiffs litter their Response with references to SFPS's employees' acts as "SFPS's" customs or practices. For purposes of Monell v. N.Y.C. Department of Social Services liability, individual public-school employees' acts differ from the SFPS Defendants' acts. As the Court explained in its legal section, a municipal entity can be held liable only for its own unconstitutional or illegal policies, and not for the tortious acts of its employees. See Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. at 689. The Court must, therefore, distinguish individual employees' acts from acts fairly attributable to the SFPS Defendants. The Plaintiffs' nomenclature impermissibly blurs that distinction and the related distinction between municipal liability and *respondeat superior* liability. The Court does not, therefore, rest its reasoning on the notion that, because individual public-school employees conducted suspicionless pat-down searches, the SFPS Defendants are liable under Monell v. N.Y.C. Department of Social Services.[84]

---

[84]Despite the Plaintiffs' contrary suggestions, Gutierrez' acts should not be treated as the School Board's acts. In Randle v. City of Aurora, 69 F.3d 441 (10th Cir. 1995)(Ebel, J.), the Tenth Circuit

> identif[ied] three elements that help determine whether an individual is a "final policymaker": (1) whether the official is meaningfully constrained "by policies not of that official's own making;" (2) whether the official's decision are final -- i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant

Even still, there is enough evidence from which a reasonable jury could conclude that the SFPS Defendants were on actual or constructive notice that their inadequate training and supervision caused ASI New Mexico to violate students' constitutional rights, and the jury could deem that inadequate training and supervision to be a custom or practice for municipal liability purposes.  The Supreme Court has explained:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bryan Cty., 520 U.S., at 410 . . . .  Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. Id., at 407 . . . .  The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." Canton, 489 U.S., at 395 . . . (O'Connor, J., concurring in part and dissenting in part).  A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities . . . . " Id., at 392 . . . ; see also Pembaur, supra, at 483 . . . (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . . ").

---

of authority.

69 F.3d at 448 (quoting City of St. Louis v. Praprotnik, 485 U.S. at 127).  The School Board's policies constrain Gutierrez; the School Board employs the superintendent and can, evidently, fire Gutierrez, see N.M. Stat. Ann. § 22-5-4(B); and Gutierrez' statutory grant of authority is to carry out the School Board's policies, not to contradict them, see N.M. Stat. Ann. § 22-5-14(1).  Moreover, New Mexico law defines "local school board" as "the policy-setting body of a school district," N.M. Stat. Ann. § 22-1-2(H), and imposes on it the duty to "develop educational policies for the school district," N.M. Stat. Ann. § 22-5-4(A).  In short, although Gutierrez undoubtedly had a close relationship with the School Board, Gutierrez is not a "final policymaker" for municipal liability purposes.

The Court also notes that it does not base its decision on the Plaintiffs' observation about the SFPS Defendants' briefing on the TRO -- that is, that the SFPS Defendants spoke of "the School District's practice of searching students at extracurricular functions."  Memorandum In Opposition at 3 (emphasis added).  In context, "practice" does not refer to a "practice" in the municipal liability sense of the term; in fact, the brief does not cite Monell v. New York City Department of Social Services.  The Plaintiffs seem to recognize their observation's weakness, as the Plaintiffs' Letter makes no legal argument from the fact.  See Plaintiffs' Letter at 2-3 (noting the phrases in the Memorandum In Opposition, but not explaining their legal significance).

Connick v. Thompson, 131 S. Ct. at 1360 (emphasis in original).  Viewing the evidence in the light most favorable to the Plaintiffs, a reasonable jury could conclude that this standard is satisfied.  The jury could conclude that, for sixteen consecutive proms, every student at Santa Fe High School and Capital High School was searched with a pat-down prior to prom.  See Archuleta Depo. Vol. II at 168:2-169:8; id. at 244:2-20;  Romero Depo. at 53:9-54:2; id. at 138:19-139:8; Hagele Depo. at 75:5-12; id. at 77:6-16; id. at 78:6-16; 86:22-87:5.  The jury also could conclude that School Board members had attended these proms.  See Gutierrez Depo. Vol. I at 131:13-25 ("I mean, we've even had Board members that come and help chaperone and assist in the past and have observed the procedures that we use for checking students before permitting them into the dance.").  Nonetheless, the jury could conclude that the SFPS Defendants did not intervene and adopt a different training and supervision regimen.  From this evidence, a reasonable jury could conclude that the SFPS Defendants knew of the widespread practice and the consequent widespread constitutional violations, and chose to adopt a "policy of inaction in light of notice that [their] program [would] cause constitutional violations," which "is the functional equivalent of a decision by the [SFPS Defendants themselves] to violate the Constitution."  Connick v. Thompson, 131 S. Ct. at 1360 (internal quotation marks omitted).  Accordingly, there is enough evidence that a jury could deem the SFPS Defendants' response to the pattern of suspicionless searches to be deliberately indifferent training or supervision and, therefore, to be an official policy or custom for municipal liability purposes.  See Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 770 ("A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is . . . deliberately indifferent training or supervision.").

**B.  A REASONABLE JURY COULD CONCLUDE THAT THE SFPS DEFENDANTS' CUSTOM OR POLICY OF CONDUCTING SUSPICIONLESS PAT-DOWN SEARCHES CAUSED SOME PORTION OF THE PLAINTIFFS' INJURIES.**

In the same vein, there is enough evidence from which a jury could conclude that the SFPS Defendants' failure to train or supervise the officers that searched their students with respect to their constitutional rights caused the deprivation of their right not to be searched absent individualized suspicion.  The Court is sensitive to the fact that where, as here,

> a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.  The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring."  Schwartz, at § 7.12.

Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 770.  Viewing the evidence in the light most favorable to the Plaintiffs, however, a reasonable jury could conclude that the SFPS Defendants' inaction in the face of a pervasive pattern of unconstitutional searches was the moving force behind that portion of the Plaintiffs' injuries that flows from the searches' suspicionless nature.  That is, considering the longstanding, widespread pattern of suspicionless pat-down searches at past proms and the evidence that School Board members had attended those proms, there is sufficient evidence from which a reasonable jury could infer that the SFPS Defendants' deliberately indifferent training and supervision of ASI New Mexico officers vis-à-vis suspicionless pat-down searches caused that portion of the Plaintiffs' injuries that flows from the searches' suspicionless nature.[85]

---

[85]The Court underscores that, as it will explain, there is insufficient evidence that the SFPS Defendants' suspicionless-search custom caused that portion of the Plaintiffs' injuries that stems from the invasive manner in which ASI New Mexico officers allegedly conducted the searches.

### C.   A REASONABLE JURY COULD CONCLUDE THAT THE SFPS DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE.

Finally, there is enough evidence from which a jury could conclude that the SFPS Defendants had the requisite state of mind.  As the Court has explained, "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  Brown v. Board of County Comm'rs v. Brown, 520 U.S. at 407.  Again, viewing the evidence in the light most favorable to the Plaintiffs, the jury could reasonably conclude that there is a widespread, years-long pattern of constitutional violations on the ground floor, and that only deliberate indifference to the constitutional implications of conducting a suspicionless pat-down search of every prom attendee could explain how the SFPS Defendants could allow this widespread practice to go on for years.

The Court acknowledges that the evidence on which the jury would base its conclusions is largely circumstantial.  The jury is being asked to infer the SFPS Defendants' liability from two principal sets of facts: (i) the pervasiveness, duration, and persistence of the suspicionless-search practice; and (ii) that individual School Board members attended proms and observed the search procedures.  The SFPS Defendants are entitled to attack the inferences that the Plaintiffs ask the jury to draw.  Taking all of those inferences in the Plaintiffs' favor, however, there is sufficient evidence from which the jury could conclude that the SFPS Defendants acted with deliberate indifference in training or supervising ASI New Mexico with respect to the widespread violation of the paper policy, that the deliberate indifference caused some percentage of the Plaintiffs' damages, and that the SFPS Defendants acted with deliberate indifference to the known or obvious consequences.  Accordingly, to the extent that the Plaintiffs seek to hold the

SFPS Defendants accountable for that portion of their damages that flows from the searches' suspicionless nature, summary judgment is inappropriate.  The Court will, therefore, deny the MSJ in relevant part.

## II.   THERE IS NO EVIDENCE ON WHICH A REASONABLE JURY COULD HOLD THE SFPS DEFENDANTS ACCOUNTABLE FOR THE INVASIVE MANNER IN WHICH ASI NEW MEXICO OFFICERS ALLEGEDLY CONDUCTED THE <u>SEARCHES</u>.

The Court will grant the MSJ to the extent that the Plaintiffs blame the SFPS Defendants for the invasive manner in which ASI New Mexico officers allegedly searched the Plaintiffs. Even treating as binding the Plaintiffs' expansive understanding of causation -- which the Court doubts the Tenth Circuit would be inclined to adopt -- there is not enough evidence on which a reasonable jury could find that the SFPS Defendants' actions were the moving force behind all of the ASI New Mexico officers' actions.  Accordingly, the Court will grant summary judgment as to this dimension of the claim.

The upshot of the Plaintiffs' argument is that the SFPS Defendants are liable for the foreseeable consequences of their search practices, and the invasive manner in which the ASI New Mexico officers searched the Plaintiffs was foreseeable in light of the SFPS Defendants' search practices.  This argument fails.  First, even if it were binding precedent -- and it is not -- the Second Circuit case on which the Plaintiffs principally base their argument, <u>Kerman v. City of New York</u>, 374 F.3d 93 (2d Cir. 2004), is not a municipal liability case.  Neither is the Court's decision in <u>Train v. City of Albuquerque</u>.  This distinction makes a key difference: the causation standard for municipal liability cases is unclear in the Tenth Circuit.    <u>See</u> <u>Schneider v. City of Grand Junction Police Dep't</u>, 717 F.3d at 769-71.

Federal law on causation in the <u>Monell v. N.Y.C. Department of Social Services</u> context is in a degree of disarray.  In the treatise on which the Tenth Circuit extensively relied in

<u>Schneider v. City of Grand Junction Police Department</u>, Professor Martin A. Schwartz of Touro

College Jacob D. Fuchsberg Law Center explains:

> Whether the basis of the plaintiff's § 1983 municipal liability claim is an officially promulgated policy, the decision of an official with final policymaking authority, a custom or practice, or deliberately indifferent training, supervision or hiring, the plaintiff must demonstrate that enforcement of the policy or practice was closely related to the violation of the plaintiff's federally protected right. Supreme Court decisions have described the requisite causation as "moving force," "direct causal link," "closely related," and "actually caused." These appear to be only alternative ways of stressing that the enforcement of the municipal policy or practice must be the proximate cause of the deprivation of the claimant's federal right. In <u>Los Angeles County v. Humphries</u>, the Supreme Court made clear that the § 1983 causation requisite applies whether the plaintiff seeks monetary or prospective relief. "Nothing in the text of § 1983 suggests that the causation requirement contained in the statute should change with the form of relief sought. In fact, the text suggests the opposite when it provides that a person who meets § 1983's elements 'shall be liable . . . in an action at law, suit in equity or other proper proceeding for redress."
>
> The Supreme Court, however, has not resolved whether the § 1983 municipal liability causation requirement is equivalent to common law proximate cause or is a more rigorous standard. There are indications that, at least for some types of municipal liability claims, the causation requirement is more rigorous than common law proximate cause. Supreme Court decisions indicate that a causation standard that is more rigorous than common law proximate cause applies for municipal liability claims based on deliberately indifferent training and deliberately indifferent hiring. For example, in <u>Board of County Commissioners of Bryan County v. Brown</u>, the Supreme Court stressed the importance of linking the allegedly deliberately indifferent hiring deficiencies to the violation of the plaintiff's federally protected right. Nevertheless, some circuit court decisions have held that the traditional proximate cause standard governs § 1983 municipal liability claims.

Schwartz, <u>supra</u>, at § 7.12 (footnotes omitted).

The Tenth Circuit appears to have addressed this issue only in a cursory fashion. In

<u>Schneider v. City of Grand Junction Police Department</u> -- a published opinion from June, 2013 --

the Tenth Circuit quoted extensively from this section of Professor Schwartz' treatise, including

the "direct causal link" test, but did not join those circuits that have endorsed the traditional

proximate cause standard. Instead, it discussed the issue as follows:

- 126 -

> [T]o proceed against the City, [the plaintiff] must present sufficient evidence to create a genuine issue of material fact as to causation.  See Monell, 436 U.S. at 692 . . . ("Congress did not intend § 1983 liability to attach where . . . causation was absent."); City of Canton, 489 U.S. at 391 . . . (requiring the identified deficiency to "be closely related to the ultimate injury"); Brown, 520 U.S. at 404 . . . (requiring the plaintiff to "demonstrate a direct causal link between the municipal action and the deprivation of federal rights"); see also Schwartz, at § 6.03[A][2] ("The various phrases employed by the Court . . . emphasize[] that the § 1983 claimant must show a close relationship between the enforcement of a municipal policy or custom and the plaintiff's injury.").

717 F.3d at 780 (footnotes omitted).  In a footnote appended to the end of the paragraph, the Tenth Circuit continued:

> Schwartz further notes:
>
> > The Supreme Court . . . has not resolved whether the § 1983 municipal liability causation requirement is equivalent to common law proximate cause or is a more rigorous standard. There are indications that, at least for some types of municipal liability claims [including claims regarding training and hiring], the causation requirement is more rigorous than common law proximate cause.
>
> Schwartz, at § 7.12[B].

717 F.3d at 780 n.11.  It may be that the Tenth Circuit has quietly endorsed Professor Schwartz' view that, with respect to training claims, the causation requirement is more rigorous than common-law proximate cause.  The Tenth Circuit did not, however, identify the quantum of additional rigor that courts should apply.

Forgotten underneath the mountain of accreted case law lies the following statutory language:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such

- 127 -

officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  Nothing obvious in the language requires any unique causation standard.  Indeed, reading the emphasized language in a plain-meaning sense, one would be forgiven for thinking that the statute imports traditional causation categories.[86]

---

[86]Although the concept of proximate causation was not yet fully developed in 1871, when Congress passed § 1983, the concept existed in embryonic form.  See Patrick J. Kelley, Proximate Cause in Negligence Law: History, Theory, and the Present Darkness, 69 Wash. U. L. Rev. 49 (1991)(charting the development of proximate-causation doctrine during the mid- and late-nineteenth centuries).  A reliable legal dictionary published in 1879, a few short years after Congress passed § 1983, distinguished proximate causes from remote causes in a way that modern lawyers would recognize.  See 1 Benjamin Vaughn Abbott, Dictionary of Terms and Phrases Used in American or English Jurisprudence 192-93 (1879)("Whenever the alleged cause of damage appears to be the remote rather than the proximate cause, no action can be sustained.").  See also Antonin Scalia & Bryan A. Garner, Reading Law 421 (2012)(listing Abbott's work as a reliable legal dictionary for interpreting texts written in the latter half of the nineteenth century).  These facts raise a hermeneutical conundrum: whether only the semantic meaning of "causes" is fixed as of 1871, based upon the term's original public meaning, or whether the legal doctrines of "causation" are also fixed.  Put differently, the question is whether a principled commitment to textualism demands that both § 1983's "'communicative content' (the linguistic meaning communicated by a legal text in context) and [its] 'legal content' (the doctrines of the legal rules associated with a text)," Lawrence B. Solum, Communicative Content and Legal Content, 89 Notre Dame L. Rev. 479, 479 (2013), be frozen in time in 1871.

The soundest way to understand this issue may lie in the distinction between interpretation and construction.  Professor Randy E. Barnett of the Georgetown University Law Center helpfully defines and explains the terms in the constitutional context:

Both interpretation and construction are activities.  *Interpretation* is the activity of identifying the semantic meaning of a particular use of language in context.  *Construction* is the activity of applying that meaning to particular factual circumstances.  Originalists may disagree about many things, but they should all agree on the meaningfulness of this distinction. Without it, originalists are very likely to talk past each other, or their critics, and to confuse themselves and others.

What defines originalism as a method of constitutional interpretation is the belief that (a) the semantic meaning of the written Constitution was fixed at the time of its enactment, and that (b) this meaning should be followed by constitutional actors until it is properly changed by a written amendment.  The original meaning of the text provides the law that governs those who govern us; and those who are bound by the Constitution, whether judges or legislators, may not properly change its meaning without going through the amendment process.

- 128 -

Instead of using classic torts vocabulary in describing municipal liability causation, the Supreme Court has instead opted for language like "affirmative link," Oklahoma City v. Tuttle, 471 U.S. at 824 n.8, or "moving force," Polk County v. Dodson, 454 U.S. 312, 326 (1981).  The Supreme Court has explained the "moving force" concept as follows:

> The plaintiff must . . . demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Board of County Comm'rs of Bryan Cnty, Okl. v. Brown, 520 U.S. at 404 (emphasis in original).  What is more, Justice Brennan indicated in a concurrence that "[o]rdinary principles of causation used throughout the law of torts" apply in § 1983 cases, City of Oklahoma City v. Tuttle, 471 U.S. at 833 n.9 (Brennan, J., concurring), and the plurality did not engage that statement.  The Supreme Court has, therefore, repeatedly avoided using the common-law tort vocabulary with which most lawyers are familiar and has, instead, used idiosyncratic vocabulary.  One can, therefore, understand why the Tenth Circuit would be reluctant to use traditional causation categories.

The Tenth Circuit appears to be in the minority.  Many circuits that have squarely

---

Randy E. Barnett, Interpretation and Construction, 34 Harv. J.L. & Pub. Pol'y 65, 66 (2011)(emphasis in original).  Applying this dichotomy to § 1983, the Court should interpret the semantic meaning of "causes" in the light of its public meaning in 1871.  The concepts that guide courts in applying that definition to differing factual circumstances are, however, subject to judicial development.  The line between interpretation and construction is hazy and disputed, see Barnett, supra, at 70 ("Originalists will not all agree about how to engage in constitutional construction."), but the distinction usefully explains that textualist interpretation does not require, or even entail, fossilized construction.

   This distinction justifies applying after-developed causation principles to § 1983.  The Court is committed to interpret the semantic content of "causes" in the light of its public meaning in 1871.  That courts later refined -- perhaps "constructed" -- more sophisticated ways to determine which real-world phenomena fall within that semantic content does not contradict that commitment.

addressed the issue have endorsed common law proximate causation standards in the municipal

liability context.   See Cash v. County of Erie, 654 F.3d 324, 341-42 (2d Cir.

2011)(Raggi, J.)("'[P]roximate cause,' although derived from tort law, fairly describes a

plaintiff's causation burden with respect to a municipal liability claim under § 1983."); Harper v.

City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008)(Paez, J.)(stating, in a municipal

liability case, that "the Plaintiff must . . . demonstrate that the defendant's conduct was the

actionable cause of the claimed injury.   To meet this causation requirement, the Plaintiff must

establish both causation-in-fact and proximate causation." (citation omitted)); Smith v. District

of Columbia, 413 F.3d 86, 102 (D.C. Cir. 2005)(Tatel, J.)("We have equated moving force with

proximate cause.")(citing Morgan v. District of Columbia, 824 F.2d 1049 (D.C. Cir.

1987)(Mikva,   J.));   Ricketts v. City of Columbia, 36 F.3d 775, 779 (8th Cir.

1994)(Hansen, J.)(requiring proof of proximate causation in a municipal liability case);[87]

----

[87]As the United States Court of Appeals for the First Circuit has explained, "[i]n applying basic tort principles to the facts raised by a particular section 1983 claim, the causation requirement may be fleshed out with reference to state tort law principles."  Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997).  Accord Ricketts v. City of Columbia, 36 F.3d at 779 (looking to state law of proximate causation).  The cases subtly differ in how they articulate the role of state law.  Some cases suggest that the federal courts should look to some particular state's causation law.  Ricketts v. City of Columbia, 36 F.3d at 779 ("[U]nder Missouri law of proximate causation, to which we may look in applying § 1983, it is enough that the defendant's fault was a 'substantial factor' in producing the plaintiff's injuries, and the defendant's fault need not have been the sole proximate cause in order to allow recovery." (emphasis in original)(internal quotation marks omitted)).  Other cases evidently look to state law for more general principles of causation.  See Rodriguez-Cirilo v. Garcia, 115 F.3d at 52.  The Court believes that the sounder approach is to look to state law as one of several tools, in addition to applicable Restatements and treatises, to illuminate general principles of causation and not to look to a particular state's law of causation.  The alternative risks applying idiosyncratic -- and possibly aberrant -- state causation doctrines, which could result in chaotic dissonance in the substantive law of § 1983.  Cf. NMRA, Civ. UJI 13-305 committee commentary (stating that "[t]he committee [responsible for creating the New Mexico Uniform Jury Instructions] feels that the but-for clause [of a causation Uniform Jury Instruction] may be unnecessary or inappropriate in particular cases," but leaving much discretion in state trial courts' hands in applying that admonition). To be sure, federal courts apply state statutes of limitations in § 1983 cases, which

- 130 -

Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990)(Becker, J.)("A plaintiff bears the

additional burden of proving that the municipal practice was the proximate cause of the injuries

suffered.").  The Court would likely join this majority of circuits, were it facing the issue without

the Tenth Circuit's evident disapproval.[88]

The Fifth Circuit appears to be the leading outlier circuit squarely holding to a higher

standard of causation in § 1983 cases.  It explains:

> We have cautioned . . . that causation under § 1983 is "not to be gauged by
> the standards of ordinary tort law."  Gonzalez v. Ysleta Indep. Sch. Dist., 996
> F.2d 745, 755 (5th Cir. 1993); [sic] (citing Martinez v. California, 444 U.S. 277,
> 285 . . . (1980)).  Indeed, this requirement of a causal connection in a § 1983
> action often may have the practical effect of imposing a heightened standard of
> proximate cause.  For example, in Martinez v. California, plaintiffs sued under
> § 1983 on behalf of a woman whose life was taken by a parolee five months after
> his release by a parole board.  The Supreme Court concluded that, "[r]egardless of
> whether, as a matter of state tort law, the parole board could be said either to have
> had a 'duty' to avoid harm to [the parolee's] victim or to have proximately caused
> her death," the board did not deprive the victim of her life within the meaning of
> the Fourteenth Amendment.  Martinez, 444 U.S. at 285 . . . (citing Palsgraf v.

_____

also leads to disuniformity.  See Beck v. City of Muskogee Police Dep't, 195 F.3d 553, 557 (10th Cir. 1999)("State statutes of limitations applicable to general personal injury claims supply the limitations periods for § 1983 claims.").  To have disuniformity not only in the procedural law of § 1983, but also in something as fundamental to its substantive law as causation, heightens the risks of unfairness -- because defendants who commit identical unconstitutional acts could be subject to liability in one state and not in another state -- and, in perhaps in rare cases, horizontal forum shopping.

[88]Judges across the ideological spectrum authored the cited opinions.  The Honorable Reena Raggi, Circuit Judge of the Second Circuit, has been a featured speaker at Federalist Society meetings.  See, e.g., Federalist Society Chapter Flourishes at Yale Law School, Yale Law School, www.law.yale.edu/utilities/12765.htm (recognizing Judge Raggi's "keynote address on the foundational importance of the jury system at the [Yale Law School Federalist Society chapter's] fifth annual banquet").  The Honorable Abner B. Mikva, former Chief Judge of the United States Court of Appeals for the D.C. Circuit, has played a similar role with the American Constitution Society.  See, e.g., Judge Mikva Predicts Challenges Ahead for the Separation of Powers, American Constitution Society for Law and Policy (June 6, 2005), www.acslaw.org/acsblog/judge-mikva-predicts-challenges-ahead-for-the-separation-of-powers (discussing Judge Mikva's appearance with the Chicago, Illinois American Constitution Society chapter).  It appears that, in most circuits, the issue is sufficiently settled that judges do not divide along predictable ideological lines.

Long Island R. Co., 248 N.Y. 339, 162 N.E. 99 (1928)).  The Court emphasized that "at least under the particular circumstances of this parole decision, appellants' decedent's death [was] too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law.  Although a § 1983 claim has been described as a 'species of tort liability,' it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute."  Id. (quoting Imbler v. Pachtman, 424 U.S. 409, 417 . . . (1976)).

This causal connection requirement may take shape as a stricter test of factual causation, but it is a more nuanced inquiry, particularly in the context of a failure to act.  In demanding that a failure to supervise or train must be "closely related" to the constitutional injury, see City of Canton, 489 U.S. at 391 . . . -- and regardless of how this test is otherwise stated, see Oklahoma City v. Tuttle, 471 U.S. at 824 n.8 . . . (indicating necessity of "affirmative link" between training inadequacies and constitutional violation); Polk County, 454 U.S. at 326 . . . (noting that official policy must be "moving force" of constitutional violation) -- the ultimate inquiry is whether there is a connection between action taken under color of state law and the constitutional harm.  Of course, that the challenged conduct was indeed action under color of state law -- that a separate nexus existed between the alleged inaction and an exercise of state authority -- is implicit in a finding that such a causal connection existed for purposes of § 1983 liability.  See Doe v. Taylor, 15 F.3d at 452 ("[I]f a 'real nexus' exists between the activity out of which the violation occurs and the teacher's duties and obligations as a teacher, then the teacher's conduct is taken under color of state law.").

Doe v. Rains Cnty. Indep. Sch. Dist., 66 F.3d 1402, 1415-16 (5th Cir. 1995)(Higginbotham, J.).

This discussion suffers from two problems.  First, to the Court's eyes, it overreads a key passage in Martinez v. California.  That section reads:

Appellants contend that the decedent's right to life is protected by the Fourteenth Amendment to the Constitution.  But the Fourteenth Amendment protected her only from deprivation by the "State . . . of life . . . without due process of law."  Although the decision to release [the parolee] from prison was action by the State, the action of [the parolee] five months later cannot be fairly characterized as state action.  Regardless of whether, as a matter of state tort law, the parole board could be said either to have had a "duty" to avoid harm to his victim or to have proximately caused her death, see Grimm v. Arizona Bd. of Pardons and Paroles, 115 Ariz. 260, 564 P.2d 1227 (1977); Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99 (1928), we hold that, taking these particular allegations as true, appellees did not "deprive" appellants' decedent of life within the meaning of the Fourteenth Amendment.

Her life was taken by the parolee five months after his release.  He was in

no sense an agent of the parole board.  Cf. Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683 . . . .  Further, the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger.  We need not and do not decide that a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the release of a prisoner on parole.  But we do hold that at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law.  Although a § 1983 claim has been described as "a species of tort liability," Imbler v. Pachtman, 424 U.S. 409, 417 . . . (1976), it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute.

Martinez v. California, 444 U.S. at 284-85 (emphasis in original)(footnotes omitted).  The Fifth Circuit's reading of the Supreme Court's rather cryptic aside about proximate causation, while plausible, is not the only possible reading.  First, in context, it appears that the thrust of the passage focuses on state action and not on the appropriate standard for causation under § 1983.  It seems better to understand the Supreme Court's aside about "whether, as a matter of state tort law, the parole board could be said . . . to have proximately caused [the parolee's victim's] death," 44 U.S. at 285 (emphasis added), as saying that one cannot reverse-engineer state action under § 1983 from state-law causation standards: that is, state action requires something more than that, under state law, a defendant has breached a common-law duty and that the breach proximately caused the plaintiff's harm.  That reading may better reconcile the Supreme Court's language with the Fifth Circuit's insight that a finding "that the challenged conduct was indeed action under color of state law -- that a separate nexus existed between the alleged inaction and an exercise of state authority -- is implicit in a finding that such a causal connection existed for purposes of § 1983 liability."  Doe v. Rains Cnty. Indep. Sch. Dist., 66 F.3d at 1415-16.  Second, the statement may stand for an even less noteworthy proposition: that state tort law may provide remedies even where § 1983 does not.  In any event, the language from Martinez v. California does not conclusively eliminate proximate causation from § 1983 cases.

- 133 -

Whatever one makes of the enigmatic language in <u>Martinez v. California</u>, the Fifth Circuit's discussion suffers from a second problem: the "ultimate inquiry" that the Fifth Circuit identified is unhelpful.  It seems strange to, in one paragraph, suggest that a § 1983 plaintiff must satisfy "a heightened standard of proximate cause," 66 F.3d at 1415, and in the next paragraph apparently endorse "a stricter test of factual causation," 66 F.3d at 1415 -- and a "nuanced" one at that, 66 F.3d at 1415 -- and then immediately state that "the ultimate inquiry is whether there is <u>a connection</u> between action taken under color of state law and the constitutional harm," 66 F.3d at 1415 (emphasis added).  Even events related through a mere but-for relationship have "a connection."

The Court suspects that the Supreme Court's, the Fifth Circuit's, and the Tenth Circuit's unfamiliar causation vocabulary stems from the intuitive sense that § 1983 actions are, in some sense, sui generis: that is, although one might characterize them as tort claims, they do not fit cleanly into established tort categories.  For example, the question is whether the Court should think of deliberate indifference claims as negligence claims, or whether they are more like intentional torts.  After all, "deliberate indifference" sounds somewhat more like the classic formulation of recklessness -- conscious disregard of a substantial and unjustifiable risk -- than it sounds like classic negligent acts or classic intentional acts.  The Supreme Court's and the Tenth Circuit's reluctance to import traditional causation categories into § 1983 may, therefore, reflect a sense that § 1983 actions resist categorization in traditional tort law categories.

Although one can understand that § 1983 actions are, in one sense, unique, none of the many formulations that the Supreme Court and the Tenth Circuit have invented separates the wheat from the chaff any better than the traditional notion of proximate causation would.  One searches the Supreme Court's and the Tenth Circuit's precedent in vain for an administrable

causation test other than proximate causation.  The courts have cycled through a multiplicity of different formulations -- whether the Supreme Court's "affirmative link," "direct cause," and "moving force," language, the Fifth Circuit's "a connection" language, or, maybe most enigmatically, the Tenth Circuit's undefined "more rigorous than common law proximate cause" phrase -- none of which has any obvious legal content that would meaningfully distinguish it from proximate cause.

Indeed, the search for a talismanic causation catchphrase is probably futile.  The notion of proximate causation works relatively well in tort law, principally because the phrase "proximate causation" is not what does the work; instead, a large body of case law informs judicial intuition about what results are sufficiently related to a defendant's breach of $x$ duty that the defendant should be called to answer for them.  Given the Supreme Court's docket limitations, it seems unlikely that the Supreme Court ever could decide enough cases in this area to similarly fill out any one of its several causation catchphrases enough to meaningfully distinguish that phrase from proximate causation.  It is, therefore, understandable that, faced with the prospect of such uncertainty, other circuits continue to apply traditional notions of proximate causation.

Not only is the search likely futile, but it seems unnecessary.  General tort law principles give federal courts the tools they need to appropriately limit the scope of municipal liability under § 1983.  The rules of proximate causation and the related sub-rules about intervening causes, among other doctrines, empower federal courts to ensure that municipal defendants -- indeed, § 1983 defendants generally -- are liable only for those constitutional violations that one may fairly attribute to § 1983 defendants.  Moreover, as a matter of first principles, if those rules are fair enough for every other defendant in front of the federal courts, the Court fails to see why they should not be fair enough for defendants in civil-rights cases -- particularly given the federal

courts' profound interest in protecting citizens' constitutional rights.

In sum, then, it might be wise for the Supreme Court and the Tenth Circuit to abandon their decades-long effort to fashion a causation lexicon that functions only within municipal liability cases.  The project has shown itself to be ineffective: the various catchphrases that the Tenth Circuit and other courts have tried to lay on top of proximate causation are poorly developed, to the point that they are devoid of distinctive legal content and, therefore, inadministrable.  Aside from merely stating that the Court has applied "proximate causation plus $x$," the Court knows of no way to meaningfully distinguish those tests from traditional proximate causation.

Having said as much, the Court nonetheless concludes that the Plaintiffs' argument that the SFPS Defendants are responsible for ASI New Mexico's alleged invasive searches fails the traditional proximate cause analysis -- and certainly does not survive any undefined greater causation requirement.  It is true enough that ASI New Mexico's "Pat Down" Guidelines ask searching officers to "be vigilant" and remind its officers that female students may hide contraband in their bras.  "Pat Down" Guidelines at 1.  It is also true that, viewing the evidence in the light most favorable to the Plaintiffs, it had been the practice within some schools to conduct pat-down searches that required female subjects to pull their bras away from their body, allowing contraband to fall.  See, e.g., Romero Depo. at 53:9-54:2; id. at 138:19-139:8; Reyes Depo. at 60:6-61:22; id. at 63:17-64:9; id. at 114:24-115:9; Deposition of Michael Hagele (taken May 7, 2012), filed March 20, 2014 (Doc. 192-7); Videotaped Deposition of Bobbie Gutierrez at 215:5-217:4 (taken April 3, 2012), filed March 20, 2014 (Doc. 192-6); "Pat Down" Guidelines at 1.  It is a massive leap, however, from such facts to the notion that an ASI New Mexico officer should themselves touch the Plaintiffs' breasts or their inner thighs -- and an even greater leap to

contend that the SFPS Defendants should have foreseen that their alleged suspicionless-search practice would lead to ASI New Mexico officers touching the Plaintiffs' breasts or inner thighs.

The Plaintiffs' contrary argument lacks a sound basis, because it characterizes the constitutional violations at too high a level of abstraction. In essence, the Plaintiffs want to argue that the SFPS Defendants were deliberately indifferent to the Plaintiffs' Fourth Amendment rights, and, therefore, hold the SFPS Defendants accountable for all nearby Fourth Amendment violations. That view of causation would, in cases like this one, eliminate municipal liability's limits. Viewing the evidence in the light most favorable to the Plaintiffs, the SFPS Defendants' suspicionless-search practice reflects a deliberately indifferent approach to training and supervision vis-à-vis whom they may search with a pat down -- every student coming to prom -- and what level of suspicion they must possess to justify that search -- no suspicion. No evidence before the Court would, however, allow a reasonable jury to conclude that the SFPS Defendants' suspicionless-search custom made foreseeable the invasive manner in which ASI New Mexico's officers conducted the searches. Put differently, the evidence before the Court would not allow a reasonable jury to conclude that the SFPS Defendants' practice was the moving force behind the deeply invasive nature of the searches that ASI New Mexico's officers allegedly conducted. In the end, even reading the evidence in the light most favorable to the Plaintiffs, the case that the Plaintiffs would make is, substantially, a *respondeat superior* argument. Monell v. N.Y.C. Department of Social Services liability does not reach that far.

The Eleventh Circuit's decision in Focus on the Family v. Pinellas Suncoast Transit Authority is inapposite. The Plaintiffs are correct that, in that case,

> a private company that had contracted with the municipal transit authority to place advertisements on transit bus shelters for third parties, refused to post an advertisement submitted by a religious organization based on its content. Focus on the Family, 344 F.3d at 1267-1270. The Eleventh Circuit held that there was

sufficient evidence to support a § 1983 claim against the municipal transit authority based on evidence that the municipal entity requested that the private company reject certain types of advertisements (including those with religious content). Id. at 1278-79. Because the municipal transit authority had directed that the private entity reject certain advertising content, there were sufficient grounds to find it liable for the private entity's rejection of signs based on the municipality's unlawful content restrictions.

Response at 38. The Plaintiffs' description of Focus on the Family v. Pinellas Suncoast Transit Authority is correct, as far as it goes. The trouble is that the municipal liability portion of that decision had nothing to do with causation -- or, more specifically, with foreseeability. The Eleventh Circuit's holding entirely turns on state action: the Eleventh Circuit concluded that the religious organization had "presented sufficient evidence that, if credited, would satisfy § 1983's state action requirement under the nexus/joint action test. This evidence fairly creates a triable issue of material fact and precludes the entry of final summary judgment against appellant. The district court erred in concluding otherwise." 344 F.3d at 1279. In fact, Focus on the Family v. Pinellas Suncoast Transit Authority does not so much as cite Monell v. N.Y.C. Department of Social Services, and it never uses the word "foreseeable" or its derivatives. The SFPS Defendants do not dispute that they are state actors. Accordingly, Focus on the Family v. Pinellas Suncoast Transit Authority is irrelevant.

The Court will, therefore, grant the MSJ as to that portion of the Plaintiffs' claims against the SFPS Defendants that relates to the invasive nature of the searches.[89]

---

[89]The Plaintiffs understand the SFPS Defendants to suggest that the Plaintiffs consented to the unconstitutional pat-down searches. See Response at 39. The Court is not certain that the SFPS Defendants intended to raise this argument; if they did, the MSJ does not do so with any vigor. For substantially the reason that the Plaintiffs have identified, the argument would be doomed from the start: as the Plaintiffs noted, the Court explained in the Romero MOO that the unconstitutional-conditions doctrine bars this argument.

III.   **THERE IS SUFFICIENT EVIDENCE TO ALLOW THE JURY TO ASSESS SOME PORTION OF THE PLAINTIFFS' COMPENSATORY DAMAGES AGAINST THE SFPS DEFENDANTS.**

The Court will deny the MSJ insofar as it asks the Court to restrict the Plaintiffs' recovery to an award of nominal damages.  The Plaintiffs have presented sufficient evidence from which the jury could find that they have suffered compensable damages and that the SFPS Defendants are accountable for some percentage of those damages.  The Court will not, therefore, restrict their recovery only to nominal damages.

The Tenth Circuit has explained the nature of joint and several liability in the § 1983 context as follows:

> Multiple tortfeasors who concurrently cause an indivisible injury are jointly and severally liable; each can be held liable for the entire injury.  It is not essential that all persons who concurrently caused the harm be joined as defendants.  Restatement (Second) of Torts § 433A, comment i, § 433B, comments c and d, and §§ 879-82.  See Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 260 n.7 and 8 . . . (1979); Menne[ v. Celotex Corp., 861 F.2d 1453, 1466); Bell v. Mickelsen, 710 F.2d 611, 619 (10th Cir. 1983)(applying Wyoming law); Prosser and Keeton on Torts, § 47, p. 328 and § 52, pp. 347-48.  Consequently, a tortfeasor who cannot prove the extent to which the harm resulted from other concurrent causes is liable for the entire harm.  Subsection (2) of § 433B states the burden of proof also shifts to the defendant in the case of concurrent causes:
>
> > "Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor."
>
> These rules apply in § 1983 actions.  Persons who concurrently violate others' civil rights are jointly and severally liable for injuries that cannot be apportioned.  See Weeks v. Chaboudy, 984 F.2d 185, 188-89 (6th Cir. 1993); Finch v. City of Vernon, 877 F.2d 1497 (11th Cir. 1989); Hinshaw v. Doffer, 785 F.2d 1260, 1269 (5th Cir. 1986); Watts v. Laurent, 774 F.2d 168, 179 (7th Cir. 1985), cert. denied 475 U.S. 1085 . . . (1986).  We conclude the burden of proof also shifts to the defendant under those circumstances, whether or not all wrongdoers are before the court.

Northington v. Marin, 102 F.3d at 1569.

There is something mysterious about the Plaintiffs' treatment of Northington v. Marin: they quote the case as follows: "Multiple defendants 'who concurrently cause an indivisible injury are jointly and severally liable; each can be held liable for the entire injury.' This rule applies equally in § 1983 cases, where multiple actors 'concurrently violate others' civil rights.'" Response at 45 (quoting Northington v. Marin, 102 F.3d at 1569). The Plaintiffs do not, however, quote the last sentence in the Court's block quotation -- that is, that "the burden of proof also shifts to the defendant under those circumstances, whether or not all wrongdoers are before the court." Northington v. Marin, 102 F.3d at 1569.

Although the Court is reluctant to advance a damages theory that the Plaintiffs did not raise, it would seem that the facts would satisfy the Tenth Circuit's standards. Here, multiple defendants -- the SFPS Defendants and ASI New Mexico -- allegedly concurrently violated the Plaintiffs' civil right to be free from searches absent individualized suspicion. The Plaintiffs have suffered indivisible injuries: the Plaintiffs have suffered only one set of damages from the SFPS Defendants' and from ASI New Mexico's alleged actions insofar as they relate to the searches' suspicionless nature. The SFPS Defendants and ASI New Mexico are, accordingly, jointly and severally liable for the Plaintiffs' injuries that stem from the suspicionless nature of the searches, and that SFPS Defendants and ASI New Mexico bear the burden as to the apportionment of damages between them.[90]

---

[90]It is important to stress a limitation of the Court's analysis on this point: the SFPS Defendants are liable only for the damages that they caused and not for the damages that only ASI New Mexico caused. As Professor Schwartz has explained:

If various injuries are separable and can be attributed to specific defendants, each defendant should be liable to the extent of the injury that he or she inflicted. Apportionment of damages is appropriate so long as there is a factual basis for at

Regardless whether the Plaintiffs ultimately bear the burden of proof on this issue, summary judgment is not appropriate. Each Plaintiff has testified that the SFPS Defendants caused injuries beyond the mere abstract constitutional violation. The Court will not exhaustively catalog each Plaintiff's testimony as to her search's effects on her, but the following selection is enough to show that there is sufficient evidence to go to the jury. Testifying about a pat-down search conducted before a different event, C. Herrera testified as follows: "Any pat-down search without probable cause would technically be invasive. If they have no reason or suspicion to be checking you physically, then why would they need to be touching every single student walking in the door." C. Herrera Depo. at 203:18-22. She elaborated: "[A]nything touching you without your permission -- it's not like they're walking up to you and asking, 'Okay, can we pat you down?' It's more like, 'okay, we're going to pat you down. Now spread your arms and legs.'" C. Herrera Depo. at 203:25-204:4. Although C. Herrera spoke about a search that she endured on a different occasion, taking all inferences in her favor, she found suspicionless searches invasive. Moreover, C. Herrera testified that, after the searches she

---

least a rough estimate limiting a defendant's liability to that part of the harm she caused. . . .

Joint and several liability should be imposed for injuries that are indivisible or that result from joint or conspiratorial conduct, because in these cases it is not possible to apportion liability according to fault.

Schwartz, supra, § 16.5(B) (footnotes omitted). There is, in the Court's view, enough of a basis to distinguish the portion of the Plaintiffs' damages that relates to the searches' invasive nature -- which the SFPS Defendants did not, as a matter of law, cause -- from the portion of the Plaintiffs' damages that relates to the searches' suspicionless nature, which ASI New Mexico and the SFPS Defendants allegedly concurrently caused. The Court's indivisible-injury analysis, therefore, applies only to the injuries that ASI New Mexico and the SFPS Defendants allegedly concurrently caused: that portion of the injuries that flows from the searches' suspicionless nature. While this may make evidence presentation difficult and jury instructions a challenge, to hold the SFPS Defendants jointly and severally liable for damages resulting from constitutional violations for which they cannot be held liable under Monell v. N.Y.C. Department of Social Services would end run Monell v. N.Y.C. Department of Social Services' limitations.

endured, she worries about going to a school event, because she now "know[s] that every single time I try and walk in a door somebody is going to possibly be touching me."  C. Herrera Depo. at 205:5-7.  She explained that having been searched at the CHS Prom "makes you worry about anywhere that you go whether you're going to have to be pat down because somebody thinks that it's appropriate."  C. Herrera Depo. at 205:10-15.

T. Herrera also testified about her search's effects on her, describing the pat-down as "awkward" and "extremely uncomfortable," and that it made her feel "violated, disrespected." T. Herrera Depo. at 68:19-25.  She spoke to her friends about "how inappropriate and how awkward" they felt after the search.  T. Herrera Depo. at 71:24-25.  She testified that she was confused as to the reason she was being searched.  See T. Herrera Depo. at 183:14-16.  She also stated that, after this event, she fears that she might "have to undergo an unreasonable or unjustified search at a future Santa Fe Public School Event," because, to her knowledge, "they haven't changed the rules."  T. Herrera Depo. at 145:9-17.

Hurtado's and London's testimony is also sufficient to defeat summary judgment. Hurtado testified that, as a result of the pat-down searches, she is "worried about going to other places that might search me because I don't want that to happen again."  Hurtado Depo. at 186:25-187:2.  She described her emotional injuries as follows: "My humiliation being one of the emotional and my fear of going anywhere else is another emotional."  Hurtado Depo. at 188:12-14.  She stated that she is anxious about possibly being searched at other events,  see Hurtado Depo. at 233:21-24, and that she has chosen not to attend certain events, evidently as a result of her fear, see Hurtado Depo. at 233:25-17.  She testified that the knowledge that, generally, concert organizers tend to search concert attendees causes her anxiety.  See Hurtado Depo. at 236:6-10.  As for London, she testified that the events at the CHS Prom ruined the

memory of the Prom for her, that it made her feel bad about herself, and that she did not go to other proms as a result. See London Depo. at 212:20-25. Although some of her damages most likely stemmed from the search's invasive nature, her testimony does not finely separate those damages from the damages resulting from the fact of undergoing a suspicionless pat-down search in a way that would allow the Court to rule as a matter of law that she suffered only nominal damages.

In sum, then, viewing the evidence in the light most favorable to the Plaintiffs, the suspicionless pat-down searches on this occasion, together with the invasive nature with which ASI New Mexico officers carried them out, caused each Plaintiff to suffer injuries, and the Court cannot, as a matter of law, apportion those damages as between the SFPS Defendants and ASI New Mexico. It is up to the jury to decide whether to credit the Plaintiffs' testimony and, if necessary, to apportion the damages among the Defendants. The Court need only determine that a reasonable jury could consider this testimony and determine that the Plaintiffs have suffered injuries that would justify an award of damages other than nominal damages, and that the jury could attribute some amount of those damages to the SFPS Defendants. The amount may be only ten dollars rather than one dollar, but the Court cannot, at this stage, say as a matter of law that the SFPS Defendants caused no damages other than the constitutional violation itself and, therefore, limit the Plaintiffs' recovery from the SFPS Defendants to nominal damages.

## IV.   THE COURT WILL DENY SUMMARY JUDGMENT AS TO THE PLAINTIFFS' CLAIMS AGAINST THE SFPS DEFENDANTS RELATED TO POSSESSION SEARCHES AND SEIZURES.

The Court will deny the MSJ to the extent that it asks the Court to dismiss the claims against them related to possession searches and seizures. The Plaintiffs pointed out that, aside from a few glancing references, the SFPS Defendants do not address their MSJ to the possession

searches and seizures, but, instead, focus their motion on the pat-down searches.  See Response at 41-42.  Moreover, the Court reaches the same result on the merits.  Accordingly, summary judgment as to the claims within Count I that relate to possession searches and seizures is inappropriate.  The Court will, therefore, deny the MSJ in relevant part.

There is sufficient evidence in the record on which the jury could find that the SFPS Defendants have a custom and practice of conducting suspicionless possession searches and confiscating certain items found during those searches.  That school officials had conducted these searches for years before the CHS Prom would allow a reasonable jury to conclude that the SFPS Defendants trained and supervised its agents with deliberate indifference to their actions' constitutional implications.  Viewing the evidence in the light most favorable to the Plaintiffs, a jury could conclude that these searches and seizures were conducted for years before proms -- proms that School Board members attended.  See Gutierrez Depo. Vol. I at 131:13-25 ("I mean, we've even had Board members that come and help chaperone and assist in the past and have observed the procedures that we use for checking students before permitting them into the dance.").  School Board member Gonzales saw widespread possession searches occurring before a 2010 Santa Fe High School prom and brought the issue to the School Board's attention.  Although the School Board revised its code of conduct, the practice continued.  See Gonzales Affidavit ¶¶ 1-12, at 1-4.  From this evidence, a reasonable jury could conclude that the SFPS Defendants were deliberately indifferent to a widespread, entrenched practice of constitutional violations.

In the same vein, there is enough evidence from which a jury could conclude that the SFPS Defendants' failure to train the officers that searched their students with respect to their constitutional rights caused the deprivation of their right not to have their possessions searched

or seized absent individualized suspicion.  Viewing the evidence in the light most favorable to the Plaintiffs, a jury could conclude that the SFPS Defendants' inaction in the face of a pervasive pattern of unconstitutional searches could serve as the moving force behind the Plaintiffs' suspicionless searches.

Finally, there is enough evidence from which a jury could conclude that the SFPS Defendants had the requisite state of mind.  Again, viewing the evidence in the light most favorable to the Plaintiffs, the jury could reasonably conclude that there is a widespread, years-long pattern of constitutional violations, and that only deliberate indifference to the consequences of conducting a suspicionless pat-down search of every prom attendee could explain how the SFPS Defendants could allow this widespread practice to go on for years.  The evidence is largely circumstantial, and the SFPS Defendants are entitled to attack the inferences that the Plaintiffs ask the jury to draw.  Taking all of those inferences in the Plaintiffs' favor, however, there is sufficient evidence from which the jury could conclude that the SFPS Defendants had the requisite culpable state of mind.

**IT IS ORDERED** that the Santa Fe Public Schools Board of Education's Motion for Summary Judgment on Count I of Plaintiffs' Second Amended Complaint [Doc. 100], filed March 3, 2014 (Doc. 187), is granted in part and denied in part.  The Court grants the motion as to that portion of the Plaintiffs' claims against the SFPS Defendants that relates to the invasive nature of the searches.  The Court otherwise denies the motion.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Aimee Bevan
Friel & Levy, P.C.
Santa Fe, New Mexico

--and--

Megan Cacace
Relman, Dane & Colfax PLLC
Washington, D.C.

--and--

Reed N. Colfax
Relman, Dane & Colfax PLLC
Santa Fe, New Mexico

  *Attorneys for the Plaintiffs*

Andrew M. Sanchez, Sr.
Matthew Lee Campbell
Cuddy & McCarthy, LLP
Albuquerque, New Mexico

-- and --

Gerald A. Coppler
Coppler Law Firm, P.C.
Santa Fe, New Mexico

  *Attorneys for Defendants Santa Fe Public Schools Board of Education, Barbara Gudwin,
  Glenn Wikle, Linda Trujillo, Frank Montano, Steven J. Carrillo, Bobbie J. Gutierrez,
  and Melanie Romero*

Terry R. Guebert
Alisa Wigley-Delara
Christopher J. DeLara
Guebert Bruckner, P.C.
Albuquerque, New Mexico

  *Attorneys for Defendant ASI New Mexico, LLC*