# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CANDICE HERRERA, T.H., a minor by
and through her father and guardian
VINCENT HERRERA, ASHLEY HURTADO,
ARIANNA LONDON, and all others similarly
situated,

        Plaintiffs,

vs.                                      No. CIV 11-0422 JB/KBM

SANTA FE PUBLIC SCHOOLS, SANTA FE
PUBLIC SCHOOLS BOARD OF EDUCATION,
BARBARA GUDWIN, GLENN WIKLE,
LINDA TRUJILLO, FRANK MONTANO,
STEVEN J. CARRILLO, in their official
capacities as members of the Santa Fe Public
Schools Board of Education, BOBBIE J. GUTIERREZ,
in her official capacity as Superintendent of Santa Fe Public
Schools, MELANIE ROMERO, individually and in her
official capacity as Principal of Capital High
School, ROBERT STEPHENS, in his official capacity
as Principal of Santa Fe High School as a necessary party
for complete relief, ASI NEW MEXICO, LLC,
JOHN/JANE DOE Nos. 1-8,

        Defendants.

## MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** comes before the Court on Defendant ASI New Mexico, LLC's Motion

for Summary Judgment on Plaintiffs' Second Amended Complaint [Doc. 100] and Supporting

Memorandum, filed March 3, 2014 (Doc. 182)("MSJ").  The Court held a hearing on April 22,

---

[1]In its Sealed Memorandum Opinion and Order, filed August 8, 2014 (Doc. 220)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court published a public version of the Sealed MOO.  See Sealed MOO at 1 n.1.  The Court gave the parties 14 calendar days to provide notice of any proposed redactions.  See Sealed MOO at 1 n.1.  The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions.  Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

2014.  The primary issue is whether Defendant ASI New Mexico, LLC can properly be held liable for violations of Plaintiffs Candice Herrera's, T.H.'s, Ashley Hurtado's, and Arianna London's rights under the Fourth Amendment to the Constitution of the United States of America that occurred when the Plaintiffs were subjected to searches before a school dance.  The Court will grant the MSJ in part and deny it in part.  The Court will grant the MSJ as it relates to the searches of the Plaintiffs' persons, because ASI New Mexico did not have a policy or practice that caused a violation of the Plaintiffs' clearly established constitutional rights.  The Court will deny the MSJ as it relates to the searches and seizures of the Plaintiffs' possessions, because ASI New Mexico did not meet its prima facie burden as to those claims.  The Court will, in a subsequent Memorandum Opinion and Order, dispose of the Plaintiffs' state-law claims.

## FACTUAL BACKGROUND

The Court will discuss the factual background in multiple parts.  First, the Court will discuss Santa Fe Public Schools and ASI New Mexico, their contractual relationship, and their respective responsibilities vis-à-vis security at school events in general.  The Court will then discuss the genesis of Santa Fe Public Schools' search practice and the Pat-Down Guidelines (undated), filed March 20, 2014 (Doc. 193-21), that ASI New Mexico created to reflect its understanding of that practice.  Third, the Court will discuss the searches that occurred at the April 16, 2011, Capital High School ("CHS") prom.  Fourth, the Court will discuss each Plaintiff's awareness of Santa Fe Public Schools' search practice; her search; and her search's effects on her.

For clarity, the Court must point out a few nomenclature notes.  Throughout its discussion of the facts, the Court will use "Santa Fe Schools" to refer to Santa Fe Schools in the

colloquial sense of the term -- that is, to the school district and to its employees, and not only to

Defendants Santa Fe Public Schools Board of Education, Santa Fe Public Schools, Barbara

Gudwin, Glenn Wikle, Linda Trujillo, Frank Montano, Steven J. Carillo, Bobbie J. Gutierrez,

Melanie Romero, and Robert Stephens (collectively, "the "SFPS Defendants"). Similarly, when

the Court describes what Santa Fe Schools and its employees typically did before school dances,

the Court will use the terms "policy" and "practice" in their colloquial sense. The Court does

not, by these words, implicitly conclude that Santa Fe Schools had a "policy" or a "practice"

within the municipal-liability meaning of those terms. The Court disposed of these issues in its

Sealed Memorandum Opinion and Order, filed May 27, 2014 (Doc. 219)("SFPS Defendants'

MOO"), and does not reopen them in this Sealed Memorandum Opinion and Order. The Court

instead uses those words as the parties use them throughout their briefs: to signify that Santa Fe

Schools had frequently arranged for particular searches before dances.

### 1.    Santa Fe Schools and ASI New Mexico; Their Contractual Relationship; and Their Respective Responsibilities vis-à-vis Security at School Events in General.

The Plaintiffs' claims against ASI New Mexico arise from pat-down searches, possession

searches, and possession seizures that occurred at the April 16, 2011, CHS prom.[2]  See Second

---

[2]ASI New Mexico asks the Court to find undisputed that the "Plaintiffs' claims against ASI arise from pat-down searches that occurred at the April 16, 2011, Capital High School ('Capital High') prom."  MSJ ¶ 1, at 3.  The Plaintiffs dispute this fact, pointing out that their "claims against ASI also arise from the possession searches and the confiscation of personal property at prom."  Plaintiffs' Opposition to Defendant ASI's Motion for Summary Judgment on Plaintiffs' Second Amended Complaint ¶ 1, at 2, filed March 20, 2014 (Doc. 193)("Response"). They point to a section of their Complaint, ¶ 135, at 24, and to the Deposition of Daniel Aguilar at 91:15-24 (taken March 8, 2012), filed March 20, 2014 (Doc. 193-1)("Plaintiffs' Aguilar Depo."), in which Aguilar, whom the Court understands to be an ASI New Mexico employee, states that "Commander Archuleta," whom the Court understands to be an ASI New Mexico employee, instructed him to discard C. Herrera's prescription bottle.  ASI New Mexico responds:

Amended Complaint ¶ 135, at 24, filed September 18, 2012 (Doc. 100)("Complaint").  "Santa Fe

High School and Capital High are located in Santa Fe, New Mexico and are in the Santa Fe

Public School District ('SFPS')."  MSJ ¶ 2, at 3 (setting forth this fact).  See Complaint ¶¶ 18-20,

at 5-6; Response ¶ 2, at 3 (not disputing this fact).  "At all times material to Plaintiffs' claims,

ASI was a limited liability company organized under the laws of New Mexico and provided

security services to public schools, private companies, and state and local governments."  MSJ ¶

14, at 5 (setting forth this fact).  See Complaint ¶ 24, at 7 (setting forth this fact); Response ¶ 14,

at 3 (not disputing this fact).[3]

"The governing and policy-making body for SFPS is the Board of Education of SFPS

('Board of Education')."  MSJ ¶ 3, at 4 (setting forth this fact).  See N.M. Stat. Ann. § 22-5-4;

Complaint ¶¶ 17-18. at 5; Response ¶ 3, at 2 (not disputing this fact).  "SFPS is responsible for

---

ASI did not search Plaintiffs' possessions or confiscate any of Plaintiffs' personal
property.  SFPS personnel conducted possession searches and confiscated items
while doing so.  Plaintiffs' assertion that ASI Commander Archuleta decided to
discard a pill confiscated from C. Herrera is inaccurate.  SFPS official, Susan
Lujan, directed Commander Archuleta to discard the items in a bag containing the
pill and Archuleta communicated that directive to Corporal Aguilar.  Archuleta's
testimony indicates that Corporal Aguilar may have misunderstood Ms. Lujan's
directive to include discarding the prescription pill.  Any such misunderstanding
would be negligence at best, which cannot support a § 1983 claim.

Reply ¶ 1, at 15 (citations omitted).  As the Court more fully explains in its analysis, ASI New
Mexico errs: the Plaintiffs' claims against ASI New Mexico arise not only from the pat-down
searches, but also from the possession searches and seizures that occurred on that day.
Accordingly, the Court has modified the proposed fact to more precisely reflect all of the claims
in the Complaint.

[3]ASI New Mexico also cites its Answer to the Complaint.  See MSJ 14, at 5.  This
evidence -- ASI New Mexico's unsworn statement -- offered for this purpose would be hearsay
not within any exception.  Regardless, the Complaint provides similar evidence, and the
Plaintiffs have not disputed the facts.  Accordingly, the Court deems the fact undisputed.

providing a safe school environment for its school activities as a regular part of its business."
MSJ ¶ 4, at 4 (setting forth this fact).  See Deposition of Bobbie J. Gutierrez at 117:25-119:13
(taken March 22, 2012, and April 3, 2012), filed March 3, 2014 (Doc. 182-1)("ASI New
Mexico's Gutierrez Depo.");[4] id. at 117:25-119:13; id. at 121:5-12; id. at 227:2-24; id. at 229:6-
22; id. at 273:18-274:16; id. at 279:18-280:12; Deposition of Melanie Romero at 100:11-20
(taken March 19, 2012), filed March 3, 2014 (Doc. 182-2)("ASI New Mexico's Romero
Depo."); Response ¶ 4, at 2 (not disputing this fact).  "At the time of the 2011 Prom, Melanie
Romero was the CHS principal."  MSJ ¶ 5, at 4 (setting forth this fact).  See Complaint ¶ 20, at
6; ASI New Mexico's Romero Depo. at 10:6-24; Response ¶ 5, at 2 (not disputing this fact).
"Principal Romero had authority to set policies and procedures related to Capital High and
Capital High events."   MSJ ¶ 6, at 4 (setting forth this fact).  See ASI New Mexico's Gutierrez
Depo. at 123:4-9; id. at 227:2-228:2; ASI New Mexico's Romero Depo. at 132:7-24; Deposition
of Martin "Mark" Archuleta at 122:17-123:6 (taken March 9, 2012, and January 30, 2014), filed
March 3, 2014 (Doc. 182-3)("ASI New Mexico's Archuleta Depo.");[5] Response ¶ 6, at 2 (not
disputing this fact).

"Before ASI began providing contractual security services to SFPS in 2004, SFPS had
its own directly employed security officers and used those security officers to conduct searches
of students and provide day-to-day security services."  MSJ ¶ 22, at 7 (setting forth this fact).

---

[4]ASI New Mexico filed both volumes of this deposition as a single exhibit, and,
throughout its briefing, cites it as a unitary deposition.  Accordingly, the Court has adopted a
similar convention.

[5]ASI New Mexico filed both volumes of this deposition as a single exhibit, and,
throughout its briefing, cites it as a unitary deposition.  Accordingly, the Court has adopted a
similar convention.

See ASI New Mexico's Gutierrez Depo. at 80:22-81:11; id. at 132:1-134:15; Deposition of

Stephanie Gurule-Lebya at 7:14-20 (taken December 10, 2014), filed March 3, 2014 (Doc. 182-

8)("ASI New Mexico's Gurule-Leyba Depo."); id. at 19:9-25; Response ¶ 22, at 4 (not disputing

this fact).[6]  "Since 1995, the SFPS Code of Conduct has provided that students can be searched

at school or at any school event."  MSJ ¶ 23, at 7 (setting forth this fact).  See Volume I of

Videotaped Deposition of Bobbie J. Gutierrez at 54:24-55:7 (taken March 22, 2012), filed April

4, 2014 (Doc. 200-1);[7] Deposition of Jennifer Garcia at 8:3-22 (taken May 14, 2012), filed

March 3, 2014 (Doc. 182-9)("ASI New Mexico's Garcia Depo."); id. at 25:25-26:13; Response

¶ 23, at 4 (not disputing this fact).[8]

---

[6]The Plaintiffs assert that, although this fact is undisputed, it is immaterial.  See Response ¶ 22, at 4.  The Court will, if necessary, decide this fact's materiality in its analysis.  See Wilson v. Jara, 866 F. Supp. 2d 1270, 1276-79, (D.N.M. Oct. 17, 2011)(Browning, J.)("Whether this fact is relevant is a legal argument, and the Court will not address United States v. Abdendi [, 361 F.3d 1282 (10th Cir. 2004)] at this time, but will consider it in its legal analysis."); Ruiz v. City of Brush, No. 05-897, 2006 WL 1816454, at *4 (D. Colo. June 30, 2006)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute[; l]egal argument should be reserved for separate portions of the brief.'").

[7]As ASI New Mexico stated in its Reply, it inadvertently failed to attach this segment of the Gutierrez deposition to its MSJ.  The Plaintiffs have not objected; accordingly, the Court will include this citation to the record.

[8]The Plaintiffs respond: "Undisputed, but incomplete.  The witness cited for the proposition that the Code of Conduct allowed searches did not have knowledge regarding the circumstances or conditions for conducting searches under the Code of Conduct."  Response ¶ 23, at 4 (citing Deposition of Jennifer Garcia at 26:14-22 (taken May 14, 2012), filed March 20, 2014 (Doc. 193-4)("Plaintiffs' Garcia Depo.")).  ASI New Mexico replies: "Ms. Garcia's lack of knowledge in this regard is immaterial."  Reply at 3 n.2.  Whether Garcia knew of the circumstances that might justify a search under the Code of Conduct does not dispute what the Code of Conduct provided.  Accordingly, the Court deems this fact undisputed.

Strictly speaking, the testimony states that the Code of Conduct "was initially developed in 1994-95."  Volume I of Videotaped Deposition of Bobbie J. Gutierrez at 55:2-55:7.  The Plaintiffs do not, however, contest the date set forth in the fact, but instead state that it is undisputed.  See Response ¶ 23, at 4.  Accordingly, the Court deems the fact undisputed.

"ASI began providing services for SFPS, including Capital High, in 2004." MSJ ¶ 15, at

5 (setting forth this fact). See Archuleta Depo. at 133:2-3; id. 134:7-11; Volume I of Deposition

of Micah Johnson at 20:14-18 (taken January 16, 2014), filed March 3, 2014 (Doc. 182-5)("Vol.

I ASI New Mexico's Johnson Depo."); Response ¶ 15, at 3 (not disputing this fact). See also

Response ¶ 15, at 11 (setting forth a similar fact)(citing Vol. I Videotaped Deposition of Bobbie

J. Gutierrez at 80:22-24 (taken March 22, 2012), filed March 20, 2014 (Doc. 193-5)("Vol. I

Plaintiffs' Gutierrez Depo.")). "ASI provided school security services generally to SFPS, and

specifically for the 2011 Capital High prom, based on a publicly bid and awarded contract

pursuant to the New Mexico Procurement Code." MSJ ¶ 9, at 4 (setting forth this fact). See

Complaint ¶¶ 24-26, at 7; Affidavit of Micah Johnson ¶¶ 3-4, at 1-2, filed March 3, 2014

(Doc. 181)("Johnson Aff."); Proposal No. 1-General 2008-09 School Security Services *passim*

(no date provided), filed March 3, 2014 (Doc. 181-1)("SFPS-ASI New Mexico Proposal"); Santa

Fe Public Schools Services Contract *passim* (dated August 18, 2010), filed May 3, 2014 (Doc.

181-1); Response ¶ 9, at 2 (not disputing this fact).[9] "SFPS was free to terminate the contract

with ASI by providing 30 days written notice prior to the intended date of termination." MSJ

¶ 10, at 4 (setting forth this fact). See Johnson Aff. ¶ 4, at 1-2; Santa Fe Public Schools Services

Contract at 1; Response ¶ 10, at 3 (not disputing this fact).[10]

_____

[9]Strictly speaking, the contracts do not expressly lay out that ASI New Mexico provided
these services pursuant to "a publicly bid and awarded contract pursuant to the New Mexico
Procurement Code," as the MSJ says. Because the Plaintiffs have stated that this fact is
undisputed, however, the Court will find the fact undisputed.

[10]The Plaintiffs assert that this fact is "[u]ndisputed, but incomplete. The Security
Services Contract could be 'terminated by either party at least 30 days prior to the intended date
of termination.'" Response ¶ 3 (quoting Santa Fe Public Schools Contract at 0080807 (no date

ASI's contract with SFPS for the 2010-2011 school year provided: "This agreement is entered into for the purpose of Contractor providing security services for Santa Fe Public School[s'] two comprehensive high schools. . . . This is too include on-site coverage on . . . prom . . . .   Refer to Proposal No. 1-General 2008-09 Social Security Services for complete details.'"

MSJ ¶ 11, at 5 (setting forth this fact)(alterations in original).  See Johnson Aff. ¶ 4, at 1-2; Santa Fe Public Schools Services Contract at 1; Response ¶ 11, at 3 (not disputing this fact).[11]

"ASI's contract with SFPS stated that '[t]he Contractor and its directors, officers, agents, and employees are not employees of the District . . . as a result of this Agreement.'"  MSJ ¶ 12, at 5. See Santa Fe Public Schools Services Contract ¶ L, at 2; Response ¶ 12, at 3 (not disputing the fact).   See also Response ¶ 16, at 11 (setting forth similar fact).   "Bobbie Gutierrez acknowledged that ASI 'security officers are [ASI New Mexico's] employees' [and] not SFPS employees."  Response ¶ 25, at 12 (Vol. I Plaintiffs' Gutierrez Depo. at 65:25-66:13).  See Reply

---

provided), filed March 20, 2014 (Doc. 193-18)).  ASI New Mexico states: "Plaintiffs claim ASI's fact is incomplete because ASI could also freely terminate the contract with proper notice.  Both parties' facts establish the relationship was at-will."  Reply at 2 n.1 (citation omitted).  First, although the Plaintiffs' addition accurately quotes the agreement, it does not specifically controvert the proposed fact, which is that the contract allowed Santa Fe Schools to terminate the contract with ASI New Mexico in a particular manner.  See MSJ ¶ 10, at 3.  Accordingly, the Court deems the fact undisputed.  As for ASI New Mexico's argument about the fact's import, the Court will, if necessary, return to this issue in the analysis.

[11]The Plaintiffs respond: "Undisputed, but incomplete.  (Ex. 18, SFPS Services Contract at 00807) (setting forth terms of contract between ASI and SFPS for the provision of security services)."  Response ¶ 11, at 3.  ASI New Mexico replies: "Plaintiffs do not dispute this fact but claim it is incomplete, and then simply refer to the contract in general. In any event, [this fact] establishes the contract required that ASI provide requested security services at SFPS proms." Reply at 3 n.4.  Although the Plaintiffs' implication that this sentence does not reflect the entire agreement between ASI New Mexico and SFPS, that fact does not specifically controvert the proposed fact.  Moreover, the Court does not know what the Plaintiffs intend the Court to take away from the observation that this single sentence does not reflect every term in the agreement. Accordingly, the Court deems the fact undisputed.

at 25 (not disputing this fact).[12]

"ASI guards could refuse directions of SFPS officials and [c]ould report circumstances of

disagreement with SFPS officials' actions or instructions to ASI management;" it is, however,

unclear whether ASI New Mexico guards ever exercised this right to refuse.  Response ¶ 17, at

11 (setting forth unmodified version of this fact).  See Deposition of Martin "Mark" Archuleta at

86:11-88: 3 (dated March 9, 2012), filed March 20, 2014 (Doc. 193-2)("Vol. I Plaintiffs'

Archuleta Depo.").[13]  ASI New Mexico "maintained the responsibility to investigate ASI

_____

[12]ASI New Mexico states that this fact duplicates the sentence before it, because both sentences "assert[] that ASI employees were not SFPS employees." Reply at 25.  Both the premise and the conclusion are wrong: this fact does not duplicate the sentence before it, and neither sentence asserts that ASI New Mexico employees were not Santa Fe Schools employees. The first fact is a statement ASI New Mexico's contract.  The second fact is about an Santa Fe Schools employee's acknowledgement that ASI New Mexico's officers are ASI New Mexico's employees and not Santa Fe Schools' employees.  Both facts imply that ASI New Mexico employees were not Santa Fe Schools employees.   The distinction, though subtle, exists.

[13]ASI New Mexico responds to this fact as follows:

> Plaintiffs' SOFs 17-19, attempting to establish that ASI guards were not supervised by SFPS personnel, play fast and loose with, or are refuted by, the record evidence. Plaintiffs' SOF 17 overstates the evidence with respect to ASI officers' discretion to refuse direction from SFPS personnel. . . .  Archuleta actually stated that if a guard felt uncomfortable with a request to search a student, because of safety concerns "or if they don't understand just even how to do the search the proper way," the guard should contact a supervisor. Mr. Archuleta did not remember whether this had ever happened.

Reply at 27 & n. 22 (citations omitted)(quoting Vol. I Plaintiffs' Archuleta Depo. at 87:19-88:3). The Court has found the fact substantially undisputed, but the Court has clarified the proposed fact.  ASI New Mexico has not specifically controverted the proposed fact's core, which is that ASI New Mexico officers had the prerogative to refuse Santa Fe Schools officials' directions. Because the evidence supports only that ASI New Mexico officers had this right and not that they had ever exercised it, the Court has changed the proposed fact in two respects: first, it changed "would report" to "[c]ould report" and has expressly qualified the fact by pointing out that "it is . . . unclear whether ASI New Mexico guards ever exercised this right to refuse."

security officers' misconduct and to discipline the officers as appropriate."  Response ¶ 20, at 12.

See Vol. I Plaintiffs' Gutierrez Depo. at 65:25-66:13; id. at 95:23-96:11; Reply at 25 (not

disputing this fact).[14]  "When a principal had a true concern about a guard she would discuss it

with the lead guard and higher ASI officials."  Response ¶ 21, at 12 (setting forth this fact).  See

Deposition of Melanie Romero at 44:4-45:8 (taken March 19, 2012), filed March 20, 2014 (Doc.

193-17)("Plaintiffs' Romero Depo."); Reply at 25 (not disputing this fact).[15]  "When the Capital

High School principal raised concerns about a guard with ASI management, she would not even

necessarily be informed of the specifics of any action ASI would take in response."  Response

¶ 22, at 12.  See Plaintiffs' Romero Depo. at 61:22-62:2; Reply at 25 (not disputing this fact).[16]

"SFPS did not conduct performance reviews of ASI employees."  Response ¶ 25, at 12 (setting

forth this fact).  See Plaintiffs' Romero Depo. at 64:19-65:5; Reply at 25 (not disputing this

fact).[17]

    "SFPS and its administrative personnel determined what security services were needed at

SFPS school locations and school-sponsored events and SFPS administrative personnel

---

[14]ASI New Mexico asserts that this fact is immaterial to its "entitlement to NMTCA immunity."  Reply at 25.  The Court will, if necessary, discuss this fact's materiality in its analysis.

[15]ASI New Mexico asserts that this fact is immaterial to its "entitlement to NMTCA immunity."  Reply at 25.  The Court will, if necessary, discuss this fact's materiality in its analysis.

[16]ASI New Mexico asserts that this fact is immaterial to its "entitlement to NMTCA immunity."  Reply at 25.  The Court will, if necessary, discuss this fact's materiality in its analysis.

[17]ASI New Mexico asserts that this fact is immaterial to its "entitlement to NMTCA immunity."  Reply at 25.  The Court will, if necessary, discuss this fact's materiality in its analysis.

instructed ASI security officers regarding expected conduct in day-to-day operations"; despite this general instruction, no one at CHS supervised ASI New Mexico officers on a day-to-day basis.  MSJ ¶ 16, at 5 (setting forth unmodified version of this fact).  See ASI New Mexico's Gutierrez Depo. at 74:12-75:16; id. at 86:15-87:16; ASI New Mexico's Romero Depo. at 25:1-14; id. at 26:12-25; id. at 37:19-38:5; id. at 43:25-45:20; id. at 48:3-11; id. at 68:19-69:7; SFPS-ASI New Mexico Proposal at 2; Vol. I ASI New Mexico's Johnson Depo. at 71:2-11; Deposition of Michael Hagele at 13:24-14:4 (taken May 7, 2012), filed March 3, 2014 (Doc. 182-5)("ASI New Mexico's Hagele Depo."); id. at 21:16-22:5; id. at 23:9-18; id. at 25:4-26:2; id. at 56:11-57:11; Plaintiffs' Romero Depo. at 68:13-69:12[18]  See also Response ¶ 18, at 11 ("SFPS did not

---

[18]ASI New Mexico asks the Court to find undisputed that "SFPS and its administrative personnel determined what security services were needed at SFPS school locations and school-sponsored events and SFPS administrative personnel instructed ASI security officers regarding expected conduct in day-to-day operations."  MSJ ¶ 16, at 5.  The Plaintiffs respond: "Disputed. SFPS staff do not supervise ASI guards on a day-to-day basis." Response ¶ 16, at 3 (citing Deposition of Melanie Romero at 68:13-69:12 (taken March 19, 2012), filed March 20, 2014 (Doc. 193-17)("Plaintiffs' Romero Depo.").   ASI New Mexico replies: "Plaintiffs' cited testimony establishes that Principal Romero played a daily role in explaining her expectations of ASI security officers and redirecting them if she felt her expectations were not being met. Principal Romero also expected ASI security officers to change their behavior to meet her and her assistants expectations." Reply ¶ 16, at 15-16.

ASI New Mexico's proposed fact remains undisputed, but the Court has altered it to reflect the Plaintiffs' addition.  That Santa Fe Schools did not supervise ASI New Mexico guards every day does not dispute the fact that, as ASI New Mexico states it, "SFPS and its administrative personnel determined what security services were needed at SFPS school locations and school-sponsored events and Santa Fe Schools administrative personnel instructed ASI security officers regarding expected conduct in day-to-day operations."  MSJ ¶ 16, at 5. Accordingly, the Court finds the fact undisputed.  Even still, however, the Plaintiffs are correct to point out that testimony indicates that no Santa Fe Schools staff -- or, more precisely, Santa Fe Schools staff at CHS -- supervised ASI New Mexico guards daily.  What is more, ASI New Mexico's statement that the testimony the Plaintiffs cited establishes that Principal Romero played a daily role rests on a misreading of her deposition.  The cited testimony reads, in full:

Q.   Do you consider that you have any role in supervising the ASI security guards that are on the Capital High School campus?

supervise the day-to-day activities of the ASI guards." (citing Plaintiffs' Romero Depo. at 68:13-69:12)).[19]  "At Capital High School, the primary direction SFPS gives to ASI occurs at a meeting

---

> A.   Define "supervising."   What --
>
> Q.   Well, from your -- I understand that they're not employees of Santa Fe Public Schools.  Let me ask it this way.  What role, if any, do you have in functioning as a supervisor for ASI security guards, in terms of giving them directions, instructions, on whatever it is?
>
> A.   Yeah, explaining my expectations, redirecting if I feel that my expectations aren't being met, and then reporting it to lead security and/or Micah or Mark.
>
> Q.   And it's your understanding and belief, if you explain your expectations to a particular security guard, that security guard will change his or her behavior and try to meet those expectations you've articulated to them?
>
> A.   Yes.
>
> Q.   Does anyone else at Capital High School play any role in the day-to-day supervision of the ASI security guards?
>
> A.   My assistants can redirect or interact with them. As far as supervising them, no.

Plaintiffs' Romero Depo. at 68:13-69:12.  Reading the testimony in the light most favorable to the Plaintiffs, it does not demonstrate that Romero daily explained her expectations of ASI New Mexico security officers; the only testimony that suggests a daily role is the last question and answer, and one can read that testimony as asking whether, given that Romero did not  give such direction on a day-to-day basis, anyone else on her staff gave such direction on a day-to-day basis.  Accordingly, reading the evidence in the light most favorable to the Plaintiffs, the Court has included the Plaintiffs' additional observation.

[19]The Court disposed of ASI New Mexico's position that Santa Fe Schools, in fact, supervised ASI New Mexico officers on a day-to-day basis in note 18.  The cited testimony does not, as ASI New Mexico insists, see Reply at 27 & n.27 (stating that this fact "is refuted by the testimony it references, wherein Romero stated that she *did* have a role in supervising ASI guards" (emphasis in original)), state that Romero supervised ASI New Mexico guards on a daily basis.  It reflects that Santa Fe Schools supervised the guards from time to time, but not that it supervised the guards every day.  Accordingly, reading the evidence in the light most favorable to the Plaintiffs, the Court finds undisputed for purposes of this opinion that Santa Fe Schools did

at the beginning of the year and during quarterly meetings with ASI's supervisory personnel and does not occur on a daily basis."  Response ¶ 19, at 11-12 (setting forth this fact.  See Plaintiffs' Romero Depo. at 42:13-18; id. at 44:4-45:8.[20]

"SFPS set qualifications that ASI security officers had to meet before they could be assigned to work at the schools"; Santa Fe Schools did not, however, independently verify whether the guards were trained in accordance with contractual requirements.   MSJ ¶ 17, at 10 (setting forth unmodified version of this fact).  See SFPS-ASI New Mexico Proposal at 3; Vol. I Plaintiffs' Gutierrez Depo. at 97:7-17.[21]   "On more than one occasion, SFPS administrators required that ASI reassign a specific security officer and not use that security officer to provide

_____

not supervise the day-to-day activities of ASI New Mexico's guards.

[20]According to ASI New Mexico, this fact "wrongly implies that SFPS officials only gave instructions to ASI at quarterly and annual meetings."  Reply at 24.  The fact does no such thing; quite the opposite.  The fact states that the primary direction Santa Fe Schools gives to ASI New Mexico happens at those meetings, which implies that such direction does not only occur at such meetings.  Accordingly, the Court deems the fact undisputed.

[21]The Plaintiffs purport to dispute the quoted language, explaining:

Disputed. [Vol. I Plaintiffs' Gutierrez Depo. at 97:7-17] (indicating that the only requirement for training of ASI guards is set forth in the contract and SFPS took no action to confirm or verify that training occurred).)  The fact is also immaterial as the qualifications cited in the School Security Services Proposal do not relate to types of trainings material to conducting searches and seizures of students.

Response ¶ 17, at 3.   ASI New Mexico replies: "Plaintiffs' assertion that SFPS did not independently verify whether ASI security officers met the qualifications required under SFPS's contract creates no dispute. [This fact] is material to SFPS's authority and control over its relationship with ASI and conditions of employment in that relationship."  Reply ¶ 17, at 16 (citation omitted).  ASI New Mexico is correct: that the Santa Fe Public Schools Services Contract sets forth the only requirement for training of ASI New Mexico guards, and that Santa Fe Schools did not independently verify this training, does not dispute the proposed fact, which is that Santa Fe Schools set qualifications that ASI New Mexico security officers had to meet. As for materiality, the Court will, if necessary, return to this dispute in the analysis.

any services to SFPS and its schools."   MSJ ¶ 18, at 6; Johnson Aff. ¶ 7, at 2.   See ASI New

Mexico's Gutierrez Depo. at 61:17-63:12; ASI New Mexico's Hagele Depo. at 39:10-40:11.[22]

---

[22]The Plaintiffs purport to dispute this fact, stating:

> Disputed. (Ex. 17, Romero Dep. at 42:19-43:4 (indicating that SFPS concerns with guards would be handled by ASI through its company protocol).) The cited testimony of Ms. Gutierrez and Mr. Hagele indicates that SFPS only recommended and could not require the reassignment of ASI guards. (Ex. 5, Gutierrez Dep. Vol. I. at 61:17-63:12, Ex. 7, Hagele Dep. at 39:10-40:11.)

Response ¶ 18, at 3.  ASI New Mexico replies:

> Plaintiffs' cited testimony that Principal Romero sometimes shared a concern with ASI personnel regarding a security officer so that ASI personnel could address it creates no dispute regarding UMF 18.  ASI's record references establish that SFPS administrators did, at times, require that ASI remove certain security officers from assignment to the SFPS contract.

Reply ¶ 18, at 16.  ASI New Mexico is correct.  Micah Johnson, ASI New Mexico's General Manager, stated that, "[o]n more than one occasion, SFPS administrators required that ASI reassign a specific security officer and not use that security officer to provide any services to SFPS and its schools."  Johnson Aff. ¶ 7, at 2.  Accordingly, ASI New Mexico met its burden to support the proposed fact.  None of the Plaintiffs' record citations disputes this fact.  First, they point to this section of Romero's deposition:

> Q.   What's the purpose of those once-a-quarter meetings?
>
> A.   ASI will check in with us, of course, on how things are going, any challenges that we still may have, whether it's with anything on the site or a particular security guard.
>
> Q.   As decisions are made in those meetings regarding how security is going to be provided, what to do about a security guard, are those, again, decisions that are made by all of the participants in those meetings?
>
> Mr. Coppler:  Object to the form.
>
> A.   Not necessarily.  For example, I could share a concern with Micah or Mark, and then they can follow their company protocol of how to handle it, especially if I have a concern about a security guard.

_____

Plaintiffs' Romero Depo. at 42:13-43:4.  First, the Court would not sustain the objection that Mr. Coppler -- the SFPS Defendants' counsel -- lodged: the question is not confusing.  It is relatively clear that his asking whether all participants at the meeting make the decisions about guards and about security procedures.  Second, ignoring the objection, the answer does not change the Court's decision.  This discussion about what could happen in particular once-a-quarter meetings does not dispute that, on certain specific occasions, Santa Fe Schools required ASI New Mexico to reassign certain officers.

Second, the Plaintiffs point to this section of Gutierrez' deposition:

> Q.   And when -- Are there also procedures where either a school principal or other staff member could bring to your attention security-related events happening at a school that they want you to become aware of?
>
> A.   Yes.  If they have had a problem with a security officer or they have viewed an interaction between a security officer and a student or a parent that they feel is inappropriate or not correct, they will sometimes ask that I speak with -- in the past, as I said, it's been Mr. Archuleta or Mr. Johnston -- or Johnson.  But typically it's handled by the associate superintendents because they have direct oversight of the schools.  I'm one step removed as superintendent.
>
> Q.   Okay.  How many instances, during the time period that you've been superintendent, have some security-related issue been brought to your attention through this process you were just discussing?
>
> A.   A handful.  Not -- not too many, really.  A handful.
>
> Q.   And can you describe for me what categories those issues -- those handful of issues they fell into?
>
> A.   Sorry.  Let me think about this just to get it in order.
>
> Q.   Sure.
>
> A.   I recall once at Capshaw and De Vargas having security officers that the principals felt just were not working out in terms of how they were getting along with students, with staff, and working with the administration, and I was asked for some intervention with Mr. Archuleta and -- and Mr. Johnston -- Johnson.  So -- Our other associate superintendent is Johnston, so I tend to say that instead of "Johnson."  I apologize.  So I would call Mike -- or Micah and share the concerns, and they've always been cooperative about saying, "We understand.  Let's look for a better match," that sort of thing.  That's happened a couple of times at Santa Fe High.
> And once, as I recall, at Capital High we had a security officer that we felt

"In providing security services under its contract with SFPS, ASI was required to enforce SFPS's

official Code of Conduct for its high schools and follow post orders for each high school as

established or approved by SFPS administrative personnel."   MSJ ¶ 19, at 6 (setting forth this

fact).  See ASI New Mexico's Romero Depo. at 48:3-15; ASI New Mexico's Archuleta Depo. at

---

had been too aggressive with a student.  Even though it was self-defense on the
part of the officer because the student attacked him, I think we all felt, and the
principals especially felt, that even once it was under control, the student was still
a little bit manhandled, and so that officer was reassigned.

Vol. I Plaintiffs' Gutierrez Depo. at 61:17-63:12.  That Gutierrez called ASI New Mexico after
certain events and asked it to remove certain officers does not dispute the fact that, on certain
occasions, Santa Fe Schools had required ASI New Mexico to remove certain officers.
        Finally, the Plaintiffs point to this section of CHS assistant principal Michael Hagele's
deposition:

        Q.      When you have had issues and concerns about guards, whether it
be lead guard or any of the other guards, have you been generally satisfied with
ASI's response when you've brought those concerns to them?

        A.      Yes, that's happened.

        Q.      And ASI has been responsive and made the changes as you
requested?

        A.      Yes, depending on, you know, availability or -- you know, it's kind
of how the two perspectives combine that that decision is made. It's a
collaboration between the school and the company.

        Q.      Have there ever been situations where you thought a guard should
be moved away from Capital High School but ultimately was not moved?

        A.      I can't think of any.

Deposition of Michael Hagele at 39:10-40:11 (taken May 7, 2012), filed March 20, 2014
(Doc. 193-7)("Plaintiffs' Hagele Depo.").  Again, that Hagele has requested changes and that
ASI New Mexico responded does not contradict the proposed fact that, on occasion, Santa Fe
Schools has required ASI New Mexico to reassign officers.  Accordingly, the Court deems this
fact undisputed.

54:16-58:5; id. at 176:23-177:9; Santa Fe High School Post Orders *passim* (no date provided),

filed March 3, 2014 (Doc. 182-4); Deposition of Daniel Aguilar at 50:1-15 (taken March 8,

2012), filed March 3, 2014 (Doc. 182-7)("ASI New Mexico's Aguilar Depo."); Response ¶ 19,

at 3 (not disputing this fact).[23]  ASI New Mexico also maintained its own policies and procedures

for providing security for Santa Fe Schools that reflected Santa Fe Schools' expectations.  See

Response ¶ 19, at 3 (setting forth unmodified version of this fact); Pat-Down Guidelines *passim*;

Standard Opporating Procedures *passim* (undated), filed March 20, 2014 (Doc. 193-21); SOP for

Pat Downs *passim* (undated), filed March 20, 2014 (Doc. 193-22); SOP for Conducting a Search

(undated), filed March 20, 2014 (Doc. 193-23).[24]

---

[23]The Plaintiffs respond that this factual assertion is "[u]ndisputed, but incomplete.  ASI also maintained its own policies and procedures for providing security for SFPS."  Response ¶ 19, at 3.  ASI New Mexico replies:

> Plaintiffs assert that these facts establishing SFPS administrators' authority and control over the details of ASI's work are incomplete because ASI also purportedly "had its own policies and procedures" for conducting pat-down searches and trained ASI and SFPS personnel in those procedures.  However, the referenced pat-down SOPs and typed patdown guidelines were not ASI's "own" policies and procedures but were SFPS policies and procedures ASI was expected to follow in conducting pat-down searches of students as communicated to ASI by SFPS personnel.

Reply at 4 n.5 (citations omitted).  The Plaintiffs' response does not dispute the fact, but rather adds an additional fact.  Accordingly, the Court finds the fact undisputed.  The Court has also found the Plaintiffs' additional fact -- modified with the nuance that ASI New Mexico added -- undisputed in the next sentence.
    The Court understands that post orders were instructions that gave ASI New Mexico guards "the breakdown of what [they were] supposed to do throughout the day."  Vol. I Plaintiffs' Archuleta Depo. at 54:23-55:3.

[24]The Plaintiffs asserted this fact, and ASI New Mexico responded to this fact, as the Court recorded supra note 23.  The Court has found the fact, as modified, undisputed: ASI New Mexico had policies and procedures in place that reflected its understanding of Santa Fe Schools' expectations.  The Court notes that, as it explained above, it does not use the word "policy" in the

SFPS administration established performance criteria regarding security officer interactions with students, including criteria for when pat-down searches could be performed, provided a room to be used as a security office at Capital High, and designated instrumentalities that ASI security officers could not use at the schools by prohibiting the use of weapons of any sort, including handcuffs, repelling liquid sprays, or batons.

MSJ ¶ 20, at 6 (setting forth this fact).  See ASI New Mexico's Gutierrez Depo. at 89:16-90:20; ASI New Mexico's Romero Depo. at 43:20-45:12; id. at 52:16:54:2; id. at 234:15-235:4; ASI New Mexico's Archuleta Depo. at 64:25-66:3; SFPS-ASI New Mexico Proposal at 3; Vol. I ASI New Mexico's Johnson Depo. at 114:3-12; ASI New Mexico's Hagele Depo. at 24:19-24; id. at 42:19-43:17; Response ¶ 20, at 4 (not disputing this fact).[25]  "In providing security services under its contract with SFPS, the role of ASI security officers was to be a presence, to observe and report occurrences to school administration, and to provide services or assistance as determined appropriate, and as requested by, SFPS and its administrative personnel."  MSJ ¶ 21, at 6-7 (setting forth this fact).  See ASI New Mexico's Gutierrez Depo. at 86:15-89:10; id. at 95:7-22; ASI New Mexico's Romero Depo. at 68:13-69:7; ASI New Mexico's Archuleta Depo. at 51:20-52:2; id. at 54:20-55:19;  Vol. I ASI New Mexico's Johnson Depo. at 71:2-11; id. at 119:7-14;[26] ASI New Mexico's Aguilar Depo. at 40:22-25; id. at 50:9-25; Response ¶ 21, at 4

_____

municipal-liability sense of the term, but in the colloquial sense of the term.

[25]The Plaintiffs assert that this fact, although undisputed, is incomplete, because ASI New Mexico "also maintained its own policies and procedures for its interactions with SFPS students."  Response ¶ 20, at 4.  The Court disposed of this argument, and ASI New Mexico's reply to it, in notes 23-24, and will not repeat itself here.

[26]The SFPS Defendants objected to a question in this section of the deposition.  The Court will overrule the objection.  The exchange was:

Q.   In terms of what you direct your security officers to do in terms of when to conduct a search of a student, you rely on the directives that have been

(not disputing this fact).[27]

## 2.    The Genesis of the Pat-Down Practice; ASI New Mexico's Pat-Down Guidelines.

"Before ASI began providing security services for SFPS, Susan Lujan was instructed on how to perform pat-down searches on students while she was working at Capshaw Middle

---

given by Santa Fe Public Schools; is that right?

> Mr. Coppler:   Object to the form of the questions [sic].

> A.    We rely on the judgment of the superintendent or the administrator who is present.

Vol. I ASI New Mexico's Johnson Depo. at 119:7-14 (capitalization and bold omitted for readability).  First, the Court notes that ASI New Mexico did not object to this question.  Second, even if ASI New Mexico had objected to this question, it now offers this testimony, indicating that it no longer intends to pursue the objection.  Third, the question is acceptable, and the Court overrules the objection to form.  The question is clear: it asks whether ASI New Mexico follows the directives of the Santa Fe Schools.

[27]The Plaintiffs respond: "Undisputed, but incomplete. ASI performed additional duties and as relevant to patdown searches, ASI also trained its employees on pat-down searches, trained SFPS officials on patdown searches, and maintained its own policy for pat-down searches."  Response ¶ 21, at 4. ASI New Mexico replies:

> Plaintiffs assert that these facts establishing SFPS administrators' authority and control over the details of ASI's work are incomplete because ASI also purportedly "had its own policies and procedures" for conducting pat-down searches and trained ASI and SFPS personnel in those procedures.  However, the referenced pat-down SOPs and typed patdown guidelines were not ASI's "own" policies and procedures but were SFPS policies and procedures ASI was expected to follow in conducting pat-down searches of students as communicated to ASI by SFPS personnel.

Reply at 4 n.5 (citations omitted).  The Plaintiffs' response does not dispute the fact, but rather adds additional facts.  Accordingly, the Court finds the fact undisputed.  The Court has found each of the Plaintiffs' specific additional facts -- that ASI New Mexico "trained its employees on pat-down searches, trained SFPS officials on patdown searches, and maintained its own policy for pat-down searches," Response ¶ 21, at 4 -- undisputed elsewhere in the facts.

School and performed pat-down searches on students while she was an assistant principal or principal at Capshaw Middle School." MSJ ¶ 24, at 7 (setting forth this fact). See Deposition of Susan Lujan at 14:1-15:25 (taken April 20, 2012), filed March 4, 2014 (Doc. 182-10)("ASI New Mexico's Lujan Depo."); id. at 72:22-74:3; id. at 190:7-194:5; Response ¶ 24, at 4.[28] "At least as of 2003, and before ASI began providing security services for SFPS in 2004, SFPS had required that all students attending the annual proms at its high schools undergo pat-down searches by security officers." MSJ ¶ 25, at 7 (setting forth this fact). See ASI New Mexico's Romero Depo. at 10:3-22; id. at 53:9-54:2; id. at 107:1-12; id. at 138:19-139:8; ASI New Mexico's Archuleta Depo. at 133:2-3; id. at 134:7-11; Johnson Aff. ¶ 8, at 2; Vol. I ASI New Mexico's Johnson Depo. 20:14-18; id. at 124:20-25; Deposition of Rose Lucero at 28:19-29:24 (taken May 15, 2012), filed March 3, 2014 (Doc. 182-11)("ASI New Mexico's Lucero Depo."); id. at 43:12-44:4; Response ¶ 25, at 4 (not disputing this fact).

"SFPS administration established the practice of performing pat-down searches on all students attending prom or other afterschool events at Santa Fe High School or Capital High." MSJ ¶ 26, at 8 (setting forth this fact). See ASI New Mexico's Gutierrez Depo. at 123:4-9; ASI New Mexico's Romero Depo. at 52:16-54:2; Johnson Aff. ¶ 8, at 2; Vol. I ASI New Mexico's Johnson Depo. at 84:10-22; id. at 89:14-22; id. at 124:20-25.[29] "At the beginning of its contract

---

[28]The Plaintiffs assert that, although this fact is undisputed, it is immaterial. See Response ¶ 24, at 4. The Court will, if necessary, decide this fact's materiality in its analysis.

[29]The Plaintiffs respond: "Disputed. SFPS established the practice of pat-downs with the participation of ASI." Response ¶ 26, at 4. ASI New Mexico replies:

Plaintiffs' contention that SFPS established the practice of pat-downs with the participation of ASI contradicts facts in their motion for partial summary judgment. Moreover, Plaintiffs' record citations . . . make clear that the practice

of pat-down searches at SFPS proms was "SOP's that [SFPS] had already created prior to [ASI] taking over the contract," and that conducting pat-down searches of all SFPS prom attendees came as a directive from SFPS administration from the beginning of ASI's contract.

Reply ¶ 26, at 16-17 (citations omitted).

ASI New Mexico is correct, but only for the second reason. That the Plaintiffs approach the facts differently in their Motion for Partial Summary Judgment, filed March 3, 2014 (Doc. 185) is of no moment; it is, as the Court explained during the hearing, rather common for parties to assume facts at summary judgment that differ from the ones that they intend to prove at trial. The Plaintiffs' purported dispute does not, however, enjoy evidentiary support. It is, of course, undisputed that ASI New Mexico participated in the practice in the sense that ASI New Mexico carried out the policy. None of the testimony that the Plaintiffs cite, however, supports their view that ASI New Mexico participated in establishing the blanket search practice.

First, the Plaintiffs cite this testimony:

Q.   And is it fair to say that for all 16 of those proms, you tried to provide the same type of security for each one?

A.   Yes.

Mr. Tucker:   Object to form.

And the 2011 Capital High School prom was not -- was not significantly different in any way.

A.   The only changes in any of the proms were venues.

Q.   And it was typical to have a premeeting before the prom with Public Schools staff to talk through the setup?

A.   Yes.

Q.   When was it first decided upon about how security would be provided at the prom?  Is that way back before the first one of the proms that --

Mr. Tucker:   Objection, foundation and form.

A.   It was the first prom we ever did.

Q.   And do you recall that meeting, who gave the instructions, who had the discussion about how to set up security?

_____

A.   I do not know who said what.  I remember a few people that were there at the time was Bill Belzner, Gloria Rendon I believe was the superintendent.  That's all I can remember offhand.

Q.   And then at subsequent proms, you would not go back and revisit whether you were going to, for example, search bags or do pat-downs; that was something that was decided at the start and then just continued on through all the proms?

A.   Yes.

Mr. Tucker:  Objection, form and foundation to that question as well.

Vol. II Deposition of Martin "Mark" Archuleta at 168:2-169:10 (taken January 30, 2014), filed March 20, 2014 (Doc. 193-3)("Vol. II Plaintiffs' Archuleta Depo.").  The Court notes that the Plaintiffs' selections of this deposition did not acknowledge the final objection.  The Court overrules the objection; the question is clear that the policy was sent once and conducted at subsequent proms.  Moreover, it is clear from context that Archuleta had some personal knowledge of the issue.  Moreover, nothing in this statement indicates that ASI New Mexico participated in "establishing" the practice of blanket searches in the sense that the Court understands ASI New Mexico to use that term -- that is, although ASI New Mexico carried out the searches and provided logistical advice, nothing indicates that ASI New Mexico participated in the decision to conduct blanket searches of everyone entering prom in the first place.  Particularly in context, neither does the following section of Archuleta's deposition:

Q.   Do you recall having these conversations with any other superintendents, about the conduct of searches at proms?

A.   The only one I remember that was originally brought up about searches was Dr. Rendon when we first took over the contract.

Q.   And was that that same initial discussion that you talked about earlier, where you set up what the -- how the searches would go?

A.   Yes.

Q.   And in the conversation with Ms. Rendon, I think you said and Mr. Belzner --

A.   Belzner, Bill Belzner.

Q.   -- who suggested that there should be pat-downs at proms?

- 22 -

_____

        Mr. Tucker:  Object to form.

        A.   It was SOP's that they had already created prior to us taking over the contract.   So it was more or less us just taking over their SOP's from them.

Plaintiffs' Archuleta Depo at 182:2-11.  First, there is no problem with the question; the question merely confirmed the witness' understanding that both Dr. Rendon and Mr. Belzner suggested that there should be pat-downs.  Second, the final answer clarifies that the question whether pat-downs should be conducted at proms was subject to standard operating procedures that Santa Fe Schools had created before ASI New Mexico took over the contract.

        The second deposition testimony is, if anything, clearer that whether to search every person who attended prom was SFPS' decision:

        Q.   Were you aware of an oral standard operating procedure how to conduct a search at special events?

        A.   How to conduct them or whether or not to conduct them?

        Q.   Let's start with whether or not to conduct them.

        A.   It was always in place.

        Q.   So you always would conduct them?

        A.   Yes.  From the first prom we did for them, we always did them.

        Q.   <u>And that came as a directive from someone in the school's administration?</u>

        <u>A.</u>    <u>Yes.</u>

        Q.   In terms of how you conduct the searches, were there any oral standard operating procedures of how searches were conducted?

        A.   Yes. We would go over it with the officers every major event before the event.  Mr. Archuleta would pull the guards into a room and say, "here's how we're going to do our searches tonight," and we review with them how to make sure you respect the students' space. But at the same time, we make sure there's no weapons, drugs or alcohol that get in.

        Q.   In those situations, would Mr. Archuleta be the one deciding how to conduct the search, or was he just carrying out an order from Santa Fe Public

with ASI, SFPS and then-Superintendent Rendon instructed ASI that pat-down searches were to

_____

Schools' administration?

        Mr. Tucker:  object to form.

        A.     He was carrying out a directive from the schools. He was doing what he was asked but went on to make sure the guards knew the boundaries.

        Q.     (by Mr. Colfax)  At some proms, pat-down searches were conducted by ASI guards on all students, right?

        A.     At some proms?

        Q.     All proms?

        A.     All proms.

Vol. I Deposition of Micah Johnson at 84:10-85:15 (taken January 16, 2014), filed March 20, 2014 (Doc. 193-11)("Vol. I Plaintiffs' Johnson Depo.")(capitalization altered for readability)(emphasis added).  The Plaintiffs also rely on this testimony:

        Q.     But you are one of the highest-ranking people in ASI.  I'm trying to find out whether anybody in ASI made a decision to pat down every student entering Santa Fe High School proms.

        A.     That's not a decision that we can make.  We work for the client; the client can make that decision.

        Q.     So the answer to my question is:  ASI did not make the decision to pat down every student going into the proms; is that right?

        A.     No.  It was a directive.

Vol. I Plaintiffs' Johnson Depo. at 89:13-22 (capitalization altered for readability).  Again, these statements specify that it was Santa Fe Schools' decision whether to conduct the search and not ASI New Mexico's decision.  Accordingly, the Court has found the fact undisputed.  The Court suspects that the purported dispute rests on different usage of the word "establish."  The Court finds the fact undisputed on the understanding that ASI New Mexico uses the word "establish" to convey that it was Santa Fe Schools' choice to begin this practice; it is undisputed that ASI New Mexico implemented Santa Fe Schools' decision, but the Court does not understand ASI New Mexico to use "establish" to exclude the possibility that ASI New Mexico implemented that decision.

be conducted of all students entering SFPS dances."   Response ¶ 26, at 12 (setting forth this fact).   See Vol. II Plaintiffs' Archuleta Depo. at 168:2-169:8; id. at 182:2-11; Vol. I Plaintiffs' Johnson Depo. at 84:10-85:12; id. at 89:12-22; Reply at 24-25 (not disputing this fact).[30]

"Based on SFPS's directive, ASI representatives understood that pat-down searches had long been part of SFPS's standard search practices and that ASI was expected to continue those practices."   Response ¶ 27, at 12 (setting forth this fact).   See Vol. I Plaintiffs' Johnson Depo. at 84:10-16; id. at 124:20-25; id. at 130:21-131:8; Vol. I Plaintiffs' Archuleta Depo. at 118:21-25; Vol. II Plaintiffs' Archuleta Depo. at 169:3-8;[31] Reply at 24-25 (not disputing this fact).[32]   "ASI

---

[30]The manner in which ASI New Mexico organized its responses to the Plaintiffs' facts has made the Court's task in examining the record difficult.   Granted, the Plaintiffs set out their facts in a numbered list and not in a lettered list, as the local rules require.   See D.N.M.LR-Civ. 56(b) ("The Response may set forth additional facts . . . .   Each additional fact must be lettered." (emphasis added)).   That technical oversight has not, however, burdened the Court or ASI New Mexico.   ASI New Mexico's Reply has, however, burdened the Court: rather than responding to each proposed fact in a lettered list --  which most litigants interpret D.N.M.LR-Civ. 56(b) to encourage, if not expressly require -- ASI New Mexico replied by: (i) scattering its discussion of certain of the Plaintiffs' responses to its facts throughout footnotes in the Reply's body; and (ii) creating a bullet point list clumping its responses to the Plaintiffs' facts together by subject matter and cross-referencing various parts of its briefing.   This method of discussing the facts has made constructing this Memorandum Opinion and Order difficult.   Nonetheless, the Court has deconstructed the Reply and captured the substance of ASI New Mexico's factual discussion.

ASI New Mexico replies to the section of the Plaintiffs' response that includes this fact by suggesting that it "reiterates or rephrases numerous facts that are duplicative to those addressed by the parties' respective motions."   Reply at 24.   According to ASI New Mexico, this fact "address[es] Plaintiffs' descriptions of the pat-downs, claimed emotional distress, and reactions at the time," which, it contends, repeats facts that it set forth in its MSJ.   Reply at 24.   Because ASI New Mexico, although complaining that these facts are repetitive, did not specifically controvert the facts in this section, the Court has found these facts undisputed.   The Court has made every effort to eliminate needless repetition in its discussion of the facts, but, so long as the evidence supports proposed facts, the Court will, where feasible, include those facts as the parties both discussed them, rather than favoring one side's description over the other.

[31]ASI New Mexico's prior counsel objected to the form and foundation of this question:

Q.     And then at subsequent proms, you would not go back and revisit

---

- 25 -

officials agreed that SFPS's blanket pat-down rule should be applied at SFPS proms."  Response

¶ 28, at 12 (setting forth this fact).  See Vol. I Plaintiffs' Archuleta Depo. at 118:6-20; Reply at

24-25 (not disputing this fact).[33]

"ASI trained its employees to follow the written 'Pat-Down Guidelines' when performing

searches at SFPS events."  Response ¶ 29, at 13 (setting forth this fact).  See Vol. I Plaintiffs'

Johnson Depo. at 73:18-25;  Reply at 24-25 (not disputing this fact).[34]  "The Pat Down

Guidelines were created by ASI for the school setting, but not necessarily for SFPS."  Response

---

whether you were going to, for example, search bags or do pat-downs; that was
something that was decided at the start and then just continued on through all the
proms?

       A.    Yes.

       Mr.  Tucker:  Objection,  form  and  foundation  to  that
question as well.

Vol. II Plaintiffs' Archuleta Depo. at 196:3-9.  ASI New Mexico does not reassert this objection
in its Reply; indeed, ASI New Mexico's only complaint about the fact is that it reiterates prior
facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact,
the Court finds it undisputed.  As to the form of the question, the question is, in context, clear.
From other sections of his deposition, it is relatively clear that Archuleta has this personal
knowledge to answer this question.  See note 28, supra. In any event, other evidence that the
Court cites supports the fact.

[32]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this
fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has
not specifically controverted the fact, the Court finds it undisputed.

[33]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this
fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has
not specifically controverted the fact, the Court finds it undisputed.

[34]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this
fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has
not specifically controverted the fact, the Court finds it undisputed.

¶ 30, at 13.   See Vol. II Plaintiffs' Gutierrez Depo. at 214:24-215:4.[35]   "The Pat Down

Guidelines require bra searches of female subjects in which the front of the bra is pulled away

from the body."  Response ¶ 31, at 13.  See Pat-Down Guidelines at 1; Reply ¶¶ 31-33, 42, & 52,

at 25-26 (not disputing this fact).[36]  "The ASI guard who conducted the pat-downs on Plaintiffs,

_____

[35]ASI New Mexico replies to this fact as follows:

Plaintiffs cite testimony by Bobbie Gutierrez expressing her belief that the
document is one "that ASI provides" and is "their guideline for pat-down
procedures."   ASI does not dispute that it created the document or that the
document reflects pat-down guidelines that ASI was to follow in providing pat-
down search services for SFPS.   However, ASI disputes any inference that it
created the guidelines to be implemented in the school setting for SFPS.  Troy
Dunn, Sr. prepared the typed Pat-Down Guidelines document to memorialize
what ASI personnel understood SFPS pat-down procedures should include based
on instructions from SFPS administrators.

Reply ¶ 30, at 28.  The Court has found the fact undisputed, as far as it goes: that is, that ASI
New Mexico created the Pat-Down Guidelines "for" the school setting, in the sense that the
document reflects ASI New Mexico's understanding of how to do searches in the school
setting -- that is, at Santa Fe Schools.  At Santa Fe Schools.  The Court understands that the facts regarding the Pat-
Down Guidelines' origins are clear: Dunn, Sr. created the document after the fact to reflect ASI
New Mexico's understanding regarding Santa Fe Schools' wishes about searches.  See Affidavit
of Troy Dunn, Sr. ¶¶ 3-4, at 1-2 (executed April 3, 2014), filed April 4, 2014 (Doc. 199)].

[36]ASI New Mexico does not dispute this fact, but asserts that it is immaterial.  See Reply
¶¶31-33, 42, & 52, at 25-26.  It elaborates:

Plaintiffs' assertions about students being instructed to pull their own bras are
immaterial because none of Plaintiffs' claims against ASI rest on having been
required to do that as part of the pat-down search at the 2011 Capital High prom.
Plaintiffs claim their Fourth Amendment right against unreasonable searches was
violated because they were required to undergo pat-down searches at the 2011
Capital High prom without individualized reasonable suspicion.  See DOC 100
(Second Amended Complaint), ¶¶ 98, 115, 124.  Plaintiffs' § 1983 claim does not
rest on the specific manner in which the pat-down searches were performed on
them, but on the fact that pat-down searches were performed on all 2011 Capital
High prom attendees.   Plaintiffs' allegations that ASI Security Officer Reyes
inappropriately grabbed, shook and groped their breasts, and stroked and groped
their upper and inner thighs during their patdowns, relate to their injury and

Rebecca Reyes, interpreted the bra pulling instruction in the Pat Down Guidelines as requiring her to have students 'grab their front bra and shake the bra.'"   Response ¶ 32, at 13 (citing Statement of Cpl. Rebecca Reyes at 1 (no date provided), filed March 20, 2014 (Doc. 193-26)); Reply ¶¶ 31-33, 42, & 52, at 25-26 (not disputing this fact).[37]   "The Pat Down Guidelines indicate that it is 'important to be vigilant' and state that students have hidden contraband on 'the inside of their legs.'"   Response ¶ 33, at 13 (quoting Pat-Down Guidelines at 1).   See Reply ¶¶ 31-33, 42, & 52, at 25-26 (not disputing this fact).[38]

"The principals of Capital High School and Santa Fe High School reviewed the written Pat Down Guidelines."   Response ¶ 34, at 13 (setting forth this fact).   See Vol. II Plaintiffs' Gutierrez Depo. at 213:13-214:11; id. at 215:5-9; Reply at 24-25 (not disputing this fact).[39]   "The Pat Down Guidelines are consistent with the training SFPS administrators received regarding

_____

> damages claims based on the unconstitutional searches and to their common law intentional tort claims, but are immaterial to the issue of § 1983 liability.  The pat-down guideline's [sic] reference to the "inside of [students'] legs" is similarly irrelevant.  Plaintiffs claim that the insides of their mid- to upper thighs were touch[ed] inappropriately.  The referenced pat-down guideline instructs not to pat in the thigh area beyond three inches above the knee. The guideline's [sic] statement regarding the "inside of [students'] legs" was not referring to the upper and inner thigh area.

Reply ¶¶ 31-33, 42, & 52, at 25-26 (citations omitted).  The Court has found the fact undisputed. The Court will, if necessary, return to the materiality issue in its analysis.

[37]The Court disposed of ASI New Mexico's sole response to these facts above, supra note 36, and will not repeat itself here.

[38]The Court disposed of ASI New Mexico's sole response to these facts above, supra note 36, and will not repeat itself here.

[39]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

SFPS's pat-down procedure."   Response ¶ 35, at 13 (setting forth this fact).   See Vol. II

Plaintiffs' Gutierrez Depo. at 216:16-217:4; Reply at 24-25 (not disputing this fact).[40]

"Superintendent Gutierrez has no objection to any aspect of the Pat Down Guidelines."

Response ¶ 36, at 13 (setting forth this fact).   See Vol. II Plaintiffs' Gutierrez Depo. at 217:5-14;

Reply at 24-25 (not disputing this fact).[41]   "SFPS officials reviewed and were familiar with ASI's

---

[40]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

[41]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

The SFPS Defendants' counsel objected to the form of a question in this section of Gutierrez' deposition.  In context, the question is clear:

> [Q.   F]rom your review today, is there anything in the pat-down guidelines as set forth in Exhibit Number 7 that you, as superintendent of Santa Fe Public Schools, object to, sitting here today?
>
> Mr. Coppler: Before you answer that question, I'd ask you to go ahead and, then, read guidelines before you answer that question.
>
> A.   I believe this is in line with training we have received as school administrators over the years.
>
> Q.   So, sitting here today, there's nothing in the pat-down guidelines in Exhibit 7 that you would object to as superintendent of Santa Fe Public Schools?
>
> A.   No.
>
> Q.   Just because I used a negative in my question, to make sure we get this right, it is correct that you have no objections to anything that's contained in the pat-down guidelines?
>
> A.   That's correct.
>
> Mr. Coppler:   Object to the form.

pat-down methods."  Response ¶ 37, at 13 (setting forth this fact).  See Plaintiffs' Romero Depo.

at 48:16-49:19; Reply at 24-25 (not disputing this fact).[42]  "ASI trained SFPS officials on

providing security in the school setting, including how to conduct pat-downs."  Response ¶ 38, at

13 (setting forth this fact).  See Plaintiffs' Romero Depo. at 50:2-9; id. at 128:19-129:15; id. at

166:12-18.[43]  "ASI educated SFPS officials on necessary security measures and procedures."

---

Vol. II Plaintiffs' Gutierrez Depo. at 216:19-217:15.  In context, the question is clear: whether she had any objection to the pat-down guidelines.  Accordingly, the Court overrules the objection.  Moreover, ASI New Mexico did not object to the question, it did not renew any such objection in its Reply, and it did not dispute the fact based on this testimony.  Accordingly, the Court deems the fact undisputed.

[42]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

[43]ASI New Mexico purports to dispute this fact, together with several subsequent facts.  It states, in relevant part:

> Plaintiffs' SOFs 38-40, asserting that ASI educated and trained SFPS officials in security matters, and collaborated with SFPS in amending post orders, are unsupported.  The testimony cited by SOF 38 establishes only that ASI demonstrated pat-downs at meetings before school functions; that "what a pat-down would look like" was discussed with ASI when it "came on board"; and that ASI showed Rose Lucero how to use the wand.  There is no evidence of broader "training."

Reply ¶¶ 38-40, at 28.  The Plaintiffs are correct: taking all reasonable inferences in the Plaintiffs' favor, the testimony that they cite is sufficient to establish that ASI New Mexico "trained SFPS officials on providing security in the school setting, including how to conduct pat-downs. " Response ¶ 38, at 13.  That testimony reads, in full:

> Q.   And then you said you saw -- you have seen ASI policy demonstrated.  Where have you seen it demonstrated?
>
> A.   I'm trying to recollect a specific.
>
>       At a training.

_____

     Q.   This would have been in a training where ASI participated in the training?

     A.   Yes, uh-huh.

* * * *

     Q.   From whom have you received training from an outside source related to security at schools?

     A.   ASI security. We have Santa Fe PD. We have like a gang task force, or SWAT, that will conduct those trainings; the sheriff's department. I can remember them at the active shooter training. We'll have the fire department, as well, if it's anything to do with safety.

     Q.   Have any of your assistant principals attended any of those meetings where there's training on security at schools?

     A.   Yes.

     Q.   Would you say they would have attended the majority of the trainings you attended, as well?

     A.   Yes, depending on when they were hired in their current positions.

     Q.   In those trainings, have you received training specific on conducting searches of students?

     A.   I have not participated recently. The one I was referring to earlier was when ASI came on board as the new contracted security, and then it was discussed, what pat-downs would look like.

Plaintiffs' Romero Depo. at 50:2-9; id. 128:19-129:15.

     Q.   Do you know if Ms. Lucero has received any training in how to operate one of the wands?

     A.   Yes, we would have -- I would have, or Mark Archuleta -- probably Mark Archuleta, Dan Aguilar, instructed her how to hold the wand and then how to kind of sweep it away from the body, kind of up and down.

Plaintiffs' Romero Depo. at 166:12-18. Taking all reasonable inferences in the Plaintiffs' failure, this evidence, although not laying out every subject of training that ASI New Mexico

Response ¶ 39, at 13.   See Vol. II Plaintiffs' Gutierrez Depo. at 225:11-226:9.[44]   "ASI

_____

could have provided, is sufficient to establish that ASI New Mexico "trained SFPS officials on providing security in the school setting, including how to conduct pat-downs."  Response ¶ 38, at 13.  Accordingly, the Court will treat this fact as undisputed for purposes of this Memorandum Opinion and Order.

[44]ASI New Mexico disagrees with this fact, stating:

Plaintiffs' SOFs 38-40, asserting that ASI educated and trained SFPS officials in security matters, and collaborated with SFPS in amending post orders, are unsupported. . . . SOF 39 asserts that ASI "educated" SFPS officials. This is unsupported.  The cited testimony limits such "education" to information from ASI regarding, e.g., the possibility that students might hide contraband at the event venue.  The record reference does not support any broader education in necessary security measures or procedures, such that ASI could have influenced the decision to have pat-down searches.

Reply at 28.  The Plaintiffs are correct: taking all reasonable inferences in the Plaintiffs' favor, the evidence that the Plaintiffs cite is sufficient to demonstrate that ASI New Mexico "educated SFPS officials on necessary security measures and procedures."  Response ¶ 39, at 13.  The cited testimony reads, in full:

One of the nice things about our relationship with ASI is they have really tried to educate us, as school administrators, when they are aware of new things that are out there, whether it be new forms of drugs or other ways to sneak things in.

I mean, you know, I think -- one of our very first proms at the Convention Center, I don't  think we would have thought about going in early and checking the toilet stalls and under the sink for, you know, plastic containers with alcohol or other illegal contraband.

But they were the first to think of that, because this convention center is open to visitors, and anyone can wander through there any time of day.  So it's not restricted, as a school site would be, where, you know, if we were having a dance in the gym, it would be locked for the day, except for, you know, students coming in to decorate.   Then, of course, we would check.

So I think they're always trying to help us remember the things that we need to check and be aware of in order to help keep our students safe and protect them from, you know, drinking and driving and leaving, or something like that.

participated in a collaborative manner in the amending of post orders that defined the methods of providing security at the various school sites." Response ¶ 40, at 14 (setting forth this fact). See Vol. I Plaintiffs' Archuleta Depo. at 55:20-56:22.[45] "The same search procedures, which included pat-downs of all students, were followed at Santa Fe High School and Capital High School proms every year for at least sixteen consecutive proms." Response ¶ 41, at 14 (setting forth this fact). See Vol. II Plaintiffs' Archuleta Depo. at 168:2-169:8; id. at 244:2-20; Plaintiffs' Romero Depo. at 53:9-54:2; id. at 138:19-139:8; Deposition of Michael Hagele at 75:5-12 (taken May 17, 2012), filed March 20, 2014 (Doc. 193-7)("Plaintiffs' Hagele Depo."); id. at 77:6-16; id. at 78:6-16; id. at 86:22-87:5; Reply at 24-25 (not disputing this fact).[46] "Bra searches of female students were part of the SFPS school dance standard pat-down search practice."

---

Vol. II Plaintiffs' Gutierrez Depo. at 225:11-226:9. Taking all reasonable inferences in the Plaintiffs' favor, the evidence that the Plaintiffs cite is sufficient to demonstrate that ASI New Mexico "educated SFPS officials on necessary security measures and procedures." Response ¶ 39, at 13. Accordingly, the Court will treat the fact as undisputed for purposes of this opinion.

[45]ASI New Mexico purports to dispute this fact, explaining: "SOF 40 is unsupported: although ASI could suggest a change to a post order, 'ASI didn't vote or have any participation in the actual approval of the change.'" Reply ¶¶ 38-40, at 28 (quoting ASI New Mexico's Archuleta Depo. at 57:20-22). ASI New Mexico has not specifically controverted the proposed fact, which is that it "participated in a collaborative manner in the amending of post orders that defined the methods of providing security at the various school sites." Response ¶ 40, at 14. The evidence supports this fact, making clear that ASI New Mexico was "involved in the process of those post orders being changed," Vol. I Plaintiffs' Archuleta Depo. at 55:20-22, in that they suggested how Santa Fe Schools could change its post orders, see Vol. I Plaintiffs' Archuleta Depo. at 56:4-15. ASI New Mexico need not have voted on or participated in approving the change to "participate[] in a collaborative manner in the amending of post orders." Response ¶ 40, at 14. Accordingly, the Court finds the fact undisputed. The Court will, however, keep ASI New Mexico's limited role in this arena in mind, if necessary, in its analysis.

[46]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts. See Reply at 24-25. Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

Response ¶ 42, at 14 (setting forth this fact). See Plaintiffs' Lucero Depo. at 28:19-25; id. at 35:6-12; Vol. I Plaintiffs' Reyes Depo. at 60:6-61:22; id. at 62:1-13; Reply ¶¶ 31-33, 42, & 52, at 25 (not disputing this fact).[47]

### 3        The Searches Conducted at the 2011 CHS Prom.

At the time of the 2011 prom, and during prior years when ASI was contracted to provide security services for SFPS, the two high schools in SFPS -- Capital High and Santa Fe High School -- had ASI security guards perform pat-down searches of all attendees at proms and similar events, such as homecoming or other dances.

MSJ ¶ 27, at 8 (setting forth this fact). See ASI New Mexico's Romero Depo. at 53:5-54:23; id. at 138:19-139:8; id. at 235:16-22; ASI New Mexico's Archuleta Depo. at 45:6-7; id. at 133:2-16; id. at 134:7-11; Vol. I ASI New Mexico's Johnson Depo. at 130:21-131:2; Deposition of Cynthia Clarke, Ph. D. at 34:1-16 (taken May 13, 2012), filed March 3, 2014 (Doc. 182-12)("ASI New Mexico's Clarke Depo."); id. at 37:20-38:5. Response ¶ 27, at 4 (stating that this fact is undisputed). "ASI and SFPS worked cooperatively to complete the searches of students with ASI guards and school officials both being actively engaged in conducting various elements of the searches." Response ¶ 47, at 14-15. See Plaintiffs' Aguilar Depo. at 120:21-121:7; id. at 136:1-7; Reply at 24-25 (not disputing this fact).[48]

"The 2011 Capital High prom was a school-sponsored event." MSJ ¶ 7, at 4 (setting forth this fact). See Complaint ¶¶ 27-28, at 8; Response ¶ 7, at 2 (not disputing this fact). "The

_____

[47]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts. See Reply at 24-25. Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

[48]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts. See Reply at 24-25. Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

2011 prom was held off Capital High premises at the Santa Fe Convention Center." MSJ ¶ 8, at 4. <u>See</u> Complaint ¶ 3, at 2; <u>id.</u> ¶ 27, at 8; Response ¶ 8, at 2 (not disputing this fact). "ASI directly employed the security officers who provided security services at the 2011 Capital High prom." MSJ ¶ 13, at 5 (setting forth this fact). <u>See</u> Santa Fe Public Schools Services Contract ¶ L, at 2; Response ¶ 13, at 3 (not disputing this fact).[49] "In preparation for a school-sponsored special event, the principal of the high school sponsoring the event would typically instruct ASI regarding the implementation of SFPS's customary search practices at the event." Response ¶ 43, at 14 (setting forth this fact). <u>See</u> Vol. II Plaintiffs' Archuleta Depo. at 168:11-14; Plaintiffs' Romero Depo. at 94:6-95:8; <u>id.</u> at 96:7-21; <u>id.</u> at 97:9-17; Reply at 24-25 (not disputing this fact).[50]

"Principal Romero directed ASI to perform standard pat-down searches of all attendees of the Capital High prom on April 16, 2011," MSJ ¶ 28, at 8 (setting forth this fact); that is, "the same pat-downs, wanding, and possession searches that were part of SFPS's customary practice," Response ¶ 45, at 14 (setting forth this fact). <u>See</u> ASI New Mexico's Romero Depo. at 130:17-132:20; <u>id.</u> at 137:18-139:24; Affidavit of Melanie Romero ¶ 3, at 1 (executed November

---

[49]Strictly speaking, the Santa Fe Public Schools Services Contract states only that it does not make ASI New Mexico's directors, officers, agents, and employees Santa Fe Schools employees, and does not say that "ASI directly employed the security officers who provided security services at the 2011 Capital High prom," MSJ ¶ 13, at 5 (setting forth this fact). The Plaintiffs have, however, deemed this fact undisputed, <u>see</u> Response ¶ 13, at 5, and it seems reasonable to infer from the cited evidence that ASI New Mexico -- and not Santa Fe Schools -- employed the security officers at the 2011 Capital High Prom. Accordingly, the Court will deem this fact undisputed.

[50]As discussed more fully above, <u>supra</u> note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts. <u>See</u> Reply at 24-25. Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

12, 2012), filed November 13, 2012; Response ¶ 28, at 4 (not disputing this fact).[51]   "Principal

Romero directed that the pat-down searches for the 2011 Capital High prom be performed in the

lobby area of the Santa Fe Convention Center with separate lines for males and females and"

played a role in assigning certain responsibilities.   MSJ ¶ 33, at 5 (setting forth this fact).   See

---

[51]The Plaintiffs state that this fact is "[u]ndisputed, but incomplete.   The direction was an implementation of SFPS' custom and practice of conducting pat-down searches."   Response ¶ 28, at 4.   ASI New Mexico replies: "No dispute exists that SFPS established the pat-down search custom and practice for SFPS proms."   Reply at 4 n.6.   In the end, the Plaintiffs do not dispute this fact, but propose to add an additional fact.   Accordingly, the Court deems the fact undisputed.   The Court has substantially incorporated the Plaintiffs' fact elsewhere.

To the Plaintiffs' addition to this fact -- which the Court incorporates after the semicolon in this sentence -- ASI New Mexico objects only that it is duplicative.   See Reply at 24-25.   Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

The Plaintiffs ask the Court to find undisputed that "ASI and SFPS discussed the nature of the searches, including the decision to conduct pat-down searches before each event."   Response ¶ 44, at 14 (setting forth this fact).   ASI New Mexico

> disputes that ASI helped make the decision as to whether patdown searches would
> occur at SFPS proms.   SFPS administrators -- not ASI --decided whether pat-
> down searches would occur at SFPS proms.   Plaintiffs' record citation also does
> not support SOF 44.   See [Vol. II Plaintiffs' Archuleta Depo. at] 168:11-14
> (establishing only that it was "typical to have a premeeting before the prom with
> Public Schools staff to talk through the set-up").   Additional testimony makes
> clear that ASI received the directives from school officials as to what security
> services to provide at prom, and that ASI had been directed to conduct pat-down
> searches at proms from the beginning of its contract with SFPS.   Id. at 168:15-
> 169:8.

Reply at 24 n.21.   ASI New Mexico is correct: the cited testimony does not establish that ASI New Mexico "and SFPS discussed the nature of the searches, including the decision to conduct pat-down searches before each event."   Response ¶ 44, at 14.   The testimony reads, in full:   "Q. And it was typical to have a premeeting before the prom with Public Schools staff to talk through the setup?   A. Yes."   Plaintiffs' Archuleta Depo. at 168:11-14.   This testimony does not establish the proposed fact, which is that "ASI and SFPS discussed the nature of the searches, including the decision to conduct pat-down searches before each event."   Response ¶ 44, at 14 (emphasis added).   Accordingly, the Court has not found the fact undisputed.   ASI New Mexico also asserts that this fact is duplicative.   See Reply at 24-25.   Given that the Court has not found the fact undisputed, the Court need not concern itself with this argument.

ASI New Mexico's Gutierrez Depo. at 227:2-17; ASI New Mexico's Romero Depo. at 130:17-

132:24; id. at 139:9-140:8; id. at 165:13-24; ASI New Mexico's Lucero Depo. at 47:25-48:9;

ASI New Mexico's Clarke Depo. at 81:14-25.[52]   "Principal Romero directed that ASI perform

---

[52]ASI New Mexico asks the Court to find undisputed that Romero "gave assignments as to who would be doing what." MSJ ¶ 33, at 5. The Plaintiffs dispute this fact, because, they say, "[t]he cited excerpts do not establish that Ms. Romero made assignments regarding who would be doing what." Response ¶ 33, at 5 (citing Plaintiffs' Romero Depo. at 133:16-134:22 for the proposition "that guards were given assignments during a joint meeting among ASI and SFPS officials"). ASI New Mexico states: "ASI record evidence supports this fact. Plaintiff's additional reference confirms Principal Romero's involvement in determining needs and making assignments at prom." Reply ¶ 33, at 17. The Plaintiffs are correct: although the evidence shows that Romero played some role in assigning certain responsibilities, the cited evidence does not squarely support the suggestion that Romero alone assigned these responsibilities. In the Plaintiffs' cited testimony, Romero says that, during a meeting that she attended together with ASI New Mexico employees, guards "were assigned their zone and what they would be doing for the evening." Plaintiffs' Romero Depo. at 134:10-11 -- were assigned, in the passive voice. This evidence is enough to suggest that Romero played a role in assigning certain responsibilities, but not enough to support ASI New Mexico's suggestion that she alone "gave assignments as to who would be doing what." MSJ ¶ 33, at 5. Moreover, Clarke's deposition reads:

> Q. When you first arrived at the 2011 Capital High School prom, how did you take up your location there at the search table? Did someone assign that to you? Did you volunteer? How did it work?
>
> A. No, I believe Melanie asked if I would stand on the line.
>
> Q. Was that in a meeting where Ms. Romero was giving out assignment to everyone or just when you arrived?
>
> A. No, it was a general assigning.
>
> Q. Did Ms. Romero do that general assigning?
>
> A. I believe.
>
> Q. Was there, in that general assigning, any description of exactly what different people should do as part of their task?
>
> A. I don't recall if she directed everyone, but her request of me was to

the pat-down searches at the 2011 Capital High prom on all attendees in a manner consistent with established SFPS past practices."  MSJ ¶ 34, at 10 (setting forth this fact).  See ASI New Mexico's Romero Depo. at 137:18-139:24; Johnson Aff. ¶ 8, at 2; Vol. I Johnson Depo. at 106:6-15; Romero Aff. ¶¶ 2-4, at 1-2; id. ¶ 8, at 2; Response ¶ 34, at 5 (not disputing this fact).  "Principal Romero was responsible for ensuring that both school personnel and ASI security officers at the 2011 Capital High prom followed proper search protocols."  MSJ ¶ 35, at 10 (setting forth this fact).  See ASI New Mexico's Romero Depo. at 139:9-24; Romero Aff. ¶ 8, at 2; id. ¶ 11, at 3; id. ¶ 14, at 3.[53]  "Principal Romero had the power to intervene and stop ASI security officers from performing pat-down searches at the 2011 Capital High prom in a manner that was inconsistent with SFPS protocol, past practices, or otherwise improper in her judgment."

---

stand on the line.

      Q.    Did she give you any direction about what you were supposed to do when you were standing on the line?

      A.    Not specifically.

Plaintiffs' Clarke Depo. at 81:14-82:9.  Although the distinction is rather narrow, the Plaintiffs are correct that that Romero's role was somewhat less expansive than ASI New Mexico's facts suggests.  Accordingly, the Court has altered the fact.

[53]The Plaintiffs respond: "Disputed.  Ms. Romero's responsibility for supervising ASI security guards during the 2011 Capital High School prom was shared with ASI employees Dan Aguilar and Mark Archuleta."  Response ¶ 35, at 5.  ASI New Mexico replies: "Plaintiffs stated similar facts in their motion for partial summary judgment.  Moreover, Principal Romero's overall authority in supervising activities at prom was in no way undermined or diminished by any supervisory authority that Corporal Aguilar and/or Commander Archuleta had over ASI security officers.  See NMSA 1978, § 22-10A-18."  Reply ¶ 35, at 17 (citation omitted).  The Court has elsewhere disposed of ASI New Mexico's comments relating to the Plaintiffs' tactics in their motion, and will not repeat itself here.  In the end, however, the Plaintiffs have not disputed the fact that Romero had this responsibility, but have added a different fact -- that she shared this responsibility with ASI New Mexico employees.  Accordingly, the Court deems the fact undisputed.

MSJ ¶ 36, at 10 (setting forth this fact).  See ASI New Mexico's Romero Depo. at 236:16-240:5;

Romero Aff. ¶ 11, at 3; Response ¶ 36, at 5 (not disputing this fact).[54]  "At the Capital High

School prom, the highest ranking ASI official, who was present, understood that it was his and

ASI's lead guard's responsibility for ensuring that all of the ASI staff were meeting their

expectations and fulfilling their job responsibilities."  Response ¶ 46, at 14 (setting forth this

fact).  See Vol. II Archuleta Depo. at 173:21-174:3; Plaintiffs' Aguilar Depo. at 104:12-105:14;

Reply ¶ 46, at 25 (not disputing this fact).[55]  "ASI performed pat-down searches on all attendees

of the 2011 Capital High prom because Principal Romero directed it to do so."  MSJ ¶ 37, at 10

(setting forth this fact).  See ASI New Mexico's Romero Depo. at 132:7-20; Vol. I ASI New

Mexico's Johnson Depo. at 84:10-85:15; id. at 89:14-22; id. at 106:6-15; Romero Aff. ¶ 2, at 1;

id. ¶ 6, at 2; id. ¶ 8, at 2.[56]  "Principal Romero asked ASI to perform pat-down searches of each

---

[54]The Plaintiffs respond: "Undisputed, but incomplete.  ASI employees had supervisory authority over the ASI guards and the authority to stop misconduct."  Response ¶ 36, at 5 (citing Plaintiffs' Aguilar Depo. at 103:21-104:3; id. at 104:12-105:14).  ASI New Mexico replies: "However, Principal Romero's overriding responsibility and statutory authority to oversee, direct, and manage the provision of security services at the 2011 Capital High prom was neither diminished nor undermined by any supervisory authority possessed by ASI personnel."  Reply at 5 n.7.  The Court finds the fact undisputed, because the Plaintiffs purport to add an additional fact and do not dispute the fact.  The Court has substantially incorporated the Plaintiffs' addition in the next sentence.

[55]ASI New Mexico responds that this fact "discusses Aguilar and Archuleta's supervisory authority over ASI security officers at the 2011 Capital High prom.  None of Plaintiffs' additional submissions create [sic] any genuine disputes that preclude summary judgment in ASI's favor."  Reply ¶ 46, at 24 (citations omitted).  The Court has deemed the fact undisputed.  The Court will, if necessary, determine this fact's legal implications in its analysis.

[56]The Plaintiffs respond: "Disputed. The pat-down searches of 2011 Capital High School Prom were also caused by SFPS's and ASI's long-standing custom and practice of performing pat-down searches at high school dances."  Response ¶ 37, at 5 (setting forth this fact).  ASI New Mexico replies:

of the attendees of the 2011 Capital High prom for the health, safety, and welfare of all attendees at the prom, and ASI believed the searches helped promote a safe prom experience for attendees."  MSJ ¶ 45, at 12 (setting forth this fact).  See ASI New Mexico's Archuleta Depo. at 112:3-23; id. 117:9-19; id. 126:14-127:8; Romero Aff ¶ 3, at 2.[57]

"Female ASI security officers, Rebecca Reyes and Sandra Vigil, performed the pat-down

---

Plaintiffs stated similar facts in their motion for partial summary judgment. Plaintiffs' claim that SFPS and ASI had a "long-standing custom and practice of performing pat-down searches at high school dances" is refuted by facts establishing that any such "custom and practice" was established by SFPS *before* ASI's contract began in 2004.

Reply ¶ 37, at 17-18 (citation omitted)(emphasis in original).  The Plaintiffs' purported dispute is, in truth, a legal conclusion -- that is, that Santa Fe Schools and ASI New Mexico had a "custom or practice" within the municipal-liability meaning of that term.  In other words, the Plaintiffs have not disputed the fact, but stated a legal conclusion that might follow from the facts.  Accordingly, the Court deems the fact undisputed.

[57]The Plaintiffs respond: "Disputed. Ms. Romero also requested pat-down searches based on SFPS policy and practice."  Response ¶ 45, at 76.  ASI New Mexico states, without substantively replying:  "Plaintiffs claim this is 'disputed' because Principal Romero also requested pat-down searches based on SFPS policy and practice."  Reply ¶ 45, at 20 (internal quotation marks rhetorical).  The Court has found the fact undisputed: that Romero also believed that, by patting down all prom attendees, she was following school policy does not call into question the asserted fact, which is that she "asked ASI to perform pat-down searches of each of the attendees of the 2011 Capital High prom for the health, safety, and welfare of all attendees at the prom, and ASI believed the searches helped promote a safe prom experience for attendees." MSJ ¶ 45, at 12 (setting forth this fact).

ASI New Mexico asks the Court to find undisputed that "[t]he pat-down searches performed on Plaintiffs by ASI security officers at the 2011 Capital High prom lasted approximately 1-1½ minutes."  MSJ ¶ 46, at 12.  As the Plaintiffs rightly point out, "[t]he cited testimony does not address the length of the pat-downs of Plaintiffs London or Tiffany Herrera." Response ¶ 45, at 6.  ASI New Mexico's reply is unsatisfactory on this score: they merely note that the testimony on which the Plaintiffs rely establishes only that London's total search -- including pat-downs, wanding, and purse retrieval -- lasted five minutes.  See Reply ¶ 46, at 20. The gravamen of the Plaintiffs' response was not, however, that London's search took longer than one and a half minutes, but that ASI New Mexico had not met its prima facie burden to show that the searches that the Plaintiffs underwent took one to one and a half minutes. Accordingly, the Court has not found the fact undisputed.

searches on female attendees of the 2011 Capital High prom after the attendees entered the Santa

Fe Convention Center."  MSJ ¶ 29, at 8 (setting forth this fact).  See Complaint ¶ 27, at 8; id.

¶ 40, at 9; Romero Aff. ¶ 12, at 3; Deposition of Candice Herrera at 114:16-115:14 (taken July

27, 2012), filed March 3, 2014 (Doc. 182-13)("ASI New Mexico's C. Herrera Depo.");

Videotaped Deposition of Tiffany Herrera at 58:16-23 (taken August 12, 2012), filed March 3,

2014 (Doc. 182-14)("ASI New Mexico's T. Herrera Depo."); Deposition of Ashley Hurtado at

115:23-116:9 (taken August 13, 2012), filed March 3, 2014 (Doc. 182-14)("ASI New Mexico's

Hurtado Depo."); Deposition of Arianna London at 118:11-22 (taken August 24, 2012), filed

March 3, 2014 (Doc. 182-16)("ASI New Mexico's London Depo."); id.at 119:22-120:19; Vol. I

Deposition of Rebecca Reyes at 85:19-21 (taken May 8, 2012), filed March 3, 2014 (Doc. 182-

17)("Vol. I ASI New Mexico's Reyes Depo."); Deposition of Sandra Vigil at 46:21-47:2 (taken

July 24, 2012), filed March 3, 2014 (Doc. 182-18)("ASI New Mexico's Vigil Depo."); Response

¶ 29, at 8 (stating that this fact is "[u]ndisputed").[58]   Reyes and "Vigil also performed wand

---

[58] Although the SFPS Defendants' and ASI New Mexico's counsel objected to the form of the question that elicited this response, by setting forth this testimony in support of its undisputed fact, ASI New Mexico evidently has waived its objection.  More than that problem, although the question that elicited the testimony was imperfect, in context, the testimony itself is clear:

> Q.      When you conducted the -- correction.  Just remind me.  You patted down every student and every female entering the building.  Is that right?
>
> A.      Yeah.
>
> Mr. Coppler: Object to the form.
>
> Ms. Wigley-Delara: Join.
>
> Q.      I'm sorry.  I didn't hear you.
>
> A.      Not everybody, just females.

searches."   Response ¶ 30, at 4 (citing Plaintiffs' Aguilar Depo. at 136:1-7.[59]   "Reyes was

instructed by the lead guard at the 2011 Capital High School prom to conduct pat-downs on

students entering the prom."   Response ¶ 55, at 15 (setting forth this fact).   See Vol. I Plaintiffs'

Reyes Depo. at 62:25-64:9; Reply *passim* (not responding to this fact).   "At the time of the

Capital prom, Rebecca Reyes was on-duty and had been assigned to conduct security at the 2011

Capital High School prom along with a host of other ASI security personnel."   Response ¶ 56, at

16 (setting forth this fact).   See Plaintiffs' Aguilar Depo. at 175:14-176:9; Reply at 24-25 (not

disputing this fact).[60]   "Rebecca Reyes knew it was inappropriate to touch students in the breast

_____

ASI New Mexico's Vigil Depo. at 46:20-47:2.   In context, Vigil's answer indicated that she
understood the question.   Accordingly, the Court finds the fact undisputed.

[59]The Plaintiffs respond to the facts quoted immediately before this statement by saying
this fact was "Disputed.   ASI guards Rebecca Reyes and Sandra Vigil also performed wand
searches."   Response ¶ 30, at 4.   ASI New Mexico replies: "Corporal Aguilar's belief that ASI
security officers Reyes and Vigil also performed wand searches at the 2011 Capital High prom is
immaterial to Plaintiffs' claims against ASI, which are based on pat-down searches."   Reply
¶ 30, at 17.   Materiality is an issue best left to the analysis.   Accordingly, the Court has added the
fact as undisputed.

The Plaintiffs ask the Court to find undisputed that "Ms. Reyes was a uniformed guard
who Plaintiffs knew was hired by SFPS and the searches were conducted in full view of and
appeared to be condoned by the principal of their school."   Response ¶ 54, at 15 (citing Vol. II
Plaintiffs' Archuleta Depo. at 259:17-22; Plaintiffs' London Depo. at 47:9-10; Plaintiffs'
C. Herrera Depo. at 89:15-90:6).   ASI New Mexico concedes that its "personnel were in uniform
at the 2011 Capital High prom, but Plaintiffs' references do not support the rest of their
statement."   Reply ¶ 53, at 28-29.   ASI New Mexico is correct: the cited testimony establishes
that ASI New Mexico officers were in uniform, see Vol. II Plaintiffs' Archuleta Depo. at 259:17-
22, that London saw the guard whom searched her in a uniform, see Plaintiffs' London Depo. at
47:9-10, and that C. Herrera knew that security guards at Capital High School worked for ASI
New Mexico, see Plaintiffs' C. Herrera Depo. at 89:15-90:6.   The facts do not support that the
Plaintiffs knew anything about the hiring arrangements between ASI New Mexico, or about
whether "the searches were conducted in full view of and appeared to be condoned by the
principal of their school," Response ¶ 54, at 15.   Accordingly, the Court has found the proposed
fact undisputed.

[60]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this

area." Response ¶ 58, at 16 (setting forth this fact).  See Vol. I Plaintiffs' Reyes Depo. at 108:5-

15; Reply ¶ 58, at 30 (not disputing this fact).[61]  "Reyes admits she patted down bare arms, had

---

fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has
not specifically controverted the fact, the Court finds it undisputed.

     The Plaintiffs ask the Court to find undisputed that "ASI General Manager Micah
Johnson approved of Ms. Reyes's conduct and took no disciplinary action against her after
investigating Plaintiffs' complaints regarding the nature of Ms. Reyes's pat-downs."  Response
¶ 57, at 16.  See Vol. I Plaintiffs' Johnson Depo. at  107:13-23; id. at 111:13-20; Vol. II
Plaintiffs' Johnson Depo. at 163:12-15.  ASI New Mexico replies:

> ASI disputes [this fact] as evidence that ASI "ratified" the inappropriate touching
> that Plaintiffs claim occurred during their patdown searches at the 2011 Capital
> High prom.  Mr. Johnson's testimony establishes that he understood Reyes to
> have performed the pat-down searches in a manner consistent with standard pat-
> down search guidelines -- which expressly do not permit, condone, or include the
> kind of inappropriate touching that Plaintiffs claim happened.

Reply ¶ 57, at 29.  ASI New Mexico is correct: this fact is misleading.  The fact implies that
Johnson knew Reyes searched the Plaintiffs in the invasive manner that they allege and endorsed
-- or, as the Plaintiffs elsewhere suggest, "ratified" -- that action.  This implication is not
supported.  The evidence makes clear that, as far as Johnson knew, Reyes had performed "the
pat-downs as instructed and following the guidelines [she had] been told."  Vol. I Johnson Depo.
at 107:21-23 (capitalization altered for readability).  Only in the light of that report did Johnson
"conclude[] that the officer followed the direction of the administration and acted appropriately,"
and declined to act against Ms. Reyes.  Vol. I Johnson Depo. at 111:13-20.  Because the fact's
phrasing misleadingly suggests that Johnson ratified an invasive search -- and not a search
consistent with the Pat-Down Guidelines, which prohibited such searches -- the Court has not
found the fact undisputed.

    [61]ASI New Mexico asserts that this fact, while undisputed,

actually supports summary judgment in ASI's favor.  [The fact] establishes that
Reyes knew it was inappropriate to touch students in the breast area while
conducting a pat-down search.  If Reyes engaged in such conduct, ASI cannot be
held vicariously liable for it under any of Plaintiffs' claims.  ASI had no policy or
practice of its own, and followed none from SFPS, that permitted Reyes to touch
female students in the breast area, and Reyes clearly could not have been acting in
the course and scope of her employment with ASI by engaging in conduct that she
knew was improper and forbidden by ASI.

Reply ¶ 58, at 30.  The Court will, if necessary, return to this argument in the analysis.

students pull their bras away from their bodies and shake them, and conducted the pat-downs with her palms open facing toward the student."  Response ¶ 59, at 16 (setting forth this fact).  See Vol. I Plaintiffs' Reyes Depo. at 59:5-25; id. at 60:14-61:7; id. at 73:14-21; Reyes Statement at 1.[62]  "Reyes acknowledged that conducting a pat-down of bare arms in search of contraband was 'stupid, because, you know, you can see their bare skin.  There's nothing there.'"  Response ¶ 60, at 17 (setting forth this fact)(quoting Vol. I Plaintiffs' Reyes Depo. at 71:24-72:8).[63]

_____

[62]ASI New Mexico purports to dispute this fact, explaining that it

is disputed as suggesting that Reyes patted down bare arms of all students she searched at the 2011 Capital High prom. Reyes patted down bare arms of only "a couple" of students at the beginning of the prom.  Reyes's written statement referring to having female students grab the front of their bra and shake the bra is immaterial because Plaintiffs' claims do not rest on having been asked to grab their own bras and shake them.  Finally, if Reyes patted-down Plaintiffs with her palms facing in and patted Plaintiffs' bare arms, she acted contrary to the pat-down guidelines ASI expected her to follow.  Moreover, such contact is not relevant to ASI's personal and individual liability for Plaintiffs' § 1983 claim based on blanket pat-down searches having been performed at the 2011 Capital High prom but relates to compensatory damages under their § 1983 claim.

Reply ¶ 59, at 30 (citations omitted).  As for the first point, the Court does not read the fact to suggest that Reyes patted down every student's bare arms; all the evidence that is needed to support the fact is evidence that she patted down bare arms, and that evidence exists.  See Vol. I Plaintiffs' Reyes Depo. at 73:14-21.  Whether the written statement is material and whether the facts exonerate ASI New Mexico are issues best left to the Court's analysis.

[63]ASI New Mexico replies:

[This fact] is immaterial. . . .  Reyes patted down bare arms of only a couple of students initially at the prom and stopped doing so once she realized it made no sense.  The guidelines ASI expected its security officers to follow instructed not to pat down on bare skin.  If Reyes patted down any of Plaintiffs' bare arms, such conduct is immaterial to ASI's personal and individual liability for Plaintiffs' § 1983 claim based on blanket pat-down searches having been performed at the prom.

Reply ¶ 60, at 30 (citations omitted).   Because ASI New Mexico has not specifically

- 44 -

"SFPS personnel, including Principal Romero, worked alongside ASI security officers in performing searches at the 2011 Capital High prom.  Rose Lucero, the athletic department secretary at Capital High, wanded the female attendees.  Other Capital High and/or SFPS personnel, along with Principal Romero, searched female attendees' bags and purses."  MSJ ¶ 30, at 9 (setting forth these facts).  See ASI New Mexico's Romero Depo. at 134:23-135:1; id. at 139:18-141:23; id. at 142:19-22; id. at 145:14-20; id. at 146:24-147:3; id. at 149:16-21; id. at 151:3-11; Electronic Mail Transmission from Melanie Romero to Bobbie Gutierrez (dated May 23, 2011), filed March 3, 2014 (Doc. 182-2); ASI New Mexico's Lucero Depo. at 9:1-12; id. at 54:7-10; id. at 54:22-25; ASI New Mexico's C. Herrera Depo. at 148:6-19.[64]  "Female students' bras were pulled and shaken or otherwise searched at the 2011 Capital High School prom as part of the pat-down search."  Response ¶ 52, at 15 (setting forth this fact).  See Vol. I Plaintiffs' Reyes Depo. at 60:6-61:22; id. at 62:1-13; id. at 114:24-115:9; Plaintiffs' Lucero Depo. at 28:19-25; id. at 58:16-19; id. at 59:3-9; id. at 64:22-24; id. at 130:8-23; id. at 131:6-12; Vol. II Plaintiffs' Gutierrez Depo. at 246:14-21; Plaintiffs' Aguilar Depo. at 167:11-16; Reply ¶ 52, at 25 (not disputing this fact).[65]

The process to be followed by SFPS personnel or ASI security officers

---

controverted the proposed fact, the Court has found it undisputed.  The Court will, if necessary, discuss this fact's materiality in its analysis.

[64]The Plaintiffs respond: "Disputed.  ASI guards Rebecca Reyes and Sandra Vigil also performed wand searches."  Response ¶ 30, at 4.  ASI New Mexico replies: "Corporal Aguilar's belief that ASI security officers Reyes and Vigil also performed wand searches at the 2011 Capital High prom is immaterial to Plaintiffs' claims against ASI, which are based on pat-down searches."  Reply ¶ 30, at 17.  Materiality is an issue best left to the analysis.  The Court has found this fact undisputed, but has elsewhere added the Plaintiffs' proposed fact.

[65]The Court disposed of ASI New Mexico's response to this fact above, supra note 35, and will not repeat itself here.

who found drugs, alcohol, or contraband in an attendee's possession while
conducting searches at the 2011 Capital High prom was to notify Principal
Romero or, if she was not nearby, to notify the nearest SFPS administrator and
provide further assistance if, and as, requested.

MSJ ¶ 31, at 9 (setting forth this fact).  See ASI New Mexico's Romero Depo. at 104:2-14; ASI

New Mexico's Archuleta Depo. at 199:9-17; ASI New Mexico's Aguilar Depo. at 146:18-147:5;

Deposition of Richard Padilla at 25:6-26:6 (taken May 15, 2012), filed March 3, 2014

(Doc. 182-19)("ASI New Mexico's Padilla Depo."); Response ¶ 31, at 4 (not disputing this fact).

"The process to be followed by ASI security officers in the event that any attendee refused to

undergo a pat-down search was to escort that individual to a school official who would then take

care of the situation."  MSJ ¶ 32, at 9 (setting forth this fact).  See ASI New Mexico's Archuleta

Depo. at 187:4-188:3; Response ¶ 32, at 5 (stating that this fact is "[u]ndisputed").

 "ASI's Policy Manual contained no policy establishing or requiring that, as a matter of

standard ASI procedures, ASI security officers perform pat-down searches on all attendees of

school events at which ASI provided security services."  MSJ ¶ 38, at 10 (setting forth this fact).

See ASI New Mexico's Archuleta Depo. at 64:25-65:13; ASI New Mexico's Aguilar Depo. at

44:10-16; Policy Manual for Associated Security Industries (no date provided), filed March 3,

2014 (Doc. 181-1)("ASI Policy Manual"); Response ¶ 38, at 5 (not disputing this fact).  "ASI

had no policy or pat-down guideline of its own that directed ASI security officers to touch the

breasts or breast area, touch bare or exposed skin, or directly touch middle, upper or inner thighs

as part of a standard pat-down search."  MSJ ¶ 39, at 10 (setting forth this fact).  See Archuleta

Depo. at 138:2-139:8; Standard Opporating [sic] Procedures at 1 (no date provided), filed March

3, 2014 (Doc. 1825-4); SOP for Pat Downs at 1 (no date provided), filed March 3, 2014

(Doc. 182-4); SOP for Conducting a Search at 1 (undated), filed March 3, 23014 (Doc. 182-4);

Pat-Down Guidelines at 1.[66]

"ASI neither received, nor followed, any policy or guideline from SFPS that directed ASI security officers to touch the breasts or breast area, touch bare or exposed skin, or directly touch middle, upper or inner thighs as part of a standard pat-down search."  MSJ ¶ 40, at 10-11 (setting forth this fact).  See ASI New Mexico's Archuleta Depo. at Depo. at 138:2-139:8; id. at 142:18-143:7; id. at 144:6-145:14; ASI New Mexico Policy Manual *passim*; Response ¶ 40, at 5 (not disputing this fact).  "ASI security officers, like school employees, performed searches on students only when specifically authorized or requested to do so by SFPS administrative

---

[66]The Plaintiffs respond: "Disputed.  ASI maintained a policy and practice that foreseeably led to the pat-down searches described in" this fact.  Response ¶ 39, at 5 (citing Pat Down Guidelines (no date provided), filed March 20, 2014 (Doc. 193-20)).  ASI New Mexico replies:

> Plaintiffs rely on the "'Pat Down' Guidelines" memorialized by Troy Dunn, Sr. as evidence contradicting this fact.  However, the typed guidelines were created from ASI's understanding of SFPS administration's expectations for student pat-downs.  See [Dunn Aff. ¶¶ 3-4, at 1-2].  Moreover, none of Plaintiffs' claims are based on them having been required to pull on their own bras as part of the pat-down procedure.  It remains undisputed that ASI had no procedure of its own, and received none from SFPS, that included or authorized the type of inappropriate touching that Plaintiffs claim occurred during their pat-down searches at the 2011 Capital High prom.

Reply ¶ 39, at 18 (citation omitted).  The Court finds the fact undisputed: the Plaintiffs have not controverted the proposed fact -- which is, in essence, that Santa Fe Schools and ASI New Mexico had no policy that authorized the more invasive searches -- but instead stated a legal conclusion -- which is that the policies Santa Fe Schools and ASI New Mexico had foreseeably led to those outcomes.  That legal conclusion is best saved for the analysis.  Accordingly, the Court deems the fact undisputed.

The Court notes that ASI New Mexico failed to attach certain sections of Archuleta's deposition that it cites in its MSJ.  The Court has, however, found this fact undisputed, because there is no evidence that ASI New Mexico had a "policy or pat-down guideline of its own that directed ASI security officers to touch the breasts or breast area, touch bare or exposed skin, or directly touch middle, upper or inner thighs as part of a standard pat-down search."  MSJ ¶ 39, at 10 (setting forth this fact).

personnel and sometimes SFPS administrative personnel performed the pat-down searches on students at the schools."   MSJ ¶ 41, at 11.   See ASI New Mexico's Romero Depo. at 55:21-56:22; ASI New Mexico's Archuleta Depo. at 64:25-66:3; Vol. I ASI New Mexico's Johnson Depo.at 114:3-12; id. at 119:7-14;[67] ASI New Mexico's Hagele Depo. at 43:18-44:3; id. at 45:7-46:3; ASI New Mexico's Aguilar Depo. at 44:10-16; id. at 45:23-46:3; ASI New Mexico's Lujan Depo. at 14:1-15:2; id. at 72:22-74:3; id. at 75:4-12; ASI New Mexico's Padilla Depo. at 22:11-20.[68]

---

[67]The SFPS Defendants' counsel objected to the question that elicited this testimony, which reads:

> Q.     In terms of what you direct your security officers to do in terms of when to conduct a search of a student, you rely on the directives that have been given by Santa Fe Public Schools; is that right?

> Mr. Coppler: Object to the form of the questions.

> A.  We rely on the judgment of the superintendent or the administrator who is present.

ASI New Mexico's Johnson Depo. at 119:7-14 (capitalization and bolding altered for readability).   The question is, in context, clear: the question asks who directed the security officers.   Accordingly, the Court overrules this objection.

[68]The Plaintiffs respond: "Disputed. ASI guards may search and seize obviously dangerous items such as a gun."   Response ¶ 41, at 5.   ASI New Mexico replies: "Plaintiffs' reference to ASI security officers being able to immediately confiscate a dangerous weapon from a purse without needing prior approval from an SFPS administrator creates no genuine dispute regarding" this fact.   Reply ¶ 39 at 18.   ASI New Mexico is correct: the proposed fact deals with the circumstances under which it could search students and not when it could seize obviously dangerous items.   The evidence that the Plaintiffs cite relates only to when ASI New Mexico could confiscate an item and not to when ASI New Mexico could search for such an item in the first place.   See Vol. II Plaintiffs' Johnson Depo. at 145:24-146:4 ("The guard would notify the administrator that something suspect was found, and then the administrator would make that decision, unless it is something clear, like a weapon.   If it's a gun, we would kind of -- we would remove it immediately.").   Accordingly, the Court has found the fact undisputed.

The standard pat-down procedure ASI security officers were to follow in performing pat-down searches at the 2011 Capital High prom instructed ASI security officers not to pat-down on bare skin, to keep their palms flat, to not "cup" their hands, to use the back of their hands in a light patting motion, and that no pat-downs should ever be done in the groin and breast areas.

MSJ ¶ 42, at 11 (setting forth this fact).  See Pat-Down Guidelines *passim*.[69]

Both SFPS administration and ASI supervisory employees believe that pat-down searches of all attendees of school dances, homecoming and similar school events, in general, and at the prom, in particular, were reasonably required to exclude drugs, alcohol, [and] weapons . . . from the prom and to dissuade attendees from taking such things to the prom.

MSJ ¶ 43, at 11 (setting forth unmodified version of this fact).  See ASI New Mexico's Romero

---

[69]ASI New Mexico also cites a section of the Archuleta Depo. in support of this assertion. It did not, however, file that portion of the Archuleta Depo.  Accordingly, the Court bases this finding on the Pat-Down Guidelines and on the fact that the Plaintiffs did not properly dispute the fact.

The Plaintiffs respond: "Disputed. ASI guards were instructed to search the bra area. [Pat-Down Guidelines *passim*.]  ASI guards were taught to pat down students with palms facing the student.  [Plaintiffs' Reyes Depo. at 59:5-16]."  Response ¶ 43, at 6.  ASI New Mexico replies:

Plaintiffs incorrectly state that ASI security officers were instructed to search the bra area.  The pat-down guidelines expressly prohibited officers from touching students in the bra area.  Plaintiffs' record citation also establishes that any directive to have students pull their own bras away from their bodies came from SFPS administrator, Dr. Clarke.  Moreover, assertions that pat-down guidelines included having students pull their own bras away from their bodies are irrelevant to Plaintiffs' claims, which are based on allegations that an ASI security officer touched them in the breast area herself.  Finally, Corporal Reyes's testimony is not clear as to who purportedly trained her to pat with palms facing in – which was contrary to the standard pat-down procedure that ASI expected its guards to follow.

Reply ¶ 19, at 18-20 (citations omitted).  The Court has found the fact undisputed.  The fact is about what the standard procedures, which the "Pat Down" Guidelines embody, required, and not about what Santa Fe Schools employees might have been taught in other settings. Accordingly, the Plaintiffs have not properly disputed the fact, and the Court deems it undisputed.

Depo. at 101:10-102:5; id. at 102:18-104:14; id. at 105:3-106:6; ASI New Mexico's Archuleta

Depo. at 112:3-23; id. at 115:18-116:19; id. at 126:14-127:8; id. at 130:11-15; id. at 130:24-

132:3; Romero Aff. ¶¶ 3-4, at 1-2.[70]  "Principal Romero and others believed it was reasonable

and necessary to perform pat-down searches of all prom attendees because there is a history of

students and event attendees hiding banned items to take those items into events."  MSJ ¶ 44, at

11 (setting forth this fact).  See ASI New Mexico's Romero Depo. at 101:10-104:1; id. at

168:18-169:8;[71] Archuleta Depo. at 112:3-23; id. at 113:7-21; id. at 115:14-116:19; Clarke Depo.

_____

[70]The Court has modified the fact, which asked the Court to find that Santa Fe Schools and ASI New Mexico employees believed these searches were reasonably required to exclude tobacco, see MSJ ¶ 43, at 11, because ASI New Mexico has not cited testimony related to tobacco.

The Plaintiffs respond: "Disputed to the extent the proposed fact suggests that the beliefs were reasonable, a legal conclusion."  Response ¶ 43, at 6.  ASI New Mexico replies: "Plaintiffs dispute any legal conclusion that the beliefs were reasonable.  UMF 43 establishes the absence of the required culpable mental state for punitive damages."  Reply ¶ 43, at 19.  In the end, the Plaintiffs have not disputed the fact.  The Court has, therefore, deemed it undisputed.  The Court will, if necessary, determine this fact's import in its analysis.

[71]The Court overrules the SFPS Defendants' objection to the question that elicited this testimony, which reads:

> Q.    Did you have, yourself, any individualized reasonable suspicion of any of the students that came into the 2011 Capital High School prom?
>
> Mr. Coppler: Object as to form.
>
> A.    Repeat the question.
>
> Q.    Sure.  Did you have any individualized suspicion of any of the students that came into the 2011 Capital High school prom?
>
> Mr. Coppler: Object as to form.
>
> A.    I'm always suspicious of any student coming into a dance, of what they could possibly bring.  So, again, it's just taking the extra precautions to ensure that they don't.  I know their energy is high, that they tend to engage in at-

at 33:5-25; id. at 68:13-69:24; id. at 80:9-20; id. at 106:17-108:16; Romero Aff. ¶ 3, at 1.[72]

"The Superintendent of SFPS did not believe it was necessary to pat-down every student entering prom."  Response ¶ 49, at 15 (setting forth this fact).  See Vol. II Plaintiffs' Gutierrez Depo. at 275:11-278:11; Reply ¶¶ 49-51, at 26 (not disputing this fact).[73]  "The Superintendent

---

[72]The Plaintiffs respond: "Disputed.  The cited testimony does not identify 'others.' Disputed as incomplete because Ms. Romero also indicated that she believed pat-down searches of all prom attendees were necessary because that was SFPS's practice.  Further disputed to the extent the proposed fact suggests that the beliefs were reasonable, a legal conclusion.  Response ¶ 44, at 6 (citations omitted).  ASI New Mexico replies:

> Plaintiffs dispute any legal conclusion that the beliefs were reasonable.  Plaintiffs fault the fact for not identifying "others."  But see, DOC 142 (Memorandum Opinion and Order) at p. 9 (stating this fact).  Plaintiffs assert the fact is incomplete because Principal Romero also believed that pat-down searches of all prom attendees were necessary because that was SFPS's practice.

Reply ¶ 44, at 20 (citation omitted).  Despite this cryptic reply, the Court deems the fact undisputed.  First, although the cited testimony does not identify "others," the cited testimony is from people other than Romero -- specifically, Archuleta and Clarke.  Second, that Romero also believed that, by patting down all prom attendees, she was following school policy does not call into question the asserted fact, which is that she "and others believed it was reasonable and necessary to perform pat-down searches of all prom attendees because there is a history of students and event attendees hiding banned items to take those items into events."  MSJ ¶ 44, at 11.  Finally, the Court does not understand the fact to suggest that her beliefs were reasonable, which, as the Plaintiffs point out, would be a legal conclusion and not a fact.  Accordingly, the Court has found the fact undisputed.

[73]ASI New Mexico, responding to several facts together, "does not dispute that Gutierrez stated these opinions, or that Principal Romero acknowledged that SFPS's search procedures were not 100 percent effective, but these statements are immaterial to Plaintiffs' claims against ASI."  Reply ¶¶ 49-51, at 26.  The Court has found the fact undisputed.  The Court will, if necessary, discuss these facts' materiality in its analysis.

of SFPS admitted that conducting pat-down searches of students only after a wand alerted would be a sufficient and effective procedure for SFPS proms." Response ¶ 50, at 15 (setting forth this fact).  See Vol. I Plaintiffs' Gutierrez Depo. at 195:13-196:1; Reply ¶¶ 49-51, at 26 (not disputing this fact).[74]  "Principal Romero acknowledged that SFPS search protocol of pat-downs, wanding, and bag searches was not always effective in excluding drugs and alcohol from the dances." Response ¶ 51, at 15 (setting forth this fact).  See Plaintiffs' Romero Depo. at 102:19-24; Reply ¶¶ 49-51, at 26 (not disputing this fact).[75]

### 4.      The Plaintiffs' Knowledge of Santa Fe Schools' Search Policy; Their Searches; The Searches' Effects.

"Students entering the 2011 Capital High School prom were subjected to pat-down searches without any individualized suspicion." Response ¶ 48, at 15 (setting forth this fact). See Vol. II Plaintiffs' Reyes Depo. at 48:9-21; Response *passim* (not responding to this fact). "Each of the four individual Plaintiffs was subjected to an intrusive pat-down search at the Capital High School prom." Response ¶ 1, at 9 (setting forth this fact). See Reply at 24 (not disputing this fact).[76]  "Principal Romero did not have individualized reasonable suspicion to search Plaintiffs at the 2011 Capital High School Prom." Response ¶ 14, at 11 (setting forth this fact).  See Plaintiffs' Romero Depo. at 168:23-170:21; id. at 172:4-11; id. at 176:12-13; id. at

---

[74]The Court disposed of ASI New Mexico's response to this fact above, supra note 71, and will not repeat itself here.

[75]The Court disposed of ASI New Mexico's response to this fact above, supra note 71, and will not repeat itself here.

[76]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

177:24-178:4; id. at 181:7-10; id. at 184:3-9; id. at 184:25-185:9; Reply at 24-25 (not disputing this fact).[77]  The Court will discuss each Plaintiff's search in turn.

a.   **C. Herrera's Awareness of SFPS' Search Policy; Her Search; Its Effects.**

"Plaintiff C. Herrera underwent pat-down searches by ASI security officers at the 2010 Capital High prom and at homecoming dances and, therefore, knew she would be subject to a pat-down search when she arrived at the 2011 Capital High prom."  MSJ ¶ 47, at 12 (setting forth this fact).  See ASI New Mexico's C. Herrera Depo. at 35:14-36:11; id. at 198:17-200:9; id. at 201:4-202:15; id. at 203:11-204:24; Response ¶ 47, at 6 (stating only "Court previously deemed undisputed" and, not, therefore, disputing the fact).

Although C. Herrera finds any search without probable cause invasive, at the time she was searched,

> Plaintiff C. Herrera had no objection to the pat-down searches she experienced in
>
> attending the 2010 Capital High prom and homecoming dances, which were like the pat-down search at the 2011 Capital High prom but for the alleged improper groping and touching of bare skin during the 2011 Capital High prom pat-down.

MSJ ¶ 48, at 12 (setting forth unmodified version of this fact).  See ASI New Mexico's C. Herrera Depo. at 198:4-200:9; id. at 201-4-15; id. at 204:5-20; Videotaped Deposition of Candice Herrera at 201:4-9 (taken July 27, 2012), filed March 20, 2014 (Doc. 193-8)("Plaintiffs'

---

[77]ASI New Mexico lists this fact among several others as duplicating certain other facts. See Reply at 24 (asserting that the "Plaintiffs' SOFs 14, 26-29, 34-37, 41, 43-56, 47, and 56" duplicate facts discussed elsewhere (footnote omitted)).  Because ASI New Mexico, although complaining that these facts are repetitive, did not specifically controvert the facts in this section, the Court has found these facts undisputed.  The Court has made efforts to eliminate needless repetition in its discussion of the facts, but, so long as the evidence supports the proposed facts, the Court will, where feasible, include those facts as the parties both discussed them, rather than favoring one side's description over the other.

C. Herrera Depo."); id. at 203:17-204:4.[78]

_____

[78]ASI New Mexico asks the Court to find undisputed the quoted portion of this fact.  The Plaintiffs respond:  "Disputed. (Ex. 8, C. Herrera Dep. at 201:4-9.) Candice Herrera indicated that any patdown not based on reasonable suspicion is objectionable and invasive. (Ex. 8, C. Herrera Dep. at 203:17-204:4.)"  Response ¶ 48, at 6.  ASI New Mexico replies:

> Plaintiffs' [sic] dispute ASI's fact by adding C. Herrera's testimony that pat-down searches at the 2010 Capital High prom "weren't so violating," "wasn't to the extent of them groping areas that were inappropriate," and that "Any pat-down search without probable cause would technically be invasive." Plaintiffs' additional citations create no genuine dispute regarding UMF 48.

Reply ¶ 48, at 20 (citations omitted).  The Court concludes that its statement more fairly reflects the evidence: although C. Herrera did not voice any objection to the pat-down searches she experienced at the 2010 dances, she nonetheless stated that undergoing a pat-down search that probable cause does not support would be invasive.  Accordingly, the Court has modified the proposed fact to fairly reflect C. Herrera's qualification of her general testimony about the search's offensiveness.

ASI New Mexico asks the Court to find undisputed that "Plaintiff C. Herrera did not object to undergoing a pat-down search at the 2011 Capital High prom, or complain regarding its scope, at the time of the search."  MSJ ¶ 49, at 12.  The Plaintiffs respond:  "Disputed.  Plaintiff Candice Herrera objected by attempting to stop the guard from raising her dress higher up her legs during the conduct of the pat-down search but was ordered by the guard to remove her hands and allow the search to proceed."  Response ¶ 49, at 6.  ASI New Mexico replies, to the Plaintiffs' response to this fact and others like it, as follows:

> ASI's evidence establishes that each Plaintiff understood that she was getting into a line to be pat-down searched at the prom, and that none of them objected to undergoing a pat-down search or reported to officials at the prom that inappropriate touching occurred during the pat-downs.  Plaintiffs' immaterial references to C. Herrera's effort to stop the ASI security officer from raising her dress during the search, and the other Plaintiffs' claimed remarks to students at the prom about the patdown searches, do not dispute [this fact].

Reply ¶¶ 49, 58, 66, & 72, at 20-21.  With respect to C. Herrera, the Plaintiffs are correct: C. Herrera testified:

> Q     And did you try to stop [the ASI New Mexico guard] from touching your breasts?
>
> A     I didn't know what was going on.  It  didn't give me enough time to react.  I had my arms still out from this and then she did that. And then after

The security guard

had [C. Herrera] spread [her] arms and legs out, and she patted along [C. Herrera's] arms, touched along the waist. And then she grabbed the outer part of [C. Herrera's] bra and moved it here. And then she grabbed the inner part of [C. Herrera's] bra and moved it here. And then she cupped [C. Herrera's] breasts and shook them.

* * * *

[A]fterwards she moved down to [C. Herrera's] waist and then she went all the way down [C. Herrera's] dress and then she pulled the dress up to about mid-thigh and she felt up the bare leg, as well.

Plaintiffs' C. Herrera Depo. at 127:16-128:9. See Response ¶ 1(a), at 9 (setting forth this fact's substance); Reply at 24-25 (not disputing this fact).[79]

a. [D]uring [C. Herrera's] pat-down search, the security officer patted C. Herrera's arms and waist, and grabbed the inner part of her bra, cupped her breasts, and felt up C. Herrera's bare leg after pulling her dress up to mid-thigh;

b. she was looking at the security officer performing the pat-down search on her when the security officer touched C. Herrera's breasts and bra clasp;

c. after the security officer touched C. Herrera's breasts, the security officer then picked up C. Herrera's dress to mid-thigh at which point C. Herrera tried to push her dress back down and the security officer told her to put her hands back up so she could finish; and

_____

that she went to reach for the dress and I tried to push her down like that. And she said, "You need to move your arms. I need to finish." I said, "Okay." I put my hands back up.

Plaintiffs' C. Herrera Depo. at 129:10-18. Viewing the facts in the light most favorable to the Plaintiffs, as the Court must at this stage, one could understand C. Herrera's physical resistance to the ASI New Mexico guard's search as a non-verbal objection to, or at least a complaint about the scope of, the search. Accordingly, the Court will not find ASI New Mexico's proposed fact undisputed.

[79]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts. See Reply at 24-25. Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

> d. when C. Herrera put her hands back up, she looked up at Principal
> Romero, who smiled at C. Herrera and turned back around.

MSJ ¶ 50, at 13 (setting forth this fact)(citations omitted).  See ASI New Mexico's C. Herrera Depo. at 127:16-128:9; id. at 129:10-18; id. at 129:16-131:2; id. at 135:16-136:2; Response ¶ 50, at 6 (stating that this fact is "[u]ndisputed").[80]  She tried "to stop the guard from lifting her dress by holding it down with her hands but the guard demanded that she remove her hands to allow the search to continue."  Response ¶ 3, at 8 (setting forth this fact).  See Plaintiffs' C. Herrera Depo. at 129:10-130:25; Reply at 24-25 (not disputing this fact).[81]

> After her pat-down search at the 2011 Capital High prom, Plaintiff C. Herrera:

> a. attended the prom, had fun at the prom, and enjoyed spending time with
> her friends there from approximately 8:00 p.m. until around 11:00 p.m.;

> b. went for ice cream afterwards with friends, ate ice cream with her
> friends in the Albertson's parking lot while sitting on or in their cars talking and
> listening to music;

> c. went to a park and spent time hanging out with her friends for a couple
> of hours where they played on the playground equipment;

> d. graduated from high school in 2011 and attended college; and

> e. was successfully employed during the summer after graduating from
> high school in 2011.

---

[80]Although the Court would not normally find characterizations of deposition testimony to be facts for summary judgment purposes, because ASI New Mexico put forth these characterizations as facts, and because the Plaintiffs have stated that this characterization of her testimony is undisputed, the Court is reluctant to reformulate the characterizations.  Accordingly, the Court has found these characterizations of testimony undisputed for summary-judgment purposes.

[81]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

MSJ ¶ 51, at 14 (setting forth these facts)(citations omitted).  See ASI New Mexico's C. Herrera Depo. at 6:20-11:18; id. at 38:18-40:5; id. at 100:4-101:5; id. at 101:18-102:20; id. at 103:20-104:16; id. at 221:12-17; id. at 224:2-10; id. at 267:9-269:4; id. at 279:10-280:15, 282:14-21; Response ¶ 51, at 7 (stating that these facts are "[u]ndisputed").[82]  C. Herrera discovered, when she left the CHS Prom, that prescription medication that had been confiscated during her search was thrown away; this discovery upset her.[83]

_____

[82]ASI New Mexico neglected to include several sections of ASI New Mexico's C. Herrera Depo. that it cited in its MSJ.  The Court has included those sections that are cited; together with the Plaintiffs' express admission that the facts are undisputed, see Response ¶ 51, at 7, the cited statements establish that the facts are undisputed.

[83]ASI New Mexico asks the Court to find undisputed that,

> [e]ven though she raised no complaint while her pat-down search was being performed, Plaintiff C. Herrera became upset and spoke with SFPS personnel and an ASI security officer when she discovered, as she was leaving the prom, that a prescription medicine pill confiscated from her on arrival had been discarded and would not be returned to her before she left.

MSJ ¶ 52, at 15.  The Plaintiffs respond:

> Disputed. Plaintiff Candice Herrera objected by attempting to stop the guard from raising her dress higher up her legs during the conduct of the pat-down search but was ordered by the guard to remove her hands and allow the search to proceed.  Disputed that Candice Herrera "became" upset upon learning that her medication had been discarded; she was already upset about being searched and having her medication confiscated.

Response ¶ 52, at 7 (citation omitted).  ASI New Mexico replies:

> Plaintiffs dispute ASI's fact based on C. Herrera having attempted to push her dress down during the pat-down search and by asserting that C. Herrera was already upset about her medication being confiscated before leaving the prom.  Plaintiffs' references create no genuine dispute regarding [this fact], which establishes that C. Herrera reported no complaint regarding purported inappropriate touching to officials at the prom, but contemporaneously

Plaintiff C. Herrera describes the emotional distress she claims to have experienced, because of the pat-down search performed on her at the 2011 Capital High prom, as worrying about whether she might be subjected to pat-down searches at other events she attends, especially school events. She was angered and embarrassed by the pat-down search.

MSJ ¶ 53, at 14 (setting forth this fact).  See ASI New Mexico's C. Herrera Depo. at 205:2-207:9; id. at 233:21-234:24; Response ¶ 53, at 7 (not disputing this fact).[84]  C. "Herrera felt

---

complained to officials regarding confiscation of her medicine.

Reply ¶ 52, at 21.

The Court will not find the proposed fact undisputed.  First, for substantially the reasons that the Plaintiffs outline, the Court has not concluded that it is undisputed that C. Herrera raised no complaints: one could interpret her physical resistance as a complaint or objection to the search.   Accordingly, it will not adopt the first clause of the proposed fact as undisputed. Second, the Court agrees with the Plaintiffs that, insofar as the proposed fact suggests that C. Herrera became upset for the first time after she discovered that her medication would not be returned to her, the fact is not undisputed: the evidence shows that the facts that C. Herrera's medication had been confiscated, see Plaintiffs' C. Herrera Depo. at 154:25-155:16, and that she had been searched, see Plaintiffs' C. Herrera Depo. at 177:15-178:3; id. at 180:11-181:11, upset C. Herrera.  Accordingly, the Court has modified the proposed fact to eliminate the implication that she became upset for the first time after she discovered that her medication would not be returned to her and does not read its undisputed fact to suggest that nothing else that evening upset C. Herrera.

[84]The Plaintiffs respond: "Undisputed, but incomplete."  Response ¶ 53, at 7.  They cite other portions of C. Herrera's deposition which suggests that she has suffered other forms of emotional distress.  See Response ¶ 53, at 7 (citing, e.g., Plaintiffs' C. Herrera Depo. at 181:7-11 ("So what would make it not violating?  You're being touched.  You're being shown on body parts that you don't want to be shown and [school officials are] standing by and watching. They're standing by knowing that it's going on.  They're allowing everybody to be pat down."). ASI New Mexico states, without substantively replying: "Plaintiffs cite additional testimony by C. Herrera that she felt uncomfortable and that the pat-down experience ranked right up there with when she found out that her dad was in jail."  Reply at 6 n.8.  The Court has found the fact undisputed, because the Plaintiffs have stated that it is undisputed.  It does not, however, read the fact to reflect the only sort of emotional distress C. Herrera suffered, but rather one category of emotional distress.

The Court also notes that, during the deposition, the Plaintiffs' counsel objected to certain questions in the testimony cited for these facts.  The Plaintiffs did not renew those objections in their Response; indeed, they labeled the facts drawn from the answers undisputed.  Accordingly, the Court overrules the objections for purposes of this opinion.

exposed and uncomfortable with her dress pulled up."  Response ¶ 2, at 10 (citing Plaintiffs' C.

Herrera Depo. at 177:15-178:3).[85]  She "did not know how to react when her breasts were

touched during her pat-down search, especially because of the guard's position of authority."

Response ¶ 4, at 9 (citing Plaintiffs' C. Herrera Depo. at 130:3-11).  See Reply at 24 (not

disputing this fact).[86]   "The experience of being searched left Candice Herrera

feeling . . . violated and exposed."  Response ¶ 11, at 11 (setting forth unmodified version of this

fact).  See Plaintiffs' C. Herrera Depo. at 180:11-181:11; Reply at 24 (not disputing this fact).[87]

---

[85]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

[86]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

[87]The Plaintiffs ask the Court to find undisputed that C. Herrera felt "extremely violated and exposed."  Response ¶ 11, at 9 (emphasis added).  The Court has disposed of ASI New Mexico's discussion of this fact above, supra note 29, and will not repeat itself here.  The Court has, however, removed the word "extremely" from the proposed fact, because C. Herrera did not use that word to describe her sense that she was violated and exposed:

> Q.    Paragraph 10 [of an unidentified document] says that you were extremely uncomfortable during the pat-down body search and felt severely violated and exposed.  Do you see that?
>
> A.    Yes, sir.
>
> Q.    Can you describe for me what you mean by 'severely violated and exposed'?
>
> [Plaintiffs' counsel:] Objection; asked and answered.
>
> A.    If you're pulling up -- the security guard is pulling up my dress, exposing my legs, which I'm uncomfortable with, she's grabbing my breasts, which is a stranger pretty much walking up to you, if somebody were to do that to you on the street, you'd call the cops.  So -- but because it was a school event and

"The presence" and evident approval of school administrators made the situation "that much more uncomfortable." Plaintiffs' C. Herrera Depo. at 180:11-181:11.[88] She "continues to worry about the possibility of people touching her." Response ¶ 13, at 11. See Plaintiffs' C. Herrera Depo. at 204:25-207:9; Reply at 24 (not disputing this fact).[89]

"Plaintiff C. Herrera never sought or received any medical treatment or counseling for

---

it's supposed to be sponsored and watched over by all the administration, it's supposed to be a comfortable situation. By it being supported by our administration, it made it that much more uncomfortable, because they're supposed to be watching out for their students, protecting them from something. And yet they're watching it and authorizing it.

So what would make it not violating? You're being touched. You're being shown on body parts that you don't want to be shown and they're standing by and watching. They're standing by knowing that it's going on. They're allowing everybody to be pat down.

Plaintiffs' C. Herrera Depo. at 180:11-181:11. The Court concludes that its description of the testimony, with the word "extremely" excised, fairly represents the testimony.

[88]The Plaintiffs ask the Court to find undisputed that "[t]he presence of SFPS administrators made Candice Herrera feel 'much more uncomfortable.'" Response ¶ 11, at 9 (quoting C. Herrera Depo. at 181:2-3). The Court disposed of ASI New Mexico's discussion of this facts above, supra note 29, and will not repeat itself here. The Court has, nonetheless, modified the Plaintiffs' proposed fact, because the cited testimony is of a slightly different tenor than the Plaintiffs' rephrasing of it makes it sound. The proposed fact suggests that the mere presence of administrators made C. Herrera feel "much more uncomfortable," without explaining the context -- that is, the baseline against which she measured her discomfort. In context, a different nuance is apparent: C. Herrera meant that, although being touched in that manner would be offensive in other settings, that administrators were not only present, but "watching . . . and authorizing" the touching made what should have been a "comfortable situation" in which the administration was "watching out for their students, protecting them from something," an uncomfortable situation. Plaintiffs' C. Herrera Depo. at 180:11-181:6. The Court concludes that its phrasing captures C. Herrera's testimony's nuances more precisely than does the Plaintiffs' proposed fact.

[89]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts. See Reply at 24-25. Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

injuries she claims to have experienced because of the pat-down search at the 2011 Capital High prom." MSJ ¶ 54, at 14 (setting forth this fact). See ASI New Mexico's C. Herrera Depo. at 233:6-20; Response ¶ 54, at 7 (stating that this fact is "[u]ndisputed").[90]

        **b.**      **T. Herrera's Awareness of SFPS' Search Policy; Her Search; Its Effects.**

"Plaintiff T. Herrera attended homecoming dances in 2010 and 2011 at Capital High with her sister, Plaintiff C. Herrera, and pat-down searches of all students were conducted at those homecoming dances." MSJ ¶ 55, at 14 (setting forth this fact). See ASI New Mexico's C. Herrera Depo. at 202:5-8; id. at 203:11-22; Videotape Deposition of Tiffany Herrera at 128:8-129:3 (taken August 13, 2012), filed March 3, 2014 (Doc. 182-14)("ASI New Mexico's T. Herrera Depo."); Response ¶ 55, at 7 (stating that the fact is "[u]ndisputed").[91]

"Plaintiff T. Herrera proceeded to the search line after arriving for the Capital High prom,

---

    [90]The Plaintiffs assert that this fact is immaterial. See Response ¶ 54, at 7. The Court will, if necessary, discuss this asserted fact's materiality in its analysis.

    The Court also notes two things about this fact. First, strictly speaking, the testimony is only about psychiatric or psychological counseling, see C. Herrera Depo. at 233:6-20, and not about all medical treatment. Because the Plaintiffs have stated that the fact is undisputed, however, the Court will find the fact undisputed. Second, during the deposition, the Plaintiffs' counsel objected to a question in the testimony cited for this fact. The Plaintiffs did not renew this objection in their response; indeed, they have stated that this fact is undisputed. Accordingly, the Court overrules the objection for purposes of this opinion.

    [91]The Plaintiffs stated that this fact is "Undisputed, [but] immaterial. The cited testimony does not establish whether Tiffany Herrera was subjected to pat-down searches at homecoming dances." Response ¶ 54, at 7. ASI New Mexico does not reply to this allegation. What is more curious, in a section of T. Herrera's deposition that ASI New Mexico does not cite in support of this fact -- and that the Plaintiffs do not cite in responding to the fact -- T. Herrera states that there was no pat-down search at the homecoming dances in 2010 and 2011. See ASI New Mexico's T. Herrera Depo. at 129:4-8. Given that the parties seem to elsewhere agree that such searches were regularly conducted before such events, and that the Plaintiffs have stated that the fact is undisputed, the Court understands the Plaintiffs to implicitly concede that T. Herrera erred in her statement that no pat-down search occurred before these dances.

waited to be pat-down searched after her sister and one or two other female students ahead of

Plaintiff C. Herrera, and observed portions of her sister's pat-down search before being pat-down

searched herself."  MSJ ¶ 56, at 15 (setting forth this fact).  See ASI New Mexico's T. Herrera

Depo. at 51:4-52:23; id. at 54:11-16; id. at 119:15-120:11; id. at 129:20-130:3; Response ¶ 56, at

7 (stating that this fact is "[u]ndisputed").

> The security guard
>
> asked [T. Herrera] to spread [her] arms out and she ran her hands along [T. Herrera's] arms which she could clearly see.  And then she continued down to pat down [T. Herrera's] waist and hips.
>
> * * * *
>
> And then she -- and then she went back up and cupped both [T. Herrera's] breasts and shook them.  And then she continued down to pat down the sides of [T. Herrera's] dress.  And then she lifted up [T. Herrera's] dress and with her bare hands she ran her hands down along the inside of [T. Herrera's] legs.

Plaintiffs' T. Herrera Depo. at 58:20-23; id. at 59:9-14.  See Response ¶ 1(b), at 9 (setting forth

substantially this fact); Response at 24 (not disputing this fact).[92]

> a. [T. Herrera] was standing face-to-face with the security officer and was looking at the security officer during T. Herrera's pat-down search;
>
> b. the pat-down search included the security officer patting T. Herrera's arms, behind her shoulder, her sides, grabbing and shaking T. Herrera's breasts, and picking up T. Herrera's dress and running her hands along the inside and outside of T. Herrera's legs up to mid-thigh and that, while this whole pat-down search was going on, T. Herrera was looking at the security officer's face but not in her eyes;
>
> c. she has never spoken to anyone who ever said that they saw her pat-down search;

---

[92]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the asserted fact, the Court finds it undisputed.

d. she does not know if Melanie Romero or any other Capital High School staff saw her pat-down search even though they were only a few feet away from her; and

e. she does not know if anybody saw her body exposed during the pat-down search.

MSJ ¶ 59, at 15-16 (setting forth these facts)(citations omitted).   See ASI New Mexico's T. Herrera Depo. at 60:24-61:19; id. at 62:8-19; id. at 63:15-64:3; id. at 65:11-67:7; id. at 69:5-11; id. at 121:24-122:4; id. at 125:4-17; Response ¶ 59, at 15-16 (stating that this fact is "[u]ndisputed").  "Plaintiff T. Herrera did not object to undergoing a pat-down search at the 2011 Capital High prom, or complain regarding its scope, at the time of the search."  MSJ ¶ 58, at 15 (setting forth this fact).   See ASI New Mexico's Romero Depo at 241:13-242:2; ASI New Mexico's Lucero Depo at 60:15-25; id. at 84:14-21; id. at 143:16-19; id. at 148:18-149:1; Romero Aff at ¶ 14; ASI New Mexico's T. Herrera Depo at 67:4-10; id. at 183:17-184:7.[93]

"T. Herrera describes the pat-down search that allegedly included the security officer touching T. Herrera's breast area and touching her bare skin as improper[,] because," among other reasons, "'they shouldn't have done such an invasive search.'"  MSJ ¶ 57, at 15 (setting forth unmodified version of this fact)(quoting ASI New Mexico's T. Herrera Depo. at 74:13-17).

---

[93]The Plaintiffs purport to dispute this fact, stating that T. "Herrera objected to the pat-down search while at prom; she specifically discussed the inappropriateness of the search with other students."   Response ¶ 58, at 7.   ASI New Mexico replies, in relevant part, that its "evidence establishes that each Plaintiff understood that she was getting into a line to be pat-down searched at the prom, and that none of them objected to undergoing a pat-down search or reported to officials at the prom that inappropriate touching occurred during the pat-downs." Reply ¶¶ 49, 58, 66, & 72, at 20.

The Court has found the fact substantially undisputed.  That T. Herrera later discussed feeling uncomfortable with the search does not specifically controvert the proposed fact, which is that she did not object or complain about the search at the time of the search.  Accordingly, the Court deems this fact undisputed for purposes of this opinion.

See ASI New Mexico's T. Herrera Depo. at 62:5-64:24; id. at 74:13-17; Plaintiffs' T. Herrera

Depo. 183:7-16; id. at 190:13-191:6.[94]  She "described her search as 'extremely uncomfortable'

and indicated that she 'felt violated, disrespected.'"  Response ¶ 4, at 10 (quoting Plaintiffs' T.

Herrera Depo. at 86:19-25).  See Reply at 24 (not disputing this fact).[95]

        After her pat-down search at the 2011 Capital High prom, Plaintiff T.
Herrera:

        a. focused on having a good time at the prom, attended the prom until
    almost the end, sat at the table having a good time talking with friends, danced,
    and the mood was "happy";

---

[94]ASI New Mexico asks the Court to conclude that it is undisputed that "Plaintiff T. Herrera describes the pat-down search that allegedly included the security officer touching T. Herrera's breast area and touching her bare skin as improper because 'they shouldn't have done such an invasive search.'"  MSJ ¶ 18, at 8 (quoting T. Herrera Depo. at 74:13-17).  The Plaintiffs respond:

        Disputed. The quoted passage is not Tiffany Herrera's explanation of why
    the search was improper.  Instead, it is her paraphrasing of a statement she made
    to her classmates following the search and therefore does not capture all of the
    reasons she found the search improper.  For example, Tiffany also objected to the
    search because it was an "unwanted touch" and because it seemed unnecessary
    given that she had spent much of the day at the venue setting up for prom.

Response ¶ 57, at 6 (quoting Plaintiffs' T. Herrera Depo. at 190:21).  ASI New Mexico replies: "Plaintiffs' references to T. Herrera's description of the pat-down as an unwanted touch, and as unnecessary because she helped set up for the prom, raise no genuine dispute regarding" this fact.  Reply ¶ 57, at 21.  The Court concludes that its modified fact better reflects the evidence: it is true that T. Herrera believed that the search was improper because it was invasive, but is also true that she characterized the touch as "molestation," Plaintiffs' T. Herrera Depo. at 190:17-19 ("[Q:] Would you characterize [being touched by the guard,] as your sister did, as molestation? A[:] Yes"), as an "unwanted touch," Plaintiffs' T. Herrera Depo. at 190:21, as embarrassing, see Plaintiffs' T. Herrera Depo. at 183:7-12, and as confusing, because she did not understand why she was being searched, see Plaintiffs' T. Herrera Depo. at 183:13-16.  Accordingly, the Court has qualified the proposed fact to clarify that T. Herrera objected to the search for reasons other than for its invasiveness.

[95]The Court has disposed of ASI New Mexico's discussion of this fact above, supra note 37, and will not repeat itself here.

b. went to Albertson's with friends and bought ice cream and ate it in the parking lot;

c. met up with friends at a park for about an hour before going home;

d. raised no complaint regarding the pat-down search with any SFPS employee while at the prom because she did not think it was necessary because she was focused on having a good time at the prom;

e. successfully continued attending high school and increased her class load to include taking community college classes to help further her career interests in being a paramedic firefighter;

f. planned to attend college to seek a Bachelor's Degree in Emergency Medicine;

g. became involved in a volunteer firefighting department;

h. participated in track and field and was a cheerleader at Capital High during her junior year of high school;

i. considered participating in track and field her senior year at Capital High if not too busy with community college classes; and

j. graduated from high school.

MSJ ¶ 60, at 16-17 (setting forth these facts)(citations omitted).  See ASI New Mexico's T. Herrera Depo at 6:5-14; id. at 8:23-12:7; id. at 13:5-20; id. at 13:21-14:13; id. at 101:16-103:18; id. at 152:17-153:7; id. at 159:11-160:6; id. at 161:1-16; id. at 160:9-25; ASI New Mexico's Gurule-Leyba Depo. at 82:23-25.[96]

---

[96]The Plaintiffs respond: "Disputed. Tiffany Herrera objected to the pat-down search while at prom; she specifically discussed the inappropriateness of the search with other students. Immaterial."  Response ¶ 60, at 7 (citations omitted).  ASI New Mexico replies:

Plaintiffs only dispute (d) by asserting that T. Herrera objected by discussing the inappropriateness of the pat-down search with other students at prom.  Her purported remarks to other students raise no dispute regarding her own testimony that she did not voice any complaints to SFPS officials at the time.  Plaintiffs also assert that UMF 60 is immaterial; however, it is directly relevant to T. Herrera's

"Plaintiff T. Herrera describes the emotional distress she claims to have experienced, because of the pat-down search performed on her at the 2011 Capital High prom, as feeling awkward, extremely uncomfortable, humiliated, violated, disrespected, and embarrassed."  MSJ ¶ 61, at 17.   See ASI New Mexico's T. Herrera Depo at 68:19-25; id. at 182:16-183:12; Response ¶ 61, at 8 (not disputing this fact).[97]  "Plaintiff T. Herrera never sought or received any medical treatment or counseling for injuries she claims to have experienced because of the pat-down search at the 2011 Capital High prom."  MSJ ¶ 62, at 17 (setting forth this fact).   See ASI New Mexico's T. Herrera Depo. at 173:21-174:5; Response ¶ 62, at 7 (stating that this fact is "[u]ndisputed").[98]

---

inability to prove "severe and extreme" emotional distress to support her IIED claim.

Reply ¶ 60, at 22 (citation omitted). ASI New Mexico is correct: that T. Herrera objected to the pat-down search by discussing the search's inappropriateness with other students does not dispute the proposed fact, which relates to Santa Fe Schools employees.  Accordingly, the Court has found the fact undisputed.

[97]The Plaintiffs assert that this fact, although undisputed, is incomplete in light of her testimony that she fears that she will be unreasonably searched without justification at a future Santa Fe Schools event, because, to her knowledge, it has not changed the rules.  See Response ¶ 61, at 17 (citing Plaintiffs' T. Herrera Depo. at 145:3-17).  ASI New Mexico asserts that "T. Herrera's expressed fear is unfounded and unreasonable given the Court's order setting permissible guidelines for searches at SFPS school events."  Reply at 7 n.8 (citing Amended Memorandum Opinion and Order, filed May 20, 2011 (Doc. 32)).  The Court has found the fact undisputed, but does not understand it to mean that these bases of emotional distress are the only bases for emotional distress.

[98]The Plaintiffs assert that this fact is immaterial.  See Response ¶ 62, at 8.  The Court will, if necessary, decide this fact's materiality in its analysis.  The Court notes that, strictly speaking, the testimony relates only to counseling services.  See ASI New Mexico's T. Herrera Depo. at 173:21-174:5.  Because the Plaintiffs have stated that this fact is undisputed, however, see Response ¶ 62, at 7, the Court has found the fact undisputed.

c.      **Hurtado's Knowledge of SFPS' Search Policy; Her Search; Its Effects**.

"Hurtado was pat-down searched by an ASI security officer without any groping when she attended the 2009 Capital High prom and had no problems with the standard pat-down search that occurred at that prom."  MSJ ¶ 63, at 17.  See ASI New Mexico's Hurtado Depo. at 153:23-154:12; id. at 155:15-21; Response ¶ 63, at 8 (not disputing this fact).[99]  "Hurtado observed other students being searched when she arrived for the 2011 Capital High prom before getting into the search line herself.  She saw pat-down searches of two females in the search line, and her fiance's pat-down search, before being searched herself."  MSJ ¶ 64, at 17 (setting forth these facts.  See ASI New Mexico's Hurtado Depo. at 97:19-98:2; id. at 99:1-100:19; id. at 101:21-108:18; Response ¶ 64, at 8 (stating that this fact is "[u]ndisputed").[100]

> Plaintiff Hurtado could not see the fronts of the female students ahead of her in line during their pat-down searches, but the portions of their pat-down searches that she could see were basically the same as the pat-down search that she experienced except that neither of those students had the inside of their thigh patted like she states hers was.

MSJ ¶ 65, at 18 (setting forth this fact).  See ASI New Mexico's Hurtado Depo. at 117:25-118:24; id. at 134:14-23; Response ¶ 65, at 8 (stating that this fact is "[u]ndisputed").[101]

---

[99]The Plaintiffs respond: "Court previously deemed undisputed."  Response ¶ 63, at 8. Because the Plaintiffs have not specifically controverted the proposed fact, the Court has deemed the fact undisputed.

[100]ASI New Mexico also cites an unidentified exhibit to Hurtado's deposition, but did not attach that exhibit.  See MSJ ¶ 64, at 17 (citing an "Exhibit 17" to Hurtado's deposition). Accordingly, the Court does not rely on that document.

[101]The Plaintiffs' counsel objected to the form of a question in this section.  See ASI New Mexico's Hurtado Depo. at 134:14-17 (recording the Plaintiffs' counsel's objection to this question: "The searches of the two females ahead of you, were they the same searches, basically, that you underwent when you went through?").  The Court will overrule the objection, because the question is acceptable and clear, and because the Plaintiffs have stated that the fact based on

"Hurtado did not object to undergoing a pat-down search at the 2011 Capital High prom, or complain regarding its scope" to Romero or to the guards "at the time of the search."  MSJ ¶ 66, at 18 (setting forth this fact).  See ASI New Mexico's Romero Depo. at 241:13-242:2; ASI New Mexico's Lucero Depo. at 60:15-25; id. at 84:14-21; id. at 143:16-19; id. at 148:18-149:1; Romero Aff. ¶ 14, at 3; ASI New Mexico's Hurtado Depo. at 135:9-21; id. at 145:19-25.[102]

> The security guard

> went down the side of [Hurtado's] body and then she went with her hands with her palms facing in and went around [Hurtado's] breasts and went inside with her thumb to check if [Hurtado] had anything in [her] cleavage.  Went down  -- again down [her] body.  Went down both [her] thighs.  [Her] inner included.

Hurtado Depo. at 109:23-110:4.  See Response ¶ 1(c), at 9 (setting forth substantially this fact); Reply at 24 (not disputing this fact).[103]

---

this testimony is undisputed.

[102]The Plaintiffs assert that this fact is "Disputed. Plaintiff Hurtado objected to the search while at prom; she complained to both another student at prom and her date about the invasiveness of her search."  Response ¶ 66, at 8.  ASI New Mexico replies: "ASI's evidence establishes that each Plaintiff understood that she was getting into a line to be pat-down searched at the prom, and that none of them objected to undergoing a pat-down search or reported to officials at the prom that inappropriate touching occurred during the pat-downs."  Reply ¶¶ 49, 58, 66, & 72, at 20.  The Court has found the fact undisputed.  That Hurtado complained to another student and to her date about the invasiveness of her search during the prom would not specifically controvert ASI New Mexico's proposed fact that Hurtado did not object to or complain about the search at the time of the search -- that is, before she entered the prom.  Accordingly, the Court will substantially deem this fact undisputed.
      The Court has, however, modified the fact proposed slightly; although the testimony reflects that Hurtado did not complain or object to Romero or to the guards, it does not demonstrate that Hurtado did not complain to anyone.  Accordingly, the Court has qualified the proposed fact to reflect this limitation.

[103]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

      a. [T]he security officer was facing Hurtado while performing the pat-down search;

      b. during Hurtado's pat-down search, the security officer patted Hurtado down the sides of her body, touched Hurtado's breasts and in her cleavage, touched her inner thigh, and removed Hurtado's shoes and banged them on the table and then had Hurtado step back into her shoes;

      c. while the security officer was performing the pat-down search, Hurtado was looking straight forward down the hallway at the entrance to the bathrooms;

      d. Hurtado looked straight forward during her pat-down search because she felt uncomfortable and did not want to pay much attention or make eye contact with the security officer; and

      e. Hurtado could not see anybody as she was looking straight forward down the hallway towards the bathrooms during her pat-down search.

MSJ ¶ 67, at 19 (setting forth this fact)(citations omitted).  See ASI New Mexico's Hurtado Depo. 109:20-110:8; id. at 111:22-112:9; id. at 113:1-114:13; Response ¶ 67, at 8 (stating that this fact is "[u]ndisputed").  "Hurtado's conduct during the search indicated her discomfort with the search."  Reply ¶ 6, at 10 (setting forth this fact).  See Plaintiffs' Hurtado Depo. at 114:2-10; Reply at 24 (not disputing this fact).[104]

      After her pat-down search at the 2011 Capital High prom, Plaintiff Hurtado:

      a. attended the prom for approximately two hours, spent time there with Plaintiff London at a reserved table, ate snacks at their table, danced a little bit with her boyfriend, took some pictures, and laughed with her friends;

      b. took a picture of herself and Plaintiff London while attending the prom;

      c. went to get something to eat with her boyfriend after leaving the prom and then went for a drive with him half-way up to Hyde Park before going home;

---

[104]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

d. graduated from high school in 2011 and attended college; and

e. was successfully employed.

MSJ ¶ 68, at 18 (setting forth this fact)(citations omitted).   See   ASI New Mexico's Hurtado

Depo. at 20:11-22; id. at 23:7-27:9; 28:9-30:2; id. at 30:12-31:12; id. at 79:2-80:4; id. at 80:19-

81:3 at 136:3-137:8; id. at 139:8-140:15; id. at 140:20-142:15; id. at 222:19-23; Unidentified

Photograph (undated), filed March 3, 2014 (Doc. 182-15); Response ¶ 69, at 8 (stating that this

fact is "[u]ndisputed").[105]

"Hurtado describes the emotional distress she claims to have experienced, because of the

pat-down search performed on her at the 2011 Capital High prom, as being worried about going

to other places, like concerts, where she might be searched, and feeling humiliation and

embarrassment because of the pat-down search."  MSJ ¶ 69, at 19 (setting forth this fact).  See

ASI New Mexico's Hurtado Depo. at 185:15-25; id. at 186:23-187:4; id. at 188:3-14; Response

¶ 69, at 8 (stating that this fact is "[u]ndisputed").[106]   She "worries every day about being

subjected to search."  Response ¶ 8, at 10 (setting forth this fact).  See Hurtado Depo. at 187:20-

---

[105]The Plaintiffs do not dispute this fact, but state that it is immaterial.  See Response ¶ 68, at 8.  The Court will, if necessary, discuss this fact's materiality in its analysis.

[106]The Plaintiffs assert that this fact, although undisputed, is incomplete, citing testimony from Hurtado's deposition in which she states that she worries every day about being searched and in which she details certain concerts that she has not attended as a result of her fear.  See Response ¶ 69, at 9 (citing Plaintiffs' Hurtado Depo. at 187:5-11; id. at 187:20-188:2; id. at 233:21-234:17).  ASI New Mexico only summarizes this testimony and does not substantively reply to it.  See Reply at 9 n.10.  The Court has found the fact undisputed, because the Plaintiffs have not specifically controverted it.  The Court does not, however, understand this fact to exhaustively catalog Hurtado's emotional damages, but to reflect some of her damages.  The Court has, in the remainder of this paragraph, expanded on her damages.

188:2; Reply at 24 (not disputing this fact).[107]   She "felt humiliated and embarrassed about being touched inappropriately by a stranger in public and in front of classmates."   Response ¶ 7, at 10. See Plaintiffs' Hurtado Depo. at 185:15-25; Reply at 24 (not disputing this fact).[108]   "The searches at prom made [her] emotionally distressed and afraid to go to events where there might be similar searches."   Response ¶ 9, at 10.   See Hurtado Depo. at 186:23-187:11; id. at 233:21-234:17; Reply at 24 (not disputing this fact).[109]

"Hurtado never sought or received any medical treatment or counseling for injuries she claims to have experienced because of the pat-down search at the 2011 Capital High prom." MSJ ¶ 70, at 19 (setting forth this fact).   See ASI New Mexico's Hurtado Depo. at 188:15-18; id. at 190:7-10; Response ¶ 70, at 8 (stating that this fact is "[u]ndisputed").[110]

### d.      London's Knowledge of SFPS' Search Policy; Her Search; Its Effects.

"London was pat-down searched her sophomore year in attending homecoming at Rio Grande High School in Albuquerque, and in attending concerts, and had no objection to the pat-down searches performed at those venues."   MSJ ¶ 71, at 19-20 (setting forth this fact).   See ASI

---

[107]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.   See Reply at 24-25.   Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

[108]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.   See Reply at 24-25.   Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

[109]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.   See Reply at 24-25.   Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

[110]The Plaintiffs assert that this fact, although undisputed, is immaterial.   See Response ¶ 70, at 8.   The Court will, if necessary, discuss this fact's materiality in its analysis.

New Mexico's London Depo. at 181:14-185:11; id. at 186:10-18; Response ¶ 71, at 8 (not disputing this fact).[111]   "London did not object to undergoing a pat-down search at the 2011 Capital High prom, or complain regarding its scope, at the time of the search."  MSJ ¶ 72, at 20 (setting forth this fact).   See ASI New Mexico's Romero Depo. at 241:13-242:2; ASI New Mexico's Lucero Depo. at 60:15-25; id. at 84:14-21; id. at 143:16-19; id. at 148:18-149:1; Romero Aff. ¶ 14, at 3; London Depo. at 134:25-135:24.[112]

> The security guard
>
> told [London] to spread [her] legs and then she patted [London's] legs down.  And then she went all the way up and then she did the other leg and then she lifted [London's] skirt a little bit and she patted [London's] legs even more.  And then she patted the front of [London], so she did [London's] stomach and [her] sides and then she did [London's] chest.  And then she put her hands underneath the seams of [London's] dress and on the sides and on the back.  And then she patted [London's] back side down.

London Depo. at 120:9-17.  See Response ¶ 1(d), at 9 (setting forth this fact).[113]

---

[111]The Plaintiffs respond: "Court previously deemed undisputed."  Response ¶ 71, at 8.  Because the Plaintiffs have not specifically controverted the proposed fact, the Court has deemed the fact undisputed.

[112]The Plaintiffs respond: "Disputed. Plaintiff Hurtado objected to the search while at prom; she complained to both another student at prom and her date about the invasiveness of her search."  Response ¶ 66, at 8.  ASI New Mexico replies: "ASI's evidence establishes that each Plaintiff understood that she was getting into a line to be pat-down searched at the prom, and that none of them objected to undergoing a pat-down search or reported to officials at the prom that inappropriate touching occurred during the pat-downs."  Reply ¶¶ 49, 58, 66, & 72, at 20.  The Court has found the fact undisputed.  That London complained to another student and to her date about the invasiveness of her search during the prom would not specifically controvert ASI New Mexico's proposed fact that London did not object to or complain about the search at the time of the search -- that is, before she entered the prom.  Accordingly, the Court will deem this fact undisputed.

[113]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

    a. [W]hile performing the pat-down search, the security officer faced London, patted London's front, stomach and sides, cupped London's breasts, lifted her dress up to midthigh level and put her hands on both sides of London's legs;

    b. while the security officer was performing the pat-down search on her legs, London was looking at Principal Romero who was going through London's purse;

    c. the other female security officer was never involved at any time during London's pat-down search; and

    d. she remembered Stephanie Leyba in the lobby area taking her ticket upon London's arrival to the prom, and Principal Romero taking her purse to search when London entered the search line, but she was not really paying attention to other people around in the lobby area.

MSJ ¶ 73, at 20 (citations omitted)(setting forth these facts).  See ASI New Mexico's London

Depo. at 20:8-17; id. at 113:20-114:11; id. at 116:6-117:17; id. at 122:25-123:3; id. at 124:12-

125:6; id. at 129:23-130:12; id. at 130:19-131:4; id. at 132:24-133:14; id. at 137:18-25; id. at

138:20-23; Response ¶ 73, at 8 (stating that these facts are "[u]ndisputed").

    After her pat-down search at the 2011 Capital High prom, Plaintiff London:

    a. attended the prom for two to three hours until about fifteen minutes before it ended, sat at her table with friends and talked and ate and drank, danced with her friends, and had fun at the prom;

    b. raised no complaint with ASI security officers or SFPS personnel about the pat-down search even though, before entering the prom ballroom, she spoke with Principal Romero and Capital High teacher, Ms. Tilp, about London's perfume and foundation having been confiscated;

    c. raised no complaint about the pat-down search with Capital High teacher Ms. Leyba even though London spoke with her for about ten minutes before leaving the prom about various matters, including the fact that London's perfume and foundation were missing from the box where she was supposed to be able to pick them up before leaving.  During this conversation, Ms. Leyba offered a cupcake to London, which she accepted;

d. hosted her friend Angelica for a sleepover at London's house that night;

e. graduated from high school in 2011 and attended college; and

f. was successfully employed.

MSJ ¶ 74, at 21 (citations omitted)(setting forth these facts).  See ASI New Mexico's London

Depo 11:9-14:9; id. at 18:3-20:12; id. at 135:10-137:17; id. at 140:2-10; id. at 150:18-152:6; id.

at 156:13-157:22; id. at 160:10-161:17; id. at 162:9-12; id. at 171:7-19; id. at 172:4-175:2; id. at

176:11-177:8.[114]

> [T]he emotional distress she . . . experienced, because of the pat-down search
> performed on her at the 2011 Capital High prom, [is] the memory of prom being
> ruined for her, feeling bad about herself, and feeling disrespected and taken
> advantage of because of the way she was searched.

MSJ ¶ 75, at 21 (setting forth this fact).  See ASI New Mexico's London Depo. at 212:17-

---

[114]The Plaintiffs purport to dispute this set of facts, pointing to a section of Hurtado's deposition in which she reported that London stated that her search was "crazy."  Response ¶ 74, at 8 (quoting Plaintiffs' Hurtado Depo. at 147:4-20).  Moreover, they assert that the fact is immaterial.  See Response ¶ 74, at 8.  ASI New Mexico replies:

> Plaintiffs dispute this fact based on London's [sic] testimony that she told two
> other students at prom that her search was "crazy."   Plaintiffs' reference creates
> no dispute regarding the fact that London spoke with officials at prom,
> complained about her perfume and foundation being confiscated, but did not
> complain to officials at prom that any inappropriate touching had occurred during
> her pat-down search.  Plaintiffs also assert that UMF 74 is immaterial; however, it
> is directly relevant to London's inability to prove "severe and extreme" emotional
> distress to support her IIED claim.

Reply ¶ 74, at 22-23 (citation omitted).  The Court has found the fact undisputed.  That London reported to Hurtado that her search was "crazy" does not dispute any of the facts above.  Accordingly, the Court has found the fact undisputed.  The Court will, if necessary, discuss the fact's materiality in its analysis.  The Court notes that ASI New Mexico is incorrect in one respect: the cited testimony is Hurtado's testimony reporting something that London said and not is London's testimony.  See Response ¶ 74, at 8 (citing Plaintiffs' Hurtado Depo. at 147:4-20).

213:17; Response ¶ 75, at 8 (stating that this fact is "[u]ndisputed").[115]  Her "prom search ruined the memory of prom for her and made her feel disrespected and bad about herself."  Response ¶ 10, at 11 (setting forth this fact).  See Plaintiffs' London Depo. at 212:17-213:7; Reply at 24 (not disputing this fact).[116]

"London never sought or received any medical treatment or counseling for injuries she claims to have experienced because of the pat-down search at the 2011 Capital High prom."  MSJ ¶ 76, at 22 (setting forth this fact).  See ASI New Mexico's London Depo. at 211:15-23; Plaintiff Arianna London's Responses to Santa Fe Public Schools' Second Interrogatories and Requests for Production of Documents at 9 (undated), filed March 3, 2014 (Doc. 182-16); Response ¶ 76, at 9 (stating that this fact is "[u]ndisputed").[117]

---

[115]Although the Plaintiffs do not dispute this fact, they assert that it is incomplete, citing London's testimony that the event brought back to life certain painful memories.  See Response ¶ 75, at 8 (citing Plaintiffs' London Depo. at 212:17-213:7).  ASI New Mexico replies only that "Plaintiffs add to London's claimed emotional distress that the pat-down search brought 'back to life' painful experiences of her past. In providing this testimony, London also noted, 'I lost my makeup and perfume.'"  Reply at 10 n.11 (citations omitted).  The Court has found the fact undisputed, but does not understand it to exhaustively catalog London's claimed emotional distress.

[116]As discussed more fully above, supra note 30, ASI New Mexico does not dispute this fact, but states that it reiterates prior facts.  See Reply at 24-25.  Because ASI New Mexico has not specifically controverted the fact, the Court finds it undisputed.

[117]The Plaintiffs assert that this fact, although undisputed, is immaterial.  See MSJ ¶ 76, at 9.  The Court will, if necessary, discuss this fact's materiality in its analysis.  The Court notes that, in London's answer to the interrogatory cited, she objected to the interrogatory that elicited this information.  See Plaintiff Arianna London's Responses to Santa Fe Public Schools' Second Interrogatories and Requests for Production of Documents at 9.  The Plaintiffs concede that the fact based on that answer is undisputed, but argue that the fact is immaterial.  Moreover, the Court overrules the objections, because they are conclusory.

Ms. Reyes does not know the Plaintiffs.  See Plaintiffs' Reyes Depo. Vol. II at 47:15-20.[118]

"No one attending the prom, including the Plaintiffs, stated to Principal Romero at any time during the prom that an ASI security officer touched any prom attendee's breasts or bare legs, pulled any attendee's bra, or otherwise touched them inappropriately while conducting pat-down searches at the prom."  MSJ ¶ 77, at 22.  See ASI New Mexico's Romero Depo. at 241:13-242:2; Romero Aff. ¶ 14, at 3; ASI New Mexico's C. Herrera Depo. at 183:20-184:22; ASI New Mexico's T. Herrera Depo. at 75:17-76:15; ASI New Mexico's Hurtado Depo. at 134:3-10; id. at 135:9-24; ASI New Mexico's London Depo at 135:13-24; id. at 139:15-140:10; Response ¶ 77, at 9 (stating that this fact is "[u]ndisputed").

> No evidence exists establishing that ASI trained, instructed, condoned, or supported having its security officers grab, cup their hands on, shake or otherwise touch an individual's breasts or front of their bra, or grope, stroke or directly touch an individual's bare skin or middle, upper or inner thighs as part of performing pat-down search  security services at the 2011 Capital High prom.

---

[118]The Plaintiffs ask the Court to find undisputed that "[t]here is no evidence that Ms. Reyes or any other ASI or SFPS personnel were aware of whether Plaintiffs had been to previous dances or had been subjected to pat-downs at those  previous dances."  Response ¶ 53, at 15 (setting forth this fact).  ASI New Mexico replies:

> The supporting reference only establishes that Ms. Reyes does not know Plaintiffs.  Moreover, it is immaterial whether any SFPS or ASI personnel knew if Plaintiffs had been to previous SFPS dances or had undergone pat-downs at previous SFPS dances.  The undisputed facts establish that every Plaintiff saw other students undergoing pat-down searches at the 2011 Capital High prom before getting into the line to be searched and knew they were in line to be pat-down searched.  Plaintiffs' conduct evinced consent to undergoing a standard pat-down search at the 2011 Capital High prom.

Reply ¶ 53, at 26-27.  ASI New Mexico is correct: the cited testimony establishes only that Reyes does not know the Plaintiffs.  The Court will, if necessary, dispose of this fact's materiality in its analysis.  The third sentence is undisputed.  Finally, the last sentence is legal argument, to which the Court will, if necessary, return in its analysis.

MSJ ¶ 81, at 24 (setting forth this fact).  See ASI New Mexico's Archuleta Depo. at 138:2-139:8;

Standard Opporating [sic] Procedures at 1; SOP for Pat Downs at 1; SOP for Conducting a

Search; Pat-Down Guidelines; Policy Manual for Associated Security Industries *passim*; ASI

New Mexico's Johnson Depo. at 73:18-23.[119]

---

[119]The Plaintiffs purport to dispute this fact, see Response ¶ 81, at 9, relying on substantially the following two portions of Reyes' deposition:

Q.   Other than Dr. Clarke, had anyone else described that that's how you should do a search of a female student, with the pulling of the bra and shaking?

A.   I believe we had it -- with Corporal Gutierrez, when we were at Santa Fe High for the proms and at the schools, as well.  Then, when I asked -- let's see.  I think Dan was -- yeah, Dan was a corporal at the time, Dan Aguilar, Corporal Aguilar.

For Capital's, it was the same thing.  He said it was the standard.  I said, "Still pulling the bra?"

He said, "Yeah, the pat-down."

And I said, "Okay."

* * * *

Q.   During the pat-down searches, was there ever a time where you would pat down on bare skin?

A.   The only time -- you know, the only time I personally did that was at Capital's and -- because I had this -- this is kind of a -- I was trying to stay consistent, and then I said, "No, that's stupid, because, you know, you can see their bare skin.  There's nothing there."  So then I just stopped.

Then I checked, like, if they had little corsages.  That's it.

Q.   Before you stopped that and you were trying to be consistent, what would you do in terms of -- you would just --

A.   This --

Q.   -- pat down everybody the same?

A.   Yeah.   Usually, like, either this, or I'd just go like that, because I felt stupid.   Sorry.

Q.   Again, since we won't be able to see --

A.   Oh, I'm sorry.

Q.   -- what you did --

A.   Oh, okay.

Q.   -- describe what you did at the Capital High School prom.   You had one hand on top with the palm facing down, one hand on the bottom with the palm facing up, and then you would just pat down along the arms of the student?

A.   Correct.

Q.   And you did that for both arms?

A.   Correct.

Plaintiffs' Reyes Depo. at 61:8-21; id. at 71:24-73:2.   ASI New Mexico replies:

> This fact establishes the complete absence of any evidence that ASI ratified the kind of inappropriate touching that Plaintiffs claim they experienced during patdown searches at the 2011 Capital High prom.   Such conduct would have violated all guidelines ASI expected its security guards to follow, and Plaintiffs have no evidence that ASI supervisory personnel observed inappropriate touching during their pat-down searches and did nothing to stop it.   Plaintiffs' references to Reyes' testimony about having students pull their own bras, and about having mistakenly patdown searched bare arms of a couple of students at the beginning of the searches, raise no genuine disputes regarding [this fact] and the absence of ASI ratification of any alleged intentional conduct by Reyes that clearly fell outside the scope of a standard pat-down search.   To the extent Reyes mistakenly patted-down bare arms of a couple of students before realizing it made no sense to do so, her conduct contradicted the pat-down procedures ASI security officers were expected to follow.

Reply ¶ 81, at 23-24 (citations omitted).   ASI New Mexico is correct.   The proposed fact is about whether ASI New Mexico

## PROCEDURAL BACKGROUND

Plaintiffs allege that:

a. ASI acted in concert with and at the direction of SFPS in performing patdown searches of all students attending the 2011 Capital High prom;

b. "ASI acted as a state actor under color of law in working jointly with Capital High School personnel in searching students at the Capital High Prom, including Plaintiffs.  ASI and Santa Fe Public Schools acted with a shared purpose in searching students at the Capital High School Prom.";

c. in performing pat-down searches of all attendees at the 2011 Capital High prom, ASI employees acted "in accordance with instructions from Santa Fe Public Schools" and "pursuant to Santa Fe Public Schools' policy, custom, and/or practice of searching students without reasonable suspicion" at SFPS events;

d. at all relevant times, SFPS "maintained authority to control and supervise ASI's conduct" at SFPS events;

e. ASI employees' "unlawful searches" of 2011 Capital High attendees "occurred as a result of Principal Romero's exercise of policy-making authority," and that SFPS "employees and agents," "acting within the scope of their employment as employees [and] agents," conducted unlawful searches without reasonable suspicion;

---

trained, instructed, condoned, or supported having its security officers grab, cup their hands on, shake or otherwise touch an individual's breasts or front of their bra, or grope, stroke or directly touch an individual's bare skin or middle, upper or inner thighs as part of performing pat-down search security services at the 2011 Capital High prom.

MSJ ¶ 81.  That Reyes spoke about students pulling their own bras and that Reyes touched individual students' bare skin does not contradict this fact, which is about ASI New Mexico's training, instruction, and approval of those acts.  Indeed, if one could infer such facts about an entity's training or ratification merely from isolated incidents that one of the entity's agents reported, every isolated incident would give rise to a training or ratification claim.  Given the absence of facts showing that ASI New Mexico "trained, instructed, condoned, or supported" actions like Reyes' actions, her actions, standing alone, cannot give rise to a training or ratification inference.

The Court notes that ASI New Mexico cited portions of Archuleta's deposition that it did not attach.  The Court has, nonetheless, found the fact undisputed, because the Plaintiffs have not produced evidence specifically controverting it.

f. the "Santa Fe Public School Defendants" are liable for and proximately caused injuries to Plaintiffs by violating Art. 2, § 10, and that timely notice, pursuant to the New Mexico Tort Claims Act, was given to the Superintendent of SFPS[;]

g. "Santa Fe Public Schools employees and agents acted negligently . . . by unreasonably and unlawfully subjecting students' persons and property to search without reasonable suspicion;" that "Defendants and Santa Fe Public Schools employees and agents . . . we're acting within the scope of their employment as employees, agents, and/or representatives of Santa Fe Public Schools," and that such negligence by "Santa Fe Public Schools employees and agents acting within the scope of their duties" created a dangerous condition for students attending the 2011 Capital High prom;

h. for their IIED claim, "Defendants engaged in extreme and outrageous conduct in subjecting Plaintiffs to unconstitutional searches" in violation of Plaintiffs' rights under the federal and state Constitutions;

i. for their prima facie tort claim, Defendants "engaged in intentional unlawful conduct in searching Plaintiffs on April 16, 2011," "acted with intent to injure Plaintiffs' legally protected interests," "violated Plaintiffs' legally protected rights," and that Defendants' conduct "was not justified."

MSJ ¶ 78, at 22 (setting forth this fact)(quoting scattered sections of Complaint).[120]

No allegation in Count II specifically identifies ASI or any of its employees as being liable for proximately causing injuries to Plaintiffs by violating Art. 2, § 10 of the New Mexico Constitution, and no allegation in the Second Amended Complaint identifies ASI as being one of the "Santa Fe Public School Defendants."

MSJ ¶ 79 at 24 (setting forth this fact)(citing Complaint *passim*).[121]   "Plaintiffs' prima facie tort

---

[120]The Plaintiffs respond: "Not a statement of fact and the complaint speaks for itself. Immaterial." Response ¶ 78, at 9. The Plaintiffs have not specifically controverted the fact that they allege what these paragraphs record. Accordingly, the Court finds the fact undisputed. The Court will, if necessary, discuss this fact's materiality in its analysis.

[121]The Plaintiffs respond: "Not a statement of fact and the complaint speaks for itself. Immaterial." Response ¶ 79, at 9. The Plaintiffs have not specifically controverted the fact that they allege what these paragraphs record. Accordingly, the Court finds the fact undisputed. The Court will, if necessary, discuss this fact's materiality in its analysis.

claim rests on the same allegations that form the bases for their other claims against ASI in the Second Amended Complaint."  MSJ ¶ 80, at 24.[122]

###### 1.      **The Complaint; Previous Memorandum Opinions.**

The Plaintiffs filed their Complaint on September 18, 2012.  See Doc. 100.  Count I alleges a claim under 42 U.S.C. § 1983 for violation of the Plaintiffs' rights under the Fourth Amendment to the Constitution of the United States of America to "be secure in their persons and effects against unreasonable searches and seizures."  Complaint ¶ 135, at 24.  Count II alleges a claim for violation of the New Mexico Constitution.  See Complaint ¶¶ 138-148, at 24-26.  Count III alleges a claim for battery.  See Complaint ¶¶ 149-152, at 26.  Count IV alleges a claim for intentional infliction of emotional distress.  See Complaint ¶¶ 153-157, at 26-27.  Count V alleges a claim for prima facie tort.  See Complaint ¶¶ 158-162, at 27.

On October 24, 2012, Romero and the SFPS Defendants moved to dismiss the remaining counts -- II through V -- of the Second Amended Complaint.  See School Defendants' Motion for Summary Judgment on Counts II, III, IV, and V of the Second Amended Complaint [Doc. 100] under the Tort Claims Act and Memorandum in Support (Doc. 108).  On November 9, 2012, the Plaintiffs' counsel informed Defendants SFPS Board of Education, Gudwin, Winkle, Trujillo, Montano, and J. Carillo, in their official capacities as SFPS Board of Education members, in her official capacity as SFPS Superintendent, Romero, in her official capacity as Capital High Principal, and Kilmer, in her official capacity as Santa Fe High School Principal that the Plaintiffs would concede the motion and file a rule 41 dismissal of Counts II-V of the Second

---

[122]The Plaintiffs respond: "Not a statement of fact and the complaint speaks for itself. Immaterial."  Response ¶ 80, at 9.  The Plaintiffs have not specifically controverted the fact that they allege what these paragraphs record.  Accordingly, the Court finds the fact undisputed.  The Court will, if necessary, discuss this fact's materiality in its analysis.

Amended Complaint against all School Defendants, which the Plaintiffs filed on November 13,
2012.  See Plaintiffs' Unopposed Motion to Voluntarily Dismiss Counts II-V Against the Schools
[sic] Defendants (Doc. 114).   On November 15, 2012, the Court entered an Order granting the
Plaintiffs' motion, and dismissing Counts II, III, IV, and V against Defendants SFPS Board of
Education; Barbara Gudwin, Glenn Wikle, Linda Trujillo, Frank Montano, and Steven J. Carrillo,
in their official capacities as members of the SFPS Board of Education; Bobbie J. Gutierrez, in
her official capacity as Superintendent of SFPS; Melanie Romero, in her official capacity as
Principal of Capital High School; and Leslie Kilmer, in her official capacity as Principal of Santa
Fe High School; and dismissing as moot the School Defendants' Motion for Summary Judgment
on Counts II, III, IV, and V of the Second Amended Complaint [Doc. 100] under the Tort Claims
Act and Memorandum in Support.  See Order at 1 (Doc. 118).

       In its Memorandum Opinion and Order, filed Jun 28, 2013 (Doc. 142)("Romero MOO"),
the Court granted summary judgment as to the individual-capacity claim against Romero.  See
Romero MSJ passim.

       In the SFPS Defendants' MOO, the Court granted summary judgment as to the Plaintiffs'
claims against the SFPS Defendants that arise out of the searches' invasive nature, but not as to
the Plaintiffs' claims against the SFPS Defendants that arise out of the searches' invasive nature.
See SFPS Defendants' MOO passim.

       2.       **The MSJ; the Response; and the Reply.**

       ASI New Mexico asserts that it cannot be held liable for the Plaintiffs' claims, because it
is not a state actor, and because it is entitled to qualified immunity.  See MSJ at 24-25.  ASI New
Mexico first reviews basic principles of state action law, noting that private actors are not usually

state actors.  See MSJ at 25-26.  ASI New Mexico reviews the standards from the joint-action

test, arguing that,

> [u]nder the joint action test, state action exists if a private party is a
> "willful participant in joint action with the State or its agents."  Johnson v.
> Rodrigues, 293 F.3d 1196, 1205 (10th Cir. 2002)(quoted authority omitted).  "In
> considering the joint action test, courts examine whether state officials and private
> parties have acted in concert in effecting a particular deprivation of constitutional
> rights."  Montoya v. Española Pub. Sch. Dist. Bd. of Edu., No. 10cv00651
> WPJ/LFG (DOC 324), at p. 14 (D.N.M. filed Aug. 23, 2012)(citing Gallagher v.
> Neil Young Freedom Concert, 49 F.3d 1442, 1453 (10th Cir. 1995)). In analyzing
> potential joint action, some courts look to whether a conspiracy existed between
> the state officials and a private actor.  See Gallagher, 49 F.3d at 1454.  Under a
> conspiracy approach, a private party may be found to be a state actor if it exerted
> influence over the challenged decision or action.  See id. Other courts have
> focused on the manner in which the alleged constitutional deprivation is effected.
> Id.  If state officials and private parties engaged in a substantial degree of
> cooperative action, or if state participation is overt and significant in carrying out
> the deprivation of a constitutional right, state action will usually be found to exist.
> Id.

MSJ  26-27.  It states that, although the area is unclear, "one principle can be gleaned from the

criteria used for determining 'joint action' -- something *more* than a private contractor's

cooperation with, or acquiescence in, the challenged decision or action is required for that party

to be a 'state actor.'"  MSJ at 27.   It notes that "state action may exist where a private party

actively participates in, and meaningfully influences, the final decision or policy that caused

deprivation of a constitutional right."  MSJ at 27 (citing, e.g., Malak v. Associated Physicians,

Inc., 784 F.2d 277 (7th Cir. 1986)).  In its view, "[t]o be acting 'in concert' requires that the

private party do more than simply cooperate with state officials or engage in conduct incidental

to performing contractual services."  MSJ at 28 (citing, e.g., Sigmon v. CommunityCare HMO,

Inc., 234 F.3d 1121, 1126-27 (10th Cir. 2000)).

       ASI New Mexico analogizes this case to Montoya v. Española Public School District

Board of Education, No. CIV 10-0651 WJ/LFG, in which the Honorable William P. Johnson,

United States District Judge of the United States District Court for the District of New Mexico,

did not find state action with respect to a private school security officer:

> Under circumstances similar to the present case, "joint action" was found not to exist where a school security officer, pursuant to contract, provided assistance in conducting the search of a student.   In Montoya, the school counselor's secretary and a security officer entered S.M.'s math class and removed her from class.   Montoya, No. 10cv00651 WPJ/LFG (DOC 324) at p. 3. They escorted her to a bathroom where she was told to remove her bra and shirt. Id.   S.M. took off her sweater but refused to remove more clothing.   Id.   The secretary and security officer requested that she take off her shirt four more times, but she refused.   Id.   When they threatened her with a strip search if she did not turn over her cell phone, S.M. gave them her phone.   Id.
>
> S.M. asserted § 1983 claims for violation of her substantive due process rights and for unlawful search and seizure against the security officer.   Id. at p. 4. The security officer worked for a private company that had contracted with the school board to provide security services for students and faculty at the school. Id. at pp. 2, 5. The bid proposal submitted by the school board stated that the contractor's employees were not considered employees of the school district and were not covered by the Workmen's Compensation of the school board.   Id. at p. 5.
>
> Noting that mere acquiescence of a state official in the actions of a private party is not sufficient to establish "joint action," the Montoya court found that the security officer's involvement in S.M.'s removal from the classroom and subsequent search was similarly insufficient for the security officer to become a "state actor."   Id. at p. 14.   The court reasoned that the security officer's conduct was incidental to performing her security officer job duties.   Id.   The court noted that no facts alleged suggested that the security officer's presence was more than "mere acquiescence" in the actions taken by the school counselor's secretary and, instead, were done with the willful purpose of depriving S.M. of her constitutional rights.   Id.
>
> The principles evinced by these authorities establish that ASI was not a "state actor" subject to personal liability for purposes of Plaintiffs' § 1983 claim.

MSJ at 28-29.

In ASI New Mexico's view, because it did not influence Santa Fe Public Schools' and/or

Romero's decision to pat-down search all attendees at the prom -- that is, because Santa Fe

Public Schools and ASI New Mexico did not conspire or agree to search every attendee -- "[n]o

'joint action' existed for ASI to be a state actor because it was not an active participant in making

the challenged decision -- ASI was simply carrying out orders in performing contractual

services." MSJ at 29-30.  Drawing on Montoya v. Board of Education, ASI New Mexico asserts

that it "was merely performing services incidental to its contract with SFPS in following

Principal Romero's authorized directive to pat-down search all 2011 Capital High prom

attendees." MSJ at 30.  It elaborates:

> Plaintiffs stretch "state action" doctrine too far by attempting to hold ASI personally liable for unconstitutional conduct simply because a governmental entity acted through ASI.  Certainly, a governmental entity cannot avoid its own "state actor" status by directing a private party to perform the challenged conduct. But the existence of "state action" as against the governmental defendant does not automatically transform the private actor into a "state actor" for personal liability purposes.  ASI was not a decision maker acting "in concert" with SFPS and Principal Romero or with a "shared purpose" in requiring pat-down searches of all 2011 Capital High prom attendees for ASI to be a "state actor" and individually liable for Plaintiffs' § 1983 claim. ASI was a private contractor providing services as requested by its client.  If "state actor" status reaches so broadly as to include ASI under these circumstances, then every private party who contracts to provide services to any governmental entity will be a "state actor" simply because it performs its contractual obligations.  Such an approach conflicts with the principle that "state actor" status for a private party is the exception rather than the rule.

MSJ at 31.

ASI New Mexico also argues that, if it is a state actor, it is entitled to qualified immunity.

See MSJ at 31.  It notes that, under law from the United States Court of Appeals for the Tenth

Circuit,

> [p]rivate party corporate defendants "acting in accord with duties imposed by a contract with a governmental body are entitled to raise the defense of qualified immunity."  DeVargas v. Mason & Hanger-Silas Mason Co., 844 F.2d 714, 723 (10th Cir. 1988).  A private party defendant "who performs a government function pursuant to a state order or request is entitled to qualified immunity if a state official would have been entitled to such immunity had he performed the function himself."  Warner v. Grand Cnty., 57 F.3d 962, 967 (10th Cir. 1995);

- 85 -

Eagon v. City of Elk City, Okla., 72 F.3d 1480, 1489 (10th Cir. 1996)(same); see also Frazier v. Bailey, 957 F.2d 920, 928-29 (1st Cir. 1992)(holding that employees of a private agency under contract to perform duties statutorily required of the state were entitled to assert a qualified immunity defense because they were the functional equivalent of public officials).

SFPS had in-house security personnel who provided security services for the schools, including pat-down searches at school-sponsored events, before contracting with ASI to fulfill that role. ASI acted pursuant to its contractual obligations when, in compliance with SFPS's historical practice and Principal Romero's specific authorized directive, ASI conducted pat-down searches of all 2011 Capital High prom attendees. In other words, ASI and its security officers performed the pat-down searches only because "the government made them do it." See DeVargas, 844 F.2d at 717. Had in-house SFPS security personnel, teachers, administrators or other school district employees performed the pat-down searches rather than ASI, they -- like Principal Romero -- would have qualified immunity against Plaintiffs' § 1983 claim. Therefore, so does ASI.

MSJ at 31-32 (record citations omitted).[123]

ASI New Mexico also asserts that it "cannot be held vicariously liable for

---

[123]ASI New Mexico also argues that the Court should grant summary judgment in its favor as to the Plaintiffs' claims under the Constitution of the State of New Mexico. See MSJ at 32-35. Because the Plaintiffs concede that they "are not pursuing any claims against ASI under the New Mexico Constitution," Response at 43 n.4, the Court will not detain itself on these arguments, except in one particular. ASI New Mexico includes its argument that it is not vicariously liable for constitutional violations under the section devoted to its arguments under the New Mexico Constitution. See MSJ at 35-36. That organization is curious, because Monell v. Department of Social Services, 436 U.S. at 658 (1978)("Monell"), and its progeny interpret 42 U.S.C. § 1983, which applies to federal constitutional violations and not to state constitutional violations. In fact, the extension of Monell to state constitutional violations would make little sense: the case rests on the peculiar context and legislative history of 42 U.S.C. § 1983, which Congress passed four decades before New Mexico became a State. Moreover, ASI New Mexico cites only federal cases, both from within the Tenth Circuit and from other United States Courts of Appeals, that deal with federal law. See MSJ at 35-36. At the same time, ASI New Mexico states that its Monell argument is the basis for granting summary judgment as to the state claims. See MSJ at 35 ("Summary judgment on Count II [-- the state claims --] is proper because no respondeat superior liability exists for negligent violation of constitutional rights against unlawful searches." (emphasis added)) If intentional, the Court is not sure what to make of this assertion. Even still, because ASI New Mexico's arguments also relate to the federal claims, and because the issue of Monell liability will resurface in the Response and the Reply, the Court will discuss and, if necessary, dispose of the vicarious-liability argument.

unconstitutional searches that were allegedly performed negligently in providing requested

contractual services."  MSJ at 35 (bold and capitalization altered for readability).  It expands:

> Even if ASI were considered to be a "state actor," Plaintiffs do not allege, and cannot prove, that ASI had an internal policy -- independent from its contractual duties to SFPS -- which required that its security officers conduct suspicionless pat-down searches of all students attending school events at which ASI provided security services.  Indeed, Plaintiffs allege that ASI employees acted "in accordance with instructions from Santa Fe Public Schools," and "pursuant to Santa Fe Public Schools' policy, custom, and/or practice of searching students without reasonable suspicion" at SFPS events in pat-down searching all 2011 Capital High prom attendees.  Plaintiffs also describe the conduct in this regard as "negligent." Summary judgment on Count II is proper because no respondeat superior liability exists for negligent violation of constitutional rights against unlawful searches.

> It is firmly established that an employer cannot be held vicariously liable on a respondeat superior theory for an employee's violation of another's constitutional rights.  See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978)(holding that Congress did not intend municipalities to be liable unless action pursuant to an official municipal policy of some kind caused the constitutional tort); see also Dickerson v. Leavitt Rentals, 995 F. Supp. 1242, 1247 (D. Kan. 1998), aff'd., 153 F.3d 726 (10th Cir.), cert. denied, 525 U.S. 1110 (1999)(holding that a corporate defendant cannot be held vicariously liable for the unconstitutional acts of their servants under § 1983). Plaintiffs have no evidence that ASI caused the constitutional violation by instituting an official policy of some nature that was the direct cause or moving force behind the claimed unlawful conduct.  See Smedley v. Corrections Corp. of Am., 175 F. App'x 943, 946 (10th Cir. 2005) (unpublished).  In conducting the pat-down searches, ASI had its security officers provide requested services pursuant to a contractual obligation.

> Moreover, Plaintiffs cannot pursue claims for unconstitutional searches based on ASI's purported negligence for simply performing under its contract. "The Fourth Amendment's 'reasonableness' standard is not the same as the standard of 'reasonable care' under tort law, and negligent acts do not incur constitutional liability."  Billington v. Smith, 292 F.3d 1177, 1190 (9th Cir. 2002); see also Madiwale v. Savaiko, 117 F.3d 1321, 1326 (11th Cir. 1997)("Negligent or innocent mistakes do not violate the Fourth Amendment."); Franks v. Delaware, 438 U.S. 154, 171 (1978)(noting that allegations of negligence are insufficient to state a claim under the Fourth Amendment).
> SFPS and its authorized administrative personnel established the practice of conducting pat-down searches on all Capital High prom attendees.  SFPS used

- 87 -

in-house security officers to conduct student searches before contracting with ASI. ASI conducted the pat-down searches of all 2011 Capital High prom attendees only because Principal Romero instructed it to do so and because of ASI's contractual obligation to provide security services as requested. If ASI was negligent by virtue of simply performing under the contract -- which is denied -- any such negligence is legally insufficient to support Plaintiffs' claims against ASI for purported violation of Plaintiffs' constitutional rights against unreasonable searches.

MSJ at 35-36 (record citations omitted). ASI New Mexico also states:

Plaintiffs' § 1983 claim in Count I rested on conclusory allegations that "Defendants" deprived Plaintiffs of their Fourth Amendment right against unreasonable searches and contained no allegations of related negligent conduct similar to that alleged in Count II. However, any purported negligence by ASI in performing contractual services for SFPS would be legally insufficient to support Plaintiffs' claims against ASI in Count I as well.

MSJ at 36 n.1 (record citations omitted).

ASI New Mexico then turns to the claims under state law, arguing that, under the NMTCA, it is immune from suit. See MSJ at 37. After reviewing general principles of NMTCA law, see MSJ at 37, ASI New Mexico discusses the provisions most relevant to the Plaintiffs' claims against it:

The NMTCA generally excludes "independent contractors" from its definition of covered public employees except for independent contractors acting in certain specified capacities. See NMSA 1978, § 41-4-3(F) (2013). However, the NMTCA includes within the definition of "public employee" anyone "acting on behalf of or in service of a governmental entity in any official capacity, whether with or without compensation." NMSA 1978, § 41-4-3(F)(3); see also Chavez [v. City of Albuquerque], 1998-NMCA-004, ¶ 11, 124 N.M. 479, 952 P.2d 474 (noting that a "public employee" covered by the NMTCA includes a person acting on behalf of or in service of a governmental entity).

Although ASI's contract with SFPS states that "[t]he Contractor and its directors, officers, agents, and employees are not employees of the District . . . as a result of this Agreement", it is well-settled that the parties' conduct and other considerations, rather than any written description, determine the legal nature of their relationship. "[T]he manner in which the parties designate a relationship is not controlling, and if an act done by one person on behalf of another is in its essential nature one of agency, the one is the agent of the other, notwithstanding

- 88 -

he is not so called." <u>Chevron Oil Co. v. Sutton</u>, 1973-NMSC-111, ¶ 4, 85 N.M. 679, 515 P.2d 1283; <u>see also</u> <u>Blea v. Fields</u>, 2005-NMSC-029, ¶ 12, 138 N.M. 348, 120 P.3d 430 (noting that how a contract defines the status of an individual does not answer whether that person is a public employee or an independent contractor).

MSJ at 37-38 (record citations omitted).  It continues:

> For determining employee status, New Mexico courts sometimes consider the extent to which the employer has, in the broadest sense, the right to control the individual.  <u>Blea</u>, 2005-NMSC-029, ¶ 12, 138 N.M. 348, 120 P.3d 430. The following factors govern the analysis: (1) whether the employer is entitled to control the manner and means of the individual's performance; (2) the method of compensating the individual; (3) whether the employer has furnished equipment for the individual; (4) whether the employer has the power to terminate the individual without cause; (5) the type of occupation involved and whether it is generally performed without supervision; (6) the skill required for the job; (7) whether the employer furnishes the tools or instrumentalities for the job; (8) how long the individual has been employed; (9) whether the work is part of the employer's regular business; and (10) whether the employer is engaged in business activities.  <u>Id.</u>  The <u>Blea</u> factors support "public employee" status for ASI and its security officers.
>
> SFPS and Principal Romero exercised control in all material respects over the pat-down searches at the prom.  Before contracting with ASI, SFPS had conducted pat-down searches on all prom attendees using in-house security personnel.  ASI's contract required that it provide security services at prom as requested by SFPS and SFPS administrative personnel.  Principal Romero specifically instructed ASI to conduct patdown searches of all prom attendees in providing security services at the 2011 Capital High prom.  ASI had no internal policy or practice of its own to conduct pat-down searches of all attendees of school events at which it provided security services, and conducted the patdown searches at the prom only because it was specifically directed by Principal Romero to do so.
>
> Principal Romero also designated the lobby area where the searches would be performed, designed the physical layout for the separate security search lines, and gave assignments as to who was to do what.  SFPS personnel and ASI security officers worked together performing security searches that evening.  If SFPS personnel or ASI security officers discovered contraband during the searches, they were to bring the matter to the attention of Principal Romero or other readily available SFPS administrators. If an attendee refused to be pat-down searched, ASI security officers were to escort that person to a school official who would decide what should be done.  Principal Romero was responsible for ensuring that SFPS personnel and ASI security officers followed proper search protocols at the prom and she had the power to intervene and stop ASI security

officers from conducting patdown searches in any manner deemed inappropriate according to her judgment.   These facts establish that, although ASI provided security officers to perform the requested patdown searches, the decision to have the searches performed and the plan for the search protocol for that evening were controlled by SFPS and Principal Romero.

SFPS administrative control over the 2011 Capital High prom security services was consistent with the extensive control that SFPS and its administrative personnel exercised over ASI's security services for the school system in general. SFPS administrative personnel determined what security services were needed at their locations and ASI was required to enforce the school system's official Code of Conduct in providing those services.   SFPS set qualifications and standards that ASI security officers had to meet before they could be assigned to work at the schools.   SFPS administration established performance criteria regarding security officer interactions with students -- including criteria for when patdown searches could be performed -- instructed or oversaw ASI personnel in the performance of any searches of students, and prohibited ASI security officers from using weapons of any kind. Capital High devoted a room at the school for ASI's use as a security office.

ASI's role was to observe and report occurrences to school administration and to thereafter provide further services or assistance as determined appropriate, and as requested, by the administrative personnel.   Providing security services for students and staff was a function of SFPS's daily business of operating public schools and was a function it had previously accomplished via in-house security personnel.   SFPS could freely terminate its relationship with ASI by providing 30 days written notice prior to the date of termination or terminate a particular security officer from providing services to SFPS under the contract with ASI.

Thus, SPFS closely supervised and controlled ASI's provision of security services at SFPS schools and school events.   SFPS did not simply contract with ASI and then leave it up to ASI to independently develop, staff, and implement security services for the school system and school-sponsored events as ASI deemed best. NMTCA immunity has been found to exist for a private party under similar circumstances.   See Celaya v. Hall, 2004-NMSC-005, 135 N.M. 115, 85 P.3d 239 (finding that NMTCA immunity existed for volunteer chaplain for county sheriff's department who had served for eight years, where he was not "self-directed" but was assigned particular duties by the department to be performed at both specific, pre-arranged times and on an as-needed basis, and was provided instrumentalities to carry out the department's regular business).

MSJ at 38-41 (record citations omitted).

Having made this extended argument under Blea v. Fields, ASI New Mexico argues that,

under a recent Supreme Court of New Mexico case, the Blea v. Fields factors are outdated.   See

MSJ at 41.  It expands:

> The New Mexico Supreme Court recently determined that a different approach than the Blea factors was more appropriate in holding that security officers employed by a private security company that contracted with the Gallup-McKinley County Board of Education were school employees for purposes of NMSA 1978, § 30-3-9 (1989).  In State v. Johnson, 2009-NMSC-049, ¶ 11, 147 N.M. 177, 218 P.3d 863, a criminal statute made unlawful any battery upon a "school employee," which included "a member of a local public school board and public school administrators, teachers and other employees of that board."  The statute contained no definition for "other employees of [the] board."  Id.
>
> In construing "other employees of [the] board" to include the private company security officers, the New Mexico Supreme Court was guided by the ordinary meaning of "employee" and the purposes served by § 30-3-9. The court noted an "employee" is "[a] person who works for another in return for financial or other compensation," "one employed by another . . . usu[ually] for wages," and that "to employ" means generally "to use or engage the services of [another]."  Id. at ¶ 12 (quoted authorities omitted).  Johnson stated that, "[u]nder the ordinary meaning of the term, an 'employee' is one who provides services to another in exchange for compensation."  Id.  The court also relied on state administrative code provisions as indicating that security officers are traditionally viewed as school employees.  Id. at ¶ 16.
>
> Noting that NMSA 1978, § 30-3-9 furthers the interests of maintaining a safe school environment, the Johnson court found that those interests were served by recognizing the private security officers as "employees" under the statute. In doing so, the court observed that the school board has a duty to provide a safe environment for school activities and that administrative codes contemplated school administrators, teachers, and security officers as being integral to the board fulfilling its responsibilities in that regard.  Id. at ¶ 20 (citing 6.11.2.6 NMAC). Based on the common meaning of "employee," the regulatory scheme treating school security officers as "school personnel," and the rationale that including security officers within § 30-3-9's protection against criminal battery furthered school safety interests, the New Mexico Supreme Court found that the private company's security officers were "school employees" covered by the statute.  Id. at ¶¶ 12, 15-17, 21.
>
> ASI also meets the Johnson court's "school employee" criteria to qualify for NMTCA immunity as an employee or agent of SFPS. SFPS contracted with ASI to provide security services for its schools and thereby "employed" ASI. ASI security officers are "school personnel" under the same administrative codes that supported finding "employee" status for the security officers in Johnson.  See 6.11.2.7(T) NMAC (defining "school personnel" as "all members of the staff, faculty and administration employed by the local school board," including "school security officers, school bus drivers and their aides, and also authorized agents of the schools, such as volunteers or chaperones, whose responsibilities

include supervision of students").

Other regulations further recognize security officers as an integral part of SFPS's overall mission of promoting a safe environment for schools and school-related events.  See 6.11.2.7(A) NMAC (providing that "administrative authority" to act officially in a disciplinary matter or for maintaining order may include school security officers to the extent of their authority as established under written local school board policies); 6.11.2.10(B)(2) NMAC (listing school security officers among the "authorized persons" to conduct searches of students); 6.11.2.7(O) NMAC (defining "public school" to include, for purposes of student discipline, any non-school premises being used for school-sponsored activities).

A "General Provision" of the administrative code describing the interrelationship between security officers and other school officials in fostering a productive and safely managed public school environment also supports "public employee" status for ASI under the NMTCA:

> A. Jurisdiction over students. All officials, employees and authorized agents of the public schools whose responsibilities include supervision of students shall have comprehensive authority within constitutional bounds to maintain order and discipline in school.  In exercising this authority, such officials, employees and authorized agents of the public schools may exercise such powers of control, supervision, and correction over students as may be reasonably necessary to enable them to properly perform their duties and accomplish the purposes of education.  This authority applies whenever students are lawfully subject to the schools' control, regardless of place.  During such periods, public school authorities shall have the right to supervise and control the conduct of students, and students shall have the duty to submit to the schools' authority.  The foregoing is intended to reflect the common law regarding the rights, duties and liabilities of public school authorities in supervising, controlling and disciplining students.  Nothing herein shall be construed as enlarging the liability of public school authorities beyond that imposed by statute, common law or public education department rule.

6.11.2.8(A) NMAC. SFPS integrated ASI security officers into the school system's daily operations in alignment with the public employee/school personnel dynamic established by these administrative codes.

MSJ at 41-44.  According to ASI New Mexico, the facts demonstrate that SFPS controlled ASI

New Mexico's officers:

> SFPS administrators determined what security services were needed at their schools and at school-sponsored events and instructed ASI security officers regarding expected conduct in day-to-day school operations.  SFPS personnel

established performance criteria for ASI security officers' interactions with students and devoted a room at Capital High to be used as a security office. ASI security officers were directed to enforce SFPS's official Code of Conduct and to follow post orders for each high school as established by SFPS administrative personnel.

ASI security officers were expected to be a presence in the school environment, to observe and report incidences to school administrators, and to provide services or assistance as SFPS administrative personnel determined to be appropriate at any given time. Just like other school personnel, ASI security officers performed searches on students only when specifically authorized or requested to do so by SFPS administrators, and sometimes SFPS administrators chose to conduct the student searches themselves. At the 2011 Capital High prom, SFPS personnel and ASI security officers worked together in carrying out searches that evening pursuant to a plan designed by Principal Romero and under her direction and supervision. In all practical respects, the ASI security officers functioned within the SFPS system the same as SFPS's previous in-house security personnel.

Consistent with the undisputed material facts and relevant law, Plaintiffs allege that SFPS "maintained authority to control and supervise ASI's conduct" at SFPS events, and that ASI performed the pat-down searches "in accordance with instructions from Santa Fe Public Schools" and pursuant to an SFPS policy, custom or practice of conducting suspicionless patdown searches on all prom attendees. Plaintiffs also allege that ASI employees' "unlawful searches" of 2011 Capital High attendees "occurred as a result of Principal Romero's exercise of policy-making authority," that SFPS "employees and agents" were "acting within the scope of their employment" and "duties" while conducting the unlawful suspicionless searches, and that timely NMTCA notice was given for claims based on this conduct.

The facts and New Mexico administrative codes establish that ASI's security services were an interwoven component of SFPS's responsibility for promoting safe educational experiences and environments for school activities. Affording NMTCA protection for the security companies and their officers who work alongside school authorities in this general mission furthers NMTCA policies providing protection for all persons "acting on behalf of or in service of a governmental entity in [an] official capacity" in the interests of promoting efficiently operated and safe public school environments. Without such protection, contracted security companies and their officers risk liability for engaging in conduct requested and needed by school officials, for which those school officials would unquestionably have NMTCA immunity. Creating such a dynamic conflicts with the cooperative and interconnected relationship between school administration and security services that is contemplated and established by the administrative code. School administrators and the security personnel they hire need to be able to work together seamlessly without concern that security assistance requested or needed in any given moment will expose one -- but not the

other -- to potential civil liability.

      The undisputed material facts, the <u>Blea</u> factors, applicable administrative codes, and the New Mexico Supreme Court's reasoning and holding in Johnson all establish that ASI was a "public employee" or agent of SFPS under the NMTCA while conducting the pat-down searches at the 2011 Capital High prom. Summary judgment should be granted in ASI's favor on Plaintiffs' claims in Counts II-V because no NMTCA waiver of immunity exists for those claims. <u>See</u> NMSA 1978, 41-4-4(A) (providing a governmental entity and any "public employee" immunity from liability for any tort except as waived by the New Mexico Religious Freedom Restoration Act and Sections 41-4-5 through 41-4-15); <u>Edwards-Flynn[ v. Yara</u>, No. CIV 08-0186 JB/ACT, 2010 WL 597067 at ** 12-13 (D.N.M. Feb. 1, 2010)](the NMTCA is the exclusive remedy for negligent and intentional torts.

MSJ at 44-46 (record citations omitted).

ASI New Mexico then turns to the intentional tort claims and argues that, even if NMTCA immunity does not bar them, the Court should grant summary judgment. <u>See</u> MSJ at 46. First, ASI New Mexico argues that consent is a defense and that the facts show consent:

      Consent is a defense for intentional torts. <u>Yount v. Johnson</u>, 1996-NMCA-046, ¶ 17, 121 N.M. 585, 915 P.2d 341; <u>see also</u> <u>Frye v. IBP, Inc.</u>, 15 F. Supp. 2d 1032, 1041 (D. Kan. 1998)(noting that, "[a]s with any intentional tort, consent is an absolute defense, even if improperly induced")(quoted authority omitted). "Consent is willingness in fact for conduct to occur. It may be manifested by action or inaction and need not be communicated to the actor. . . . If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact." <u>Restatement (Second) of Torts</u> § 892 at 362 (1979). Consent can also be implied by "custom." <u>Id.</u> at § 892(2), cmt. d.

      Plaintiffs voluntarily entered the search lines expecting to undergo pat-down searches similar in scope to those they had experienced at previous school events. None of them raised any objection to having standard pat-down searches performed at the time. Conducting pat-down searches of all Capital High prom attendees was an established practice for a number of years before 2011. Under the circumstances, ASI and its personnel reasonably understood that attendees, in general, and Plaintiffs in particular, had consented to undergoing standard and customary pat-down searches as part of attending the 2011 Capital High prom. Plaintiffs cannot pursue intentional tort claims in Counts III-V for pat-down searches falling within the scope of that consent.

MSJ at 47 (record citations omitted). As for the invasive nature of the searches, ASI New

Mexico notes that the Plaintiffs have not sued individual employees, but, instead, sued only ASI New Mexico. See MSJ at 48. In its view, there are no allegations that ASI New Mexico intended what it calls "inappropriate" or "improper" touching, and no evidence would support such allegations. MSJ at 48. It argues that it is not vicariously liable for any such touching, because it lies outside the course and scope of employment, and because ASI New Mexico did not ratify it:

> An employee's intentional tortious conduct may fall within the course and scope of employment if the action "(1) is the kind the employee is employed to perform; (2) occurs during a period reasonably connected to the authorized employment period; (3) occurs in an area reasonably close to the authorized area; and (4) is actuated, at least in part, by a purpose to serve the employer." Lessard v. Coronado Paint & Decorating Ctr., Inc., 2007-NMCA-122, ¶ 12, 142 N.M. 583, 168 P.3d 155 (quoted authority omitted); see also UJI 13-407 NMRA (providing that an act of an employee is within the scope of employment if "it was something fairly and naturally incidental to the employer's business assigned to the employee" and "was done while the employee was engaged in the employer's business with the view of furthering the employer's interest and did not arise entirely from some external, independent and personal motive on the part of the employee").

> Even though the alleged inappropriate touching occurred while ASI security officers were assigned to conduct pat-down searches at the 2011 Capital High prom, that circumstance is insufficient to bring the conduct within the course and scope of their employment. "Committing an intentional tort on company time, from one's seat on company premises, does not necessarily mean the tort was committed within the course and scope of employment." Bradley v. Lovelace Sandia Health Sys., No. 27,936, 2009 WL 6667452, * 6 (N.M. Ct. App. Nov. 13, 2009)(unpublished); see also Los Ranchitos v. Tierra Grande, Inc., 1993-NMCA-107, ¶¶ 9, 12, 17, 116 N.M. 222, 861 P.2d 263 (granting summary judgment for the employer of an employee who embezzled funds while providing accounting services to a client even though the embezzlement occurred during the employee's regular work hours at the employer's office).

> Moreover, the undisputed material facts make clear that the security officers were not employed by ASI to perform pat-down searches that included the alleged inappropriate touching. The inappropriate touching that Plaintiffs claim occurred could not have been done with the view of furthering any business interests of ASI given that such conduct would have violated and exceeded the scope of the standard pat-down search services that Principal Romero had requested and which ASI had agreed to provide. The alleged acts of touching or

shaking Plaintiffs' breasts, grabbing their bras, stroking their bare skin, middle, upper or inner thighs, or other inappropriate touching that deviated from the standard and customary pat-down search procedure would have been activated by a security officer's personal prurient motives. See Los Ranchitos, 1993-NMCA-107, ¶ 17, 116 N.M. 222, 861 P.2d 263 (holding trial court correctly determined that, as a matter of law, the employee's conduct of embezzling from the plaintiff while providing accounting services was activated by the employee's personal motives and, as such, could not reasonably be found to serve or advance her employer's interests).

Not only would the alleged inappropriate touching fall outside the course and scope of an ASI security officer's employment, but no evidence establishes that ASI condoned such conduct by any of its security officers at the 2011 Capital High prom.  "The intentional act of the employee does not become the act of the employer unless the employer expressly authorized, commanded, or committed the act itself."  Martin-Martinez v. 6001, Inc., 1998-NMCA-179, ¶ 13, 126 N.M. 319, 968 P.2d 1182; see also Bradley, 2009 WL 6667452 at * 7 (an employer may be held liable for an employee's conduct that is outside the course and scope of employment only where the employer assents to or ratifies the conduct); Los Ranchitos, 1993-NMCA-107, ¶ 12, 116 N.M. 222, 861 P.2d 263 (noting that the employer could not be held liable for conduct outside the course and scope of the employee's employment given the absence of evidence establishing that the employer authorized or ratified the conduct).

ASI neither had, nor followed, any pat-down policies or practices that expressly authorized, commanded, or directed the kind of inappropriate touching that Plaintiffs claim occurred.   To the contrary, ASI pat-down search guidelines instructed its security officers against performing pat-down searches in a manner that included the alleged inappropriate touching.   No evidence establishes that ASI endorsed, supported, or otherwise ratified inappropriate touching of prom attendees during pat-down searches at the 2011 Capital High prom of the kind that Plaintiffs claim to have experienced.   ASI cannot be held vicariously liable for the alleged intentional conduct that fell outside the course and scope of employment and is entitled to summary judgment on Plaintiffs' intentional tort claims based on purported inappropriate touching by ASI security officers.

MSJ at 48-51 (record citations omitted).

ASI New Mexico also states that the Plaintiffs' claim for intentional infliction of emotional distress should fail.  See MSJ at 51-54.  First, it argues, its conduct does not satisfy the extreme-and-outrageous-conduct prong.  See MSJ at 51-53.  Second, it argues, the Plaintiffs have not suffered the extreme and severe distress that the law requires.  See MSJ at 53-54.

ASI New Mexico then turns to the Plaintiffs' prima facie tort claim, and argues that the

Plaintiffs have not pled and cannot prove such a claim.  See MSJ at 54.  First, it reviews basic

principles of prima facie tort law:

> "Prima facie tort is intended to provide a remedy for persons harmed by
> acts that are intentional and malicious, but otherwise lawful, which 'fall outside of
> the rigid traditional intentional tort categories.'"  Bogle v. Summit Inv. Co.,
> L.L.C., 2005-NMCA-024, ¶ 22, 137 N.M. 80, 107 P.3d 520 (cited and quoted
> authority omitted).  Plaintiffs may not use prima facie tort to evade the stringent
> requirements of other established doctrines of law.  Stock v. Grantham, 1998-
> NMCA-081, ¶ 38, 125 N.M. 564, 964 P.2d 125.  For these reasons, dismissal of a
> prima facie tort claim is required "when the pleaded factual basis is within the
> scope of an established tort."  Healthsource, Inc. v. X-Ray Assocs. of N.M., P.C.,
> 2005-NMCA-097, ¶ 35, 138 N.M. 70, 116 P.3d 861 (dismissing a prima facie tort
> claim which "merely realleg[ed] the facts in support of the other causes of action,
> adding only a bare recital of the elements of prima facie tort relating to intent and
> justification")(citing Hill v. Cray Research, 864 F. Supp. 1070, 1080 (D.N.M.
> 1991).

MSJ at 54-55.  ASI New Mexico then turns to what it contends is a flaw in the Plaintiffs'

pleading:

> In pleading prima facie tort, Plaintiffs incorporate all the proceeding
> allegations in their Second Amended Complaint that formed the bases for their
> other claims against ASI.  Then Plaintiffs simply state conclusory allegations that
> Defendants "engaged in intentional *unlawful* conduct in searching Plaintiffs on
> April 16, 2011," "acted with intent to injure Plaintiffs' legally protected interests,"
> "violated Plaintiffs' legally protected rights," and that Defendants' conduct "was
> not justified."
>
> These allegations fail to state a claim for prima facie tort, which is based
> on *lawful* conduct by a party specifically undertaken with intent to injure and
> without sufficient justification.  See Bogle, 2005-NMCA-024, ¶ 22, 137 N.M. 80,
> 107 P.3d 520.  Where the alleged conduct itself is unlawful under existing
> doctrines of law, prima facie tort does not apply.  Id.  Plaintiffs' prima facie tort
> count also lacks any factual allegations independent from those pleaded to support
> Plaintiffs' other claims.  Summary judgment is proper because Plaintiffs' prima
> facie tort claim is merely duplicative to their other claims, and/or because
> application of the doctrine in these circumstances would constitute an improper
> means for Plaintiffs evading their burden of proof on essential, and appropriate,
> elements of their other claims.  See Stock, 1998-NMCA-081, ¶¶ 38-39, 125 N.M.
> 564, 964 P.2d 125 (holding that prima facie tort claim was properly dismissed

because it was based on same factual allegations as plaintiff's other intentional tort theories); Healthsource, Inc., 2005-NMCA-097, ¶ 35, 138 N.M. 70, 116 P.3d 861 (prima facie tort claim must be dismissed when the pleaded factual basis falls within the scope of an established tort) (citing Hill, 864 F. Supp. at 1080).

MSJ at 55. ASI New Mexico also asserts that the Plaintiffs have failed to produce evidence of

the tort:

> The elements of prima facie tort are: (1) the commission of an intentional, lawful act by the defendant, (2) done with intent to injure the plaintiff, (3) causing injury to the plaintiff, and (4) the lack of, or insufficient, social or economic justification for the act. Gioia, 194 F. Supp. 2d at 1222; see also Bogle, 2005-NMCA-024, ¶ 22, 137 N.M. 80, 107 P.3d 520. The act complained of must be committed with the intent to harm. Schmitz v. Smentowski, 1990-NMSC-002, ¶ 45, 109 N.M. 386, 785 P.2d 726. This means that there must be an "actual intention to injure, not merely an intent to do the act which may result in the claim to injury." Lexington Ins. Co. v. Rummel, 1997-NMSC-043, ¶ 14, 123 N.M. 774, 945 P.2d 992 (cited authority and quotation marks omitted).
>
> "Intent to injure" is more than mere insensitivity and is used synonymously with "malice" within New Mexico's prima facie tort jurisprudence. Lexington Ins. Co., 1997-NMSC-043, ¶¶ 10, 14, 123 N.M. 774, 945 P.2d 992. Malice is the intentional doing of a wrongful act without just cause or excuse. Kitchell v. Pub. Serv. Co. of N.M., 1998-NMSC-051, ¶ 17, 126 N.M. 525, 973 P.2d 344. Moreover, not only must the act be intentional, but the defendant must know that the act was wrong when he did it. Id. The plaintiff's burden in proving that a defendant acted with the intent to injure is a "heavy" one. Lexington Ins. Co., 1997-NMSC-043, ¶ 12, 123 N.M. 774, 945 P.2d 992. Once intent to injure is established, a balancing test compares the defendant's malicious intent against the defendant's justifications for the injurious conduct and the severity of the plaintiff's injury. Id. at ¶ 11. However, where a plaintiff cannot establish evidence of intent to injure, no need exists for conducting the justification balancing test. Id. Plaintiffs' prima facie tort claim fails these standards.
>
> Plaintiffs have no evidence that, in complying with Principal Romero's directive to perform pat-down searches on all prom attendees, ASI did so with specific intent to injure Plaintiffs. Rather, the undisputed material facts establish that ASI performed the pat-down searches pursuant to Principal Romero's request and ASI's contractual obligations to provide requested security services at prom. Moreover, pat-down searches of all prom attendees were customarily performed in prior years, and Plaintiffs raised no objections regarding the 2011 Capital High prom pat-down searches before or while they occurred. Similar searches of prom attendees had yielded contraband in the past and ASI believed that detecting and confiscating banned items -- such as weapons, drugs, or alcohol -- protected the students by promoting a safe and successful prom experience for all attendees.

These same undisputed material facts also establish that ASI was motivated by legitimate business reasons and had justifiable grounds for complying with Principal Romero's directive to perform pat-down searches on all students attending the prom. ASI's interests in fulfilling its contractual obligations and its desire to protect attendees against harmful contraband were sufficient justifications for performing the requested pat-down searches -- particularly given that Plaintiffs had no clearly established constitutional right to be free from these suspicionless searches at the time. Summary judgment should be granted because Plaintiffs cannot prove that ASI acted with malicious intent to injure them, and without justification, as required for prima facie tort.

MSJ at 55-57 (record citations omitted).

Finally, ASI New Mexico turns to the punitive-damages issue, and argues that any demand for punitive damages fails both because the Court should grant summary judgment as to each claim against it and because there is no evidence of the culpable mental state. See MSJ at 57-58. It notes that the standard for awarding punitive damages is high:

Punitive damages may be awarded only where a plaintiff establishes that the defendant's conduct was willful, wanton, malicious, oppressive, fraudulent and in bad faith, or committed recklessly with wanton disregard for the plaintiff's rights. Bogle, 2005-NMCA-024, ¶ 28, 137 N.M. 80, 107 P.3d 520; see also Youren v. Tintic Sch. Dist., 343 F.3d 1296, 1308 (10th Cir. 2003)(punitive damages may be awarded in § 1983 actions only when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others).

MSJ at 58. It argues that the evidence does not satisfy this standard:

ASI was simply following Principal Romero's directive, SFPS established practice, and providing requested contractual security services by performing the pat-down searches at the 2011 Capital High prom. ASI believed that the searches furthered the overall purpose of protecting the prom attendees from dangerous banned items and promoted a safe and successful prom experience for all concerned. ASI security officers did not forcibly perform pat-down searches on Plaintiffs over their objections at the prom. Moreover, Plaintiffs had no clearly established right to be free from the suspicionless pat-down searches at the time of the 2011 Capital High prom. Under such circumstances, ASI did not act with evil motive or reckless indifference toward violating Plaintiffs' rights by performing the pat-down searches. These undisputed material facts establish the absence of any culpable mental state sufficient to support awarding punitive

damages for Plaintiffs' constitutional rights and state law claims. ASI is entitled to summary judgment in its favor on Plaintiffs' punitive damages claim as a matter of law.

MSJ at 58 (record citations omitted).

The Plaintiffs oppose the MSJ.  They assert that ASI New Mexico's argument that, because it did not influence SFPS, it is not a state actor, "is legally and factually flawed." Response at 18.  They elaborate: "Legally, courts regularly find state action where a state actor directs a private actor to engage in the unconstitutional conduct.  Factually, the evidence supports a finding that ASI did in fact participate in the decisions to pat-down all students entering SFPS dances."  Response at 18.  Noting that state action is a legal issue for the Court, see Response at 18, the Plaintiffs argue that the facts satisfy two of the four tests recognized in the Tenth Circuit:

Courts have recognized a variety of circumstances where conduct by private actors is properly considered state action and that can result in liability under § 1983 for both the private actors and associated state actors.  See, e.g., Dennis v. Sparks, 449 U.S. 24, 27 (1980).  The Tenth Circuit has described four separate tests to determine whether a private party has acted under color of law in causing a deprivation of federal rights, which would allow the injured party to bring claims under § 1983 against all entities and individuals who participated in the deprivation of rights: (1) the nexus test; (2) the symbiotic relation test; (3) the joint action test; and (4) the traditional public powers test or public functions test. See Gallagher v."Neil Young Freedom Concert," 49 F.3d [at 1447].

Although ASI only addresses the joint action test, ASI's admissions and the evidence establish that ASI's conduct is state action under either the joint action or nexus tests.

Response at 19.

The Plaintiffs begin with the joint action test.  They note that the "conspiracy" line of cases on which ASI New Mexico relies is not the exclusive method for finding joint action; in their view, "the alternative 'cooperation/participation' method for establishing joint action is more apt in these factual circumstances."  Response at 20 n.2.  They state that, under Tenth

Circuit law, "courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights."   Response at 20 (internal quotation marks omitted).   They point to <u>Coleman v. Turpen</u>, 697 F.2d 1341 (10th Cir. 1982), <u>Lusby v. T.G. & Y Stores, Inc.</u>, 749 F.2d 1428 (10th Cir. 1984), <u>vacated sub nom. on other grounds</u>, <u>City of Lawton v. Lusby</u>, 474 U.S. at 805 (1985), and <u>Anaya v. Crossroads Managed Care Sys., Inc.</u>, 195 F.3d 584 (10th Cir. 1999), as exemplifying the Tenth Circuit's application of the principle that joint or cooperative activity between state actors and private actors can give rise to state action.   <u>See</u> Response at 20-21.   They then argue that this case satisfies the Tenth Circuit's standards:

> The cooperative activity between the state and private actors in <u>Coleman</u> and <u>Lusby</u> are even less than the level of cooperation between SFPS and ASI in this case.   ASI was undoubtedly a willful participant in the pat-down searches with SFPS.   ASI had been conducting, without objection, patdown searches at the direction of SFPS for seven years.   ASI officials agreed with SFPS's directive that pat-down searches should be conducted at prom events.   ASI and SFPS discussed the nature of the searches, including the decision to conduct pat-down searches before each event.   ASI and SFPS worked cooperatively to complete the searches of students with ASI guards and school officials both being actively engaged in conducting various elements of the searches.   ASI guards and SFPS officials even alternated who carried out various aspects of the searches for different students.   ASI guards and SFPS officials' roles in the searches were virtually indistinguishable and it would be difficult to imagine a scenario where a state actor and a private actor had a more cooperative relationship related to the conduct that formed the basis for a § 1983 claim.
> The evidence readily establishes that the level of cooperation between SFPS and ASI and ASI's willful participation in the pat-down searches make ASI a state actor under the joint action test.

Response at 21 (internal citations omitted).   In their view, ASI New Mexico misapplies the joint action test.   <u>See</u> Response at 22.   According to them, it is not true that, as ASI New Mexico suggests, "private actors can be viewed as state actors *only* where they exert some influence over a state actor's decision to engaged in the challenged unconstitutional act."   Response at 22

(emphasis in original).  They note that "[j]oint action can also exist where a state actor influences or directs a private actor to engage in unconstitutional conduct."  Response at 22 (citing, e.g., Blum v. Yaretsky, 457 U.S. 991 (1982)).  They elaborate:

> Having misunderstood that state action can be found under the joint action test when the influence is flowing either way, from private actor to state actor *or* from state actor to private actor, ASI admits all the predicate facts necessary for finding state action here and in particular that SFPS (a state actor) directed ASI (a private actor) to conduct the unconstitutional pat-down searches.  At the same time, ASI's assertion that it did not participate at all in the development of search practices and procedures for SFPS schools and events is not supported by the evidence.  For example, ASI trained SFPS officials on providing security in the school setting, including how to conduct pat-downs.
>
> ASI also educated SFPS officials on necessary security measures and procedures.  ASI also participated in a collaborative manner in the amending of post orders that defined the methods of providing security at the various school sites.  In support of its state action argument, ASI relies heavily on two cases where courts declined to find state action -- Montoya v. Española Pub. Sch. Dist. Bd. of Educ., Case No. 10-cv-00651 WPJ/LFG (D.N.M. Aug. 23, 2012)(attached as Exhibit 25) and Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121 (10th Cir. 2000) -- neither case is applicable here.  Montoya, an unpublished Judge Johnson case, involved facts where there was either no or minimal involvement by state officials in the challenged conduct, and Sigmon addressed a different legal basis for finding joint action (conspiracy rather than cooperation and participation) and a distinct factual scenario where the plaintiff alleged that the private actor influenced the state actor to engage in unconstitutional conduct rather than the reverse as occurred here.

Response at 22-23 (emphasis in original)(record citations omitted).

The Plaintiffs first distinguish Montoya v. Board of Education:

> In Montoya, three students alleged a violation of their constitutional rights by Española school officials and ProSec, the private company that provided security for the schools.  Montoya, 10-cv-00651 at 1-2. The allegations involved three separate incidents: (1) a student who was taken to a bathroom by a school administrator and a ProSec guard and directed to remove her bra and shirt, but only took off her sweater and had her phone confiscated; (2) a student who was lured from school by a ProSec guard, who took her to a remote location and raped her; and (3) a student who was separated by a ProSec guard from another student with whom she was fighting and had her arm injured by the guard.  Id. at 3-4. The plaintiffs argued "that the ProSec guards are state actors because they are paid out

public funds by the school, and because the guards gained access to Plaintiffs only by virtue of their status as school security guards."  Id. at 4.  When the facts in *Montoya* relevant to determining whether joint action existed are examined, it is clear that the case is distinct from the circumstances presented here.

Two of the *Montoya* plaintiffs did not present any evidence of school officials directing, influencing, or participating in the challenged conduct.  Id. at 14.  No school official was involved in any way in the rape of the one student or in the injuring of the arm of the other student.  Id. ("There is no suggestion that anyone at the school knew that Defendant Archuleta was luring Plaintiff E.S. from her in-school suspension classroom into his car at the time the assault occurred.  Similarly, there is no allegation that a school official aided Defendant John Doe in separating Plaintiff G.T. from another girl with whom she had been fighting.").  The best state participation argument the students could assert was that the guards got access to the students through their company's contract with the school.  Id. at 11.  Judge Johnson appropriately found that this fact, standing alone, was not sufficient to establish joint action.  Id. at 12; see Gallagher, 49 F.3d at 1448 (noting that the tests for state action ensure that "the state will be held liable for constitutional violations only if it is responsible for the specific conduct of which the plaintiff complains.").  The third *Montoya* plaintiff was able to identify at least some participation by a school employee because as articulated by Judge Johnson:

> Admittedly, there was some school official involvement when Defendant Martinez accompanied the school counselor's secretary into Plaintiff S.M.'s classroom.  However, Defendant Doe's [sic][124] presence when Plaintiff was removed from the classroom could be seen as incidental to performing his job duties as security guard, rather than done with willful purpose of depriving Plaintiff S.M. of her constitutional rights.  There are no facts alleged which suggest that Defendant Doe's presence was more than "mere acquiescence" of the actions taken by the school counselor's secretary.

*Montoya*, 10-cv-00651 at 14.  Judge Johnson does not address in any detail the

---

[124]The Plaintiffs state:

> Defendant Doe was another security guard involved in the incident related to the student having her arm injured.  It appears that Judge Johnson meant to refer to Defendant Martinez throughout this section because he was discussing the cell phone/search incident where it appears Defendant Martinez was the only security guard involved.

Response at 24 n.3.

roles the security guard and the school administrator played in asking the student
to take off her sweater, threatening a strip search, or confiscating the phone.
Instead, he merely suggests that, based on the facts presented, the security guard
was a mere bystander.  Id.  It is clear that the level of direction, influence, and
joint action in this case—a seven year joint custom and practice of conducting
patdown searches -- was not present in Montoya.  In addition, no argument can be
made that the ASI security guards were mere bystanders because it is undisputed
that they actually carried out the patdown searches.

Response at 24-25.

The Plaintiffs also distinguish Sigmon v. CommunityCare HMO, Inc., because of both

factual and legal differences.  See Response at 26.  In their view, the plaintiff in that case relied

only on the conspiracy line of cases, and not on the substantial-degree-of-cooperative-action

cases, as they do.  See Response at 26.  Further, they distinguish the case's facts:

Factually, Sigmon is distinct because the state actor rather than the private
actor actually carried out the allegedly unconstitutional act.  Tulsa made the
decision to terminate plaintiff and actually carried out the termination.
Accordingly, in that case, the plaintiff was required to show that the private actor
somehow influenced the challenged conduct, but failed to do so because there was
no evidence that any CommunityCare action caused Tulsa's determination to
terminate.  Here, of course, the private actor (ASI) carried out the unconstitutional
pat-downs and, as a result, to show state action Plaintiff need only show that the
state actor (SFPS) directed or influenced the decision to conduct the pat-downs,
which is disputed.

Response at 26.  In their view, ASI New Mexico's "admissions combined with the undisputed

facts establish that under the joint action test, ASI was engaged in state action when conducting

the searches at the 2011 Capital High School prom. ASI has presented no persuasive factual or

legal basis for reaching any other conclusion."  Response at 26.

The Plaintiffs also argue that ASI New Mexico was a state actor under a second test -- the

nexus test.  See Response at 26.  In support, it principally relies on Gallagher v. Neil Young

Freedom Concert:

- 104 -

The Tenth Circuit has clearly stated that where a state actor directs a private security contractor to perform unconstitutional pat-down searches on people attending an event, state action is present.  Gallagher, 49 F.3d at 1450.  "To be sure, if the appellants could demonstrate that the pat-down searches directly resulted from the [state actor's] policies then the required nexus would be established" for the purpose of finding state action.  Id.  In Gallagher, individuals who attended a concert at a state university in Utah brought an action under § 1983 against the university, the concert promoter, and the firm providing security for the concert, asserting that the pat-down searches of concert attendees violated the Fourth Amendment.  Id. at 1446.  The district court granted summary judgment in favor of the defendants, concluding that because the searches were conducted by employees of a private security company, the searches did not constitute state action under § 1983.  Id.  The Tenth Circuit affirmed the district court, but on the grounds that the challenged searches were conducted pursuant to a policy formulated *solely* by the private security company and that there was "no evidence in the record indicating that the University's rules and policies influenced the formulation or execution of [the pat-down] policy."  Id. at 1450; see also Blum, 457 U.S. at 1008.

Response at 27 (emphasis in original).  The Plaintiffs also point to Focus on the Family v, Pinellas Suncoast Transit Authority, 344 F.3d 1263 (11th Cir. 2003), in which the United States Court of Appeals for the Eleventh Circuit held that

"where the state contractually requires the private actor to take particular actions -- e.g., to reject proposed advertisements under certain specifically delineated circumstances -- then it can be said . . . that in acting in accordance with the governmental directive the private actor is merely a surrogate for the state, and the tie between them is sufficiently strong for the nexus/joint action test to be satisfied."

Response at 2 (quoting 344 F.3d at 1278-79).  They also note that,

[h]aving particular relevance to the circumstances presented here, the Eleventh Circuit continued in Focus on the Family by noting that the state action "conclusion is strengthened when there is record evidence that the state itself unmistakably directed the private actor to take particular actions."  Focus on the Family, 344 F.3d at 1279 (emphasis added).

The unmistakable principle established in these cases is that where a state actor directs or influences the challenged conduct of the private actor, state action is present.

In its brief, ASI not only acknowledges, but emphasizes the fact that SFPS directed and influenced the decision to pat-down students at the 2011 Capital

High prom.  [MSJ] at 8, ¶ 28 ("Principal Romero directed ASI to perform standard pat-downs"); id. at 30 ("ASI conducted pat-down searches . . . because it was directed to do so by Principal Romero")[;] id. ("SFPS had ASI continue that practice [of pat-downs] after ASI's contract with SFPS began").)

     ASI's admissions that SFPS and Principal Romero directed the company to perform pat-down searches demands a finding of state action under the nexus test.

Response at 28.

The Plaintiffs next turn to the qualified immunity issue.  See Response at 28.  Because this case's outcome largely hinges on whether ASI New Mexico is entitled to qualified immunity, it is worth quoting the Plaintiffs' argument in full.  First, the Plaintiffs argue that "qualified immunity is not available to ASI as a corporate entity with a long-term, renewable contract with a state actor."  Response at 29 (capitalization and bold altered for readability).  In so concluding, the Plaintiffs construe qualified immunity jurisprudence differently from ASI New Mexico:

     The Supreme Court has held that government officials performing discretionary functions are shielded from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  On its face, qualified immunity only protects government officials and not governmental bodies or private actors.  In Wyatt v. Cole, the Supreme Court considered whether qualified immunity "is available for private defendants faced with § 1983 liability for invoking a state replevin, garnishment, or attachment statute."  Wyatt v. Cole, 504 U.S. 158, 168-69 (1992).  The Court concluded that qualified immunity is not available in that context.  Id.

     The Supreme Court subsequently found that the particular circumstances and the identity of the actors is critical to determining whether qualified immunity should be available to a private entity engaged in state action. See Richardson v. McKnight, 521 U.S. 399, 401 (1997)(holding that that "prison guards who are employees of a private prison management firm are [not] entitled to a qualified immunity from suit by prisoners charging a violation of 42 U.S.C. § 1983"); Filarsky v. Delia, __U.S.__, 132 S. Ct. 1657 (2012) (holding that a private attorney, who had been retained by a city to assist in an investigation of suspected wrongdoing by a city employee, could raise a qualified immunity defense).  The rationale the Court applied in Richardson and Filarsky establishes that qualified

immunity is not appropriate here.

In Richardson, a prisoner brought a federal constitutional tort action against two prison guards, who he alleged injured him by placing him in extremely tight physical restraints. Richardson, 521 U.S. at 401. The two prison guards were employees of a private prison management company that managed a privatized Tennessee correctional facility for the state. Id. at 401-02. The Supreme Court concluded that the prison guards were not entitled to raise qualified immunity. Id. at 411. The factors the Court considered regarding the purpose of qualified immunity apply analogously here and support a similar finding that qualified immunity should not be afforded to ASI, a private corporation providing security services to a school district under a renewable long-term contract.

The Court first noted that "the most important" concern addressed by qualified immunity is what earlier precedent described "as protecting the public from unwarranted timidity on the part of public officials by, for example, 'encouraging the vigorous exercise of official authority.'" Id. at 408-09 (quoting Butz v. Economou, 438 U.S. 478, 506 (1978)). The Supreme Court found that in the context of a private company that has to bid for a long-term contract to provide regular services for a government, the fear of timid employees is not present. Id. at 409. The competitive market pressures created by the bidding process "mean not only that a firm whose guards are too aggressive will face damages that raise costs, thereby threatening its replacement, but also that a firm whose guards are too timid will face threats of replacement by other firms with records that demonstrate their ability to do both a safer and a more effective job." Id. at 409.

Like ASI, the prison management firm in Richardson was engaged to perform a major administrative task for a profit. See id. The fact that the prison management firm's contract had to be renewed, like the ASI contract, supported the Court's finding that liability for damages would not affect the firm's performance because "its performance is disciplined, not only by state review but also by pressure from competing firms who can try to take its place." Richardson, 521 U.S. at 410 (internal citations omitted). As the Supreme Court concluded, "in other words, marketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." Id. Like the employees of the private prison management firm, ASI's employees "resemble those of other private firms and differ from government employees." See id.

The Supreme Court next found that the privatization of Tennessee prisons, like the privatization of security for Santa Fe schools, helps resolve a second reason for qualified immunity, which is ensuring that talented candidates are "not deterred by the threat of damages suits from entering public service." Id. at 411 (quoting Wyatt, 504 U.S. at 167). The Court noted that the comprehensive insurance requirements of the private prison management contract "increases the likelihood of employee indemnification and to that extent reduces the

employment-discouraging fear of unwarranted liability potential applicants face." Richardson, 521 U.S. at 411.  In the context of the ASI and SFPS contract, insurance coverage was a requirement.

Richardson finally considered the third purpose of the qualified immunity doctrine, which is that it addresses the fact that lawsuits may distract employees from their duties.  Richardson, 521 U.S. at 411.  The Court concluded in the context of a private corporation that "the risk of 'distraction' alone cannot be sufficient grounds for an immunity."  Id.  That principle applies equally here where ASI, a sizeable company with over $2 million in annual revenue and over fifty clients, could absorb the distraction of some employees as a result of the company being a party to a lawsuit.

The Supreme Court subsequently decided Filarsky, which involved a one-time retention of a private individual to perform a specific task for the City because it did not have a qualified employee to perform the task.  Filarsky, 132 S. Ct. at 1660.  Filarsky did not involve a long-term contract that was subject to a bidding process or a corporation seeking qualified immunity.  Indeed, Filarsky acknowledged that it was not faced with circumstances where "the various incentives characteristic of the private market in [Richardson] ensured that the guards would not perform their public duties with unwarranted timidity or be deterred from entering that line of work."  Filarsky, 132 S. Ct. at 1667.

The Supreme Court's rationale in Richardson and Filarsky, which were decided after the Tenth Circuit decided Warner v. Grand County, 57 F.3d 962 (10th Cir. 1995) and DeVargas v. Mason & Hanger-Silas Mason Co., 844 F.2d 714 (10th Cir.1988), compels the conclusion that a private corporation like ASI, which has a contract to perform a major, lengthy task for a government agency, should not be entitled to raise qualified immunity.  Furthermore, the Richardson and Filarsky Courts were not presented with a corporation seeking qualified immunity and there are several factors beyond the general purposes of qualified immunity addressed in Richardson that compel a finding that a corporation in this context should not be permitted to raise a defense of qualified immunity.  See, e.g., Sallie v. Tax Sale Investors, Inc., 998 F. Supp. 612, 621 (D. Md. 1998) (concluding that in light of Richardson and Wyatt "it cannot be expected that the Supreme Court will allow a private business corporation, as distinct from its officers and employees, to claim the benefits of qualified immunity")(emphasis omitted).

Permitting corporations to raise a qualified immunity defense also leads to the anomalous result where corporations performing functions for governments will have more protection from suit than the governments, government officials, or private individuals engaged in the same unconstitutional conduct.  ASI argues in its motion that it is entitled to protection under the Monell standard for local governmental liability *and* it is entitled to protection under the qualified immunity doctrine.  Of course, government officials and private actors deemed to be engaged in state action are not entitled to the protections of Monell and local governments are not entitled to qualified immunity.  See Leatherman v. Tarrant

- 108 -

Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 165–67 (1993); Monell v. Dep't of Social Servs. of N.Y.C., 436 U.S. 658, 690-91 (1978).

For the rationale articulated in Richardson and Filarsky, the particular circumstances presented in this case, and the incoherence of applying Monell and qualified immunity protections to a corporation like ASI, the company should not be permitted to raise the defense of qualified immunity.

Response at 29-31 (emphasis in original)(record citations omitted).

The Plaintiffs also contend that ASI New Mexico is not entitled to qualified immunity:

ASI bases its qualified immunity argument on the assertion that if "in-house SFPS security personnel, teachers, administrators or other school district employees performed the pat-down searches rather than ASI, they -- like Principal Romero— would have qualified immunity against Plaintiffs' § 1983 claim." That is incorrect. The Court's decision on Ms. Romero's qualified immunity was based on the threshold findings "that Romero did not participate in the pat-down searches, and that she did not observe T.H.'s, London's, or Hurtado's pat-down searches" and only a portion of Candice Herrera's pat-down. If Romero had conducted the pat-downs as described by Plaintiffs, she would not have been entitled to qualified immunity. See, e.g., Dodds v. Richardson, 614 F.3d 1185, 1195 (10th Cir. 2010)(noting that the touchstone for determining the liability of a government official for the unconstitutional conduct of another is that official's "personal involvement" in the conduct). In contrast to Ms. Romero, the undisputed evidence establishes that Rebecca Reyes, an ASI employee and the lead guard for Santa Fe High School, actually performed the pat-down searches on the Plaintiffs.

Response at 33 (record citations omitted). Noting that the Court has found that less-intrusive patdown searches violated the constitution, the Plaintiffs argue that the intrusive searches that the Plaintiffs underwent must also violate the Constitution. See Response at 33-34.

The "clearly established" prong must also be resolved in favor of Plaintiffs. In the schools-search context, the reasonableness of a search under the Fourth Amendment varies based on the context and nature of the search. The general rule is that in the school or school-activity context, officials must have reasonable, individualized suspicion before conducting a search of a student. New Jersey v. T.L.O., 469 U.S. 325, 341 (1985). In other words, the search of a student by or at the direction of a school official is permissible only if "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." T.L.O., 469 U.S. at 342.

- 109 -

Despite the reasonable suspicion requirement, the Supreme Court has found that a search in the school context may still be reasonable without such suspicion in "limited circumstances[] where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion *would be placed in jeopardy by a requirement of individualized suspicion*." See Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 624 (1989)(emphasis added); Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 674 (1995)(O'Connor, J., dissenting).  When considering whether a particular search fits within this limited exception, courts must weigh, on one side, the scope of the privacy interest at issue and the character of the intrusion on that interest against, on the other side, the "nature and immediacy" of the governmental interest at issue and the efficacy of the means used to address the threat to that interest.  See Vernonia, 515 U.S. at 654-66.

Relying on Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364 (2009), this Court has found that a search that required female prom attendees to lift their skirts to mid-thigh (the part of the search the Court concluded that Ms. Romero was potentially responsible for) was not clearly established as unconstitutional in 2011.  The searches that Ms. Reyes and ASI are potentially responsible for as described by Plaintiffs (which must be accepted as true in the context of this Motion) are much more intrusive than the lifting of dresses search that was considered in the context of Ms. Romero's motion.  The searches for which ASI and Ms. Reyes may be responsible included, among other things, the cupping of breasts, the feeling of bare legs and arms, the lifting of dresses to midthigh, and the putting of fingers inside of a dress to check a student's cleavage.

As this Court has already indicated, it was clearly established under the standard set forth in T.L.O., Earls, Vernonia, and Stafford that a suspicionless search of this intrusiveness was unconstitutional.    (Doc. 142, Mem. Op. re: Qualified Immunity at 121)(suggesting that Principal Romero would not have been entitled to qualified immunity if she had seen the "ASI New Mexico guards touch the female attendees' breasts or require the female attendees' to pull out their bra straps.").

Balancing the searches' "intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests" as instructed in Vernonia and Earls, the suspicionless searches of Plaintiffs were plainly unconstitutional.  See Vernonia, 515 U.S. at 652-53; Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822 (2002).

On the one hand, the searches were excessively intrusive in light of the age and sex of the students.  Touching a female high school student's bare skin, cupping her breasts, putting fingers around her cleavage, and pulling her bra from her skin are extraordinarily intrusive.  See Safford, 557 U.S. at 374.  As students do not "shed their constitutional rights . . . at the schoolhouse gate," Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969), and thus retain some reasonable expectations of privacy in the school context, the exceptionally

invasive searches performed constitute a substantial invasion of Plaintiffs' Fourth Amendment interests.

On the other hand, the searches as described by Plaintiffs were not related to the objective of the search, which was, according to SFPS, to keep banned items out of the dances. As the searching guard acknowledged, touching a students' bare legs and arms, which were in plain view, is not necessary or helpful in accomplishing the Schools' stated objective. As the ASI guard considered the purpose of the bare arm searches, she thought to herself, "'[n]o, that's stupid, because, you know, you can see their bare skin. There's nothing there." In addition, Principal Romero acknowledges that the searches were not effective in excluding drugs and alcohol from the dances. Indeed, the Superintendent of schools did not believe it was necessary to pat-down every student entering prom.

Nor were the searches related to any infraction. To the contrary, the students were searched because school officials believed that they have the basis to be suspicious of any student attending a dance. Such a blanket assumption is directly contrary to the *individualized* reasonable suspicion requirement. *See. e.g.*, *T.L.O.*, 469 U.S. at 341. There was no basis to believe that any of the four Plaintiffs had broken any school rule or were in any way likely to break a school rule. (Ex. 17, Romero Dep. at 168:23-170:21 (Principal Romero acknowledging that she did not have individual suspicion regarding any students arriving at prom (except perhaps a group of students who arrived on a "party bus"); *id.* at 172:4-11 (describing Candice Herrera as a student about whom Principal Romero had no concerns), *id.* at 176:12-13, 177:24-178:4, 181:7-10 (Principal Romero describing Tiffany Herrera); *id.* 184:3-9 (Principal Romero describing that she had no concerns, disciplinary or otherwise, regarding Ashley Hurtado); *id.* at 184:25-185:9 (Principal Romero stating that she was not aware of any disciplinary issues related to Arianna London).)

Accordingly, it was clearly established that a suspicionless search of every student entering prom that included the cupping of breasts, the pulling of bra straps, and the touching of bare skin violated the students' Fourth Amendment rights to be free from an unreasonable search.

Even if the searches were viewed from the perspective of ASI's own acknowledged policy for conducting pat-downs (rather than from the perspective of how the students described the pat-downs), the searches would still violate clearly established law.

ASI maintained a set of Pat Down Guidelines for conducting pat-downs on SFPS students. The Guidelines include an instruction that ASI officers should "[h]ave the subject (female only) using their own hands pull the front of the bra at the underwire slightly way from the skin to allow any contraband to fall." (Ex. 20, Pat Down Guidelines.) These Guidelines were created by ASI for the school setting, but not necessarily for SFPS. (Ex. 6, Gutierrez Dep. Vol. II at 214:24-215:4.) The ASI guard who conducted the pat-downs on Plaintiffs interpreted the bra pulling instruction as requiring her to have students "grab their front bra and shake the bra." (Ex. 26, Reyes Statement.)

As this Court has previously discussed, a pat-down procedure that "require[s] the female attendees' to pull out their bra straps" stands in violation of the scope of rights established by the Supreme Court in Safford. See (Doc. 142, Mem. Op. re: Qualified Immunity at 121.) In Safford, a Safford Middle School assistant principal directed an administrative assistant and school nurse to search a thirteen-year-old female student's clothes for pills he suspected she had on her person. Safford, 557 U.S. at 369. The two school employees had the student "remove her jacket, socks, and shoes, leaving her in stretch pants and a T-shirt (both without pockets), which she was then asked to remove." Id. The student was then "told to pull her bra out and to the side and shake it, and to pull out the elastic on her underpants, thus exposing her breasts and pelvic area to some degree." Id. Importantly, the Supreme Court concluded that the assistant principal had reasonable suspicion to believe that the student was distributing prohibited prescription-strength pain relievers. Id. at 373-74. Nonetheless, that reasonable suspicion, which may have justified a search of outer clothing and backpacks did not justify the "quantum leap" to a search of undergarments that included pulling the bra and underwear away from the skin. Id. at 377.

Here, of course, there was no reasonable suspicion that any particular student was hiding anything in her bra as she entered prom. Nonetheless, Reyes testified that, in compliance with ASI's policy, she had all female students grab their bras, pull it away from their skin, and shake it. The Supreme Court's condemnation of pulling bras and underwear away from the skin of a student and creating the possibility of exposing breasts or the pelvic area to some degree, even with reasonable suspicion, put ASI on notice that its policy of having students pull and shake their bras was unconstitutional. As the Supreme Court has described, a right can be clearly established without a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Courts should inquire into "whether the law put officials on fair notice that the described conduct was unconstitutional" and not engage in "a scavenger hunt for prior cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

Rebecca Reyes's conduct in patting down students by cupping their breasts, grabbing and moving their bras, feeling their bare legs and arms, lifting their dresses and putting her fingers into students' cleavage violated clearly established Fourth Amendment law. Similarly, ASI's policy of having students pull their bras away from their skin (and as interpreted by Ms. Reyes as requiring students to shake their bras) violated the clearly established law as set forth in *Safford*. Accordingly, even if ASI could raise qualified immunity as a corporation with a multi-year, renewable contract to provide a broad range of security services for SFPS, the facts demonstrate that it should not be granted summary judgment on qualified immunity grounds.

Response at 34-38 (selected record citations omitted).

The Plaintiffs also clarify their liability theory as against ASI New Mexico.   See Response at 38-39.  They state that their theory is not a vicarious-liability theory, but a direct-liability theory under Monell.   See Response at 39.  The first step in their theory is to identify ASI New Mexico's policy or practice; in their view, ASI New Mexico

> undoubtedly had a custom and practice of conducting pat-downs of all students at SFPS.  ASI acknowledges that in conjunction with and at the direction of SFPS, ASI conducted patdown searches of all students attending SFPS dances for at least seven years, including at sixteen proms.  This long-standing, consistent practice certainly qualifies as a custom or usage.  ASI emphasizes that there is some evidence suggesting that the pat-down practice began before ASI started providing security services to SFPS. There is no basis, however, for concluding that ASI's adopting an existing practice as its own makes its potential liability any different under Monell than if it had created the practice.
>
> In addition, it is undisputed that ASI maintained a policy regarding how pat-downs of SFPS students should be conducted by ASI guards.  This ASI pat-down policy, which was developed and approved by ASI, included having female students pull their bras away from their skin.  The policy also directs guards to be vigilant and keenly aware of the fact that "[s]tudents have hidden contraband in not so obvious places such as taped bottles to the inside of their legs, hidden pills between their toes, ect (sic)."

Response at 40 (record citations omitted).

Having so identified ASI New Mexico's policy, the Plaintiffs contend that ASI New Mexico is responsible for its policies' foreseeable results and contend that the invasiveness of the Plaintiffs' searches was such a result.   See Response at 40.  They expand:

> ASI's established policy for conducting pat-down searches at school dances included the pulling and shaking of students' bras, and that the bra areas of Plaintiffs were searched as a result of that established practice.
>
> This pat-down policy only further invited the type of invasive searches Plaintiffs experienced. For example, the written Pat Down Guidelines (which were reviewed by SFPS principals) invite invasive searches by specifically instructing those performing pat-downs to "be vigilant" in their searches and reminding that contraband may be hidden in the bra area between a student's breasts.  Such instructions invite guards seeking to employ the required vigilance to conduct their searches in such a way as to ensure that no contraband hidden around a student's breasts could escape detection. Because  personally pulling and

shaking the student's bra and/or feeling around and under her breasts provides greater assurance that no contraband goes undetected, that guards tasked with performing mandatory bra searches on student after student might conduct more invasive searches in an attempt to identify contraband concealed in the bra area is hardly unexpected or unforeseeable.

The same holds true for the other overly intrusive aspects of Plaintiffs' searches, such as the lifting of Plaintiffs' dresses and patting down of their bare legs and inner thighs.  Where, as here, guards tasked with conducting pat-downs are instructed as to the importance of vigilance in performing the searches and specifically warned that contraband may be concealed on a student's inner thigh, one would expect that guards would check students' inner thighs for contraband (which is most easily accomplished by lifting the student's dress and/or feeling with one's hand).  See (Ex. 20, Pat Down Guidelines)(explicitly instructing guards to be vigilant to the possibility that students taped bottles to their inner thighs).)

Where, as here, there is at least some evidence supporting a finding of foreseeability, that determination is a fact question that must be resolved by the jury.

Response at 41-42 (selected record citations omitted).

The Plaintiffs also argue that, because Johnson ratified Reyes' conduct, ASI New Mexico

is liable under Monell:

Private corporations may be liable under § 1983 when a policy-making employee ratifies the conduct of an employee.  See, e.g., Jones v. Preuit & Mauldin, 808 F.2d 1435, 1442, opinion vacated in part on reh'g, 822 F.2d 998 (11th Cir. 1987); Miami Int'l Realty Co. v. Town of Mt. Crested Butte, Colo., 579 F. Supp. 68, 70 (D. Colo. 1984)(noting that corporate liability could exist based on corporate ratification or wrongdoing by the corporation's high-ranking officers); see also City of St. Louis, 485 U.S. at 127 (holding that when a municipal policy-maker "approve[s] a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality. . ."); Pembaur[ v. City of Cincinnati, 475 U.S. 469, 483 (1986)](holding that where a city official "responsible for establishing final policy with respect to the subject matter in question" makes a "deliberate choice to follow a course of action . . . from among various alternatives," municipal liability attaches to that decision).

After Plaintiffs raised concerns regarding the pat-downs at the 2011 Capital High School prom, ASI General Manager, Micah Johnson, ratified its security guards' conduct of subjecting all students at the prom to pat-downs in the manner described by Ms. Reyes.  Notably, Ms. Reyes's description of the searches included pulling bras away from the body, which the Court has noted was in violation of clearly established law.

- 114 -

Micah Johnson is indisputably a final policy-making authority of ASI. He is one of the owners and founders of the company. Mr. Johnson is the general manager of the company and is one of the highest ranking officials and has no supervisors.  Although few courts have considered the requirements for being considered a policymaking authority in the context of private corporations, Mr. Johnson necessarily qualifies as a policymaking authority given the fact that he is one of the three highest-ranked officials in the company.  Brammer-Hoelter, 602 F.3d at 1189-90 (describing the test for determining who has final policymaking authority in the municipal context).

ASI is liable for the actions of Ms. Reyes at the 2011 Capital High School prom because after investigating the pat-downs, ASI's General Manager approved of her actions, took no action against her, and made no effort to change the practices of the company regarding pat-down searches.

Response at 43.

The Plaintiffs then turn to the NMTCA argument, and contend that it has "four fatal flaws": (i) it contradicts ASI New Mexico's state-action argument; (ii) "because ASI is a corporation and not an individual, the appropriate analysis under the NMTCA is whether ASI is an instrumentality of the state, which it is not, rather than whether ASI is a public employee"; (iii) even under the public-employee standard, ASI New Mexico is liable, because it is an independent contractor and not a public employee; (iv)  "even if ASI were a public employee, it would be liable under the NMTCA waiver of immunity for public employees operating a building."  Response at 43.   As for the first argument, the Plaintiffs note the arguable inconsistency in ASI New Mexico's argument; they also point out that their own argument is internally consistent: all public employees are state actors, but not all individuals possibly liable under § 1983 are public employees.  See Response at 44-45.  For the second argument, the Plaintiffs contest ASI New Mexico's analytical framework:

When the New Mexico Supreme Court has considered whether the NMTCA applies to a private corporation, it has conducted its analysis under the "instrumentality of the state" provision and not the "public employee" provision of the NMTCA.  See[,] e.g., Cole v. City of Las Cruces, 99 N.M. 302, 305 (1983).

In <u>Cole</u>, the Rio Grande Natural Gas Association ("Association") entered into an agreement with the City of Las Cruces regarding the City's use of the Association's natural gas transmission and distribution system.  <u>Id.</u> at 303.  When the plaintiff was injured by a natural gas explosion in the Association's system, he brought suit against the City, the Association, and others.  <u>Id.</u>  The Association claimed that it had immunity under the NMTCA because the City exercised near complete control over the Association in relation to the natural gas system.  <u>Id.</u>  The agreement between the Association and the City provided that the City was "'to solely operate and maintain the Association's entire natural gas transmission and distribution system.'"  <u>Id.</u> at 305 (citation omitted).  The agreement further described that "'the City shall have the right to supervise, direct and control the employees of the Association.'"  <u>Id.</u> (citation omitted).  Despite the extensive control the City had over the Association, the New Mexico Supreme Court held that the Association was not an instrumentality of the State, because the Association was "a private corporation and is not the type of 'instrumentality' contemplated within the context of the Act."  <u>Id.</u>; <u>see also</u> <u>Armijo v. Dep't of Health & Env't</u>, 108 N.M. 616, 618 (1989)(finding Tort Claims Act did not apply to mental health facility despite the extensive state regulatory scheme to which the mental health facility was subject, including "safety, building standards, client eligibility, and extensive requirements of case documentation.").

The New Mexico Supreme Court later relied on <u>Cole</u> to conclude that a private corporation can qualify as a governmental entity (in that case in the context of the Public Works Minimum Wage Act) only if "under the totality of the circumstances the government entity is so intertwined with the private entity that the private entity has become an alter ego of the public entity."  <u>Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc.</u>, 129 N.M. 677, 685-86 (2000).

Even if all of the evidence of control cited by ASI (which, as described below, Plaintiffs largely dispute) were accepted, SFPS's control over ASI does not even approach the level of control that was still insufficient to find application of the NMTCA in <u>Cole</u> and nowhere near the level of entanglement that would make ASI an alter ego of SFPS.  <u>Id.</u>  Accordingly, ASI cannot properly be considered an instrument of the state.

Response at 45-46.

Further, in the Plaintiffs' view, even if it is appropriate to analyze Santa Fe Public Schools' and ASI New Mexico's relationship under the NMTCA's public-employee provision, ASI New Mexico is an independent contractor and not a public employee.  <u>See</u> Response at 46.  The Plaintiffs point out that: (i) the contract expressly states that ASI New Mexico employees are not independent contractors; (ii) the contract states that NMTCA limits Santa Fe Schools'

liability, but says nothing about the NMTCA's application to ASI New Mexico; (iii) Gutierrez

identified ASI New Mexico's guards as ASI New Mexico employees and not Santa Fe Schools

employees; and (iv) the SFPS Defendants have stated in this litigation that ASI New Mexico is

an independent contractor.   See Response at 46-47.   The Plaintiffs also point out that other

factors beyond the parties' understanding of their relationship -- most significantly, the degree of

control that Santa Fe Schools exercised over ASI New Mexico's actions -- support a conclusion

that ASI New Mexico is an independent contractor.  See Response at 47.  They elaborate:

> The evidence supports a finding that ASI and not SFPS controlled the day-to-day activities of ASI guards in the context of the SFPS contract.  The hallmarks of employee control, including who gave day-to-day directives, who investigated employee performance, and who had the power to discipline were all held by ASI. ASI officials understood that ASI guards could refuse directions of SFPS officials and would report circumstances of disagreement with SFPS officials' actions or instructions to ASI management. (Ex. 2, Archuleta Dep. Vol. I at 86:11-87:13, 87:19-88:3 (testifying that ASI guards are instructed to contact an ASI supervisor if they are uncomfortable with an instruction from a SFPS official).)  SFPS did not supervise the day-to-day activities of the ASI guards. (Ex. 17, Romero Dep. at 68:13-69:12.) At Capital High School, the primary direction SFPS gives to ASI occurs at a meeting at the beginning of the year and during quarterly meetings with ASI's supervisory personnel and does not occur on a daily basis. (Ex. 17, Romero Dep. at 42:13-18, 44:4-45:8.)
>
> ASI maintained the responsibility to investigate ASI security officers' misconduct and to discipline the officers as appropriate. (Ex. 5, Gutierrez Dep. Vol. I at 65:25-66:13; 95:23-96:11.) When a principal had a true concern about a guard she would discuss it with the lead guard and higher ASI officials. (Ex. 17, Romero Dep. at 44:4-45:8.) When the Capital High School principal raised concerns about a guard with ASI management, she would not even necessarily be informed of the specifics of any action ASI would take in response. (*Id.* at 61:22-62:2.) SFPS did not track how ASI responded to performance-related issues SFPS raised with ASI management. (*Id.* at 64:8-11.) SFPS did not conduct performance reviews of ASI employees. (*Id.* at 64:19-65:5.)
>
> At the Capital High School prom, the highest ranking ASI official who was present understood that it was his and ASI's lead guard's responsibility to ensure that all of the ASI staff were meeting their expectations and fulfilling their job responsibilities. (Ex. 3, Archuleta Dep. Vol. II at 173:21-174:3; Ex. 1, Aguilar Dep. at 104:12-105:14.)
>
> The evidence readily supports a finding that ASI, and not SFPS, controlled

the day-to-day activities of ASI guards and that ASI was an independent contractor of SFPS and not a public employee subject to immunity under the NMTCA.

Response at 47-48.

The Plaintiffs also assert that they did not consent to the pat-down searches.  See Response at 48.  First, they note that ASI New Mexico did not plead consent as a defense in Defendant ASI New Mexico, LLC's Answer to First Amended Complaint, filed November 28, 2011 (Doc. 67)("ASI New Mexico's Answer"); accordingly, in their view, ASI New Mexico has waived this defense.  See Response at 49.  Second, the Plaintiffs argue that ASI New Mexico's consent argument is artificially narrow: even if the Plaintiffs consented to a standard pat-down search by getting in line, they argue, they did not consent to the invasive searches they say occurred.  See Response at 49-50.  Third, they argue that they did not consent to the pat-down by attending past dances:

> Consent can only be found at this stage if the undisputed facts establish that Plaintiffs' words and conduct "are reasonably understood" as consent to be patted down.  Dubbs v. Head Start, Inc., 336 F.3d 1194, 1219 (10th Cir. 2003) (quoting RESTATEMENT (SECOND) OF TORTS § 892(2)).  In other words, would Ms. Reyes have understood that the Plaintiffs had consented to the pat-downs.  Under that standard, ASI's emphasis on Plaintiffs' attendance at past school dances is misplaced.  There is no evidence that Ms. Reyes or any other ASI or SFPS personnel were aware of whether Plaintiffs had been to previous dances or had been subjected to pat-downs at those previous dances.  (Ex. 16, Reyes Dep. Vol. II at 47:15-20 (indicating that she did not know any of the Plaintiffs.))  As a result, there is no basis for asserting that Plaintiffs' mere presence in the search line could be interpreted by Ms. Reyes as conduct indicating a consent to the types of pat-downs performed at past dances.
>
> Furthermore, the evidence supports a finding that Plaintiffs did object to the pat-downs at the time of the searches and that the nature of the searches were so shocking that the Plaintiffs could not even verbally articulate their objection. As Candice Herrera described, "I didn't know what was going on. It didn't give me enough time to react. I had my arms still out from this and then she did that. And then after that she went to reach for the dress and I tried to push her down like that." (Ex. 8, C. Herrera Dep. at 129:10-18.)  Tiffany Herrera described how

the search was objectionable, "[i]t was extremely uncomfortable. I felt violated, disrespected." (Ex. 9, T. Herrera Dep. at 68:19-25.)  Ashley Hurtado's conduct during the search indicated her discomfort. (Ex. 10, A. Hurtado Dep. at 114:2-10.)

The relationship between Plaintiffs and the ASI guards and school officials who watched and ordered the pat-downs cannot be underestimated in its effect on Plaintiffs' ability and responsibility to articulate their objections to the searches.  Ms. Reyes was a uniformed guard who Plaintiffs knew was hired by SFPS and the searches were conducted in full view of and appeared to be condoned by the principal of their school. (Ex. 3, Archuleta Dep. Vol. II at 259:17-22 (noting that the ASI security guards were in uniform at the 2011 Capital High School prom); Ex. 13, London Dep. at 47:9-10)(describing Ms. Reyes as wearing a uniform at prom); Ex. 8, C. Herrera Dep. at 89:15-90:6) (describing seeing ASI guards at Capital High School campus every day).) Indeed, for Plaintiffs, the principal was undoubtedly the highest authority figure at this school event and her failure to intervene and apparent approval of the process undoubtedly affected their ability to articulate an affirmative objection. (Ex. 8, C. Herrera Dep. at 182:22-183:15.)  This context of the searches mitigates if not eliminates any perceived implied consent by Plaintiffs.

Courts have regularly recognized that the disparity of power inherent in the teacher-student relationship affects a student's ability to give informed consent.  See, e.g., State v. Edwards, 48 Kan. App. 2d 264, 271 (2012); State v. McKenzie-Adams, 281 Conn. 486, 506 (2007) (overruled in part on other grounds by State v. Payne, 303 Conn. 538 2012).) This disparity is relevant here where the ASI guards were functioning jointly with school officials and conducting the searches in full view of the school officials.   In the context of this particular power dynamic it can be expected that the students would not affirmatively object to the unconstitutional conduct as they might in a context without such a dramatic power differential.  Second, the school officials had their own obligation to object on behalf of the students as they were being subjected to the unconstitutional searches.  See, e.g., Bloxham v. Glock Inc., 203 Ariz. 271, 274 (Ct. App. 2002); Joseph M. v. Ne. Educ. Intermediate Unit 19, 516 F. Supp. 2d 424, 442 (M.D. Pa. 2007).

Plaintiffs' demonstrated lack of comfort with the searches combined with the dubious proposition that a student can give implied consent to invasive conduct by or on behalf of a school official and the school officials' own independent duty to protect the students from harm easily allow the Court to find that Plaintiffs did not effectively consent to a pat-down search of any kind.

Response at 50-52.

The Plaintiffs also take issue with ASI New Mexico's view that its employees were not acting within the course and scope of their employment.  See Response at 52.  In their view, this

issue generally is a question of fact, see Response at 52 (citing, e.g., Pena v. Greffet, 922 F. Supp. 2d 1187 (D.N.M. 2013)(Browning, J.)), and all four factors that New Mexico courts use to decide whether an employee committed a tort within the scope of his employment point in favor or the conclusion that Reyes acted within the scope of her employment:

New Mexico applies a four-part test to determine whether an employee's tort occurred within the scope of his or her employment. "An employee's action, although unauthorized, is considered to be in the scope of employment if the action (1) is the kind the employee is employed to perform; (2) occurs during a period reasonably connected to the authorized employment period; (3) occurs in an area reasonably close to the authorized area; and (4) is actuated, at least in part, by a purpose to serve the employer." Peña, 922 F. Supp. 2d at 1230 quoting (Lessard v. Coronado Paint & Decorating Ctr., Inc., 142 N.M. 583, 588 (2007); RESTATEMENT (THIRD)OF AGENCY § 7.07(2)). Each of these factors supports a finding that Ms. Reyes was acting within the scope of her employment as a senior security guard with ASI when she conducted the pat-downs on Plaintiffs at the 2011 Capital High School prom.

Ms. Reyes's employment duties specifically included performing security services for ASI in the context of SFPS events. Ms. Reyes was instructed by the lead guard at the 2011 Capital High School prom to conduct pat-downs on students entering the prom. The kind of conduct challenged by Plaintiffs undoubtedly falls within the conduct Ms. Reyes was employed to perform. The fact that the specific manner Ms. Reyes used to conduct the pat-downs (as described by Plaintiffs) was not specifically authorized by ASI does not affect the scope of employment analysis. Allender v. Scott, 379 F. Supp. 2d 1206, 1220 (D.N.M. 2005)(finding that tribal police officer was acting in the scope of his employment when he apprehended, arrested and detained plaintiff even if his alleged use of excessive force was presumably not authorized).

There is no question that the second and third parts of the scope-of-employment test are met. The pat-downs occurred during Ms. Reyes's employment period and in an area she was directed and authorized to work. Ms. Reyes was on-duty and had been assigned to conduct security at the 2011 Capital High School prom along with a host of other ASI security personnel. This case does not present circumstances in any way analogous to those this Court considered in Peña where the employee's conduct "occurred neither while he was doing work for which the [employer] paid him nor during hours at which he was at work." Peña, 922 F. Supp. 2d at 1257. Nor does it involve a geographical distance like that considered in Peña. Id. (noting that the alleged conduct occurred 250 miles from the employee's work site).

It is apparent that Ms. Reyes' pat-downs were done in part, if not solely, in an attempt to further the interests of ASI. Ms. Reyes was instructed to conduct

pat-downs, and there is no indication that the escalation of the pat-downs to include additional overly intrusive, inappropriate elements was based on an independent course of conduct not intended to further any purpose of the employer.  "An independent course of conduct represents a departure from, *not an escalation of*, conduct involved in performing assigned work or other conduct that an employer permits or controls." RESTATEMENT (THIRD) OF AGENCY § 7.07 (emphasis added).  Ms. Reyes's conduct stands in stark contrast to <u>Los Ranchitos v. Tierra Grande, Inc.</u>, 116 N.M. 222, 227 (1993)[,] where the court found that the embezzlement by an accounting firm's employee was activated by the employee's personal motives and "as such, they could not reasonably be found to serve or advance [the accounting firm's] interests." <u>Id.</u>

All four elements of the scope-of-employment test support a finding that Ms. Reyes's conduct was within the scope of her employment.  ASI's assertion to the contrary appears to be based on the assertion that it cannot be held liable for any *unauthorized* conduct by Ms. Reyes.  This assertion, however, finds no legal support. <u>See</u>, <u>e.g.</u>, <u>McCauley</u>, 80 N.M. at 181 (finding employer liable for actions of rancher who ended altercation about the speed of driving neighbor's cattle by engaging in the unauthorized conduct of shooting the neighbor); <u>Peña</u>, 922 F. Supp. 2d at 1230 (noting that the standard for determining the scope of employment is premised on the fact that the challenged conduct is unauthorized).  While ASI may have instructed Ms. Reyes to conduct pat-downs at the prom in a certain manner, she escalated the pat-downs to include the even more inappropriate actions of the cupping of breasts, touching of bare skin, and the lifting of skirts.  There is sufficient evidence to conclude that the escalation of the pat-down was intended to serve the purpose of ASI. RESTATEMENT (THIRD) OF AGENCY § 7.07.  Accordingly, ASI may be held liable for the torts of Ms. Reyes.

Further, ASI ratified Ms. Reyes's conduct. <u>See</u> <u>Los Ranchitos</u>, 116 N.M. at 226 (noting that an employer can be held liable for the conduct of an employee where the employer subsequently ratifies the conduct).  The ASI General Manager approved of Ms. Reyes's conduct and took no disciplinary action against her after investigating Plaintiffs' complaints regarding the nature of Ms. Reyes's patdowns.

Response at 53-55 (emphasis in original).

The Plaintiffs assert that they have produced sufficient evidence to satisfy the elements of the IIED claim.  <u>See</u> Response at 55.  As to the extreme-and-outrageous-conduct factor, the Plaintiffs note that the Court must take as true their account of the facts, <u>see</u> Response at 56, and assert that the conduct they allege,

done in public in front of male and female classmates, other ASI guards, and

school officials, occurred in the public lobby area of the Santa Fe Convention
Center.  Being subjected to this sort of violating conduct on the crowning night of
a high school career could certainly lead a reasonable jury to exclaim,
"Outrageous!"

Response at 56.  The Plaintiffs also note that the special relationship between the parties gives

rise to an abuse-of-power dynamic -- that is, the teachers and the security guards who work for

the school "have an affirmative duty to protect students," and "[t]hat relationship magnifies the

outrageous nature of the pat-down searches."   Response at 57.  As for the emotional-distress

issue, the Plaintiffs assert as follows:

Emotional distress is severe "if it is of such an intensity and duration that
no ordinary person would be expected to tolerate it."   UJI 13–1628 NMRA.
Plaintiffs have expressed the extensive distress they suffered as a result of the
searches.  As Candice Herrera described, she felt severely violated and exposed
by the searches, feelings that were exacerbated by the fact that the actions were
supported by the SFPS administration.  Candice Herrera explained that the highly
invasive search she endured at prom was one of the most stressful and
emotionally difficult events in her life.  Tiffany Herrera, who was sixteen at the
time of the searches, similarly testified about how the searches confused her and
felt wrong.  Candice Herrera went on to explain that she continues to worry about
going to school events because of the possibility of people touching her.  Arianna
London's prom search ruined the memory of prom for her and made her feel bad
about herself.  The patdown searches made Ms. London feel disrespected.  Id.
Ashley Hurtado felt humiliated and embarrassed about being touched
inappropriately by a stranger in public and in front of classmates.  The searches
made her emotionally distressed and afraid to go to events where there might be
similar searches.  Ms. Hurtado worries about the searches on an almost daily
basis.
The evidence is sufficient to support a finding for Plaintiffs on their
intentional infliction of emotional distress claims.

Response at 58 (record citations omitted).

The Plaintiffs also assert that the Court should allow the prima facie tort claim to

proceed.  See Response at 58.  In their view, New Mexico permits them to plead prima facie tort

in the alternative to their other claims, and, "[u]ntil the close of the evidence at trial, dismissal on

the grounds that Plaintiffs' prima facie tort claim overlaps with other tort claims is premature."
Response at 59.  Second, citing the liberal standards governing construal of pleadings, they note
that the Complaint's inclusion of "unlawful" instead of "lawful" was inadvertent, and that ASI
New Mexico has been on notice that they asserted a prima facie tort claim from the start of the
case.  See Response at 59-60.  As for the intent element, the Plaintiffs in essence assert that the
issue is generally a fact issue, and that this evidence supports its case:

> Here, the evidence of the overly intrusive pat-down searches without any
> reasonable suspicion of any of the Plaintiffs is sufficient to find that Defendant
> ASI acted without justification.  These suspicionless searches as conducted by
> Ms. Reyes were not reasonably related to any demonstrated danger any of the
> Plaintiffs may have presented.  Ms. Reyes had the choice to conduct more limited
> searches but chose not to pursue them, knowing that it was not appropriate to
> touch students in the breast area.
>     ASI does not address the fact that searches as described by Plaintiffs were
> done without justification because ASI once again views the facts in the light
> most favorable to it.  ASI solely argues that pat-downs as directed by Principal
> Romero or as had been conducted in the past were done with justification.  That is
> not the relevant question; instead, to prevail on summary judgment, ASI would
> have to establish that the pat-downs as described by Plaintiffs were done with
> justification. That, ASI cannot do.

Response at 60-61 (record citations omitted).

Finally, with respect to punitive damages, the Plaintiffs argue that,

> [w]hen the facts are properly viewed in the light most favorable to Plaintiffs it is
> readily apparent that there is sufficient evidence to meet that standard.  Indeed,
> ASI has not even moved for summary judgment on the substance of Plaintiffs'
> battery claims and "since battery usually is a matter of the worst kind of
> intentions, it is a tort which frequently justifies punitive damages[.]" W. Page
> Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS § 9, at 40 (5th ed.
> 1984).
>     In its argument, ASI does not consider the fact that cupping breasts,
> patting bare skin, pulling dresses to mid-thigh, placing fingers underneath the
> seams of dresses to check cleavage, and the touching inner thighs as Plaintiffs
> describe can meet the standard of recklessness and wanton disregard for
> Plaintiffs' rights.  Indeed, ASI does not even acknowledge its own employee's
> testimony that the pat-down searches she performed included "pat[ting] their

heads a little bit" (Ex. 15, Reyes Dep. Vol. I at 91:20-24); having "[f]emale students … grab their front bra and shake the bra" (Ex. 26, Reyes Statement); "[t]he pat-down of the bare arms" (Ex. 15, Reyes Dep. Vol. I at 73:14-21); and having "[p]alms open," facing the student (*id*. at 59:5-24).

       The overly intrusive pat-down searches as described by Plaintiffs and Ms. Reyes are sufficient for a jury to find that Ms. Reyes's conduct was malicious, willful, reckless, wanton, fraudulent or in bad faith and ASI's motion for summary judgment on Plaintiffs' punitive damages claim should be denied.

Response at 61-62 (selected record citations omitted).  Accordingly, the Plaintiffs ask the Court

to deny the MSJ.  See Response at 62.

       ASI New Mexico disagrees, stating:

       The parties' summary judgment filings establish that the facts relating to Plaintiffs' claims against Defendant ASI New Mexico, LLC ("ASI") are, for all material purposes, undisputed.  The few disputed issues of fact Plaintiffs attempt to raise fail to create any genuine disputes and/or are immaterial to their claims. Plaintiffs' proposed additional facts are duplicative to those already undisputed, are immaterial, or are not supported by the cited references.  Under a proper construction of applicable law, the undisputed material facts establish that ASI is entitled to summary judgment in its favor on all claims in Plaintiffs' Second Amended Complaint.

Reply at 1.[125]  It substantially reiterates the arguments that it made in its MSJ.  First, as to the

state-action issue, ASI New Mexico underscores that Santa Fe Schools, and not ASI New

Mexico, authorized the pat-down searches -- indeed, in their view, only Santa Fe Schools had the

authority to require such searches.  See Reply at 31.  It notes that it had no policies requiring

those searches and that it "would not have conducted pat-down searches at SFPS proms, in

general, absent specific requests for such services by SFPS administrators."  Reply at 31.

Particularly, it states that it would not have conducted pat-downs at the prom had Romero not

---

[125]ASI New Mexico consumes much of the first 14 pages of its Reply laying out what, in its view, are undisputed facts, see Reply at 1-14, and presents its responses to the Plaintiffs' factual arguments in the second 16 pages of its Reply, see Reply at 15-30.  The Court has disposed of the substance of these pages in discussing the factual background, and will not reiterate those facts here.  The Court will, instead, focus on the Reply's legal arguments.

directed it to conduct the pat-downs.  See Reply at 31.  They expand:

> ASI made no "state action" decision to require all 2011 Capital High prom attendees to undergo pat-down searches, but merely acquiesced in SFPS officials' initiatives, decisions, and directives in that regard.   These facts are fatal to Plaintiffs' § 1983 claim against ASI.
>
> The "state action" forming the foundation of Plaintiffs' § 1983 claim based on blanket pat-down searches at the 2011 Capital High prom was action taken by SFPS alone.  The fact that SFPS administrators implemented their state action decisions by directing ASI to perform requested contractual services accomplishing SFPS's directive does not make ASI a "state actor" as Plaintiffs contend.  Nor did ASI initiate or undertake any conduct of its own that invoked the power of the state, or bent the will of state powers to ASI's own purposes, such that the decision by SFPS administrators to pat-down search all prom attendees was caused in any way by ASI. Rather, ASI relied on directives from SFPS administrators on whether pat-down searches of a student would occur in any SFPS setting -- and acquiesced to those client directives by providing pat-down services only when instructed to do so.
>
> While the facts are undisputed, ASI and Plaintiffs interpret and apply the governing legal principles quite differently.   In opposing ASI's summary judgment motion, Plaintiffs rely on the same authorities, argument, and reasoning regarding "state action," "state actor" status, the "nexus" and "joint action" tests that they asserted in their motion for partial summary judgment.   In responding to Plaintiffs' MPSJ, ASI previously distinguished Plaintiffs' cases and explained the flaws in Plaintiffs' analysis in arguing that ASI was a "state actor" under the "nexus" and "joint action" tests, and can be held personally and individually liable, under § 1983, for blanket pat-down searches having occurred at the 2011 Capital High prom.  For these reasons, ASI incorporates herein by reference Defendant ASI New Mexico, LLC's Response To Plaintiffs' Motion For Partial Summary Judgment, pp. 1-2, 8-25 (DOC 190), as Reply argument supporting ASI's summary judgment motion and as rebuttal to Plaintiffs' Response argument at pages pp. 17-28.
>
> The fundamental and fatal analytical flaw pervading Plaintiffs' "state action" and "state actor" arguments -- as applied to ASI -- is Plaintiffs' rationale that "state action can be found under the joint action [and nexus] test[s] when the influence is flowing either way, from private actor to state actor or from state actor to private actor . . . ."   See Plaintiffs' Response at p. 22 (emphasis in original).  Plaintiffs are improperly conflating distinct principles to conclude that, if SFPS is liable as a "state actor" for its unconstitutional "state action" decision of directing ASI security officers to pat-down search all prom attendees, then the analysis flows the other way and ASI must necessarily be a "state actor" subject to individual and personal liability because it carried out the "state action" decision made by SFPS administrators.

However, "state action" by SFPS that SFPS carried out through it directives to ASI is not "state action" *by* ASI for which ASI may be held personally and individually liable.  See Brophy v. Ament, No. CIV 07-0751 JB/KBM, 2009 WL 5206041, * 16 (noting that Tenth Circuit decision finding that officers who actively aid in a private individual's repossession of a vehicle amounts to state action for purposes of a § 1983 claim did not address whether the private individual's actions could be classified as state action and, therefore, was not determinative of whether the private individuals' actions amounted to state action in the case at hand).  ASI followed SFPS administration directives.  The "something more" than a private party's acquiescence and cooperation with a governmental entity's directive that would convert the private party into a "state actor" for personal § 1983 liability simply does not exist in this case.

Reply at 33 (emphasis in original).[126]  ASI New Mexico also argues that the Plaintiffs' attempts

to distinguish Montoya v. Board of Education and Sigmon v. CommunityCare HMO, Inc.,

demonstrate Plaintiffs' misapprehension of ⸻joint action‖ principles.   The Montoya security officer's participation in removing a student from class and searching her lacked "joint action: because the security officer was complying with directives from a school official and performing services incidental to her company's contract with the school.  Sigmon is relevant to the absence of any "joint action" agreement or cooperative effort between SFPS and ASI to force students to unconstitutionally undergo pat-down searches given that SFPS administrators were the sole decision makers on when pat-down searches would occur and ASI merely followed SFPS administrators' directives in that regard.

Reply at 33 at n.25.

_____

[126]This incorporation by reference of a party's own briefing in a reply creates problems. The local rules provide that "[a] party may adopt by reference another party's motion or other paper by making specific reference to the filing date and docket number of such motion or other paper."  D.N.M.LR-Civ. 7.1(a)(emphasis added).  The rule is unclear whether "another party's" modifies only "motion" or also modifies "other paper," but the better reading of the language is probably that it does; "[a] party may adopt by reference . . . other paper . . ." would be an awkward way of saying any document, and if "other papers" were construed so broadly there would be no need for "another party's" motion.   ASI New Mexico has not here adopted by reference another party's motion or other paper; it instead purports to incorporate its response to a separate motion.  Such a maneuver is not proper incorporation by reference, but is, in effect, an end run around page limits.  The Court has nonetheless considered the arguments in this other briefing, see Defendant ASI New Mexico, LLC's Response to Plaintiffs' Motion for Partial Summary Judgment (Doc. 185), filed March 17, 2014 (Doc. 190), in disposing of the motion, but will not reiterate the arguments in this Memorandum Opinion and Order.

- 126 -

ASI New Mexico then argues that Tenth Circuit law forecloses the Plaintiffs' contention that it is not entitled to qualified immunity.  See Reply at 34.  It argues:

> In Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc., 413 F.3d 1163 (2005), the Tenth Circuit specifically recognized the narrow reach of Richardson's holding to apply to private parties who assume a major task from the government and undertake the operation with very limited direct government supervision:
>
>> After concluding that the defendants could not claim qualified immunity, the Court narrowed the scope of its holding.  [Richardson, 504 U.S. at 413.]  It noted that Richardson arose in the context where 'a private firm, systematically organized to assume a major lengthy task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms.'  Id.  The Court then clarified that Richardson 'does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision.'  Id.
>
> Rosewood, 413 F.3d at 1167.  Rosewood[] further noted that, based on Richardson's substantial-supervision caveat, courts have allowed private defendants to assert qualified immunity when the defendants were closely supervised by the government.  Id.  The Tenth Circuit reasoned that the private defendant may have been entitled to qualified immunity based on government oversight of its activities, but limited its analysis to the Richardson policy considerations because the defendant had not raised the government supervision argument before the district court.  Id.
>
> Plaintiffs' reliance on the Richardson policy arguments as defeating ASI's entitlement to qualified immunity is misplaced.  Unlike the Richardson defendant, ASI did not assume responsibility over security for SFPS and independently operate in that capacity with little government oversight.  Rather, ASI served as an adjunct to SFPS in the essential governmental activity of promoting safe school environments and acted under close official supervision in doing so.  Indeed, SFPS exercised complete control over whether ASI security officers would pat-down search students at any time in providing security services for the schools.
>
> The Richardson policy rationale does not govern and ASI is entitled to qualified immunity under DeVargas, Warner, Eagon, Frazier, Rosewood, Filarsky v. Delia, 132 S. Ct. 1657 (2012)(cited by Plaintiffs and recognizing Richardson's limited application), and this Court's decision finding qualified immunity for Principal Romero.  Finally, Rosewood found that the district court erred in concluding that the qualified immunity defense could only apply to individuals,

and held "that there is no bar against a private corporation claiming qualified immunity." 413 F.3d at 1166. If ASI was a "state actor" for purposes of Plaintiffs' § 1983 claim (which is denied), then ASI is entitled to summary judgment on that claim based on qualified immunity.

Reply at 34-35 (record citations omitted). ASI New Mexico also contends that the

Plaintiffs' reasoning that, because ASI security officers performed the actual pat-down searches, ASI is not entitled to qualified immunity like Principal Romero (who requested, but did not actually perform patdown searches herself) is nonsensical. Plaintiffs' argument that the alleged inappropriate touching during the pat-downs defeats qualified immunity for ASI misses the mark. Plaintiffs' § 1983 claim rests on their Fourth Amendment right against unreasonable searches having been violated because pat-down searches were performed on all prom attendees without reasonable suspicion. Any inappropriate touching that allegedly occurred during those unconstitutional searches relates to Plaintiffs' compensatory damages for the unconstitutional searches. Finally, Plaintiffs argue that having female students pull their bras away from themselves as part of a pat-down search vitiates qualified immunity for ASI. However, Plaintiffs' claims do not arise from having been asked to pull their own bras away from their bodies during their pat-down searches at the 2011 Capital High prom. Plaintiffs cannot defeat ASI's entitlement to qualified immunity by asserting that ASI violated a clearly established right against Plaintiffs being asked to pull their own bras away from their bodies when, according to Plaintiffs' allegations, that conduct that did not occur.

Reply at 35-36 n.26 (record citations omitted).

ASI New Mexico also contends that the Plaintiffs' argument under <u>Monell</u> is incorrect,

because

it was SFPS's -- not ASI's -- custom or practice to pat-down search all prom attendees, ASI did not "develop" the guidelines for SFPS, Plaintiffs' claims do not rest on having been asked to pull on their own bras, and the pat-down guidelines instructed *against* engaging in the kind of inappropriate touching that Plaintiffs claimed occurred.

Reply at 36 (emphasis in original). As for the foreseeability argument, ASI New Mexico replies:

The cases that Plaintiffs cite stand for the proposition that a party who initiates or recommends an unconstitutional course of action is not relieved of responsibility for same even though an intervening third party may exercise independent judgment in determining to follow the course of action recommended by the

defendant.  See Kerman v. City of New York, 347 F.3d 93, 126-27 (2d Cir. 2004).
If Reyes grabbed and groped Plaintiffs' breasts, patted their bare arms, and
stroked and felt their upper and inner thighs as they claim, then she clearly was
not determining to follow the course of action recommended by the typed ["]Pat-
Down Guidelines."  Instead, she was exercising independent judgment to take an
entirely different course.  Plaintiffs' foreseeability argument has no merit.

      Plaintiffs' "ratification" argument is similarly illogical.  Plaintiffs contend
that ASI, through Micah Johnson, ratified inappropriate touching during their pat-
down searches because Mr. Johnson did not discipline Reyes after investigating
Plaintiffs' post-prom complaints that improper touching occurred.  However, Mr.
Johnson's investigation indicated that Reyes complied with standard pat-down
search guidelines -- not that she departed from them in the manner that Plaintiffs
claim.  Plaintiffs have no evidence that anyone from ASI knew that Reyes
touched them inappropriately during their pat-downs and failed to intervene or
otherwise condemn such conduct.

Reply at 36-37 (record citations omitted).

    ASI New Mexico also asserts that it is entitled to immunity under the NMTCA and under

State v. Johnson, 2009-NMSC-049, 147 N.M. 177, 218 P.3d 863, and that the

Plaintiffs' "instrumentality" argument sidesteps the issue and does not defeat or
undermine NMTCA immunity for ASI under the Johnson analysis.  Plaintiffs'
"independent contractor" arguments, and related heavy reliance on issues
regarding supervisory authority and control over details of the work, miss the
mark.  Johnson held that the Court of Appeals erred in denying employee status
based on similar reasoning.  See 2009-NMSC-049, ¶¶ 6-8, 21.  Moreover, the
undisputed facts establish that SFPS exercised complete control over the specific
conduct at issue under Plaintiffs' claims -- the circumstances under which
students would undergo pat-down searches.  ASI and its security officers were
clearly agents carrying out SFPS directives by conducting pat-down searches of
all 2011 Capital High prom attendees.

Reply at 37-38.

    As for the consent argument, ASI New Mexico's reply is three sentences long: "Plaintiffs

evinced consent to a standard pat-down search by entering the search line at prom.  In claiming

battery, Plaintiffs alleged they were 'physically contacted and searched without their consent'

and ASI denied that allegation.  ASI's denial adequately placed Plaintiffs on notice of ASI's

consent defense to Plaintiffs' battery claim." Reply at 38 (record citations omitted). ASI New

Mexico's scope-of-employment argument is similarly brief:

> Plaintiffs note that Reyes knew it was inappropriate to touch in the breast area or patdown bare skin. Doing so clearly violated pat-down guidelines that ASI expected its security officers to follow. Reyes' alleged knowing and intentionally wrongful touching could not have been motivated by any legitimate desire to further ASI's interests under the circumstances. Nor does evidence exist that ASI authorized, condoned, or in any other way ratified such behavior by Reyes. For these reasons, ASI cannot be held vicariously liable under any of Plaintiffs'' intentional tort theories if such inappropriate touching occurred. See Los Ranchitos v. Tierra Grande, Inc., 1993-NMCA-107, 861 P.2d 263.

Reply at 38-39. As for the IIED claim, ASI New Mexico reasserts, without substantial

argument, that the "Plaintiffs' evidence falls far short of that required for proving an IIED claim"

-- that is, that their emotional distress is severe and extreme. Reply at 39.

ASI New Mexico also asserts that, because the Plaintiffs' allegations are all of unlawful

conduct, the Plaintiffs' prima facie tort claim should fail. See Reply at 39. They expand:

> Prima facie tort may not be used to avoid the burdens of proof for claims falling within established and traditional intentional tort categories. Plaintiffs' inappropriate touching allegations fall within the bounds of established traditional torts they have pleaded. Plaintiffs' assertion that they may pursue prima facie tort as an alternative theory begs the question: on what *lawful* conduct are Plaintiffs basing a prima facie tort claim given the factual allegations in their complaint?
>
> Moreover, Plaintiffs have no evidence that ASI conducted pat-down searches at the 2011 Capital High prom with intent to harm them -- rather, the undisputed evidence establishes that ASI personnel hoped that such searches would protect prom attendees from dangerous contraband. ASI's contractual obligation to provide requested security services to SFPS justified its compliance with Principal Romero's directive to pat-down search all 2011 Capital Prom attendees. Plaintiffs' argument that ASI is subject to prima facie tort liability because it cannot establish that pat-downs involving the alleged inappropriate touching were done with justification underscores Plaintiffs' complete misuse of prima facie tort doctrine. Summary judgment for ASI is proper on Plaintiffs' prima facie tort claim.

Reply at 39-40.

Finally, ASI New Mexico underscores its view that there is no basis to award punitive damages.  See Reply at 40.  In its view, the Plaintiffs' assertions regarding what Reyes' conduct says about her mental state are irrelevant, because whatever Reyes' mental state may have been, "no evidence exists that ASI possessed the required culpable mental state to support awarding punitive damages as against ASI, and it cannot be held vicariously liable for punitive damages based on Reyes' alleged culpable mental state."  Reply at 40 (citing UJI 13-1827 NMRA).

At the hearing, the Court began by stating its early thoughts: (i) Focus on the Family v, Pinellas Suncoast Transit Authority strongly suggested state action;[127] (ii) Montoya v. Board of Education is factually distinct from this case; and (iii) ASI New Mexico does not have the benefit of qualified immunity on the § 1983 claim, meaning that claim would survive.  See Transcript of Hearing at 3:5-25 (Court), taken April 22, 2014 ("Tr.").[128]  As for the state claims, the Court, noting that ASI New Mexico probably was an independent contractor subject to general tort principles, was inclined to dismiss Count II and leave only battery; was inclined to grant summary judgment as to the IIED claim; and did not see conclusive evidence of consent as to either battery or prima facie tort.  See Tr. at 4:1-23 (Court).

ASI New Mexico stated that, in its view, Focus on the Family v, Pinellas Suncoast Transit Authority was distinguishable, because the case's focus was on whether the private party was a necessary party, and the analysis hinged on whether the government entity directed a

---

[127]The Court misspoke when it stated that the Tenth Circuit decided Focus on the Family v, Pinellas Suncoast Transit Authority.  See Transcript of Hearing at 3:7-8 (Court), taken April 22, 2014 ("Tr.").  The case is an Eleventh Circuit case.

[128]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

private party to do something, thereby engaging in state action.  See Tr. at 5:2-6:2 (Goble).  In its view, the other cases that it cited in its MSJ and Reply demonstrate that there must be something more than a private party's mere compliance, but, instead, there must be joint direction to a common goal -- that is, "there has to be some sort of decision making going on in the mind of the private party in order to direct itself toward the same objective that [the governmental entity] is directing itself towards."  Tr. at 6:3-21 (Goble).  Relying particularly on Anaya v. Crossroads Managed Care Sys., Inc., Anaya v. Crossroads Managed Care Sys., Inc. and Gallagher v. Neil Young Freedom Concert, ASI New Mexico stated that the law "require[s] something more than simply following a directive."  Tr. at 6:22-7:4 (Goble).  ASI New Mexico stated that, if that distinction is incorrect, "state action becomes a lot simpler doctrine.  And there [are] a lot more . . . private party state actors out there[] than I would understand to exist under the doctrine."  Tr. at 7:5-14 (Goble).  ASI New Mexico returned to its argument that it did not exercise any decision-making authority, but instead reacted to Romero's directive.  See Tr. at 7:15-8:9 (Goble).  As for the nexus test, ASI New Mexico reasserted that, because the record demonstrates only that ASI New Mexico reacted to a directive -- and did not participate in formulating the directive -- it is not a state actor.  See Tr. at 8:10-17 (Goble).

After the SFPS Defendants declined to speak, see Tr. at 9:2-4 (Court, Coppler), the Court brought the parties' attention to its decision in Tapia v. City of Albuquerque, No. CIV 13-0206 JB/ACT, --- F. Supp. 2d ---, 2014 WL 1285680 (D.N.M. Mar. 31, 2014), in which the Court laid out its view of state action principles, see Tr. at 9:5-19 (Court).

The Plaintiffs confirmed that they argued that ASI New Mexico was a state actor only under the nexus test and the joint action test, and not under the public-function test or the

symbiotic-relationship test.  See Tr. at 9:20-10:12 (Court, Colfax).  The Plaintiffs first responded to ASI New Mexico's argument that, because it was not involved in the decisions to conduct the pat-down searches, it could not be held liable; in the Plaintiffs' view, no case law supports that view, and

> a host of case law . . . stands for the proposition that if a state actor directs you, through any one of a number of mechanisms, to engage in unconstitutional action, there is state action there, and the private actor may be held liable for actually carrying out the conduct, even if they didn't participate in the decision.

Tr. at 10:22-11:24 (Colfax).  In the Plaintiffs' view, the private actors in Coleman v. Turpen and Focus on the Family v, Pinellas Suncoast Transit Authority were not involved in the decisions to engage in unconstitutional conduct, but were still liable.  See Tr. at 11:25-13:6 (Colfax).  The Plaintiffs also contended that Gallagher v. Neil Young Freedom Concert supports their position, because the Tenth Circuit noted that the plaintiffs in that case did not show that the pat-downs directly resulted from a university policy.  See Tr. at 13:11-14:7 (Colfax).  After summarizing the cases that the Response discusses, the Plaintiffs stated that ASI New Mexico rests its argument on two principal sources of authority: Montoya v. Board of Education and Lugar v. Edmonson Oil Co., 457 U.S. 922 (1982).  See Tr. at 14:8-15:9 (Colfax).  In their view, Lugar v. Edmonson Oil Co. does not stand for the proposition that there must be "something more than just following the directive of the state actor," but instead for the notion that merely using a mechanism laid out in a state statute does not create state action -- but the four tests that the Court discussed at the opening of the Plaintiffs' argument would establish that "something more."  Tr. at 15:10-16:4 (Colfax).

The Plaintiffs also reiterated substantially their Response's argument on state action: ASI New Mexico has, in essence, admitted the elements of the nexus test, and ASI New Mexico

willfully participated in the state's conduct, which satisfies the joint-action test.  See Tr. at 16:8-

17:18 (Colfax).  They concluded:

> So, in summary, the concept that you are not responsible -- that a private actor is not responsible for unconstitutional conduct, merely because it's following the directive of the state actor, doesn't free them from liability under 1983.  In fact, it's quite the opposite.  It establishes that liability.
>
> And the fact that ASI does not recognize, is the significance that they actually can participate in the unconstitutional conduct.  If you look at the cases they cite, either the state actor didn't participate in the unconstitutional conduct, or the private actor didn't participate.
>
> Here, they are both participating: Public schools directed it; ASI carried it out.

Tr. at 17:19-18:8 (Colfax).

ASI New Mexico identified what it understood to be a "philosophical difference between

[its] position and" the Plaintiffs': "this concept of 'something more.'"  Tr. at 18:16-19.   In

essence, in ASI New Mexico's view, the Plaintiffs' thinking on the issue suffers from a flaw:

"they take principles out of the case where the factual circumstances are so very different, and

where the focus is on trying to see whether there is state action by the government in order to

find it responsible."  Tr. at 18:19-19:3 (Goble).  The Court asked ASI New Mexico to explain

that statement, particularly with an eye to Focus on the Family v. Pinellas Suncoast Transit

Authority; ASI New Mexico stated that, in its view, this case was not about whether the private

entity could be held liable, but about whether the governmental entity was liable:

> That case was trying to hold the governmental entity liable for the fact that the private contractor would not post certain advertisements in the bus.  In Focus on the Family they discuss about the private actor being involved in the case.  It was only in the context of whether or not the private actor was an indispensable party for purposes of the injunctive relief that plaintiffs were trying to obtain.  Because the governmental defendant said:  You can't order us to make someone who is not here post certain advertisements.  You need them here in order to grant injunctive

relief, and they're not here.

So that was a Rule 19 issue, as far as the discussion related to private party. There wasn't any discussion about Section 1983 liability with respect to the private party's conduct. It was all about whether or not the state, the governmental entity, could be liable for the private party refusing to post certain advertisements in the bus.

And it makes me -- you know, there was a comment by the Court in the Brophy case that I think -- that summarizes the concept that I'm trying to articulate. And that is the idea the flaw that I seem to feel exists in the rationale by plaintiffs is that once they find there's state action by the state, that any private party somehow at all involved tangentially at all in any way in carrying it out, whether they had anything to do with the state action decision or not, becomes a state actor themselves for their own separate individual and personal liability.

THE COURT: Well, but I guess -- I mean, I hear your articulation of that. I've never heard that before. And that's what's strange to my ears is that we never ask whether there is state action by the state. I mean, I've never heard it articulated that way. So it seems to me to be a step that is just -- it's not a step. If the state does something, it's a state action. We only really look at state action because it involves individuals. That's where it comes up in 1983 actions. It's -- you know, if the State of New Mexico does something, I don't know how you would even -- I don't know what the inquiry would be -- it would be a state action. The same way the school board here, it does something, that sort of -- it seems to me sort of not even a terribly interesting step in the analysis. You have state action by the state. I'm never heard it phrased that way, but you have it.

MS. GOBLE: I don't disagree there is action by the state. I think I meant in terms of the Gallagher situation. What if the situation were the conduct at issue was -- if we start the analysis with the fact that ASI performed pat-down searches. And if plaintiffs had said: I want to sue the government as well. Then they would come in and do sort of a Gallagher kind of analysis. Is there state action to be able to hook --

THE COURT: Doesn't Gallagher hurt you, though, because isn't the thing that was missing in Gallagher is that the University of Utah was not directing the security people to do what they were doing? They were just doing -- they were there to provide security, and this is the way they decided to provide security.

Here, on the other hand, there seems to me much more direction to what you were supposed to do.

MS. GOBLE: Well -- and perhaps I'm getting the idea from a flaw that I saw in the Brophy case, which is a discussion -- which again is another fight over

a car kind of case.  But in that case the Court noted that one of the authorities that had been cited by the plaintiffs to argue there was state action by the private actor was actually a case that was addressing whether it was state action by state officials.  And the court noted that the Tenth Circuit did not address whether the private individual's actions could be classified as state action.  Therefore, the Tenth Circuit's holding is not determinative of whether Ament's and Fisk's actions amounted to state action.

So perhaps I'm misunderstanding that thought in <u>Brophy</u>, and maybe I'm just interpreting it incorrectly.  But that was a distinction that seemed important to me; that we want to find the private party to be a state actor, you have to start with that private party's conduct.  Then you have to see, did that private party take some initiative of its own?  Did that private party engage in some conduct of its own that led to the deprivation of the constitutional right?

And our position is simply -- we were indifferent.  There weren't going to be pat-down searches unless -- and typically the process was, we received our directives from the principal of the school who was in charge of the event.  We were indifferent.  It didn't happen because we tried to talk them into it.  It didn't happen because we influenced their decision.   We awaited to be given our direction.

And I think that in the <u>Coleman</u> case, what's significant about that case, and <u>Gallagher</u> notes this, that at least there is a little bit something more in that case by the private actor, in that, yes, the private actor did have a contract to go pick up the car and tow it and hold it.  But in that case the private actor took one more step.  And he wanted his bill to get paid, so he clothed himself in state authority, and sold the car to pay his own bill.

So, you know, it's really kind of thinking about what the court -- the Tenth Circuit said in [<u>Anaya v. Crossroads Managed Care Systems, Inc.</u>,], you know, being reckless or careless about following a directive, or being involved in some activity that leads to a deprivation of a constitutional right that the government is involved in, is not enough to convert that private party into a state actor.

And then, when I couple that with the language from <u>Brophy</u>, that's where I come up with this thought that really you have to start:  What's the private conduct?  And there is no private conduct here that made pat-downs occur at the 2011 Capital High prom on the part of ASI.  It really simply awaited its instructions.  And if those instructions had been given, ASI would not have been there providing pat-down services.

Tr. at 19:4-25:12 (Court, Goble)(underlining added for clarity).  The Court asked why ASI New

Mexico's conduct did not satisfy this section from <u>Tapia v. City of Albuquerque</u>:

> Under the nexus test, state action is present if the state has ordered the private conduct, or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 993 . . . (1982). A court determines under the nexus test whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself." Jackson v. Metro. Edison Co., 419 U.S.[ 345, 352 (1974)].

Tapia v. City of Albuquerque, --- F. Supp. 2d ---, 2014 WL 1285680, at *25. See Tr. at 25:16-26:8 (Court). ASI New Mexico replied:

> If I remember the Blum case correctly, I believe the focus again was on whether or not the state could be held liable for a private actor's conduct. And I do think it makes a difference as to who is the person engaged in the conduct? And then, who are you trying to hold responsible for that conduct? And if the question originates from the private actor status -- and I think that was also what happened in Jackson -- was we're looking at a private actor, but is there sufficient government involvement here?
>
> And that's where ASI comes from, as far as, you know, ASI isn't engaged in any conduct that led to any decision for there to be those searches. It simply waited to see if they were going to happen, and if it was going to be directed to do them.
> So if the analysis is we're going to hold private party responsible -- and that's what plaintiffs are trying to do, they're trying to hold ASI individually and personally responsible for a violation of a constitutional right, where no conduct or initiative on its part led to the decision that caused the deprivation.

Tr. at 26:9-27:6 (Goble)(underlining added for clarity). The Court also pointed to this explanation of the joint-action test from Tapia v. City of Albuquerque and asked ASI New Mexico to explain how its conduct did not satisfy it: "State action exists under the joint-action test if the private party is a 'willful participant in joint action with the State or its agents.'" Tapia v. City of Albuquerque, 2014 WL 1285680, at *25 (quoting Dennis v. Sparks, 449 U.S at 27). See Tr. at 27:7-18 (Court). ASI New Mexico then responded as follows; its response closed the parties' arguments on state action:

MS. GOBLE:  Well -- and if willful participation means simply following a directive, then state action is really a very simple concept.

I think of the Anaya case as instructive in addressing that, where -- Anaya was a situation where there was a group, a private entity group, that had an arrangement that when persons were arrested for being under the influence, then they would be admitted into their facility, and they got paid money for it.  And at some point in the time, they formed kind of a little community activity sort of organization, and they put some of the local authorities, the police officer authorities, on this committee with them.  And they were very encouraging in developing a policy or practice of trying to make sure that they were a little bit more aggressive in the community of getting help for people who were under the influence.  As a result of that, there was a great increase in the number of people who got arrested.  And as a result of the increase in number of people that got arrested, suddenly this private entity had a lot more people in their facility, so it was making more money.

And the Tenth Circuit found, for there to be some sort of willful participation, there were at least some issues of fact about whether there may have been something going on there.  Because they said, just being reckless --

THE COURT:  Hold your thought right there, because I meant to ask Mr. Colfax this question.  You nibble around the edges on the facts, but at least on the state action [are] there any facts that you're trying to raise that keep[] the Court from doing what I think I have to do [--] that I [must] make this determination as a matter of law?  [Are] there any facts here that you think the jury needs to determine before I make that legal ruling?

MR. COLFAX:  I don't think so, Your Honor. I think it's simply the -- under the legal standard, as you just articulated for both joint action and nexus, a state actor directs a private actor to engage in some conduct.  The private actor engages in that conduct.  And I think that's the key point that Ms. Goble skips over.

So what's the conduct of ASI?  They did it.

And that's what distinguishes all of these cases is that they actually did the conduct.  Public schools also did the conduct by ordering them to conduct the pat-down searches.  That's undisputed.  Everybody agrees public schools ordered them to engage in the conduct, and they did it.  Now, are there, you know, additional, potentially disputed facts that could be useful in supporting that decision?  Yes.  For example, ASI actually did participate in the decision.  But we don't need to show that.  The mere fact that they were directed to do it by a actor, that gets a state action and liability under 1983.

THE COURT:  Okay.  So you basically have a green light to get a legal ruling on this.  Are you suggesting there is some fact that the jury needs to decide before I decide this issue?  Most defendants are trying to avoid a trial entirely.  They don't want to go to a trial at all.

MS. GOBLE:  Right.

THE COURT:  So they're not usually saying, well, we need a jury trial to determine that issue.  I think you want me to determine this as a matter of law.  That's the reason you filed your motion for summary judgment.

MS. GOBLE:  I think the facts are undisputed --

THE COURT:  Right.

MS. GOBLE:  -- you know, on what ASI's role was.

THE COURT:  Right.

MS. GOBLE:  Principal Romero is the one who issued the directive.  I don't think that plaintiffs have raised disputed issues of fact on that.

THE COURT:  No, they kind of nibble around the edges.  But it looked to me on this issue, it was largely a matter of law.

All right.  Well, I'll certainly relook at these cases with your, sort of, proposal in mind, and -- for how to deal with them.  I still am inclined to think that this is going to fit within a couple of the tests that I've used.  I certainly think that with the Lugar[ standard], you've got to have more than just relying on some state statute, like replevin or repossession or something like that.  But I think "the more" is somewhat defined by the four tests, two of which the plaintiffs invoked here.

Tr. at 27:19-31:11 (Goble, Court, Colfax).

The Court then turned the parties' attention to the qualified-immunity issue, stating that,

although it was unfamiliar with the area, it seemed that qualified immunity probably would not

be available.  See Tr. at 31:12-32:6 (Court).  ASI New Mexico substantially reiterated its briefs'

arguments: that Richardson v. McKnight is limited to its facts, and that Rosewood Servs., Inc. v.

- 139 -

Sunflower Diversified Servs., Inc. and Filarsky v. Delia indicate that where a court is

dealing with the private entity that works in somewhat of an adjunct capacity with the government, a private corporation that works under close supervision, then those market principles and the interests the government has in being able to operate efficiently and not being distracted, . . . are all directly served by extending qualified immunity to private entity under those circumstances.

The Filarsk[y] case goes right through that analysis, and states it very clearly.  It says, "First, the government has an interest in avoiding unwarranted community.  This is true on the part of persons that are engaged in the public's business of helping the government conduct its business."

They said, "Second, the government has an interest in ensuring that talented candidates are not deterred by the threat of damage it seeks for entering public services."

And third, that "The public interests in ensuring performance of government duties are free from the distractions that can accompany lawsuits as implicated whether those are duties are discharged by private individuals or permanent government employees."  So it recognized both that Wyatt was very, very limited to its facts, and that Richardson was very limited to its facts.  And it embraced the concept that[]Rosewood recognized, which Rosewood in 2005, had evinced this same sort of distinction; had argued, well, there were these arguments in Richardson as to why it didn't work there.  But those arguments don't apply unless you've got a defendant who is just like the defendant in Richardson.

ASI is nowhere in comparison alike, like the private firm in Richardson that assumed complete control over, and managed a privatized prison system.  ASI received all its direction from SFPS administrators.  It came in and did what it was told to do.  It was not given the keys to the kingdom and told, Come in and set up whatever security system you think is best for the school district; staff it however you think is best; put in whatever measures in place that you think should be put into place.

Instead, they received SOPs upon arrival that were established for each school.  They were told to follow those SOPs.  They had a code of conduct that, you know, they were told this is what we enforce here.  They received directives on a daily basis.  If the principal didn't feel they were responding to needs that needed to be met, she might instruct that they put their attentions in different places throughout the school.  They didn't run the school security system.

And I think Richardson doesn't apply here to lead to the result of qualified immunity.  When you look at DeVargas, when you look at Rosewood, when you

- 140 -

look at Warner, these cases very heavily are aligned with the factual circumstances we have here, where we have a private corporation that basically provides a service, and it does so under supervision; it does so under direction, and it would create chaos within the system, which I think -- you know, even the New Mexico Administrative Code envisions that security officers really are part of trying to accomplish the objective of the school, which is to provide a safe learning environment; they work closely, hand in hand in that capacity. One thing is clear, they derive their authority only from a school administration. And that's set by administrative code. So what they can come in and do, that's going to be determined by the school administration.

They're not acting independently. There is no independent thought here. There is no independent contractor who comes in and sets up the system. We come in and do and provide the service that we're asked to provide. You know, under those circumstances, Tenth Circuit authority supports qualified immunity very strongly. And nothing in Filarsk[y] detracts from that fact. In fact, I think Filarsk[y], thankfully, is a bit of a good recent Supreme Court clarification of what Richardson meant. And it very much expressly limited Richardson to its specific facts of that kind of defendant. And ASI is not the kind of defendant that existed in the Richardson case in any way, shape or form.

Tr. at 32:7-36:11 (underlining added for clarity).

The Plaintiffs began their argument by pointing to Richardson v. McKnight. See Tr. at 36:15-19 (Colfax). The Court asked if, in their view, the Supreme Court had shifted its view of qualified immunity in recent years; the Plaintiffs stated that the Supreme Court would probably come to the same ruling in Richardson v. McKnight. See Tr. at 36:20-37:8 (Court, Colfax). The Plaintiffs stated that Filarsky v. Delia differs Richardson v. McKnight:

Filarsk[y] really is a distinct situation from what the court faced in Richardson. In Filarsk[y] you had a municipality identify a particular lawyer they wanted to do this one very specific task, investigating some misconduct by an employee. So they target this lawyer; say, We need you, we want you to do it; hire him; and off he goes and does his work. And the Court says, in that circumstance, qualified immunity makes sense, when you look at the various purposes of qualified immunity.

Richardson --

THE COURT: Although, you can tell what the bar is citing. You can see

- 141 -

this in Tapia.  You can see that they're citing this case for the proposition that private attorneys are entitled to qualified immunity.  They don't really ask for me to look at the particular facts of the attorney's relationship.  They just say:  Private attorney, hired by the state, qualified immunity.  You think that's wrong?

MR. COLFAX:  Well, I think it's wrong just to apply it generally in that concept that --

THE COURT:  You think there might be some private attorneys hired by the state that would not be entitled to qualified immunity?

MR. COLFAX:  There certainly, theoretically, could be, if it were a more long-term contract that went open to a bidding process, where the private attorney was covered by the insurance of the state actor, then some of those purposes that are identified in Filarsk[y]and Richardson fall by the wayside, and that weren't present in Richardson.

Really, the critical things are the fact that this was open to a bidding process in Richardson, and it was not in Filarsk[y].  That allows the risks, the dangers that a private corporation takes on when working with the government and potentially being liable under the Constitution.  That all gets built into that bidding process.

THE COURT:  And you think ASI, unlike a lawyer taking on a single project, could build in the cost of these 1983 actions?

MR. COLFAX:  That's right.  ASI, and every other company that was part of that competition to try to get that bid.

THE COURT:  And you think that test is alive and well; you think after the 2012 decision, that that test is still there and available?

MR. COLFAX:  I do.  And, in fact, Filarsk[y] certainly didn't overrule Richardson; didn't even suggest that the reasoning was incorrect in Richardson.  They took the same concepts, the same principles and purposes of qualified immunity, and applied them to the set of facts that were formed in Filarsk[y].  So, if anything, the Supreme Court confirmed the reasoning in Richardson when they took on the Filarsk[y]case.

So there is, of course, a legal question that we've been talking about on qualified immunity.  But there is also a significant factual question as well, which is:  What is the conduct for which ASI is entitled to assert qualified immunity?

Of course, this is ASI's motion, so we can dispute facts on this.  And the

only rational way to think about qualified immunity in this context, where you have a corporation that is calling for qualified immunity, that has its employees engaged in this conduct that has to be viewed from the light most favorable to the plaintiffs.  In there you have to look at how did the plaintiffs describe these searches?  And, as the Court has previously found, in dealing with the qualified immunity of the principal, Principal Romero, maybe the mere fact of asking somebody, or conducting pat-downs of every single person entering a prom, that may not have been clearly established.

But if you go beyond that, and you rely very heavily on the Safford case, and you engage in conduct such as pulling a bra away from the skin, whereas, the plaintiffs describe the searches where their breasts are being cupped; their fingers in their cleavage, hands going up their thighs.  All of that conduct certainly was clearly established, and that would violate the Constitution.

So even if you were to apply qualified immunity, you have to apply it to the facts in the light most favorable to the plaintiffs.  In that situation you have a constitutional violation, as the Court has found, and you have it clearly established, as a necessary conclusion from the Court's reasoning relying on Safford cases.

Ms. Goble talks about that there would be chaos if you didn't apply qualified immunity in this context.  Well, you said it, Your Honor, and in my practice I have seen it.  This doesn't come up very often that you have qualified immunity being sought by a private entity.  Not only is qualified immunity being sought by a private actor, but here, it's not even an individual -- as was the case both in Richardson and Filarsk[y] -- but it's being sought by a private corporation, so actually in a sense makes it an even stronger case for not applying qualified immunity than you have in Richardson, because the market forces, the concept that you're going to have a person distracted, they're even less served in the context where you have a private corporation calling for qualified immunity.

Then, on top of that, there is some illogic to the concept that ASI is seeking here, which is this private corporation gets not only qualified immunity protection, but also gets protection under protection under Monell.  So you'd have to establish a custom and practice.  Then you'd also have to establish a constitutional violation that's clearly established.  That is -- I have never seen that done before in any case, number one.

Number two, is that would put private corporations to have the strongest protection against liability for constitutional violations than any other category of actors.  Private individuals, they can assert qualified immunity.  They can't assert a Monell defense.  Governmental entities, they can assert a Monell defense, but they can't assert qualified immunity.  Government employees, individuals, they

can assert qualified immunity, but they can't assert <u>Monell</u>.

       ASI is coming before the Court and asking for both levels of protection. So just one more reason on a legal basis of why qualified immunity should not apply here.

       When you look at the logic, a <u>Monell</u> defense makes sense, because a private corporation is acting -- when it's acting as a state actor, it's acting very much like a governmental entity that can raise a custom and practice policy defense under <u>Monell</u>.

       Qualified immunity, just is not as logical as <u>Monell</u>.  And certainly having them both gives them a level of protection that is simply unprecedented.

Tr. at 37:5-42:21 (Colfax, Court).

       ASI New Mexico began its reply by suggesting that the Plaintiffs' "theories are an ever-shifting target":

> I think that is evidenced by their own motion for summary judgment that noted -- and it seemed to be a distinction that made sense to me -- noted that the Section 1983 claim was based on the fact that the pat-down searches occurred -- assuming they had been done appropriately -- any inappropriate touching was not the basis for a constitutional claim under Section 1983.
>
>     And they make a statement in their brief.  I think it's on pages 27 to 29 -- somewhere in there, they argue, they expressly argue that, that the Section 1983 is about the fact of the pat-down searches occurred.  And that when Officer Reyes departed from performing the standard pat-down search, she wore a different hat, and she stopped being a state actor, and then that relates to the common law intentional tort claims.
>
>     Then, in responding to ASI's motion for summary judgment, which had proceeded along similar lines, they start making the argument, Oh, no, no, now we've got another constitutional violation based upon the way that the pat-downs were conducted.
>
>     Well, I disagree with that conceptually.  Because I think the constitutional violation was the fact that the pat-down searches occurred of every attendee.  That was what the Court's ruling was based upon, not based upon the manner in which they were performed.  Whatever damages might flow from that would go to their compensatory damages issue, if there was some manner about the way it was performed, might potentially be a damages issue.

It's not another constitutional violation. My response to that, that they want to base an argument on there being a Section 1983 claim against ASI, based upon the scope and the manner in which the pat-downs were allegedly performed inappropriately, then I have to say <u>Monell</u>.  I have to say <u>Monell</u> in response to that.  Because where is the policy by ASI that told an officer to ever touch anyone during a pat-down in the way that they allege occurred?  There isn't one.

Those are the undisputed facts at this point.  ASI didn't have one of its own.  There is no policy in its manual.  There is no guideline that ever instructs a guard to touch someone they're conducting a pat-down search on the way in which they allege they were touched.

THE COURT:  But do you have any case that applies <u>Monell</u> to a private corporation?

MS. GOBLE:  Yes.

THE COURT:  What is it?

MS. GOBLE:  Actually, <u>DeVargas</u> discusses the application of <u>Monell</u> to private corporation.  And <u>DeVargas</u> is -- actually rejects the argument that plaintiffs are making:  Well, you can't have <u>Monell</u> and you can't have qualified immunity.  <u>DeVargas</u> discusses that at pages 722 to 723 of the opinion in <u>DeVargas</u>.  It says, No, you're sort of mixing apples and oranges here.

THE COURT:  I guess I understand more the application of qualified immunity to corporations.  But I'm having a hard time seeing how you'd ever apply <u>Monell</u> to a corporation.

MS. GOBLE:  Well, <u>DeVargas</u> recognized the application of <u>Monell</u> to private corporations.  And I could probably --

THE COURT:  Read me where it did that.

MS. GOBLE:  All right.  I'm on page 722. And it cites -- it starts a discussion, "<u>DeVargas</u> argues that if we conclude that private parties may claim immunity, we should distinguish between individual defendants and the corporate defendant, and grant Section 1983 qualified immunity only to the individuals." Bases this argument on the following syllogism, and makes reference to corporate defendants similarly are not vicariously liable under Section 1983, under the <u>Monell</u> Doctrine.  And it refers to <u>Lusby [v.] TG& Y Stores, Inc.</u>, 749 F.2d 1423 for that principle.  Then it goes on to discuss the same kind of argument that plaintiffs are making here.  And they said, We don't see any reason why there is any reason why the corporate defendant can't potentially assert both.  Because

they are really very different concepts.

And the court in Monell is simply saying there is no respondeat superior liability from here.  Qualified immunity rests on a completely different kind of analysis.  It's not about respondeat superior liability.

And so I think that's a distinction DeVargas was making:  Saying that one does not exclude the other.  They're governed by different principles and different consideration[s].

And if the plaintiffs are trying to base, or departing from what they stated in their own motion for summary judgment, and in responding to ASI's motion for summary judgment want to try to base a constitutional right violation against ASI based on a couple of approaches they try to pursue, one of which is this idea that there was inappropriate touching that occurred by the guard, then I think Monell comes right into play.

To the extent that they want to argue, and did argue in responding to ASI's motion for summary judgment, that somehow there is a constitutional violation because the pat-down guidelines did include that someone being searched might be asked to pull their own bra away from their body, I say that is neither here nor there.  And one cannot base a constitutional violation on thin air.

That's completely contrary to the factual allegations of their complaint as to what occurred.  It makes no sense to pretend to hold ASI liable for a policy that they say in theory is unconstitutional, but didn't occur.

I do think that Richardson -- or that Filarsk[y] has indeed distinguished Richardson very emphatically from the circumstances of this case, where the Supreme Court expressly said: "In  Richardson, we considered whether guards employed by a privately run prison facility could seek the protection of qualified immunity.   Richardson was a self-consciously narrow decision.   We have answered the immunity question narrowly in the context in which it arose that is specifically stated and recognized in Filarsk[y].  And that situation that arose was a private firm, systematically organized to assume a major lengthy administrative task managing an institution with limited direct supervision by the government."

That's very consistent with the observations made by the Tenth Circuit in Rosewood Services, where the Tenth Circuit noted Richardson's narrow application, and said that, "In light of the narrow application of Richardson, the supervision caveat: Courts have allowed private individuals to assert qualified immunity when the defendants were closely supervised by the government."

There is no question here that the conduct at issue was very closely

- 146 -

supervised by the government.  ASI didn't engage in it unless the government told it to do so.  It simply had no authority otherwise.  It waited to be told to do it; otherwise, it didn't happen.

And in <u>DeVargas</u> the court said that, "We have held generally that when private parties act pursuant to contractual duties and perform governmental functions, they can claim qualified immunity.  That a private party defendant is a corporation should not change this result."

And in <u>Rosewood</u> in 2005, the Tenth Circuit noted that from <u>DeVargas</u>, and found that to still be the law in the Tenth Circuit.

THE COURT:  All right.  Well, let me give that some thought.  It's a new area for me.  I don't think I've written in that area, so I'll have to give that some thought.

Tr. at 43:3-49:9 (Goble, Court).

After noting that the Plaintiffs abandoned Count 2, <u>see</u> Tr. at 49:12-15 (Goble, Court), ASI New Mexico turned to the NMTCA argument, <u>see</u> Tr. at 49:21-24 (Goble).  After a brief digression regarding agency law, <u>see</u> Tr. at 49:25-52:22 (Goble, Court), the Court pointed out that the contract with Santa Fe Public Schools stated that ASI New Mexico was not a public employee; although it acknowledged that the label the parties put on the relationship is not controlling, the Court asked if the label complicated ASI New Mexico's attempt to evade liability, <u>see</u> Tr. at 53:2-54:2 (Court, Goble).  ASI New Mexico substantially reiterated its briefs' arguments regarding <u>State v. Johnson</u>, <u>Celaya v. Hall</u>, <u>Blea v. Fields</u>, and administrative regulations; its theme was that the substance of the parties' relationship -- and not its form -- controls the analysis.  <u>See</u> Tr. at 55:3-57:15 (Goble).

The Plaintiffs noted that ASI New Mexico's positions are inconsistent and contended that their position is consistent: ASI New Mexico is not a state employee, but an independent contract, and ASI New Mexico is a state actor.  <u>See</u> Tr. at 57:19-59:13 (Court, Colfax).  The

Plaintiffs reiterated their arguments on the NMTCA issue from their Response: (i) the proper standard is whether the corporation is an instrumentality of the state; and (ii) even under the public-employee standard, ASI New Mexico is an independent contractor, because ASI New Mexico supervised most of the day-to-day work.  See Tr. at 57:14-61:3 (Colfax).  In their view, State v. Johnson ultimately stands for the same proposition that Celaya v. Hall does -- that the relevant consideration is who controls the guards' conduct.  See Tr. at 61:4-17 (Court, Colfax).[129]

ASI New Mexico noted that it carefully tethers its arguments to the claims pleaded in the Complaint: that is, "that there was inappropriate touching that the guard engaged in upon the persons of the plaintiffs; not that there was an unconstitutional violation of a policy that existed that required the plaintiffs to do something themselves as part of the pat-down searches."  Tr. at 63:10-22 (Goble).  Accordingly, in its view, the discussion about the Plaintiffs snapping their own bras is a red herring.  See Tr. at 64:16-25 (Goble).  ASI New Mexico reiterated its point that, in its view, that Santa Fe Schools directed the guards makes the guards' actions not state action. See Tr. at 64:9-18 (Court, Goble).  As for the instrumentality argument under the NMTCA, ASI New Mexico stated, without elaboration, that it "has not asserted that it is a local public body, as that is defined by the" NMTCA.  Tr. at 64:19-65:3 (Goble).  ASI New Mexico continued:

[T]here does seem to be some disconnect here to be arguing that ASI can be liable

---

[129]The parties also squabbled over ASI New Mexico's suggestion that the Plaintiffs' approach to summary judgment briefing was dishonest -- that is, that the Plaintiffs changed their story in their briefing.  See Tr. at 46:21-47:17 (Goble); Tr. at 61:18-62:19 (Colfax); Tr. at 62:20-63:25 (Goble, Court)  The Court will include that portion of these exchanges that contributes to the Court's resolution of the case, but will not record the more accusatory portions of these exchanges in detail.  The Court notes, however, that: (i) the Plaintiffs are entitled to move for summary judgment based on alternative theories of liability, but (ii) the Plaintiffs must move for summary judgment as to the claims that they pleaded in their Complaint and not based on claims that, although the evidence might support them, are not pleaded in the Complaint.  To allow the Plaintiffs to change their theory of recovery at this stage would prejudice ASI New Mexico.

for the intentional tort of an employee, when that employee, arguably, would be a public employee under the Tort Claims Act that would be immune from that suit. So you just avoid that by not naming the employee, but try to get the employer on the hook for it.  That's where, conceptually, I have a disconnect with what they're trying to do.

But it also sort of leads into the concept of holding employers liable for the intentional torts of their employees, which is sort of the next layer of ASI's motion for summary judgment.  I mean, even if there isn't Tort Claims Act immunity here, there is a general principle in our common law that, most of the time, generally speaking, employers are not vicariously liable . . . for the intentional torts of their employees.

And the evidence in this case, even as noted by the plaintiffs in their response to ASI's motion for summary judgment, is that -- they pointed out facts that indicated Reyes understood that the kind of touching that they claim occurred would have been wrong, which brings me front and center to this concept of how could she possibly have been serving the interests of her employer in any way by knowingly engaging in conduct that she knew to be inconsistent with the manner in which she was trained and expected to conduct pat-down searches?

She -- obviously, if anyone who would engage in that kind of conduct of touching someone inappropriate in a way that they allege occurred -- is operating from some personal purient motive of their own, and couldn't possibly be serving the interests of their employer, given that the conduct they were engaged in, they knew to be wrong, and prohibited by the employer.

This is very much like -- I think it's [Los Ranchitos v. Tierra Grande, Inc.] with the accountant -- she was involved in performing her accountant duties at her place of employment, servicing one of her employer's clients.  And while she was doing so . . . , she decided she would go ahead and embezzle  some money.  And the Court in that case found, you know, this is not an intentional tort that is within the scope and course of employment in any way.  This is clearly -- she was on a lark of her own.

Those circumstances are very similar to the circumstances here.  There is no way the security officer, who was engaged in the kind of touching that they say occurred, and who knew that that touching was wrong and contrary to the guidelines and expectations that she was expected to be following, could be acting to serve the interests of her employer.  So I think the allegations of that kind of touching fall squarely within case law that says an employer cannot be held liable for it.

Now, secondly, I'd like to point out, there is absolutely no evidence of any

ratification of such conduct by ASI. There is no evidence in this case that anyone from ASI saw or knew in any way that this occurred at the prom, and did nothing to protect the plaintiffs from it, or did nothing to react to it. The only ratification evidence that they offer is Mr. Johnson's investigation several weeks later, after the allegations arose, when he asked Officer Reyes to describe how she -- you know, what pat-down search she conducted at the prom. She wrote up a statement. The statement was consistent with the guidelines as to how pat-downs are supposed to be directed.

And they say, because he didn't do anything to her, that's ratification. That does not meet the legal standard for ratification under any case that I have seen that attempts to hold the employer vicariously liable for an intentional act of any employee. Or actually directly liable because if we ratify, you have your own direct liability.

So we believe that, regardless of the Tort Claims Act argument, that you go to another layer of analysis where ASI is not liable for these alleged intentional torts, all of which arise from this inappropriate touching. The touching hadn't occurred in the course of a pat-down search because it was outside the course and scope of employment, and it was conduct that was in no way ratified by ASI.

Tr. at 65:4-68:15 (Goble). ASI New Mexico briefly summarized the remaining points in its briefing relating to consent, IIED, prima facie tort, and punitive damages. See Tr. at 68:19-72:4 (Goble).

The Plaintiffs closed by responding to each of ASI New Mexico's points on the tort claims. See Tr. at 72:15-18 (Colfax). As to the consent issue on the battery claim, the Plaintiffs contended that they were basing it not on a non-intrusive pat-down search, but on the intrusive searches that they have described. See Tr. at 72:19-73:2 (Colfax). On the IIED issue and on the punitive-damages issue, the Plaintiffs contended that the questions whether this conduct was extreme and outrageous, and whether this conduct justifies punitive damages, should go to the jury. See Tr. at 73:3-18 (Colfax). The Plaintiffs then turned to the prima-facie tort issue, explaining:

Prima facie tort, as plaintiff described, it is an alternative theory because it is based on lawful conduct. This occurs frequently, where a plaintiff will bring

intentional tort claims as well as having a prima facie tort claim going along with it.  I think the scenario that a judge -- that Your Honor, I think you alluded to at the beginning of your remarks -- would be that prima facie tort claim stays in the case until it's being submitted to the jury.  I agree that I don't believe it can be submitted along with a battery claim or intentional infliction of emotional distress claim.  But I anticipate ASI will be moving for judgment as a matter of law during the course of the trial.  And if those other claims were to get knocked out, it would be appropriate to submit the prima facie tort claims to the jury.

THE COURT:  But even at the end of a case, what scenario would you have in which you are going to say that the conduct here was legal, but there was still some intentional or some intent to inflict harm on the defendant?

MR. COLFAX:  Well, a theoretical possibility would be, for example, if the Court said: Insufficient evidence for intentional infliction of emotional distress claim to be submitted to the jury, and the plaintiffs consented to the battery, so the conduct, at least as it relates to the tort claims, is lawful.  Whether they consented to the battery, there is no -- there is insufficient evidence for intentional infliction -- that could be a scenario where a prima facie tort claim going to the jury would be appropriate.

It's not something, obviously, we're advocating, but we certainly have to prepare for the possibility that those other tort claims could be knocked out.  So that's what the prima facie tort claim stands in for.

Then, finally --

THE COURT:  What about the intent requirement?  Ms. Goble commented here.  I mean, there wasn't any intent to do harm.  There was certainly no bad sort of intent.  What do you make of that, as far as the intent requirement?

MR. COLFAX:  Well, the intent requirement for prima facie tort in New Mexico has really been defined as conduct without justification, which I think is an easier concept to understand in this context.

And so the -- it's relatively clear that a guard searching, in the way the plaintiffs describe, there was insufficient justification for that level of searches.  In fact, even the guard, herself, acknowledged, yes, well, patting down bare arms, bare legs, it doesn't make a lot of sense, but I did it anyway.

So that's the kind of conduct that is simply without justification.  And if the Court's rulings flow in such a way where that's the -- that conduct violates no other common law, no other provision of common law, well then, the prima facie tort claim would make sense there.  There is otherwise lawful conduct that's being

engaging in without justification.

        THE COURT:  All right.

Tr. at 73:19-76:8 (Colfax, Court).

    Finally, as to the scope-of-employment issue, the Plaintiffs substantially reiterated their arguments from the briefing: principally, that Reyes' decisions represented an escalation of authorized conduct and not a complete departure from authorized conduct.  See Tr. at 76:9-77:10 (Colfax).  They elaborated:

> ASI and public schools asked this guard to conduct pat-down searches.  They told her:  Be vigilant because students have hidden -- taped bottles to do their legs; you know, make them snap their bras, make sure there is nothing hidden in the bra area.  And she escalated.  And she conducted a pat-down where she was touching breasts, she was touching bare legs, pretty clearly in an attempt to try the serve the interests of her employer.  At the very least, it is permissible for a jury to conclude that.
>
>     So the scope of employment, I think, it's well framed with this distinction between the escalation and departure.  There is just no suggestion that she was departing from the kind of conduct she was being asked to serve.
>
>     Misguided?  Yes.  Unauthorized?  Yes.
>
>     ASI's motion really seems to be premised on this idea that if the conduct is unauthorized, then there is -- you're outside the scope of employment.  It can't possibility be the standard.  There would be no point in having any scope of employment decisions, if it only occurred when you had authorized conduct.  Of course, authorized conduct is within the scope of employment.  The whole doctrine is around -- you know, it appears when you have unauthorized conduct.
>
>     So, yes, the conduct may very well have been unauthorized.  But she escalated what was authorized conduct into what occurred at the prom, and what the allegations are.

Tr. at 78:11-79:15 (Colfax).

    The Court gave ASI New Mexico "the last word on [its] motion," which it focused on the common-law claims:

I'll just comment on the last argument that Mr. Colfax made. If he doesn't like the choice of the word "unauthorized," then let me be clear. Perhaps that wasn't the best word. How about prohibited? It was prohibited conduct. And I don't know how one can argue that an employee, engaging in conduct that she has admitted she knows to be wrong and prohibited, is escalating her job duties, and, therefore, simply still falling within the scope of her employment. I think an employee, when they know they are making a departure from the course of conduct that they know they're supposed to be following, is very clearly acting outside the course and scope of employment, under the <u>Los Ranchitos</u> case.

With respect to the argument on prima facie tort, it was -- plaintiffs' counsel represented to you that the standard is really not about intent, but it's about there being no justification. That's not really a correct statement of the law

At page 56 of our motion for summary judgment, the elements of prima facie tort are set out. The first one being the commission of an intentional, lawful act by the defendant, done -- second one, "done with intent to injure the plaintiff; 3, causing injury to the plaintiff; and 4, a lack of or insufficient social or economic justification for the act.

"Intent to injure is more than mere insensitivity, and is used synonymously with malice. Within New Mexico's prima facie tort jurisprudence, not only must the act be intentional, but the defendant must know that the act was wrong when he did it. The plaintiffs' burden in proving that a defendant acted with the intent to injure is a heavy one."

And here's the significant part. "Once intent to injury is established, a balancing test compares the defendant's malicious intent against the defendant's justifications for the injurious conduct and the severity of the plaintiff's injury.

"However, where a plaintiff cannot establish evidence of intent to injur[e], no need exists for conducting the justification balancing test." And [the Plaintiffs'] prima facie tort fails these standards.

* * * *

One last thing I would like to say on the issue of state action is, if I can somehow summarize in a nice, succinct notion, the idea of ASI's theory. And this is it: <u>Lugar</u>, <u>Cunningham</u>, <u>Sigmar</u>, <u>Lusby</u>, <u>Carey</u>, <u>Lee</u>, <u>Adickes</u>, all these cases that are looking at action -- even <u>Gallagher</u> -- when you look at the party you're trying to hold liable, you start with them. What did they do? And when you're talking about a private party, you say: What was the conduct of the private party that could be construed as state action by the private party?

And when you're applying the joint action test or the nexus test.  If we're looking at the nexus test, what conduct did the private party engage in, such that the ultimate act that's challenged to be unconstitutional, the decision to engage in that conduct can be attributed back to the private party.

Under the joint action test, what conduct did the private party undertake?  What initiative, what decision did it engage in that led to the decision that resulted in the constitutional deprivation?

And under the facts of this case, there simply is no conduct by ASI that caused a decision to be made by Principal Romero that all attendees would be subjected to pat-down searches at the 2011 Capital High prom.  We awaited directives.  That's what the facts establish.  There is no question about that.

All the authority of that decision rested with an SFPS administrator.  And she was the SFPS administrator for that particular function.  It was her choice to make.  There is no evidence in this case that ASI heard she was thinking about not doing it, and decided:  Let's try to talk her into doing it.  Let's try to make her change her mind.  Let's get her to decide to do it this year, because we want to be there.  We want to make some money off of this prom.

There is no evidence of that whatsoever.  ASI awaited its directive.  Had there been no directive issued to it to conduct searches of all attendees of the 2011 Capital High prom by Principal Romero, it would not have happened.

So in the state action analysis, and all these cases, that's the starting point.  The point is:  What conduct, what initiative, what wheels did ASI supposedly set in motion so that it either clothed itself in state authority or it coerced state authority in some way to bring about the end objective:  That being a decision that would subject all attendees of the 2011 Capital High prom to be pat-down searched.

Tr. at 78:23-83:3 (Goble).

The Court then stated its inclinations.  See Tr. at 83:6-11 (Court).  It noted that it was

inclined to conclude that the facts would satisfy the tests for state action.  See Tr. at 83:8-13

(Court).  It stated that it was uncertain as to qualified immunity; noting that it had reviewed the

language that limited Richardson v. McKnight, and cautioning that this area was new to the

Court, it stated that "it concerns me that maybe qualified immunity does apply here.  And if it

does, then we may be where we were with the Romero decision." Tr. at 83:14-21 (Court). It stated that it did not have any inclinations as to the Monell issue, but would study the issue. See Tr. at 83:22-24 (Court). On the NMTCA issue, the Court was inclined to conclude that ASI New Mexico is an independent contractor, so the NMTCA would not immunize ASI New Mexico from liability. See Tr. at 83:25-84:3 (Court). On the battery claim, the Court stated that, under the Plaintiffs' facts, consent was not present, so the battery claim might go to the jury. See Tr. at 84:4-7 (Court). The Court stated that it was likely to dismiss the IIED claim, because the facts do not rise to the shocking level one expects in such cases. See Tr. at 84:8-13 (Court). The Court further stated:

> The prima facie tort, I'm still not understanding how there is going to be any theory that goes to the jury that anything was lawful here. So I'll have to look at that. Probably, most of the time, I dismiss these prima facie torts out early because they simply don't apply. I have had, I think, one situation over the last 11 years where I kept it until I instructed the jury, and then didn't send it back. But let me take a look at it. I'm inclined to think this one is going to fail on both the intent and the balancing, and on the lack of unlawful -- or lack of lawful conduct here, because all the theories are basically ones in which the plaintiffs are alleging some sort of lawful -- unlawful conduct.
>
> So I think that's going to be a grant in part. I'll have to study it to see exactly what I'm going to leave and what I allow to go forward.

Tr. at 84:14-84:6 (Court).

In the Electronic Mail Transmission from Reed Colfax to the Court (dated April 14, 2014), filed April 14, 2014 (Doc. 207)("Plaintiffs' Letter"), the Plaintiffs provide additional argument on certain points raised in the MSJ and in other motions -- as relevant here, the applicability of State v. Johnson. The Plaintiffs note that their counsel had misunderstood the Court's question regarding the case during the hearing and wrote to clarify their view of the case:

> In State v. Johnson the New Mexico Supreme Court considered the

definition of "school employee" under the criminal statute prohibiting assault and battery on school personnel. State v. Johnson, 147 N.M. 177 (2009). The case does not mention or purport to address the definition of "public employee" under the NMTCA, but ASI suggests that the court's methods for interpreting "school employee" under the criminal statute can be used to define "public employee" under the NMTCA.

The two principles of statutory construction used in Johnson are not appropriate for construing the NMTCA. First, the Johnson court relied on the dictionary definition of "employee" because "nothing in the statute indicates the Legislature intended something other than the ordinary meaning of "employee" to apply." Id. at 180. In contrast, the Legislature specifically limited the meaning of employee under the NMTCA, which excludes "independent contractors"" and has eighteen additional subparagraphs that operate to limit the scope of public employees granted immunity under the NMTCA. Indeed, the very dictionary definition of "employee" used by the Johnson court, "[a] person who works for another in return for financial or other compensation," id., would include the independent contractors who are specifically excluded from the NMTCA's "public employee" definition.

Second, the Johnson court relied on the principle that a criminal statute must "be interpreted in light of the harm or evil it seeks to prevent." Id. at 180 (internal quotations omitted). The court concluded that "[t]he purpose of the battery upon school personnel statute is to decrease incidents of violence at schools by enhancing the penalties for crimes committed against 'employees' of the school." Id. Accordingly, the court gave the "school employee" definition the broadest possible meaning to further the purpose of the criminal statute. The NMTCA, of course, is not a criminal statute and is based on the Legislature's recognition of "the inherently unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." N.M. Stat. Ann.§ 41-4-2. Unlike the construction of "employee" in the context of the battery against school personnel statute, broad construction of "employee" under the NMTCA does not further the purpose of the statute. Neither principle of construction used by the Johnson court is applicable here and the decision cannot be interpreted as setting forth a new approach for interpreting "public employee" under the NMTCA.

Plaintiffs respectfully submit that the information provided above will assist the Court in resolving the issues raised during the hearing.

Plaintiffs' Letter at 4-5.

The SFPS Defendants' counsel responds:

Dear Mr. Colfax:

I do not believe that your 22 page letter submission to Judge Browning constitutes proper motion practice under the Federal Rules of Civil Procedure or the Local Rules.   While I do recall that the Court invited letter submissions regarding the issue of non-payment of Arianna London's sanction, I don't recall that the Court established a timeframe for additional briefing on the cross motions for summary judgment.   It has now been 6 days since the motions hearing and we are put at a significant disadvantage in having to respond to your additional briefing and evidence that was delivered directly to the Court without seeking leave of the Court to do so.   I object to your submissions to the Court and ask the Court not to consider this matter absent proper motion practice and an opportunity to be heard.

Electronic Mail Transmission from Gerald Coppler to Reed Colfax at 1, dated April 14, 2014, filed April 14, 2014 (Doc. 208).   The SFPS Defendants did not provide additional briefing or evidence.

ASI New Mexico responds:

Judge Browning and counsel:

ASI joins SFPS in objecting to Plaintiffs' 22-page letter to the Court, which includes unauthorized additional briefing and record references.   Plaintiffs failed to seek the Court's permission for this briefing, which as SFPS' counsel points out is not allowed by the rules.   With respect to ASI's Motion for Summary Judgment, Plaintiffs are effectively submitting a sur-reply to address the deficiencies of their Response.   Plaintiffs' response ignored ASI's argument with respect to [the issue that the Plaintiffs' Letter raises].   ASI also asks the Court not to consider the unauthorized and belated matter in Plaintiffs' letter.   This submission is particularly inappropriate and contrary to judicial economy in light of the Court's current docket and the short timeframe for consideration of the existing, properly filed briefing and exhibits prior to the May pretrial conference.

Electronic Mail Transmission from Matt T. Tucker to the Court, dated April 14, 2014, filed April 14, 2014 (Doc. 209).   ASI New Mexico did not provide further briefing or evidence.

The Court will consider this additional material.   The Court is sensitive to the Defendants' objections to these arguments' timeliness, but, in the interest of deciding the MSJ and other motions correctly on the merits, the Court concludes that it serves the interests of

justice to consider the evidence and argument that the Plaintiffs have cited.  ASI New Mexico

has not disputed the evidence, offered any contrary evidence, or disputed what the Plaintiffs

contend.  ASI New Mexico has had ample opportunity to make its case, and it has declined to put

forth further evidence or argument.   Nothing in the rules requires that the Court ignore

apparently good evidence because of when it was presented in the summary judgment process.

Moreover, to the extent that anything in the rules would prevent the Court from considering this

material, the Court concludes that it is in the interest of justice to consider this material, and,

therefore, waives any such prohibition in the local rules.  <u>See</u> D.N.M.LR-Civ. 1.7 ("These rules

may be waived by a Judge to avoid injustice.").

**<u>LAW REGARDING SUMMARY JUDGMENT</u>**

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving

party's case.'" <u>Herrera v. Santa Fe Pub. Schs.</u>, No. CIV 11-0422 JB/KBM, 2013 WL 3462484, at

*23 (D.N.M. June 28, 2013)(Browning, J.)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>,

939 F.2d 887, 891 (10th Cir. 1991)).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "If

the *moving* party will bear the burden of persuasion at trial, that party must support its motion

with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it

to a directed verdict if not controverted at trial."  <u>Celotex Corp v. Catrett</u>, 477 U.S. at 331

(Brennan, J., dissenting)(emphasis in original).[130]   Once the movant meets this burden, rule 56

---

[130]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme

requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained

---

Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A C. Wright & A. Miller, Federal Practice & Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the Court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified-immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at 586-87] (footnote omitted).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  "The Tenth Circuit, in Rhoads v. Miller, [352 F.

App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[131] explained that the blatant

---

[131]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

contradictions of the record must be supported by more than other witnesses' testimony[.]"

Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation

omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.  And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility. . . .

> Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court concludes that Rhoads v. Miller, How v. City of Baxter Springs, 217 F. App'x. 787 (10th Cir. 2007)(unpublished), Ortlieb v. Howery, 74 F. App'x 853 (10th Cir. 2003)(unpublished) and United States v. Reed, 195 F. App'x 815 (10th Cir. 2006)(unpublished) has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

that will serve as the foundation for answering the legal question before the court" before

inquiring into whether there are genuine issues of material fact for resolution by the jury.  584

F.3d at 1326-27 (Holmes, J. concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir.

1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are

irrelevant to the qualified immunity analysis because that analysis assumes the validity of the

plaintiffs' facts").  See Robles v. Schultz, No. CIV 08-0438 JB/KBM, 2010 WL 1441287, at *14

(D.N.M. March 15, 2010)(Browning, J.)("Robles has successfully established the violation of a

clearly established right and therefore qualified immunity is not appropriate. The burden then

shifts to McElroy and Compton to prove that no genuine issue of material fact exists." (citing

Thomson v. Salt Lake County, 584 F.3d at 1326-27 (Holmes, J., concurring)).

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  West v. Atkins, 487

U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or

reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendant] set[s] in motion a series of events that [the defendant] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [his or her] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens[ v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971)("Bivens"),] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

      1.     **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447.  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and

avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." Jojola v. Chavez, 55 F.3d at 493. Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)). Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493. What constitutes the required real nexus, however, is not completely clear. As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

## 2.    Individual Liability.

Under § 1983, "Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255.   Thus, government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.   Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).   Accord Pena v. Greffett, 922 F. Supp. 2d at 1219.   The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"   Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).   "Thus, Defendants are liable for the harm proximately caused by their conduct."   Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).   As the Court has previously concluded: "[A] plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of

causation . . . ."   Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury complained-of under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.   Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."   Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."   Id.   In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.   See, e.g., Warner v. Orange County Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.   Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."   Martinez v. Carson, 697 F.3d at 1255. The Tenth Circuit gave an example of a superseding intervening cause, quoting the Honorable Samuel J. Alito, then-Circuit Judge for the Third Circuit, now-associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to

- 168 -

> shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 104 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.      Supervisory Liability.

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, [] exercise of control or direction, or [] failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(internal alterations omitted).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not

enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its <u>deliberate</u> conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that <u>Ashcroft v. Iqbal</u> limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See <u>Garcia v. Casuas</u>, 2011 WL 7444745, at *25-*26 (citing <u>Dodds v. Richardson</u>, 614 F.3d 1185 (10th Cir. 2010)). The language that may have altered the landscape for supervisory liability in <u>Ashcroft v. Iqbal</u> is as follows: "Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676. The Tenth Circuit in <u>Dodds v. Richardson</u> held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199. The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule existing Supreme Court precedent," but stated that "<u>Iqbal</u> may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." <u>Dodds v. Richardson</u>, 614 F.3d at 1200. It concluded that <u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." <u>Dodds v. Richardson</u>, 614 F.3d at 1200. The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after <u>Aschroft v. Iqbal</u>:

> A plaintiff may [] succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in Bd. of Cnty. Comm'rs v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing

- 171 -

their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01

(quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

    **4.**    **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted

injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish

municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an

underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that

there is a direct causal link between the policy or custom and the injury alleged.  See Graves v.

Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its

officers adequately, the plaintiff must show that the municipality's inaction was the result of

deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING STATE ACTION AND CIVIL-RIGHTS CLAIMS

The Supreme Court has stated that it is a judicial obligation to not only

> preserve an area of individual freedom by limiting the reach of federal law and
> avoid the imposition of responsibility on a State for conduct it could not control,
> but also to assure that constitutional standards are invoked when it can be said that
> the State is responsible for the specific conduct of which the plaintiff complains.

Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 295 (2001)(internal

quotations and citations omitted).  The Fifth and Fourteenth Amendment rights at issue secure

protection only against infringement through state action.  See, e.g., Flagg Bros., Inc. v. Brooks,

436 U.S. 149, 156 (1978)("[M]ost rights secured by the Constitution are protected only against

infringement by governments.").  Under some circumstances, however, the conduct of private

parties may be deemed to be state action when the "conduct allegedly causing the deprivation of

a federal right may be fairly attributable to the State."  Lugar v. Edmondson Oil Co., Inc., 457

U.S. 922, 937 (1982).  Whether the conduct may in fact be "fairly attributed" to the state requires a two-part inquiry.  "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible."  Lugar v. Edmondson Oil Co., Inc., 457 U.S. 937.  "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937.  See West v. Atkins, 487 U.S. 42, 48 (1988)(explaining that, to state a claim under § 1983, the plaintiff must show: (i) deprivation of a right that the federal constitution or federal laws secure; and (ii) that a person acting under color of state law caused the deprivation).

The Supreme Court in Lugar v. Edmondson Oil Co., Inc. explained that the two prongs merge when the claim is "directed against a party whose official character is such as to lend the weight of the State to his decisions," whereas they remain distinct when analyzing the conduct of private parties.  457 U.S. at 937.  The first prong of the Lugar v. Edmondson Oil Co., Inc. test -- that the deprivation of a right is attributable to the state -- is satisfied when "the authority of state officials . . . put the weight of the State behind [the d]efendant's private decision[.]"  457 U.S. at 940.  The Supreme Court in Lugar v. Edmondson Oil Co., Inc. further instructed that the second prong, identification of a defendant as a state actor, may arise "because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state."  457 U.S. at 937.

In Lugar v. Edmondson Oil Co., Inc., the Supreme Court determined that the plaintiff's allegation that private conduct unlawful under state law deprived the plaintiff of his property without due process failed to state a claim under § 1983.  See 457 U.S. at 940.  The Supreme

Court also held that the plaintiff's claim alleging that the private parties had invoked a state statute maliciously or without valid grounds did not give rise to state action. <u>See</u> 457 U.S. at 940. Instead, that claim amounted to nothing more than the private misuse or abuse of a state statute. <u>See</u> 457 U.S. at 940-41.

For a private individual to be acting under color of state law, the deprivation of a federal right "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. at 937.

> Congress did not, in using the term "under the color of state law," intend to subject private citizens, acting as private citizens, to a federal lawsuit whenever they seek to initiate a prosecution or seek a remedy involving the judicial system. To hold otherwise would significantly disregard one purpose of the state action requirement, which is to "preserve[] an area of individual freedom by limiting the reach of federal law and federal judicial power." <u>Lugar</u>, 457 U.S. at 936. Instead, in enacting § 1983, Congress intended to provide a federal cause of action primarily when the actions of private individuals are undertaken with state authority. <u>See id.</u> at 934. Thus, absent more, causing the state, or an arm of the state, to initiate a prosecution or serve process is insufficient to give rise to state action.

<u>How v. City of Baxter Springs</u>, 217 F. App'x. 787, 793 (10th Cir. 2007)(unpublished).

### 1.      **<u>Whether There is State Action by Private Actors is a Legal Determination That the Court Makes.</u>**

The Tenth Circuit has described the determination of state action as "particularly fact-sensitive, so the circumstances must be examined in their totality." <u>Marcus v. McCollum</u>, 394 F.3d 813, 819 (10th Cir. 2004). According to the Tenth Circuit, "[t]he Supreme Court has

counseled us that the state action inquiry, although a legal determination to be made by the court, [see Gilmore v. City of Montgomery, 417 U.S. 556, 570 (1974),] requires the 'sifting [of] facts and weighing [of] evidence." Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1271 (10th Cir. 1989)(quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961)). In Gilmore v. City of Montgomery, 417 U.S. 556 (1974), the Supreme Court found that, although it was the Court's role to determine whether the use of zoos, museums, parks, and other recreational facilities by private school groups and private non-school organizations "involved government so directly in the actions of those users as to warrant court intervention on constitutional grounds[,]" the factual record before the Supreme Court "[did] not contain sufficient facts upon which to predicate legal judgments of this kind." 417 U.S. at 570.

On the other hand, leaving the determination of state action to the jury has shown to be ill-advised. The cases in which the acts of private entities have been held to constitute state action or to be under color of law, and cases in which they have not, tend to be distinguished "by fine shadings in the sometimes complex interrelationships that develop between the state and private bodies." Adams v. Vandermark, 787 F.2d 588, 1986 WL 16606, at *2 (6th Cir. 1986)(unpublished). In Adams v. Vandermark, the United States Court of Appeals for the Sixth Circuit reviewed a jury instruction from the United States District Court for the Eastern District of Michigan, instructing the jury on when to find state action. The Sixth Circuit found that the few words that were given to the jury on when to find state action "gave the jury little to guide it in making its determination on this crucial element of the claim for relief." 1986 WL 16606, at *2. The Sixth Circuit noted that the application of the symbiotic-relationship test and the joint-relationship test are "very difficult and complex questions," and, "[t]o the extent a jury is to

decide upon the proper factual predicates for this essentially legal determination, it must be given instructions that are clear, precise and informative as to the factors involved and the factual issues to be determined."  1986 WL 16606, at *2.  The Sixth Circuit found that the defendants were entitled to a new trial, because the jury was given no direction that could have enabled it to make the necessary underlying factual determination regarding state action.   1986 WL 16606, at *2-*3.

### 2.      Tests for Determining State Action by a Private Party.

The Supreme Court has articulated four different tests for courts to use in determining whether conduct by an otherwise private party is state action: (i) the public-function test; (ii) the nexus test; (iii) the symbiotic-relationship test; and (iv) the joint-action test.  See Johnson v. Rodrigues (Orozco), 293 F.3d at 1202-1203 (reviewing the various tests); Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995)(noting that "[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation." (internal quotation marks omitted)).

### a.      Public-Function Test.

Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State."  Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974).  The public-function test is difficult to satisfy, because while many functions may be traditionally governmental, few are "exclusively" governmental functions, as the test requires.  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1456.  The courts have found exclusive government functions to include holding elections, performing necessary municipal functions, and running a nursing facility.  See Johnson v. Rodrigues (Orozco), 293 F.3d at 1203.

**b.**     **Nexus Test.**

Under the nexus test, state action is present if the state has ordered the private conduct, or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 993 (1982).   A court determines under the nexus test whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself." Jackson v. Metro. Edison Co., 419 U.S. at 351.  "Private use of state-sanctioned private remedies or procedures does not rise to the level of state action. . . .  But when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." Tulsa Professional Collection Servs, Inc. v. Pope, 485 U.S. 478, 486 (1988)(internal citations omitted).

**c.**     **Symbiotic-Relationship Test.**

Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity."   Burton v. Wilmington Parking Authority, 365 U.S. 715, 725 (1961).  "[E]xtensive regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state] and a private [party] that is required for state action." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1451.

> The applicable decisions clearly establish no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity.  Questions as to how far the state has insinuated itself into the operations of a particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree.

Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1452.

        **d.**        **Joint-Action Test.**

State action exists under the joint-action test if the private party is a "willful participant in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27 (1980). Courts look to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1453. "[I]f there is a substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1454 (internal quotation marks and citations omitted). Joint participation can also take the form of a conspiracy between public and private actors; in such cases, the plaintiff must show that the public and private actors shared a common, unconstitutional goal. See Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1126 (10th Cir. 2000). Even a conspiracy claim requires a sufficient level of state involvement to constitute joint participation in the unconstitutional actions. See Soldal v. Cook County, 506 U.S. 56, 60 n.6 (1992). The Tenth Circuit has previously dismissed constitutional claims against a private individual where the plaintiff did not give specific facts showing a conspiracy evidencing state action. See Martinez v. Winner, 771 F.2d 424, 445 (10th Cir. 1985)("Beyond the bare conclusory allegation that [the defendant], a private citizen, conspired with the other defendants to deprive plaintiff of his constitutional and civil rights, no facts are stated indicating that [the defendant] did anything . . .").

In Gallagher v. Neil Young Freedom Concert, the Tenth Circuit surveyed several

instances in which courts have found action "under color of state law" where governmental and

private parties have acted together in joint-action:

> We have applied the joint action test in several cases involving allegations that private citizens acted in concert with police officers in making arrests. In both Carey v. Continental Airlines Inc., 823 F.2d 1402 (10th Cir. 1987), and Lee v. Town of Estes Park, 820 F.2d 1112 (10th Cir. 1987), we held that citizens who made complaints to police officers that resulted in arrests were not state actors. We found nothing in the record in either case from which we could infer that the allegedly unconstitutional arrests "resulted from any concerted action, whether conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power." Carey, 823 F.2d at 1404. In both cases, the record indicated that the police officers had made an independent decision to make the challenged arrest. In contrast, in Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1429 (10th Cir. 1984), cert. denied, 474 U.S. 818 (1985), we concluded that a store security guard who reported a suspected shoplifter to the police was a state actor. We noted that the officer that made the arrest did not make an independent investigation but relied on the judgment of the security guard. In Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982) (per curiam), we applied the joint action test by focusing on the manner in which the alleged constitutional deprivation was carried out. There, the plaintiff challenged the seizure and sale of his property and named as defendants not only state officials but also the wrecking company that towed his truck and subsequently sold it. We found the company to be a state actor because it had "jointly participated in seizing the truck by towing it away" and because the company's sale of the plaintiff's property was "an integral part of the deprivation." Id. at 1345.

49 F.3d at 1453-56. The Tenth Circuit noted that, "just as with the other tests for state action,

the mere acquiescence of a state official in the actions of a private party is not sufficient." 49

F.3d at 1453. The Tenth Circuit found that the joint-action test can be satisfied where police are

involved in cooperative action with a private party when "the police have substantially assisted

in the allegedly wrongful conduct." 49 F.3d at 1455. Joint participation typically arises when

the authorities agree to facilitate unconstitutional acts by a private party through affirmative

action. See Soldal v. Cook County, 506 U.S. at 60 n.4.

### 3.     The Influence of Police Involvement on Private Action as State Action.

The Tenth Circuit has found that the involvement of the police does not necessarily convert a defendant's abuse of state law into conduct attributable to the state for purposes of § 1983 liability.  See Yanaki v. Iomed, Inc., 415 F.3d 1204, 1210 (10th Cir. 2005)(citing Winterland Concessions Co. v. Trela, 735 F.2d 257, 262 (6th Cir. 1984); Taylor v. Gilmartin, 686 F.2d 1346, 1348-49, 1355 n.3 (10th Cir. 1982); Torres v. First State Bank of Sierra County, 588 F.2d 1322, 1327 (10th Cir. 1978)).  In Yanaki v. Iomed, Inc., the plaintiffs argued that the involvement of the police acting in concert with the defendants in the search of the plaintiffs' residence converted the defendants' actions into conduct attributable to the state for the purposes of § 1983 liability.  See 415 F.3d at 1209-10.  The Tenth Circuit held that the plaintiffs "fail[ed] to satisfy the first part of the [Lugar v. Edmondson Oil Co., Inc.] color of law test because the conduct that Plaintiffs complain[ed] deprived them of their constitutional rights was caused by and [could] only be attributed to the private Defendants."  415 F.3d at 1210.  The Tenth Circuit, therefore, found it unnecessary to address whether the private defendants were state actors.  See 415 F.3d at 1210.  Additionally, merely following a procedure established by state law does not transform a private party's activity into state action.  See Scott v. Hern, 216 F.3d 897, 906-07 (10th Cir. 2000); Kirksey v. Theilig, 351 F. Supp. 727, 733 (D. Colo. 1972)(holding that self-help repossession of an automobile by a private party is not action under color of state law).

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  The Fourteenth Amendment extends the prohibition against unreasonable search and seizures to state officers, including school officials. See New Jersey v.

T.L.O., 469 U.S. 325, 334-37 (1985).   "The touchstone for determining the constitutionality of a governmental search is the 'reasonableness' of the search."   Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1184 (quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)).   See Maryland v. King, 133 S. Ct. 1958, 1969 (2013)("'The Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner.'")(quoting Schmerber v. California, 384 U.S. 757, 768 (1966)).  The Supreme Court has reiterated that a warrantless search must be reasonable in its manner and scope, and that the search's reasonableness depends on balancing legitimate governmental interests against the intrusion upon individual's privacy:

> Even if a warrant is not required, a search is not beyond Fourth Amendment scrutiny; for it must be reasonable in its scope and manner of execution.  Urgent government interests are not a license for indiscriminate police behavior.  To say that no warrant is required is merely to acknowledge that "rather than employing a per se rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable."   This application of "traditional standards of reasonableness" requires a court to weigh "the promotion of legitimate governmental interests" against "the degree to which [the search] intrudes upon an individual's privacy."

Maryland v. King, 133 S. Ct. at 1970 (citations omitted).

## 1.    The Special-Needs Doctrine.

While "[i]n the criminal context, reasonableness usually requires a showing of probable cause," Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 828 (citing Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 619 (1989)), "in the context of safety and administrative regulations, a search unsupported by probable cause may be reasonable when special needs, beyond the normal need for law enforcement, make the warrant and

probable-cause requirement impracticable," Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 828-29 (internal quotation marks and citation omitted). The Supreme Court refers to this "exception[] to the warrant and probable-cause requirements for a search when special needs beyond the normal law enforcement make those requirements impracticable" as the "special needs doctrine." Illinois v. Caballes, 543 U.S. 405, 425 (2005)(Ginsburg, J., dissenting)(quoting Griffin v. Wisconsin, 483 U.S. 868, 873 (1987))(internal quotation marks omitted).  See Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 707 F. Supp. 2d 1190, 1241 n.36 (D.N.M. 2010)(Browning, J.)("The 'special needs' doctrine, which has been used to uphold certain suspicionless searches performed for reasons unrelated to law enforcement, is an exception to the general rule that a search must be based on individualized suspicion of wrongdoing.")(quoting Ferguson v. City of Charleston, 532 U.S. 67, 79 n.15 (2001))(internal quotation marks omitted), rev'd in part, vacated in part sub nom., Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011).

Special needs "inhere in the public school context."  Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 828-29 (stating "that a warrant and finding of probable cause are unnecessary in the public school context because such requirements would unduly interfere with the maintenance of the swift and informal disciplinary procedures [that are] needed," and that strict adherence to the probable-cause requirement would undercut the substantial need for teachers and administrators to maintain order  in the schools)(quoting Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653 (1995); New Jersey v. T.L.O., 469 U.S. at 340-41)).   Thus, although it is well-settled that students do not "shed their constitutional rights . . . at the schoolhouse gate," Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503,

506 (1969), "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children," Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 656.

The Supreme Court has recognized that a search in the school context may still be reasonable without individualized suspicion in "'limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 674 (O'Connor, J., dissenting)(quoting United States v. Martinez-Fuerte, 428 U.S. 543, 624 (1976)). See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. at 830 (stating that "a finding of individualized suspicion may not be necessary when a school conducts drug testing"). The Supreme Court in New Jersey v. T.L.O. stated that the legality of a student search depends on the search's reasonableness. See 469 U.S. at 341-42. To determine a search's reasonableness, a court must consider: (i) whether the action was justified at its inception; and (ii) whether the search was reasonably related in scope to the circumstances which justified the interference. See New Jersey v. T.L.O., 469 U.S. at 341-42. A student search will be justified at its inception when "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." New Jersey v. T.L.O., 469 U.S. at 341-42. The search will be reasonable in scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." New Jersey v. T.L.O., 469 U.S. at 342.

The Court has recognized that, ultimately, determining whether a student search is

reasonable requires balancing the students' privacy interest with the government's interest in performing the search, and then determining whether the scope of the search is reasonably related to that government interest:

> To determine whether a particular "type of school search is constitutionally reasonable," a reviewing court must consider the "scope of the legitimate expectation of privacy at issue," the "character of the intrusion that is complained of," and the "nature and immediacy of the governmental concern at issue" and the efficacy of the means employed for dealing with it.

Herrera v. Santa Fe. Pub. Sch., 792 F. Supp. 2d at 1193 (quoting Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 654-66).

### 2.  Controlling Supreme Court Precedent on School-Related Searches.

In Vernonia School District 47J v. Acton, the Supreme Court found that the school district's student athlete drug policy, which authorized random urinalysis testing of students who participated in the district's school athletics program, was reasonable and thus constitutional. See 515 U.S. at 646, 665.  In reaching this conclusion, the Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the majority, considered the nature of the privacy interest upon which the search intruded, the intrusiveness of the search, and the nature and immediacy of the governmental concern at issue and the efficacy of the search's means for meeting it.  See 515 U.S. at 665.  The Supreme Court noted that, "[p]articularly with regard to medical examinations and procedures, therefore, 'students within the school environment have a lesser expectation of privacy than members of the population generally.'"  515 U.S. at 656-57 (citation omitted).  "Legitimate privacy expectations are even less with regard to student athletes."  515 U.S. at 656.

> They require "suiting up" before each practice or event, and showering and changing afterwards.  Public school locker rooms, the usual sites for these

> activities, are not notable for the privacy they afford.  The locker rooms in
> Vernonia are typical: No individual dressing rooms are provided; shower heads
> are lined up along a wall, unseparated by any sort of partition or curtain; not even
> all the toilet stalls have doors.  As the United States Court of Appeals for the
> Seventh Circuit has noted, there is "an element of 'communal undress' inherent in
> athletic participation," Schaill by Kross v. Tippecanoe Cnty. Sch. Corp., 864 F.2d
> 1309, 1318 (1988).

515 U.S. at 657.  The Supreme Court also noted that there was "an additional respect in which

school athletes have a reduced expectation of privacy."  515 U.S. at 657.  The Supreme Court

stated that, by choosing to go out for a team, students "voluntarily subject themselves to a degree

of regulation even higher than that imposed on students generally."  515 U.S. at 657.

> In Vernonia's public schools, they must submit to a preseason physical exam
> (James testified that his included the giving of a urine sample, App. 17), they must
> acquire adequate insurance coverage or sign an insurance waiver, maintain a
> minimum grade point average, and comply with any "rules of conduct, dress,
> training hours and related matters as may be established for each sport by the head
> coach and athletic director with the principal's approval."  Record, Exh. 2, p. 30,
> ¶ 8.  Somewhat like adults who choose to participate in a "closely regulated
> industry," students who voluntarily participate in school athletics have reason to
> expect intrusions upon normal rights and privileges, including privacy.

515 U.S. at 657.[132]

---

[132]The Court has noted that, in light of the Supreme Court's recent decisions in Florida v. Jardines, 133 S. Ct. 1409 (2013), and United States v. Jones, 132 S. Ct. 945 (2012), both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the Katz v. United States reasonable-expectation-of-privacy test is still good law." United States v. Alabi, No. CR 11-2292 JB, 2013 WL 1876791, at *34 (D.N.M. Apr. 30, 2013)(Browning, J.)(citing Minnesota v. Carter, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)).  Although the Court concluded in United States v. Alabi that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the Katz v. United States[, 389 U.S. 347 (1967)] reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach," 2013 WL 1876791, at *35, these two Supreme Court decisions may also raise the question whether a search's reasonableness still hinges on balancing the government's interest in the search against the subject's reasonable privacy expectations.  In June of 2013, however, after having decided Florida v. Jardines, and United States v. Jones, Justice Scalia

Turning to the degree of intrusion, the Supreme Court in <u>Vernonia School District 47J v.</u>

<u>Acton</u> stated that the degree of intrusion depended upon the manner in which production of the

urine sample was monitored.  <u>See</u> 515 U.S. at 658.  Under the district's policy, the male students

produced samples at a urinal along a wall and remained fully clothed, and were observed only

from behind, if at all, and the female students produced samples in an enclosed stall, with a

female monitor standing outside listening for sounds of tampering.  <u>See</u> 515 U.S. at 658.  The

Supreme Court stated: "These conditions are nearly identical to those typically encountered in

---

dissented from the Supreme Court's decision in <u>Maryland v. King</u>, and criticized the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to <u>Katz v. United States</u> and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'" <u>Maryland v. King</u>, 133 S. Ct. at 1986 (Scalia, J., dissenting).  Justice Scalia also pointed out that a person's "privacy-related concerns" in their body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the <u>body</u> is at stake? (The Fourth Amendment lists "persons" <u>first</u> among the entities protected against unreasonable searches and seizures.)

<u>Maryland v. King</u>, 133 S. Ct. at 1982 (Scalia, J., dissenting)(emphasis in original).  Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or <u>attends a public school</u>. Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

<u>Maryland v. King</u>, 133 S. Ct. 1989 (Scalia, J., dissenting)(emphasis added).  Thus, while Justice Scalia no doubt remains highly critical of <u>Katz</u>' unprincipled test, the Court nonetheless concludes that the Supreme Court still relies on a person's privacy expectation as one side of the reasonableness balancing equation when determining whether a search is reasonable for Fourth Amendment purposes.

public restrooms, which men, women, and especially schoolchildren use daily.   Under such conditions, the privacy interests compromised by the process of obtaining the urine sample are in our view negligible."  515 U.S. at 658.  The Supreme Court also considered the other privacy-invasive aspect of urinalysis -- the information it discloses concerning a person's body, and the materials he or she has ingested.  See 515 U.S. at 658.  The Supreme Court noted that the tests looked only for standard drugs, that the test results were disclosed only to a limited class of school personnel who "have a need to know," that they were not turned over to the law enforcement authorities, and that they were not used for any internal disciplinary function.  515 U.S. at 658.  Turning to the governmental interest, the Supreme Court found that the concern of deterring drug use was important, that there was an immediate crisis of drug use, and that "a drug problem largely fueled by the 'role model' effect of athletes' drug use, and of particular danger to athletes, is effectively addressed by making sure that athletes do not use drugs."  515 U.S. at 661-64.  Taking into account "the decreased expectation of privacy, the relative unobtrusiveness of the search, and the severity of the need met by the search," the Supreme Court concluded that the policy was reasonable and thus constitutional.  515 U.S. at 664-65.

In Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls, the Supreme Court considered whether a student activities drug testing policy, which required all students who participated in competitive extracurricular activities to submit to drug testing, was constitutional, because it reasonably served the school district's important interest in detecting and preventing drug use among its students.  See 536 U.S. at 825.  The Supreme Court noted that a "student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety."  536 U.S. at 830.  The Supreme

Court concluded that the students affected by the policy had a limited expectation of privacy, because the students who participated in the competitive extracurricular activities voluntarily subjected themselves to many of the same intrusions of their privacy as do student athletes. See 536 U.S. at 831.  The Supreme Court stated:

> Some of these clubs and activities require occasional off-campus travel and communal undress.  All of them have their own rules and requirements for participating students that do not apply to the student body as a whole.  For example, each of the competitive extracurricular activities governed by the Policy must abide by the rules of the Oklahoma Secondary Schools Activities Association, and a faculty sponsor monitors the students for compliance with the various rules dictated by the clubs and activities.   This regulation of extracurricular activities further diminishes the expectation of privacy among schoolchildren.

536 U.S. at 832.  The Supreme Court also found that, given the "minimally intrusive nature of the sample collection and the limited uses to which the test results are put, we conclude that the invasion of students' privacy is not significant."  536 U.S. at 833.  The policy required a faculty monitor to wait outside the closed restroom stall, listening for normal sounds of urination to guard against tampered samples, while the student produced a sample.  See 536 U.S. at 832-33. The policy also required test results to be kept in confidential files separate from the student's other educational records and that the results be released to school personnel only on a need-to-know basis.  See 536 U.S. at 833.  The Supreme Court analogized this policy to the policy in Vernonia School District 47J v. Acton and found that, as the policy in Vernonia School District 47J v. Acton, it was minimally intrusive.  See 536 U.S. at 833-34.  The Supreme Court further noted that governmental concern in preventing drug use by schoolchildren is an important concern, and that "the necessity for the State to act is magnified by the fact that this evil is being visited not just upon individuals at large, but upon children for whom it has undertaken a special

- 188 -

responsibility of care and direction."  536 U.S. at 834.  The Supreme Court also noted that the school district presented specific evidence of drug use in the schools.  See 536 U.S. at 835.  The Supreme Court found that, given the nationwide epidemic of drug use, and the evidence of increased drug use in the district's schools, it was reasonable for the school district to enact the drug testing policy.  See 536 U.S. at 836.

In Safford Unified School District No. 1 v. Redding, 557 U.S. 364 (2009), the Supreme Court held that a strip search, based upon individualized suspicion, in which school employees required a student suspected of dealing pharmaceutical drugs at school to "remove her clothes down to her underwear, and then 'pull out' her bra and the elastic band on her underpants," was an unreasonable search in violation of the student's Fourth Amendment rights.  Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 374.  The week before the search, another student told the assistant principal, Kerry Wilson, that students were bringing drugs and weapons on campus, and that he had been sick after taking pills that a classmate gave him.  See 557 U.S. at 371-72. That student then handed a pill to Wilson and identified another student, Marissa Glines, as having given him the pill.  Wilson called Glines out of class and found a day planner with various contraband items, and required Glines to turn out her pockets and open her wallet, in which Wilson found a blue pill, several white pills, and a razor blade.  When Wilson asked where Glines obtained the blue pill, Glines indicated that another student, Savana Redding, gave the pill to her, and denied knowing about the day planner and the contraband items found within the planner.  See 557 U.S. at 372.  "Wilson did not ask [Glines] any followup questions to determine whether there was any likelihood that [Redding] presently had pills: neither asking when [Glines] received the pills from [Redding] nor where [Redding] might be hiding them."  557 U.S.

at 372.  Wilson, and the school's administrative assistant, Helen Romero, required Glines to

undergo a search of her bra and underpants by the administrative assistant and the school nurse,

which did not turn up any additional pills.  See 557 U.S. at 373.  Wilson then called Redding to

his office and showed her the day planner.  "[W]hile she denied knowledge of the contraband,

[Redding] admitted that the planner was hers and that she had lent it to [Glines]."  557 U.S. at

373.  In relation to Redding, the Supreme Court noted:

> Wilson had other reports of their friendship from staff members, who had
> identified [Redding] and [Glines] as part of an unusually rowdy group at the
> school's opening dance in August, during which alcohol and cigarettes were found
> in the girls' bathroom. Wilson had reason to connect the girls with this
> contraband, for Wilson knew that Jordan Romero [the student who had originally
> complained and gotten sick] had told the principal that before the dance, he had
> been at a party at [Redding]'s house where alcohol was served. [Gline]'s
> statement that the pills came from [Redding] was thus sufficiently plausible to
> warrant suspicion that [Redding] was involved in pill distribution.

557 U.S. at 373.  Wilson next showed Redding the blue pill and the white pills, and asked her

whether she knew anything about them.  See id. at 368.  Redding said that she did not.  When

Wilson told Redding that it had been reported to him that she was distributing the pills, she

denied doing so and granted Wilson permission to "search her belongings."  557 U.S. at 368.

Romero came into the office and helped Wilson search through Redding's backpack, which did

not turn up any contraband or pills.  Wilson then told Romero to take Redding to the nurse's

office to search her clothes for pills.

> Romero and the nurse, Peggy Schwallier, asked [Redding] to remove her jacket,
> socks, and shoes, leaving her in stretch pants and a T-shirt (both without pockets),
> which she was then asked to remove. Finally, [Redding] was told to pull her bra
> out and to the side and shake it, and to pull out the elastic on her underpants, thus
> exposing her breasts and pelvic area to some degree.  No pills were found.

557 U.S. at 369.  Redding's mother filed suit against the school district, Wilson, Romero, and

Schwallier.  See 557 U.S. at 369.  The United States Court of Appeals for the Ninth Circuit,

sitting en banc, held that the strip search violated Redding's Fourth Amendment rights, but

concluded that Schwallier and Romero were not liable "since they had not acted as independent

decisionmakers."  557 U.S. at 369-70 (citing Redding v. Safford Unified Sch. Dist. No. 1, 531

F.3d 1071, 1089 (9th Cir. 2008)(en banc)). The Ninth Circuit held that Redding's Fourth

Amendment rights were, however, clearly established at the time of the search and that Wilson

was thus not protected by qualified immunity, because "these notions of personal privacy are

'clearly established' in that they inhere in all of us, particularly middle school teenagers, and are

inherent in the privacy component of the Fourth Amendment's proscriptions against

unreasonable searches."  Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 369 (quoting

Redding v. Safford Unified Sch. Dist. No. 1, 531 F.3d at 1089).

In relation to whether the search was unreasonable, and thus violated Redding's

constitutional rights, the Supreme Court first concluded that the New Jersey v. T.L.O. reasonable-

suspicion standard applied to Wilson's search of Redding's backpack:

> There is no question here that justification for the school officials' search was
> required in accordance with the T.L.O. standard of reasonable suspicion, for it is
> common ground that [Redding] had a reasonable expectation of privacy covering
> the personal things she chose to carry in her backpack, and that Wilson's decision
> to look through it was a "search" within the meaning of the Fourth Amendment.

Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 373 n.3.  The Supreme Court

nonetheless held that Wilson's suspicion up to the time that he searched Redding's backpack and

Romero searched her "outer clothing" was sufficient to make that extent of the search

reasonable:

> If a student is reasonably suspected of giving out contraband pills, she is
> reasonably suspected of carrying them on her person and in the carryall that has

> become an item of student uniform in most places today.  If Wilson's reasonable
> suspicion of pill distribution were not understood to support searches of outer
> clothes and backpack, it would not justify any search worth making.  And the look
> into [Redding]'s bag, in her presence and in the relative privacy of Wilson's
> office, was not excessively intrusive, any more than Romero's subsequent search
> of her outer clothing.

557 U.S. at 373-74.  The Supreme Court agreed with the Ninth Circuit, concluding that Wilson's

direction to extend the search and require Redding to "pull her underwear away from her body in

the presence of the two officials who were able to see her necessarily exposed her breasts and

pelvic area to some degree," and overstepped the intrusion which Wilson's suspicions permitted

and constituted an unreasonable search.  557 U.S. at 374.  The Honorable David Souter, former

Associate Justice for the Supreme Court, who penned the majority opinion, pointed out that there

is "obviously different meaning of a search exposing the body from the experience of nakedness

or near undress in other school circumstances.  Changing for gym is getting ready for play;

exposing for a search is responding to an accusation reserved for suspected wrongdoers and

fairly understood as . . . degrading."  557 U.S. at 375.  Justice Souter noted that "[t]he indignity

of the search does not, of course, outlaw it," but concluded that "the content of the suspicion

failed to match the degree of intrusion."  557 U.S. at 375.  Justice Souter reasoned:

> Wilson knew beforehand that the pills were prescription-strength ibuprofen and
> over-the-counter naproxen, common pain relievers equivalent to two Advil, or one
> Aleve.  He must have been aware of the nature and limited threat of the specific
> drugs he was searching for, and while just about anything can be taken in
> quantities that will do real harm, Wilson had no reason to suspect that large
> amounts of the drugs were being passed around, or that individual students were
> receiving great numbers of pills.
>
> Nor could Wilson have suspected that [Redding] was hiding common
> painkillers in her underwear.  Petitioners suggest, as a truth universally
> acknowledged, that "students . . . hid[e] contraband in or under their clothing,"
> and cite a smattering of cases of students with contraband in their underwear.  But
> when the categorically extreme intrusiveness of a search down to the body of an

adolescent requires some justification in suspected facts, general background possibilities fall short; a reasonable search that extensive calls for suspicion that it will pay off.  But nondangerous school contraband does not raise the specter of stashes in intimate places, and there is no evidence in the record of any general practice among Safford Middle School students of hiding that sort of thing in underwear; neither Jordan nor [Gline] suggested to Wilson that [Redding] was doing that, and the preceding search of [Gline] that Wilson ordered yielded nothing.  Wilson never even determined when [Gline] had received the pills from [Redding]; if it had been a few days before, that would weigh heavily against any reasonable conclusion that [Redding] presently had the pills on her person, much less in her underwear.

       In sum, what was missing from the suspected facts that pointed to [Redding] was any indication of danger to the students from the power of the drugs or their quantity, and any reason to suppose that [Redding] was carrying pills in her underwear.  We think that the combination of these deficiencies was fatal to finding the search reasonable.

557 U.S. at 375-77.

Justice Souter, with whom Chief Justice Roberts, Justices Scalia, Kennedy, Breyer, Alito, and Thomas joined, disagreed, however, with the Ninth Circuit's conclusion that Redding's right was clearly established, and held that Wilson was entitled to qualified immunity.  See 557 U.S. at 377-79.  Justice Souter noted that "there is no need that the very action in question have previously been held unlawful" and that "officials can still be on notice that their conduct violates established law in novel factual circumstances."  557 U.S. at 377-78 (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999); Hope v. Pelzer, 536 U.S. 730, 741 (2002))(internal quotation marks omitted).  Justice Souter nevertheless concluded that, because "the number of cases viewing school strip searches differently from the way we see them are numerous enough, with well-reasoned majority and dissenting opinions, [there existed] doubt that we were sufficiently clear in the prior statement of the law."  Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. at 378-79.  The Supreme Court accordingly held that the circumstances "warranted" granting

Wilson qualified immunity.  557 U.S. at 379.  In reaching this conclusion, the Supreme Court's

decision was informed by the fact that

> other courts considering qualified immunity for strip searches have read T.L.O. as
> "a series of abstractions, on the one hand, and a declaration of seeming deference
> to the judgments of school officials, on the other," which made it impossible "to
> establish clearly the contours of a Fourth Amendment right . . . [in] the wide
> variety of possible school settings different from those involved in T.L.O." itself.

557 U.S. at 378 (alterations in original)(quoting Jenkins v. Talladega City Bd. of Ed., 115 F.3d

821, 828 (11th Cir. 1997)(en banc)).

### 3.    School-Related Search Precedent.

In Doe ex rel. Doe v. Little Rock School District, 380 F.3d 349 (8th Cir. 2004), the United

States Court of Appeals for the Eighth Circuit found that the practice of the Little Rock School

District, which subjected students to random, suspicionless searches of their persons and

belongings by school officials was unconstitutional, because the searches unreasonably invaded

the students' legitimate expectations of privacy.  380 F.3d at 351.  The Eighth Circuit noted that

public school students have lesser expectations of privacy, owing, in large part, to the

government's responsibilities as guardian and tutor of the children entrusted to its care.  See 380

F.3d at 353.  The Eighth Circuit stated that "[p]ublic school students' privacy interests, however,

are not nonexistent."  380 F.3d at 353.

> It is true that the legitimate expectation of privacy retained by members of certain
> sub-populations of a public school's student body falls below the already limited
> baseline level of privacy afforded to public school students generally.  For
> instance, the Supreme Court has analogized students who voluntarily participate
> in school athletics or other competitive extracurricular activities to adults who
> choose to participate in a "closely regulated industry," in that both groups
> voluntarily subject themselves to "intrusions upon normal rights and privileges,
> including privacy."  Vernonia, 515 U.S. at 656-57 . . .  (internal quotations
> omitted); Earls, 536 U.S. at 831-32 . . . .  Sports and other competitive
> extracurricular activities usually have separate systems of rules that do not apply

to the student body as a whole, and often involve such requirements as mandatory physicals, frequent communal undress, and traveling and lodging in close confines.  By consciously choosing to "go out for the team" or other competitive extracurricular endeavor, such students agree to waive certain privacy expectations that they would otherwise have as students in exchange for the privilege of participating in the activity.  But the search regime at issue here is imposed upon the entire student body, so the LRSD cannot reasonably claim that those subject to search have made a voluntary tradeoff of some of their privacy interests in exchange for a benefit or privilege.

380 F.3d at 353-54.  The Eighth Circuit then inquired into the intrusiveness of the search.

See 380 F.3d at 354.  The Eighth Circuit concluded that the search invaded the students' privacy

interests in a major way, stating that "[a] search of a child's person or of a closed purse or other

bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a

severe violation of subjective expectations of privacy."   380 F.3d at 354 (citation omitted).

"Students often carry items of a personal or private nature in their pockets and bags, and many

students (whether or not they are carrying contraband) must surely feel uncomfortable or

embarrassed when officials decide to rifle through their personal belongings."  380 F.3d at 654-

55.

Whatever privacy interests the LRSD students have in the personal belongings that they bring to school are wholly obliterated by the search practice at issue here, because all such belongings are subject to being searched at any time without notice, individualized suspicion, or any apparent limit to the extensiveness of the search.  Full-scale searches that involve people rummaging through personal belongings concealed within a container are manifestly more intrusive than searches effected by using metal detectors or dogs.  Indeed, dogs and magnetometers are often employed in conducting constitutionally reasonable large-scale "administrative" searches precisely because they are minimally intrusive, and provide an effective means for adducing the requisite degree of individualized suspicion to conduct further, more intrusive searches.  The type of search that the LRSD has decided to employ, in contrast, is highly intrusive, and we are not aware of any cases indicating that such searches in schools pass constitutional muster absent individualized suspicion, consent or waiver of privacy interests by those searched, or extenuating circumstances that pose a grave security threat.

380 F.3d at 355.   The Eighth Circuit also noted that the character of the intrusions were qualitatively more severe than that in Vernonia School District 47J v. Acton and Board of Education of Independent Sch. Dist. No. 92 of Pottawatomie County v. Earls, because, in the case before it, the searches could lead directly to the imposition of criminal sanctions.   See 380 F.3d at 355.   The Eighth Circuit further found that the Littler Rock Schools failed to demonstrate the existence of a need sufficient to justify the substantial intrusion.   See 380 F.3d at 356.

> While the LRSD has expressed some generalized concerns about the existence of weapons and drugs in its schools, it conceded at oral argument that there is nothing in the record regarding the magnitude of any problems with weapons or drugs that it has actually experienced.   All schools surely have an interest in minimizing the harm that the existence of weapons and controlled substances might visit upon a student population, but public schools have never been entitled to conduct random, full-scale searches of students' personal belongings because of a mere apprehension.

380 F.3d at 356.   The Eighth Circuit determined that the Littler Rock Schools' search practice was unreasonable, because the Littler Rock Schools' search practice effectively reduced expectations of privacy to nothing, and there was no evidence of unique circumstances that would justify significant intrusions.   See 380 F.3d at 356.

In B.C. v. Plumas Unified School District, 192 F.3d 1260 (9th Cir. 1999), the Ninth Circuit concluded that the "random and suspicionless dog sniff search" of a high school student "was unreasonable in the circumstances."[133]   192 F.3d at 1267.   The Ninth Circuit found that the students' privacy interests were not minimal, although they have a lesser expectation of privacy than members of the population generally.   See 192 F.3d at 1267.   The Ninth Circuit stated that

---

[133] The Ninth Circuit found that the dog sniff was a search, because it infringed the student's reasonable expectation of privacy.   See 192 F.3d at 1266.

deterring student drug use is an important -- if not compelling -- government interest, but noted that the record did not disclose that there was a drug crisis or a drug problem at the high school. See 192 F.3d at 1268.   "In the absence of a drug problem or crisis at Quincy High, the government's important interest in deterring student drug use would not have been placed in jeopardy by a requirement of individualized suspicion."   192 F.3d at 1268 (internal quotation marks and citation omitted).

In Hough v. Shakopee Public Schools, 608 F. Supp. 2d 1087 (D. Minn. 2009), the United States District Court for the District of Minnesota found that a policy of daily, suspicionless searches was not reasonable and thus was unconstitutional.   See 608 F. Supp. 2d at 1108.   The district court recognized that any student's expectation of privacy is limited in a public school environment.   See 608 F. Supp. 2d at 1100-01.   The defendant argued that students waived their right to privacy when they chose to accept special education services from the school district. See 608 F. Supp. 2d at 1101.   The district court rejected this argument, stating that

> participating in a special-education program is very different from participating in athletics (as in Vernonia School District) or in competitive extracurricular activities (as in Earls).   No student is entitled under the law to play football or sing in the choir, but every disabled student is entitled under the law to special-education services.   Moreover, because school attendance is compulsory, a student's participation in a special-education program is not voluntary in the same way that participation in extracurricular activities is voluntary.   MRVSEC "cannot reasonably claim that those subject to search have made a voluntary tradeoff of some of their privacy interests in exchange for a benefit or privilege." Doe, 380 F.3d at 354.

608 F. Supp. 2d at 1101.   The district court found that the special-education students' legitimate expectation of privacy fell below the "already limited baseline level of privacy afforded to public school students generally," because they sacrifice the privacy of medical and other information about their disabilities, but stated that the students "nevertheless retain some legitimate

expectation of privacy in their bodies, clothing, and personal possessions."  608 F. Supp. 2d at

1103.   The district court found that the searches were intrusive.   See 608 F. Supp. at 1103.

Generally, students were asked to remove their shoes and socks, turn down the waistband of their

pants, empty their pockets, search their backpacks and purses, and, at times, submit to a pat

down.  See 608 F. Supp. 2d at 1103.  The district court stated:

> On the whole, MRVSEC's searches were extraordinarily intrusive.  As in
> Doe, the students' backpacks and purses, and the contents of their pockets, were
> searched.  Doe found such searches to be "highly intrusive" and characterized
> them as "wholly obliterating" the students' "privacy interests . . . in the personal
> belongings that they bring to school."  Id. at 355.   But whereas Doe involved
> occasional searches of the possessions of randomly selected students, MRVSEC
> searched the possessions of every student every day.  Thus, even if MRVSEC had
> stopped at searching possessions, its searches would have been far more intrusive
> than the "highly intrusive" searches struck down in Doe.

> But MRVSEC did not stop at searching possessions.  MRVSEC searched
> people. The students not only had their backpacks, purses, and the contents of
> their pockets searched, but students were required to partially disrobe (i.e., to take
> off their shoes and socks, and sometimes coats, sweaters, or sweatshirts) and to
> permit school employees to look inside their clothes (i.e., under their waistbands
> and pant legs).  And, most importantly, the students were touched. Every day,
> every student either was patted down or was at least subject to being patted down.

> MRVSEC's searches were as intrusive as any government search that any
> American citizen is likely to experience in her lifetime, unless she is incarcerated.
> Anyone who has been thoroughly searched at an airport -- who has had her arms,
> legs, chest, and back touched by a stranger, and then had her most personal
> possessions pawed through -- knows exactly how intrusive such a search is.  The
> MRVSEC searches were even more intrusive, and every student experienced them
> every day.

> In sum, the Court concludes that the MRVSEC searches were
> extraordinarily intrusive -- far more intrusive than the searches approved in
> Vernonia School District and Earls, and far more intrusive than the searches
> disapproved in Doe. In none of those cases did school officials, without
> individualized suspicion, force students to take off clothing, look inside of
> students' clothing, or touch students.   Indeed, with the exception of one
> case . . . involving students who had committed crimes and were attending what
> was essentially a correctional facility, defendants have not cited a single case in

- 198 -

which a court approved suspicionless searches of students that were nearly as intrusive as MRVSEC's.

608 F. Supp. 2d at 1105.  The district court found that the evidence regarding the purpose of the policy, which was to remove distractions and dangerous items, and to create a calm and focused environment where students feel safe, was insufficient to justify an intrusive search of every student every day.  See 608 F. Supp. 2d at 1106.  The district court stated:

> MRVSEC has given the Court no reason to believe that far less intrusive searches would not adequately ensure compliance with the guidelines about dangerous and distracting items. Virtually every item that school officials have identified as being dangerous or distracting (guns, knives, cell phones, iPods, and lighters), as well as virtually every dangerous or distracting item that any plaintiff has ever brought to school (Leatherman multi-tools, nunchaku, and lighters), could be detected with a metal detector.  Such screening would be far less intrusive than the searches MRVSEC now employs -- and, quite possibly, would be more effective at detecting dangerous or distracting items.
>
> . . . .
>
> The search policy could be narrowed in other respects.  The policy could be changed so that illegal items that are found are not required to be turned over to law enforcement.  Students could be given the option of checking backpacks, purses, and coats with school officials at the beginning of the day in lieu of having those items searched. And more thorough searches could be reserved for students who set off a metal detector or otherwise give school officials some reason to suspect that they are carrying dangerous or disruptive items.  MRVSEC has submitted no evidence that these or other less intrusive alternatives would not adequately accomplish the purposes of the intrusive searches that MRVSEC now employs.

608 F. Supp. 2d at 1106-07.  Balancing these factors, the district court thus concluded that the policy of daily, suspicionless searches was not reasonable.  See 608 F. Supp. 2d at 1109.

In United States v. Hartwell, 436 F.3d 174 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit addressed a similar issue but in a non-school setting -- whether a search that a Transportation Security Administration ("TSA") agent conducted offended the

Fourth Amendment.  436 F.3d at 175.  On May 17, 2003, Hartwell arrived at the Philadelphia

International Airport.  See 436 F.3d at 175.  "He reached the security checkpoint, placed his hand

luggage on a conveyor belt to be x-rayed, and approached the metal detector.  Hartwell's luggage

was scanned without incident, but he set off the magnetometer when he walked through."  436

F.3d at 175.  Hartwell removed all items from his pockets and passed through the metal detector

again.  See 436 F.3d at 175.  A TSA agent took Hartwell aside after he passed through the metal

detector and used a handheld "wand-like magnetometer to discover what set off the metal

detector."  436 F.3d at 175.  The wand revealed a solid object in Hartwell's cargo pants pocket.

See 436 F.3d at 175-76.  The agent asked what the object was, but Hartwell did not respond.

See id. at 176.

> What occurred next is the subject of some dispute.  Hartwell claims that he
> was escorted to a private screening room near the checkpoint, where he refused
> Padua's repeated requests to reveal the contents of his pocket.  Frustrated by
> Hartwell's unresponsiveness, Padua eventually reached into Hartwell's pocket and
> pulled out a package of drugs.  He immediately called the Philadelphia police,
> who searched Hartwell, found two additional packages of drugs and about $3000
> in cash, and promptly arrested him.
>
> The government claims that neither Padua nor the police officer ever
> reached into Hartwell's pocket without his consent. According to Agent Padua,
> the following occurred.  After requesting private screening, Hartwell refused
> several requests to empty his pocket, nervously backed away from Agent Padua
> while he was being questioned, and suddenly dropped his pants.  This suspicious
> behavior prompted Padua to call for backup.  A police officer arrived and asked
> Hartwell to remove any items from his pocket, and Hartwell complied by handing
> over one package of drugs.  He then feigned falling to the floor and dropped a
> second package of drugs.

436 F.3d at 176.  The Third Circuit found that the administrative-search doctrine justified the

search at the airport checkpoint.    See 436 F.3d at 178.   The Third Circuit noted that

"[s]uspicionless checkpoint searches are permissible under the Fourth Amendment when a court

finds a favorable balance between the gravity of the public concerns served by the seizure, the

degree to which the seizure advances the public interest, and the severity of the interference with

individual liberty."  436 F.3d at 178-79 (quoting Illinois v. Lidster, 540 U.S. 419, 427 (2004);

Brown v. Texas, 443 U.S. 47, 51 (1979))(internal quotation marks omitted).  The Third Circuit

found that the airport checkpoint passed the test set forth in Brown v. Texas.

> First, there can be no doubt that preventing terrorist attacks on airplanes is of
> paramount importance.
>
> Second, airport checkpoints also "advance[] the public interest," as Brown
> requires. As this Court has held, "absent a search, there is no effective means of
> detecting which airline passengers are reasonably likely to hijack an airplane."
> Additionally, it is apparent that airport checkpoints have been effective.
>
> Third, the procedures involved in Hartwell's search were minimally
> intrusive.  They were well-tailored to protect personal privacy, escalating in
> invasiveness only after a lower level of screening disclosed a reason to conduct a
> more probing search.  The search began when Hartwell simply passed through a
> magnetometer and had his bag x-rayed, two screenings that involved no physical
> touching.  Only after Hartwell set off the metal detector was he screened with a
> wand -- yet another less intrusive substitute for a physical pat down.  And only
> after the wand detected something solid on his person, and after repeated requests
> that he produce the item, did the TSA agents (according to Hartwell) reach into
> his pocket.
>
> In addition to being tailored to protect personal privacy, other factors make
> airport screening procedures minimally intrusive in comparison to other kinds of
> searches.  Since every air passenger is subjected to a search, there is virtually no
> "stigma attached to being subjected to search at a known, designated airport
> search point."  Moreover, the possibility for abuse is minimized by the public
> nature of the search.  "Unlike searches conducted on dark and lonely streets at
> night where often the officer and the subject are the only witnesses, these searches
> are made under supervision and not far from the scrutiny of the traveling public."
> And the airlines themselves have a strong interest in protecting passengers from
> unnecessary annoyance and harassment.
>
> Lastly, the entire procedure is rendered less offensive -- if not less
> intrusive -- because air passengers are on notice that they will be searched.  Air
> passengers choose to fly, and screening procedures of this kind have existed in
> every airport in the country since at least 1974.  The events of September 11,

2001, have only increased their prominence in the public's consciousness. It is inconceivable that Hartwell was unaware that he had to be searched before he could board a plane.  Indeed, he admitted that he had previously been searched before flying.

In conclusion, Hartwell's search does not offend the Fourth Amendment even though it was initiated without individualized suspicion and was conducted without a warrant.  It is permissible under the administrative search doctrine because the State has an overwhelming interest in preserving air travel safety, and the procedure is tailored to advance that interest while proving to be only minimally invasive, as that term is understood in Brown.

436 F.3d at 179-81 (internal citations and footnotes omitted).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from

government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227

(1991)(per curiam)).   "If qualified immunity is to mean anything, it must mean that public

employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604

F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457

U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken

beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.

Saucier v. Katz, 533 U.S. at 205.  When a defendant asserts qualified immunity, the plaintiff must

demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights;

and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins

v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

**1.      Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a

qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court has recognized seven circumstances where district courts should

proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the violation question "may create a risk of bad decisionmaking" because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. at 2031-32.  See Kerns v. Bader, 663 F.3d at 1181.[134]  "Courts

---

[134]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation)

question.   And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.   The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."   663 F.3d at 1187 n.5.   On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.   A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.   See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).   In Mitchum v. Foster, the Supreme Court explained:

>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

> 407 U.S. at 238-39.   Congress did not say it would remedy only violations of "clearly established" law, but that

>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

- 206 -

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than

should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[135]  The Tenth

---

have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).

[135]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases. 131 S. Ct. at 2032. As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small." It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment. Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job. The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way. Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts. The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice. The justice system

Circuit will remand a case to the district court for further consideration when the district court

has given cursory treatment to the clearly established prong of the qualified immunity analysis.

See Kerns v. Bader, 663 F.3d at 1182.

─────────────────────

depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance. Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012). In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation. See 132 S. Ct. at 2092, 2097. In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 at 1660, 1668. In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error. See 132 S. Ct. at 1241, 1250. The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant. See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention. A trial judge can overwork a "large" case. It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

888 F. Supp. 2d at 1222 n.35.

## 2.      **Clearly Established Rights in the Qualified Immunity Analysis.**

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).   "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).   "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir.

2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit

explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. at 741.

## ANALYSIS

The Court will grant the MSJ as to the federal claims in part and deny it in part.  The Court concludes that the Plaintiffs' claims against ASI New Mexico include claims for the possession searches and the confiscation of personal property at the prom, and ASI New Mexico has not carried its summary judgment burden as to those claims.  As for the claim arising out of the searches of the Plaintiffs' persons, the Court concludes that summary judgment is appropriate.  ASI New Mexico is entitled both to Monell's rule against vicarious liability and to raise qualified immunity.  As a result, ASI New Mexico can be held liable only if it had a policy or practice that directly caused a violation of the Plaintiffs' clearly established constitutional rights.  ASI New Mexico had no such policy or practice.  As a result, summary judgment as to the claim arising out of the searches of the Plaintiffs' persons is appropriate.

I.     **THE PLAINTIFFS' CLAIMS AGAINST ASI NEW MEXICO INCLUDE CLAIMS FOR THE POSSESSION SEARCHES AND THE CONFISCATION OF PERSONAL PROPERTY AT THE PROM, AND ASI NEW MEXICO HAS NOT CARRIED ITS SUMMARY JUDGMENT BURDEN AS TO THOSE CLAIMS.**

At the outset, it is important to clarify what claims the Plaintiffs assert against ASI New Mexico.  ASI New Mexico drafted its MSJ on the apparent belief that the Plaintiffs' claims against it arise only from the searches of the Plaintiffs' persons, and not from the searches and confiscations of the Plaintiffs' possessions.  See MSJ ¶ 1, at 3 ("Plaintiffs' claims against ASI arise from pat-down searches that occurred at the April 16, 2011, Capital High School ('Capital High') prom.").  It is, undoubtedly, true that the gravamen of the Complaint is about the invasive manner of the Plaintiffs' searches.  Equally undoubtedly, however, the Complaint asserts claims against ASI New Mexico related to possession searches and confiscation.  The Complaint mentions ASI New Mexico several times in connection with possession searches.  For example:

> The Plaintiffs and other students attending the 2011 Capital High School Prom were embarrassed and humiliated by the offensive and degrading searches of their bodies and possessions by Santa Fe Public Schools staff and the ASI security guards working in concert with, and at the direction of, Santa Fe Public Schools staff.

> * * * *

> Candice was ordered to present her purse to be searched and was not given the option of declining the search. Candice did not know what items the Capital High School officials and ASI employees were looking for.

> All of the contents of Candice Herrera's purse were dumped onto the table and examined by Capital High School personnel. Principal Romero personally searched the contents of Candice's purse. A container of hand lotion and a manicure kit with a nail file and nail clippers were confiscated by Capital High School staff and removed from Candice's purse. Candice was also forced to remove the battery to her cell phone and the memory card from her digital camera for inspection.

> The Capital High School staff who searched Candice's bag also

confiscated the prescription medication Candice carried in her purse in a prescription bottle with her name on it. Candice had previously suffered bouts of dizziness and required the medication to prevent her from fainting.

Upon information and belief, the Capital High School employees who searched Candice's belongings performed the searches at the direction of Santa Fe Public Schools and/or Principal Romero.

Candice Herrera's medication was not returned to her after Prom. Instead, as Candice was leaving Prom she was informed by the school nurse that the medication had been discarded.

The other items confiscated from Candice were put in a box with other students' possessions and available for students to search through when they left the Prom.

* * * *

Instead of asking Ashley to remove her shoes, the [ASI New Mexico] guard crouched down and took off Ashley's shoes. This made Ashley feel uncomfortable and made her lose her balance. When searching Ashley's shoe, the security guard banged the shoe against the ground, leaving a permanent scratch.

Complaint ¶ 10, at 4; id. ¶¶ 48-53, at 11; id. ¶ 62, at 13 (paragraph numbers omitted from all).

The Plaintiffs cite Aguilar's testimony to support one of these allegations:

Q.   Was there a name on the bottle?   Do you know?

A.   Yes, sir.

Q.   What was the name on the bottle?

A.   It was Candice Herrera.

Q.   Was the prescription given back to her, the bottle, whatever it was?

A.   No, I was instructed to discard it.

Q.   Who told you to do that?

A.   Commander Archuleta.

Plaintiffs' Aguilar Depo. at 91:15-24.   The Plaintiffs characterize this statement as "describing being instructed by ASI Commander Archuleta to discard Plaintiff Candice Herrera's prescription medicine."   Response ¶ 1, at 2.   The Plaintiffs do not cite other testimony -- presumably because, although this testimony would be insufficient to withstand a motion for summary judgment had ASI New Mexico met its prima facie summary judgment burden as to any of the possession-search or confiscation claims, the testimony is sufficient to deny the asserted fact, which is that the Plaintiffs' claims against ASI New Mexico arise only from pat-down searches.

ASI New Mexico's response to this dispute is unsatisfactory.   It asserts:

> ASI did not search Plaintiffs' possessions or confiscate any of Plaintiffs' personal property.   SFPS personnel conducted possession searches and confiscated items while doing so.   Plaintiffs' assertion that ASI Commander Archuleta decided to discard a pill confiscated from C. Herrera is inaccurate. SFPS official, Susan Lujan, directed Commander Archuleta to discard the items in a bag containing the pill and Archuleta communicated that directive to Corporal Aguilar.   Archuleta's testimony indicates that Corporal Aguilar may have misunderstood Ms. Lujan's directive to include discarding the prescription pill. Any such misunderstanding would be negligence at best, which cannot support a § 1983 claim.

Reply ¶ 1, at 15 (citations omitted).   To support this narrative, ASI New Mexico attaches this portion of Archuleta's deposition -- to which the Court has added the final two questions and answers, for context:

> Q.   Do you know who was conducting the searches of possessions for the female students?

> **A.   I believe it was Ms. Romero.   I believe Sue Lujan was there.   And there was another female, but I don't remember who it was.   Oh, Dr. Clark.**

> Q.   Did you become aware at some point during the searches for the Capital High School prom that a bottle of prescription medicine had been found?

> **A.   Yes.**

Q.   And what do you recall about that?

**A.   It was found, and I know it was turned over to -- I don't know to whom it was turned over. I know it was turned over to a Public Schools official.**

Q.   Did you play any role in directing where that prescription medicine should be -- or what should be done with it?

**A.   No.**

Q.   Did you ever see the prescription bottle yourself?

**A.   I saw the bottle when they were holding it.**

Q.   But you weren't asked to give any direction about what should be done with it.

MR. TUCKER:  Object to form.

**A.   Not that I can remember, no.**

Q.   Do you know whose the prescription bottle was?

**A.   No.**

Q.   Even today, do you know?

**A.   I -- No.  I'm trying to think if they told me, but I don't remember I was told.**

Q.   And who, if anybody, that evening did you talk to about it, about the prescription bottle?

MR. TUCKER:  Object to form.

**A.   I knew Dr. Morgan was aware of it.  And the only reason I remember him being aware of it, because he was holding the contraband, stuff that we would find, in a baggie.  But that's all I remember. I mean, that's who I know for sure that I saw holding it or had it.**

MR. COLFAX:  Can I get that marked, please?

- 216 -

(Deposition Exhibit 6 was marked for identification.)

Q.   I've handed you what's been marked as Archuleta Exhibit 6.  It's an incident report dated April 16, 2011, from Corporal Aguilar.  And I'll give you a chance to review that if you'd like.  And I'll just let you know I'm going to focus more down toward the bottom of the discussion of the pill bottle.

**A.  Okay.**

Q.   So this -- Let me first just talk generally about it.  This incident report is an ASI form.  Correct?

**A.  Yes.**

Q.   Filled out typically by an ASI guard when there was some incident.  Is that right?

**A.  Yes.**

Q.   Okay.  And this one was filled out by Corporal Aguilar, who was lead security at the Capital High School prom.  You see down toward the end of this report, Corporal Aguilar states "Upon conduct a search on a female student Candice Herrera on her personal belonging (purse) --"

MR. COPPLER:  I'm sorry, I have to -- I just -- Can we go off the record?

MR. COLFAX:  Sure.

(A recess was taken from. 10:07 a.m. to 10:12 a.m.)

Q.   All right.  So continuing on with Corporal Aguilar's account, he goes on to say "Our guards found prescription pill bottle and her name on it.  It was confiscated and given to Commander.  Commander then notified Sue Lujan and was told to flush it down the toilet and the pill bottle discarded.  Commander then asked me to do it so I (Corporal Aguilar) discarded it."

First, when he references "Commander," that's you.··Right?

**A.  Yes.**

Q.   In reading Mr. Aguilar's account, does that refresh your recollection at all about what happened with the prescription pill bottle?

**A.  Yes.**

- 217 -

Q.  And do you, after reading this, agree with Corporal Aguilar's account?

**A.  To some extent, yes.**

Q.  What extent do you not agree with it?

**A. When he showed me the pill bottle, it was not just a pill bottle.  It was also the little baggie that I explained that Dr. Morgan was holding that we had Tylenol mixed in there, there was some Midols, some sinus pills and that in there.  So it was all in that baggie.  So when I told him to flush it, I meant the contents in the plastic, to flush that.**

**Now, the pill bottle at that point should have been given to Dr. Morgan, because we had said, "This has the student's name.  This has to go back."  So what I told him to flush was the contents in the plastic bag.**

Q.   And there's a reference to Sue Lujan in that account.  What role, if any, did she play in deciding what to do with the prescription medicine?

**A.  I don't know the banter between her and Mr. Aguilar.  I just know she was -- when the bottle was found, again, like I said, I saw it, it went to her.  Then I next saw it again, Dr. Morgan had it.  From that point on, I'm not sure what was discussed. But Sue Lujan turned to me and said, "Dump the stuff in the baggie --" or "Dump the stuff in the baggie, just flush it down, because we're not going to keep it."**

Q.   And so Ms. Lujan was the one who gave you the direction to dump the medications that were in the baggie.

**A.   Correct.**

Q.   And just so it's clear, the prescription pill bottle was separate from the baggie.

**A.   No, it was in the baggie.  At one point, it was removed and Dr. Morgan was holding it and getting the student's name.  That was when I told Mr. Aguilar to dump the contents in the baggie, so I assumed the pill bottle had stayed out.**

Q.   But from Corporal Aguilar's account, it appears it got --

**A.   It got dumped, yes.**

- 218 -

Deposition of Martin "Mark" Archuleta Volume 2 at 191:24-197:2 (taken January 30, 2014), filed April 4, 2014 (Doc. 200-2)(emphasis in original).  ASI New Mexico stuck to this theory throughout the Reply, never substantively arguing anything with respect to the possession-search/confiscation claims.  See Reply at 12 n.15 ("In responding to Plaintiffs' motion for partial summary judgment, ASI disputed that . . . any ASI security officers searched Plaintiffs' possessions because evidence establishes that those searches were conducted by SFPS personnel. . . .  [P]ossession searches are immaterial to Plaintiffs' unconstitutional search claim against ASI."); Reply at 13 n.16 ("Plaintiffs' references to  . . . possession searches in [a proposed undisputed fact] are immaterial to their 1983 claim against ASI.").

The troubles with this response are simple and several.  First, and most fundamentally, the Complaint says what it says; it is ASI New Mexico's burden at summary judgment to, taking the Plaintiffs' claims as pled, "show that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., 2013 WL 3462484, at *23 (quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d at 891).  See Celotex Corp. v. Catrett, 477 U.S. at 323.  ASI New Mexico, evidently believing that the Plaintiffs had not asserted any possession-search or confiscation claims against it, did not attempt to meet this burden in its MSJ.  Its attempt to salvage its summary judgment efforts in its Reply by arguing about one slice of testimony largely misses the point: given the claims the Plaintiffs have pleaded, ASI New Mexico bears the affirmative burden to demonstrate that no evidence supports the Plaintiffs' claims, and, having misapprehended the Complaint's claims, ASI New Mexico failed to carry that burden.

Even if the Court were to find that ASI New Mexico had carried its prima facie burden,

its response to the Plaintiffs' evidence is inadequate.  The Plaintiffs did not, as ASI New Mexico states, "assert[] that ASI Commander Archuleta decided to discard a pill confiscated from C. Herrera."  Reply ¶ 1, at 15.  The Plaintiffs assert, instead, that Archuleta instructed Aguilar to discard a bag containing that pill.  See Response ¶ 1, at 2.  Stating, as ASI New Mexico does, that Aguilar may have been mistaken is no answer.  Indeed, its answer expressly rests on Archuleta's disagreement with Aguilar's account of the event.  The Court must, at the summary judgment stage, view the facts in the light most favorable to the nonmovant, and Aguilar's narrative suggests that Archuleta -- even at Lujan's direction -- directed him to dispose of the bag containing the pill.

None of this is to say that ASI New Mexico is, in fact, liable for the possession searches or the confiscation.  ASI New Mexico could have raised much the same defenses to those claims. Having misapprehended the Complaint, however, ASI New Mexico did not meet its prima facie burden as to those claims that it overlooked.  Accordingly, the Court will deny the MSJ to the extent that it addresses the possession-search and confiscation dimensions of the Plaintiffs' § 1983 claim against ASI New Mexico.

## II.   THE COURT WILL GRANT SUMMARY JUDGMENT AS TO THE CONSTITUTIONAL CLAIMS FOR SEARCHES OF THE PLAINTIFFS' PERSONS, BECAUSE ASI NEW MEXICO ENJOYS QUALIFIED IMMUNITY FOR THAT PORTION OF THE SEARCHES FOR WHICH IT IS RESPONSIBLE -- THE SUSPICIONLESS NATURE.

The Court will grant the MSJ as to the constitutional claims for searches of the Plaintiffs' persons.  Under binding Tenth Circuit precedent, ASI New Mexico is entitled to both Monell's rule against vicarious liability and to the qualified-immunity defense.  Under Monell, ASI New Mexico is not responsible for the invasive nature of the searches, because no policy or practice

that ASI New Mexico had foreseeably led to those searches.  Qualified immunity immunizes ASI New Mexico for the suspicionless nature of the searches, because, although the searches violated the Plaintiffs' constitutional rights, those rights were not clearly established at the time of the search.  Accordingly, summary judgment is appropriate.

### A.   ASI NEW MEXICO IS A STATE ACTOR.

The Court concludes that ASI New Mexico is a state actor.  The substance of ASI New Mexico's argument is not so much that ASI New Mexico is not a state actor; it is, instead, that ASI New Mexico is not responsible for the decision-making phase of the state action that harmed the Plaintiffs.  That argument is, however, misplaced: whether ASI New Mexico was responsible for the decision-making phase of the state action that harmed the plaintiffs, although a factor in the analysis, does not change that ASI New Mexico freely engaged in this conduct, acting as Santa Fe Schools' right hand in conducting these searches, over a period of many years. Accordingly, although the Court grants the MSJ as to the constitutional claims, it does not grant the MSJ on the basis that ASI New Mexico is not a state actor.

ASI New Mexico's relationship with Santa Fe Public Schools satisfies the joint-action test.  The Tenth Circuit has explained the test as follows:

> "State action is . . . present if a private party is a 'willful participant in joint action with the State or its agents.'" [Gallagher v. "Neil Young Freedom Concert", 49 F.3d at 1453 (quoting Dennis v. Sparks, 449 U.S. [at 27].  The query is thus, "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights."  Id.  "[S]ome courts have adopted the requirements for establishing a conspiracy under Section 1983. These courts conclude that '[a] requirement of the joint action charge . . . is that both public and private actors share a common, unconstitutional goal.'"  See id., at 1454 (quoting Cunningham v. Southlake Ctr. for Mental Health, Inc., 924 F.2d 106, 107 (7th Cir. 1991)).

Anaya v. Crossroads Managed Care Systems, Inc., 195 F.3d at 596.  The case satisfies this

standard.  ASI New Mexico's agents both figuratively and literally stood side-by-side Santa Fe

Schools officials conducting searches like those at issue in this case for years.  ASI New

Mexico's agents conducted these searches pursuant to Santa Fe Schools' directives.  Moreover,

ASI New Mexico trained and educated school officials on various security measures.  ASI New

Mexico was, in essence, Santa Fe Schools' right hand in conducting searches before proms.

Accordingly, Santa Fe Schools and ASI New Mexico "acted in concert in effecting a particular

deprivation of constitutional rights."  Dennis v. Sparks, 449 U.S. at 27.

ASI New Mexico's relationship with Santa Fe Public Schools also satisfies the nexus test.

That test asks whether the Santa Fe Public Schools "has provided such significant

encouragement, either overt or covert, that the choice must in law be deemed to be that of the

State."  Blum v. Yaretsky, 457 U.S. at 993.  Again, Santa Fe Schools gave sufficient overt

encouragement and engaged ASI New Mexico in a contract to carry out the service. [136]

---

[136]The Court substantially agrees with the Plaintiffs' treatment of Sigmon v. CommunityCare HMO, Inc.: that case deals with the conspiracy line of cases and not with the more apposite substantial-degree-of-cooperative-action cases.  Moreover, the case is factually distinct, for the reasons that the Plaintiffs explain:

> [T]he state actor rather than the private actor actually carried out the allegedly unconstitutional act. Tulsa made the decision to terminate plaintiff and actually carried out the termination.  Accordingly, in that case, the plaintiff was required to show that the private actor somehow influenced the challenged conduct, but failed to do so because there was no evidence that any CommunityCare action caused Tulsa's determination to terminate. Here, of course, the private actor (ASI) carried out the unconstitutional pat-downs and, as a result, to show state action Plaintiff need only show that the state actor (SFPS) directed or influenced the decision to conduct the pat-downs, which is undisputed.

Response at 26.  Further, the Plaintiffs also are correct with respect to Montoya v. Espanola Public School District: that case essentially involved private security guards standing nearby while state actors deprived the plaintiff of her rights.  See generally Montoya v. Espanola Pub. Sch. Dist., No. CIV 10-0651 WJ/LFJ, Memorandum Opinion and Order at 14 (Doc. 324).  The

ASI New Mexico's contrary argument that it was not involved in deciding whether to search all students at school dances is, although not irrelevant, only one factor in the state-action analysis -- a factor that two other factors outweigh: (i) the longstanding  nature of its relationship with Santa Fe Schools, by which ASI New Mexico was intimately involved with Santa Fe Schools' security procedures, and (ii) that ASI New Mexico's agents carried out the pat-downs at issue.  That ASI New Mexico did not influence the initial decision to pat-down search all prom attendees, although persuasive as a causation argument, does not change the Court's state-action conclusion.  Accordingly, the Court concludes that ASI New Mexico was a state actor.

## B.    ASI NEW MEXICO IS ENTITLED BOTH TO MONELL'S RULE AGAINST VICARIOUS LIABILITY AND TO QUALIFIED IMMUNITY.

Under binding Tenth Circuit precedent, ASI New Mexico is entitled both to Monell's rule against vicarious liability and to the qualified-immunity defense.  As the Plaintiffs point out, this regime doubly insulates private corporations from liability, in a manner other defendants do not enjoy.  That said, cases from the Supreme Court and the Tenth Circuit mandate this result. Moreover, on close examination of the logic behind Monell and qualified immunity, the initial instinct that this regime unfairly burdens plaintiffs is unfounded.

First, it is important to iron out the appropriate nomenclature in this area: properly understood, Monell is not a "defense," but an element of the Plaintiffs' claims.   As the Honorable Frank Easterbrook, Judge for the United States Court of Appeals for the Seventh Circuit, has explained,

> Monell does not create a "defense".  It identifies an element of a plaintiff's claim, so the burden is on the plaintiff to demonstrate the essential policy or custom.

---

relationship between ASI New Mexico and Santa Fe Schools is much closer than the relationships involved in Montoya v. Espanola Public School District.

> See, e.g., Board of County Commissioners v. Brown, 520 U.S. 397,
> 403 . . . (1997)("[I]n Monell and subsequent cases, we have required *a plaintiff*
> seeking to impose liability on a municipality . . . to identify a municipal 'policy'
> or 'custom' that caused the plaintiff's injury.")(emphasis added).

Smith v. Chicago School Reform Bd. of Trustees, 165 F.3d 1142, 1149 (7th Cir. 1999).  To put

an even finer point on the issue, the Monell standard springs from the Supreme Court's reading

of § 1983's causation standard:

> We begin with the language of § 1983 as originally passed:
>
>> "*[A]ny person who,* under color of any law, statute, ordinance, regulation,
>> custom, or usage of any State, *shall subject, or cause to be subjected,* any
>> person . . . to the deprivation of any rights, privileges, or immunities
>> secured by the Constitution of the United States, shall, any such law,
>> statute, ordinance, regulation, custom, or usage of the State to the contrary
>> notwithstanding, be liable to the party injured in any action at law, suit in
>> equity, or other proper proceeding for redress . . . ."
>
> 17 Stat. 13. (emphasis added).
>
>> The italicized language plainly imposes liability on a government that,
>> under color of some official policy, "causes" an employee to violate another's
>> constitutional rights.  At the same time, that language cannot be easily read to
>> impose liability vicariously on governing bodies solely on the basis of the
>> existence of an employer-employee relationship with a tortfeasor.  Indeed, the fact
>> that Congress did specifically provide that A's tort became B's liability if B
>> "caused" A to subject another to a tort suggests that Congress did not intend
>> § 1983 liability to attach where such causation was absent.

Monell, 463 U.S. at 691-92.  It is true that the Tenth Circuit has -- once, in a footnote -- referred

to Monell as a defense:

> We do not address the issue of Harlow immunity with respect to Chief Munger or
> the City's liability under Monell with respect to these claims because neither
> defendant raised these defenses below or on appeal, and thus we lack the
> necessary facts.  We leave these determinations to the trial court on remand.

Flanagan v. Munger, 890 F.3d 1559, 1572 n.20 (10th Cir. 1989).  One cannot, however, square

this single offhand reference to Monell as a defense with the Supreme Court's later guidance

- 224 -

that, "in Monell and subsequent cases, we have required *a plaintiff* seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."   Board of County Commissioners v. Brown, 520 U.S. at 403 (emphasis added).   Properly understood, then, Monell's rule against vicarious liability is not a "defense", but the standard a plaintiff must meet to prove that a municipality subjected him or her to a deprivation of federal legal rights or caused such a deprivation.   In other words, Monell explains the causation standard that a plaintiff suing a municipality must prove as part of his or her case-in-chief.[137]

That clarification deflates the argument that, by applying both Monell and qualified immunity to a private corporation, that private corporation enjoys more "defenses" than other defendants enjoy.   Monell and qualified immunity occupy different analytical space: Monell is a fact-based causation standard, and qualified immunity is a legal defense.   It is true, in a practical sense, that these two doctrines make recovery in § 1983 suits against private corporations difficult.   That difficulty is not, however, a reason not to apply both standards.   Monell simply articulates the burden of proof that a plaintiff must satisfy: before a plaintiff may take money from an entity's pockets -- rather than, for example, from that entity's individual employee -- the plaintiff must hurdle both Monell's factual barrier, by proving that the entity caused the deprivation of his or her federal rights, and qualified immunity's legal barrier, by proving that the entity thereby violated clearly established law.   See DeVargas v. Mason & Hanger-Silas Mason

_____

[137]Several circuits have held that municipalities may waive Monell's requirements.   See, e.g., Kinnison v. City of San Antonio, 580 F. App'x 271, 275-76 (5th Cir. 2012)(collecting cases).   The Court agrees that a municipality may concede causation in any given case and that it may waive a Monell argument for appellate purposes by failing to raise it in a trial court.   Even still, however, properly applied, Monell and its progeny require a plaintiff to affirmatively prove that a municipal policy or custom caused his or her injury.

Co., Inc., 844 F3d at 722-23 (allowing a private corporation to rely on both Monell and qualified

immunity).

Having clarified the applicable language, the Court turns first to the point no party

disputes: Monell applies to corporations, including ASI New Mexico. Despite the Court's initial

puzzlement in the hearing, it is clear under Tenth Circuit law, and has been for decades, that

Monell's rule against vicarious liability applies to private corporations:

> Although the Supreme Court's interpretation of § 1983 in Monell applied
> to municipal governments and not to private entities acting under color of state
> law, caselaw from this and other circuits has extended the Monell doctrine to
> private § 1983 defendants. Dickerson v. Leavitt Rentals, 995 F. Supp. 1242, 1247
> (D. Kan. 1998), aff'd. 153 F.3d 726 (10th Cir. 1998), cert. denied, 525 U.S.
> 1110 . . . (1999); DeVargas v. Mason & Hanger–Silas Mason Co., Inc., 844 F.2d
> 714, 722-23 (10th Cir.1988); see also Jackson v. Illinois Medi-Car Inc., 300 F.3d
> 760, 766 (7th Cir. 2002); Burke v. North Dakota Dep't of Corr. & Rehab., 294
> F.3d 1043, 1044 (8th Cir. 2002); Austin v. Paramount Parks, Inc., 195 F.3d 715,
> 729 (4th Cir. 1999); Harvey v. Harvey, 949 F.2d 1127, 1129–30 (11th Cir. 1992);
> Rojas v. Alexander's Dep't Store, 924 F.2d 406, 408-09 (2d Cir. 1990).
> Therefore, a private actor "cannot be held liable *solely* because it employs a
> tortfeasor -- or, in other words . . . cannot be held liable under § 1983 on a
> *respondeat superior* theory." Monell, 436 U.S. at 691 . . . .

Dubbs v. Head Start, Inc., 336 F.3d at 1216 (footnote omitted). The Plaintiffs evidently concede

as much, both in the briefing and during the hearing:

> Plaintiffs . . . do not seek to find ASI liable for its employee's violations of § 1983
> under a respondeat superior theory. Plaintiffs' argument for finding ASI liable for
> the acts of Ms. Reyes is consistent with the Tenth Circuit's finding that a private
> entity engaged in state action can be held liable under standards established in
> *Monell*.

Response at 48. See Tr. at 52:13-18 (Colfax)("[A Monell] defense makes sense, because a

private corporation is acting -- when it's acting as a state actor, it's acting very much like a

governmental entity that can raise a custom and practice policy defense under [Monell].).

There is a fair question whether this is a wise rule. The Honorable David Frank

Hamilton, Circuit Judge for the United States Court of Appeals for the Seventh Circuit, in an opinion which the Honorable Richard A. Posner, Circuit Judge for the United States Court of Appeals for the Seventh Circuit, joined, criticized this rule at length, noting that, in his view, Monell's rule against vicarious liability incorrectly reads history, and stating that, in his view, the consensus among the federal courts of appeals extending Monell's rule to private corporations was an error.   See Shields v. Illinois Dep't of Corrections, 746 F.3d 790-92 (7th Cir. 2014)("Congress . . . enacted § 1983 against the backdrop of *respondeat superior* liability and presumably assumed that courts would apply it in claims against corporations under § 1983."). The Court agrees.  Whatever the merits of this argument, however, Tenth Circuit precedent binds the Court on this point.

The central dispute in deciding this MSJ is whether ASI New Mexico, may also assert a qualified immunity defense.  ASI New Mexico cites multiple published Tenth Circuit cases that suggest as much.  See MSJ at 31 (citing, e..g, DeVargas v. Mason & Hanger-Silas Mason Co., 844 F.2d; Warner v. Grant Cnty., 57 F.3d).  The Plaintiffs do not attempt to distinguish these cases, instead raising essentially three arguments against allowing ASI New Mexico to raise a qualified immunity defense: (i) Richardson v. McKnight and Filarsky v. Delia, which the Supreme Court "decided after the Tenth Circuit decided Warner v. Grand County and DeVargas v. Mason & Hanger-Silas Mason Co., compel[] the conclusion that a private corporation like ASI, which has a contract to perform a major, lengthy task for a government agency, should not be entitled to raise qualified immunity," Response at 32; (ii) "the particular circumstances presented in this case," Response at 32 -- presumably, perceived similarities between this case and Richardson v. McKnight -- and (iii) "the incoherence of applying Monell and qualified

immunity protections to a corporation like ASI," Response at 32.

For substantially the reasons that ASI New Mexico raises in its Reply, see Reply at 34-35, the Court disagrees with each argument.  Neither Richardson v. McKnight nor Filarsky v. Delia vitiates on-point Tenth Circuit precedent.  Although the facts of this case are logically intermediate between Richardson v. McKnight and DeVargas v. Mason & Hanger-Silas Mason Co., given what the Supreme Court and the Tenth Circuit have recognized as the limited reach of Richardson v. McKnight, qualified immunity is appropriate.  Finally, as the Court has explained, there is nothing incoherent about applying both Monell's causation standard and qualified immunity's legal defense to a corporation like ASI New Mexico.

First: before Richardson v. McKnight, it would have been relatively clear under Tenth Circuit law that ASI New Mexico was entitled to raise qualified immunity.  The Tenth Circuit held "that a private individual who performs a government function pursuant to a state order or request is entitled to qualified immunity if a state official would have been entitled to such immunity had he performed the function himself."   Warner v. Grand Cnty., 57 F.3d at 967. Moreover, the mere fact that ASI New Mexico is a corporation does not prevent it from asserting qualified immunity.  See Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc., 413 F.3d at 1166 ("Under DeVargas, then, the fact that Sunflower is a corporation does not preclude it from arguing that it is entitled to assert qualified immunity.  We therefore hold that there is no bar against a private corporation claiming qualified immunity.").   The Plaintiffs, implicitly recognizing the difficulties that DeVargas v. Mason & Hanger-Silas Mason Co. and Warner v. Grand County present to their claims, argue that, after Richardson v. McKnight, those cases are no longer good law.

Tenth Circuit's reading of Richardson v. McKnight in Rosewood Services, Inc. v. Sunflower Diversified Services, Inc., substantially weakens the Plaintiffs' argument.  The Tenth Circuit in Rosewood Services, Inc. v. Sunflower Diversified Services, Inc. describes Richardson v. McKnight's facts and the limits of its holding:

> In Richardson, the Supreme Court held that prison guards at a private, for-profit prison could not assert qualified immunity.  The Court held that a private individual is only entitled to qualified immunity if a claim of immunity is supported by historical practice or based on public policy considerations.  Id. at 403–04 . . . .  In discussing the policy considerations, the Court recognized three purposes served by qualified immunity.  First , by reducing the threat of litigation, qualified immunity "protect[s] the public from unwarranted timidity on the part of public officials."  Id. at 408 . . . .  Second, qualified immunity helps "'to ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service.'"  Id. (quoting Wyatt v. Cole, 504 U.S. [at 167]).  Third, qualified immunity reduces the chance that lawsuits will distract officials from their governmental duties.  Id.  The Court determined that these considerations did not weigh in favor of permitting private prison guards to assert qualified immunity, and because there was no historical evidence that private prison guards were granted immunity, the Richardson Court refused to allow the defendants to claim qualified immunity.  Id. at 412 . . . .

> After concluding that the defendants could not claim qualified immunity, the Court narrowed the scope of its holding.  Id. at 413.  It noted that Richardson arose in the context where "a private firm, systematically organized to assume a major lengthy task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms."  Id.  The Court then clarified that Richardson "does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision."  Id.

> In light of this substantial-supervision caveat, the courts of appeals have allowed private individuals to assert qualified immunity when the defendants were closely supervised by the government.  See, e.g., Bartell v. Lohiser, 215 F.3d 550, 557 (6th Cir. 2000).  Similarly here, the Defendants argue that they should be allowed to assert qualified immunity because they are closely supervised by SRS.  Consequently, Richardson is distinguishable, the Defendants argue, and qualified immunity may be asserted.

> This may be true. [The private non-profit organization defendants] may be

entitled to qualified immunity based on the oversight they receive from [the state]. This case, however, does not present an opportunity to decide this issue because the Defendants failed to raise this argument below. Indeed, the District Court recognized the limited nature of <u>Richardson</u>'s holding, but noted that the Defendants in this case "do not attempt to explain how this case falls outside the realm of <u>Richardson</u>." <u>Rosewood Servs.</u>, 2003 WL 22090897 at *23 n. 7. Because this "substantial supervision" argument was not made below, it is waived on appeal. <u>See</u> <u>Cummings v. Norton</u>, 393 F.3d 1186, 1190–91 (10th Cir. 2005).

Therefore, the Defendant's sole argument on appeal is that policy considerations warrant permitting them to assert qualified immunity.

<u>Rosewood Services, Inc. v. Sunflower Diversified Services, Inc.</u>, 413 F.3d at 1166-67. In light of this waiver, the Tenth Circuit went on to hold that, because Sunflower Diversified was subject to competitive market pressures, it was not entitled to qualified immunity. <u>See</u> 413 F.3d at 1168-69.

In <u>Filarsky v. Delia</u>, the Supreme Court recognized <u>Richardson v. McKnight</u>'s limited reach. In that case, a subject of a workplace investigation sued an attorney whom a city had hired to represent it in that workplace investigation. <u>See</u> 132 S.Ct. at 1660. The attorney raised qualified immunity. The United States Court of Appeals for the Ninth Circuit held that he was not entitled to qualified immunity, "because he was a private attorney and not a City employee." 132 S. Ct. at 1661. Because this decision conflicted with a decision from the United States Court of Appeals for the Sixth Circuit, the Supreme Court granted a petition for certorari. <u>See</u> 132 S.Ct. at 1661. Chief Justice John G. Roberts, Jr., writing for a unanimous Court, discussed at some length the history of private individuals' involvement in carrying out government functions, concluding that "the common law did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities." 132 S.Ct. at 1661-64. Further, after reviewing history related to individuals "engaged in public service on a temporary or occasional basis," Chief Justice Roberts

concluded that "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis." 132 S.Ct. at 1665.

Chief Justice Roberts then explained why the purposes of government immunity did not require a different result:

Nothing about the reasons we have given for recognizing immunity under § 1983 counsels against carrying forward the common law rule.  As we have explained, such immunity "protect[s] government's ability to perform its traditional functions." Wyatt v. Cole, 504 U.S. 158 [at 167].  It does so by helping to avoid "unwarranted timidity" in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits.  Richardson v. McKnight, 521 U.S. [at 409–411].

We have called the government interest in avoiding "unwarranted timidity" on the part of those engaged in the public's business "the most important special government immunity-producing concern."  Id. at 409 . . . .  Ensuring that those who serve the government do so "with the decisiveness and the judgment required by the public good," Scheuer v. Rhodes, 416 U.S. 232, 240 . . . (1974), is of vital importance regardless whether the individual sued as a state actor works full-time or on some other basis.

Affording immunity not only to public employees but also to others acting on behalf of the government similarly serves to "'ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service.'" Richardson, supra, at 408 . . . (quoting Wyatt, supra, at 167 . . . ).  The government's need to attract talented individuals is not limited to full-time public employees. Indeed, it is often when there is a particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals. This case is a good example: Filarsky had 29 years of specialized experience as an attorney in labor, employment, and personnel matters, with particular expertise in conducting internal affairs investigations. App. to Pet. for Cert. 59, 89; App. 156. The City of Rialto certainly had no permanent employee with anything approaching those qualifications. To the extent such private individuals do not depend on the government for their livelihood, they have freedom to select other work -- work that will not expose them to liability for government actions. This makes it more likely that the most talented candidates will decline public engagements if they do not receive the same immunity enjoyed by their public employee counterparts.

Sometimes, as in this case, private individuals will work in close coordination with public employees, and face threatened legal action for the same conduct. See App. 134 (Delia's lawyer: "everybody is going to get named" in threatened suit). Because government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag -- facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity. Under such circumstances, any private individual with a choice might think twice before accepting a government assignment.

The public interest in ensuring performance of government duties free from the distractions that can accompany even routine lawsuits is also implicated when individuals other than permanent government employees discharge these duties.  See Richardson, supra, at 411 . . . .   Not only will such individuals' performance of any ongoing government responsibilities suffer from the distraction of lawsuits, but such distractions will also often affect any public employees with whom they work by embroiling those employees in litigation. This case is again a good example: If the suit against Filarsky moves forward, it is highly likely that Chief Wells, Bekker, and Peel will all be required to testify, given their roles in the dispute.  Allowing suit under § 1983 against private individuals assisting the government will substantially undermine an important reason immunity is accorded public employees in the first place.

Distinguishing among those who carry out the public's business based on the nature of their particular relationship with the government also creates significant line-drawing problems.  It is unclear, for example, how Filarsky would be categorized if he regularly spent half his time working for the City, or worked exclusively on one City project for an entire year. See Tr. of Oral Arg. 34–36. Such questions deprive state actors of the ability to "reasonably anticipate when their conduct may give rise to liability for damages," Anderson v. Creighton, 483 U.S. 635, 646 . . . (1987)(alteration and internal quotation marks omitted), frustrating the purposes immunity is meant to serve.  An uncertain immunity is little better than no immunity at all.

132 S.Ct. at 1665-66.

Chief Justice Roberts also explained that neither Wyatt v. Cole nor Richardson v. McKnight mandated a different result.  See Filarsky v. Delia, 132 S.Ct. at 1666.

Our decisions in Wyatt v. Cole . . .  and Richardson v. McKnight . . . are not to the contrary.  In Wyatt, we held that individuals who used a state replevin law to compel the local sheriff to seize disputed property from a former business partner were not entitled to seek qualified immunity.  Cf. Lugar, 457 U.S.

922 . . . (holding that an individual who uses a state replevin, garnishment, or attachment statute later declared to be unconstitutional acts under color of state law for purposes of § 1983).  We explained that the reasons underlying recognition of qualified immunity did not support its extension to individuals who had no connection to government and pursued purely private ends.  Because such individuals "hold no office requiring them to exercise discretion; nor are they principally concerned with enhancing the public good," we concluded that extending immunity to them would "have no bearing on whether public officials are able to act forcefully and decisively in their jobs or on whether qualified applicants enter public service." 504 U.S., at 168 . . . .

Wyatt is plainly not implicated by the circumstances of this case. Unlike the defendants in Wyatt, who were using the mechanisms of government to achieve their own ends, individuals working for the government in pursuit of government objectives are "principally concerned with enhancing the public good." Ibid.  Whether such individuals have assurance that they will be able to seek protection if sued under § 1983 directly affects the government's ability to achieve its objectives through their public service.  Put simply, Wyatt involved no government agents, no government interests, and no government need for immunity.

In Richardson, we considered whether guards employed by a privately run prison facility could seek the protection of qualified immunity. Although the Court had previously determined that public-employee prison guards were entitled to qualified immunity, see Procunier v. Navarette, 434 U.S. 555 . . . (1978), it determined that prison guards employed by a private company and working in a privately run prison facility did not enjoy the same protection. We explained that the various incentives characteristic of the private market in that case ensured that the guards would not perform their public duties with unwarranted timidity or be deterred from entering that line of work. 521 U.S., at 410–411 . . . .

Richardson was a self-consciously "narrow[ ]" decision.  Id., at 413 . . . ("[W]e have answered the immunity question narrowly, in the context in which it arose").  The Court made clear that its holding was not meant to foreclose all claims of immunity by private individuals.  Ibid.  Instead, the Court emphasized that the particular circumstances of that case -- "a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms" -- combined sufficiently to mitigate the concerns underlying recognition of governmental immunity under § 1983.  Ibid.  Nothing of the sort is involved here, or in the typical case of an individual hired by the government to assist in carrying out its work.

- 233 -

Filarsky v. Delia, 132 S.Ct. at 1666-67.

The Honorable Sonia M. Sotomayor, Associate Justice of the Supreme Court, concurred in the Court's opinion, and added as follows:

The Court of Appeals denied qualified immunity to Filarsky solely because, as retained outside counsel, he was not a formal employee of the City of Rialto. I agree with and join today's opinion holding that this distinction is not a sound basis on which to deny immunity.

I add only that it does not follow that *every* private individual who works for the government in some capacity necessarily may claim qualified immunity when sued under 42 U.S.C. § 1983. Such individuals must satisfy our usual test for conferring immunity. As the Court explains, that test "look[s] to the 'general principles of tort immunities and defenses' applicable at common law, and the reasons we have afforded protection from suit under § 1983." Ante, at 1662 (quoting Imbler v. Pachtman, 424 U.S. 409, 418 . . . (1976)).

Thus in Richardson v. McKnight, 521 U.S. 399 . . . (1997), we denied qualified immunity to prison guards who were privately employed, despite their quintessentially public function. We did so because we found "no special reasons significantly favoring an extension of governmental immunity" in that context. Id., at 412 . . . . We left open, however, the question whether immunity would be appropriate for "a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." Id., at 413 . . . .

Filarsky, supported by the United States as *amicus curiae,* contends that he fits into this coda because he worked in close coordination with and under the supervision of City employees. Whether Filarsky was supervised by those employees, and did not himself do the supervising, is unclear. But there is no doubt that Filarsky worked alongside the employees in investigating Delia. In such circumstances, I agree that Filarsky should be allowed to claim qualified immunity from a § 1983 suit. As the Court's opinion persuasively explains, there is a " 'firmly rooted' tradition of immunity" applicable to individuals who perform government work in capacities other than as formal employees. Id., at 404 . . . ; see *ante,* at 1662-1665. And conferring qualified immunity on individuals like Filarsky helps "protec[t] government's ability to perform its traditional functions," and thereby helps "protect the public at large." Wyatt v. Cole, 504 U.S. 158, 167-168 . . . (1992). When a private individual works closely with immune government employees, there is a real risk that the individual will be intimidated from performing his duties fully if he, and he alone, may bear the

- 234 -

price of liability for collective conduct.  See *ante*, at 1665–1666; see also *ante,* at 1666 (noting distraction caused to immune public employees by § 1983 litigation brought against nonimmune associates).

This does not mean that a private individual may assert qualified immunity *only* when working in close coordination with government employees. For example, Richardson's suggestion that immunity is also appropriate for individuals "serving as an adjunct to government in an essential governmental activity," 521 U.S., at 413 . . . , would seem to encompass modern-day special prosecutors and comparable individuals hired for their independence. There may yet be other circumstances in which immunity is warranted for private actors. The point is simply that such cases should be decided as they arise, as is our longstanding practice in the field of immunity law.

Filarsky v. Delia, 132 S.Ct. at 1669-70 (Sotomayor, J., concurring)(emphasis in original).[138]

Particularly in light of Filarsky v. Delia and Rosewood Services, Inc. v. Sunflower Diversified Services, Inc., Richardson v. McKnight's rule applies only where all of the following circumstances are present: "private firm [is] systematically organized to assume a major lengthy administrative task . . . with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms." Filarsky v. Delia, 132 S.Ct. at 1667 (quoting Richardson v. McKnight, 521 U.S. at 413).  Moreover, it expressly left open the question whether immunity is appropriate for a private individual -- or, it would seem, an entity -- acting under close official supervision.  See 521 U.S. at 413.  In practice, Richardson v. McKnight may be limited to situations where the government privatizes an entire function -- as Tennessee did with its prison system in Richardson v. McKnight.[139]

---

[138]The Honorable Ruth Bader Ginsburg, Associate Justice of the Supreme Court, also concurred.  See Filarsky v. Delia, 132 S.Ct. at 1668-69 (Ginsburg, J., concurring).  The concurrence discussed issues irrelevant to this Memorandum Opinion and Order.

[139]The Court's composition has changed.  Richardson v. McKnight was a five-to-four decision.  Associate Justice Stephen Breyer wrote the majority, which Associate Justices John Paul Stevens, Sandra Day O'Connor, David Souter, and Ruth Bader Ginsburg joined.  Associate

This case does not present those anything of that scale.  ASI New Mexico was not systematically organized[140] to assume the task of providing security for Santa Fe Public Schools -- it, instead, was hired to provide security subject to Santa Fe Public Schools' direction and alongside its personnel.  Richardson v. McKnight does not, accordingly, eliminate ASI New Mexico's entitlement to raise qualified immunity.

The Plaintiffs' policy arguments also fail.  The Plaintiffs' contention that competitive market pressures will be sufficient to prevent ASI New Mexico from being too timid fails: given that ASI New Mexico works closely alongside immune government employees -- like Romero -- the notion that it alone will bear full liability for conduct that both government employees and ASI New Mexico employees jointly cause risks intimidating ASI New Mexico from performing its functions to the full extent.  Given the importance of ensuring that children are safe at school events, that risk is unacceptably high.  See Filarsky v. Delia, 132 S.Ct. at 1670 (Sotomayor, J., concurring)("When a private individual works closely with immune government employees, there is a real risk that the individual will be intimidated from performing his duties fully if he, and he alone, may bear the price of liability for collective conduct.").  The second factor, ensuring that the threat of damages suits does not deter talented candidates from entering public service, also cuts in ASI New Mexico's favor.  It is true that the parties' contract required that

---

Justice Antonin Scalia wrote the dissenting opinion, which Chief Justice William Rehnquist, and Associate Justices Anthony Kennedy and Clarence Thomas, joined.  Three members of the Richardson v. McKnight majority have left the Court -- and both remaining members, Justices Breyer and Ginsburg, joined the majority opinion in Filarsky v. Delia, which recognized Richardson v. McKnight's limitations, in full.

[140]Although this fact does not appear in the undisputed facts, the Plaintiffs assert that ASI New Mexico has "over $2 million in revenue and over fifty clients."  Response at 31.  A corporation that has fifty clients is unlikely to have been systematically organized to assume a major lengthy administrative task with limited direct government supervision.

ASI New Mexico maintain general liability insurance.   That factor is persuasive in the full-privatization context:

> Second, "privatization" helps to meet the immunity-related need "to ensure that talented candidates" are "not deterred by the threat of damages suits from entering public service."   It does so in part because of the comprehensive insurance-coverage requirements just mentioned. The insurance increases the likelihood of employee indemnification and to that extent reduces the employment-discouraging fear of unwarranted liability potential applicants face. Because privatization law also frees the private prison-management firm from many civil service law restraints, Tenn. Code Ann. § 41-24-111 (1990), it permits the private firm, unlike a government department, to offset any increased employee liability risk with higher pay or extra benefits. In respect to this second government-immunity-related purpose then, it is difficult to find a *special* need for immunity, for the guards' employer can operate like other private firms; it need not operate like a typical government department.

Richardson v. McKnight, 521 U.S. at 511 (selected citations omitted).   Here, however, the dynamics of the market differ:  as in Filarsky v. Delia, there is no evidence that Santa Fe Schools had any permanent employee with ASI New Mexico's qualifications and resources in security. Because ASI New Mexico does not appear to depend on the government for its economic livelihood -- as a company running one fully privatized government function does -- it has the freedom to select work that will not expose it to liability for government actions, which makes more likely that it "will decline public engagements if [its employees] do not receive the same immunity enjoyed by their public employee counterparts."  Filarsky v. Delia, 132 S.Ct. at 1666.

Extending qualified immunity to ASI New Mexico also serves the third and final justification for immunity -- "[t]he public interest in ensuring performance of government duties free from the distractions that can accompany even routine lawsuits."  132 S.Ct. at 1666.  It is quite clear that threats of lawsuits like this one distract ASI New Mexico from its main duties. This third factor also cuts in favor of extending qualified immunity to ASI New Mexico.

Accordingly, because ASI New Mexico acted under close official supervision, thereby distinguishing it from the defendant in Richardson v. McKnight, the Court will permit ASI New Mexico to assert a qualified immunity defense.

### C.   ASI NEW MEXICO IS ENTITLED TO QUALIFIED IMMUNITY, BECAUSE THE ONLY CONDUCT FOR WHICH IT MAY BE HELD ACCOUNTABLE -- THE SUSPICIONLESS NATURE OF THE SEARCHES -- DID NOT VIOLATE CLEARLY ESTABLISHED LAW.

The Court will grant the MSJ as to the constitutional claims.  Taking together the operation of Monell and qualified immunity, ASI New Mexico is accountable under § 1983 only for the searches' suspicionless nature, and not for the invasive nature of the searches. Accordingly, ASI New Mexico enjoys qualified immunity.

It is important first to identify the conduct for which ASI New Mexico may fairly be held liable.  It is not the case, as the Plaintiffs suggest, that ASI New Mexico is on the hook for every action by its employees.  Rather, because ASI New Mexico is entitled to Monell's rule against vicarious liability, it is on the hook for its employees' actions only if they foreseeably flowed from a company policy or procedure.

For substantially the reasons the Court more fully explained in its previous Sealed Memorandum Opinion and Order dealing with the SFPS Defendants, no official ASI New Mexico policy that existed foreseeably caused the invasive searches of which the Plaintiffs complain.  The best that the Plaintiffs can do to identify a policy is to point to the Pat-Down Guidelines and to the fact that Johnson did not discipline Reyes.  Even assuming, without deciding, that these actions are sufficient to create a policy for Monell purposes, the most of which ASI New Mexico could be accused is having a policy of suspicionless searches and a policy of having students manipulate their bras.  It is a considerable leap, however, from such

facts to the notion that an ASI New Mexico officer should <u>themselves</u> touch the Plaintiffs' breasts or their inner thighs -- and an even greater leap to contend that ASI New Mexico should have foreseen that its alleged practices would lead to ASI New Mexico officers touching the Plaintiffs' breasts or inner thighs.

Moreover, for the reasons that the Court more fully explained in Romero MOO, which disposed of the claims against Romero, the suspicionless-search practice, standing alone, did not violate clearly established law.  The Court will not rehash its analysis here, but will point the parties to its Memorandum Opinion and Order and incorporate its reasoning on this issue by reference.  <u>See</u> Romero MOO at 2 ("The Court concludes . . . that the Plaintiffs' right to be free from these suspicionless  pat-down searches was not clearly established at the time of the Prom in April, 2011.").

In sum, the suspicionless search practice did not violate clearly established law, and the bra-pulling practice, although it violated clearly established law, did not foreseeably lead to the harm that the Plaintiffs endured.  In other words, (i) although the suspicionless-search practice caused the Plaintiffs some injuries, it did not violate clearly established law, so ASI New Mexico is immune from liability from those injuries; and (ii) although ASI New Mexico's bra-pulling practice violated clearly established law, it did not, under <u>Monell</u>, cause the injuries that the Plaintiffs endured.  Accordingly, summary judgment is appropriate.

**IT IS ORDERED** that the requests in Defendant ASI New Mexico, LLC's Motion for Summary Judgment on Plaintiffs' Second Amended Complaint [Doc. 100] and Supporting Memorandum, filed March 3, 2014 (Doc. 182), are granted in part and denied in part as to the federal claims.  The motion is granted as it relates to the searches of the Plaintiffs' persons.  The

motion is denied as it relates to the searches and seizures of the Plaintiffs' possessions.   The

Court will, in a subsequent Memorandum Opinion and Order, dispose of the Plaintiffs' state-law

claims.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Aimee Bevan
Friel & Levy, P.C.
Santa Fe, New Mexico

--and--

Megan Cacace
Relman, Dane & Colfax PLLC
Washington, D.C.

--and--

Reed N. Colfax
Relman, Dane & Colfax PLLC
Santa Fe, New Mexico

      *Attorneys for the Plaintiffs*

Andrew M. Sanchez, Sr.
Matthew Lee Campbell
Cuddy & McCarthy, LLP
Albuquerque, New Mexico

-- and --

Gerald A. Coppler
Coppler Law Firm, P.C.
Santa Fe, New Mexico

      *Attorneys for Defendants Santa Fe Public Schools Board of Education, Barbara Gudwin,*
       *Glenn Wikle,  Linda Trujillo, Frank Montano, Steven J. Carrillo, Bobbie J. Gutierrez,*
       *and Melanie Romero*

Terry R. Guebert
Alisa Wigley-Delara
Christopher J. DeLara
Guebert Bruckner, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant ASI New Mexico, LLC*